# Appendix / Exhibits

**Declaration of Gary D. Rowe**

I, Gary D. Rowe, declare:

1.    I am a Deputy Federal Public Defender in the Central District of California. I represent Steven Kilty in his § 2255 motion proceedings.

2.    In investigating this case, I attempted to obtain the trial file from Mr. Kilty's trial lawyer, Robison Harley.

a.    I first spoke to Mr. Harley and requested a copy of the trial file on August 13, 2021, while I was working on the appeal in this case. Mr. Harley told me that he did not have it because he either threw it away or sent it to Mr. Kilty. Mr. Kilty informed me that he never received the trial file.

b.    I spoke to Mr. Harley again on May 16, 2022. This time, Mr. Harley told me that his former paralegal, Sandra Mattarollo, may have had the Kilty trial file on a portable hard drive, but that he was unable to contact her. The missing portable hard drive would have his only copy of the trial file, he told me.

c.    At that point, I asked the investigator with whom I am working, my colleague John Nguyen, to attempt to locate Ms. Mattarollo and the trial file, to see it still exists. I also asked Mr. Nguyen to contact Mr. Harley to arrange an interview. In addition, on July 22, 2022, and again on August 3, 2022, I emailed Mr. Harley, asking to talk about the case. On August 3, I received a reply email from Mr. Harley's paralegal, Maya Jauregui, who stated that Mr. Harley was in trial, but that she will let him know that I would like to set a call. I never received a return call or email from Mr. Harley.

3.    Because I did not have access to the trial file, I contacted one of the lawyers at the United States Attorney's Office who tried the case, Jerry Yang, to try to recreate the discovery that would have been in Mr. Harley's trial file.

a.    I told Mr. Yang that I could not obtain the trial file from Mr. Harley and asked Mr. Yang if he would provide me with the discovery that his

1

office had provided to Mr. Harley. Mr. Yang informed me that, in addition to video and photographic exhibits that the government provided to Mr. Harley, the United States had produced to Mr. Harley documents with Bates numbers 1-875 and offered to make these items available to me. I was able to obtain these documents from the United States Attorney's office (with the exception of a single page, Bates number 1, which I obtained from a trial filing.)

   b.   Bates numbers 1-835 were produced in two batches (1-462, and 463-835) before trial. Bates numbers 836-875 were produced in three batches after trial. According to the accompanying discovery letter Bates number 836-842 was produced on August 7, 2019, a little over 10 months after Mr. Kilty's guilty verdict on October 2, 2018. Bates numbers 844-875 was produced a month later, on September 11, 2019, approximately 11 months after the guilty verdict, according to the accompanying discovery letter. I do not know when Bates number 843 was produced, because the government has not been able to locate the discovery letter that may have accompanied it. Because of its Bates number, I presume that it was produced between the first and the third post-trial discovery production.

   c.   On August 3, 2022, I asked the government if I had been provided with all the discovery produced to trial counsel. I also asked whether any Jencks Act statements were produced before trial after the prosecutors prepared the government's witnesses to testify. My inquiry was sent to AUSA Sean Preston, who did not respond. (Mr. Yang had left the office at that point.) I called Mr. Preston that week and left a voicemail message, but I did not hear back. I have therefore presumed that the discovery I have (Bates 1-875) represents all that the government provided to trial counsel.

   4.   Filed with the § 2255 motion and memorandum of points and authorities is a set of exhibits. These exhibits are assembled into an appendix, which is Bates numbered consecutively, for the Court's convenience. The exhibits are as follows:

App. 3

a.      Exhibit A is a true and correct copy of selected portions of the trial transcript in *United States v. Kilty*, No. 5:16-cr-00024-JGB. I have divided this exhibits into nine sub-exhibits (numbered A-1 (opening statements), A-2 (closing statements), etc.), for the Court's convenience.

b.      Exhibit B is a true and correct copy of select trial exhibits.

c.      Exhibit C is a true and correct copy of Jury Instruction Number 18, which addressed the elements of the involuntary manslaughter offense, 18 U.S.C. § 1112, charged in this case.

d.      Exhibit D consists of a true and correct copy of selected portions of the discovery the government provided to me and produced before trial. Exhibit D-1 consists of portions of the first batch of pre-trial discovery the government produced. Exhibit D-2 consists of portions of the second batch of discovery the government produced.

e.      Exhibit E consists of a true and correct copy of the discovery the government produced after trial. Exhibit E-1 consists of a series of emails from and to Sabah Issa, along with FBI notes on them. Exhibit E-2 is an email from Michael Kandoll to Michael Butolph, dated June 1, 2017; this is the second batch of post-trial discovery the government produced. Exhibit E-3 contains two reports of an accident that occurred on June 1, 2017: one from the Directorate of Emergency Services dated September 11, 2017; and a second from the Fort Irwin Police Department, dated June 22, 2017.

f.      Exhibit F is a true and correct copy of an email from Sabah Issa to Michael Butolph dated July 7, 2017.

g.      Exhibit G is a true and correct copy of a "Scope of Work" plan and proposal from Sabah Issa, dated July 11, 2017.

h.      Exhibit H is a true and correct copy of an email from Danny Knell to Christopher Queen, Joshua Raheem, and Michael Butolph, dated June 16, 2014.

i.     Exhibit I is a true and correct copy of an email from Danny Knell to Jonathan Braga, Carlos Esmurriadiaz, Michael Butolph, Wayne Taylor, and Craig Fabrizio, dated June 12, 2014.

j.     Exhibit J is a true and correct copy of a PowerPoint presentation that appears to be an attachment to the email in Exhibit I.

k.     Exhibit K is a true and correct copy of an email from Michael Butolph to Danny Knell, Jonathan Braga, Wayne Taylor, and Saul Contreras, dated June 11, 2014.

l.     Exhibit L is a true and correct copy of an email from Danny Knell to Matthew Cummings, Graham Swenson, and Michael Butolph, dated November 18, 2014.

m.     Exhibit M is a true and correct copy of excerpts from a deposition of Sabah Issa, taken on November 8, 2019, as part of a civil case in the Central District arising out of the same accident that gave rise to this criminal case. The civil case is No. 5:15-cv-00703-JGB(SPx).

n.     Exhibit N is a true and correct copy of excerpts from a deposition of James Hijoe, as part of that civil case.

o.     Exhibit O is a true and correct copy of excerpts from a deposition of Michael Butolph, as part of that civil case.

p.     Exhibit P is a true and correct copy of the U.S. Court of Appeals for the Ninth Circuit's opinion affirming the conviction.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 14, 2022, at Los Angeles, California.

/s/ Gary Rowe

Gary D. Rowe

# Exhibit A

# Trial Transcript Excerpts

# Exhibit A-1

# Opening Statements
ECF 140 at 12-23
September 25, 2018 (P.M. Session)

Case 5:22-cv-01625-JGB  Document 148  Filed 09/15/23  Page 8 of 672  Page ID #:106
Case 5:16-cr-00024-JGB  Document 148  Filed 09/15/23  Page 1 of 672  Page ID #:1413

1

1                    UNITED STATES OF AMERICA
                   UNITED STATES DISTRICT COURT
2                 CENTRAL DISTRICT OF CALIFORNIA
                        EASTERN DIVISION
3
                             - - -
4                 HONORABLE JESUS G. BERNAL
             UNITED STATES DISTRICT JUDGE PRESIDING
5                            - - -

6
     UNITED STATES OF AMERICA,        )
7                                     )
                      PLAINTIFF,      )
8                                     )
     VS.                              )   CASE NO.:
9                                     )   ED CR 16-0024-JGB
     STEVEN KILTY,                    )
10                                    )
                      DEFENDANT.      )
11                                    )
     _____)
12

13

14
              REPORTER'S TRANSCRIPT OF PROCEEDINGS
15
                      (P.M. SESSION)
16
                TUESDAY, SEPTEMBER 25, 2018
17
                 LOS ANGELES, CALIFORNIA
18

19

20

21

22

23
                LAURA MILLER ELIAS, CSR 10019
24            FEDERAL OFFICIAL COURT REPORTER
              350 WEST 1ST STREET, ROOM 4455
25             LOS ANGELES, CALIFORNIA 90012
                   PH:  (213)894-0374

```
 1
       APPEARANCES OF COUNSEL:
 2

 3    ON BEHALF OF PLAINTIFF:

 4              UNITED STATES ATTORNEY'S OFFICE

 5              BY: PAUL D. LEVERS

 6                  JERRY YANG

 7              ASSISTANT UNITED STATES ATTORNEY

 8              RIVERSIDE, CALIFORNIA

 9

10

11    ON BEHALF OF DEFENDANT:

12

13              ROBISON DOOLING HARLEY, JR., ESQ.

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1              Very well as I said at the end of the trial, I will
 2       give you more full set of instructions that you will take
 3       with you to deliberate on your verdict.
 4              Now is the time to have opening statements.  Are
 5       the parties ready to deliver their opening statements?
 6       Mr. Levers.
 7              MR. LEVERS:  Thank you, Your Honor.
 8              June 2nd, 2014 started off like any other day.
 9       Dail Keiper got up early to catch the bus to work, had
10       breakfast, kissed his wife goodbye and around 4:30 a.m.
11       hopped on the commuter bus in Barstow.
12              Dinorah Aguillar was the driver of the bus.  This
13       morning was like any other for her, too.  She drove this
14       route regularly.  She picked up people in Barstow including
15       Mr. Keiper, the victim, Jesus Aguilar and half dozen other
16       passengers and she headed out on the half hour, 45-minute
17       drive to Fort Irwin.
18              On the way out there, something unexpected happened
19       that would end the life of Dail Keiper.  What I'm about to
20       show you is the video taken from the bus Mr. Keiper was on
21       that Dinorah Aguilar was driving as they toward Fort Irwin at
22       5:06 a.m.
23              (Video played for the jury.)
24              MR. LEVERS:  The accident took the life of Dail
25       Keiper, it took the arm of Jesus Aguilar and caused assorted
```

App. 10

13

 1   other injuries among the passengers.  What Dail Keiper and

 2   Dinorah Aguilar didn't know was that the defendant, Mr. Kilty

 3   was parked in the middle of the slow lane.  She didn't see it

 4   until it was too late.  She almost avoided the accident, but

 5   the right side of the bus caught the back of Mr. Kilty's semi

 6   and was crushed including the front right passenger

 7   compartment where Mr. Keiper was waiting to go to work.

 8          Now, the commuter bus out to Fort Irwin runs pretty

 9   much every day.  It's for people going out to the Fort Irwin

10   army base.  Barstow for those of you who don't know is a city

11   out in the desert up the 15.  You've probably seen it on the

12   way to Vegas if you haven't otherwise visited.  Fort Irwin is

13   a major army base out there about a half hour, 45 minutes out

14   into the desert.  There's a lot of people that work there

15   soldiers as well as civilian employees like Mr. Keiper.

16          Dinorah, the bus driver, picks people up every

17   morning at 4:30 at several different stops in Barstow.

18   Routine trip.  And they drive out there picking everybody up

19   down Fort Irwin Road.  This is a little desert road that is

20   the primary access point for Fort Irwin base.

21          Now, you'll see in this picture here, there's a

22   lane off to the right of Fort Irwin Road.  That's what's

23   called the bypass lane.  This is a lane that they set up for

24   trucks, buses, other commercial traffic to get them off the

25   main road for various reasons including security and traffic

App. 11

 1    purposes.  Buses and trucks were required to take this road

 2    and Ms. Aguilar did.

 3          This is the road.  It's a two lane, one way road,

 4    the fast and the slow lane, crossing through the middle of

 5    the desert.  No lights, nothing around, just desert.  What

 6    you're looking at here is the spot where Mr. Kilty parked his

 7    truck overnight.  You'll hear that Mr. Kilty got there the

 8    night before on June 1st, and he pulled his truck right here

 9    in the middle of that slow lane and parked it there.

10          He didn't put out any cones.  He didn't put out

11    those little reflective triangles.  He didn't put out a

12    flare.  He didn't even pull over to the shoulder which you

13    can see, and you'll hear testimony about, is more than enough

14    to accommodate a big rig.  You can line up a dozen of them

15    out there.  Nothing but desert.

16          What he did do was put his little sun shade in the

17    truck, you can see it in that picture, and go to sleep.  The

18    result about ten hours later, Ms. Aguilar couldn't avoid the

19    truck and struck it in the morning.

20          Now, you'll hear testimony that there is a check-in

21    point that is sometimes operational on this road.  From 6:00

22    to 8:00 a.m. in the morning, the army pulls out the orange

23    barricade like that and puts it in the middle of the slow

24    lane and they stop trucks there for security purposes to keep

25    them away from the main gate during the rush hour.

1          The rest of the time, it's a road just like any

2     other.  This barricade was not in the road that night.  You

3     can see it in this picture in the bottom left.  It was off to

4     the left with the writing on it clearly visible in case

5     anyone had any questions.  Trucks stop here from 6:00 a.m. to

6     8:00 a.m. only.  You have any questions, there's the number

7     for the main gate.  But for whatever reason, Mr. Kilty

8     decided to park and go to sleep in that lane overnight.

9          Now, you're going to hear testimony from now

10    retired Officer Paul Gray of the California Highway Patrol.

11    Now, Paul Gray was a member of the MAIT team which is the

12    Multi-disciplinary Accident Investigation Team for the

13    California Highway Patrol.  Basically, as he'll explain,

14    these are especially trained Highway Patrol officers with

15    lots of experience, he's investigated hundreds of crashes,

16    that are assigned to the most serious crashes in the State of

17    California that CHP investigates.

18         They don't go investigate, you know,  a fender

19    bender or a little something scratches the bumper.  They tend

20    to investigate major accidents, fatalities, things of that

21    sort.  They look at what happened, how it happened and why it

22    happened.

23         Officer Gray will tell you why this happened.  That

24    the primary cause of Ms. Aguilar being unable to avoid this

25    truck parked in the middle of road at night on a dark desert

 1    was the fact there was truck parked in the middle of the road

 2    that no one expected.  He'll testify that Mr. Kilty was in

 3    violation of California Vehichle Code for a couple different

 4    sections for parking there in the road at night.  And he'll

 5    look at the total circumstances of the case about how did

 6    Ms. Aguilar respond to the obstacle in the road, this truck.

 7         And he'll tell you his conclusion was she behaved

 8    reasonably as a reasonable driver under those circumstances

 9    in that she was unable to avoid it.  He'll tell you that this

10    happened right after the start of civil twilight.  Civil

11    twilight is that time of day when night ends and the sun

12    hasn't crested the horizon yet, but the horizon is just

13    starting to glow.

14         On this day, June 2nd, that was between 5:04 a.m.

15    when the horizon just started to glow and 5:33 when the sun

16    rises.  This accident occurred at 5:06 a.m. only two minutes

17    after the sky had started to lighten and almost a full hour

18    before the checkpoint would have been operational.  Dinorah

19    Aguilar testified that she had no idea there would be a truck

20    waiting on the road.  Had no reason to expect.

21         Officer Gray will tell you that civil twilight,

22    this was dangerous.  It's still dark.  It was hard to see the

23    truck, but more than that, the skyline would mask the truck.

24    I'd like you to watch this video again and look as the truck

25    starts to come up, the protrusion of the truck seems to blend

 1    into the skyline.  So a reasonable driver which he concluded

 2    Dinorah Aguilar acted as might not have been able to avoid

 3    this accident in time.

 4              (Video played for the jury.)

 5              MR. LEVERS:  You'll hear the primary cause of this

 6    accident was the fact that Mr. Kilty parked his big rig with

 7    no safety precaution whatsoever in the middle of a moving

 8    lane of traffic overnight.  Ms. Aguilar wasn't able to avoid

 9    it in time.

10              At the end of this trial, ladies and gentlemen, we

11    will ask you to find Mr. Kilty guilty of involuntary

12    manslaughter for his grossly negligent action in parking in

13    the middle of a road overnight as well as being a substantial

14    part of the accident that caused the death of Mr. Keiper.

15              Thank you.

16              THE COURT:  Mr. Harley.

17              MR. HARLEY:  Yes, sir.

18              Ladies and gentlemen, shortly after 5:00 a.m.,

19    Monday, June 2nd, 2014 an incompetent, negligent and reckless

20    bus driver crashed the bus into the rear of Mr. Kilty's

21    lawfully parked big rig tractor-trailer carrying a large Army

22    vehicle on to the base.  This is photograph of the bus

23    driver, and this bus driver Aguilar was carrying eight

24    passengers, one of whom was killed.  That's Mr. Dail Keiper.

25              Now, Mr. Kilty had arrived the night before.  He

1   was asleep in his cab and was parked at the official check-in

2   point in the No. 2 lane at the Fort Irwin Bypass Road.  He

3   was waiting for the Army to check his vehicle and give him

4   permission to go on to the base with the military cargo he

5   had transported out from the state of Wisconsin.

6           Now, for almost two years after this crash, nobody

7   was charged.  During that period of time, civil lawsuits were

8   filed and the bus driver sued Mr. Kilty for damages.  Now

9   eventually, the prosecutor not the Army, not the military,

10  not the Department of Defense, it's the prosecutor in this

11  case who got the CHP involved.  But here's when the problems

12  come.  The CHP never done any federal investigations before.

13  They'd never investigated a federal crime.  They were put in

14  a unique situation in which they had no experience.

15          So all they did was lots of paperwork to produce a

16  102-page written report saying for first time that Mr. Kilty

17  was at fault for the death of Dail Keiper.  Now, the entire

18  CHP investigation was flawed and it was incomplete.  Here's

19  why.  They did no accident reconstruction.  They did no

20  accident re-enactment.  They never interviewed the bus

21  driver.  They never interviewed Mr. Kilty.

22          They never interviewed any eyewitnesss.  They never

23  consulted with any experts, and they never developed any

24  additional facts that were unknown at the time of the

25  original investigation.  The only evidence they had to look

App. 16

1    at was this 11-second video which you just saw.  And any

2    evidence that was inconsistent with their conclusion, they

3    rejected.

4         Now, had the CHP done a competent and complete

5    investigation, they would have found the following.  That

6    number one, Ms. Aguilar's ability to safely operate a motor

7    vehicle was compromised due to her history of uncontrolled

8    diabetes requiring insulin since the year 2012.

9         Fact No. 2:  As far back as 2012, her doctors were

10   telling her that insulin means no longer can you be a bus

11   driver.

12        Fact No. 3:  She refused to take the insulin as

13   directed by doctors.

14        Fact No. 4:  She lied to doctors and nurses for

15   years about taking insulin when she wasn't taking insulin.

16        Fact No. 5:  The evidence will show that driving

17   without taking insulin was more important to her than the

18   safety of her passengers.

19        Fact No. 6:  Besides her diabetes, she had a

20   history of blurry vision.

21        Fact No. 7:  She had a history diabetic retinopathy

22   which is a condition which eventually results in blindness.

23        Fact No. 8:  On June 2nd, 2014 she was driving in

24   the wrong lane, that's the No. 2 lane.  She should have been

25   driving in the bus lane which is the No. 1 lane on this

```
 1   bypass road, the fast lane.  If she was driving in the
 2   correct lane, the right lane where she was supposed to, the
 3   No. 1 lane, this collision would have never happened.
 4          Fact No. 9:  On June 2nd, 2014 just before the
 5   accident, you'll hear from eyewitnesses and bus passengers
 6   themselves that she was swerving all over the lane.
 7          Fact No. 10:  She only had four-and-a-half hours of
 8   sleep and exhibited signs of fatigue according to some of the
 9   bus passengers.
10          Fact No. 11:  Many of these bus passengers couldn't
11   understand why she was driving in the No. 2 lane when
12   everybody familiar with that roadway knew that big rigs
13   habitually lined up in the No. 2 lane waiting for this
14   check-in point so they can bring their cargo on to the base.
15          Fact No. 12:  On June 2nd, 2014 she was wearing
16   unknown prescription eye glasses when hr must recent bus
17   driver license of May 2013 said no prescription or corrective
18   lenses are to be worn by her.
19          Fact No. 13:  On June 2nd, 2014 she knew that a
20   bike rack was in front of that vehicle partially obstructing
21   the right front headlamp which is being illuminated, uh, just
22   prior to the collision and she chose to continue driving and
23   do nothing about that obstruction of her right front
24   headlamp.
25          Fact No. 14:  On June 2nd, 2014 she knew she
```

App. 18

1    couldn't see that far because she was only using her low

2    beams and she never bothered to hit the light switch in order

3    to turn the high beams on so she could see Mr. Kilty's truck

4    and avoid it in time.  And all that was required was a flick

5    of the wrist in order switch the low beams to the high beams.

6           Fact No. 15:  She will testify that she was trained

7    never to use her high beams.  That's a credibility issue

8    you're gonna have to wrestle with, ladies and gentlemen.

9           Fact No. 16:  Her testimony is contaminated with

10   bias.  After this accident went down, she filed a complaint

11   for general damages, special damages, punitive damages

12   seeking a lot of money for this injury that she caused.  And

13   then five months later, she showed up in the Army

14   Investigation Unit with her own lawyer in tow telling the

15   Army investigators that she wasn't going 45 miles an hour.

16   She's going at a lower speed limit 40 miles an hour.

17          Fact No. 17:  The CHP and the prosecution rely on

18   this video which is shown to you in opening statement.  But I

19   caution you, ladies and gentlemen, because you'll see another

20   video with analytics on it.  This video that was shown to you

21   and probably will be shown to you many times during the

22   course of this proceeding is misleading in terms of what the

23   bus driver Ms. Aguilar can actually see.

24          First of all, this video was placed four feet above

25   the bus driver's eyes in the center of the bus.  Completely

UNITED STATES DISTRICT COURT

 1  different location than the eyes of the bus driver who was

 2  four feet below and off to the left-hand side.  This means

 3  that video is pointing down and creating far less -- far less

 4  negative contrast which makes everything much darker than

 5  what the bus driver actually saw.

 6          Another factor, No. 2, in regards to the misleading

 7  aspect of this video that was shown to you and will be shown

 8  to you several times during the course of this trial is this

 9  video has a much slower frame rate than the human eye.  It

10  has four frames per second as opposed to the human eye which

11  has 30 frames per second.

12          Now, unlike the prosecution and the CHP, there are

13  defense experts who did an exhaustive analysis comparing

14  contrasting the video that was shown to you and the video

15  with all the analytics on it to show how much lighter and

16  more visible this parked truck was because it had a much

17  higher frame rate than the human eye.

18          And then another factor considering the misleading

19  aspect of this video that was shown to you and will be shown

20  to you is, again, the defense was able to retrieve and review

21  the same video relied upon by the government with all these

22  analytics on it, and it was turned over by the bus company

23  lawyer who is representing Ms. Aguilar and it refutes what

24  Ms. Aguilar said.

25          She made it very clear to all the investigators who

App. 20

```
 1   were interviewing her back on June 2nd when the events were
 2   fresh in her mind and she explained she braked for three
 3   solid seconds before the collision.  Well, the video will
 4   show you, the video with analytics which you haven't seen
 5   yet, will show that she was actually accelerating a full
 6   three seconds before the crash.  She was accelerating from
 7   46 miles an hour to 49 miles an hour and was going about
 8   50 miles an hour upon impact.
 9           Another factor showing that this video that you've
10   seen is misleading is the CHP and the Army investigation
11   according to her statement went out there to see if there's
12   any confirmatory bus braking skid marks.  And during that
13   investigation, there were absolutely no skid marks to support
14   and corroborate Ms. Aguilar's statement that she was braking
15   for three solid seconds before the collision took place.
16           Now, ladies and gentlemen, at the end of the case,
17   we'll be asking you folks for a finding of not guilty based
18   upon what the facts are and what the law demands.
19           Thank you very much for your time, your attention,
20   your patience.
21           THE COURT:  Thank you, Mr. Harley.
22           Mr. Levers or Mr. Yang, you have your first
23   witness?
24           MR. LEVERS:  The United States would call Dinorah
25   Aguilar.
```

# Exhibit A-2

# Closing Statements
ECF 187 at 22-77
October 2, 2018 (A.M. Session)



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

HONORABLE JESUS G. BERNAL, U.S. DISTRICT JUDGE


UNITED STATES OF AMERICA,           )
                                    )
             Plaintiff,             )
                                    )
        vs.                         ) Case No.
                                    ) EDCR 16-24-JGB
                                    )
STEVEN KILTY,                       )
                                    )
             Defendant.             )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS
RIVERSIDE, CALIFORNIA
TUESDAY, OCTOBER 2, 2018
TRIAL DAY 5
A.M. SESSION


ADELE FRAZIER, CSR 9690, CRR, RMR
Federal Official Court Reporter
United States District Court
3470 Twelfth Street
Riverside, California 92501
adelefraziercsr@gmail.com

1   **<u>APPEARANCES OF COUNSEL:</u>**

2   **For the Plaintiff:**

3          OFFICE OF THE UNITED STATES ATTORNEY
           By:  JERRY YANG, Assistant United States Attorney

4                PAUL LEVERS,
                 Special Assistant United States Attorney

5          3403 Tenth Street, Suite 200
           Riverside, California 92501

6

7

    **For the Defendant:**

8

9          ROBISON D. HARLEY
           Attorney at Law
           825 North Ross Street

10         Santa Ana, California  92701

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

App. 24

1    tell anyone, including me, how the jury stands numerically or

2    otherwise on any question submitted to you, including the

3    question of the guilt of the defendant, until you have reached

4    a unanimous verdict or have been discharged.

5         Very well.  As I said, a copy of these will be

6    provided to each of you in the jury room to deliberate.

7         Very well.  Now's the time for closing arguments.

8    Are the parties prepared to deliver the closing arguments?

9         MR. LEVERS:  Yes, your Honor.

10        MR. HARLEY:  Yes, sir.

11        THE COURT:  Very well.  Mr. Levers or Mr. Yang.

12        MR. LEVERS:  Yes, your Honor.

13        June 2nd, 2014, no one knew that day that the

14   defendant the night before had parked his truck in the middle

15   of a moving lane of traffic and gone to sleep.  As a result of

16   him parking overnight on that dark, deserted road Mr. Keiper

17   was killed.

18        Now, we've talked a lot in this case about various

19   different experts, various different bits of testimony, but

20   keep this mind, this case is about a person.  This case is

21   about Dail Keiper, who was on his way to work that morning and

22   had no idea that it would be his last.  That's why we're here.

23        Now, what's the charge in this case?  Involuntary

24   manslaughter, which involuntary manslaughter is the unlawful

25   killing of a human being without malice aforethought and

1    without an intent to kill.  No one here is saying that the

2    defendant intended to kill Mr. Keiper.  That would be a murder

3    case.  But he did kill him through his own negligence and his

4    actions, and that's why we are here today.

5          Now, in order to convict the defendant of this

6    charge, there are six elements that we must prove.  And if we

7    prove each and every one of those elements, as the judge

8    instructed you, you must vote to convict.  I'm going to go

9    through them briefly right now:

10         First, the defendant committed an act that might

11   produce death.  In this case it actually did produce death;

12         Second, the defendant acted with gross negligence,

13   which he did by parking in a moving lane of traffic overnight;

14         Third, the defendant's acts were the proximate cause

15   of the death of the victim.  We're going to talk a little bit

16   more about that later, but it means that his acts were a

17   substantial part in causing the death;

18         The killing was unlawful.  That just means it wasn't

19   self-defense.  I think no one is really disputing that in this

20   case.  That's not at issue;

21         The defendant either knew that such conduct was a

22   threat to lives of others or knew of circumstances that would

23   reasonably cause the defendant to foresee that such conduct

24   might be a threat to the lives of others.  This is similar to

25   the gross negligence instruction because it talks about what

1  was in his head or should have been in his head.  He was a

2  professional driver.  He knew what he was doing was dangerous;

3          And finally, the killing occurred at Fort Irwin Army

4  Base, which everyone agrees.  We actually stipulated to that.

5          Let's talk a little bit about a summary of the

6  evidence we heard in this case.  This case occurred at the

7  bypass road at Fort Irwin, a road that trucks and buses were

8  sent out on.  You heard testimony from multiple witnesses that,

9  except from 6:00 to 8:00 in the morning when there was a

10  check-in point -- and there was a sign telling you it was 6:00

11  to 8:00 in the morning -- this was a regular road out to Fort

12  Irwin.  You could drive in either lane.  Buses could drive in

13  the left lane or the right lane except from 6:00 to 8:00.  This

14  accident occurred at 5:00 in the morning, 5:06.

15          And what happened that night?  You've seen this

16  video.  Is it perfect?  No.  What is?  But it is the only

17  direct evidence we have of exactly what happened on that night

18  when -- on what appears to be an overcast night -- morning from

19  the video, Ms. Aguilar, driving the bus, like every morning,

20  wasn't able to respond in time to the hazard she did not know

21  was there that was placed by the defendant.

22          (Video played.)

23          MR. LEVERS:  It's easy to go back in hindsight and

24  say she should have seen the truck sooner.  But she did the

25  best she can.  She didn't want to die.  She didn't want to get

App. 27

 1  in a wreck.  She tried her best.  And she didn't create this

 2  situation, the defendant did.

 3          Now, you heard Officer Paul Gray testify how

 4  initially at that time of day under those weather conditions,

 5  those lighting conditions, this truck would have appeared to

 6  blend into the background.  It would have looked like another

 7  obstruction on the horizon unless you know what you're looking

 8  for.  We'll talk about that a little more later.

 9          When you know it's there, you can see it, but no one

10  knew it was there.  It was -- as Officer Gray testified, an

11  unexpected hazard is much more dangerous.  Even Stein Husher

12  admitted in a previous report you, basically, have to cut in

13  half the distance you can see something at when it's unexpected

14  because you're not looking for it.  By the time the truck got

15  close enough to make out, she tried to swerve and failed.

16          She also didn't know that she was running into

17  something carrying a tan Army tank, essentially, a heavy duty

18  recovery vehicle, a color that blended into the desert,

19  essentially, camouflaged.  And this was the result:  The

20  accident that took the life of Dail Keiper, took the arm of

21  Jesus Aguilar, and caused us all to be here today.

22          Now, let's talk a little more in detail about the

23  elements that the Government has proven to you.  First, element

24  one, the defendant committed an act that might produce death.

25  The act of being parking overnight in the middle of a moving

App. 28

1    lane with no safety equipment, no lights, not putting on the

2    shoulder.  How do we know this element has been proven?  Not

3    only did this act might produce death, it, in fact, did produce

4    death.  Dail Keiper's life was taken.

5            Element two, the defendant acted with gross

6    negligence, which is defined as a wanton or reckless disregard

7    for human life.  Basically, his actions disregarded the danger

8    to people around him.  How do we know this element has been

9    proven?  Let's look at the evidence.  First, he parked in the

10   middle of that lane overnight.  Now, they're going to say there

11   was a check-in point sign right there.  True.  But, you know,

12   there was also a sign that says trucks stop here hours 6:00 to

13   8:00 a.m. Monday through Friday with a number for the main

14   gate.  It does not say trucks stop here at 8:00 p.m. on a

15   Sunday night, go ahead and park in the middle of a lane and go

16   to sleep.  I think even Dr. Royer, the defense expert, said

17   yeah, you don't need a sign telling people not to stop in the

18   middle of the road overnight.  It's common sense.

19           This isn't just a regular driver.  He is, in fact, a

20   professional driver.  He drives for a living.  He doesn't just

21   drive to work, driving is his work.  He's done it for 20 years.

22   He knows about the dangers and hazards of the road more than

23   anybody.

24           And when he was parked in that lane, he had no reason

25   to think by his prior experience that this was okay.  Based on

UNITED STATES DISTRICT COURT

App. 29

1   his own testimony, the last time he got there, he said 5:00 or

2   6:00 -- right around the hours this was opening -- there were

3   already trucks parking there because the thing was probably

4   open.  The checkpoint was running when he got there.  That

5   gives him no basis to think that it's okay to park there

6   overnight in the middle of the lane.  It just doesn't make

7   sense.

8          And he didn't have time to put out cones?  Didn't

9   have time to put out reflectors?  Even though he got out of the

10   car and walked around?  But he had time to put on his sun

11   shade, get undressed and go to sleep.

12          Now, in addition to his experience that he talked

13   about, he's specifically trained in this.  He even testified --

14   so did Derrico -- this is common knowledge, at dawn or dusk,

15   rain or snow, let alone at night, you need to make yourself

16   easier to see, turn on your lights.  If you are having trouble

17   seeing other vehicles, other drivers are having trouble seeing

18   you.  Common sense.  What else?  When parked on the side of the

19   road, be sure to turn on the four-way emergency flashers.  This

20   is important at night.

21          He didn't park on the side of the road.  He parked in

22   the middle of the road.  There's specific instructions when you

23   park in the middle of the road.  If you must stop on the

24   shoulder of the road or middle of the road, you must put out

25   your warning devices within ten minutes.  Place your warning

App. 30

1   devices at the following locations:  Two lane divided highway,

2   ten feet in front of the vehicle, 100 feet behind and ahead of

3   the vehicle.  There's a nice little diagram for how to do it

4   when you're on one of those one-way roads.

5          And This isn't some training he went through 20 years

6   ago and forgot.  He testified he's seen people put these out.

7   He carries them.  He knows about them.  But he didn't bother to

8   do it.

9          Let's go through a few things for gross negligence.

10  He parks in the middle of the road.  Not the shoulder, the

11  middle of the road.  No cones.  No reflective triangles, which

12  we know he had.  No hazards lights.  He knew about them.  He

13  had them.  He said it takes a half second to press the button.

14  He was more concerned about his battery.

15         He doesn't park on the shoulder of the road, which

16  would have been simple.  There's a big shoulder right there.

17  You heard multiple witness, they've seen trucks parked on the

18  shoulder before.  If you're parking somewhere you're not

19  supposed to park, you don't park in the middle of the road.

20  You pull over.

21         He goes to sleep overnight.  This was not someone

22  that parked at 5:00 a.m. waiting for a 6:00 a.m. check-in.  He

23  parked at 8:30 the night before and went to sleep in the road.

24  He failed to follow his own manual.  And why?  Because he

25  wanted to be first in line.  He told you about that.  He

App. 31

1    waited, like, three hours last time.  He didn't want to wait

2    this time.  Honestly, if he had to park in the middle of the

3    road to save some time in the morning, well, he figured

4    probably nothing would happen.  He was tired.  He disregarded

5    the safety of others for his own convenience.  It is the

6    definition of gross negligence.

7           Now, let's talk about element three, the defendant's

8    act was the proximate cause of the death of the victim.  What

9    does that actually mean, *proximate cause*?  The instructions

10   define it for you.  Proximate cause is one that played a

11   substantial part in bringing about the death so that the death

12   was the direct result or a reasonably probable consequence of

13   the defendant's act.

14          Now, it seems like most of the trial was discussing

15   this element, wasn't it?  Although was it really?  Nowhere in

16   this instruction does it say the defendant has to be the sole

17   cause.  We put on testimony that he was the primary cause.

18   Officer Paul Gray of the MAIT team said Dinorah Aguilar was not

19   at fault and he was the primary cause.  But that's actually

20   more than we need to prove in this case.  We just need to show

21   that he was a substantial part in bringing about the death.

22   And no matter how much you talk about how Dinorah Aguilar was

23   supposedly a bad driver or she could have done something

24   different or reacted faster, none of that changes that he was a

25   substantial part in bringing about the death.  And it was a

 1   direct result or a reasonable probable consequence of the

 2   defendant's act.

 3           How do we know that?  Because you can't have an

 4   accident where a bus hits somebody parked in the middle of the

 5   road overnight and say that fact that somebody parked in the

 6   middle of the road overnight was not a substantial part of the

 7   accident.  If he had not done that, we would not be here.  If

 8   he had put out cones, we would not be here.  If he put out

 9   triangles, we would not be here.  If he put on his lights, we

10   would not be here.  If he parked on the shoulder, we would not

11   be here.  His conduct is a substantial part of the accident.

12           Now, you heard a lot of defense experts testifying.

13   I'll go over it briefly.  What did they really testify to?  I

14   mean, first you have Dr. Stein Husher, who gives this visible

15   800 feet number to everybody.  Anthony Stein uses it.  Herb

16   Summers uses it.  That seems to be the basis of all their

17   testimony.  But when I tried to pin him down on, well, what

18   time did you do this?  Did you actually write down the time?

19   No.  Do they know it's the same lighting conditions?  Because

20   looking at this -- looking at this still, it sure looks like it

21   was overcast that day.  And the day they took it, it sure looks

22   clear on the tape.

23           Did they use someone who didn't expect the truck?

24   No.  Did they put out cones making the truck easier to see so

25   everyone knew?  Yes.  The first time they did it, they left the

 1   lights on.  In fact, when he was cornered on all these things,

 2   what did Dr. Husher say?  Well, this isn't actually my test.

 3   It's not my conclusion.  He was, kind of, implying it was.  But

 4   once he started talking about how badly it was done -- I don't

 5   know -- he finally said he was just like another guy there.

 6   This was a test some Army guys that we have no idea if they had

 7   any idea what they were doing.  They didn't testify.

 8         And we heard Paul Gray say this test was worthless

 9   for all the reasons I just discussed, and -- because a straight

10   visibility number, when you know you're expecting something, is

11   useless in a case of an unexpected hazard.  Because as even

12   Dr. Husher said -- excuse me, Stein Husher said in one of his

13   previous reports that he wrote, in a case of unexpected hazard,

14   you cut the distance in half to account for it.  So 800 feet

15   becomes 400 feet and suddenly the accident isn't so avoidable.

16         And that's, kind of, common sense, isn't it?  Let me

17   give you a little example.  If you've gone to the zoo, taken

18   your kids or you've gone yourself, they usually have -- usually

19   there's a tree or something that you walk by and you don't see

20   anything at first.  Someone points it out and you look at it

21   closer, there's a lizard that blends into the tree or sometimes

22   butterflies, some little camouflaged creature.  Once you see

23   this camouflaged creature, it's easy to see.  You know exactly

24   where it is.  You know exactly where to look just like everyone

25   now knows exactly where to look on this picture.

UNITED STATES DISTRICT COURT

App. 34

1        But when you're not expecting it, when you're walking

2   by, you can walk right past it.  That's the definition of an

3   unexpected hazard.  In that case it was an unexpected

4   camouflaged creature; in this case it's an unexpected

5   camouflaged truck against the sky line blending into the

6   desert.  As a result, the accident occurred.

7        There is no reasonable way that you can look at the

8   evidence in case and find that the defendant parking his truck

9   overnight in the road was not a substantial part of this

10  accident happening.  Even if you don't agree he was totally at

11  fault, he's still a substantial part of the accident.

12       Let's review.  He parked overnight in the middle of

13  the road and a bus hit him.  Dail Keiper's death was a direct

14  result of that action.  He died because of the crash.  The

15  defendant's actions were absolutely a substantial part in

16  bringing about the death.  And no testimony we heard really

17  contradicted that.

18       Now, element five, the defendant either knew that

19  such conduct was a threat to the lives of others or knew of

20  circumstances that would reasonably cause the defendant to

21  foresee that such conduct might be a threat to the lives of

22  others.  This goes back to gross negligence.  It's similar.  He

23  knew -- he was a professional truck driver.  He knew hazards on

24  the road.  He knew parking on the road was dangerous.  He's

25  been driving for 20 years professionally.  In that time no

App. 35

1    doubt he's seen many unexpected hazards, many bits of danger,

2    but he chose to ignore that.  He chose to park in the road and

3    go to sleep, out of negligence, out of not carrying about what

4    happened to others, because he was concentrated on being first

5    in line the next day.  That was his concern, not the safety of

6    other people on the road.

7          We heard a lot of the passengers, but what did they

8    really tell us that really matters in this case when you boil

9    it down?  You heard there's a lot of lawsuits going on.

10   Everybody wants money.  We heard there were a lot of changing

11   stories.  People saying something different a year ago or

12   something different four years ago.  We heard one of the

13   witnesses shout very loudly, *Truck.*  *Truck*, despite not telling

14   the officer about it, not being in the video, and no one else

15   seems to have heard it, but he was suing too for emotional

16   damages.

17         And you heard a couple of them talk about how they

18   saw trucks on the road all the time, which, when you think

19   about this, doesn't really matter even if it was true because

20   if someone else did something stupid -- or dangerous, I mean,

21   that it's okay for the defendant to do something worse?  But

22   yet several of them, when pinned down on it, stated previously

23   that the trucks were on the shoulder before, not on the road,

24   whether to officers or whether at previous testimony.  Somehow

25   their testimony has changed over time to trucks were on the

UNITED STATES DISTRICT COURT

1    shoulder, which makes sense that's where you would park, to

2    yeah, they've seen trucks in the middle of the road before.

3            And they were all upset at Dinorah Aguilar.  They

4    blame her, which is understandable.  She was the one they saw.

5    She was the one they knew.  It's easy to blame the person in

6    front of you.  But it's not her fault; it is the defendant's.

7            Let's briefly check off those elements we discussed.

8    The defendant committed an act that might produce death?  Yes.

9    There was, in fact, a death.

10           The defendant acted with gross negligence?  Yes.  He

11   disregarded his training.  He disregarded his common sense.  He

12   was more consumed with being first in line, as he told you,

13   than looking out for everybody else's safety.

14           The defendant's acts were the proximate cause of the

15   death of the victim?  Remember the language on this one,

16   substantial part.  There is no reasonable way to conclude that

17   someone parking their truck in the road in the middle of the

18   night and being struck, that their act of parking in the road

19   in the middle of the night was not a substantial part of the

20   accident.  It would not have happened if not for that.

21           The killing was unlawful?  This is not a self-defense

22   case.

23           The defendant either knew of conduct threat to the

24   lives of others or knew of circumstances that would reasonably

25   cause the defendant to foresee that such conduct might be a

App. 37

1   threat to the lives of others?  In other words, he knew who he

2   was doing was dangerous, or based on your training and

3   experience, it should have reasonably caused him to foresee

4   that this was dangerous.  He's been driving for 20 years.  He

5   knows parking in the road is dangerous.

6           And everybody agrees this killing occurred at Fort

7   Irwin Army Base.

8           Ladies and gentlemen, Dinorah Aguilar, for all the

9   things they talked about her, she was just doing her job.  She

10  was just going to work.  She did her best.  Maybe it wasn't

11  enough, but she's not the one that put the hazard out there.

12  She's not the one that caused this.  She was just trying to

13  survive and protect her passengers.  And for Mr. Keiper she

14  failed, but the defendant caused it.

15          (Video played.)

16          MR. LEVERS:  The defendant was focused on being first

17  in line the next morning.  As a result, that morning is the

18  last day of Dail Keiper's life.  Find him guilty, ladies and

19  gentlemen.  Thank you.

20          THE COURT:  Thank you, Mr. Levers.

21          Mr. Harley.

22          MR. HARLEY:  Thank you, your Honor.  I need maybe

23  30 seconds to set up.

24          Okay to proceed?

25          THE COURT:  You may.

App. 38

 1          MR. HARLEY:  Thanks.  Ladies and gentlemen, for over

 2   two years this bus driver was an accident waiting to happen.

 3   Her driving with uncontrolled diabetes is like driving drunk.

 4   The only difference is when you drive drunk, you sober up and

 5   you're able to drive eventually.  Driving with uncontrolled

 6   diabetes never goes away.  You live with it.  You die with it.

 7          Now, both of these conditions make the driver

 8   dangerous to passengers, as well as the public at large.  Here

 9   the bus driver certainly suffered from uncontrolled and

10   untreated diabetes.  You've heard substantial evidence

11   indicating that since 2012 she had such issues as vision

12   problems, blurry vision, diabetic retinopathy, which was

13   getting worse and progressing to a bad situation over years,

14   fluctuating blood sugar levels, hyperglycemia.  These all

15   affect alertness and concentration.  Also, she had some unknown

16   prescription glasses that was not noted on her driver's

17   license.

18          Essentially, ladies and gentlemen, she knew about her

19   condition, because she admitted in court that her doctors and

20   her nurses were telling her constantly -- continuously since

21   2012 to start taking insulin and to get eye checkups, because

22   they knew her vision was going sideways on her.  Even

23   California law, as Officer Gray, the cop involved, indicated

24   that if you're diabetic, you should not -- you can't get a

25   driver's license.

App. 39

 1          And actually you heard some testimony from

 2    Dr. Geller, who reviewed her pharmacy records.  And you heard

 3    those were records from Kaiser in Ms. Aguilar's name showing

 4    she is actually buying and paying for insulin.  And so who

 5    knows, she's telling you even though the doctors were telling

 6    her to take insulin, she wasn't taking insulin, yet there are

 7    pharmacy records that she's paying her hard-earned cash to

 8    purchase insulin and other things to control her diabetes.

 9          Both of those things can't be true, ladies and

10    gentlemen.  You folks are the ultimate triers of fact, and you

11    have to make those credibility determinations.  I can't tell

12    you how to make those credibility determinations, the

13    prosecutor or judge.  It's solely up to you, ladies and

14    gentlemen.

15          Every time the bus driver was driving against the

16    direction of her doctors, she was puttering her own

17    self-interest ahead of the safety of her passengers and public

18    at large.  That to me shows a wanton and reckless disregard for

19    human lives, the lives of her passengers.  It reflects an *I*

20    *don't care* attitude.  And this *I don't care* attitude was shown

21    after the crash.  She indicated to you that she immediately got

22    up and started helping and tending to the wounded passengers.

23    You talk to the other eyewitnesses, the other passengers, they

24    told you that was not true.  She just was on the phone

25    communicating to her company, probably getting advice as to

App. 40

 1   what to do and what to say.  She was covering, what we call,

 2   her butt so she has a good story to tell CID when they show up

 3   and start their investigation, as well as Fort Irwin PD.

 4          And you know she didn't disclose half this diabetic

 5   information to Fort Irwin PD, the CID, or anybody else that

 6   showed up shortly after on June 2nd, 2014, where all the events

 7   were fresh in everybody's mind.

 8          Now, the prosecutor will predictably argue that I'm

 9   beating up on her, I'm attacking her character, it's a

10   character assassination.  Ladies and gentlemen, that's

11   certainly the furthest thing from my mind.  If anybody felt I

12   was attacking her character, please, I wasn't trying to do

13   that.  All I was doing was challenging her conduct, her actions

14   and her credibility on the stand and challenging her reckless

15   disregard for the passengers and the public at large.

16          I was challenging her credibility when she filled out

17   that DMV form signed under oath, which made no mention of her

18   diabetic condition.  I was challenging her credibility when she

19   was solely concerned about her bus passengers when bus

20   passengers observed her doing nothing by way of assistance to

21   any of the passengers, the wounded passengers, or even

22   Mr. Keiper.

23          Some of you may think she is a sympathetic person.  I

24   agree.  She's working.  She's got nothing really going for her.

25   She's got a lot of mental, emotional, physical health issues.

App. 41

 1    There's no question about that.  I think sympathies go out for

 2    her.  You've heard the judge already tell you that you can't

 3    feel sympathy in this case.  You're objective, neutral arbiters

 4    of fact.  You can't feel sympathy for her.  Even though there

 5    are some sympathetic aspects of this lady, who, according to

 6    the Government, was doing her job and driving to work every day

 7    with a bus load of passengers, you can't consider sympathy for

 8    her.  So please don't do that when you're back there

 9    deliberating in the jury room.

10          And plus, just consider this in mind if there's

11    anybody inclined to feel sympathy for her, remember, she's

12    filed a massive lawsuit for general damages, special damages,

13    and punitive damages.  So she's going to make out all right

14    financially as a result light of this crash.  So please don't

15    feel sympathy for her because I expect at the end of the day

16    these lawsuits will arrive at fruition and she'll get some

17    money out of it.  So please don't feel sympathy for her.

18          Now, the prosecution appears to be relying on two

19    California Vehicle Code Sections that apply -- or they say

20    apply.  Remember, this is on a federal installation.  It's not

21    on California land.  It's a federal installation.  But they are

22    trying to use two particular California Vehicle Code Sections

23    to establish the unlawful act committed by Mr. Kilty.  And the

24    first one is California Vehicle Code 25300.  And, again, I'm

25    not going to read the whole thing but, essentially, it requires

App. 42

1    three emergency reflectors to be placed 10 feet behind a truck,

2    100 feet behind a truck, 200 feet behind a truck.  It doesn't

3    say anything about flares.  It doesn't say anything about

4    cones.  It doesn't say anything about hazard lights.  It

5    doesn't say anything about keeping the interior lights on.

6    None of that.  The prosecution is trying to interject all of

7    this stuff when it's not even a California Vehicle Code

8    violation.

9            So the only thing that this law addresses is three

10   red emergency reflectors.  That's it, ladies and gentlemen.

11   Nothing about flares.  Nothing about cones.  Nothing about

12   truck lights.  Nothing.  Nada.  Zippo.  Zilch.

13           Again, ladies and gentlemen, I would suggest a clear

14   reading of this is that it's not a violation because Mr.

15   Kilty's truck was not disabled.  You use these emergency

16   reflectors when you have a disabled truck.  Mr. Kilty's truck

17   was never parked off the roadway.  There was not any type of

18   emergency requiring at least three red emergency reflectors.

19   In fact, there was no emergency out there requiring any type of

20   emergency reflectors.

21           Mr. Kilty was parked in a well-known staging area.

22   And I emphasize the word *staging*.  I'm not making this up,

23   ladies and gentlemen.  You heard from eyewitnesses that this is

24   a staging area.  It's been that way for years, ever since the

25   Fort Irwin bypass road opened up way back in 2009.  And that

UNITED STATES DISTRICT COURT

App. 43

1    staging area is for trucks to stop overnight in the number two

2    lane at the location, the check-in point in the number two

3    lane.  And they just wait.  There's no need for them to put out

4    these emergency reflectors because that is a staging area

5    check-in point so the trucks can line up before the 6:00 a.m.

6    check-in time and then proceed through the security clearance

7    to be able to proceed to the main gate.

8         And it's required that all trucks to be inspected and

9    cleared in order to do that.  And the military even has

10   portable bathrooms out there and a water faucet for truckers to

11   use when they're parked there overnight in anticipation of

12   lining up for this 6:00 a.m. check-in point.

13        Now, all the eyewitnesses and the bus passengers told

14   you that big rig truckers, and everybody else who commutes to

15   Fort Irwin on that bypass road or even the bypass road main

16   road, know that big trucks would habitually line up bumper to

17   bumper waiting for that check-in point, so they can clear the

18   lane and then proceed to the main base.

19        And also they did this because, obviously, they

20   couldn't go before 6:00 a.m. because you've heard testimony

21   from all sorts of military people that the people in charge of

22   unloading this heavy duty cargo, they don't get to work before

23   6:00, so there's no way to get on that base before 6:00 a.m. in

24   the morning and have these -- have the military people off-load

25   the vehicles.  You've got to wait until 8:00 or afterwards in

App. 44

1   order for the military personnel to arrive in order to unload

2   these cargoes that are showing up at all hours of the night.

3          Now, evidently the only two people in this case that

4   didn't know about this staging area and the fact that the

5   trucks were required to stop in the number two lane and the

6   buses were required to proceed past them in the number 1 lane

7   is the cop and the bus driver.

8          I want to move down to Exhibit 4.  Ladies and

9   gentlemen, you'll have these exhibits back in the room, but I

10  just want to highlight things when you're back there evaluating

11  the facts, which you are the sole judge of.  And particularly

12  it states, *No person shall bring a vehicle to a complete stop*

13  *upon a highway so as to impede or block the normal and*

14  *reasonable movement of traffic unless the stop is necessary for*

15  *the safe operation or in compliance with the law*.

16         Ladies and gentlemen, what does that mean?  Number

17  one, there is no violation of this particular Vehicle Code

18  Section, California Vehicle Code Section, on federal property.

19  Why?  Because Mr. Kilty was not blocking or impeding normal and

20  reasonable movement of traffic because the normal, reasonable

21  movement for buses was the number 1 lane, it wasn't the number

22  two lane.  So the normal and reasonable flow of traffic in the

23  number two lane was these big rig trucks stopped in

24  anticipation of check-in point.

25         The normal and reasonable flow of traffic was the

UNITED STATES DISTRICT COURT

App. 45

1    number 1 lane.  Had that bus driver been operating in the

2    number 1 lane pursuant to the normal and reasonable flow of

3    traffic this accident would never have occurred.  It wouldn't

4    have occurred.

5           And also stopping in the check-in point way before

6    6:00 was necessary, quote, for the safe operation or in

7    compliance with the law.  Remember, before getting on the base,

8    all these tractor trailers had to be inspected for safety and

9    security concerns.  That means that these trucks were stopped

10   for safe operation or in compliance with the law.  Whether it's

11   for the safe operation or in compliance in the law, it matters

12   not.  The bottom line is this truck was stopped there well

13   before 6:00 a.m. for safe operation and in compliance with the

14   law.  This is the military law, and these are long-established

15   rules and regulations.  All the witnesses testified to that.

16   And it was common knowledge.

17           MR. LEVERS:  Objection.  Misstates the facts.

18           THE COURT:  Sustained.

19           MR. HARLEY:  Ladies and gentlemen, you heard the

20   evidence in regards to tractor trailers parking in anticipation

21   of this check-in point.  And also, again, all the military

22   personnel needed in order to get these heavy duty equipment

23   unloaded did not arrive until 6:00 a.m.

24           Now, simply put, ladies and gentlemen, this was a

25   tragic accident.  Now, how do we know that?  First of all

App. 46

1    ladies and gentlemen, Mr. Kilty never got any type of citation.

2    They're talking about two citations there, Fort Irwin PD, CID.

3    The military never issued any type of traffic citation.

4    Nothing.  Whether it was for 2240 of the Vehicle Code or 2530

5    Fort Irwin PD CID, nobody from the military ever issued him any

6    type of traffic citation.

7                Two, remember the testimony of the coroner assistant.

8    They ruled this homicide way back in 2014, when the autopsy was

9    conducted, was an accident, not a homicide.  And it remained

10   that way, an accident, until almost two years later when the

11   prosecution got Mr. Gray, hired him, and paid for him.

12               MR. LEVERS:  Objection.  Misstates the facts.

13               THE COURT:  You have to stick to the evidence, Mr.

14   Harley.

15               MR. HARLEY:  All right.

16               THE COURT:  Sustained.

17               MR. HARLEY:  Are remained -- the cop eventually got

18   involved one year later.  I believe the evidence showed that he

19   did not get involved until May of 2015, and it took about a

20   year in order to complete his investigation.  The evidence also

21   showed that this was his first case -- federal case.  And he

22   came up with a conclusion at the end of his investigation,

23   which was approximately a year.  So if you take a year from

24   2015 of May, that's probably 2016, and that's when he came up

25   with the manslaughter opinion.

1          Ladies and gentlemen, throughout the remainder of my

2    argument I'm talking about the CHP.  The cop's investigation

3    was flawed.  It was incomplete.  It was, basically, pretty much

4    a sham.  The prosecution had mentioned about Gray's opinion,

5    that the Army investigation was useless, I'm saying the exact

6    opposite.  Gray's investigation was useless.  It was

7    incomplete, and it was a sham.  And here's why:

8               1, There was no accident reconstruction;

9               2, No accident re-enactment;

10              3, Never interviewed the bus driver;

11              4, Never interviewed Mr. Kilty;

12              5, Never interviewed any eyewitnesses;

13              6, Never interviewed any past or present bus

14   passenger;

15              7, Never consulted any experts;

16              8, Never developed any new facts;

17              9, Never did any braking distance analysis.

18         Remember, braking distance analysis actually -- and

19   again, I'm still perplexed.  Gray made it clear that he was

20   investigating Mr. Kilty and the Arizona license, commercial

21   license he had, but if you look at Exhibit 37 of the

22   prosecution, they rely on a Wisconsin commercial driver's

23   license.  So there's nothing -- there appears to be something

24   wrong with the reliance on the wrong state commercial license.

25         And even if you rely on No. 37, there's some good

UNITED STATES DISTRICT COURT

App. 48

1    language in there that actually supports our position that the

2    bus driver had plenty of time to brake, because -- this is

3    Exhibit 37 that you will have back there.  And you can read

4    this for yourself, ladies and gentlemen.

5           And this is the Wisconsin driver's manual that Gray

6    talked about.  You can see here there are three phases,

7    perception distance, a reaction distance and braking distance,

8    total stopping distance.  So if you go through that and read

9    it -- it's difficult to read here, but, basically, it talks

10   about a total stopping distance for a bus going 55 miles an

11   hour.

12          Here we have a bus going about 45 miles an hour,

13   which means the braking distance should be less.  But at least

14   the stopping distance for this bus going 55 miles an hour, you

15   add the perception time and distance, it's approximately

16   three-quarters of a second.  That 55-mile-an-hour bus travels

17   60 feet.  The reaction time distance is another three quarters

18   of a second and that's 60 feet distance traveled.  The braking

19   time/distance is four and a half seconds for 170 feet.

20          You add all those times up and you come to 6 seconds

21   and 290 feet.  That's for a bus to stop going 55 miles an hour

22   and bringing that bus to a stop at zero.  If you factor in

23   45 miles an hour, this same bus going and braking with the same

24   perception-reaction time and same braking distance, you have

25   approximately 4.9 seconds traveling a distance of 237 feet.

1          So, ladies and gentlemen, this actually helps us

2     because we know -- or we should know based on the evidence --

3     that bus is going somewhere in the neighborhood of 45 miles an

4     hour, which means that according to the prosecution's own

5     exhibit, the stopping distance and time would be even less.

6          Also, the cop never did any braking distance

7     analysis.  And that means a bus going at 45 miles an hour, the

8     braking distance would be 113 to 135 feet.  That's at a bus

9     going 45 miles an hour as opposed to 50 miles an hour.  The cop

10    never did any braking time analysis.  And the evidence -- which

11    means -- and you've heard evidence from some of the experts

12    indicating that a bus going at 45 miles an hour, it would take

13    3.4 to 4.1 seconds to brake from 40 miles an hour going down to

14    the speed limit of zero.

15         And, again, ladies and gentlemen, these are all

16    factors -- well-known physics factors you can plug in an

17    equation in order to come up with that conclusion.  This

18    officer had about a year time in order to plug in some of these

19    factors in order to arrive at the braking time and the braking

20    distance in order for this particular bus driver to bring that

21    bus traveling from 45 miles an hour down to zero, approximately

22    3.4 to 4.1 seconds, and also a total distance traveled, while

23    that bus is braking, 113 to 135 feet.

24         Also, the officer never did any perception-reaction

25    analysis to establish a time it would take to make a lane

UNITED STATES DISTRICT COURT

App. 50

1    change.  And, again, there were two ways this bus driver had of

2    avoiding that fatal traffic collision:  One was braking and

3    staying in the number two lane, and the other one was a lane

4    change maneuver.  Neither of which were done.

5         And, again, even the police officer, Gray, had to

6    admit that there's no evidence that that bus braking at all, no

7    braking marks coming from the bus.  There were marks out there,

8    ladies and gentlemen, but they came from the tractor trailer

9    that the bus driver crashed into.

10        Ladies and gentlemen, time for the lane change is

11   critical because the evidence is some of the experts

12   testified -- or everybody testified that there was only a one-

13   to two-foot overlap between the right front of the bus and the

14   left rear of the tractor trailer.  In other words, Ms. Aguilar,

15   despite all the disabilities she had, almost made a lane change

16   to -- in order to completely avoid this crash.  The evidence

17   was approximately one second earlier -- if she had reacted one

18   second earlier, she would have been able to make that complete

19   lane change to avoid crashing into Mr. Kilty's vehicle.  And

20   that life or death difference of one second is huge.

21        And that means if you eliminate any of the following

22   factors that caused her to crash into the vehicle, like the

23   diabetes, the vision problems, driving in the wrong lane,

24   driving with low beams instead of high beams, speeding too

25   fast, exceeding the prima facie speed limit, not accelerating

UNITED STATES DISTRICT COURT

App. 51

1    from 46 to 49 miles an hour as one of the videos shows, not

2    hitting the rumble strips, reacting to the truck earlier, not

3    reacting to Mr. Chestnut's yell, hey, get off the rumble

4    strips, or not reacting to Mr. Chestnut's yelling at one, maybe

5    two times, *Truck.   Truck*, out there and never even bothering to

6    hit the brakes -- if any one of those factors had been

7    eliminated, we would not be here because that would make any

8    one or all of those factors make the one-second difference to

9    allow the bus driver, if she was properly paying attention, if

10   she was properly alerted to what she was doing and

11   concentrating on, what she was doing instead of off somewhere

12   else, she could have avoided this fatal bus accident.  And one

13   second in this particular case makes a big difference.

14          Remember, ladies and gentlemen, it is just one second

15   that made the difference, and any one of those factors,

16   certainly, could have made a difference in order to turn a

17   fatal lane change into a safe lane change in order to avoid the

18   crash resulting in the death -- the untimely death of Dail

19   Keiper.

20          This cop never bothered to do any perception-reaction

21   analysis to determine if any one of those factors would have

22   made a difference in making a safe lane change in order to

23   avoid the collision.

24          We have already gone through the Wisconsin driver's

25   license you have before you.

UNITED STATES DISTRICT COURT

App. 52

1              That's Exhibit 37.  That shows you what a bus

2    traveling at 55 miles an hour would be able to do if it applied

3    its brakes and how long it would take to go from 55 miles an

4    hour down to a complete stop and how long distance-wise it

5    would take.  And certainly -- applying the facts in Exhibit 37

6    are certainly sufficient to prove that the driver did not

7    operate that motor vehicle or that bus with the caution

8    characteristic of an ordinary sober person.

9              Also, this police officer never interviewed any long

10   haul truckers that since 2009 that number two lane was reserved

11   habitually, and habitually used, as a staging area for these

12   big rigs carrying military equipment from all 48 states to drop

13   them off in the Fort Irwin military base.

14             And these witnesses, the bus passengers and some of

15   the people are going to and from Fort Irwin, certainly told you

16   that they saw on many prior occasions big rigs lined up in the

17   number two lane with no reflectors, with no lights on, waiting

18   for that 6:00 a.m. check-in point.

19             You also heard specifically from Matt Derrico, who

20   was a long-haul trucker out there, as far as 2011/2012 making

21   deliveries to the Fort Irwin base and he would be parked there

22   -- I believe one time he was parked there from 10:00 at night

23   until the 6:00 a.m. check-in point at this staging area and

24   another time he was there, I believe, 5:00 in the morning.  At

25   any rate, he was certainly well there before 6:00.  He parked

App. 53

1    his truck in the number two lane in the staging area, which is

2    well-known to everybody, except the police officer and the bus

3    driver, and turned his lights off and didn't use any emergency

4    red reflectors or anything like that and parked there and

5    waited for the 6:00 a.m. check-in point.

6            And I believe he said when he got there there were

7    trucks already lined up in front of him.  By the time the

8    6:00 a.m. check-in point opened there were trucks behind him.

9    So there's a big long line of long haul truckers out there

10   carrying heavy military equipment stacked back to back, one

11   right in front of the other, with no red emergency reflectors

12   and no lights on.  So, ladies and gentlemen, this is a policy

13   and procedure and military law that was well-established way

14   before June 2nd, 2014.

15           Also, I just wonder -- it's just an aside.  It's not

16   really important, but I believe I asked Ms. Aguilar how long

17   did it take her to get from -- to the Fort Irwin military base

18   after she left last stop in Barstow, which is the cemetery, and

19   she said ten minutes.  Ladies and gentlemen, that's way off.

20   Her ability to perceive and recollect what's going on is

21   severely affected.  I have no clue why.  I don't know.  All I'm

22   suggesting to you is when she's estimating a ten-minute drive

23   out there and everybody else says it takes at least 30 minutes

24   to almost 45 minutes to get from the last stop, the cemetery in

25   Barstow, to the Fort Irwin military installation was at least

App. 54

1   30 to 45 minutes.

2          The cop never interviewed any of these bus passengers

3   who knew the military law, rules and regulations, that trucks

4   would stop in the number two lane long before the 6:00 a.m.

5   check-in point without lights or without putting out their

6   emergency reflectors.  It was common knowledge.  You don't have

7   to be a bus driver or cop to know that big rigs would

8   habitually park in that area.

9          You don't have to be that way.  You just have to be

10  aware of what's going on.  Again, we don't have to prove

11  anything, ladies and gentlemen.  We didn't have to get up and

12  present a defense case because the burden's on the prosecution

13  to prove every each and every element beyond a reasonable

14  doubt.  We had no obligation.  But we did have a few facts we

15  felt were important for your consideration after the

16  prosecution rested because not all the facts were presented.  A

17  lot of those facts were gone over.  A lot of those facts were

18  not disclosed to you during the prosecution's case.

19         Also, this cop never knew that any of the bus

20  passengers -- remember, he had knowledge that there were bus

21  passengers out there who lived throughout this traumatizing

22  incident.  He never bothered to interview them.  He never

23  interviewed the bus passengers saying it was light enough to

24  see Mr. Kilty's big rig in plenty of time to avoid a crash

25  either by braking or making a lane change.  Remember,

1  Mr. Chestnut -- I think he was a good spokesman for all the

2  eight bus passengers -- came in and he told you that after

3  hitting the rumble strips, he said, he yelled, *Hey*.  And again,

4  I'm not doing justice to the volume he used in front of you in

5  open court, but it was a lot louder than that.  And then after

6  the bus was going in the number two lane for a period of time

7  he yelled, *Truck*.

8          And this gentleman is seated far behind Ms. Aguilar.

9  And it was light enough outside for him to see a truck way up

10  ahead in order to yell *Truck* at least once and maybe twice in

11  order to alert the driver that there was a hazard in front of

12  her.  Evidently, there was no reaction.  The cop never went out

13  and explored that, and had we not tracked him down, you folks

14  would have never heard that.  You would just be relying on

15  Aguilar, the bus driver's testimony, as well as the cop's

16  testimony.  And I think that presents a woefully misleading

17  chronology of the events the way they unfolded in this

18  particular case on June 2nd, 2014.

19          I think it's pretty clear -- Mr. Chestnut made it

20  clear he can certainly see, and he's seated a few seats behind

21  the driver.  If he can see it far in advance, the drive should

22  have been able to see it far in advance.

23          Also, the cop never interviewed Chestnut or any other

24  passengers to learn what they personally experienced, what they

25  personally saw, what they personally heard as far as the rumble

App. 56

1    strips are concerned or how they are traumatized by the bus

2    driver's grossly negligent and reckless driving.

3           And he never interviewed any one of these bus

4    passengers to learn who they blamed for the driving.  Remember,

5    each and every one of those passengers blamed the bus driver

6    and not Mr. Kilty.  The only witness in this entire case to

7    blame Mr. Kilty is the cop.  Never even Ms. Aguilar blamed Mr.

8    Kilty.  And this is all after a sham, useless investigation.

9           So every time that the prosecution says that the CID

10   or the military conducted a sham or useless investigation, just

11   put it back on them.  I think the cop in this case produced a

12   sham investigation.  He never interviewed anybody from CID or

13   Fort Irwin PD.  Never interviewed anybody from the Army and

14   some of these reenactments June 3rd or 4th a couple days later.

15   Never interviewed who felt the bus driver was at fault and not

16   Mr. Kilty.

17          And then also they presented -- the prosecution

18   presented you Exhibits -- that's 6-A.  And, ladies and

19   gentlemen, these are still shots from that smart video that

20   they introduced and they've shown you several times already

21   during the course of this trial and during their final

22   argument.  But these are stills taken from them.  And here's

23   6-B and here's 6-C.  Again, there's been talk about negative

24   contrast.  And you can see there's negative contrast here as

25   you work your way back, negative contrast, negative contrast

App. 57

1   way back here.  Ladies and gentlemen, that's the type of stuff

2   that should have alerted this bus driver that there was this

3   obstruction several hundred feet in front of her.

4            Also, what's really important, ladies and gentlemen,

5   when this was presented to you by the prosecution, remember

6   we've been talking about data, analytics like deceleration,

7   acceleration, speed, G force, lateral movement, things like

8   that, this is taken from a video that has none of that data.

9   Remember that.  We had to go out and present our video, 204,

10  that had a lot of data on there.  Wouldn't it have been

11  interesting to figure out whether that bus was going back and

12  forth, like you heard the bus passengers say she was doing, or

13  whether or not she was actually accelerating as opposed to

14  decelerating in anticipation of getting out of the way of this

15  hazard that was approaching?

16           These are some of the things that were missing from

17  the prosecution's presentation.  And that's why we had to go

18  out and get our own expert in this particular case in order to

19  share with you all the data that was missing from the

20  prosecution's video.  And when the cop got up there, all he did

21  was rely on that 10- to 11-second video without any data on

22  there, and that's why there's another exhibit back there for

23  your consideration.  You can compare and contrast the data that

24  was wiped off the prosecution's video with the data that's on

25  the defense video.  They came from the same agencies.

App. 58

1          And this video, no matter whether you consider the

2    defense video or the prosecution video, it's misleading,

3    because you've heard evidence about four frames per second.

4    Remember, it presents a misleading picture of what the bus

5    driver actually saw because it captures a rate of four frames

6    per second.  The human eye captures the frames at 30 frames per

7    second.  That means that the human eye captures a lot more

8    light than this video camera does, and that's why this video

9    camera is capturing a lot less light and appears a lot darker

10   than what was actually available to the human eye. So consider

11   that when you're going through our video or you're going

12   through the prosecution's video.

13          Also, the evidence shows that this video was four

14   feet above the driver's eyes.  And it was also in the center of

15   the bus and that shows a downward angle as you're looking at

16   here.  So the lens of the camera is a lot higher than the lens

17   of the bus driver in this particular case because it's going

18   downward because it's a lot higher.  So the lens of the

19   driver's eyes would have and see a lot more negative contrast,

20   which is important, in order to alert the driver of an oncoming

21   hazard.

22          Now, also you got evidence of some photographs taken

23   by the Army during their investigation and re-enactment.  And

24   particularly this is Exhibit 34.  And it shows the lighting

25   conditions at the time of 5:06.  And, again, this is on

App. 59

1   June 3rd.  It's not June 2nd, it's June 3rd.  And it shows what

2   the lighting conditions are like.  But this is a little bit

3   misleading because the bus should have been up on the ridge

4   line, and then you would have been able to clearly see the bus.

5   And that's what we call negative contrast.  And this is

6   5:06 a.m. on June 3rd, 2014.

7          And then there's another photograph taken by the

8   Army, the CID, and the Fort Irwin PD.  I believe it says 5:15.

9   That's nine minutes later.  And that shows the negative

10  contrast.  You can clearly see a bus that is up there on the

11  ridge line.  And it has a negative contrast making it very

12  clear to anybody looking out there that's paying attention that

13  this is a bus and a vehicle because of the way it appears on

14  the twilight area.

15         And, again, during that period of time there's,

16  basically, nine-seconds difference.  And if you're going at

17  45 miles an hour, all you have to do is figure out -- if you're

18  driving for nine minutes from 5:06 to 5:09 at 45 miles an hour

19  you would be traveling a distance of 500 -- almost 600 feet.

20  And so that's -- the start is here.  And then after you've

21  traveled the 600 feet, you're at this particular location.  And

22  here you still have plenty of time to avoid this bus out here.

23         So, ladies and gentlemen, that's something you can

24  factor in when you're trying to figure out this distance

25  reaction time because during that period of time the bus is

App. 60

1    traveling over that location.

2            Now, on June 4th there was a similar re-enactment

3    done by the Army.  And the lighting might have been a little

4    different, but the main takeaway from that is the bus was

5    visible at 800 feet.  And the Army concluded that it takes

6    12 seconds to travel 800 feet at 45 miles an hour.  Just like

7    traveling the distance between the bus depicted in this

8    photograph, this photograph, took about nine seconds and it

9    traveled about 600 feet.

10           So these are some of the calculations that were made

11   based on evidence that is actually taken and captured that you

12   will have back in the jury room.  All of this reflects a

13   perception-reaction time that the bus driver had plenty of time

14   to do either one of two things, apply the brakes, which you

15   know she didn't, or make a safe lane change.  These are factors

16   you can consider when you're back in the deliberation room

17   trying to figure out how much the bus driver knew and how much

18   she should have known before finally getting around to taking

19   evasive action.

20           Now, again, ladies and gentlemen, a trial is a search

21   for the truth, and you didn't get any help from the police

22   officer.  And here's why:  We were able to do a frame-by-frame

23   analysis of the events about 4.5 seconds leading up just to

24   give you an idea.  And, again, we want you to consider this.

25   And you'll have that back in there because they were all marked

1   exhibits, 310 to 329.  But here you have -- remember, these are

2   all stills taken from Exhibit 204.  That's the 11-second video

3   with lots of data on it including speed, acceleration,

4   deceleration, G force, lateral force.  Exhibit 204 starts

5   11 seconds before the crash.  And Exhibit 204, which you have

6   on there, will show an acceleration from 46 miles an hour to

7   49 miles an hour when the bus driver crashes into the truck.

8          Now, I'm going to start at Exhibit 310.  You'll have

9   this.  This is 310 to 329.  And I've broken up every quarter

10  second because, remember, the frame rate of this camera is four

11  frames per second.  So that's why we split it up to the frame.

12  Every quarter second we he show a different shot here.  And

13  what I want you to do as we go through frame-by-frame analysis,

14  we're starting at 4.7 seconds before impact.  This is what this

15  means, minus 4.7.  And that's 4.7 seconds before impact.  The

16  data shows she's going 48 miles an hour.  And then you look at

17  the ridge line here, and this is where you should be paying

18  attention to the negative contrast.

19         And, again, remember, she has -- pay attention to all

20  this because it shows that she has her low beams on, not her

21  high beams, the low beams.  Again, ladies and gentlemen, had

22  she had those high beams on, certainly she would have been

23  seeing those reflectors on the back of Mr. Kilty's truck far in

24  advance as to when they show up here.  So she never had her

25  high beams on.  And I have no idea where in the world she came

1    up with the idea she was told or instructed during her 40 hours

2    of classroom work or or 40 hours behind-the-wheel training she

3    was only supposed to use low beams no matter what time of night

4    she was driving.

5           As we go through this you can see the low beams are

6    on.  And then also you can see that the right side there's no

7    light.  It's all on the left side as we go through here.  Pay

8    attention to the negative contrast.  This is the contrast

9    between the sky and the hills in the background.

10          And then keeping in mind that this is a video lens

11   capturing what is seen at the video lens, i.e., four feet above

12   and four feet to the right of her.  It's not capturing what

13   Ms. Aguilar's eyes are capturing because this would have a

14   downward motion and would show less negative contrast.

15          And also pay attention to the increase of speed as we

16   go through here.  Remember, this video started out at 46.  Once

17   we get to 4.75 seconds before the crash, it's up to 48.

18          And then also I want you to pay attention to a couple

19   things here to show you when the driver actually reacted.  This

20   is the driver right over here.  Remember this C mark.  And it

21   looks like explanation point.  As I go through this, you'll see

22   the change eventually which establishes the first time she

23   reacts.

24          Also pay particular attention to the solid white line

25   over here.  You can see the solid white line over here.  It

App. 63

1   will remain in that position until she begins the turning

2   movement, and then the solid white line will move over in that

3   direction.

4           So you have 310.  Then you go to 311.  Same area.  No

5   movement here.  Still 48 miles an hour.  You're beginning to

6   see some negative contrast out there.

7           And again this is a camera.  It's not the human eye.

8           312 you see the same white line position and the same

9   driver position.

10           313, same thing.

11           314.

12           315, we're down to minus 3.5 seconds before impact.

13           THE COURT:  You have five minutes.

14           MR. HARLEY:  All right.  Ladies and gentlemen, here's

15   an increase in speed, and then you see the same white line.  No

16   movement.  Same white line.

17           Ladies and gentlemen, when you get down here, still

18   no reaction because the white line is still there and there's

19   no movement with this bus driver.

20           Now, for the first time -- there is no reaction --

21   1.5 seconds you're beginning to see the reflection off the mud

22   flap here and then also you're beginning to see the reflector

23   tape.  It's all over there.  Again, 49 miles an hour,

24   1.25 seconds, all the way up to 325 and you're beginning to see

25   more of the reflector tape.  Had she had her high beams on, you

App. 64

1   would have been able to see that more clearly.

2          Now, you can clearly see the reflector tape.  She

3   still has her low beams on.  Just think how much earlier she

4   could have seen the reflector tape if she had high beams on.

5          Remember, you still have the exclamation point over

6   here.  And you have the same position of the white -- solid

7   white line.  Then here the very first indication there's some

8   reaction is the little exclamation point changes indicating

9   movement by the driver.  She's beginning her turning movement.

10  How do we know that?  Look at the white line.  It shows she's

11  moving to the left.

12          Ladies and gentlemen, she didn't react to this

13  obvious hazard up there until .5 seconds before the crash took

14  place.

15          Ladies and gentlemen, trying to finish up in the time

16  period, there's an old saying, garbage in, garbage out.  The

17  cop:  No interviews, no re-enactment, no distance calculations.

18  All the interviews of the experts we had to go out -- and,

19  obviously, you pay experts.  The reason we had to go out and

20  get them is because the police officer did not do his job.

21          And these experts, I'm talking about Geller.  I'm

22  talking about Husher, Stein.  Summers.  Royer.  They have

23  collective years of experience of over 150 years.  The police

24  officer had about 18 and a half years.  And he's getting paid

25  too.  Evidently, he gets a nice compensation package because

1    he's able to retire after 18 and a half years.

2              Again, ladies and gentlemen, the ignorance of the

3    actual military rules and regulations that were in effect is

4    not an excuse.

5              Also, diabetes is very critical in this case.  I'm

6    not going to go over that.  You heard the evidence from

7    Dr. Geller.  And I know I never asked any of you folks about

8    diabetes.  Maybe some of you know people that are affected by

9    diabetes.  I don't know.  But you can only use what was

10   presented in court, not your own personal knowledge as far as

11   how diabetes played an impact in this particular case.  That's

12   because that would be taking outside information and applying

13   it to some critical facts of this case.

14             So the prosecutor's already mentioned about we had to

15   go out and pay money for defense experts.  Well, obviously, we

16   had to because these particular inquiries were not made by the

17   police officer.  There's nothing wrong with experts getting

18   paid.

19             The prosecutor's already argued the bus passenger

20   bias because they already had their minds made up.  Well,

21   ladies and gentlemen, any reasonable, fair-minded person in

22   that bus would certainly be a little bit angry and agitated

23   about what that bus driver did to them.  It's common sense.

24   It's obvious.

25             The prosecutor will argue I'm putting the bus driver

UNITED STATES DISTRICT COURT

 1   on trial.  Nonsense, ladies and gentlemen.  I'm putting her

 2   credibility on trial; I'm not attacking her.  Just tell Jesus

 3   Aguilar or Dail Keiper, these people that severely traumatized.

 4          Again, Jesus Aguilar, you notice how the skillful

 5   prosecutor was able to push Mr. Aguilar, who suffers arm

 6   injuries and TBI, off into eventually saying that the bus

 7   was -- excuse me, the truck was parked on the right shoulder as

 8   opposed to the number two lane in contradiction of all the

 9   other eyewitnesses.

10          The prosecutor argues the bus driver was just doing

11   her job, doing what she had been doing for a year and a half.

12   Ladies and gentlemen, so what.  That has no issue -- or no

13   bearing on the issues in this particular case.  It's like me

14   defending a drunk driver telling me the drunk driver is doing

15   his job going to work -- to and from work every day for a year

16   and a half.

17          Ladies and gentlemen, these are some of the arguments

18   I anticipate the prosecution making.  I have to sit down and

19   keep quiet.  I only have one chance to talk to you.  The

20   prosecutor is going to be up here and rebut things I say.

21          They said Mr. Kilty should have been aware of the

22   heightened area of due care because he was a bus driver --

23   excuse me -- because the heightened area because of trucker.

24          THE COURT:  Mr. Harley, you're done.

25          MR. HARLEY:  I apologize.  Thank you.

App. 67

```
 1                THE COURT:  Mr. Levers or Mr. Yang.

 2                MR. YANG:  May I proceed, your Honor?

 3                THE COURT:  You may.

 4                MR. YANG:  Ladies and gentlemen, let's get this

 5     straight, defendant parked his semi-truck towing a giant

 6     military vehicle in the middle of the road in the middle of the

 7     night and then went to sleep -- went to sleep.  And the next

 8     morning, because of that, a bus comes over and collides with

 9     his truck, and his defense is that he was not a substantial

10     cause, a substantial part of that accident, that he wasn't

11     reckless by parking his truck in the middle of the night towing

12     a large military vehicle without any lights or warnings

13     whatsoever in the middle of the road, that he wasn't reckless.

14     That's a ridiculous argument.  That's a ridiculous argument,

15     ladies and gentlemen.  That defies common sense, which you are

16     allowed to use, which you should use in your deliberations.

17                See, ladies and gentlemen, there are two kinds of

18     accidents, okay.  Generally speaking there are two kinds of

19     accidents:  There are in-avoidable accidents and avoidable

20     accidents.  Avoidable accidents -- let me give you an example.

21     A woman driving a large pickup truck has a heart attack.  In

22     the course of a heart attack her foot stomps on the gas, goes

23     through an intersection and hits a small car parked across the

24     street.  Ladies and gentlemen, that is an in-avoidable

25     accident.  That is just part of life.  That happens.
```

App. 68

1          What we have here is an avoidable accident.  And the

2    difference?  What is the difference?  The difference is

3    choices.  The lady in the heart attack didn't have a choice.

4    She had a heart attack, foot on the brake.  She didn't have a

5    choice.  Defendant, however, had many choices here.  And let's

6    go through some of those choices.

7          See, ladies and gentlemen, when he got there the

8    night before, 8:30, he had choices.  The first choice was the

9    gate wasn't operational at that point at 8:30 in the middle of

10   the night.  You saw on the sign 6:00 to 8:00 a.m., Monday

11   through Friday.  That's when the gate's operational.  So when

12   he got there, the gate wasn't operational.  He could have

13   proceeded directly on to the base.  And if he had any

14   questions, if it was unclear, there was a phone number.  You

15   saw the phone number.  Main gate.  Call the phone number.  Find

16   out.  But he didn't do that; instead, he parked his truck right

17   there at the gate.

18          Now, if he wanted to park there, park on the shoulder

19   -- you saw how big that shoulder is.  It's a huge shoulder.

20   You could have parked multiple trucks.  His truck would have

21   easily fit on the shoulder.  But he didn't want to park on the

22   truck (sic).  You know why he didn't want to park on the truck

23   (sic), ladies and gentlemen?  Because someone might sneak

24   around when he's asleep.  Someone might sneak around and get

25   first in line.  And you know that was important to him.  He

App. 69

1    admitted to you on the stand that that was important to him to

2    be first in line, and he didn't want to take the risk of

3    somebody cutting in front of him.

4           Okay.  That's fine.  So park partially on the

5    shoulder and partially on the roadway signifying to everyone

6    else, hey, I'm, kind of, in line.  Park partially on the

7    shoulder.  But that, ladies and gentlemen, still presents a

8    little bit of a risk because somebody could still go around and

9    be number one, and then he might have to be number two or

10   number three when the gate opened.  See, those were choices,

11   ladies and gentlemen.

12          So okay.  Now, defendant made the choice, I want to

13   be here on the roadway, however foolish that may be.  I want to

14   be on the roadway because I want to be number one in line when

15   the gate opens.  So then what should he have done?  He could

16   have, ladies and gentlemen -- he could have -- and I submit

17   this to you -- he could have even parked on the shoulder, set

18   his alarm for right before when the gate was going to open and

19   then wake up, move his truck on to the roadway, put on his

20   hazards on.  He could be there maybe an hour or 30 minutes.  He

21   would still probably be first.

22          But guess what, ladies and gentlemen?  That's going

23   to require that he wakes up from his sleep.  That's going to

24   interrupt his sleep because he wouldn't be able to sleep as

25   much as he could have.  We know that's important to him because

App. 70

1   he bothered to put up that sun shade so when the crack of dawn

2   came up he wouldn't be disturbed by the light.

3          So now, okay, defendant's made his choice, let's park

4   on the roadway.  It's crazy, but let's park on the roadway.

5   All right.  So what could he have done?  It's obvious.  You

6   don't need to hear experts or some attorneys tell you.  It's

7   obvious.  You put up flares.  If he didn't want to burn a

8   flare, okay, use up a flare, put up safety triangles.

9   Everyone's driven down the road and seen trucks parked on the

10  shoulder -- not on the roadway, but the shoulder with safety

11  triangles, right.  But that's going to take some work, as you

12  saw, 10 feet, 100 feet, 200 feet.  But that's going to take a

13  little bit more work.  He had the opportunity to because he

14  testified he went around, walked around, looked at stuff.  I

15  think he said he even went to the restroom.  He had the

16  opportunity to, but he didn't.

17         Okay.  So that's going to take too much work.  If

18  you're too lazy to put up three triangles, then what should you

19  do?  Push the hazard button.  It would have taken a second.  He

20  could have done it in the comfort of his own cockpit.  Take one

21  finger, push the button.  The lights flash.

22         So why didn't he do that?  He told you guys.  He told

23  everyone here.  Because that would have used up his battery.

24  It would have caused the possibility of him not being able to

25  start his truck the next morning and then being late on his

 1    delivery.  He put the self-interest of himself -- he put his

 2    own self-interest above the safety of those other passengers.

 3         Ladies and gentlemen, let me tell you something very

 4    important, he not only told you that he did not use the safety

 5    flashers because of the battery but he, basically, admitted

 6    that he thought about it.  He thought about it because he knew

 7    that it was a danger.  He thought this could be a danger.  I'm

 8    going to -- am I going to use my safety flashers?  No, because

 9    I want to save my battery.  He thought about it.

10         It's not just some confused person.  I didn't realize

11    I was a danger.  No.  He realized he posed a danger, and he

12    chose.  He weighed the cost and benefits, and he chose not to

13    put on those safety flashers.  And it's, kind of, funny, ladies

14    and gentlemen.  You don't want to burn your battery, okay, put

15    out the triangle.  You can't have it both ways.  And the kind

16    of accident that was caused is exactly the kind of accident

17    that we expected, which is someone might rear end you sitting

18    in the middle of the road.

19         And, ladies and gentlemen, I submit this to you, if

20    he had been in a little car, he had been in some Honda Civic or

21    some little car, he would not have parked in the middle of the

22    road with no safety triangle, no safety lights, no flares.  He

23    would have been off to the side of the road.  But because he

24    was in a giant semi-truck, protected, 60 feet, 40 feet away

25    from the back of the truck, protected by a giant military

UNITED STATES DISTRICT COURT

App. 72

1   vehicle, he's okay with taking that risk.  And, ladies and

2   gentlemen, that is reckless.  That is reckless and that is a

3   disregard for the safety of others.

4          Now, the defense, they raise a number of arguments to

5   try to disrupt you from actually a fairly simple case here,

6   which is somebody parked their truck in the middle of the road

7   in the middle of the night with no warnings whatsoever and a

8   bus crashed you into it.  They want to distract you from that

9   fact so they come up with all these various arguments.  And let

10  me try to go some of the ones I want to address.

11         First of all, this whole business about disabled

12  truck in the road, that's when they have to use safety

13  triangles, ladies and gentlemen, the truck was disabled.  It

14  was parked in the middle of the road.  It wasn't moving.  It

15  wasn't temporarily at a light.  It was disabled.  And defendant

16  disabled the truck in the middle of the road, okay.  It's a

17  cute argument, but it's not compelling, all right.

18         Second, ladies and gentlemen, this whole business

19  about the left-hand lane, right-hand lane buses can only go on,

20  its all a bunch of confusion.  You know why?  Is because the

21  testimony is that the right lane is for trucks and the left

22  lane is for buses only -- only when the gate is operational.

23  But during the time of this accident, the gate was not

24  operational.  And as Michael Butolph -- and he's the Deputy

25  Director of Emergency Services for Fort Irwin -- he would know.

App. 73

1    He told you the gate, when it's not operational, there are no

2    lane restrictions.

3            So what is all this stuff about left lane, right

4    lane?  It's just a bunch of confusion.  The only thing that

5    matters here is when the gate is not operational, there are no

6    lane restrictions.

7            Now, the passengers, you heard a lot of testimony

8    about the passengers, but, look, ladies and gentlemen, that was

9    just a mess of confusion, okay.  So the passengers, when they

10   pass by the check-in point, it's unclear whether the gate was

11   operational when they passed by or wasn't operation so they

12   couldn't give you a time.  They couldn't give you a pinpoint.

13   It was a mess of confusion.  And some of them, ladies and

14   gentlemen -- amazingly enough, some of them their memories

15   actually improved once they filed lawsuits against the bus

16   company, okay.  Their memories all of a sudden became better,

17   and they came up with all these new theories and new

18   observations.

19           But I submit to you, ladies and gentlemen, their

20   testimony cannot be credited over the testimony of Michael

21   Butolph and the two officers who also testified, okay:  Officer

22   Grove, who patrolled the area.  He's the patrol officer in the

23   area.  He knows the area.  He goes by it multiple times a day

24   when he's on patrol.  And he told you -- he told you what

25   Michael Butolph told you, which is when the gate is not

App. 74

```
 1    operational, there are no lane restrictions.  Again, that's

 2    just a bunch of confusion.

 3            Now, the other passenger, Michael Chestnut, I think

 4    the defense said he's a good representative of the passenger

 5    testimony or something to that effect.  I agree.  He is a good

 6    representative, okay, because he has some severe problems with

 7    his testimony.  Now, on direct examination he may have been

 8    very impressive.  He may have been very impressive.  He came in

 9    here, former military man.  Answered questions very directly,

10    forcefully, competently.  Remember when he was asked about

11    yelling Truck, how loud he was, very confident military man,

12    full of force, okay.

13            But remember when he got cross-examined, it's like he

14    almost shriveled up.  First, he admitted he had no lasting

15    physical injuries, no lasting physical injuries, but he did

16    admit he is suing for his emotional damages, okay.  And,

17    magically, too his memory also seemed to have improved.  His

18    memory improved because he spoke to the officers a few days

19    after the accident and he told them some things.  And then all

20    of a sudden here in court he had additional details to offer,

21    all that business about yelling Truck, yelling Hey, all that

22    stuff.  He had all this additional information to offer that he

23    never mentioned once.

24            Does he look like the kind that needs to wait for you

25    to ask the question before he's going to tell you everything?
```

UNITED STATES DISTRICT COURT

 1   He's more than happy to tell you everything.  He wants to tell

 2   you everything, extremely proud of telling you everything in a

 3   confident and believable manner.  That's the kind of guy he is.

 4   He didn't say anything about yelling *Truck* or yelling *Hey* or

 5   any of that stuff.

 6            And remember the yelling of the Truck, how loudly he

 7   claimed it was.  And he said he not only did it once, he did it

 8   twice, five to ten seconds before the impact.  Well, ladies and

 9   gentlemen, watch the video.  There's audio in there.  There's

10   nobody yelling *Truck*.  There's not only nobody yelling *Truck*,

11   you never hear it.  There's also no indication that anyone's

12   yelled *Truck*.  Everyone's probably been in a car before, either

13   as a driver or passenger, where the driver didn't see something

14   and someone says hey, watch out, pedestrian, you know.  What

15   the driver does?  You know what the driver does.  The driver

16   doesn't keep on driving; the driver slows down, turns around,

17   looks.

18            Do you see any of that in the video not at all?  You

19   know why nobody yelled truck?  You know why?  Michael Butolph

20   (sic) lied to you, ladies and gentlemen.  He embellished his

21   testimony and he lied to you.

22            What you can rely on is the testimony of Officer

23   Grove, okay.  Officer Grove patrols the area, drives by several

24   times a day.  And he told you, outside the gate operational

25   hours, trucks are not parked there.  That makes sense, right.

1    That makes sense.  Why would somebody wait in line when you

2    don't have to?  You would go straight to the base.  You would

3    go straight to the base.  That's crazy.  That's also consistent

4    with what Michael Butolph told you.

5            This business about the diabetes, ladies and

6    gentlemen, let me briefly mention it.  The diabetes, there's no

7    evidence diabetes was actually affecting Ms. Aguilar, okay.

8    Yes, she has diabetes, but even as the defense expert admitted,

9    many people can have diabetes without actually manifesting any

10   real symptoms.  It's like -- it's like cholesterol.  A lot of

11   people have high cholesterol but not everybody is suffering the

12   symptoms of high cholesterol, okay.

13           The defense experts, ladies and gentlemen, let me

14   mention them.  First of all, the bus driver is not on trial,

15   okay.  This is not the trial against Dinorah Aguilar.  This is

16   the trial against Steven Kilty, okay.  Now, they're going to

17   try to blame her because it -- it -- it's good to blame

18   somebody else, to have somebody else to point the finger at,

19   but she's not on trial.

20           Now, this team of defense experts -- basically, you

21   have a team of defense experts who, basically, more or less --

22   I'm just roughly summarizing -- they more or less conclude as a

23   team or bits and pieces that the accident was avoidable, that

24   she should have been able to swerve and get around it, okay.

25   And then on the other hand you have the Government, the United

UNITED STATES DISTRICT COURT

1  States witness Officer Gray, who tells you the accident was

2  in-avoidable.

3        Okay.  So how do you decide which one of these

4  testimonies to credit?  Well, ask yourself, ladies and

5  gentlemen, the first thing you should ask yourself who's paying

6  them?  Who's paying the bills?  The -- who's paying the bills

7  and why is the expert saying what the expert is saying?

8        Now, look, ladies and gentlemen, it doesn't matter

9  if -- if you're at a used car dealership or someone's trying to

10  sell you life insurance or some defense expert or government

11  expert, frankly, is up here telling you something, you should

12  question why is this person telling me?  Who are they getting

13  paid by?  What is their motivation?  And as you heard here, the

14  defense experts are being paid a lot of money.  They're being a

15  lot of money.  It's a good gig for them to testify.  And they

16  are loyal to their client.  They're loyal to their client

17  because they're being paid this money.

18        Now, contrast that with Officer Gray.  He's a former

19  CHP officer.  He's retired.  He's not making any money off of

20  this.  He should be out playing golf, doing something

21  somewhere, instead he's here testifying with no compensation.

22  He's just testifying.  What is his dog in the fight?

23        Besides the payment issue, ladies and gentlemen, the

24  defense experts all suffer from one huge problem.  They all

25  rely on this 800-foot visibility fact that they rely on.  Where

1   did the 800 feet come from?  It came from Mr. Husher.  Where

2   did Mr. Husher get it from?  He got it from the Army

3   re-enactment video he testified about.  The problem with that

4   video, ladies and gentlemen, is it was not an accurate

5   representation of the amount of daylight at the time of the

6   accident.

7          You saw they had that first run at approximately

8   5:06, okay.  They got down that road, took a few minutes.  By

9   the time they got there, they realize the the lights were on.

10   Obviously, the lights flashing on the truck is a problem if

11   you're trying to figure out the visibility of the truck.  They

12   had to doubled back.  They should have waited until the next

13   day.  At that time during the day every single minute counts.

14   But they didn't.  They went ahead and did the run again.  By

15   now the sun is beginning to come out even more.

16          Every minute matters, ladies and gentlemen.  And

17   based on that, based on, as well, the expectancy -- they had a

18   person in there who knew, *When am I going to see the truck?*

19   *When am I going to see the truck?*  *Oh, I see the truck.*  You're

20   looking for the truck in the middle of the road.  Based on

21   those two problems, they concluded 800 feet.

22          So, ladies and gentlemen, the other expert,

23   Dr. Stein -- Dr. Stein, okay, not mister, Dr. Stein -- claimed

24   that Dinorah Aguilar's driving was consistent with chronic

25   fatigue syndrome, and he based this on her lack of responding

1    to the truck that's coming.  Okay.  Isn't it also consistent

2    with someone not seeing the truck?  If they don't see the

3    truck, they're not going to be swerving, right?

4           THE COURT:  Five minutes.

5           MR. YANG:  Why did he make that conclusion

6    nonetheless?  Because he's a paid expert.  And he's a loyal

7    paid expert.  And he's going to conclude -- even when another

8    explanation is reasonable possible, he's going to come to the

9    conclusion favoring the one paying him, which is the defendant.

10   And remember, he wouldn't even factor in she had an additional

11   three hours of nap.  He even said even six hours wouldn't

12   matter.  Good loyal expert.  Not believable.

13          Ladies and gentlemen, all the degrees in the world,

14   all the Ph.D.s, all the experts, all the accident

15   reconstructionists, they can't come in here and tell you

16   something that flies in the face of common sense, which is you

17   do not park a loaded truck, loaded with a giant military

18   vehicle, in the middle of the road with no flares, no

19   triangles, no hazard lights, and then go to sleep.  You just

20   don't do that.  That is reckless and that is indifferent to the

21   safety of others.  And based on all of that, ladies and

22   gentlemen, I ask you to return the true and only verdict that's

23   consistent with the evidence presented, which is a finding of

24   guilty.

25          THE COURT:  Thank you, Mr. Yang.

UNITED STATES DISTRICT COURT

# Exhibit A-3

# Testimony of Michael Butolph
ECF 141 at 4-36
September 26, 2018 (P.M. Session)

UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

- - -

HONORABLE JESUS G. BERNAL
UNITED STATES DISTRICT JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,      )
                               )
            PLAINTIFF,         )
                               )
VS.                            )   CASE NO.:
                               )   ED CR 16-0024-JGB
STEVEN KILTY,                  )
                               )
            DEFENDANT.         )
                               )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

(P.M. SESSION)

WEDNESDAY, SEPTEMBER 26, 2018

LOS ANGELES, CALIFORNIA


LAURA MILLER ELIAS, CSR 10019
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, ROOM 4455
LOS ANGELES, CALIFORNIA 90012
PH:  (213)894-0374

```
1    APPEARANCES OF COUNSEL:

2

3    ON BEHALF OF PLAINTIFF:

4              UNITED STATES ATTORNEY'S OFFICE

5              BY: PAUL D. LEVERS

6                  JERRY YANG

7              ASSISTANT UNITED STATES ATTORNEY

8              RIVERSIDE, CALIFORNIA

9

10

11   ON BEHALF OF DEFENDANT:

12

13              ROBISON DOOLING HARLEY, JR., ESQ.

14

15

16

17

18

19

20

21

22

23

24

25
```

App. 83

```
 1                          INDEX

 2

 3  WITNESSES FOR
    THE GOVERNMENT:
 4                   DIRECT    CROSS    REDIRECT    RECROSS

 5  BUTOLPH, MICHAEL

 6  BY:  MR. YANG       4                    34
    BY:  MR. HARLEY            16                        36
 7

 8  CHANGSRI, CHANIKARN

 9  BY:  MR. YANG      37

10

11  GRAY, PAUL

    BY:  MR. LEVERS     44
12  BY:  MR. HARLEY           84, 110

13

14  SOBIESIAK, DONNA

15  BY:  MR. YANG      105

16          EXHIBITS            RECEIVED

17             (NONE OFFERED)

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1    LOS ANGELES, CALIFORNIA; WEDNESDAY, SEPT. 26, 2018; 1:22 P.M.

 2                              - - -

 3              THE COURT:  Good afternoon.

 4              Uh, your next witness?

 5              MR. YANG:  Your Honor, the United States calls

 6    Michael Butolph to the stand.

 7              THE COURT:  Have him come forward.

 8              THE CLERK:  Please stand and raise your right hand.

 9                    (Witness sworn.)

10              THE CLERK:  Thank you.  Please be seated.

11              State your name and spell your last name for the

12    record.

13              THE WITNESS:  My name is Mike Butolph,

14    B-u-t-o-l-p-h.

15              THE COURT:  Proceed.

16                    DIRECT EXAMINATION

17    BY MR. YANG:

18    Q.   Good afternoon, Mr. Butolph.  Who are you employed by?

19    A.   I am a Department of Army civilian so the United States

20    army.

21    Q.   And what is your position there?

22    A.   I am the Deputy Director of Emergency Services.

23              THE COURT REPORTER:  Could you move that microphone

24    a little closer?

25              THE WITNESS:  Sure.
```

App. 85

```
1              THE COURT REPORTER:  Thank you very much.
2    BY MR. YANG:
3    Q.    How long have you been in that capacity?
4    A.    The position I'm in now, I was hired on in 2007 so it's
5    going on 11 years, a little over 11 years.
6    Q.    What duties and responsibilities do you have in that
7    position?
8    A.    As the Deputy Director of Emergency Services, I've got a
9    staff that includes responsibility for fire and emergency
10   services, police, fire prevention, paramedics, military
11   police, and law enforcement.
12   Q.    What type of training do you receive for that position?
13   A.    Well, specifically training for all of that?  Not a lot.
14   However, the duties and responsibilities directly related to
15   my previous job as I retired out of the army in 2002, uh,
16   from Fort Irwin, and at that time, I was the provost marshal
17   which means I was in charge of the law enforcement, uh,
18   aspect of it, uh.  And along with that, I was in charge of
19   overseeing the contract for the fire department as well, and
20   that's why I was hired on as a deputy director.
21   Q.    Do you have a, uh -- an office for your job?
22   A.    I do.  I do have an office.
23   Q.    Where is that located?
24   A.    It's the National Training Center in Fort Irwin.
25   Q.    So is it actually on the base?
```

1    A.    It is, yes.

2    Q.    So is it fair to say that you're familiar with the base,

3    Fort Irwin?

4    A.    Very familiar with Fort Irwin, yes.

5    Q.    How many people approximately are on the base at any

6    given moment?

7    A.    Well, it fluctuates because it's the National Training

8    Center.  The soldiers and their family members number about

9    12,500, uh, and then every month -- nearly every month, there

10   is a rotation, if you will, of solders that come from all

11   over the United States, and they number between 3 and 5000,

12   uh, so they'll come for 15 or 20 days, and then they'll

13   leave.

14          We also have contractors out there, a number of

15   those and Department of Army civilians so adding all of those

16   together, Monday through Friday, typically, it ranges up to

17   about 20,000 people Monday through Friday, and then it -- and

18   then it dies off on the weekend.

19   Q.    Do -- all of those people, do they all live on the base?

20   A.    No.  Uh, 95 percent or more of the soldiers assigned to

21   Fort Irwin live on post, and that's because they have the

22   available housing there.  Everyone else I talked about, oh,

23   the civilians and all the contractors, they all live off

24   base.

25   Q.    And do -- the people who live off base, do they commute

1   to the base for work?

2   A.   They have to commute to the base for work, yes.

3   Q.   Are there lots of, uh, deliveries, uh, delivery trucks,

4   for example, to the base?

5   A.   Sure.   In response to the previous question, there's

6   about 20,000 people on post so there are post exchange,

7   commissary, uh, food courts, um, any number of deliveries,

8   and so it's typical of what you would see going to and from a

9   small city.

10   Q.   How many paved roads lead into the base -- onto the

11   base?

12   A.   There is exactly one rode that goes to the National

13   Training Center, and it's called Fort Irwin Road.

14   Q.   Historically, has the Fort Irwin Road been a dangerous

15   road?

16   A.   Sure.   Uh, Fort Irwin Road specifically has, uh, markers

17   unfortunately alongside the road --

18            MR. HARLEY:   Excuse me.   Objection.   403.

19            THE COURT:   Uh, overruled.

20   BY MR. YANG:

21   Q.   Go ahead, please.

22   A.   Okay.   So Fort Irwin Road, if you were to travel out

23   there, you would be able to count well over 50 crosses

24   alongside the road, and those are due to deaths that have

25   occurred since Fort Irwin has -- was established so well over

1    50 crosses out there.

2    Q.    And how big is Fort Irwin Road?

3    A.    Well, Fort Irwin Road off the installation is a typical

4    county road, if you will.  It's got opposing lanes of travel,

5    and then they have some passing lanes as well so it's not

6    like a normal freeway.  It's just a typical county road.

7    Q.    So approximately how many lanes all together?

8    A.    Um, really you've got one lane heading north, one lane

9    heading south, and then every once in a while,

10   intermittently, there will be some passing lane.  That's

11   about it.

12   Q.    Have there ever been efforts made to reduce the danger

13   on that road?

14   A.    Sure.  In and around 2004, the county and the state put

15   some money into widening the shoulders of the road and

16   putting in some ribbing actions along the, uh -- the no

17   passing zones and putting up signs along the road as well.

18   Q.    Has there ever been a -- what's referred to as a bypass

19   road built on the Fort Irwin Road?

20   A.    Right.  What -- what you are referring to is an old road

21   that had been established and was established for a long

22   period of time, but it hadn't actually been used as a bypass

23   road until 2009, uh, that it was actually impressed into

24   service, if you will, as a -- as a true bypass road.

25   Q.    And what is the purpose of this bypass road?

1 A. Okay. We know that Monday through Friday, every day, we

2 have about 3,000 vehicles that access Fort Irwin. Um, those

3 vehicles are anywhere from passenger vehicles to large trucks

4 that are hauling, moving and delivering stuff, and we know

5 that the speed differential between those vehicles is

6 significant, especially since the last six to eight miles

7 going into Fort Irwin is a constant uphill.

8   So the specified reason for the bypass road is to

9 separate the large and slow and -- and, uh, heavy vehicles

10 from the passenger vehicles at a certain time during the day

11 to allow people who are utilizing their POVs, private owned

12 vehicles, to get to work, to be on work on time and not have

13 to, uh, be bottled up behind some slower moving traffic and

14 then make some rash decisions about passing and put others in

15 danger.

16   So really, essentially, the road was implemented

17 and is utilized to separate those two types of traffic.

18 Q. Which kind of vehicles primarily use the bypass road?

19 A. Um, the bypass road, if you were to go out there Monday

20 through Friday, you would see school buses, you would see the

21 NTC commuter buses that are taking people to and from

22 Fort Irwin -- actually to Fort Irwin, uh, and then you would

23 see all of the different delivery vehicles, moving vehicles

24 that are bringing people's household goods to the

25 installation. You would see any number of other cargo types

1  of vehicles that would use the bypass road.

2  Q.   Let me show you an exhibit that's been admitted as

3  Exhibit Number 1.  Do you recognize this photograph or this

4  screen shot?

5  A.   I do, yes.

6  Q.   And what does this screen shot depict?

7  A.   Well, as you're -- as you're looking at the photo there,

8  the left-hand portion, it depicts Fort Irwin Road Proper as

9  we call it?  And that's the main road for all of the, uh,

10  passenger vehicles that go onto Fort Irwin.  And then to the

11  lower left center, you'll see a cutoff, and that's the

12  beginning of the bypass road.

13  Q.   Okay.  So just to make sure I understand, uh, so the

14  road that's on the top of that fork, that's the regular

15  Fort Irwin Road?

16  A.   Yes, the one that's labeled Fort Irwin Road is

17  Fort Irwin Road, yes.

18  Q.   Okay.  And the second road to the bottom of it on the

19  picture is the, uh, bypass road.

20  A.   Is the bypass road yes.

21  Q.   Is there a speed limit on the bypass road?

22  A.   There is a speed limit.  It's posted as 45 miles per

23  hour.

24  Q.   And what -- is that the speed limit in June of 2014?

25  A.   Yes.

1    Q.   Okay.  Is there a speed limit on the regular Fort Irwin
2    Road?
3    A.   On the road that's labeled Fort Irwin Road, yes.  Uh,
4    that's 60 miles per hour.
5    Q.   60?
6    A.   60.
7    Q.   Is the bypass road located on federal property?
8    A.   Yes, it is.
9    Q.   Does the California Vehicle Code apply to this part of
10   the road?
11   A.   Yes, it does.
12   Q.   Is there a checkpoint on the bypass road?
13   A.   A checkpoint is established on the bypass road, yes.
14   Q.   Okay.  And what is the purpose of this checkpoint?
15   A.   The checkpoint was implemented to, um -- as I stated
16   earlier, we divert the large, slow, heavy moving traffic off
17   to the bypass road yet we still know we have, uh, one access
18   control point which allows access to the installation.
19        So Monday through Friday, from 06 or 6:00 a.m. in
20   the morning till 8:00 a.m. in the morning, we have whatever
21   vehicles that are on that road stop at that checkpoint from
22   6:00 to 8:00 in the morning, and that allows the rest of the
23   vehicles on Fort Irwin Road, the passenger vehicles and the
24   workers typically, to get to work on time without having to
25   maneuver around the large, slow moving vehicles.

App. 92

1    Q.    And this checkpoint, did it exist in June of 2014?

2    A.    It did, yes.

3    Q.    And what do you physically see at the checkpoint?

4    A.    If you were to drive the bypass road, uh, you would see

5    a checkpoint sign?  It's yellow?  We have a water barrier

6    that's not full of water that allows our people to drag it

7    out into the roadway.  And then on that water barrier, orange

8    water barrier, there's a sign posted that says that there's a

9    checkpoint from 6:00 to 8:00.  Uh, we also put in a

10   port-a-john and a hand washing station there as well.

11   Q.    When the checkpoint is operational, are there personnel,

12   security personnel stationed at the checkpoint?

13   A.    Well, so here's how the checkpoint works.  We have

14   people go out and put the barrier in the road, and if I have

15   enough people, uh, a person will stay there, but they're not

16   actually conducting a checkpoint, if you will.  Uh, they'll

17   put the barrier in the road and then move back up to the

18   access control point, continue processing all the passenger

19   vehicles.  And then prior to 8 o'clock, we'll have people

20   down there, and that's when they'll do their checkpoint

21   operations.

22   Q.    Is there anything placed -- when the checkpoint is

23   operational, is there anything placed on the road to, uh,

24   block part of the traffic?

25   A.    Sure.  On the right-hand side of the, uh, bypass road

```
 1   cause this is a 2-lane road, uh, one way two-lane road
 2   heading north, uh, on the right-hand lane, if you will, uh,
 3   there's an orange barricade, uh, that's placed in -- in the
 4   middle of that lane.
 5   Q.   Let me have you take a look at Exhibit 33.  Is this the
 6   object that you're referring to?
 7   A.   That's the orange water barrier, yes.
 8   Q.   Um, is this the, uh, orange water barrier that was used
 9   in June of 2014 at the checkpoint?
10   A.   Yes, it is.
11   Q.   And is that the same sign that was on the orange water
12   barrier?
13   A.   Seems like, yes.
14   Q.   For that time period?
15   A.   Yes.
16   Q.   Okay.  So outside of 6:00 to 8:00 a.m. Monday through
17   Friday, what is a delivery truck supposed to do when they get
18   to this checkpoint area?
19   A.   There aren't any travel restrictions on the bypass road,
20   um, so whatever trucks are on that road outside those hours
21   that are posted, um, the vehicles that are on the bypass road
22   just continue on up to the access control point.
23   Q.   Are they supposed to stop at the checkpoint outside of
24   the hours listed on the checkpoint?
25   A.   There's nothing to indicate a reason to stop, and no,
```

1    they don't stop.

2    Q.    When the checkpoint is not operational, where is the,

3    uh, orange water barrier stored?

4    A.    Okay.  So this picture, it shows where it's really

5    stored, but it doesn't really give you a real good

6    indication.  But essentially, all we do is, uh, people just

7    drag that out of the middle of the paved roadway and push it

8    off to the shoulder of the road.

9    Q.    Let me have you take a look at Exhibit Number 11,

10    please.  Do you see the, uh, orange water barrier in this

11    photograph?

12    A.    I do, off on the right-hand side, yes.

13    Q.    Okay.  And is that where the water barrier is normally

14    stored when the checkpoint is not operational?

15    A.    Right in or around there, yes.

16    Q.    If you can take a look at Exhibit Number 2, please.  Uh,

17    what does this photograph depict?

18    A.    Okay.  So this is actually, uh, the checkpoint itself,

19    and, you know, we refer to it as a checkpoint.  It's just a

20    place where people stop for a couple of hours before they

21    proceed.  So you see off there in the distance, you'll see

22    the orange barricade that's been placed off to the shoulder,

23    uh, the yellow checkpoint sign and, uh -- and then the

24    port-a-john with, uh -- with the hand washing station.

25    Q.    Um, are you aware of trucks routinely stopping at this

```
1   checkpoint overnight?

2   A.   I am not aware of trucks stopping at that checkpoint

3   overnight, no.

4   Q.   Um, other than defendant's truck, are you aware of any

5   other trucks ever stopping overnight --

6   A.   No.

7   Q.   -- at the checkpoint?

8   A.   No.

9   Q.   And are you familiar with the, uh, time and day of the

10  accident that we're here for the trial?

11  A.   Uh, not the specific day of the week, uh, but I know it

12  was June 2014, yes.

13  Q.   Did you know if at the time of the accident, was the

14  checkpoint operational?

15  A.   The time of the traffic collision, no, the checkpoint

16  was not operational.

17  Q.   Were there any security people, uh, stopping?

18           MR. HARLEY:  Your Honor, I should be objecting.

19           That last question, lack of foundation.

20           THE COURT:  Ask your next question.

21  BY MR. YANG:

22  Q.   Are you aware of any obstacles that prevented the

23  defendant from proceeding directly to the base prior to the

24  accident?

25  A.   No.
```

UNITED STATES DISTRICT COURT

1    Q.   And with the exception of this accident, um, have there

2    been any other major accidents that you are aware of on the,

3    uh, bypass road since 2009?

4    A.   No.

5              MR. YANG:  No further questions.

6              THE COURT:  Mr. Harley.

7                        CROSS-EXAMINATION

8    BY MR. HARLEY:

9    Q.   Sir, are you familiar with the distance from the

10   beginning of Fort Irwin Road up to the entrance of the actual

11   Fort Irwin military installation?

12   A.   The distance from where it diverges?

13   Q.   Right.

14   A.   Until it goes where?

15   Q.   I'm talking about the beginning of Fort Irwin Road down

16   by I-15.

17   A.   Got it.

18   Q.   Okay?  There's a cemetery down there.  Driving

19   Fort Irwin Road all the way up to the main gate of the

20   Fort Irwin military installation, do you have any idea how

21   long that is?

22   A.   Uh, it's over 30 miles.

23   Q.   And you've driven it yourself; is that correct?

24   A.   Yes, I have.

25   Q.   And the speed limit the entire way is 60 miles an hour.

```
 1    A.   The posted speed limit is 65.

 2    Q.   65?

 3    A.   Yes.

 4    Q.   Okay.  Now, when you say the posted speed limit, is

 5    there a traffic and engineering survey done by Caltrans in

 6    order to post that 65-mile per hour speed limit or does the

 7    Department of Defense do that?

 8    A.   The portion of the road that's called Fort Irwin Road

 9    off of the installation is the responsibility of Caltrans.

10    Q.   Okay.  Now, what about where does the federal property

11    start as you're proceeding northbound on Fort Irwin Road?

12    A.   Uh, it stops at a location that people refer to as the

13    tanks.  There's, uh, a couple of tanks on the side of the

14    road.

15    Q.   Well, as you're going northbound on the Fort Irwin Road,

16    does the federal property start before it splits from the

17    main road to the bypass road?

18    A.   No.

19    Q.   Okay.  So sometime after the split we talked about, um,

20    the federal property begins.

21    A.   Yes.

22    Q.   Now, who is responsible for posting the speed limits on

23    the federal property?

24    A.   The Nation Training Center is, yes.

25    Q.   Okay.  That's a different institution than Caltrans.
```

UNITED STATES DISTRICT COURT

1    A.   Yes.

2    Q.   All right.  And I presume the National Training Center

3    had promulgated, uh, these safe speed limits of 65 miles an

4    hour on the main road and 45 miles an hour on the bypass

5    road.

6    A.   Sir, the 65 is off of the installation.  We have nothing

7    to do with the 65 an hour speed limit.

8    Q.   Okay.  And what about the, uh, bypass road?

9    A.   The 45 mile an hour road is -- is our responsibility,

10    yes.

11    Q.   And when you say our responsibility, as far as

12    developing speed limit signs on that bypass road, that's done

13    by the National Training Center.

14    A.   Yes.

15    Q.   As opposed to Caltrans.

16    A.   Yes.

17    Q.   And that's because it's on federal property?

18    A.   Yes.

19    Q.   Now, the rules and regulations, uh, that were in effect

20    as far as speed limits were concerned were in effect from

21    June, uh -- strike that, from January till the end of June in

22    2014; is that correct?

23    A.   I'm not understanding your question.

24    Q.   Okay.  Were there any changes in rules or regulations as

25    far as what lanes the traffic was supposed to be in on this

App. 99

```
 1   bypass road as it's proceeding northbound?
 2   A.   Relative to speed limit or relative to lane of travel?
 3   Q.   Well, we'll start with speed limit.
 4   A.   If people were on the bypass road on the installation --
 5   Q.   Right.
 6   A.   --  they are to be doing -- they were to be traveling at
 7   45 miles an hour.
 8   Q.   All right.  And that's during the entire bypass road.
 9   A.   Yes.
10   Q.   All right.  Now, that entire bypass road is about, what,
11   3.9 miles?
12   A.   It's, uh, right around four miles so yes.
13   Q.   All right.  And during that bypass road, there are
14   posted signs on that bypass road; right?
15   A.   Yes.
16   Q.   And we've talked about some of them.  At the checkpoint,
17   there's a check-in sign; right?
18   A.   Yes.
19   Q.   And then there is a, uh -- a water barrier with signs
20   posted on it; correct?
21   A.   Yes.
22   Q.   And do you know how many speed limit signs there are as
23   a person is proceeding northbound on the bypass road?
24   A.   No, I don't.
25   Q.   All right.  But whatever signs, they would be 45 miles
```

1    an hour.

2    A.    Yes.

3    Q.    And then, uh, also, there are signs out there as to, uh,

4    what vehicles were to travel in what lane of the bypass road;

5    right?

6              MR. YANG:  Objection, Your Honor.

7              Ambiguous as to time.

8              THE COURT:  Sustained.

9    BY MR. HARLEY:

10   Q.    Well, between January and June of 2014, I'm talking

11   about all those months.  Okay?  Were there signs out there

12   telling what vehicles were supposed to be in what lane?

13   A.    There are a couple of signs that say, uh, authorized

14   vehicles only for the left-hand travel lane.

15   Q.    And how many signs were out there saying authorized

16   vehicles in the left-hand lane?

17   A.    Uh, at least a couple.  I don't know the total number.

18   Q.    All right.  And when you say authorized vehicle, what

19   vehicle was authorized to travel in the left lane?

20   A.    School buses, buses delivering soldiers and commuter

21   buses.

22   Q.    Okay.  So essentially . . . bus traffic was authorized

23   into the Number one lane which is the fast lane; right?

24   A.    Yes.

25   Q.    Okay.  And what type of traffic was told to use the

1    Number two lane?

2    A.    There weren't any indications telling people what lane

3    to use other than the authorized vehicles signs.

4    Q.    Okay.  And that only applied to the buses.

5    A.    Yes.

6    Q.    Not semi-tractor-trailers.

7    A.    Correct.

8    Q.    And because semi-tractor-trailers are slower moving;

9    right?

10   A.    Well, not all the time, but in this instance, yes.

11   Q.    And in your opinion, uh, the slower moving

12   tractor-trailers hauling heavy military cargo, uh, should be

13   operated in the Number two lane which is the slower lane;

14   right?

15   A.    Uh, I don't know that I have a -- a basis to offer a

16   good opinion on that.

17   Q.    Well, as your position as director.

18   A.    Sure.

19   Q.    What is your understanding -- as to where these slower

20   moving large tractor-trailers that are hauling military

21   equipment, what lane should they be traveling in, the Number

22   one or the Number two lane?

23   A.    The slow lane.  Yes.

24   Q.    Being the Number two lane.

25   A.    Yes.

1    Q.   Now, was there ever a sign out there telling the bus

2    drivers, either school bus driver and community bus driver

3    and a bus driver of soldiers to travel in the Number two

4    lane?

5    A.   No.

6    Q.   Are you aware of any rule or regulation telling any type

7    of buses -- bus drivers to travel in the Number two lane?

8    A.   No.

9    Q.   Now, you talked about this checkpoint that was

10   operational during the first six months of 2014.  Was there a

11   painted marking on three separate locations on the Number one

12   lane, that's the fast lane, saying bus only?

13            MR. YANG:  Objection, Your Honor.

14            Vague as to time.

15            THE COURT:  Sustained.

16            MR. HARLEY:

17   Q.   All right.  During the month of June, did you become

18   aware of a painted marking on the Number one lane as it

19   proceeds northbound on this bypass road where it's painted

20   bus only?

21            MR. YANG:  Objection, Your Honor.  Vague as to time

22   as to what part of June.

23            MR. HARLEY:  During the entire month of June,

24   Your Honor.

25            THE COURT:  Overruled.

App. 103

```
 1   BY MR. HARLEY:

 2   Q.   That means you can answer.

 3   A.   I know that, but you're asking me again did -- am I

 4   aware of what?

 5   Q.   Of bus only paintings that were put in the middle of the

 6   Number one lane.

 7   A.   Yes.

 8   Q.   And how many bus only paintings were put in the middle

 9   of the Number one lane?

10   A.   I don't know.

11   Q.   All right.  In addition to those bus painting -- the bus

12   only lane, painted Number one lane, there were signs -- at

13   least a couple signs indicating or telling bus drivers that

14   the Number one lane is -- was for authorized vehicles only.

15   A.   Yes.

16   Q.   And pursuant to your policy, uh, is it your

17   understanding that that advisory is communicated to all bus

18   drivers who are using the Fort Irwin Bypass Road?

19        MR. YANG:  Objection, Your Honor.  Vague as to

20   time, whether it's before or after the accident.

21        THE COURT:  Sustained.

22   BY MR. HARLEY:

23   Q.   Well, let's start with before the accident.  Were you

24   ever made aware as to whether or not these signs that were

25   put on the Fort Irwin Bypass Road stating authorized vehicles
```

App. 104

1    only applied to the bus drivers?

2    A.    Yes.

3    Q.    You were aware of that; right?

4    A.    Yes.

5    Q.    And you do have representatives that communicate with

6    these companies, uh, that were run by -- that the bus drivers

7    were working for; is that right?

8    A.    Yes.

9    Q.    And they're representatives from your department going

10   on and sharing this information with the bus drivers and also

11   the companies that are responsible for driving buses to the

12   base; correct?

13   A.    Yes.

14   Q.    Now, this checkpoint was operational start -- well, well

15   before January 2014 and remains operational today; right?

16   A.    Yes.

17   Q.    And so that same time, 6 to 8 o'clock in the morning, is

18   consistent no matter what time of the year it is; correct?

19   A.    Correct.

20   Q.    So when it's 6 o'clock in the morning, if it's during

21   summer hours, it's gonna be completely lit by the sun; right?

22          MR. YANG:  Objection, Your Honor.  Calls for

23   speculation, argumentative.

24          MR. HARLEY:  I think this is something within his

25   knowledge, Your Honor.

```
 1              THE COURT:  Then ask him if he knows.
 2    BY MR. HARLEY:
 3    Q.   Well, do you know whether or not the sun is out by
 4    6 o'clock in the morning in the month of June?
 5    A.   Don't know specifically.
 6    Q.   Well, how about generally using your background and your
 7    common sense?
 8              MR. YANG:  Objection, asked and answered.
 9              THE COURT:  Sustained.
10    BY MR. HARLEY:
11    Q.   Now, how about in the middle of winter?  Let's take
12    January.  Would the sun be out at 6:00 o'clock in the morning
13    when this checkpoint opened up in January?
14              MR. YANG:  Objection, Your Honor.  Same.
15              THE COURT:  Ask him if he knows.
16    BY MR. HARLEY:
17    Q.   Do you know?
18    A.   I don't know specifically, no.
19    Q.   Okay.  Just generally, do you think the sun would be up
20    at 6:00 a.m. in January?
21    A.   At 6:00 o'clock in the morning?
22    Q.   Right.  Or is it still dark out?
23    A.   I don't know specifically.
24    Q.   Well, how about generally.
25    A.   Sir, I -- I don't know what you're asking for here.
```

```
 1    Q.   I'm just asking for your general opinion as to whether
 2    or not you believe the sun would be out on that portion of
 3    the bypass road that you've been working on for a number of
 4    years since 2007.
 5              MR. YANG:  Objection, Your Honor.  Relevancy.
 6              THE COURT:  Sustained.
 7              His opinion is not relevant.
 8    BY MR. HARLEY:
 9    Q.   Do you know one way or the other?  I'm not asking for
10    your opinion.  I just want to know if you know.
11    A.   No, I don't know, sir.
12    Q.   Now, do you know one way or the other . . . as to
13    whether or not -- well, strike that.  How many times, uh,
14    during the year 2014 had you been out to that checkpoint
15    location?
16    A.   Numerous times.
17    Q.   Numerous times?
18    A.   Sure.
19    Q.   And were you out there, uh, before the 6:00 a.m.
20    check-in point?
21    A.   I had been out there before, yes.
22    Q.   And, uh, were you aware that prior to 6:00 a.m. that
23    there were any vehicle traffic tractor-trailer-wise lining up
24    in the Number two lane in preparation of going through the
25    check-in point?
```

UNITED STATES DISTRICT COURT

1    A.    No.

2    Q.    Okay.  And so at exactly 6:00 a.m. every morning, that's

3    when all the traffic would begin parking at that location in

4    order to be inspected.

5    A.    Yes.

6    Q.    And would they remain in that location until 8:00 a.m.?

7    A.    Yes.

8    Q.    And how long was the line of tractor-trailers during

9    this period of time, 6:00 to 8:00?

10   A.    It depends.

11   Q.    Okay.  From what to what?

12   A.    Well, it depends on, uh, day of the week, day of the

13   rotational calendar, number of soldiers coming in, number of

14   soldiers going out.  We've seen zero to, uh, over a hundred.

15   Q.    Tractor-trailers lined up in the Number two lane.

16   A.    Sure.

17   Q.    And if I direct your attention to Monday, June 2nd,

18   would that help give an estimation about how many

19   tractor-trailers were lined up to clear that, uh, checkpoint?

20   A.    That's June 2nd, 2014, I don't have any recollection of

21   how many trucks were on that road.

22   Q.    Now, there is a, uh -- you indicated a porta-potty out

23   there?

24   A.    Yes.

25   Q.    And that's for truckers in case they need to use it?

```
 1   A.   It's for whomever needs to use it, sure.

 2   Q.   Have you ever gone through -- or have your ever stayed

 3   out there at that check-in point to see how long it takes

 4   truckers to get through if they're lined up as far as 100

 5   trucks?

 6   A.   Yes.

 7   Q.   And how long does it generally take for them to get

 8   cleared and through that checkpoint location?

 9   A.   Each truck?

10   Q.   Right, each truck.

11   A.   Process depends on the person.  If they don't have any

12   derogatory background information and their bill of lading

13   lines up, um, it -- and the name check comes back, it's less

14   than five minutes per truck.

15   Q.   And this inspection, it does occur to all the trucks who

16   happen to be lined up; correct?

17   A.   Yes.

18   Q.   Now, a 2008 traffic study revealed that the peak traffic

19   period at the main gate was between 5:00 a.m. and 8:00 a.m.

20   on the weekdays; right?

21   A.   Yes.

22   Q.   And then the vast majority of personnel traveling to the

23   Fort Irwin base for work must report to work, i.e., clear the

24   main gate and be at their desk between 6:00 a.m. and

25   8:00 a.m.; right?
```

1    A.    Yes.

2    Q.    And then the traffic studies you conducted show peak

3    hours between 5:00 a.m. and 8:00 a.m.  Your department

4    personnel were aware based on your own observations that the

5    vast bulk of commercial traffic arrived at the main gate

6    between 6:00 a.m. and 8:00 a.m.; correct?

7    A.    Yes.

8    Q.    And this is because personnel tasked with unloading

9    commercial shipments do not report to work until after

10   6:00 a.m.; right?

11   A.    That was our assumption.

12   Q.    Okay.  So somebody unloading, arriving at the gate, uh,

13   before 6:00 a.m. would not be able to have the assistance of

14   personnel to unload the equipment they were bringing on base;

15   is that correct?

16   A.    Not necessarily.

17   Q.    Okay.  When you say not necessarily, are there personnel

18   tasked with unloading commercial shipments before 6:00 a.m.

19   in the morning?

20   A.    Yes.

21   Q.    And how is that arranged in order for a trucker to get

22   on base before 6:00 a.m.?

23   A.    They either get on before 6:00 or after 8:00.  They

24   don't get on.

25   Q.    Okay.  Now, there's no notification telling the bus

 1    driver that they could proceed to the gate before 6:00 a.m.

 2    in the morning; is that correct?

 3              THE COURT:  You said bus driver.

 4              MR. HARLEY:  I'm sorry, what?

 5              THE COURT:  You said bus drive.

 6              MR. HARLEY:  I apologize.

 7    Q.   There's no -- there's no sign out there telling anybody

 8    it was okay for a bus driver to proceed to the main gate if

 9    he showed up before the 6:00 a.m. check-in pint -- point, is

10    there?

11    A.   You said bus driver.  You want me to answer the question

12    about a bus driver.

13              THE COURT:  You said it again.

14              MR. HARLEY:  Did I say it again?  I apologize.

15    Q.   Is there any sign out there telling -- a long haul

16    trucker with military cargo who's trying to get in the base,

17    is there any sign anywhere on that Fort Irwin Bypass Road

18    telling that trucker if he arrived before 6:00 a.m. to

19    proceed to the main gate?

20    A.   There's no sign.

21    Q.   And was there any sign out there telling a long haul

22    trucker what to do -- after he arrived at 8:00 o'clock what

23    to do?

24    A.   There's no sign.

25    Q.   Now, there does appear to be a telephone number on that

App. 111

1    water barrier; right?

2    A.    Yes.

3    Q.    And that's a telephone to the main gate?

4    A.    Yes, it is.

5    Q.    And what specifically, uh, in your opinion is that there

6    for?

7    A.    It was there just in case somebody had a question?  They

8    could call the main gate.

9    Q.    But in order to utilize that, they would have to stop;

10   correct?

11   A.    In order to see the phone number?

12   Q.    Yes.

13   A.    They would have to stop, yes.

14   Q.    Now, is there a . . .  is there a phone booth or a phone

15   anywhere in the area?

16   A.    On the bypass road, no.

17   Q.    Okay.  And so the only thing out there for truckers is a

18   porta-potty and, uh, a water fountain of some sort?

19   A.    The hand wash station.

20   Q.    And that's for truckers who happen to end up out there?

21   A.    Or whomever might be out there, sure.

22   Q.    But it just happened to be at the check-in point.

23   A.    We put it there specifically for that.

24   Q.    And would that -- it would be a fair statement to say it

25   was put there specifically for the truckers that were

1    stopping there during the checkpoint?

2    A.   Well, the assumption was most of the people that would

3    use it would be those people stopping at the checkpoint,

4    yes --

5    Q.   Okay.

6    A.   -- but other people can use it.

7    Q.   Now, between August 2009 and the completion of the AIE

8    system upgrade to mitigate February 2010, all commercial

9    vehicles and buses were required and in practice did stop,

10   use the bypass road; correct?

11   A.   That's correct.

12   Q.   And during peak hours, this practice of stopping

13   commercial trucks in the right-hand lane for security checks

14   and directing buses to the left-hand of the bypass road

15   worked without incident.  Correct?

16   A.   Yes.

17   Q.   And outside of the hours of 6:00 a.m. and 8:00 a.m. on

18   weekdays, the temporary checkpoint was not in effect;

19   correct?

20   A.   It wasn't operational, yes.

21   Q.   And then the trucks could proceed to the main gate using

22   the bypass road without stopping; correct?  Correct?

23   A.   When?

24   Q.   After the 8:00 a.m. cut-off.

25   A.   Yes.

UNITED STATES DISTRICT COURT

1  Q.    Now, additionally, during non-peak hours, buses

2  continued to use the left lane bypass road; correct?

3  A.    They used the bypass road, yes.

4  Q.    And specifically during non-peak hours, buses continued

5  to use the left-hand lane of the bypass road; right?

6  A.    They used whatever lane they wanted to outside those

7  operational hours.

8  Q.    But isn't it true specifically during non-peak hours,

9  buses continued to use the left lane of the bypass road to

10  proceed to the main gate?  Isn't that a true statement?

11          MR. YANG:  Objection, Your Honor.

12          Vague as to non-peak hours.

13          THE COURT:  Overruled.

14          THE WITNESS:  Restate it, please?

15  BY MR. HARLEY:

16  Q.    During non-peak hours, buses continued to use the left

17  lane of the bypass road to proceed to the main gate.

18  A.    Yes.

19  Q.    So isn't it true that during peak hours as well as

20  non-peak hours, buses continued to use the left lane of the

21  bypass road both during non-peak and peak hours?

22  A.    Peak hours at the bypass road, yes, they would use the

23  left-hand lane.

24  Q.    Now, while this . . . was there ever any rule or

25  regulation telling bus drivers to use the Number two lane?

```
 1              THE COURT:  Asked and answered.
 2              MR. HARLEY:  All right.
 3   Q.   Now, while this is operational and these trucks --
 4   excuse me.  During this check-in point, the only lanes that
 5   these truckers were supposed to be stopping in was the Number
 6   two lane; right?
 7   A.   The right-hand lane, yes.
 8   Q.   Right.  They were not supposed to be stopping in the
 9   Number one lane, the left-hand lane; right?
10   A.   Correct.
11   Q.   Because that was being used for the buses that were
12   going northbound on the Number one lane; correct?
13   A.   Yes.
14              MR. HARLEY:  Could I have a moment Your Honor?
15              I think I'm done.
16              THE COURT:  Yes.
17              MR. HARLEY:  I have nothing further.
18              THE COURT:  Redirect?
19              MR. YANG:  Thank you, Your Honor.
20                     REDIRECT EXAMINATION
21   BY MR. YANG:
22   Q.   Mr. Butolph, let me direct your attention to the
23   discussion regarding this, uh, authorized vehicle only sign.
24   You recall that discussion?
25   A.   Yes.
```

```
 1   Q.   Okay.  Um, when was -- do you know when that sign was
 2   placed at the checkpoint?
 3   A.   The signs for authorized vehicles were placed at the
 4   time we implemented the bypass road.
 5   Q.   Um, and that sign, um, does it mean that buses were
 6   required to use the left lane between 6:00 to 8:00 a.m.?
 7            MR. HARLEY:  Objection, Your Honor.  Leading,
 8   suggestive.
 9            THE COURT:  Overruled.
10   BY MR. YANG:
11   Q.   Between 6:00 to 8:00 a.m. Mondays through Fridays, were
12   buses required to use the left lane?
13   A.   Only at that checkpoint area.  That's the reason we put
14   the signs up there, to allow the buses to bypass that
15   operations to continue forward without being stopped.
16   Q.   I'm asking you do you see the distinction between, um,
17   allowed versus required?
18   A.   Yes.
19   Q.   Okay.  So were buses allowed to use the left lane under
20   that sign in -- during those hours?
21   A.   Yes, they were.
22   Q.   Okay.  But were they required to use that lane?  The
23   left lane.
24   A.   During 6:00 to 8:00?
25   Q.   Yes.
```

1   A.   Monday through Friday?  Yes.

2   Q.   Okay.  Outside of the, uh, 6:00 to 8:00 a.m. on Mondays

3   through Fridays, could the bus travel in any lane?

4   A.   There were no restrictions on travel of any lane outside

5   6:00 to 8:00.

6            MR. YANG:  No further questions, Your Honor.

7            THE COURT:  Mr. Harley?

8                     RECROSS-EXAMINATION

9   BY MR. HARLEY:

10  Q.   Are you aware of anybody telling any one of these bus

11  companies that the buses were to use only the Number two

12  lane?  Are you aware of anything like that?

13  A.   No.

14  Q.   Are you aware of any rule or regulation promulgated by

15  the NTC that required the bus driver to use low beams and

16  never to use high beams?

17  A.   No.

18  Q.   And you are certain that nobody from your organization

19  ever told any bus driver or any bus company that the bus

20  drivers had to use the Number two lane only.

21  A.   Correct.

22            MR. HARLEY:  Nothing further.

23            THE COURT:  You may step down.  Thank you.

24            Mr. Yang.

25            MR. YANG:  Your Honor, the United States calls

# Exhibit A-4

# Testimony of Paul Gray
(Direct Examination)
ECF 141 at 44-84
September 26, 2018 (P.M. Session)

UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

- - -

HONORABLE JESUS G. BERNAL
UNITED STATES DISTRICT JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,        )
                                 )
              PLAINTIFF,          )
                                 )
VS.                              )    CASE NO.:
                                 )    ED CR 16-0024-JGB
STEVEN KILTY,                    )
                                 )
              DEFENDANT.          )
                                 )
_____)



REPORTER'S TRANSCRIPT OF PROCEEDINGS

(P.M. SESSION)

WEDNESDAY, SEPTEMBER 26, 2018

LOS ANGELES, CALIFORNIA










LAURA MILLER ELIAS, CSR 10019
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, ROOM 4455
LOS ANGELES, CALIFORNIA 90012
PH:  (213)894-0374

App. 119

```
 1     APPEARANCES OF COUNSEL:
 2
 3     ON BEHALF OF PLAINTIFF:
 4              UNITED STATES ATTORNEY'S OFFICE
 5              BY: PAUL D. LEVERS
 6                  JERRY YANG
 7              ASSISTANT UNITED STATES ATTORNEY
 8              RIVERSIDE, CALIFORNIA
 9
10
11     ON BEHALF OF DEFENDANT:
12
13              ROBISON DOOLING HARLEY, JR., ESQ.
14
15
16
17
18
19
20
21
22
23
24
25
```

UNITED STATES DISTRICT COURT

```
1                              INDEX

2

3    WITNESSES FOR
     THE GOVERNMENT:
4                          DIRECT     CROSS      REDIRECT     RECROSS

5    BUTOLPH, MICHAEL

6    BY:  MR. YANG        4                        34
     BY:  MR. HARLEY               16                          36
7

8    CHANGSRI, CHANIKARN

9    BY:  MR. YANG       37

10

11   GRAY, PAUL

     BY:  MR. LEVERS     44
12   BY:  MR. HARLEY             84, 110

13

14   SOBIESIAK, DONNA

15   BY:  MR. YANG      105

16          EXHIBITS            RECEIVED

17          (NONE OFFERED)

18

19

20

21

22

23

24

25
```

```
 1                    THE WITNESS:  Thank you.
 2                    MR. LEVERS:  The United States calls Paul Gray to
 3   the stand.
 4                    THE CLERK:  Please raise your right hand.
 5                         (Witness sworn.)
 6                    THE CLERK:  Please be seated.
 7               State your name and spell your last name for the
 8   record.
 9                    THE WITNESS:  My name is Paul Gray.  Last name is
10   spelled G-r-a-y.
11                         DIRECT EXAMINATION
12   BY MR. LEVERS:
13   Q.   Good afternoon, Mr. Gray.
14   A.   Good afternoon.
15   Q.   Now, did you used to work for the California Highway
16   Patrol?
17   A.   Yes, I did.  I'm since retired.
18   Q.   When did you retire?
19   A.   Uh, two months ago.
20   Q.   Congratulations.
21   A.   Thank you.
22   Q.   How long did you work for the California Highway Patrol?
23   A.   It was just around 18-and-a-half years.
24   Q.   And during that time, what position did you hold with
25   highway patrol?
```

1    A.   Well, when I first got out of the Academy, I was an

2    officer, patrol officer in San Jose, and I transferred to

3    East L.A. after about a year-and-a-half, um, I was a patrol

4    officer there, and then moved into various positions while I

5    was at East L.A. including an accident review officer, also a

6    field training officer.  And in approximately 2006, 2007, I

7    started advancing in my accident investigation training and

8    eventually moved into what we call the MAIT unit which is an

9    acronym for Multi-Disciplinary Accident Investigation Team.

10   Q.   Now, even before you were on the MAIT team, was

11   investigating accidents part of your job as a patrol officer?

12   A.   It was, yes.

13   Q.   Approximately how many accidents would you say you

14   investigated?

15   A.   Somewhere in the neighborhood 400.

16   Q.   And you said that after that, you were an accident

17   review officer; right?

18   A.   Yes.

19   Q.   What is that?

20   A.   Um, at various times, I would be assigned -- and it's

21   basically a desk job where I would receive -- sometimes there

22   were two of us that were doing it, but at times, it was just

23   myself.  I'd receive the investigations that the field

24   officers would take, and I would review them sometimes just

25   for grammar and accuracy but often times, it was also for to

App. 123

 1    see if they got the correct cause of the accident, um, just

 2    basically checking for accuracy within the reports

 3    themselves.

 4    Q.   Would you say it's kind of like a supervisory role when

 5    it comes to accidents over the patrol officers?

 6    A.   In the sense that I had ability to send it back to them

 7    for corrections or suggestions.

 8    Q.   And you said in 2007, you started with the MAIT unit.

 9    A.   Yes.

10    Q.   Can you tell us a little bit more what exactly the MAIT

11    unit is?

12    A.   Sure.  There's eight MAIT units throughout the state.

13    There's one in each division, and then also our headquarters

14    has a MAIT unit.  Basically, they are small units, typically

15    anywhere between three to five, sometimes six officers.  A

16    sergeant is on the team as well.  There's also a Caltrans

17    engineer that's assigned to the team and also a mechanic or a

18    motor carrier.

19         As far as the MAIT teams go, we are the accident

20    reconstructionist for the department.  We're called to major

21    collisions.  We're called to investigate perhaps a patrol

22    vehicle collision, anything that's a little bit more than a

23    typical road patrol officer can handle in their

24    investigation.

25    Q.   Now, in order to get on the MAIT team, are they -- do

App. 124

1    they usually hire people that are already experienced patrol

2    officers like yourself?

3    A.    Yes.

4    Q.    And are there any specific qualifications to be on the

5    MAIT team?

6    A.    There are.  And there's an intern or a -- well, there's

7    a year-long internship that we have to do in order to even

8    get onto the team itself.  Along with that, there's training

9    that we have to -- certain benchmarks that we have to meet in

10   order to even apply.

11   Q.    And specifically as to yourself, what training and

12   experience did you have just to get on the MAIT team?

13   A.    The -- well, as far as accident investigation goes,

14   we're all trained in the Academy with the basic accident

15   investigation.  In order to get on the MAIT team, obviously

16   you need more than that.  So the next level of training is

17   intermediate accident investigation.  Then they have an

18   advanced course, an advanced accident investigation.

19          From there, we have to take a qualifying exam in

20   order to start in what we call the TAR program or the Traffic

21   Accident Reconstruction program.  That program has two-week

22   long courses so it's basically a month course that trains us

23   in traffic accident reconstruction.

24          From there, if we pass all those classes

25   successfully, we get into an internship with a MAIT unit for

1    a year, that's required, and then we have to be recommended

2    for the ability to take the test.  And then there's a

3    qualifying test in order to get into the MAIT or the Traffic

4    Accident Reconstruction unit or system within the highway

5    patrol.

6    Q.    And did you do all that training?

7    A.    I did.

8    Q.    And did you do your one-year internship?

9    A.    Yes.

10   Q.    And did you pass the test?

11   A.    Yes.

12   Q.    And between 2007 and 2014, did you do any continuing

13   education or continuing training in traffic accidents?

14   A.    I did.  That's part of the -- that's part of -- in order

15   to stay on the MAIT unit is we have to do continuing

16   education.  Along with that, I'm also accredited with what we

17   call ACTAR which is the Accreditation Commission of Traffic

18   Accident Reconstructionists, and that's a national

19   accreditation committee.  And with that, I also do continuing

20   education in order to keep that accreditation.

21   Q.    Now, over the course of just your time in MAIT, I'm not

22   talking about accidents when you were a patrol officer, just

23   your time in MAIT from 2007 until you retired, approximately

24   how many major collisions did you investigate?

25   A.    Just in MAIT, I would say somewhere in the neighborhood

1  of four to 500.

2  Q.  Now, I'm going to direct your attention specifically to

3  June 2nd, 2014.  Are you familiar with the facts of a fatal

4  collision that occurred on the Fort Irwin Bypass Road on that

5  date?

6  A.  I am.

7  Q.  Now, was this collision initially investigated by the

8  U.S. Army, I believe the CID team?

9  A.  It was along with the Fort Irwin Police Department.

10  Q.  And was the CHP asked to assist in that investigation in

11  May of 2015?

12  A.  In -- yes, May of 2015.

13  Q.  And did you do so?

14  A.  Yes.

15  Q.  Okay.  And is -- among law enforcement in the region, is

16  MAIT kind of considered the -- the biggest expert when it

17  comes to traffic collisions?

18  A.  Can you repeat that?  I'm sorry.

19  Q.  I'm saying among the regional law enforcement agencies,

20  is MAIT kind of the specialist when it comes to traffic

21  collision?

22  A.  Well, we certainly do -- we certainly assist allied

23  agencies in traffic accident investigations.  There are some

24  departments within our jurisdiction -- oh, I'm sorry, within

25  our area that have some further training, um, but, yes in a

| | |
|---|---|
| 1 | general sense, we are -- we are looked upon or we are sought |
| 2 | out after as far as to get, you know, some more advice on |
| 3 | traffic accident investigation. |
| 4 | Q.   So, for example, it might not be uncommon for a small |
| 5 | police agency that didn't have a traffic specialist to call |
| 6 | you guys in on a major accident. |
| 7 | A.   Yes. |
| 8 | Q.   And you -- as part of your role, you would go help out |
| 9 | and investigate. |
| 10 | A.   True. |
| 11 | Q.   Okay.  And you went out and investigated on this case |
| 12 | starting in May of 2015. |
| 13 | A.   Yes. |
| 14 | Q.   Now, what information did you review as part of your |
| 15 | investigation? |
| 16 | A.   In May when we began -- or when we got this case, we |
| 17 | were given -- obviously, we were given all the reports.  The |
| 18 | reports that were generated from CID and also Fort Irwin |
| 19 | Police Department, we were given them, the photographs that |
| 20 | they took.  We weren't given physical control of any |
| 21 | evidence, but we were advised of what evidence they did have. |
| 22 | There were, uh -- there was a video that came with the packet |
| 23 | that we received from them. |
| 24 | I'm trying to remember. |
| 25 | Uh, we did go out there, and I can't recall.  I |

```
1   believe it was sometime in May, we went out to Fort Irwin and
2   met with the CID and the Fort Irwin Police Department
3   investigators.  We looked at the scene.  We measured the
4   scene out on that day.  I believe it was that day, it might
5   have been a subsequent day when we measured the scene.
6   Q.   Did you also examine the bus?
7   A.   We did examine the bus.  It wasn't on that particular
8   day, but we had an opportunity to go to the Victor Valley
9   Transit bus yard and evaluate the bus on that time.
10  Q.   Okay.  Well, let's start at the beginning then.  Where
11  did this collision occur?
12  A.   This collision occurred on the -- what they consider or
13  what they call the bypass road.  Uh, a it's a road that is --
14  it could be a frontage road or adjacent to Fort Irwin Road
15  that goes into the Fort Irwin army base, and that was --
16  that's where the collision occurred, on that bypass rode.
17  Q.   I'm going to direct your attention to Exhibit Number 2.
18  Is this the location -- does it appear to be the location of
19  where the accident occurred?
20  A.   Yes.
21  Q.   And is that what you call the check-in point right
22  there?
23  A.   That is what is called the check-in point, yes.
24  Q.   Okay.  And does this road consist of two moving lanes of
25  traffic?
```

```
 1   A.   It does.
 2   Q.   As you sometimes -- do you sometimes refer to the fast
 3   lane as the Number one lane and the slow lane and the Number
 4   two lane?
 5   A.   That's correct.
 6   Q.   We're talking about fast and slow lane.  Just different
 7   terminology; right?
 8   A.   Yes.
 9   Q.   Okay.  Now, as part of your investigation, were you able
10   to determine where the truck had been parked on the bypass
11   road?
12   A.   Yes.
13   Q.   I'm going to direct your attention to Exhibit 8.  Does
14   this picture accurately depict where the truck was parked on
15   the bypass road?
16   A.   It does, yes.
17   Q.   Was he parked in a moving lane of traffic?
18   A.   Yes.
19   Q.   Okay.  That's the slow lane; right?
20   A.   Correct.
21   Q.   All right.  And was he parked on the shoulder or was he
22   parked actually in the lane?
23   A.   In the lane.
24   Q.   Now, you mentioned that you've actually inspected the
25   scene of this accident; is that correct?
```

1    A.    Yes.

2    Q.    Okay.  So does that road have a shoulder next to it?

3    A.    It does.  On both -- on both sides of the roadway, there

4    are -- there is a shoulder.

5    Q.    And that can be seen in both of these pictures off to

6    the side of the landing.  I believe the white car is parked

7    on the shoulder on the right side; is that correct?

8    A.    Well, yes.  Looking on -- at this photograph, it'd be

9    in -- in the left of -- of the, uh -- to the truck, the big

10   rig.  But there's also a shoulder just to the right of the

11   yellow line that's on the right of the roadway.

12   Q.    Is that shoulder what's also sometimes called an

13   emergency lane?

14   A.    It can be, yes.

15   Q.    And was this shoulder wide enough to accommodate a

16   tractor-trailer parking?

17   A.    Yes.

18   Q.    Are you aware of any reason why the defendant would not

19   have been able to pull and park on the shoulder of the road,

20   either shoulder along this road?

21   A.    No.

22   Q.    Now, based on your investigation, was the defendant a

23   licensed commercial truck driver?

24   A.    Yes.

25   Q.    I'd like to direct your attention to Exhibit 38, page

UNITED STATES DISTRICT COURT

1    13.   I'm sorry.   Exhibit 38, page 2.   According to the

2    Wisconsin DMV record, when did the defendant first obtain his

3    permit to drive a commercial vehicle?

4    A.   Thank you.   Uh, it appears from this document in, uh,

5    January of 2002.

6    Q.   So approximately 12-and-a-half years prior to this

7    accident.

8    A.   Yes.

9    Q.   Now, are you familiar with commercial versus general

10    license, vehicle license holders based on your experience?

11    A.   Uh, I'm familiar.   Yes.

12    Q.   Do drivers who hold a commercial license receive more

13    training on road safety than the average driver?

14    A.   Yes.

15    Q.   Is part of that training focused on the increased

16    hazards a large commercial vehicle may pose to other

17    vehicles?

18    A.   Yes.

19    Q.   Now, were you able to obtain from the Wisconsin DMV the

20    commercial driver's license that was in effect at the time

21    the defendant obtained his commercial permit and license?

22    I'm sorry, I didn't -- I didn't ask that very clearly.   Um,

23    have you seen a copy of the driver's license manual he would

24    have to review to get his license, the one they were using in

25    Wisconsin?

```
 1    A.    Yes.

 2    Q.    Okay.  Directing your attention to Exhibit 37, is that

 3    the Wisconsin driver's manual?

 4    A.    It is, yes.

 5    Q.    For commercial drivers?

 6    A.    Yes.

 7    Q.    And you've reviewed it.

 8    A.    Uh, portions of it, yes.

 9    Q.    Specifically, I'm gonna direct your attention to page 6.

10    And you have a book up there if that would be easier to look

11    at?

12    A.    Yeah.  If you could direct me to which book?

13    Q.    It's going to look like this.

14              THE COURT:  Tab 37.

15              THE WITNESS:  Thank you, sir.

16    BY MR. LEVERS:

17    Q.    It'll say six of 20 on the bottom right-hand corner of

18    the page.

19    A.    I see it, yes.

20    Q.    Does this specifically contain a section under

21    communicating your presence about when it's hard to see which

22    starts at dawn or dusk or in rain or snow, you need to make

23    yourself easier to see?

24    A.    It does, yes.

25    Q.    And can you read allowed what that says?
```

1    A.    Yes.  Uh, in bold, it says when it is hard to see, and

2    then after that, it says at dawn or dusk, in -- or in rain or

3    snow, you need to make yourself easier to see.  If you're

4    having other trouble seeing other vehicles, other drivers

5    will have trouble seeing you.  Turn on your lights.  Use the

6    headlights, not just the identification or clearance lights.

7    Use the low beams.  High beams can bother people in, uh -- in

8    the daytime as at night.

9    Q.    And is there a section underneath that that states when

10   parked at the side of the road, when you pull off the road

11   and stop, be sure to turn on the four-way emergency flashers?

12   This is important at night.  Drivers have crashed through the

13   rear of a parked vehicle because they thought it was moving

14   normally?

15   A.    Yes.

16   Q.    And under that, is there a section that says if you must

17   stop on a road or the shoulder of a road, you should put out

18   your --

19              THE COURT REPORTER:  I'm sorry, Counsel.  Could you

20   slow down just a little bit?

21              MR. LEVERS:  I'm sorry.

22              THE COURT REPORTER:  Thank you.

23   BY MR. LEVERS:

24   Q.    Is there a section that says if you must stop on a road

25   or the shoulder of a road, you should put out your reflective

 1    triangles within ten minutes?  Place your warning signs at
 2    the following location and then provide instructions on
 3    placing the triangles?
 4    A.   It does, yes.
 5    Q.   Now, specifically on page 8 . . .  on page 8,
 6    Figure 2-10, does it specifically provide an example of how
 7    to put out those cones if you have to stop on a one-way
 8    highway?
 9    A.   It gives an example of how to do that, yes.
10    Q.   And it shows that you put out triangles ten feet behind
11    your vehicle, 100 feet behind your vehicle and then 100 feet
12    behind that; is that correct?
13    A.   That is correct.
14    Q.   And on page -- going back to page 7, it specifically
15    says that and references Figure 2-10, is that correct, saying
16    if you must stop on a one-way or divided highway, place one
17    device that is ten feet, 100 feet and 200 feet towards the
18    approaching traffic?
19    A.   Yes.
20    Q.   Thank you.  Now, does this handbook minimum the
21    California Vehicle Code requirements?
22    A.   It does.
23    Q.   Now, specifically, when a commercial driver crosses
24    state lines, are they required to follow the vehicle code of
25    the state they're in?

App. 135

1   A.    Yes.

2   Q.    So if you're a California driver, and you're in Texas,

3   you have to follow Texas rules; right?

4   A.    That's correct.

5   Q.    But in this case, it appears the rules he was trained on

6   are the same as the rules here in this regard.

7   A.    Yes.

8   Q.    Now, talking about dawn or dusk as is mentioned in here,

9   it is harder to see vehicles at dawn or dusk?

10  A.    It is.

11  Q.    Why?

12  A.    Uh, well, specifically, the lighting is less at that

13  particular time.  There's also other reasons such as, uh, a

14  contrast.  Um, perhaps if there's any type of . . .  well,

15  I'll just leave it at as far as the lighting goes and

16  contrast, that's why it's harder to see at dawn or dusk.

17  Q.    It's those periods of changing light?

18  A.    Yes.

19  Q.    Now, we're talking about the California Vehicle Code.

20  I'm gonna refer you to Exhibit Number 3.  Can you please read

21  Section a of California Vehicle Code 25300 sub a?

22  A.    Yes.  Every vehicle which if operated during darkness

23  would be subject to the requirements of Section 25100 and

24  every truck tractor irrespective of width shall at all times

25  be equipped with at least three red emergency reflectors.

1   The reflectors need to be carried by only one vehicle in

2   combination.

3   Q.   And what does Section C say on that same statute?

4   A.   When the vehicle is disabled or parked off the roadway

5   but within ten feet thereof during darkness, warning

6   reflectors of the type specified in Subdivision A shall be

7   immediately placed by the driver as follows:  One at a

8   distance of approximately 200 feet and one at a distance of

9   approximately 100 feet to the rear of the vehicle and one at

10  the traffic side of the vehicle not more than ten feet to

11  rear of the vehicle.

12       The reflectors shall, if possible, be placed

13  between the edges of the roadway and the vehicle but in no

14  event less than two feet to the left of the widest portion of

15  the vehicle or load thereon.

16  Q.   So the California Vehicle Code requires commercial

17  drivers to carry those red emergency reflectors.

18  A.   It does.

19  Q.   And is it also required then to place those reflectors

20  when parked within ten feet of the edge of the road?

21  A.   Yes.

22  Q.   Now, did you view the video from the bus of the

23  collision?

24  A.   I did.

25  Q.   I'm gonna draw your attention to Exhibit 6.  Now, you've

1    also seen some still pictures from that video; is that

2    correct?

3    A.    Yes.

4    Q.    I'm gonna draw your attention to Exhibit 6C.

5                MR. LEVERS:  One moment please, Your Honor.

6                THE COURT:  Why don't we take our recess at this

7    time, and you can figure that out.

8                Ladies and gentlemen, we'll be in recess for about

9    10, 15 minutes.  During that time, please do not discuss the

10   case with anybody including amongst yourselves.  Do not let

11   anybody else discuss the case with you, keep an open mind,

12   and do not in any way try to learn about this case.  We'll be

13   in recess for about ten minutes.

14               THE CLERK:  All rise for the jury.

15                         (Jury not present.)

16               THE COURT:  You may step down, sir.

17                          (Recess taken.)

18               THE COURT:  Mr. Gray, you are still under oath.

19               Do you understand that?

20               THE WITNESS:  Yes.

21               THE COURT:  Please proceed.

22   BY MR. LEVERS:

23   Q.    Is that still frame from the video you reviewed,

24   Exhibit 6C?

25   A.    It appears to be, yes.

1   Q.   And based on that picture and the video in its entirety,

2   did Mr. Kilty deploy any warning reflectors behind his truck?

3   A.   No.

4   Q.   Any cones?

5   A.   No.

6   Q.   Any flares?

7   A.   No.

8   Q.   From the video were you able to determine whether the

9   defendant had his taillights on or off?

10  A.   Off.

11  Q.   Now, the statute referenced before 25300, did the

12  defendant violate Vehicle Code Section 25300 C when he parked

13  his truck in the moving lane without deploying any warning

14  reflectors?

15  A.   Yes.

16  Q.   Now, directing your attention to Exhibit 44.  Is this an

17  example of one way a truck might put out reflecting triangles

18  to indicate its presence?

19  A.   Yes.

20  Q.   Did the defendant do anything remotely similar to this

21  in this instance?

22  A.   No.

23  Q.   Now, does the California Vehicle Code also prohibit

24  impeding or blocking of a roadway?

25  A.   It does, yes.

UNITED STATES DISTRICT COURT

```
 1    Q.   Directing your attention to Exhibit 4.  I'm showing you
 2    California Vehicle Code Section 22400.  Can you please read
 3    it aloud?
 4    A.   Yes, sir.  2400 A:  No person shall drive upon a highway
 5    at such a slow speed as to impede or block the normal and
 6    reasonable movement of traffic unless the reduced speed is
 7    necessary for safe operation because of a grade or in
 8    compliance with law.
 9         No person shall bring a vehicle to a complete stop
10    upon a highway so as to impede or block the normal and
11    reasonable movement of traffic unless the stop is necessary
12    for safe operation or in compliance with law.
13    Q.   Are you aware of any facts in this case that would have
14    required the defendant to stop for safe operation or in
15    compliance with the law?
16    A.   No.
17    Q.   Based on that is it your opinion the defendant was in
18    violation of California Vehicle Code 22400 A?
19    A.   Yes.
20    Q.   Now, we mentioned earlier that as part of your
21    investigation, you examined the bus that was involved in the
22    collision?
23    A.   Yes.
24    Q.   Directing your attention to Exhibit 12, is this the bus
25    as it was when you examined it?
```

UNITED STATES DISTRICT COURT

1   A.   Yes.

2   Q.   Obviously, this isn't out on the bypass road.  Where was

3   this at?

4   A.   This was at the, I believe it's the Victor Valley

5   Transit main yard.  I'm not entirely sure, but I know it was

6   the Victor Valley Transit facility.

7   Q.   I'm also going to direction your attention sequentially

8   to Exhibit 13, Exhibit 14.  Is this a picture of a similar

9   bus to the bus that Ms. Aguilar was driving?

10  A.   Yes.

11  Q.   I think it was referred to as the exemplar bus, an

12  example of what the bus looked like?

13  A.   Correct.

14  Q.   Exhibit 15.  Is this also the same type of bus she was

15  driving?

16  A.   Yes.

17  Q.   Exhibit 16.  And that's once again is the bus that was

18  in the accident; correct?

19  A.   Correct.

20  Q.   Exhibit 17.  That's a bit of a closer shot of that same

21  bus?

22  A.   Yes.

23  Q.   Exhibit 18.  What's that a picture of?

24  A.   This is just a much closer shot of the bus.  I believe

25  this is up towards where the front entry door would be, but

```
 1    I'm not certain.
 2    Q.    Exhibit 19.  Is that a picture of the inside of the bus?
 3    A.    It is, yes.
 4    Q.    And I believe that picture was actually taken at the
 5    check in point?
 6    A.    At the scene of the collision, yes.
 7    Q.    And is the white bag there in the middle, the bag
 8    covering the body of the decedent, Mr. Keiper?
 9    A.    I don't know for sure.
10    Q.    Exhibit 20.  Is that also a picture of the inside of the
11    bus?
12    A.    Yes.
13    Q.    Exhibit 21.  What's that a picture of?
14    A.    That's also from an inside perspective of the bus.  That
15    particular picture is at the transit yard.
16    Q.    And Exhibit 22.  Also a picture of the bus; correct?
17    A.    Correct.
18    Q.    Now, do these pictures accurately depict two things?
19    One, the example bus that was like the bus that Ms. Aguilar
20    was driving as well as the actual bus after the accident?
21    A.    Yes.
22    Q.    Now, as part of your investigation, did you also
23    investigate the condition of the roadway?
24    A.    Yes.
25    Q.    Turning you back to Exhibit 2.  And this is the location
```

App. 142

1   where the collision occurred?

2   A.   That's correct.

3   Q.   And does it consist of two moving lanes?

4   A.   Yes.

5   Q.   Both moving in the same direction?

6   A.   Yes.

7   Q.   Now, did you also observe signage in the area of the

8   collision?

9   A.   I did.

10   Q.   Do you know what the signage was like at the time of the

11   accident?

12   A.   I don't have personal knowledge of what the signage was

13   like at the time of the accident.  I was told some time later

14   what it was.

15   Q.   And I believe there was a sign saying authorized

16   vehicles here for the left lane?

17   A.   Something similar to that, yes.

18   Q.   And by the time you went out there, there was also lines

19   painted that said bus only left lane; is that correct?

20   A.   Yes.

21   Q.   So based on the report was that bus only signage there

22   at the time of the accident?

23          MR. HARLEY:  Objection.  Lack of foundation.

24          THE COURT:  Sustained.

25   BY MR. LEVERS:

1  Q.  When you reviewed the report, you reviewed the report to

2  base your opinion on, you reviewed the report from Army CID

3  officers; is that correct?

4  A.  I did, yes.

5  Q.  At the time of the accident was there any mention in

6  that report of those bus only markings being there?

7           MR. HARLEY:  Same objection, Your Honor.  Still

8  lack of foundation.  It relies on hearsay.

9           THE COURT:  Sustained on hearsay.

10 BY MR. LEVERS:

11 Q.  Now, are you aware of any laws or regulations that

12 required buses to travel in the left lane?

13 A.  No.

14 Q.  And based on your examination of the scene and your

15 knowledge of the law, was Ms. Aguilar doing anything wrong

16 legally by traveling in the right lane?

17 A.  No.

18 Q.  She was allowed to travel in that lane?

19 A.  Correct.

20 Q.  An analogy might be, for example, the carpool lane.  You

21 can travel in the carpool if you're a carpool, but you don't

22 have to; right?

23 A.  That's correct.

24           MR. HARLEY:  Objection.  Irrelevant.

25           THE COURT:  Overruled.

App. 144

```
 1   BY MR. LEVERS:
 2   Q.   Was she acting lawfully at the time of this incident?
 3   A.   Yes.
 4           MR. HARLEY:  Objection.  Conclusion of law,
 5   inadmissible conclusion of law.
 6           THE COURT:  Overruled.  You may answer.
 7           MR. LEVERS:  I believe he already answered,
 8   Your Honor.
 9   Q.   Turning your attention to Exhibit 10.  Does this exhibit
10   accurately depict the scene of the accident at the time of
11   the accident or shortly thereafter?
12   A.   It shows some of the scene of where the collision
13   occurred, yes.
14   Q.   And next to -- next to the truck, there was a sign off
15   on the side of the road that said trucks stop here, hours
16   6:00 a.m. to 8:00 a.m. Monday through Friday and a number for
17   the main gate; is that correct?
18   A.   Correct.
19   Q.   Now, what time did this collision occur?
20   A.   From my recollection --
21           MR. HARLEY:  Objection.  Lack of foundation.  No
22   personal knowledge.
23           THE COURT:  Sustained.
24           MR. LEVERS:  Your Honor, may I be heard side bar on
25   that?
```

```
1              THE COURT:  Just ask another question.
2    BY MR. LEVERS:
3    Q.   Based on your review of the documentation that you used
4    in preparing your expert opinion, did you use the number that
5    the collision occurred at 5:06 a.m.?
6              MR. HARLEY:  Your Honor, I'm going to object.  Lack
7    of foundation.  Hearsay.  Crawford v. Washington.
8              THE COURT:  Overruled.
9              THE WITNESS:  Yes.
10   BY MR. LEVERS:
11   Q.   And at 5:06 a.m., would this checkpoint have been
12   operational?
13   A.   No.
14   Q.   And was there anything about this checkpoint, any of the
15   signage, that would legally require a truck driver to stop in
16   the middle of the slow lane overnight?
17   A.   No.
18   Q.   And is there anything about this sign that changes any
19   of the vehicle codes you've just told us about?
20   A.   No.
21   Q.   So the sign does not preempt the Vehicle Code?
22   A.   That's correct.
23   Q.   And even if a driver were responding to this sign or
24   another sign, would they still be legally required to use
25   warning devices to alert other drivers of their presence?
```

1    A.    That depends.

2    Q.    If they stopped in that lane at night with a truck?

3    A.    Yes.

4    Q.    They would still be required to use warning devices?

5    A.    That's correct.

6    Q.    And based on your experience as a CHP officer and your

7    training, do you consider this sign as giving a lawful order

8    to anyone to stop in the middle of the road?

9    A.    No.

10   Q.    Now, did you also consider the weather at the time of

11   the collision?

12   A.    Oh, as far as our report and our investigation, we

13   looked back at the history on that day of the collision to

14   see what the weather was, yes.

15   Q.    And what did you learn?

16   A.    Um, I don't remember.  I don't recall specifically as

17   far as what the weather report was giving us, um, aside from

18   the wind at the time and I believe the visibility.

19   Q.    What was the wind?

20   A.    Uh, at the time, again, I'm not sure what the weather

21   report was giving us the exact time of when the collision

22   occurred, but it was somewhere in the vicinity of that time.

23   It was reporting ten miles plus.  Maybe a little over ten

24   miles an hour out of the northwest, I believe.

25   Q.    And is a ten-mile-an-hour wind enough for a driver to

```
1    have to make some corrections when steering a large vehicle

2    like a bus?

3    A.   It could be, yes.

4    Q.   So could this be what Ms. Aguilar was doing when the bus

5    was shifting a little bit on the video?

6    A.   Possible.

7    Q.   Now, let's talk about the lighting.  What were the

8    general lighting conditions on the bypass road at 5:06 a.m.

9    at the time of the collision?

10   A.   Dark.

11   Q.   Was there any artificial lighting in the area?

12   A.   No.

13   Q.   Any streets lights?

14   A.   No.

15   Q.   Was the moon risen?

16   A.   I believe at that time the moon had already, um, gone

17   below the horizon.

18   Q.   And what time was sunrise on that date June 2nd, 2014?

19   A.   If I recall correctly, 5:04 in the morning.

20   Q.   Does civil twilight start at 5:04?

21   A.   I'm sorry.  Civil twilight was 5:04.  Sunrise I don't

22   recall.

23   Q.   Does 5:33 sound about right?

24   A.   Yes.

25   Q.   What is civil twilight?
```

|   |   |
|---|---|
| 1 | A.   Civil twilight is -- I'm not sure of the true definition |
| 2 | of civil twilight.  From my understanding it's when you just |
| 3 | start seeing some of the sky start to get a little bit light. |
| 4 | It's kinda that first indication the sun is going to come up. |
| 5 | Q.   So that's the transition time between nighttime and |
| 6 | morning time? |
| 7 | A.   Yes. |
| 8 | Q.   And so if civil twilight started at 5:04, the collision |
| 9 | would have occurred two minutes after the start of civil |
| 10 | twilight; is that correct? |
| 11 | A.   That's correct. |
| 12 | Q.   At that time twilight does it potentially make it harder |
| 13 | to see objects on the road? |
| 14 | A.   It can, yes. |
| 15 | Q.   Why? |
| 16 | A.   Well, certainly at that twilight hour, it's still dark. |
| 17 | Even though we're seeing a little bit of light in the sky |
| 18 | itself, it's very slight little bit of light.  The |
| 19 | environment is still going to be a dark environment.  Uh, as |
| 20 | that light grows a little bit in the sky, it could project |
| 21 | some shadows.  It could start conflicting with some contrast |
| 22 | issues.  It's documented and known in the accident |
| 23 | reconstruction community that it's harder to see during those |
| 24 | hours or those minutes really of twilight. |
| 25 | Q.   So oddly enough it might actually be harder to see when |

1    it's a little bit brighter than say an hour before when it's

2    purely dark?

3    A.    I'm not sure of that, no.

4    Q.    But it's hard to see during civil twilight?

5    A.    It is for sure.

6    Q.    Now, you mentioned contrast.  What is contrast?

7    A.    Contrast is really just the difference really meaning

8    pertaining to light and color of an object and its

9    background.  Perhaps a good example would be my tie is

10   contrasting with my white shirt so that's a color contrast.

11   Same thing could happen with a light contrast as well.

12   Q.    For instance if you were wearing a white tie and a white

13   shirt, it would be much harder to see your tie?

14   A.    Certainly.  It would be less contrast.

15   Q.    I'm going to direct your attention to Exhibit 6A.  You

16   recognize this as a still shot from the video you reviewed?

17   A.    Yes.

18   Q.    Now, can you see the horizon on this picture?

19   A.    Yes.

20   Q.    Is the horizon completely flat or are there disruptions

21   in the horizon?

22   A.    It's not completely flat.  There's some undulation in

23   the topography in the background.

24   Q.    Now, we know now that the object in the middle, the

25   squarish-shaped object was the truck in the road; is that

1  correct?

2  A.    Correct.

3  Q.    But at the time, it could have appeared as part of the

4  horizon to the driver?

5  A.    Could have.

6  Q.    And how did you reach this conclusion?

7  A.    Uh, I reached the conclusion just by viewing the video.

8  Uh, I saw while viewing the video that there were some, um,

9  what I referred to as undulations in the topography in the

10 background.  And that the dark object or that squarish object

11 in the middle could be confused or at least temporarily

12 confused as part of the topography in the background.

13 Q.    And talking about contrast, did that lack of contrast in

14 the background and -- sorry.  Did the lack of contrast here

15 potentially make the truck more difficult to see?

16 A.    Well, there's two really areas of contrast.  There's the

17 contrast with the sky, and then there's contrast with

18 anything below that sky or that horizon.  Uh, so certainly

19 you can see that there's contrast between that object and the

20 sky behind it, but in this video or in this still, there's

21 really no contrast with whatever that object is and the dark

22 roadway behind it.

23 Q.    Directing your attention to Exhibit 34.  Is this the

24 photograph you reviewed as part of your investigation?

25 A.    Yes.

App. 151

```
1    Q.   And this was a photograph taken the next day at
2    5:06 a.m., the next day the same time as the accident?
3    A.   Correct.
4    Q.   In this photograph there's some lights you can see in
5    the distance there just under the horizon.  What are those?
6    A.   I'm not entirely sure what those lights are.  It's a
7    vehicle obviously.  I'm not entirely sure what kind of
8    vehicle or if that answers your question, I'm not sure.
9    Q.   It appears to be a vehicle with its lights on?
10   A.   Yes.
11   Q.   Is it visible because the lights are on?
12   A.   It's more visible because the lights are on, yes.
13   Q.   Now, have you personally been out at this area around
14   this time of the morning?
15   A.   I have, yes.
16   Q.   And would you say this photograph is a fair
17   representation of the lighting at that time?
18   A.   I believe this photograph in particular is a fair
19   representation of the lighting at that time.
20   Q.   And to be fair, this photograph was probably a little
21   bit lighter than the bus video.  Would you say that's true?
22   A.   Absolutely, yes.
23   Q.   And would say this is probably a little more accurate
24   than the bus video?
25   A.   As far as the lighting conditions, absolutely.
```

```
 1    Q.   Now, was there another photograph taken nine minutes
 2    later at 5:15 a.m.?
 3    A.   I believe so.
 4    Q.   I'm going to direct your attention to Exhibit 35.  Is
 5    this photograph noticeably lighter than the photograph in
 6    Exhibit 34?
 7    A.   Yes.
 8    Q.   Even though it's only nine minutes later?
 9    A.   Yes.
10    Q.   Is it fair to say that during this civil twilight
11    period, every minute that passes the sky brightens
12    considerably?
13    A.   I would say there's a marked difference in the lighting
14    conditions as time goes by somewhat rapidly, yes.
15    Q.   As opposed to, for instance, a photo taken at noon and
16    12:09 during the day with no clouds, that's probably gonna be
17    almost exactly the same; right?
18    A.   Yes.
19    Q.   But here it's changing much more rapidly?
20    A.   Absolutely, yes.
21    Q.   Now, as part of your investigation, were you aware of a
22    couple of re-enactments that were done the next day on
23    June 3rd, 2014?
24    A.   I was aware of it, yes.
25    Q.   Have you seen the videos from those re-enactments?
```

UNITED STATES DISTRICT COURT

```
 1    A.    I have seen one video of one of the re-enactments.

 2    Q.    And that video comes to a conclusion, I believe,

 3    Mr. Stein said the visibility was about 800 feet or something

 4    like that.  Does that sound right?

 5    A.    I believe they came to the conclusion of 850 feet was

 6    the visibility.

 7    Q.    Did you have a disagreement with the conclusion that

 8    visibility represented the visibility at the time of the

 9    accident?

10    A.    I did, yes.

11    Q.    Why?

12    A.    There were a few reasons why I disagreed with that

13    number.  One of them was that that particular, um, what we

14    were just referring to as time goes by it gets lighter

15    noticeably, um, or rather quickly.  Um, that particular

16    video, uh, when it first started, they were, I believe, about

17    a mile before this crash location.  They started that video

18    or they started their re-enactment at 5:06 which was the time

19    of the crash.

20          In that video it looks somewhat similar to the

21    lighting conditions as that first photograph that we saw at

22    5:06.  It took them approximately, um, four minutes to get

23    where this collision occurred.  As we know as time goes by,

24    four minutes it's going to be a little bit lighter.  At that

25    time they noticed that the subject vehicle that they were
```

 1  using as a vehicle in the background to measure had its

 2  lights on.  So right there the conditions of their test did

 3  not match the conditions of the crash.

 4  Q.   Fair to say it's a lot easier to see the vehicle with

 5  its lights on when it's also lighter outside?

 6  A.   Yes.

 7  Q.   Now, did they also leave cones out?

 8  A.   Yes.

 9  Q.   So they had cones out as well in addition to the vehicle

10  parked there?

11  A.   They did, yes.

12  Q.   And after they went out there and got there at about

13  5:10 realized oops, we left the lights on, did they redo the

14  whole thing?

15  A.   I don't know they redid the whole thing.  I know they

16  backed up some distance, I'm not sure how much, and started

17  the process over again to see where they could visualize that

18  subject bus or that example bus in the foreground.

19  Q.   And by the time they got out there the second time,

20  would you say the lighting was more like it was in this

21  Exhibit 36?

22  A.   I couldn't say if it was similar to 36 or not.

23  Q.   Oh, I'm sorry.  35.  Is it fair to say it was brighter

24  than it would have been at the time of the accident?

25  A.   Yes.

1   Q.   And one of the things you factor into an accident like
2   this is something called expectancy; is that true?
3   A.   Yes.
4   Q.   What is expectancy?
5   A.   Expectancy could be a broad term, but basically, we all
6   have kind of a predisposition on how things are going to
7   work, how something might operate or how some occurrence
8   might play out.  Perhaps a good example of expectancy is
9   driving on the freeway versus driving in your neighborhood or
10  your residential area.
11        You expect that in a residential area it's gonna
12  be, uh, the speed limit is gonna be a little slower.  There
13  might be people getting in and out of cars.  There might be
14  some pedestrians crossing the roadway.  There could be
15  children playing throwing balls across the roadway.  All
16  those things you expect to happen in a residential area.
17        Well, you don't expect those things obviously on a
18  freeway.  If you saw those things on the freeway, that would
19  be an unexpected hazard and that's basically what expectancy
20  is.
21  Q.   So how does an unexpected versus expected hazard factor
22  into your analysis of a collision?
23  A.   What expectancy -- how that factors into looking at how
24  someone's going to react to an object in front of them a
25  pedestrian, a vehicle, whatever, it's going to elongate that

1    time for that particular driver to, uh, make a conclusion or

2    to determine that that particular object is a hazard.  It's

3    just going to extenuate that particular distance.

4           So if I went out the following day and took a

5    measurement on how far away an object is and I can see it,

6    that distance is not going to be accurate to the collision or

7    to the driver of that particular vehicle during the collision

8    because there's prolongation of expectancy which is just

9    going to close that gap so to speak.

10   Q.    So hypothetically speaking, two different hazards in the

11   road.  Both equally visible.  One you expect to see and one

12   you don't.  If the average driver going to be slower to

13   respond to the hazard they don't expect to see?

14   A.    Yes.

15   Q.    Is that just how perception and reaction works?

16   A.    Well, perception and reaction is different than

17   expectancy.

18   Q.    Okay.  But let me ask you what is perception and

19   reaction?

20   A.    Perception and reaction really is going to occur after

21   that period of expectancy.  So when an object is clearly

22   visible and identifiable, um, when you notice an object or a

23   pedestrian or a vehicle, uh, where it is, what it is, what

24   it's doing, then you can start the time period.

25           And perception and reaction really is just kind of

1    describing a time period of identification of what that

2    hazard is and what do I need to do to avoid it.  Those are

3    all factored into the perception part.  A reaction is

4    somewhat self-explanatory.  Your brain is telling you okay, I

5    need to react.  What is that reaction going to be?  Those

6    kinds of decisions make up perception and reaction.

7    Q.    Now, one way to put it is the total time to respond is

8    something might include the expectancy time, the time to

9    perceive it and the time to react to it.

10   A.    Yes.

11   Q.    Now, was the defendant's truck parked in the middle of

12   the slow lane an unexpected hazard?

13   A.    Yes.

14   Q.    And in your opinion would this have affected Dinorah

15   Aguilar's reaction time to that hazard?

16   A.    Yes.

17   Q.    And specifically it would increase the time it takes to

18   her react and the distance needed to react?

19   A.    Yes.

20   Q.    Which is very different from looking to see if you can

21   see something when you know it's already there; right?

22   A.    That's correct.

23   Q.    What was your conclusion about Ms. Aguilar's reaction

24   just prior to the collision?

25   A.    Can you be more specific just prior?

1  Q.   What was your conclusion about Ms. Aguilar's -- her
2  reaction time and attempt to avoid the vehicle?
3  A.   Well, I certainly felt that it fell within a range of
4  the population how they would react.  There's a certain range
5  for the population that would react similar to how Dinorah
6  Aguilar reacted.  That's the conclusion I came up with.
7  Q.   So in other words, you would not say she was outside the
8  range of normal?
9  A.   I would not.
10  Q.   In all fairness, there are probably some people that
11  could have reacted and avoided it.  Is that fair?
12  A.   That's fair to say.
13  Q.   Okay.  But she was within a normal reaction range of the
14  population?
15  A.   Yes.
16  Q.   Normal driver in other words?
17  A.   Yes.
18  Q.   Now, did you also consider the speed of the bus at the
19  time of the collision?  I'm sorry.  I'm skipping away from
20  Dinorah.  Just in your analysis of the event, did you factor
21  in the speed of the bus?
22  A.   Well, we certainly took note of it as the investigators
23  from CID and the Fort Irwin Police Department noted.
24  Q.   And what was your calculation of approximately how fast
25  the bus was traveling?

UNITED STATES DISTRICT COURT

1    A.   Well, the MAIT unit did not do any calculations as far

2    as the speed goes of the bus.

3    Q.   Well, what was the number you used based on the

4    calculations done by the CID team?

5    A.   The Fort Irwin Police Department they performed some

6    calculations based off of the video.  And if I recall

7    correctly, they came up with a range of 43 to 47 miles an

8    hour.

9    Q.   And based on your review of the video and facts of this

10   case, are you comfortable with around that range?

11   A.   I am, yes.

12   Q.   And did you find speed to be a factor in this collision?

13   A.   No.

14   Q.   And what do you mean by that when you say speed wasn't a

15   factor?

16   A.   Well, when we look at a factor of the collision, we look

17   at that and I don't believe I talked about primary collision

18   factor.  Primary collision factor is when we look at the

19   causation and the factor of the collision, we look at was

20   there a violation of law and did that violation of law cause

21   the collision.  And so in this particular case, we did not

22   find a violation of any speed law, um, and we didn't go any

23   further with that because, obviously, there wouldn't have

24   been the cause of collision with her speeding.

25   Q.   Now, did you also consider the physical condition of the

1  bus driver Dinorah Aguilar?

2  A.   Again, uh, we took note of it as we were reviewing and

3  investigating what the military agency investigated.

4  Q.   Did you find any evidence there of any physical

5  condition or limitation that would have basically caused this

6  accident?

7  A.   No.

8  Q.   Was there any evidence that she suffered any form of

9  diabetic episode?

10  A.   There was no evidence of that.

11  Q.   Was there any evidence that her diabetes at all was a

12  factor in this collision?

13  A.   No.

14  Q.   Now, did you consider the possibility that she was

15  distracted or otherwise inattentive at the time of the

16  collision?

17  A.   We certainly looked or we certainly were curious about

18  that and we noted in the video that there was no indication

19  of that.

20  Q.   Did she appear to be alert?

21  A.   Yes.

22  Q.   Appear to be attentive to the road?

23  A.   It appeared so, yes.

24  Q.   Now, what was your final determination as to the primary

25  collision factor in this accident?

App. 161

1   A.   Primary collision factor was the act of stopping the big

2   rig in a moving lane of traffic at nighttime and shutting off

3   the lights becoming darkened out and the driver not placing

4   any type of warning devices for any drivers approaching.

5   Q.   And was it surprising to you having reviewed this case

6   that the bus driver Ms. Aguilar was unable to avoid this

7   collision?

8           MR. HARLEY:  I'm going to object.  Irrelevant as to

9   whether it's surprising or not, Your Honor.

10         THE COURT:  Sustained.

11         MR. LEVERS:  No further questions.

12         MR. HARLEY:  Your Honor, can I confer a little bit?

13         THE COURT:  Yes.

14         MR. HARLEY:  For the record, Your Honor, 6A.

15                  CROSS-EXAMINATION

16   BY MR. HARLEY:

17   Q.   Sir, you see that; right?

18   A.   Yes, sir.

19   Q.   And to your knowledge that is a still video that came

20   off that proximate 11-second video -- strike that.  How long

21   was the video you observed?

22   A.   Uh, I believe you just mentioned -- I believe it was 10

23   to 11 seconds.  Somewhere in that neighborhood.

24   Q.   And this 11-second video you observed or 10 to

25   11 seconds, uh, did it have any analytics on it?

App. 162

# Exhibit A-5

# Testimony of Mathew Derrico
ECF 186 at 71-88
September 28, 2018 (A.M. Session)

1                  UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

3          HONORABLE JESUS G. BERNAL, U.S. DISTRICT JUDGE

4

5    UNITED STATES OF AMERICA,              )
                                            )
6                   Plaintiff,              )
                                            )
7                                           ) Case No.
                    vs.                     ) EDCR 16-24-JGB
8                                           )
     STEVEN KILTY,                          )
9                                           )
                    Defendant.              )
10   _____)

11

12                REPORTER'S TRANSCRIPT OF PROCEEDINGS
                         RIVERSIDE, CALIFORNIA
                      FRIDAY, SEPTEMBER 28, 2018
13                           TRIAL DAY 4
                            A.M. SESSION

14

15

16

17

18

19

20

21

22   _____
              **ADELE FRAZIER, CSR 9690, CRR, RMR**
23               Federal Official Court Reporter
                 United States District Court
24                   3470 Twelfth Street
                 Riverside, California 92501
25                 adelefraziercsr@gmail.com

1    **APPEARANCES OF COUNSEL:**

2    **For the Plaintiff:**

3            OFFICE OF THE UNITED STATES ATTORNEY
             By:  JERRY YANG, Assistant United States Attorney
4                 PAUL LEVERS,
                  Special Assistant United States Attorney
5            3403 Tenth Street, Suite 200
             Riverside, California 92501
6

7
     **For the Defendant:**
8
             ROBISON D. HARLEY
9            Attorney at Law
             825 North Ross Street
10           Santa Ana, California  92701

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              MR. LEVERS:  Okay.  Thank you.  No further questions.

 2              THE COURT:  Thank you, Doctor.  You're excused.

 3   Thank you.

 4              THE COURT:  Mr. Harley.

 5              MR. HARLEY:  May I approach just briefly?              10:59

 6              (Outside The Presence Of The Jury:)

 7              MR. HARLEY:  Your Honor, my paralegal just went out

 8   and talked to this person, and he indicated that he did tell

 9   Mr. Kilty about trucks stopping in advance of the 6:00 a.m. to

10   8:00 a.m. checkpoint.  And he told Mr. Kilty that prior to      11:00

11   June 2nd, 2014.  I can go out and verify.  I just haven't had

12   the time.

13              THE COURT:  Do you have another witness besides him?

14              MR. HARLEY:  I just asked my paralegal and she said

15   Mr. Lienert's going to be here at 11:15.                        11:00

16              THE COURT:  All right.  Verify that.  If you verify

17   that, you can call him now.

18              MR. LEVERS:  May I ask for one clarification?  Was he

19   instructed to stop before the main gate checkpoint or this

20   checkpoint out in the middle of the bypass road?               11:00

21              MR. HARLEY:  No, checkpoint.  He was personally

22   stopped in 2009 -- I told you guys this before -- at the exact

23   same checkpoint.  I'm talking about in the bypass road, not the

24   main gate.

25              MR. LEVERS:  Very well.                              11:00
```

 1          THE COURT:  You can call him if you can verify that

 2  with him.

 3               (In the Presence of the Jury:)

 4          THE COURTROOM DEPUTY:  Right this way.  Please step

 5  up and raise your right hand.                              11:01

 6          Do you solemnly swear that the testimony you are

 7  about to give in the cause now pending before this Court will

 8  be the truth, the whole truth, and nothing but the truth so

 9  help you God?

10          THE WITNESS:  Yes, sir.                            11:01

11          THE COURTROOM DEPUTY:  Please be seated.  State your

12  name and spell your last name for the record.

13          THE WITNESS:  Mathew Joseph Derrico, D-e-r-r-i-c-o.

14          THE COURT:  Proceed.

15      **DEFENDANT'S WITNESS, MATHEW JOSEPH DERRICO, WAS SWORN,**

16                      **DIRECT EXAMINATION**

17  BY MR. HARLEY:

18  Q.  Mr. Derrico, what's your current occupation?

19  A.  Truck dispatcher and owner.

20  Q.  And what does a truck dispatcher do?                   11:02

21  A.  We coordinate loads for pick up and delivery.

22  Q.  All right.  Now, I want to take you back to June of 2009.

23  Were you a dispatcher back then?

24  A.  For myself, yes.

25  Q.  All right.  But were you also a long-haul trucker?      11:02

```
 1    A.    Correct.

 2    Q.    And can you describe what you do as a long-haul trucker?

 3    A.    Pick up loads from point A and deliver them in a timely

 4    manner to point B.

 5    Q.    All right.  And is this all over the country?          11:02

 6    A.    Yes, sir.

 7    Q.    And I want to take you back to June of 2009.

 8          MR. YANG:  Objection, your Honor.  Relevancy, the

 9    prior discussion before.

10          THE COURT:  Overruled.                                 11:03

11    BY MR. HARLEY:

12    Q.    I want to take you back to June 2009.  Did you haul some

13    equipment to the Fort Irwin military base?

14    A.    Yes, sir.

15    Q.    Do you remember where you came from?                   11:03

16    A.    Oak Claire, Wisconsin.

17    Q.    So that's point A?

18    A.    Yes, sir.

19    Q.    Point B was Fort Irwin?

20    A.    Correct.                                               11:03

21    Q.    And were you hauling any particular type of military gear?

22    A.    We were hauling two Humvees and a welding trailer.

23    Q.    All right.  And then you brought that out to Fort Irwin?

24    A.    Yes, sir.

25    Q.    Do you remember about what time of the day or night you  11:03
```

```
 1   arrived in the area of Fort Irwin?

 2   A.    I arrived on June 26th at 2:00 a.m.

 3   Q.    In the morning?

 4   A.    Yes, sir.

 5   Q.    And once you arrived there, what, if anything, did you do        11:04

 6   before you got on base?  Did you stop?

 7   A.    I -- we were stopped at the checkpoint area.

 8   Q.    All right.  And you're familiar with the checkpoint area?

 9   A.    Yes.

10   Q.    On the bypass road?                                              11:04

11   A.    Yes, sir.

12   Q.    All right.  Can you describe this checkpoint area?

13   A.    It's two lanes of traffic that veer off of the main road

14   that goes into the fort.  And its purpose is staging trucks and

15   equipment coming into the fort.                                        11:04

16   Q.    And this is the number 2 lane?

17   A.    The far right lane.

18   Q.    As opposed to the number 1 lane?

19   A.    Correct.

20   Q.    When you arrived at 2:00 a.m., did you actually park in          11:04

21   that lane?

22   A.    Yes.

23   Q.    Did you remain parked there from 2:00 a.m. to 6:00 a.m. in

24   the morning when the check-in point opened up?

25   A.    Yes.                                                             11:05
```

1    Q.    And were there any trucks around that were parked either

2    in front of you or behind you during that period of time?

3    A.    There was trucks parked in front of me when I got there.

4    Q.    All right.  And by the time the check-in point opened up,

5    about how many trucks were parked behind you?                        11:05

6    A.    Just as many as there were in front of me, probably more.

7    Q.    How many were parked in front of you?

8    A.    I'd say about 15.

9    Q.    And how many behind, if you recall?

10   A.    15 to 20.                                                        11:05

11   Q.    All right.  Now, during the -- from the hours of 2:00 a.m.

12   in the morning until 6:00 a.m. what were you doing besides --

13   were you parked there the entire time?

14   A.    I was parked, and I slept.

15   Q.    All right.  And how far behind the trucks front -- or       11:05

16   immediately in front of you were you?

17   A.    Figure 75 feet per truck times 10 would be 750 -- about

18   1,000 feet from the first one.

19   Q.    And when you went to sleep at 2:00 a.m. in the morning,

20   were your lights on or lights off in the truck?                      11:06

21   A.    Lights off.  Engine off.

22   Q.    Did you put any type of warning devices 10 feet, 100,

23   200 feet behind you?

24   A.    No.  You don't do that when you're in a parking area.

25   Q.    All right.  And you were aware of that particular rule as     11:06

App. 170                              UNITED STATES DISTRICT COURT

1  far back as June 2009?

2  A.   Yes.

3  Q.   Now, was there another time period that you showed up at

4  the same exact location?

5  A.   Yes.                                                    11:06

6  Q.   And do you remember the date of that?

7  A.   It was July 12th of 2012 -- excuse me, January 12th of

8  2012.

9  Q.   And about what time did you show up at that point in time?

10 A.   I showed up at 10:00 a.m.                               11:06

11 Q.   And when you showed up at 10:00 a.m.?

12 A.   10:00 p.m.  10:00 p.m.

13 Q.   10:00 p.m.

14       And when you showed up, did you, again, stop in the

15 checkpoint?                                                  11:07

16 A.   Yes.

17 Q.   And were you the first in line, the second in line, or do

18 you recall?

19 A.   I was number three.

20 Q.   And what type of military equipment were you carrying on  11:07

21 this trip?

22 A.   It was a small military cargo truck.

23 Q.   Okay.  And this is a big tractor trailer that you're

24 driving?

25 A.   Yes.                                                    11:07

1    Q.   Was it the same type of tractor trailer that you were

2    driving during your first stop on June 26, 2009?

3    A.   Similar, yes.

4    Q.   All right.  And what was your point A on January 13th,

5    2012?                                                          11:07

6    A.   Oshkosh, Wisconsin.

7    Q.   All right.  And when you arrived at this check-in point,

8    were you the first in line or what, if you recall?

9    A.   No.  I was number three.

10   Q.   And what did you do after 10:00 p.m.?  You parked the    11:07

11   vehicle in the number 2 lane?

12   A.   Yes.

13   Q.   As you'd done on previous occasions?

14   A.   Correct.

15   Q.   What do you do after you parked there?                   11:07

16   A.   Went to sleep.

17   Q.   All right.  Now, is there a port-a-potty there?

18   A.   Yes.

19   Q.   Is there a washing area or a fountain area anywhere in the

20   area?                                                         11:08

21   A.   Yes.  Right next in the port-a-potty.

22   Q.   You understood that to be for truckers spending the night

23   there?

24   A.   Correct.

25   Q.   Waiting for the check-in point at 0600?                  11:08

```
 1    A.    Correct.
 2    Q.    When you parked all night the second time out there, did
 3    you have your lights on?
 4    A.    No.
 5    Q.    You put up any warning devices?                              11:08
 6    A.    No.
 7    Q.    Why not?
 8    A.    Because it's a parking area.
 9    Q.    All right.  When you say a parking area, it's a parking
10    area or staging area for tractor trailer rigs bringing military   11:08
11    equipment on board?
12    A.    Correct.  Correct.  It's where they stage us before you
13    come on base.  They don't want everybody coming in at once.
14    Q.    All right.  And then -- now, I want to turn your attention
15    to June 2nd, 2014.  You were a dispatcher; is that correct?       11:08
16    A.    Correct.
17    Q.    Were you the person that dispatched Mr. Kilty to the Fort
18    Irwin military base?
19    A.    I was.
20    Q.    And what type of equipment did you direct him to take?      11:09
21    A.    He took a tractor trailer, and he picked up a military
22    truck, a new one, out of Oshkosh.
23    Q.    Did he stop in Arizona or did he come straight out from
24    Oshkosh, if you know?
25    A.    Straight out from Oshkosh, I believe.                       11:09
```

UNITED STATES DISTRICT COURT

1    Q.   All right.  But you were the one that dispatched him out

2    to the Fort Irwin military base?

3    A.   Yes.

4    Q.   And when you dispatched him, did you tell him -- well, had

5    you dispatched him earlier -- at an earlier point in time to a          11:09

6    military base?

7    A.   Oh, most definitely.

8    Q.   Okay.  On that prior occasion, you were responsible for

9    him showing up with other military gear?

10   A.   Yes.                                                               11:09

11   Q.   And on those prior occasions when he showed up, did you

12   let him know about the parking procedures in anticipation of

13   the 6:00 a.m. to 8:00 a.m. check-in point?

14   A.   Correct.

15   Q.   What did you tell him?                                             11:10

16   A.   You want to be there as early as possible.  You want to be

17   the first in line or as close as you can first in line, to make

18   sure that you get there as quick as you can, park in the

19   staging area so that way you can get unloaded early enough to

20   get out of there at a reasonable time.                                 11:10

21   Q.   Okay.  And you told him it was important to show up early

22   so you can get in and out?

23   A.   Correct.

24   Q.   Because otherwise you'd be waiting a long period of time?

25   A.   Yes.                                                              11:10

| | |
|---|---|
| 1 | Q.   And you were the one that actually dispatched him out to |
| 2 | the Fort Irwin area on June 2nd, 2014? |
| 3 | A.   I was. |
| 4 |      MR. HARLEY:  I have nothing further. |
| 5 |      THE COURT:  Cross-examination. |
| 6 |      MR. YANG:  May I proceed, your Honor? |
| 7 |      THE COURT:  You may. |
| 8 |      MR. YANG:  Thank you, your Honor. |
| 9 | **CROSS-EXAMINATION** |
| 10 | BY MR. YANG: |
| 11 | Q.   It's Mr. Derrico; is that correct? |
| 12 | A.   Correct. |
| 13 | Q.   Good morning. |
| 14 | A.   Good morning. |
| 15 | Q.   You testified earlier that -- I believe you said you were |
| 16 | a long-haul trucker; is that correct? |
| 17 | A.   Yes.  I was. |
| 18 | Q.   Previously you were a long-haul trucker? |
| 19 | A.   Yes. |
| 20 | Q.   And how long were you a long-haul trucker for? |
| 21 | A.   A long time, since 1996. |
| 22 | Q.   That's about 20 years you were a long-haul trucker? |
| 23 | A.   Yeah. |
| 24 | Q.   Is that correct? |
| 25 | A.   Yes.  Yes. |

11:10

11:11

11:11

11:11

11:11

1    Q.    And just -- this may be obvious, but a long-haul trucker

2    drives semi-trucks; is that correct?

3    A.    Correct.

4    Q.    And, typically, you have a large load behind the

5    semi-truck; is that correct?                                    11:12

6    A.    Yes, sir.

7    Q.    Typically, the loads are fairly heavy; is that correct?

8    A.    Yes.

9    Q.    And semi-trucks are more dangerous to other motorists than

10   normal passenger cars; would you agree with that?               11:12

11   A.    I would not.

12   Q.    Okay.  When a semi-truck hits a passenger car, it is more

13   dangerous; is that correct?

14   A.    That would be correct.

15   Q.    Okay.  So in other words, semi-trucks, during an accident,  11:12

16   are more dangerous to passenger cars than other passenger cars;

17   is that correct?

18   A.    It depends on the accident, so I'd say incorrect.

19   Q.    Okay.  You are aware of the accident between Mr. Kilty's

20   truck and the commuter bus on June 2nd, 2014; is that correct?   11:12

21   A.    I am.

22   Q.    You never contacted any law enforcement to talk about your

23   role in this accident, did you?

24   A.    Um, I don't think so, no.  I wasn't -- I was in contact

25   with Steve and with the insurance company.                      11:13

UNITED STATES DISTRICT COURT

1    Q.   Sure.  But you never reached out to any law enforcement

2    that was investigating this accident to contact them about your

3    testimony today; is that correct?

4    A.   To the best of my knowledge there was no law enforcement

5    that investigated this.  I believe it was done on base by MPs,          11:13

6    and there was no contact for me to contact.

7    Q.   Did you -- my question is you never contacted any MPs to

8    talk about this accident; is that correct?

9    A.   There was none to contact.

10   Q.   You never contacted the Fort Irwin Police Department to          11:13

11   talk about this accident; is that correct?

12   A.   That is correct.

13   Q.   In other words, the statements that you made today in

14   court about your role as the dispatcher, you never told any

15   Fort Irwin Police Department investigators about this; is that          11:14

16   right?

17   A.   I guess not.  I didn't think it was pertinent.

18   Q.   And, sir, you work for the same company as Mr. Kilty did?

19   A.   I wasn't employed by them.  I was an agent working on --

20   for them as a contractor.  I'm no longer with them, but I was          11:14

21   at the time.

22   Q.   And that company is being sued because of this accident;

23   is that right?

24   A.   It's possible.  I don't have any association with the

25   management or anything like that.  My role with them was to          11:14

```
 1   dispatch trucks, and I leased equipment to drivers in need.
 2   Q.   Mr. Derrico, as a semi -- a long-haul trucker you received
 3   training; isn't that correct?
 4   A.   It depends on where you come from, but yes.
 5   Q.   You've received training, though?                          11:15
 6   A.   Yes.
 7   Q.   Correct?
 8   A.   Yes.
 9   Q.   You received training on how to drive a semi-truck?
10   A.   Correct.                                                   11:15
11   Q.   In fact, you hold a special license that allows you to
12   drive a semi-truck that normal commuters are not allowed to
13   drive; is that correct?
14   A.   That is correct.
15   Q.   It's a class A license; is that correct?                   11:15
16   A.   Yes, sir.
17   Q.   As part of that class A license, you had to get additional
18   training that normal commuters do not get; isn't that right?
19   A.   That is correct.
20   Q.   Okay.  As part of that training, isn't it true that you're 11:15
21   trained that when a semi is stopped on a moving road, that
22   you're supposed to put out safety triangles to warn other
23   motorists; isn't that correct?
24   A.   On a roadway, yes.  In a staging area, no.
25   Q.   My question is on a roadway, you're trained to put out      11:16
```

UNITED STATES DISTRICT COURT

1   safety triangles if you stop on a roadway; isn't that right?

2   A.   If it's an emergency stop, yes.

3   Q.   Alternatively, if you're stopped on a roadway, you can put

4   out safety flares; isn't that right?

5   A.   If it's an emergency stop, yes.                          11:16

6   Q.   Alternatively, if it's an emergency stop on a roadway,

7   you're trained to use your hazard lights; isn't that right?

8   A.   If it's an emergency stop, yes.

9   Q.   And, in fact, if you're parked on the side -- on the

10  shoulder of a roadway, you're trained to put out some sort of  11:16

11  flare to alert drivers during an emergency stop; wouldn't that

12  be right?

13  A.   During an emergency stop, yes.

14  Q.   And, in fact, you have driven many, many miles on the

15  road; isn't that right?                                       11:17

16  A.   That is correct.

17  Q.   Okay.  And you've seen semi-trucks on the shoulder of

18  freeways with their safety triangles out; isn't that correct?

19  A.   That is correct.

20  Q.   Three safety triangles; isn't that correct?             11:17

21  A.   Excuse me?

22  Q.   Three safety triangles specifically?

23  A.   Yes.

24  Q.   You've seen that, right?

25  A.   Yes.                                                     11:17

```
 1    Q.   In fact, you guys are -- long-haul truckdrivers are taught
 2    to put the first safety triangle at ten feet away from the
 3    truck; isn't that correct?
 4    A.   Yes.
 5    Q.   The second one at 100 feet from the truck; isn't that          11:17
 6    correct?
 7    A.   Yes.
 8    Q.   And the third one at 200 feet; isn't that correct?
 9    A.   Yes.
10    Q.   And in fact, you've -- when you've seen those safety           11:17
11    triangles, that has actually helped you identify the disabled
12    truck; isn't that correct?
13    A.   On a roadway, correct.
14         MR. YANG:  No further questions, your Honor.
15         THE COURT:  Very well.                                         11:18
16                   REDIRECT EXAMINATION
17    BY MR. HARLEY:
18    Q.   Sir, is there a difference between what you term a staging
19    area and an emergency stop?
20    A.   Yes.                                                           11:18
21    Q.   And what's the difference?
22    A.   An emergency stop example would be if you had a breakdown
23    or a flat tire or just a need to stop.  Let's say there was
24    another motorist in peril and you stopped to assist them and
25    you pull off to the side of the road or if your truck becomes      11:18
```

1  disabled on a roadway.  A staging area would be an area

2  designed and set up to park trucks to bring them in in an

3  organized manner into a location.

4  Q.   All right.  And this stop in the area of the check-in

5  point on the bypass road is a staging area?                    11:19

6  A.   That is correct.

7  Q.   Which means you're supposed to stop and wait for check-in

8  for security purposes and then proceed when instructed to do

9  so?

10  A.   That is correct.  There's a sign out there that says      11:19

11  checkpoint.

12  Q.   And based on that sign, that's -- well, that is a staging

13  area?

14  A.   Yes.

15  Q.   And you made that known to Mr. Kilty when you're          11:19

16  dispatching him out there?

17  A.   I did.

18  Q.   And so -- all right.  When you're stopped in a staging

19  area, is it your opinion you have to set up flares, triangles,

20  reflective triangles and flares and things like that, to warn  11:19

21  oncoming traffic?

22  A.   No.

23  Q.   Even when you're parked in the number 2 lane in the Fort

24  Irwin bypass road?

25  A.   That's a safe haven for a driver to stop.                 11:19

UNITED STATES DISTRICT COURT

1  Q.   It was like that when you stopped on June 26, 2009?

2  A.   Yes.

3  Q.   And it was still like that when you stopped there on

4  January 13th, 2012?

5  A.   Yes.                                                    11:20

6  Q.   Now, the prosecution asked you whether or not anybody

7  ever -- whether or not anybody -- strike that.  Withdraw it,

8  your Honor.

9        The prosecutor asked whether or not you reported your

10 observations to anybody from law enforcement.  Do you remember  11:20

11 that question?

12 A.   Yes, I do.

13 Q.   Now, were you available for contact by Fort Irwin PD if

14 they wanted to reach out to you?

15 A.   I was.                                                   11:20

16 Q.   Were you available for contact if CID wanted to reach out

17 and contact you?

18 A.   I was.

19 Q.   Were you available for contact if anybody from the CHP

20 wanted to reach out and contact you?                         11:20

21 A.   I was.

22 Q.   Did any of those people ever reach out and contact you?

23 A.   They did not.

24 Q.   Now, were you aware that it was almost two years after

25 June 2nd, 2014, before any charges were filed against Mr.    11:21

UNITED STATES DISTRICT COURT

1  Kilty?

2  A.    I was.

3  Q.    And during that period of time, did you have any reason to

4  reach out to law enforcement in connection with this traffic

5  collision?                                                      11:21

6  A.    No.

7              MR. HARLEY:  Nothing further.

8              THE COURT:  Any recross?

9              MR. YANG:  No questions, your Honor.

10             THE COURT:  Mr. Derrico, you're excused.            11:21

11             THE WITNESS:  Yes, sir.  Thank you.

12             THE COURT:  Mr. Harley, can you keep the second set

13  of doors closed, please?

14             THE COURTROOM DEPUTY:  Right this way, sir.  Please

15  step up here.  Please raise your right hand.                   11:22

16             Do you solemnly swear that the testimony you are

17  about to give in the cause now pending before this Court will

18  be the truth, the whole truth, and nothing but the truth so

19  help you God?

20             THE WITNESS:  I do.                                 11:22

21             THE COURTROOM DEPUTY:  Thank you.  Please be seated.

22             State your name and spell your last name for the

23  record.

24             THE WITNESS:  Mike and last name's L-i-e-n-e-r-t.

25             THE COURT:  Proceed.                                11:23

UNITED STATES DISTRICT COURT

# Exhibit A-6

# Testimony of Five Fort Irwin Commuters
(excerpts re: pre-6:00 a.m. parking at bypass road checkpoint)

ECF 142 at 87 (Michael Chestnut), 106 (Ariel Derosier), 118-19
(Michelma Tusieseina), 124-28 (Gregory Hoegle)
September 27, 2018 (P.M. Session)

ECF 186 at 92-93, 98 (Mike Lienert)
September 28, 2018 (A.M. Session)

```
 1                    UNITED STATES OF AMERICA
                    UNITED STATES DISTRICT COURT
 2                 CENTRAL DISTRICT OF CALIFORNIA
                         EASTERN DIVISION
 3
                             - - -
 4                 HONORABLE JESUS G. BERNAL
             UNITED STATES DISTRICT JUDGE PRESIDING
 5                           - - -

 6
     UNITED STATES OF AMERICA,        )
 7                                    )
                    PLAINTIFF,        )
 8                                    )
     VS.                              )   CASE NO.:
 9                                    )   ED CR 16-0024-JGB
     STEVEN KILTY,                    )
10                                    )
                    DEFENDANT.        )
11                                    )
     _____)
12

13

14               REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                        (P.M. SESSION)

16                 THURSDAY, SEPTEMBER 27, 2018

17                    LOS ANGELES, CALIFORNIA

18

19

20

21

22

23                 LAURA MILLER ELIAS, CSR 10019
                 FEDERAL OFFICIAL COURT REPORTER
24               350 WEST 1ST STREET, ROOM 4455
                 LOS ANGELES, CALIFORNIA 90012
25                    PH:  (213)894-0374
```

```
 1
      APPEARANCES OF COUNSEL:
 2

 3    ON BEHALF OF PLAINTIFF:

 4            UNITED STATES ATTORNEY'S OFFICE

 5            BY: PAUL D. LEVERS

 6                JERRY YANG

 7            ASSISTANT UNITED STATES ATTORNEY

 8            RIVERSIDE, CALIFORNIA

 9

10

11    ON BEHALF OF DEFENDANT:

12

13            ROBISON DOOLING HARLEY, JR., ESQ.

14

15

16

17

18

19

20

21

22

23

24

25
```

App. 186

```
 1                           INDEX

 2

 3     WITNESSES FOR
       THE DEFENSE:
 4                        DIRECT      CROSS      REDIRECT      RECROSS

 5     HUSHER, STEIN

 6     BY:  MR. HARLEY      5                       47
       BY:  MR. LEVERS                 38                        48
 7
       BRIDGETTE, NAOMI
 8
       BY:  MR. HARLEY     51                       65
 9     BY:  MR. LEVERS                 62

10     CHESTNUT, MICHAEL

11     BY:  MR. HARLEY     68                      101
       BY:  MR. YANG                   88
12
       DEROSIER, ARIEL
13
       BY:  MR. HARLEY    102                      112
14     BY:  MR. LEVERS                110

15     TUSIESENIA, MICHELMA

16     BY:  MR. HARLEY    113                      121
       BY:  MR. YANG                  120
17
       HOEGLE, GREGORY
18
       BY:  MR. HARLEY    123
19     BY:  MR. LEVERS                128

20
                 EXHIBITS              RECEIVED
21

22              117                   51

23              263                   51

24

25
```

App. 187

1    don't know.

2    Q.   And then on these prior occasions, would you see, uh,

3    big rigs parked back to back on the No. 2 lane in the area of

4    the checkpoint well before the 6:00 a.m. check-in time?

5    A.   Oh, yes, sir.  That was the purpose in the Fort Irwin

6    bypass is a place for those vehicles to stage.  I would say

7    more often than not, I observed vehicles staged at that

8    location.

9    Q.   And this is within the No. 2 lane.

10   A.   Yes, sir.

11   Q.   And how -- how much before the 6:00 a.m. check-in point

12   would you see vehicles staged in that particular area?

13   A.   Well, the -- the bus, when it ran on a normal schedule,

14   we were always there before 6:00 o'clock.  We never hit that

15   point any earlier than about 4:00, 4:25.  That's when I

16   observed them so obviously, yes, sir, it was before 6:00

17   o'clock.  Yes, sir.

18   Q.   And how many big rig vehicles would you be seeing

19   stacked up parked in the No. 2 lane waiting for that

20   checkpoint to open?

21   A.   Sometimes it would be one or two vehicles.  Sometimes,

22   of course, it would be none.  And, uh, a couple of times,

23   there were up to three to four vehicles lined up, staged and

24   loggered and whatever terminology you want to use, yes, sir.

25   That -- that specifically depended, sir, on what point of the

1   A.   Around --

2   Q.   Before the check-in point would start at 6 o'clock?

3   A.   I've seen 'em at 4:00 in the morning.

4   Q.   So you've seen these vehicle -- these semis lining up.

5   A.   Yes.

6   Q.   Uh, as early as 4:00 in the morning.

7   A.   Yes.

8   Q.   Waiting for the check-in time to start at 6 o'clock.

9   A.   Yes.

10  Q.   And how many -- and, uh, which lane of traffic would

11  these big rigs be lining up in?

12  A.   The second lane.

13  Q.   When you say the second one, is that the left one or the

14  right one?

15  A.   Uh, the right one.

16  Q.   And on how many -- would you see just one or two trucks

17  or would there be more than one or two trucks lining up at as

18  early as 4:00 a.m. for the 6:00 a.m. checkpoint?

19  A.   Um, about two around an earlier time, but at like 6:00,

20  there's like five, maybe six sometimes.

21  Q.   All of which been lining up, back-to-back, waiting for

22  the checkpoint to open?

23  A.   Yes.

24  Q.   And they would always be in the No. 2 lane?

25  A.   Yes.

```
 1    arrived.
 2    Q.   All right.  Now, prior to June 2nd, 2014, had you seen
 3    big rigs parked in the No. 2 lane in this bypass road?
 4    A.   Yes.
 5    Q.   On how many occasions?
 6    A.   Um . . . um, going on to the, uh . . . to the main
 7    gate, I would see the -- the -- the trucks parked there.
 8    Q.   When -- when --
 9    A.   And occasionally, uh, going home, I would also see, uh,
10    trucks parked there as well.
11    Q.   All right.  Now, when you saw these big rigs parked
12    there, would it be in No. 1 or the No. 2 lane?
13    A.   Uh, clarify.  What -- what is No. 1, No. 2?
14    Q.   Okay.  The No. 1 lane is the left lane.  The Number
15    two's the right lane.
16    A.   Okay.  It would be on No. 2, sir.
17    Q.   No. 2 lane.  And when you saw these buses -- strike
18    that.  And when you saw these trucks parked in the No. 2
19    lane, um, at what hours of the day would you see that?  Would
20    that be outside -- before the hours of 6:00 a.m.?
21    A.   Yes.  It would be in -- in the morning time line and,
22    um, on or about 5, uh, between the hours of 5:00 and 6:00.
23    Q.   And would you see some of these big rigs, uh, park back
24    to back waiting for this checkpoint to open before 6:00 a.m.?
25    A.   Yes, I did see that.
```

 1   Q.   On many occasions?

 2   A.   Um . . .

 3   Q.   Just an estimate.

 4   A.   It can be anywhere from five up to several occasions.

 5   Q.   All right.  And can you give us a range of how many big

 6   rig trucks you would see at a time parked one behind the

 7   other before the checkpoint opened up at 6 o'clock?

 8   A.   Huh . . .

 9   Q.   Just a range.

10   A.   I would say during, uh, what we call, uh, prior to

11   rotation.  Prior to our rotation, there's a new unit coming

12   in to train.  I would say . . . five, maybe six times?

13   Q.   Just parked back to back.

14   A.   Uh, they -- they'll -- they'll just be parked back to

15   back.

16   Q.   In the No. 2 lane.

17   A.   Yes.

18   Q.   In the checkpoint area.

19   A.   Yes.

20   Q.   And you indicated as soon as you're awakened by this

21   collision, um, it was light enough out for you to see things?

22   A.   Yes.

23   Q.   Uh, now, who do you find at fault for this collision?

24   A.   I have no concrete or full evidence on -- on what took

25   place.

```
 1   Q.   All right.  But you had previously been riding that bus

 2   on a regular basis.

 3   A.   Yes.

 4   Q.   Now, on these previous occasions, I want to talk to you

 5   about your knowledge of the procedure on this bypass road.

 6   Were there any type of procedures for the bus to be driving

 7   in any particular lane?

 8   A.   Yes, I believe, uh . . .  that they had to drive on the

 9   left --

10        MR. LEVERS:  Objection.  Lack of personal

11   knowledge.

12        THE COURT:  Sustained.

13   BY MR. HARLEY:

14   Q.   All right.  On these prior occasions when you're going,

15   uh, northbound on the Fort Irwin Bypass Road, uh, would you

16   have an opportunity to see any type of big rigs parked on the

17   bypass road?

18   A.   Yes.

19   Q.   And at what hours of the day would you make that

20   observation on these previous occasions?

21   A.   Well, it was before the bus -- bus, uh, drove past it.

22   Q.   All right.  And about what time of the day would you see

23   these big rigs, uh, on -- parked on the bypass road?

24   A.   Before 6:00, I believe.

25   Q.   All right.  You're familiar with a check-in point that
```

1   started at 6:00 o'clock and ended at 8:00 o'clock; is that

2   right?

3   A.   Yes.

4   Q.   And was that operational, uh, during the times that you

5   were, uh, riding the bus to and from Fort Irwin?

6   A.   They -- they would -- there would be a line of trucks

7   and . . .  I'm not sure if -- it was so long ago, I'm not

8   sure if the MPs were out there at the time?

9   Q.   Okay.  But when you saw these tractor-trailers parked

10  outside, what lane were they parked in?

11  A.   On the right-hand side.

12  Q.   Of that -- okay.

13  A.   Of the road.

14  Q.   And was it off to the shoulder or was it within the

15  right-hand lane?

16  A.   They were on the road.

17  Q.   Okay.  Off --

18  A.   Right-hand road.

19  Q.   Okay.  Which mean -- when you say on the road, you're in

20  the right-hand lane --

21  A.   Well, there's two -- there is two roads.  There's two

22  sides.

23  Q.   Okay.

24  A.   And they were on the -- the right-hand side of the road.

25  Q.   And how many bus -- how many tractor-trailers would you

```
 1    see lined up, uh, stopped in the right lane?

 2    A.   It just depended of -- of the day or if there was a

 3    rotation on 'em.

 4    Q.   Okay.  Can you give me a range?  From . . .

 5    A.   Uh, it was so long ago.  I know after I got a -- uh,

 6    after, I was there for ten years.

 7    Q.   Right.

 8    A.   So during that time, it fluctuated from six, three.  It

 9    could be as much as ten.

10    Q.   These are tractor-trailer rigs that were stopped

11    completely in the No. 2 lane.

12    A.   Yes.

13    Q.   And would you see that activity of several

14    tractor-trailer rigs being stopped in the No. 2 lane before

15    the 6:00 a.m. check-in point?

16    A.   Yes.

17    Q.   And were they always parked in the area of the check-in

18    point?

19    A.   Yes.

20    Q.   Now, how early would you say you saw these big rigs

21    parked in that particular area before 6:00 a.m.?  How much

22    earlier would you say?

23    A.   Well, just when I drove a . . .  when I rode the bus,

24    uh, whatever the time bus left to get there.

25    Q.   Okay.
```

1   A.   The earliest bus.

2   Q.   Now, were there times when you would drive your

3   privately owned vehicle?

4   A.   Yes.

5   Q.   And when you drove your privately owned we -- vehicle,

6   would you go all the way on the main Fort Irwin Road?

7   A.   I would go, yes, on the main road.

8   Q.   All right.  And as you drove by the check-in point on

9   the bypass road, uh, was it easy for you to see the check-in

10   point on the bypass road?

11   A.   Yeah, it was easy to see the vehicles on the -- on the

12   bypass.

13   Q.   And then, uh, long before the check-in point would you

14   see big rigs parked on the bypass road as you're driving

15   northbound in your privately owned vehicle.

16   A.   Yes.

17   Q.   And would that -- would it be a fair -- what time were

18   you going to the installation in your privately owned

19   vehicle?  Earlier?

20   A.   Sometimes earlier.  It -- just depending, um, what time

21   I had to be there in the morning for the military.  If I had

22   to go to PT or if I had to report to the dining facility.

23   Q.   But there are numerous occasions when you actually drove

24   your privately owned vehicle on the Fort Irwin installation

25   long before 5:00 a.m.

App. 195

```
 1    A.    Yes.

 2    Q.    And were there occasions during that period of time when

 3    you look over and see trucks stopped in the No. 2 lane of the

 4    bypass road?

 5    A.    As far as I'm aware, yes.

 6    Q.    And would there be on occasion more than one

 7    tractor-trailer truck parked back-to-back?

 8    A.    Yes.

 9              MR. HARLEY:  I have nothing further.

10              THE COURT:  Cross.

11                          CROSS-EXAMINATION

12    BY MR. LEVERS:

13    Q.    Afternoon, Mr. Hoegle.

14    A.    Good afternoon.

15    Q.    Just a few quick questions.

16    A.    Sure.

17    Q.    Um, that time in June at 5:06 in the morning, it would

18    have still been dark out; right?

19    A.    Uh, I'm assuming, yes.

20    Q.    Okay.  And . . .

21              MR. HARLEY:  Excuse me.  Object, Your Honor.

22              Lacks foundation.  Move to strike.

23              THE COURT:  Overruled.

24    BY MR. LEVERS:

25    Q.    And you were upset about all the people that got hurt in
```

1           UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

3        HONORABLE JESUS G. BERNAL, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,              )
                                           )
6                  Plaintiff,              )
                                           )
7                                          ) Case No.
                   vs.                     ) EDCR 16-24-JGB
8                                          )
    STEVEN KILTY,                          )
9                                          )
                   Defendant.              )
10  _____)

11

12              REPORTER'S TRANSCRIPT OF PROCEEDINGS
                      RIVERSIDE, CALIFORNIA
13             FRIDAY, SEPTEMBER 28, 2018
                        TRIAL DAY 4
                       A.M. SESSION
14

15

16

17

18

19

20

21

22  _____
            **ADELE FRAZIER, CSR 9690, CRR, RMR**
23            Federal Official Court Reporter
              United States District Court
24               3470 Twelfth Street
              Riverside, California 92501
25             adelefraziercsr@gmail.com

1   **APPEARANCES OF COUNSEL:**

2   **For the Plaintiff:**

3           OFFICE OF THE UNITED STATES ATTORNEY
            By:  JERRY YANG, Assistant United States Attorney
4                PAUL LEVERS,
                 Special Assistant United States Attorney
5           3403 Tenth Street, Suite 200
            Riverside, California 92501

6

7

    **For the Defendant:**
8
            ROBISON D. HARLEY
9           Attorney at Law
            825 North Ross Street
10          Santa Ana, California  92701

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  **M A S T E R   I N D E X**

2            FRIDAY, SEPTEMBER 28, 2018; TRIAL DAY 4

3                         A.M. SESSION

4                Chronological Index of Witnesses

5   WITNESSES CALLED BY THE DEFENDANT              PAGE

6   HERBERT SUMMERS
         Direct Examination by Mr. Harley          10
7        Cross-Examination by Mr. Yang             27
         Redirect Examination by Mr. Harley        34
8

9   JORDAN GELLER, M.D.
         Direct Examination by Mr. Harley          44
10       Cross-Examination by Mr. Levers           67
         Redirect Examination by Mr. Harley        69
11       Recross-Examination by Mr. Levers         70

12
    MATHEW DERRICO
13       Direct Examination by Mr. Harley          72
         Cross-Examination by Mr. Yang             80
14       Redirect Examination by Mr. Harley        85

15
    MIKE LIENERT
16       Direct Examination by Mr. Harley          89
         Cross-Examination by Mr. Yang             94
17       Redirect Examination by Mr. Harley        98

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1   A.   Correct.  The -- I would catch the bus -- well, still do

2   -- at 4:25 in the morning at William Street.  And it arrives

3   Fort Irwin proper at the main gate about 5:10, 5:15.  So yes,

4   you would go by the bypass or the checkpoint prior to that.

5            MR. HARLEY:  Your Honor, may I confer briefly?        11:27

6            THE COURT:  Yes.

7            MR. LEVERS:  Your Honor, the Government -- the United

8   States will offer to stipulate that he has previously ridden

9   the bus with Dinorah Aguilar.

10            THE COURT:  Very well.  Proceed.                     11:28

11   BY MR. HARLEY:

12   Q.   Now, sir, when you were on that bus with Dinorah Aguilar,

13   would you see big rigs parked on the side of the road?

14   A.   That is correct.  At the -- I believe it's at 6:00 a.m.

15   that they actually hold truck traffic at that checkpoint.  But  11:28

16   there are some trucks that they want to be first to get to

17   their delivery point.

18   Q.   Right.

19   A.   So they'll show up earlier, prior to 6:00, and start

20   parking at that checkpoint.                                   11:28

21   Q.   All right.  And this is in the number two lane, the slow

22   lane?

23   A.   That's correct.

24   Q.   And would the -- what would the bus do when you were

25   riding the bus that you actually observed?  Would it go in the  11:28

1    number 1 lane?

2    A.    That's correct.

3    Q.    All right.  And about how many times would you say you

4    road this bus with this person we've stipulated was Ms. Aguilar

5    where you would actually pass these big rigs parked in the          11:29

6    number 2 lane before the 6:00 a.m. check-in point?

7    A.    How many times?

8    Q.    Yes.  Just a ballpark estimate.

9    A.    Okay.  Well, let me give you a little background on that

10   is the way the drivers work is they bid for the individual         11:29

11   route -- routes.  And I think that bidding process comes up

12   about every six months.  So it was at least four or five months

13   that I'd -- that she had been that bus driver on that

14   particular route.  So there was multiple occasions where she

15   was the driver and I drove by that checkpoint.                      11:29

16   Q.    And where you actually ride by in that bus while she's the

17   driver in the number 1 lane to avoid hitting the big rigs

18   parked in the number two lane?

19   A.    Repeat, please.

20   Q.    Were you actually riding in the bus driven by Ms. Aguilar    11:29

21   prior to June 2nd, 2014, where she actually drove in the number

22   1 lane past tractor trailers that were stopped in the number 2

23   lane?

24   A.    That is correct, yes.

25   Q.    And would that be done on more than one occasion?            11:30

```
 1            MR. YANG:  No further questions, your Honor.

 2            THE COURT:  Very well.  Mr. Harley.

 3                   REDIRECT EXAMINATION

 4   BY MR. HARLEY:

 5   Q.   Sir, on these occasions you talked about seeing buses    11:36

 6   either -- strike that.

 7            These occasions where you've seen tractor trailer

 8   rigs parked in the number 2 lane or parked partially on to the

 9   shoulder, were those instances all occurring before the

10   6:00 a.m. check-in point?                                      11:36

11   A.   That's correct, yes.

12            MR. HARLEY:  I have nothing further.

13            THE COURT:  Any recross?

14            MR. YANG:  No, your Honor.

15            THE COURT:  You may step down, sir.               11:36

16            MR. HARLEY:  May we approach?

17            THE COURT:  Yes.

18            (Outside The Presence Of The Jury:)

19            MR. HARLEY:  Your Honor, I have Mr. Royer, and I'm

20   planning on putting my client on the stand.  I would --      11:37

21   Mr. Royer is somewhere between Barstow and -- not Barstow, Las

22   Vegas.  I understand he's coming down.  We can't get a hold of

23   him.  But from my conversation with him yesterday, I made it

24   very important that he be down here by 1:30 or 2:00 at the

25   latest.  So I guess I'm asking the Court if we could just hold 11:37
```

App. 202

# Exhibit A-7

# Testimony of David Royer and Steven Kilty

ECF 143 at 7-19 (Royer), 20-44 (Kilty)
September 28, 2018 (P.M. Session)

<pre>
 1                    UNITED STATES OF AMERICA
                  UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
                        EASTERN DIVISION
 3
                            - - -
 4                HONORABLE JESUS G. BERNAL
              UNITED STATES DISTRICT JUDGE PRESIDING
 5                          - - -

 6
      UNITED STATES OF AMERICA,         )
 7                                      )
                     PLAINTIFF,         )
 8                                      )
      VS.                               )   CASE NO.:
 9                                      )   ED CR 16-0024-JGB
      STEVEN KILTY,                     )
10                                      )
                     DEFENDANT.         )
11                                      )
      _____)
12

13

14
              REPORTER'S TRANSCRIPT OF PROCEEDINGS
15
                      (P.M. SESSION)
16
                FRIDAY, SEPTEMBER 28, 2018
17
                   LOS ANGELES, CALIFORNIA
18

19

20

21

22

23
                LAURA MILLER ELIAS, CSR 10019
24            FEDERAL OFFICIAL COURT REPORTER
              350 WEST 1ST STREET, ROOM 4455
25            LOS ANGELES, CALIFORNIA 90012
                  PH:  (213)894-0374
</pre>

1

APPEARANCES OF COUNSEL:

2

3   ON BEHALF OF PLAINTIFF:

4           UNITED STATES ATTORNEY'S OFFICE

5           BY: PAUL D. LEVERS

6               JERRY YANG

7           ASSISTANT UNITED STATES ATTORNEY

8           RIVERSIDE, CALIFORNIA

9

10

11  ON BEHALF OF DEFENDANT:

12

13          ROBISON DOOLING HARLEY, JR., ESQ.

14

15

16

17

18

19

20

21

22

23

24

25

App. 205

```
 1                              INDEX

 2   WITNESSES FOR
     THE DEFENSE:
 3                     DIRECT      CROSS     REDIRECT    RECROSS

 4   ROYER, DAVID

 5   BY:  MR. HARLEY       7
     BY:  MR. YANG                    17
 6

 7   KILTY, STEVE

 8   BY:  MR. HARLEY     20                      43
     BY:  MR. LEVERS                 36
 9

10

11          EXHIBITS            RECEIVED

12
            246 - 237               4
13
            239                    13
14
            240                    13
15
            204                    46
16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1                THE COURT:  Mr. Lienhart?
 2                MR. HARLEY:  Excuse me.  I -- Mr. Royer.  He's one
 3   of our experts, Your Honor.
 4                THE COURT:  So advise my clerk when he's present.
 5                THE CLERK:  The court's in recess.
 6                          (Recess taken.)
 7                THE COURT:  Mr. Harley, call your next witness.
 8                MR. HARLEY:  Thank you.  David Royer.
 9                Your Honor, may I confer just briefly?
10                THE CLERK:  Please step right up here.
11                Please stand and raise your right hand.
12                          (Witness sworn.)
13                THE CLERK:  Thank you, please be seated.
14                State your name and spell your last name for the
15   record.
16                THE WITNESS:  My name is David Royer.  My last name
17   is spelled R-o-y-e-r.
18                THE COURT:  Proceed.
19                          DIRECT EXAMINATION
20   BY MR. HARLEY:
21   Q.   Good afternoon, Mr. Royer.  What's your current
22   occupation?
23   A.   I'm a Consulting Traffic and Highway Engineer.
24   Q.   All right.  And just for the record, I notice you came
25   down without a coat and tie?
```

1    A.    Yes.

2    Q.    Is there a reason for it?

3    A.    Oh, I was out of state on a partial vacation, and I got

4    called into court today, and this is the fanciest outfit that

5    I had.

6    Q.    All right.  Now, what's your current occupation -- and

7    how long have you been working in that occupation?

8    A.    I've been 54 years in my current occupation.

9    Q.    All right.  And can you give us your background,

10   training and experience?

11   A.    Yes.  I have a Bachelor's Degree in Civil Engineering

12   from California State College, back in those days.  I went to

13   work for the City of Los Angeles designing highways.  Did

14   that for five years.  Went over to the -- what's now the

15   Department of Transportation with the City of Los Angeles.

16   Worked the remainder of my 32-year career with them.

17         And I retired 22 years ago and went into my own

18   consulting business.  And I do consulting for cities, I do

19   some litigation work like we're doing now.  I do work for

20   private engineering firms that need my expertise and such as

21   that.  So I'd say I'm semi-retired now.

22   Q.    All right.  And have you qualified as an expert before?

23   A.    Yes.

24   Q.    Both in court and at depositions?

25   A.    Yes.

```
 1    Q.   Can you give us an approximate number of times you've
 2    qualified as an expert both in court and in depositions?
 3    A.   Probably 550 times, roughly.
 4    Q.   Now, are you familiar with what's referred to as the
 5    National Manual on Uniform Traffic Control Devices?
 6    A.   Yes, very much so.
 7    Q.   How long have you been working with that particular
 8    manual?
 9    A.   Well, I have been working with that manual since 2014
10    when the manual was adopted in the State of California, and I
11    also served on the committee -- Federal Highway
12    Administration Committee that writes the manual and uniform
13    traffic control devices.  So I am very familiar with the
14    manual, and I probably use it or refer to it two or three
15    times at least every week.
16    Q.   Now, is Fort Irwin governed by the National Manual on
17    Uniform Traffic Control Devices?
18    A.   Yes.  All military installations are.
19    Q.   Now, you're familiar with the accident scene that
20    happened on June 2nd, 2014, on the Fort Irwin Bypass Road.
21    A.   Yes.
22    Q.   And how are you familiar with that?
23    A.   I was retained by the insurance carrier through their
24    attorney to look at the traffic collision and determine at
25    least what I felt was any violation of highway design or
```

```
 1   traffic engineering concepts and requirements.
 2   Q.   And did you actually go out to the scene and inspect it?
 3   A.   No.  I never went to the scene to inspect it.  I had
 4   some very good photographs that were taken in the
 5   reconstruction.  So there was no need for myself to go out,
 6   and I left that up to accident reconstructionists.
 7   Q.   And you reviewed photographs of the signage out there
 8   that was in place June 2nd, 2014.
 9   A.   Yes.
10   Q.   Now, were you aware of a sign out there quote "Be
11   Prepared to Stop"?
12   A.   Yes.
13   Q.   And is that in conformance with MUTCD?
14   A.   Uh, no, in -- in two ways.  First of all, it was the
15   wrong shape, and in a temporary situation was the wrong
16   color.  And secondly, the sign was left up and not removed
17   when it was no longer needed because it was telling the
18   traffic to be prepared to stop when there was no need to stop
19   at that time.
20   Q.   And pursuant to the MUTCD, are there procedures that are
21   required to close a lane in advance?
22   A.   Uh, yes.
23   Q.   Any type of signage that's required?
24   A.   Yes, they -- in the MUTCD, there's a specific set of
25   signs basically so that every driver that comes along
```

App. 210

 1   understands those signs.  When they see 'em used like on a

 2   freeway lane closure or a city street lane closure or in this

 3   case, a rural highway closure, they are seeing the exact,

 4   same signs for uniformity throughout all the states as well

 5   as national parks, military installations and such.

 6   Q.   Now, does the MUTCD call for two additional signs over

 7   and above what you observed to be placed out there?

 8   A.   Yes.

 9   Q.   To be placed in advance warning traffic to get out of

10   lanes peak hours?

11   A.   Yes.  It requires a minimum of two advance signs.

12   Usually, there's three advance signs.  And as well as the

13   traffic control devices in place actually at the point of

14   closure such as either traffic cones or striping, et cetera.

15   Q.   All right.  Now, I want to turn your attention to that

16   big book up there.  Do you see that to your left?

17   A.   Oh, yes.

18   Q.   Can you go to Exhibits 239 and 240?

19        MR. HARLEY:  With the Court's permission.

20        THE CLERK:  239?

21        MR. HARLEY:  239 and 240.

22   Q.   Do you recognize that?

23   A.   Yes.

24   Q.   And how do you recognize that?

25   A.   Uh, it's right out of the California manual on uniform

UNITED STATES DISTRICT COURT

1   traffic control devices as well as the federal manual on

2   uniform traffic control devices.  And it's not only in this

3   section, it's in the very beginning general description of

4   the manual on uniform traffic control devices which I'll call

5   MUTCD.  That's the, uh, acronym for it.

6   Q.   And does that appear to be an accurate representation of

7   MUTCD, Section B-01?

8   A.   Yes.

9   Q.   And moving on down to Exhibit 240, do you see that?

10  A.   Yes.

11  Q.   And do you recognize that?

12  A.   Yes, I do.

13  Q.   How do you recognize that?

14  A.   Uh, one, I produced it, um, but it is part six which is

15  temporary traffic control.  That's what we had here,

16  temporary traffic control.  And it shows two different ways

17  that you can safely and uniformly close a moving lane of

18  traffic or as I like to call it, a hot lane of traffic, uh,

19  because it was not a protected lane.  Uh, so it is an open

20  lane of traffic that all -- that is being used by vehicles

21  that are approaching the location in either lane.

22         MR. HARLEY:  Your Honor, request permission to

23  admit 239, 240, and then after that assuming admission,

24  request permission to publish.

25         THE COURT:  Any objection?

```
 1              MR. YANG:  No, Your Honor.

 2              THE COURT:  They're both received.

 3                  (Exhibits 239 and 240 admitted.)

 4              THE COURT:  You may publish.

 5              MR. HARLEY:  Your Honor, for the record, 239.

 6    Q.    Sir, do you see Exhibit 239?

 7    A.    Yes.

 8    Q.    And does that appear to be an accurate representation of

 9    MUTCD 6B.01?

10    A.    Yes, it's directly out of the manual.

11    Q.    All right.  And did you become aware of whether or not

12    in your opinion that particular MUTCD section was followed in

13    connection with the accident that took place on June 2nd,

14    2014?

15    A.    No, it was not.

16    Q.    And can you explain?

17    A.    Uh, the section says that all TTC, that stands for

18    Temporary Traffic Control, devices shall be removed as soon

19    as practical when they are no longer needed.  When the work

20    is suspended for a short period of time, temporary traffic

21    control devices that are no longer appropriate shall be

22    removed or covered.

23    Q.    And in this situation, you became aware that the

24    temporary traffic control device was not removed from the

25    scene.
```

```
 1   A.   That's correct.  The two advance signs that say Be
 2   Prepared to Stop were not removed or turned away from
 3   traffic.  And then there was also another sign that said, uh,
 4   something about inspection point or a point of inspection or
 5   something like that.  Uh, that also needed to be turned away
 6   from traffic.
 7              MR. HARLEY:  Your Honor, requesting permission to
 8   put up 240.
 9              THE COURT:  You may.
10   BY MR. HARLEY:
11   Q.   All right.  Sir, is this a diagram that's prepared by
12   you?
13   A.   Uh, It was copied by me.  It is a -- the, uh, typical
14   application Number 33 out of the manual on uniform traffic
15   control devices.  It's exactly the same in the California
16   manual as the federal manual, and it shows on the right-hand
17   side a way to handle it short term which this could be
18   considered as well as long term on the left side.
19   Q.   Okay.  So the right hand, these are both ways to comply
20   with the MUTCD; is that correct?
21   A.   Correct.  Cause this is temporary traffic controls only
22   in effect I think two -- two hours of the working days.
23   Q.   All right.  And you indicated that the right-hand side
24   diagram was -- how is that different from the left-hand side
25   diagram?
```

App. 214

```
 1   A.    Uh, it's short term in this situation.  Since it was
 2   five out of seven days a week, you could stripe it which is
 3   shown on the left side or the right side is, uh, the traffic
 4   control devices would have to be turned toward traffic.  Uh,
 5   the arrow board, sequential arrow board would be have to be
 6   turned on telling traffic to move over.  Uh, the cones would
 7   have to be set, only about a dozen cones over about 600 feet.
 8   And then the -- where you see the cross hatched area on the
 9   right, that is where the trucks would be lined up.
10   Q.    Okay.  So on the right-hand side are the requirements
11   for MUTCD Temporary Traffic Control on a short-term basis.
12   A.    Yes.
13   Q.    And it's your understanding based on your investigation
14   and review of the signage out there on June 2nd, 2014, the
15   short-term alternative for MUTCD was not complied with.
16   A.    Yes, not complied with at all.
17   Q.    All right.  Now, going over to the long term and
18   intermittent route for complying with MUTCD, based on your
19   investigation and your review of the signage out there, was
20   that particular alternative in the MUTCD complied with?
21   A.    No, it was not.  And that's another -- this is another
22   option that could have been done where you'd actually go out
23   and stripe the lane out permanently.  Uh, and that way, you
24   wouldn't have to come turn all the signs, uh, because uh, I
25   need to move all of the traffic, 24 hours a day, out of the
```

```
1    Number two lane.  So it could be done either way.
2          It would only be done on the right-hand side most
3    practically, uh, if they needed two lanes at certain times of
4    the day.  But from what I understand in terms of volumes, it
5    all goes back down to one lane just a little beyond the
6    inspection point because it comes back onto the main highway.
7          So you're gonna drop the lane up there any ways.
8    If it was my -- my project, I would have permanently striped
9    the No. 2 out and totally protected the inspection operation,
10   uh, 24 hours a day.
11   Q.   So neither option was complied with.
12   A.   Yes.  You can comply with either one of these.
13   Q.   But in this case, neither one of those two alternatives
14   was complied with.
15   A.   Correct.  None of the signs, no arrow board was
16   operating, uh, no cones or delineation devices were in place
17   or anything to protect the, uh, traffic that was stopped in
18   the, uh, No. 2 lane.
19          MR. HARLEY:  Thank you.
20          THE COURT:  Cross-examination.
21          MR. YANG:  Thank you, Your Honor.
22   May I proceed, Your Honor?
23          THE COURT:  You may.
24          MR. YANG:  Thank you, Your Honor.
25
```

App. 216

```
 1                      CROSS-EXAMINATION
 2   BY MR. YANG:
 3   Q.    Good afternoon, Mr. Royer.
 4   A.    Good afternoon.
 5   Q.    You are familiar with the proper placement of signage;
 6   is that correct?
 7   A.    Correct.
 8   Q.    You are familiar with the proper content on signage;
 9   isn't that correct?
10   A.    That's correct.
11   Q.    And under the -- I believe it's called the MUTCD.
12   You're familiar with that code?
13   A.    Yes.
14   Q.    Okay.  So under the MUTCD, you don't need signs on the
15   highway telling drivers to don't just stop your car and park
16   in the middle of the road overnight; isn't that correct?
17   A.    If you have, uh -- if you have no signs in, that's
18   correct.
19   Q.    Okay.  But I'm just saying on a regular highway, you
20   don't need a sign telling drivers not to stop in the middle
21   of the road and park overnight; isn't that correct?
22   A.    Correct, unless they might be confused by the signs, but
23   that is correct.
24   Q.    Okay.  And there's no need because that type of conduct
25   is obviously dangerous; isn't that correct?
```

1  A.   Uh, that's more a human factors, uh, decision as to

2  whether a person might be confused or not confused, and

3  that's outside my expertise.

4  Q.   And under the MUTCD, um, roads don't need to have

5  signage that says that stopped vehicles need to put out

6  safety triangles to warn other vehicles; isn't that correct?

7  A.   That's -- that's correct.  Under the California Vehicle

8  Code, correct.

9  Q.   Because under the California Vehicle Code, the law

10  requires drivers to, uh, put out safety triangles to warn

11  other vehicles under those circumstances; isn't that right?

12  A.   That's correct.  Whenever a truck, uh, is stopped on a

13  shoulder of a road or otherwise disabled, they have to put

14  out triangles.

15  Q.   In fact, stopping on the shoulder of a road, you should

16  put out safety triangles; isn't that right?

17  A.   Yes.  Unless they -- unless the vehicle can be moved,

18  uh, immediately.  That's my understanding.

19  Q.   And you also don't need, uh, signage on a highway that

20  vehicles parked in the hot lane of traffic need to put out

21  hazard lights to warn other vehicles; isn't that correct?

22  A.   Could you repeat it again?

23  Q.   On a highway under the MUTCD, you don't seed signage

24  that says that vehicles parked in the hot lane of traffic

25  need to put out hazard lights to warn other vehicles; right?

```
 1   A.    Hazard lights are the triangles or?

 2   Q.    Hazard lights like the warning lights on a vehicle?

 3   A.    Oh, oh.  The four-way flashers.

 4   Q.    Correct.

 5   A.    Yeah, if the vehicle has four-way flasher, uh . . .

 6   Q.    You don't need signage telling drivers that they need to

 7   engage that if they're stopped in the middle of the road

 8   under the MUTCD; isn't that correct?

 9   A.    Oh, under the vehicle code, that's correct.

10   Q.    Okay.

11   A.    I don't think that's in the MUTCD.

12         MR. YANG:  No further questions, Your Honor.

13         THE COURT:  Any redirect?

14         MR. HARLEY:  No, sir.

15         THE COURT:  Sir, you're excused.  Thank you.

16         THE WITNESS:  Thank you.

17         THE COURT:  Enjoy the rest of your vacation.

18         THE WITNESS:  Well, I'm going home now.

19         I was on my way home.

20         THE COURT:  Mr. Harley.

21         MR. HARLEY:  Yes, sir.

22         Mr. Kilty.

23         THE COURT:  Mr. Kilty, come forward.

24         THE CLERK:  Please raise your right hand.

25              (Defendant sworn.)
```

```
 1                THE CLERK:  All right, thank you.

 2                Please be seated.

 3                State your name and spell your last name for the

 4    record.

 5                THE WITNESS:  My name is Steve Kilty, K-i-l-t-y.

 6                THE COURT:  Proceed.

 7                          DIRECT EXAMINATION

 8    BY MR. HARLEY:

 9    Q.   Mr. Kilty, what's your current occupation?

10    A.   Truck driver.

11    Q.   And I want to take you back to June 2nd, 2014.  Were you

12    a commercial truck driver back then?

13    A.   Yes.

14    Q.   And how many years had you been a commercial trucker

15    prior to June 2nd, 2014?

16    A.   20 years.

17    Q.   And can you describe some of your duties over that

18    20-year period of time?

19    A.   Just taking freight from -- to and from across the

20    United States.

21    Q.   Okay.  And that applies to all the continental states?

22    A.   Yes.

23    Q.   48 states?

24    A.   Yes.

25    Q.   And what type of freight do you transport across the
```

App. 220

1   states during this 20-year period of time?

2   A.   Um, I used to do van and refer freight so it would have

3   been cold storage freight or, um -- this accident would have

4   been heavy duty freight.  Like military vehicles.

5   Q.   Okay.  Now, prior to June 2nd, 2014, had you delivered

6   some type of freight to the Fort Irwin Military Base?

7   A.   Yes.  It was, um, some kind of military truck.

8   Q.   And do you remember what month and what year that was?

9   A.   No, I don't.  I think it was a couple of months before

10  the accident.

11  Q.   Okay.  So it was in 2014, but it was a couple months

12  before June 2nd, 2014.

13  A.   Yes.

14  Q.   And do you remember what type of vehicle you were

15  transporting on that first trip to Fort Irwin?

16  A.   No, I don't recall.

17  Q.   And do you remember from where you dispatched?  On this

18  first trip I'm talking about.

19  A.   Um, no, I don't.  I'm assuming it was probably from

20  another state, not Wisconsin.

21  Q.   Not what?

22  A.   Not from Wisconsin.

23  Q.   All right.  Now, you did arrive in the area of the

24  check-in point of the Fort Irwin Bypass Road; is that

25  correct?

App. 221

```
 1    A.    Yes.

 2    Q.    Do you recall about what time it was?

 3    A.    Um, the sun was still up so -- was up so it was probably

 4    between 5:00 and 6:00.

 5    Q.    Between 5:00 and 6:00?

 6    A.    Yes.

 7    Q.    And when you showed up between 5:00 and 6:00, was that

 8    in the area of the check-in?

 9    A.    Yes.

10    Q.    Now, when you showed up between 5:00 and 6:00 a.m., were

11    there other vehicles parked in the No. 2 lane ahead of you?

12    A.    Yes.

13    Q.    About how many trucks -- strike that.  Were these all

14    heavy duty, big rig, tractor-trailer type trucks?

15    A.    Yes.

16    Q.    And there were you indicated -- well, how many

17    tractor-trailers were ahead of you stopped in the No. 2 lane?

18    A.    Mmm, twenty.

19    Q.    All right.  And did you actually stop behind those

20    twenty vehicles?

21    A.    Yes.

22    Q.    And did you wait the 20th vehicle in line for the

23    check-in point to open up at 6:00 o'clock?

24    A.    Yes.  It actually opens at 8:00.

25    Q.    Okay.  But the check-in point opened up at 6:00.
```

UNITED STATES DISTRICT COURT

1   A.   Yes.

2   Q.   You -- you and the twenty trucks in front of you had

3   shown up before 6:00 o'clock.

4   A.   Yes.

5   Q.   And in what lane were all these twenty trucks including

6   yours parked from about 5:00 to 6:00 o'clock until this, uh,

7   check-in point opened up?

8   A.   Right lane.

9   Q.   I'm sorry?

10   A.   The right lane.

11   Q.   Okay.  In the middle of the right lane?

12        THE COURT:  I'm sorry.  Can you clarify whether it

13   was 5:00 or 6:00 a.m. or p.m. when you first arrived?

14        MR. HARLEY:  Okay.  I apologize, Your Honor.

15   Q.   When you said you showed up at 5:00 or 6:00, was it 5:00

16   or 6:00 a.m. or 5:00 or 6:00 p.m.?

17   A.   I'm sorry.  It was 5:00 a.m. -- between 5:00 and

18   6:00 p.m. -- a.m.  Sorry.

19   Q.   Okay.  And this is, uh . . .  in connection with waiting

20   for a check-in, uh, time of 6 o'clock.

21   A.   Yes.

22   Q.   Now, prior to coming out here, had you been told about

23   this check-in point on the Fort Irwin Bypass Road?

24   A.   Yes.

25   Q.   And -- and is that -- when you showed up with twenty

```
 1   vehicles in front of you, was that expected or was that
 2   unexpected?
 3   A.   Unexpected.
 4   Q.   All right.  But the actual parking in the area, uh, you
 5   were informed by other people in your company that's routine.
 6   A.   Yes.
 7   Q.   And so based on what you were told, you parked behind
 8   twenty vehicles and waited.
 9   A.   Say that again?
10   Q.   You parked behind these twenty tractor-trailer trucks in
11   the No. 2 lane and waited.
12   A.   Yes.
13   Q.   Until the check-in point.
14   A.   Yes.
15   Q.   Now, how long did it take to proceed forward, uh, after
16   being checked in?
17   A.   I -- I guess about an hour after.  I'd say 9:00 o'clock
18   in the morning.
19   Q.   About 9:00 o'clock?
20   A.   Yes.
21   Q.   And do you remember how long the actual inspection took
22   place?
23   A.   Um . . . a few minutes.
24   Q.   All right.  And were you made aware of the reasons for
25   the inspection?
```

1    A.   Um, it's just typical.  They just look over your truck

2    to make sure it's, um -- you ain't carrying anything extra

3    like they, um, take the mirrors and stuff underneath the

4    truck, but no, they, uh -- and check your background.

5    Q.   All right.  And, um, after that all that was done, you

6    were able to proceed forward about 9:00 a.m.

7    A.   Yes.

8    Q.   Now, the check-in point evidently closed at

9    8:00 o'clock.  What caused you to stay in the location for an

10   additional hour before you're able to proceed onto the

11   Fort Irwin base?

12   A.   Well, because all the other trucks in front of you

13   for -- it's called a moving down the road or into the base.

14   Q.   Now, at about 9:00 a.m., you're able to start moving

15   down the road.

16   A.   Yes.

17   Q.   And when you say the road, this is the Fort Irwin Bypass

18   Road.

19   A.   Yes, moving into the rest of -- into the gate and then

20   finally to where we had to deliver.

21   Q.   And prior to showing up here on this particular date,

22   were you told about where to drive your big, tractor-trailer

23   rig?

24           MR. LEVERS:  Objection.  Vague?

25           THE COURT:  Sustained.

```
 1   BY MR. HARLEY:
 2   Q.   What was -- when you showed up the first time, was there
 3   an understanding where you're supposed to drive your
 4   tractor-trailer rig?  As far as the No. 1 or No. 2 lane.  If
 5   you recall.
 6   A.   I don't recall, but most of the trucks are in the No. 2
 7   lane.
 8   Q.   All right.  And this No. 2 lane is the right lane.
 9   A.   Yes.
10   Q.   Which is the slower lane.
11   A.   Yes.
12   Q.   And do you happen to recall, uh, how fast or how slow
13   you were going that first time hauling this large, heavy
14   military wrecker?
15   A.   The date of the accident?
16   Q.   No, I'm talking about the first time, if you recall.
17   A.   No, I don't recall.
18   Q.   Now, was that the only prior occasion you had been in
19   the area of that checkpoint before June 2nd, 2014?
20   A.   Just the time that we were just talking about.
21   Q.   Yes.
22   A.   Yeah.  Just that one time.
23   Q.   All right.  Now, I want to direct your attention to
24   June 2nd, 2014.  You were out here.
25   A.   Yes.
```

1    Q.    At that check-in sign location.

2    A.    Yes.

3    Q.    Now, where did you start from on that particular time --

4    date when you ended up out here on June 2nd?

5    A.    Um, I started in Oshkosh, Wisconsin on May 29th.  Which

6    is a Thursday.

7    Q.    All right.  And, uh, when you started there -- did you,

8    uh, where did you head initially?

9    A.    I headed directly to Fort Irwin.

10   Q.    All right.  And do you know what time you arrived?

11   A.    Um, 8:30 on Sunday night.

12   Q.    How much?

13   A.    8:30 on Sunday night.

14   Q.    And Sunday night would be June 1st.

15   A.    Yes.

16   Q.    All right.  And it was about 8:30.

17   A.    Yes.

18   Q.    And, uh, when you arrive -- and this is at the location

19   of the check-in point you were, uh -- it's the exact, same

20   location you had earlier been to; is that correct?

21   A.    Yes.

22   Q.    And could you still see that temporary barrier sign out

23   there, check-in point, 0600 to 0800?

24   A.    Yes.

25   Q.    And did you park at that location?

1   A.   Yes.

2   Q.   Now, this time, were there any trucks in front of you?

3   A.   No.

4   Q.   So you were the first truck in this line.

5   A.   Yes.

6   Q.   And then, uh, once you parked there, um, did you use a

7   port potty or this water fountain or anything like that?

8   A.   No.

9   Q.   Okay.  And what did you do after you parked there?

10  A.   Uh, got out of the truck and just walked around and

11  checked everything out on the trailer, make sure everything

12  was good and made sure I looked at that sign that said Monday

13  through Friday check-in so I just got back in the truck and

14  went to bed.  Shut the truck off, went to bed.

15  Q.   All right.  And, um, did you put any reflector devices

16  or any flares or anything that -- like that behind your

17  vehicle?

18  A.   No.

19  Q.   And, uh, why not?

20  A.   Because I thought it was a safe place to park.

21  Q.   All right.  Now, on that previous occasions, did any of

22  those trucks in front of you have any type of reflectors,

23  triangles, flares or anything out behind them?

24  A.   No.

25  Q.   All right.  So, uh, now, did you sleep straight through?

UNITED STATES DISTRICT COURT

1   A.   Yes.

2   Q.   And were you awaking -- awakened by something out of the

3   ordinary?

4   A.   Yes.  By the bus hitting me.

5   Q.   All right.  And how did that feel?  That impact.

6   A.   It was like pretty crazy, actually.

7   Q.   All right.  And what was your response?

8   A.   Um, I was pretty disoriented.

9   Q.   All right.  And did you eventually get out of the

10  vehicle?

11  A.   Um, yeah, after I got my composure and got dressed,

12  yeah.

13  Q.   All right.  And once you got out of the -- were you able

14  to get out of the left-hand side or the right-hand side of

15  your vehicle?

16  A.   Uh, left door, the driver's door.

17  Q.   And once you got out of the left-hand side of the

18  vehicle, uh, did you go back -- well, when was the first time

19  you became aware of what hit you?

20  A.   Um, I guess when I woke up after the initial accident

21  happened, and I found myself on the floor and stood up and

22  said like what the -- what happened, and looked out and

23  looked my mirror and seen something that hit the rear end of

24  my trailer.

25  Q.   So you eventually got out of your tractor-trailer.

1    A.    Yes.

2    Q.    And where did you go?

3    A.    Um, I got out, and a gentleman was running by asking if

4    I had a First Aid kit.

5    Q.    Okay.  Now, this gentleman running by and asked if you

6    had a First Aid kit, was he one of those passengers who

7    testified in open court a few days ago?

8    A.    No, I think he was the truck driver.  He was another

9    truck driver.

10   Q.    Oh, okay.  There's another truck out there?

11   A.    He had -- I -- I assume he musta -- after the accident

12   happened, he musta came around, and I don't even know where

13   he came from.

14   Q.    Okay.  So this gentleman was asking for a First Aid kit?

15   A.    Yes.

16   Q.    And did you have one available?

17   A.    No.

18   Q.    All right.  And what's the next thing you recall

19   happening after this accident?

20   A.    Um . . .  I walked around to back of the truck, and

21   there was three of the passengers.  I believe they said they

22   were the passengers off the bus standing there.

23   Q.    All right.  So --

24   A.    Behind the truck.

25   Q.    By this time, three of the passengers had gotten off the

1   bus?

2   A.   Yes.

3   Q.   And had paramedics or anybody arrived at that point in

4   time?

5   A.   No.

6   Q.   So at this point in time, you had three passengers off

7   the bus.

8   A.   Yes.

9   Q.   And what, if anything, did you observe them doing?

10  A.   Um, they were just asking if everybody was okay and

11  then, um . . .

12  Q.   Were you asking whether they were okay, also?

13  A.   Yes.  And then, um, asked if I had first aid, and I said

14  no and then asked if I'd called 911, and I said no, not yet.

15  Q.   I'm sorry, what?

16  A.   They asked if I called 911, and I said no, not yet.

17  Q.   All right.  Did you eventually call 911?

18  A.   No, I did not.  Somebody else already had.

19  Q.   Okay.  And then after somebody called 911, uh, how long

20  was it before, uh, law enforcement or emergency personnel

21  started showing up?

22  A.   It seemed like only a few minutes, they were there.

23  Q.   And, um . . .  how long after -- was it paramedics that

24  showed up or was it, uh, CID, Fort Irwin PD or do you recall?

25  A.   I don't recall.

1    Q.   All right.  Now, do you recall, uh, CID or Fort Irwin PD

2    contacting you?

3    A.   Yeah, I think it was more after they were taking care of

4    the passengers of the bus, and then it -- when -- when it was

5    later on in the morning already before I had contact, was

6    talking to any of those people.

7    Q.   Okay.  And did they come by and talk to you?

8    A.   Yes.

9    Q.   And you gave them your statement.

10   A.   Yes.

11   Q.   And this is, uh, before noon of June 2nd, 2014.

12   A.   Yes.

13   Q.   Now, were you injured at all?

14   A.   No.

15   Q.   Now, um . . .  how long was your tractor-trailer out

16   there before you were able to leave the scene?

17   A.   From the time of the accident?

18   Q.   Yes.

19   A.   Um, about nine to ten hours.

20   Q.   All right.  And when you left the scene, was it in your

21   big rigor or did the tractor-trail -- well, strike that.

22   Was -- the tractor-trailer portion of it with the heavy

23   wrecker on the back, where was that taken to?

24   A.   Um, after everything was cleared, I proceeded up to the

25   base and delivered the truck.

```
1    Q.   Okay.  So the trailer portion of it with the heavy, uh,
2    wrecker, what do you call it?
3    A.   Yeah, it was a HEMTT wrecker.
4    Q.   HEMTT wrecker.
5    A.   Mm-hmm.
6    Q.   So you were able to move forward and travel on base with
7    it.
8    A.   Yeah, after we had, um, a mechanic come and help me get
9    the -- everything, um, so it was movable.
10   Q.   Okay.  And about what time were you able to get to base?
11   A.   Um, I'd -- I'd say it was about 2:00 to 2:15 maybe.
12   Q.   All right.  And when you got on base, the personnel were
13   there in order to help, uh, remove that, uh, HEMTT wrecker.
14   A.   Yes.
15   Q.   Now, are you aware that military personnel that, uh, are
16   needed in order to remove that HEMTT wrecker from your
17   tractor-trailer don't show up to do their job until 6:00
18   o'clock or later?
19   A.   It would have been later.
20   Q.   So you aren't involved in the moving process of this
21   HEMTT wrecker off your tractor-trailer.
22   A.   No.
23   Q.   It's military personnel?
24   A.   Yes.
25   Q.   And they only work certain hours during the day.
```

1    A.    Yes.

2    Q.    And in your understanding, what type of, uh -- what type

3    of time did they show up?

4    A.    Well, I'm assuming if that, um, wait time was from 6:00

5    to 8:00 --

6              MR. LEVERS:  Objection.  Speculation.

7              THE COURT:  Sustained.

8              MR. HARLEY:  Okay.

9    Q.    Are you aware of when these military people show up in

10   order to remove that HEMTT wrecker from your trailer portion

11   of the tractor-trailer?

12   A.    After 8:00 o'clock.

13   Q.    Now . . . while you're at the scene, before the

14   investigators, uh, told you to go on your way and deliver the

15   vehicle on the base, did any cite -- any person cite you,

16   either Fort Irwin PD, CID or anybody else connected to law

17   enforcement cite you for any type of vehicle code violation?

18   A.    No.

19   Q.    Or military code violation?

20   A.    No.

21   Q.    Or any MUTCD violation?

22   A.    No.

23   Q.    Now, when did you first become aware, uh, that you were

24   actually being charged with any type of offense?  How many

25   years later?

```
 1    A.    A year-and-a-half.
 2    Q.    And prior to that, nobody had contacted you in regards
 3    to, uh, any citations or criminal charges arising from this
 4    incident; is that --
 5    A.    No.
 6    Q.    -- correct?  So it was over a year-and-a-half later.
 7    A.    Yes.
 8    Q.    That's when you're first notified.
 9    A.    Yes.
10    Q.    Do you remember how you were notified?
11    A.    Mmm . . . no, I don't.
12              MR. HARLEY:  I have nothing further.
13              THE COURT:  Cross-examination?
14              MR. LEVERS:  May we approach briefly?
15              THE COURT:  What's that?
16              MR. LEVERS:  I'm sorry.  May we approach briefly?
17              THE COURT:  You want to approach?
18              MR. LEVERS:  Yes.
19              THE COURT:  Come forward.
20         (The following proceedings occurred at side bar:)
21              THE COURT REPORTER:  I can't hear you.  You're
22    gonna have to speak up.
23              MR. LEVERS:  He said no one tried to contact him,
24    but MAIT did try to contact him and his attorney denied a
25    second interview.
```

App. 235

```
1              MR. HARLEY:  Well, that's exercising a
2    constitutional right.
3              MR. LEVERS:  He said no one tried to contact him.
4              THE COURT:  Well, you can impeach him of that.
5              MR. HARLEY:  Your Honor, let me make an appropriate
6    objection.  He doesn't know when these people contacted him.
7    Okay?  So it's assuming his attorney communicated it to him.
8              THE COURT:  So he can ask.
9              MR. HARLEY:  Okay.  Just for the record, I'm
10   objecting because of potential exercising of his Fifth
11   Amendment right to remain silent.
12             THE COURT:  The fact that they tried to contact him
13   or not has nothing to do with him saying anything.  He could
14   just say no, I don't want to talk to you.
15                   (Side bar concluded.)
16                   CROSS-EXAMINATION
17   BY MR. LEVERS:
18   Q.   Good afternoon, Mr. Kilty.
19   A.   Hi.
20   Q.   Mr. Kilty, are you aware that before you were actually
21   charged in this case, the CHP MAIT division did request an
22   interview with you, and the request was denied by your
23   attorney?
24   A.   No, I didn't know that.
25   Q.   Now, Mr. Kilty, you just testified that you -- prior to
```

```
1   this in 2014, you'd been a bus drive -- excuse me, a truck
2   driver for approximately 20 years having crossed 48 states;
3   is that correct?
4   A.   Yes.
5   Q.   And is it fair to say that as a bus -- as a truck
6   driver, you've seen pretty much every kind of driver on the
7   road imaginable?
8   A.   Yes.
9   Q.   You've seen bad drivers.
10  A.   Yes.
11  Q.   You've seen good drivers.
12  A.   That's right.
13  Q.   Old drivers?
14  A.   That's right.
15  Q.   You've seen bus drivers.
16  A.   Yes.
17  Q.   Truck drivers?  You -- you name it, you've seen it;
18  right?
19  A.   That's right.
20  Q.   Now, wouldn't it be fair to say that you know there's a
21  lot of really bad drivers out there?
22  A.   Yes.
23  Q.   Now -- and as part of being a truck driver, you had to
24  have training that's more extensive than the normal person
25  gets for just a regular driver's license; is that correct?
```

```
 1   A.    Yes.
 2   Q.    And as part of that training, you were trained that if
 3   you have to stop in the middle of a road, you have to put out
 4   reflectors, flares, turn on your lights, that kind of thing?
 5   A.    Yes.
 6   Q.    And, in fact, in California, you're legally required to
 7   carry those triangular reflectors; is that correct?
 8   A.    All 48 states.
 9   Q.    And just to jump ahead, on June 4th, 2014 -- I mean
10   June 2nd, did you have those reflectors on your truck?
11   A.    Yes.
12   Q.    Okay.  Thank you.  And I'm sure on all those times
13   driving, you'd seen those reflectors used at times by people;
14   right?
15   A.    Yes.
16   Q.    Have you -- have you used them yourself in the past?
17   A.    Yes.
18   Q.    And in all that time driving, I'm sure you've driven at
19   night many, many times.
20   A.    Yes.
21   Q.    And is it harder to see other cars and vehicles at
22   night?
23   A.    Yes.
24   Q.    In fact, that's why cars have taillights, to make 'em
25   easier to see, isn't it?
```

```
 1   A.   That's right.
 2   Q.   Now, let's talk about June 4th -- actually, let's talk
 3   about the night before, June 3rd.  And you said you got
 4   there, I believe it was around 8:30 p.m.?
 5   A.   Yes.
 6   Q.   Now --
 7            THE COURT:  June 2nd.
 8            MR. LEVERS:  Oh, did I say . . .
 9            THE COURT:  You said the 3rd and the 4th.
10            MR. LEVERS:  Oh.
11            THE COURT:  It was June 1st.
12            MR. LEVERS:  June 1st.
13   Q.   You got there at about 8:30 p.m.; correct?
14   A.   Yes.
15   Q.   And the last time that you were there around 5:00 to
16   6:00 in the morning, you said there was something like twenty
17   trucks already parked in front of you.
18   A.   Yes.
19   Q.   And this time, it was just you.
20   A.   Yes.
21   Q.   So you parked in the No. 2 lane.  That's the slow lane;
22   right?
23   A.   Yes.
24   Q.   Okay.  You said you got out of your truck and walked
25   around it?
```

UNITED STATES DISTRICT COURT

```
 1    A.    Yes.

 2    Q.    And you mentioned that you saw the -- the orange barrier

 3    off on the side of the road; correct?

 4    A.    Yes.

 5    Q.    Okay.  And that's the barrier, I'm not gonna put it up

 6    again, that we've all seen that says 0600 to 0800 and has a

 7    number for the front gate; right?

 8    A.    Yes.

 9    Q.    You didn't call that number for the front gate, did you.

10    A.    Why would I?

11    Q.    You didn't call that number for the front gate, did you.

12    A.    No.

13    Q.    Thank you.  Now, when you walked around that truck, did

14    you take that opportunity to put out cones?

15    A.    No.

16    Q.    Did you take that opportunity to put out a flare?

17    A.    No.

18    Q.    Did you take that opportunity to put out those little

19    reflective triangles you have?

20    A.    No.

21    Q.    When you went back to the truck, did you turn on your

22    emergency blinkers?

23    A.    No.

24    Q.    Did you leave on your taillights?

25    A.    No.
```

UNITED STATES DISTRICT COURT

```
 1   Q.   In fact, you indicated to I believe it was Officer
 2   Gutierrez and Officer Grove that you were concerned that the
 3   tail -- the blinkers, the taillights might drain your
 4   battery; is that correct?
 5   A.   That's right.
 6            MR. LEVERS:   One moment please, Your Honor.
 7   Q.   So, in fact, you thought about turning on your blinkers,
 8   but you didn't because of the battery; correct?
 9   A.   No, I didn't say that.
10   Q.   Well, you said you mentioned the reason you didn't turn
11   them was because of your battery to Officer Gutierrez and
12   Grove; is that correct?
13   A.   I shut them off because there's all kinds of reasons why
14   I shut them off.
15   Q.   And is one of the reasons because you were concerned
16   about your battery?
17   A.   Yeah.
18   Q.   Now, you have like the, uh, hazard lights, the emergency
19   flashers on your truck, don't you?
20   A.   Yes.
21   Q.   And you know how to turn them on?
22   A.   Say again?
23   Q.   You know how to turn them on?
24   A.   Yeah.
25   Q.   Is it hard to turn them on?
```

UNITED STATES DISTRICT COURT

```
 1   A.   No.

 2   Q.   What do you have to do?

 3   A.   Just push a button.

 4   Q.   Okay.  Now, you mentioned the last time that you were

 5   out there, there were twenty trucks in front of you, and it

 6   took about give or take three hours to get through that

 7   checkpoint.  Is that fair?

 8   A.   Yes.

 9   Q.   Okay.  And you didn't want to wait in line for three

10   hours this time, did you.

11   A.   No.

12   Q.   In fact, you indicated to Officer Gutierrez and Officer

13   grove that you, uh, wanted to get ahead of the line this

14   time.

15   A.   Yes.  Or be first.

16   Q.   You wanted to be first.  And that's what you were

17   thinking about when you put up your sunshade and then went to

18   sleep; isn't that correct?

19   A.   Yeah.

20   Q.   But you weren't thinking about other cars on the road,

21   were you.

22   A.   This was a safe area.

23   Q.   You weren't thinking about other cars the road, were

24   you?

25   A.   No.
```

```
 1    Q.   No.  And finally, Mr. Kilty, if you'd put out cones,

 2    triangles, turned on your lights or even pulled over onto the

 3    shoulder, this accident never would have happened, would it.

 4    A.   Can't say.

 5              MR. LEVERS:  No further questions.

 6              THE COURT:  Mr. Harley.

 7                        REDIRECT EXAMINATION

 8    BY MR. HARLEY:

 9    Q.   Sir, um, you know that there's a difference between a

10    staging area and an emergency stop.

11    A.   Yes.

12    Q.   And, uh, what's the difference as you in the trucking

13    industry use that term?

14    A.   The staging area is up at Fort Irwin where you park, and

15    you figure that's a safe area to park.  And if you're broke

16    down or if your vehicle is disabled, you use your emergency

17    flashers or your triangles in an emergency situation.

18    Parking at Fort Orwin -- Irwin is not an emergency situation.

19    Q.   Because it's a staging area.

20    A.   Yes.

21    Q.   The No. 2 lane right at the stop sign for the check-in

22    point.

23    A.   Yes.

24    Q.   Now -- and while you're stopped there from 8:30 all the

25    way up to 5 o'clock, did you have any reason to believe that
```

```
1    a bus carrying eight passengers would crash into your rear
2    end?
3    A.   No.
4    Q.   And why is that?
5    A.   Cause I thought I was in a safe area, and that in
6    staging area, that was a safe place to park.
7              MR. HARLEY:  I have nothing further.
8              THE COURT:  Any recross-examination?
9              MR. LEVERS:  No, Your Honor.
10             THE COURT:  Mr. Kilty, you may step down, sir.
11             THE WITNESS:  Thank you.
12             THE COURT:  Mr. Harley?
13             MR. HARLEY:  Defense moves for -- well . . .
14             THE COURT:  You have to ask to confer if you're not
15   listening to me.
16             MR. HARLEY:  Oh, I'm sorry.  May I confer?
17             THE COURT:  Yes.
18             MR. HARLEY:  Your Honor, may I approach the Court
19   briefly?  We -- we are resting, but I just want to make sure
20   the exhibits were moved into evidence.
21             THE COURT:  You can reserve the issue of the
22   exhibits.
23             MR. HARLEY:  Okay, fine.  We rest.
24             THE COURT:  Any rebuttal witnesses?
25             MR. LEVERS:  No, Your Honor.
```

# Exhibit A-8

# Trial Counsel's Statement to Court Concerning Lack of Written Army "Rules and Regulations" Governing Parking at the Bypass Road Checkpoint

ECF 186 at 41
September 28, 2018 (A.M. Session)

1                UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

3          HONORABLE JESUS G. BERNAL, U.S. DISTRICT JUDGE

4

5    UNITED STATES OF AMERICA,            )
                                          )
6                    Plaintiff,           )
                                          )
7                                         ) Case No.
                     vs.                  ) EDCR 16-24-JGB
8                                         )
     STEVEN KILTY,                        )
9                                         )
                     Defendant.           )
10   _____  )

11

12                REPORTER'S TRANSCRIPT OF PROCEEDINGS
                        RIVERSIDE, CALIFORNIA
13                  FRIDAY, SEPTEMBER 28, 2018
                            TRIAL DAY 4
                           A.M. SESSION
14

15

16

17

18

19

20

21

22   _____
          **ADELE FRAZIER, CSR 9690, CRR, RMR**
23           Federal Official Court Reporter
             United States District Court
24                3470 Twelfth Street
             Riverside, California 92501
25            adelefraziercsr@gmail.com

1   **<u>APPEARANCES OF COUNSEL:</u>**

2   **For the Plaintiff:**

3           OFFICE OF THE UNITED STATES ATTORNEY
            By:  JERRY YANG, Assistant United States Attorney
4                PAUL LEVERS,
                 Special Assistant United States Attorney
5           3403 Tenth Street, Suite 200
            Riverside, California 92501

6

7

    **For the Defendant:**
8
            ROBISON D. HARLEY
9           Attorney at Law
            825 North Ross Street
10          Santa Ana, California  92701

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Right.

 2              MR. HARLEY:  -- can't point to a particular written

 3   policy, but he's been out there on a number of occasions, and

 4   pursuant to conversations with other truckers that were parked

 5   in front of him and behind him, he was, certainly, aware of the      10:16

 6   rules and regulations even though he did not eyeball them.

 7              THE COURT:  What rules and regulations?  He was aware

 8   of what other truckers did.  So he was aware of what other

 9   truckers typically did, but what rules and regulations are you

10   talking about?                                                       10:16

11              MR. HARLEY:  The rules promulgated by the Fort Irwin

12   PD.

13              THE COURT:  And he can state that according to the

14   rules that he knew were promulgated by the Fort Irwin PD he was

15   doing that, according to those rules that he knew?                   10:16

16              MR. HARLEY:  No, your Honor, he can't do that.

17              THE COURT:  Okay.  So, again, we're back to there are

18   no rules or regulations that this trucker can point to which

19   allowed him to do what he did.

20              MR. HARLEY:  No written rules or regulations.            10:16

21              THE COURT:  Right.  So all he can testify to is he

22   did the same, perhaps, as Mr. Kilty did in this time and there

23   was no accident and that maybe other truckers did the same

24   thing.

25              MR. HARLEY:  That's true.  And also this knowledge --    10:17
```

# Exhibit A-9

# Discussions and Rulings Concerning Expert Opinions of Dr. Anthony Stein

ECF 83 at 5-10
November 30, 2017 (A.M. Session)

ECF 179 at 102-115
December 1, 2017 (A.M. Session)

ECF 185 at 4-7
September 27, 2018 (A.M. Session)

1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

3        HONORABLE JESUS G. BERNAL, U.S. DISTRICT JUDGE

4

5  UNITED STATES OF AMERICA,              )
                                          )
6                  Plaintiff,             )
                                          )
7                                         ) Case No.
                   vs.                    ) EDCR 16-24-JGB
8                                         )
   STEVEN KILTY,                          )
9                                         )
                   Defendant.             )
10  _____ )

11

12              REPORTER'S TRANSCRIPT OF PROCEEDINGS
                     RIVERSIDE, CALIFORNIA
                  THURSDAY, NOVEMBER 30, 2017
13                      TRIAL DAY 3
                       A.M. SESSION

14

15

16

17

18

19

20

21

22  _____
         ADELE FRAZIER, CSR 9690, CRR, RMR
23          Federal Official Court Reporter
              United States District Court
24                3470 Twelfth Street
              Riverside, California 92501
25              adelefraziercsr@gmail.com

1   **APPEARANCES OF COUNSEL:**

2   **For the Plaintiff:**

3            OFFICE OF THE UNITED STATES ATTORNEY
             By:  BILAL ESSAYLI
4                 PAUL LEVERS
             Assistant United States Attorneys
5            3403 Tenth Street, Suite 200
             Riverside, California 92501

6

7

    **For the Defendant:**

8

             ROBISON D. HARLEY
9            Attorney at Law
             825 North Ross Street
10           Santa Ana, California  92701

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **RIVERSIDE, CALIFORNIA; THURSDAY, NOVEMBER 30, 2017**

2                          **8:30 A.M.**

3               (Outside The Presence Of The Jury:)

4          THE COURT:  Good morning.

5          THE COURTROOM DEPUTY:  We're on the record here in

6     EDCR 16-24-JGB, United States of America vs. Steven Kilty.

7     Counsel, please state your appearances.

8              MR. LEVERS:  Paul Levers for the United States.

9              MR. ESSAYLI:  Good morning, your Honor.  Bilal

10    Essayli for the United States.

11             MR. HARLEY:  Rob Harley for Mr. Kilty at my side.

12    Also present is Sandra Mattarollo, my paralegal.

13             THE COURT:  Are there any issues to discuss before we

14    bring in the jury?

15             MR. ESSAYLI:  We'd like to alert the Court of some

16    requests we'll be making today.  As the defense knows, we

17    didn't have any expert reports prior to trial.  We raised that

18    at our status conference.  Defense indicates they intend to

19    call four separate experts.  We received three reports Tuesday

20    night and one report this morning.  We'd like the Court to --

21    they're not super long or voluminous.

22             We'd like the Court to review them.  We believe a lot

23    is cumulative, not relevant -- some of it is not relevant under

24    403.  There's two particular reports we're going to ask to

25    exclude and that is the report by Mr. Stein, Defense

```
 1    Exhibit 242.  That was the one produced this morning.  On that
 2    basis alone we believe it should be excluded as untimely.  In
 3    addition to that, we believe a lot of information in the report
 4    is not reliable under 702, not of the kind an expert would rely
 5    on, and it also goes to 704(b) where there's information being
 6    elicited about the state of mind of the defendant and the bus
 7    driver, which is a violation of 704(b).
 8            The other report we would move to exclude would be
 9    Defense Exhibit No. 241, which is prepared by David Royer.
10    This is the traffic engineer analysis of the road at the Fort
11    Irwin base and whether it complied with the manual on uniform
12    traffic control devices.  We're happy to get into some more
13    detail later, but we think it's not particularly relevant and
14    would be confusing as to the issues at court here because it
15    doesn't bear on the relevant facts of the case.
16            THE COURT:  Okay.  Let's start with the first report.
17    Mr. Harley, the Stein -- the Anthony Stein report.
18            MR. HARLEY:  Let me grab my stuff, your Honor.
19            First of all, your Honor, we're not intending to
20    introducing these.  I was just -- if there's a need to refresh
21    recollection, I just put them in the trial book.  None of these
22    I plan on introducing.
23            THE COURT:  Well, expert reports are not normally
24    introduced into evidence, anyway.  That doesn't answer the
25    issue.  The issue is if this report, basically, summarizes the
```

1  substance of what he's about to testify to, why wasn't this

2  report produced earlier to allow the Government an opportunity

3  to look into the testimony and prepare for it and, perhaps,

4  retain their own expert.  That's why the disclosure rules about

5  experts exist, not because the reports are introduced into

6  evidence or not introduced into evidence, but simply to give

7  proper notice for the other side to be prepared.

8           Why wasn't this report produced earlier.

9           MR. HARLEY:  Could I have a moment, your Honor, to

10  check?

11           THE COURT:  Yes.

12           MR. HARLEY:  Your Honor, back on November 20th we

13  started sending what we felt was compliance with Rule 16.  And

14  we told them specifically our expectations of what Mr. Stein

15  would opine and testify to the following and we gave them eight

16  bullets points.  Since that time the prosecution has asked us

17  to expand on that.  So we've done that.  And for -- the

18  prosecution has been asking me to expand on those eight bullet

19  points.  And I've been communicating with Dr. Stein, and he

20  indicated that this is the first time that he would be able to

21  expand upon it based on my transferring some of the

22  information.

23           Again, I wasn't taking notes.  I was just trying to

24  convey to Mr. Stein what the prosecution wanted to do in

25  connection with those specific eight bullet points that we

```
 1   provided to them back on November 20th, 2017.  And I have a
 2   copy of those eight bullet points the Court can refer to.
 3           THE COURT:  Do those eight bullet points mirror the
 4   eight opinions reflected in the report?
 5           MR. HARLEY:  Yes, sir.  Line by line.  We expanded
 6   upon them.
 7           MR. ESSAYLI:  The report he's referring to is a
 8   letter drafted by the defense counsel in which the broad
 9   subject matters on which the witness intended to testify about.
10   We never got the opinions of the witness and what the basis of
11   those opinions were until this morning.  We never got a report
12   from the witness.  We got a letter from defense counsel as to
13   what he expected this witness to testify about.  It's my
14   understanding that this report was not completed until last
15   night or this morning.  He was working on the report during
16   trial.
17           So the letter we got was, He will do this.  He will
18   form an opinion about this subject matter, but we never
19   actually got those opinions until today.
20           THE COURT:  Very well.  Let me see that letter.  Do
21   you have a copy of it someplace?
22           MR. HARLEY:  May I approach, your Honor?
23           THE COURT:  Yes.
24           MR. ESSAYLI:  Can I see the letter to confirm it's
25   the same one?
```

```
1              THE COURT:  Yes.
2              So you're saying this is -- the letter on
3   November 20th, this is the first time that you produced the
4   subject areas of the testimony to the Government?
5              MR. HARLEY:  In written form, yes.  I believe.
6              Is that right?  Okay.
7              Yes.  Your Honor, I just have to refer to my
8   paralegal because I was in --
9              THE COURT:  Very well.  You may confer with her.
10             MR. HARLEY:  Okay.  I got -- okay.  Nothing in
11  writing, your Honor.  I did have definite conversations prior
12  to this about our experts we were contemplating retaining in
13  order to testify.  And there were some -- well, it's not an
14  excuse, but it's an explanation.  I've been in trial up until
15  Wednesday before Thanksgiving, so a lot of this was done by
16  phone while I was in the middle of the trial.
17             Yes, if I'm not mistaken, it was a week from last
18  Monday, which is the Monday before Thanksgiving.
19             THE COURT:  Very well.  So I've reviewed the letter.
20  We've compared it to the report.  It seems to pretty closely
21  track the report itself.  It does describe not only the subject
22  matters of the opinions, but the anticipated opinions.  So I'm
23  inclined, unless there's anything more, Mr. Essayli, to allow
24  the testimony of Dr. Stein.
25             MR. ESSAYLI:  Well, your Honor, although he provided
```

1   the broad subject matters, he didn't provide the basis for

2   those opinions, so we didn't really know what those opinions

3   were based on in order for us to challenge it.  What I would

4   ask, your Honor, is not for a ruling at this time, possibly at

5   the conclusion of the case in chief.  We'd like the Court to

6   review these reports, because we do believe there are some

7   issues inherently problematic with the reports under *Daubert*,

8   702, and 704.  It's just we're in a limited capacity -- we got

9   it this morning -- in order to be able to litigate.

10          THE COURT:  I will do that.  I will make a final

11  ruling on it.

12          When in your sequence of witnesses do you intend to

13  call Dr. Stein?

14          MR. HARLEY:  It will be this afternoon.

15          THE COURT:  What number witness is he for you?

16          MR. HARLEY:  He'll probably be -- well, he could be

17  any number.  I had everybody show up at noon.  So there are

18  scheduling issues.  I can accommodate the Court and counsel.

19          THE COURT:  Very well.  Why don't we just get started

20  with the testimony.  If needed, we will take up these issues at

21  the noon hour.

22          MR. ESSAYLI:  Thank you, your Honor.

23          THE COURT:  So let's bring the jury in.

24          (In the Presence of the Jury:)

25          THE COURT:  Call the case, please.

<pre>
 1                   UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

 3            HONORABLE JESUS G. BERNAL, U.S. DISTRICT JUDGE

 4

 5   UNITED STATES OF AMERICA,              )
                                            )
 6                   Plaintiff,             )
                                            )
 7                                          ) Case No.
                          vs.               ) EDCR 16-24-JGB
 8                                          )
     STEVEN KILTY,                          )
 9                                          )
                     Defendant.             )
10   _____)


11                 REPORTER'S TRANSCRIPT OF PROCEEDINGS
12                       RIVERSIDE, CALIFORNIA
                        FRIDAY, DECEMBER 1, 2017
13                           TRIAL DAY 4
                            A.M. SESSION
14

15

16

17

18

19

20

21

22   _____
                 ADELE FRAZIER, CSR 9690, CRR, RMR
23              Federal Official Court Reporter
                United States District Court
24                   3470 Twelfth Street
                Riverside, California 92501
25                adelefraziercsr@gmail.com
</pre>

App. 258

<u>**APPEARANCES OF COUNSEL:**</u>

**For the Plaintiff:**

        OFFICE OF THE UNITED STATES ATTORNEY
        By:  BILAL ESSAYLI
            PAUL LEVERS
        Assistant United States Attorneys
        3403 Tenth Street, Suite 200
        Riverside, California 92501


**For the Defendant:**

        ROBISON D. HARLEY
        Attorney at Law
        825 North Ross Street
        Santa Ana, California  92701

1    You're excused.

2              THE WITNESS:  Thank you, your Honor.

3              THE COURT:  Ladies and gentlemen, we will be breaking

4    for lunch.  Let's return at 1:15.  Until then don't discuss

5    this case with anybody.  Don't let anybody else discuss it with

6    you.  Do not try to learn about this case.  Keep an open mind

7    about the issues of the case.  Let's be back at 1:15.

8              (Outside The Presence Of The Jury:)

9              THE COURT:  Very well.  Who is your next witness?

10             MR. HARLEY:  I was going to take Special Agent Wood

11   out of order.  I know I represented the Court I'm trying to get

12   all my experts on, but I'm trying to get him off as soon as

13   possible.

14             THE COURT:  You still intend to call Mr. Stein?

15             MR. HARLEY:  Anthony Stein, yes.  It will be a lot

16   quicker.  All my other experts will be a lot quicker.

17             THE COURT:  Very well.  Then let's go over Mr. Stein.

18             MR. ESSAYLI:  Your Honor, for Mr. Wood, if he's going

19   to come and testify about, you know, what he did at the

20   reenactment, that's fine.  We would object to any expert

21   conclusions about the cause of the collision or any other

22   opinions, because he does not have any background or expertise

23   in traffic investigations, and he will tell that to the Court,

24   your Honor.

25             THE COURT:  Are you intending to elicit any opinion

```
 1   testimony from Mr. Wood.

 2          MR. HARLEY:  Yes.  He was part of the prosecution

 3   team that generated that report that's reflected in 211 and 212

 4   of our exhibit book.  And he was working in conjunction with

 5   about four or five CID agents, and they together came up with

 6   the conclusion about the probable cause to believe that Deborah

 7   Aguilar committed involuntary manslaughter, vehicular

 8   manslaughter, as well as reckless driving with bodily injury.

 9          THE COURT:  Well, what's your objection to that?

10   Lack of expertise?

11          MR. ESSAYLI:  Yes, your Honor, to render those

12   opinions.  I believe he's outside your Honor -- if the Court's

13   interested in examining him outside the presence of the jury.

14   We spoke to him just before the last session that started here

15   this morning and he confirmed that he does not have an

16   expertise in traffic investigations.

17          THE COURT:  Very well.  Let's go to Mr. Stein first,

18   I guess.  I understand that you've lodged an objection based on

19   the timing of the disclosure of the opinions.  Do you have any

20   further objections to specific opinions which are proffered?

21          MR. ESSAYLI:  Yes, your Honor.  May I approach the

22   lecturn?

23          THE COURT:  You may.  So opinion number one.

24          MR. ESSAYLI:  Your Honor, I want to focus on opinions

25   3, 4, 5, and 6.
```

```
 1              THE COURT:  Very well.  I want to focus on opinion 1.
 2    So do you have any objection to him opining on opinion 1?
 3              MR. ESSAYLI:  As written here, I don't have a
 4    specific objection.  Other than if he's going to get into what
 5    was in the defendant's mind at the time, I would object to any.
 6              THE COURT:  They're not opinions; they're facts.
 7              MR. ESSAYLI:  Yes, your Honor.
 8              THE COURT:  So they're not proper opinions.
 9              MR. ESSAYLI:  Yes, your Honor.
10              THE COURT:  So they will be excluded.
11              Opinion number 2, do you have any objection as to
12    that?
13              MR. ESSAYLI:  I do, your Honor, because he is saying
14    that the line -- I'm sorry.  He's making a conclusion about how
15    Mr. Kilty would interpret the signs, and I would object to that
16    assumption.
17              THE COURT:  What is your response to that?  I mean,
18    you've already had testimony regarding the signage and whether
19    it complied with certain standards.  This seems to be treading
20    into the subjective perception of the driver at the time.  So I
21    think it might be excludable under 403.  He doesn't really have
22    any personal knowledge as to when and how, to what extent Mr.
23    Kilty observed the signage, so I don't think there's a
24    sufficient basis for opinion number 2.  And I also think it
25    should be excluded under 403.
```

1          MR. HARLEY:  Okay.

2          THE COURT:  So that's my ruling.

3          MR. HARLEY:  On opinion number 2, that's excluded?

4          THE COURT:  Right.

5          Number 3, go ahead, Mr. Essayli.

6          MR. ESSAYLI:  Yes, your Honor.  Opinion 3 has no

7    scientific opinions.  They're facts and conclusions based on

8    selected witness statements.  So, basically --

9          THE COURT:  So, Mr. Harley, tell me how opinion 3 is

10   an opinion and not a fact.

11         MR. HARLEY:  It's an opinion based on factual

12   investigation from the CID.

13         THE COURT:  Tell me how is it an opinion.  So

14   Ms. Aguilar was not driving in the left lane.  That's a fact.

15         MR. HARLEY:  Right.

16         THE COURT:  So it's not the subject of opinion.  As

17   to whether she should have been driving on the left lane,

18   what's the basis of that opinion?  I mean, and what is

19   *supposed to* mean?  Legally required to?  Common practice?  What

20   does *supposed to be driving on the left lane* mean?

21         MR. HARLEY:  Established policies, rules and

22   procedures that were in place even before the accident took

23   place on June 2nd.

24         THE COURT:  To the extent there's a policy, practice

25   or procedure indicating that, that's a factual issue, not an

1  opinion issue.  So I think you've already introduced facts

2  regarding practice regarding where the bus should have been.  I

3  don't think that's the proper basis for opinion.

4            MR. HARLEY:  That's opinion 3(a).

5            THE COURT:  Right.  3(b) is a fact, not an opinion.

6            MR. HARLEY:  That's correct.

7            THE COURT:  So it's excluded.

8            Opinion number 4.

9            MR. HARLEY:  3(b) is excluded also, your Honor?

10           THE COURT:  Yes.  Number 4 is an opinion.

11           MR. ESSAYLI:  Yes, your Honor.  Number 4 is an

12  opinion.  And I guess we'd be able to cross-examine him because

13  he's basing it on the prior witness's testimony.  But to the

14  extent that he's an expert on human factors, I would agree that

15  that's an opinion.

16           My concern is the subopinion that's listed under

17  there, and that Ms. Aguilar should have had an expectation that

18  the truck is in the right lane.  One, that gets into her state

19  of mind, which I don't think he has a proper basis to render

20  that opinion; and two, his entire conclusion is based on a

21  witness statement from Mr. Hoegle, who is not on the bus at the

22  time of the collision.

23           And I really don't want to get into a mini trial in

24  front of the jury, your Honor, but his witness statement is

25  very clear that he was not on the bus.  He was basing his

 1   comments on a different driver.  He couldn't identify the

 2   driver.  He said she's either hispanic or white.  He said she's

 3   26 to 27 years old.  And she was heavyset.  And he couldn't

 4   otherwise identify her.

 5          THE COURT:  So this is what I think about the

 6   subopinion, Mr. Harley; I think it's just an attempt to state

 7   what another witness has stated, and it's not really an

 8   opinion.  You can elicit the fact from which you can draw a

 9   conclusion.  It doesn't take an expert to make the inference

10   that if, in fact, there had been trucks stopped there before,

11   they should have expected it, but I don't think that's the

12   basis of an expert opinion.  It's just a circumstantial fact.

13          You may respond.

14          MR. HARLEY:  The reason is in the MAIT report it

15   lists expectancy, so that was a consideration taken by Gray

16   when he was preparing his MAIT report.

17          THE COURT:  Right.  But I think that's an arguable

18   point, right.  I mean expectancy can be argued.  It's not --

19   it's whether or not she had indications that there would be a

20   truck stopped there based on prior experiences.  So you can

21   argue it.  I don't think it's the subject of expert opinion as

22   to whether she should or shouldn't have expected the truck to

23   be stopped in the road.  You can elicit facts and argue the

24   inference.  So the subopinion is excluded.

25          MR. HARLEY:  But the basic opinion number 4 is okay?

1          THE COURT:  That's okay.

2          Number 5.

3          MR. ESSAYLI:  Your Honor, it's the same concern the

4     Court just mentioned about an attempt to really get in witness

5     statements through this expert.  A lot of these people --

6     regarding the four and a half hours the basis of that opinion.

7     That person's already testified.  That was Officer Gutierrez.

8          THE COURT:  Right.  This is a little bit different

9     because to the extent that Dr. Stein has expertise on what are

10    the symptoms and facts which would lead to a conclusion of

11    chronic fatigue in drivers, then he can rely on facts to make

12    that conclusion.  So if he does have facts about that, then I

13    that's the proper basis for the opinion.

14         MR. ESSAYLI:  Our other concern, your Honor, he is a

15    psychologist.  He is a Ph.D.  He is not a medical doctor.  We

16    haven't received any information that he has the expertise to

17    make a medical diagnosis of chronic fatigue, especially without

18    ever having examined Ms. Aguilar or knowing anything about her

19    medical background.

20         THE COURT:  I can have you -- I can have you voir

21    dire him on that, whether or not he has sufficient expert on

22    that area.

23         MR. ESSAYLI:  Yes, your Honor.  To the extent that

24    counsel's permitted to examine on opinion 5, we would

25    strenuously object to counsel eliciting the statements from

 1    these witnesses that the expert is relying on and bringing

 2    those in front of the jury.

 3              THE COURT:  Right.  You can't elicit hearsay on your

 4    direct of your own expert.

 5              MR. HARLEY:  Okay.  Now, in that regard to chronic

 6    fatigue, I know the Court doesn't want me to go into negligent

 7    or reckless driving before June 2nd.

 8              THE COURT:  Right.

 9              MR. HARLEY:  I hear the Court on that.

10              THE COURT:  Right.

11              MR. HARLEY:  But I do have witnesses hereupon which

12    this expert is basing his opinion that she did appear --

13              THE COURT:  Well, they might be able to testify to

14    that if they -- if it's admissible, if I allow it, and from

15    their personal perspective.  It wouldn't be hearsay.

16              MR. HARLEY:  Even though it occurred before June 2nd?

17              THE COURT:  That's something we have to talk about,

18    whether it would be introduced under habit or custom.  But that

19    doesn't pertain to whether or not you can elicit from Dr. Stein

20    their statements.  You cannot.

21              MR. HARLEY:  Okay.  He's not going to say that, but

22    he's still going to give his opinion.  If he wants to explore

23    the basis of it, that's on him.

24              THE COURT:  Right.

25              MR. ESSAYLI:  Our concern there is he's going to say

UNITED STATES DISTRICT COURT

 1 │ the basis of my opinion are the witnesses in the bus who saw
 2 │ her hit the rumble strip.  He's going to, basically, be
 3 │ eliciting the substance of these witness statements as --
 4 │ without calling these witnesses.
 5 │          THE COURT:  I mean, that's the nature of expert
 6 │ testimony.  He can rely on hearsay statements to form a
 7 │ conclusion if he has expertise on that subject area.
 8 │          MR. ESSAYLI:  Yes, your Honor.
 9 │          THE COURT:  That's the nature of that beast.
10 │          MR. ESSAYLI:  But -- your Honor, yes, I do understand
11 │ the difference with expert witnesses, but we would say that
12 │ there's got to be some basic minimum standards for experts to
13 │ testify, and the Court can serve as that gate-keeping role.  I
14 │ don't want to get into a mini trial on this, but if you go
15 │ through the witness statements, they're second, third hearsay
16 │ about what other people heard about this bus driver.  They
17 │ don't clearly identify her.  So I think it's unfair, and not
18 │ really reliable, for this person to just read some selected
19 │ statements out of context.
20 │          THE COURT:  So you may voir dire him on that.
21 │          MR. ESSAYLI:  Okay.  Thank you, your Honor.
22 │          MR. HARLEY:  That's opinion 5; is that right?
23 │          THE COURT:  Yes.
24 │          MR. ESSAYLI:  Out of the presence of the jury.
25 │          THE COURT:  Yes, out of the presence of the jury.

UNITED STATES DISTRICT COURT

1           MR. ESSAYLI:  Thank you, your Honor.

2           MR. HARLEY:  I assume 5(a) and 5(b) and 5(c) are okay

3     because I do have witnesses out there?

4           THE COURT:  5(a), (b), and (c) are not opinions.

5     They're facts.

6           MR. HARLEY:  But from that fact in 5(a) he's drawing

7     an opinion that she's suffering from chronic fatigue.

8           THE COURT:  Right.  Well, I mean, I don't think fact

9     (a) is disputed, right?  She's testified to that.

10          MR. HARLEY:  That is true.

11          THE COURT:  Right.  So I think he can state that

12    fact.  There's been testimony.  5(b).

13          MR. ESSAYLI:  (B) and (c) are our main concerns.

14          THE COURT:  I don't think he can state those facts

15    unless -- well, I don't think -- I think we'll have to learn

16    that through the voir dire of the expert, both on his expertise

17    and whether he sufficiently relied on reliable information to

18    form his opinion.  And Mr. Essayli will be permitted to voir

19    dire him on that.  So I'll make a decision as to that, whether

20    he can testify.  I don't think he can -- even if I allow him to

21    testify as to his opinion, I don't think he can state (b) and

22    (c) because those are hearsay statements.

23          MR. HARLEY:  Okay.  And I do have witnesses to

24    support the fact that she would chronically appear to be

25    falling asleep, hitting rumble strips, on prior occasions

 1   leading up to June 2nd, 2014.

 2           THE COURT:  So let me tell you what I think the

 3   parameters are of that testimony.  Maybe it would serve you

 4   better to try to call that witness first.  That's up to you.

 5           MR. HARLEY:  I will do it.

 6           THE COURT:  So habit -- if you want to proffer that

 7   it's admissible under habit, it has to be specific incidents,

 8   not characterizations.  She can't say I saw her drive

 9   recklessly before.  She has to say, I saw her hit the rumble

10   strips so many times over this period of time to establish a

11   habit.  And then I would make the determination whether the

12   frequency over the period of time establishes the prerequisites

13   for a habit.  And then I would -- if I do think that's been

14   established, then I would allow that witness to establish as to

15   those incidents.

16           Now, the fact that I may allow you to elicit

17   testimony as to specific incidents, does not permit you to

18   characterize those incidents of those facts in any way.  Do you

19   understand the distinction?  So you can't have her say I saw

20   her drive erratically.  I saw her drive recklessly.

21           MR. HARLEY:  I hear you.  I understand now, okay.

22           THE COURT:  It's the fact --

23           MR. HARLEY:  The fact.

24           THE COURT:  -- that she hit the rumble strips, if

25   that comes in.

UNITED STATES DISTRICT COURT

```
 1              MR. HARLEY:  Understood.

 2              THE COURT:  Okay.  But I will have further discussion

 3    about that.

 4              MR. ESSAYLI:  Yes, your Honor.  We'd like to be heard

 5    at that time.

 6              THE COURT:  You would.

 7              Number 6.

 8              MR. ESSAYLI:  Number 6, your Honor.

 9              THE COURT:  It, kind of, favors the Government,

10    right?

11              MR. ESSAYLI:  Well, I think he's referring to our

12    video.  I think he's -- my concern is the opinion -- that it's

13    misleading the jury.  I think he can have an opinion about the

14    reliability of the camera and how it projects, but for example,

15    1 and 2 are not his opinions.  He's, basically, taking those

16    from our prior expert, Stein Husher, who already testified

17    about the camera.

18              THE COURT:  Right.  It's the reliability, right.  He

19    says that on 6(a) that it's -- that's his opinion that it's not

20    reliable, and he can rely on other expert's factual findings as

21    to that.

22              MR. HARLEY:  That's why I put Stein Husher on the

23    stand initially, to provide the foundation for it, your Honor.

24              THE COURT:  Right.  So I think 6(a) is okay.

25              MR. ESSAYLI:  Your Honor, opinion 7 also appears to
```

 1 | be a fact.

 2 | THE COURT:  Yeah.  7 is a fact.  So it's not an

 3 | opinion.  7 is out.

 4 | MR. HARLEY:  That's 7(a) as well as 7(b)?

 5 | THE COURT:  Yes.

 6 | MR. ESSAYLI:  Your Honor, 8 is not an opinion.  He's,

 7 | basically -- -

 8 | THE COURT:  Right.  It's a *should*.  I mean, that's

 9 | not a subject matter for expert opinion.  It depends on what

10 | *should* mean.  So 8 is out.

11 | So those are the parameters of Mr. Stein's testimony.

12 | MR. HARLEY:  Your Honor, can I ask one question?

13 | THE COURT:  Yes.

14 | MR. HARLEY:  I missed on opinion number 1, did you

15 | say that's excluded entirely, (a) and (b)?

16 | THE COURT:  Yes.

17 | MR. HARLEY:  That's excluded entirely.

18 | THE COURT:  Yes.  Those are not opinions.  Those are

19 | facts.  They're not opinions.  Of course drivers operate their

20 | vehicles based on their expectations and driver experience.

21 | It's a fact.  (B), Mr. Kilty's only prior experience had him

22 | stopping at this location.  That's a fact.  It's either true or

23 | not true.  It's not debatable.

24 | MR. ESSAYLI:  Your Honor, just so we're clear,

25 | because I don't want any confusion during trial, opinion 1 is

```
 1   excluded.  Opinion 2 is excluded.  Opinion 3 is excluded.

 2   Opinion 4, the top portion is admitted, but the subopinion is

 3   excluded.

 4             THE COURT:  That's correct so far.

 5             MR. ESSAYLI:  Opinion 5 the Court will permit the

 6   Government to take the witness up on voir dire and will reserve

 7   ruling.  Opinion 6.

 8             THE COURT:  (A) is permitted.

 9             MR. ESSAYLI:  (A) is permitted.  And then opinion 7

10   is excluded.  And opinion 8 is excluded.

11             THE COURT:  That's correct.

12             MR. ESSAYLI:  Thank you, your Honor.

13             THE COURT:  Be back be ready to go at 1:00 in case --

14   1:00 -- is Dr. Stein here?

15             MR. HARLEY:  Yes.  They're both out in the hallway.

16             THE COURT:  Maybe we can have the voir dire at 1:00.

17             (Lunch recess.)

18

19

20

21

22

23

24

25
```

<pre>
 1                  UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

 3            HONORABLE JESUS G. BERNAL, U.S. DISTRICT JUDGE

 4

 5   UNITED STATES OF AMERICA,            )
                                          )
 6                    Plaintiff,          )
                                          )
 7                                        ) Case No.
                      vs.                 ) EDCR 16-24-JGB
 8                                        )
     STEVEN KILTY,                        )
 9                                        )
                      Defendant.          )
10   _____)


11                REPORTER'S TRANSCRIPT OF PROCEEDINGS
12                      RIVERSIDE, CALIFORNIA
                  THURSDAY, SEPTEMBER 27, 2018
13                         TRIAL DAY 3
                          A.M. SESSION
14

15

16

17

18

19

20

21

22   _____
             ADELE FRAZIER, CSR 9690, CRR, RMR
23            Federal Official Court Reporter
               United States District Court
24                  3470 Twelfth Street
               Riverside, California 92501
25                adelefraziercsr@gmail.com
</pre>

1    **APPEARANCES OF COUNSEL:**

2    **For the Plaintiff:**

3            OFFICE OF THE UNITED STATES ATTORNEY
             By:  JERRY YANG, Assistant United States Attorney
4                 PAUL LEVERS,
                  Special Assistant United States Attorney
5            3403 Tenth Street, Suite 200
             Riverside, California 92501

6

7

     **For the Defendant:**

8
             ROBISON D. HARLEY
9            Attorney at Law
             825 North Ross Street
10           Santa Ana, California  92701

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      M A S T E R   I N D E X

2            THURSDAY, SEPTEMBER 27, 2018; TRIAL DAY 3

3                          A.M. SESSION

4                 Chronological Index of Witnesses

5


6     WITNESSES CALLED BY THE PLAINTIFF            PAGE

7     PAUL GRAY
           Continued Cross-Examination by Mr. Harley     7
8          Redirect Examination by Mr. Levers           24
           Recross-Examination by Mr. Harley            27
9


10

11    WITNESSES CALLED BY THE DEFENDANT            PAGE

12    ANTHONY STEIN
           Direct Examination by Mr. Harley            43
13         Cross-Examination by Mr. Yang              61
           Redirect Examination by Mr. Harley         79
14

15

16    WITNESSES CALLED BY THE PLAINTIFF            PAGE

17    JESUS AGUILAR
           Direct Examination by Mr. Levers           82
18         Cross-Examination by Mr. Harley           84
           Redirect Examination by Mr. Levers        95
19

20

21

22

23

24

25
```

1        **RIVERSIDE, CALIFORNIA; THURSDAY, SEPTEMBER 27, 2018**

2                    **9:00 A.M.**

3        (Outside The Presence Of The Jury:)

4        THE COURTROOM DEPUTY:  Calling case EDCR 16-24-JGB,

5 United States of America vs. Steven Kilty.  Counsel, please   09:04

6 state your appearances.

7        MR. LEVERS:  Paul Levers for the United States.  Good

8 morning, your Honor.

9        THE COURT:  Good morning.

10       MR. YANG:  Jerry Yang on behalf of the United States,   09:04

11 and present with us at counsel's table is FBI Special Agent

12 Shannon Snead.

13       THE COURT:  Good morning.

14       MR. HARLEY:  Rob Harley for Mr. Kilty, present before

15 the Court.   09:04

16       THE COURT:  We have some scheduling issues?

17       MR. HARLEY:  Yes, sir.  I have a doctor, Tony Stein.

18 He is an expert from the previous hearing we wanted to call.

19 Evidently, he had an emergency or pressing issues, so he wanted

20 to be able to get on the stand this morning at 9:00.   09:05

21 Evidently, the Government, at this point in time, is reluctant

22 to take him out of order in that sequence.  But assuming

23 there's about 15 to 20 minutes left on cross and redirect, we

24 can put him on after that.  And that will occur before

25 Mr. Jesus Aguilar gets on the stand.   09:05

1      THE COURT:  Are you agreeable with the doctor

2  testifying after the completion of Mr. Gray's testimony?

3      MR. YANG:  Yes, your Honor.  It's still a bit out of

4  sequence, but I think that can accommodate everybody's

5  interest.                                              09:05

6      THE COURT:  Very well.  Let's begin then.  Is

7  Mr. Gray here?

8      MR. HARLEY:  Yes.

9      THE COURT:  The jury is here so let's begin.

10      MR. LEVERS:  Would you like us to have Mr. Gray take   09:05

11  the stand?

12      THE COURT:  Yes.

13      MR. YANG:  Your Honor, I don't know if we'll have

14  another opportunity to discuss Mr. Stein's testimony prior to

15  him taking the stand, but there were certain pretrial rulings  09:05

16  by the Court.  They were contained in the transcript of

17  December 1st in the a.m.  We've spoken to counsel.  I think

18  we're in agreement with the areas that he can cover and cannot

19  cover, but just in case somehow a question comes up, the

20  Government will still be objecting.  I just wanted to note that  09:06

21  for the Court.

22      THE COURT:  The same rulings as before apply now.  Do

23  you understand?

24      MR. HARLEY:  I understand.  I'm asking questions

25  directly from the transcript of what occurred in the previous  09:06

```
 1    case.  But out of an abundance of caution, I will alert

 2    Dr. Stein.  I know we made some pretrial evidentiary rulings.

 3              THE COURT:  Can I have a copy of that page of the

 4    transcript that you're referring to, Mr. Yang?  Do you have a

 5    copy?                                                      09:06

 6              MR. LEVERS:  I'm not sure if we have a hard copy,

 7    your Honor.

 8              THE COURT:  Does anybody have a hard copy of that?

 9              MR. YANG:  I have one copy.

10              THE COURT:  Okay.  He can make copies.           09:06

11              MR. YANG:  Thank you, your Honor.  May I approach,

12    your Honor?

13              THE COURT:  Yes.

14              MR. HARLEY:  I assume these same arguments put out

15    there by me will be included in this particular evidentiary  09:07

16    hearing?

17              THE COURT:  What do you mean?

18              MR. HARLEY:  I want to make sure I articulated my

19    reasons for the admission of those particular issues that were

20    excluded.  If I don't make a record of it, it won't be appealed  09:07

21    properly.  I'm trying to make a record.

22              THE COURT:  Okay.  So you can make your record.

23              MR. HARLEY:  Okay.  Thank you.

24              MR. LEVERS:  And just so the Court is aware, I

25    believe it starts approximately at page 103 and 104 where these  09:07
```

```
 1   rulings are first addressed.
 2            THE COURT:  Copy those pages only, 103 to 110.
 3            THE COURTROOM DEPUTY:  Want me to bring in the jury?
 4            MR. LEVERS:  You should probably do 103 to 120.  It's
 5   discussed for a while.                                          09:07
 6            (In the Presence of the Jury:)
 7            THE COURT:  Re-swear the witness.
 8            THE COURTROOM DEPUTY:  Please stand and raise your
 9   right hand.
10            Do you solemnly swear that the testimony you are      09:09
11   about to give in the cause now pending before this Court will
12   be the truth, the whole truth, and nothing but the truth so
13   help you God?
14            THE WITNESS:  I do.
15            THE COURTROOM DEPUTY:  Thank you.  Again, please be    09:09
16   seated.
17            State your first name and spell your last name for
18   the record.
19            THE WITNESS:  First name is Paul, P-a-u-l, last name
20   Gray, G-r-a-y.                                                  09:10
21            THE COURT:  Very well.  You may proceed.
22            MR. HARLEY:  Thank you, your Honor.
23         PLAINTIFF'S WITNESS, PAUL GRAY, WAS RE-SWORN,
24                  CONTINUED CROSS-EXAMINATION
25   BY MR. HARLEY:                                                  09:10
```

# Exhibit B

# Selected Trial Exhibits



EXHIBIT 1
1 of 1



EXHIBIT 2
1 of 1



EXHIBIT 10
1 of 1



App. 285

EXHIBIT 33
1 of 1



App. 286

DEFENDANT'S EXHIBIT
246
tabbies



DEFENDANT'S
EXHIBIT
247

Exhibit C

Jury Instruction on Elements (No. 18)

FILED
CLERK, U.S. DISTRICT COURT

OCT - 2 2018

CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. EDCV16-00024-JGB |
| Plaintiff, | FINAL JURY INSTRUCTIONS GIVEN |
| v. | |
| STEVEN KILTY, | |
| Defendant. | |

## JURY INSTRUCTION NO. 18

### Involuntary Manslaughter

The defendant is charged in the Indictment with involuntary manslaughter in violation of Section 1112 of Title 18 of the United States Code. Involuntary manslaughter is the unlawful killing of a human being without malice aforethought and without an intent to kill. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant committed an act that might produce death;

Second, the defendant acted with gross negligence, defined as wanton or reckless disregard for human life;

Third, the defendant's act was the proximate cause of the death of the victim. A proximate cause is one that played a substantial part in bringing about the death, so that the death was the direct result or a reasonably probable consequence of the defendant's act;

Fourth, the killing was unlawful;

Fifth, the defendant either knew that such conduct was a threat to the lives of others or knew of circumstances that would reasonably cause the defendant to foresee that such conduct might be a threat to the lives of others; and

Sixth, the killing occurred at Fort Irwin Army Base.

App. 290

# Exhibit D

# Discovery Produced Before Trial

# Exhibit D-1

# Pretrial Government Discovery
### First Batch, Bates 1–462
(excerpts)

FOR OFFICIAL USE ONLY
Law Enforcement Sensitive

DEPARTMENT OF THE ARMY
U.S. ARMY CRIMINAL INVESTIGATION COMMAND
Fort Irwin CID Office
6th MP Group, Building 986 Inner Loop Road, Fort Irwin, CA 92310-5077

30 Mar 2015

MEMORANDUM FOR: SEE DISTRIBUTION

SUBJECT:   CID REPORT OF INVESTIGATION - 1ST CORRECTED FINAL
(CY/SSI/JOINT - 0159-2014-CID146-81168 - 5H3N / 5Q5A / 9G2F

DATES/TIMES/LOCATIONS OF OCCURRENCES:
1. 02 JUN 2014, 0430 - 02 JUN 2014, 0600; FORT IRWIN ROAD, FORT IRWIN,
CA 92310

DATE/TIME REPORTED: 02 JUN 2014, 0530

INVESTIGATED BY:
SA BLAINE S MOORE, 7363
SA JOSHUA RAY STEWART, 8009
SA KEVIN MARTIN WOOD, 7946
SA MATTHEW R. CUMMINGS, 6580

SUBJECT:
1. AGUILAR, DINORAH ELIZABETH; CIV; ▮▮▮▮▮▮ (DOB); (POB);
FEMALE; WHITE; ▮▮▮▮▮▮▮▮▮▮
[CARELESS OR RECKLESS DRIVING], [INVOLUNTARY MANSLAUGHTER]

2. KILTY, STEVEN R; CIV; ▮▮▮▮▮▮ (DOB); (POB); MALE; WHITE; ▮
▮▮▮▮▮▮▮▮▮▮▮ ZZ ; [CARELESS OR
RECKLESS DRIVING], [INVOLUNTARY MANSLAUGHTER]

VICTIM:
1. KEIPER, DAIL LEE SENIOR (DECEASED); DODCR ▮▮▮▮▮▮▮▮ (DOB);
(POB); MALE; WHITE; ▮▮▮▮▮▮▮▮▮▮ FC ;
[CARELESS OR RECKLESS DRIVING], [INVOLUNTARY MANSLAUGHTER]

2. CHESTNUT, MICHAEL JOSEPH; DODCR; ▮▮▮▮▮▮ (DOB); (POB);
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ CARELESS OR
RECKLESS DRIVING]

1
FOR OFFICIAL USE ONLY
Law Enforcement Sensitive

App. 293



**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

3. BRIDGETTE, NAIOMI AUDREA; CIV; ███████████
███████████████████████ ZZ ; [CARELESS
OR RECKLESS DRIVING]

4. MARTINEZ, PEDRO ; SPC; ████████████████████
████████████ [CARELESS OR RECKLESS DRIVING]

5. AGUILAR, JESUS JUNIOR; CIV; █████████████
OTHER; ████████████████ ZZ ; [CARELESS OR
RECKLESS DRIVING]

6. DEROSIER, ARIEL KAYLEEN; CPL; ███████████
████████████████████████████████████████
FC ; [CARELESS OR RECKLESS DRIVING]

INVESTIGATIVE SUMMARY:

This report was generated to make administrative changes.

This office was notified by SSG Clinton HOLT, Desk Sergeant, Fort Irwin Military Police
(FIMP), Fort Irwin, CA 92310 (FICA), of an on-post traffic fatality.

Investigation conducted jointly by USACIDC and The San Bernardino County Sheriff's
Department-Coroner Division (SBCSD-CD), 175 South Lena Road, San Bernardino, CA 92415
(SBCA), with the SBCSD-CD as the lead investigative agency, established probable cause to
believe Ms. AGUILAR and Mr. KILTY committed the offenses of Vehicular Manslaughter,
Involuntary Manslaughter and Reckless Driving, when Ms. AGUILAR recklessly crashed her bus
into the back of Mr. KILTY's truck while it was parked in the right lane of the Fort Irwin Bypass,
without any emergency hazard placards or other identifying measures in place. This vehicle
collision directly resulted in the death of Mr. KEIPER along with the injuries sustained by several
other passengers who were riding the bus driven by Ms. AGUILAR at the time of the collision.

The SBCSD-CD conducted an autopsy of Mr. KEIPER and determined Mr. KEIPER's manner of
death was Accidental and the cause of his death was multiple blunt force injuries. Based on the
totality of investigation, subject, witness and victim interviews, traffic reports, death scene
examination, and review of medical records, the investigative findings of this office agree with
the final determination of death as reported by the SBCSD-CD.

MAJ Gilbert J. COMLEY, Special Assistant to the U.S. Attorney, FICA, concurred probable
cause existed to believe Ms. AGUILAR and Mr. KILTY committed the offenses of Vehicular

App. 294

USA-00002

**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

Manslaughter, Involuntary Manslaughter and Reckless Driving.

STATUTES:

18 U.S.C. 1112(a), Involuntary Manslaughter

CA Penal Code; Section 192, Vehicular Manslaughter

CA Vehicle Code; Section 23104, Reckless Driving

EXHIBITS:

Attached:

1. Agent's Investigation Report (AIR) of SA SWANSON, 2 Jun 14.

2. State of California Traffic Collision Report, 2 Jun 14.

3. VEOLIA Transportation Daily Bus Report, 2 Jun 14.

4. Statement of Mr. LIENERT, 2 Jun 14.

5. Consent to Search of Mr. LIENERT, 2 Jun 14.

6. Evidence/Property Custody Document (EPCD), Document Number (DN): 095-14.

7. CD containing Call Logs from Mr. LIENERT'S phone, 2 Jun 14.

8. Death Scene Examination AIR of SA WOOD, 3 Jun 14.

9. Photographic Packet. (Death Scene)

10. CD containing all original images associated with Exhibit 9. (USACRC and file copy only)

11. AIR of SA SWANSON, 26 Jun 14.

12. EPCD, DN: 73-14.

13. CD containing Victorville Transit Authority (VVTA), Internal Bus Video, 3 Jun 14.

14. CD containing photographs of scene provided by SGT GUTIERREZ, 3 Jun 14.

**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

App. 295

USA-00003

15. Traffic Collision Sketch prepared by SGT GUTIERREZ, 3 Jun 14.

16. Weed Army Community Hospital Emergency Room (WACH ER), Medical Records of Ms. AGUILAR, 3 Jun 14.

17. CD containing FICA Video Reenactment, 4 Jun 14.

18. EPCD, DN: 74-14.

19. CD containing Autopsy Photographs of Mr. KEIPER, 4 Jun 14.

20. VVTA Driver Complaints pertaining to Ms. AGUILAR, 4 Jun 14.

21. EPCD, DN: 76-14 and associated hand receipt.

22. Statement of Mr. CHESTNUT, 13 Jun 14.

23. Statement and Interview Sketch of SPC DEROSIER, 13 Jun 14.

24. Statement of Mr. TUSIESEINA, 17 Jun 14.

25. Statement of Mr. AGUILAR, 17 Jun 14.

26. Statement and Seating Layout of SPC MARTINEZ-MIRANDA, 19 Jun 14.

27. WACH ER Medical Records of Mr. CHESTNUT, 26 Jun 14.

28. WACH ER Medical Records of SPC MARTINEZ-MIRANDA, 26 Jun 14.

29. WACH ER Medical Records of SPC DEROSIER, 26 Jun 14.

30. Statement of Ms. BRIDGETTE, 26 Jun 14.

31. AIR of SA SWANSON, 30 Jul 14.

32. EPCD, DN: 103-14.

33. (2) EPCDs prepared by SGT GUTIERREZ, 3 Jun 14.

34. CD containing Extracted Forensic Files from the VVTA Removable HDD System, 1 Jul 14.

35. SBCSD Electronic Storage Device Processing Request, 1 Jul 14.

App. 296

USA-00004

**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

36. Statement of SSG HOEGLE, 30 Jul 14.

37. AIR of SA WOOD, 29 Aug 14.

38. Drivers License Record of Mr. KILTY, 1 Aug 14.

39. Drivers License Record of Ms. AGUILAR, 18 Aug 14.

40. SBCSD-CD Autopsy Protocol, Toxicology Report, SBCSD-CD Body Examination Checklist and SBCSD-CD Coroner Investigation, Coroner's Case #701404229, 18 Aug 14.

41. Statement of Mr. DAVIS, 20 Aug 14.

42. Statement of Mr. HERRERA, 20 Aug 14.

43. AIR of SA WOOD, 22 Oct 14.

44. FIMP Military Police Report and Traffic Report, Report Number: 00618-2014-MPC146, 7 Oct 14.

45. USACIL Digital Evidence Report, Report Number: 2014-CID131-1383, 12 Oct 14.

46. AIR of SA WOOD, 20 Nov 14.

47. DVD containing audio/video recorded interview of Ms. AGUILAR, 17 Nov 14.

48. Fort Irwin Physical Security Plan (Commercial Vehicle Procedures), 20 Nov 14.

49. AIR of SA WOOD, 10 Dec 14.

50. USACIL Laboratory Examination Request, 1 Aug 14. (USACRC and file copy only)

Not Attached:

None.

The originals of Exhibits 1 through 5, 8, 9, 11, 13 through 15, 17, 22 through 26, 30, 31, 34 through 39, 41 through 43, 46 and 49 are maintained in the files of this office. The originals of Exhibits 6, 12, 18, 21, 32 and 33 are maintained in the files of the Evidence Depository, this office. The originals of Exhibits 7, 10, 19, and 47 were attached to the USACRC copy of this report. The originals of Exhibits 16 and 27 through 29 are maintained in the files of WACH ER.

**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

App. 297

USA-00005

**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

The original of Exhibit 20 is maintained in the files of VVTA. The originals of Exhibit 40 are maintained in the files of the SBCSD-CD. The originals of Exhibits 45 and 50 are maintained in the files of USACIL. The originals of Exhibits 44 and 48 are maintained in the files of the FIMP. Copies of Exhibits 1 through 5, 8, 9, 11, 13 through 15, 17, 22 through 26, 30, 31, 34 through 39, 41 through 43, 46 and 49; retained at the Crime Records Center, become the original exhibits of record, when final disposition of the originals retained by this office occurs; IAW AR 25-400-2.

STATUS: This is a Final (C) Report. This investigation was conducted jointly with the SBCSD-CD, Coroner's Case #701404229. Commander's Report of Disciplinary or Administrative Action (DA Form 4833) is pending.

CID reports of investigation may be subject to a Quality Assurance Review by CID Higher Headquarters.

Report Prepared By:                                    Report Approved By:

*for.*

MATTHEW R. CUMMINGS                         CHRISTOPHER R. HENNIGAN
Special Agent                                             Special Agent

DISTRIBUTION:
Dir, USACRC, Quantico, VA
Commander, U.S. Army Criminal Investigation Command (ATTN: CIOP-CO), Quantico, VA
Commander, 6th Military Police Group (CID), Joint Base Lewis-McChord, WA
Commander, 22nd Military Police Battalion (CID), Joint Base Lewis-McChord, WA
Armed Forces Medical Examiner, Dover Air Force Base, DE
Commanding General, National Training Center and Fort Irwin, Fort Irwin, CA
Chief of Staff, National Training Center & Fort Irwin, Fort Irwin, CA
Commander, U.S. Army Garrison, Fort Irwin, CA
Director, Emergency Services, (ATTN: LTC SWENSON), Fort Irwin, CA
Special Assistant U.S. Attorney (ATTN: ), Fort Irwin, CA
Staff Judge Advocate (ATTN: LTC MILLER), Fort Irwin, CA
FILE

**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

App. 298

USA-00006

**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

**DEPARTMENT OF THE ARMY**
U.S. ARMY CRIMINAL INVESTIGATION COMMAND
Fort Irwin CID Office
6th MP Group, Building 986 Inner Loop Road, Fort Irwin, CA 92310-5077

22 Dec 2014

MEMORANDUM FOR: SEE DISTRIBUTION

SUBJECT:   CID REPORT OF INVESTIGATION - FINAL (C)/SSI/JOINT - 0159-2014-
CID146-81168 – 5H3N / 5Q5A / 9G2F

DATES/TIMES/LOCATIONS OF OCCURRENCES:
    1. 02 JUN 2014, 0430 - 02 JUN 2014, 0600; FORT IRWIN ROAD, FORT IRWIN,
CA 92310

DATE/TIME REPORTED: 02 JUN 2014, 0530

INVESTIGATED BY:
    SA BLAINE S MOORE, 7363
    SA JOSHUA RAY STEWART, 8009
    SA KEVIN MARTIN WOOD, 7946
    SA MATTHEW R. CUMMINGS, 6580

SUBJECT:
    1. AGUILAR, DINORAH ELIZABETH; ███████████████████████████

    2. KILTY, STEVEN R; CIV; ██████████████████████ [CARELESS OR
RECKLESS DRIVING], [INVOLUNTARY MANSLAUGHTER]

VICTIM:
    1. KEIPER, DAIL LEE SENIOR (DECEASED); DODCR; ██████████████████

    2. CHESTNUT, MICHAEL JOSEPH; DODCR; ███████████████████████
███████████████████████████████ [CARELESS OR
RECKLESS DRIVING]

1
**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

App. 299

USA-00007

**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

3. BRIDGETTE, NAIOMI AUDREA; CIV; ████████████████ ██████████████████████████ ZZ ; [CARELESS OR RECKLESS DRIVING]

4. MARTINEZ, PEDRO ; SPC; ██████████████████████ ██████████████████ [CARELESS OR RECKLESS DRIVING]

5. AGUILAR, JESUS  JUNIOR; CIV; ████████████████ ██████████████ Z ; [CARELESS OR RECKLESS DRIVING]

6. DEROSIER, ARIEL KAYLEEN; CPL; ████████████████ ██████████████████████████ FC ; [CARELESS OR RECKLESS DRIVING]

INVESTIGATIVE SUMMARY:

This office was notified by SSG Clinton HOLT, Desk Sergeant, Fort Irwin Military Police (FIMP), Fort Irwin, CA 92310 (FICA), of an on-post traffic fatality.

Investigation conducted jointly by USACIDC and The San Bernardino County Sheriff's Department-Coroner Division (SBCSD-CD), 175 South Lena Road, San Bernardino, CA 92415 (SBCA), with the SBCSD-CD as the lead investigative agency, established probable cause to believe Ms. AGUILAR and Mr. KILTY committed the offenses of Vehicular Manslaughter, Involuntary Manslaughter and Reckless Driving, when Ms. AGUILAR recklessly crashed her bus into the back of Mr. KILTY's truck while it was parked in the right lane of the Fort Irwin Bypass, without any emergency hazard placards or other identifying measures in place.  This vehicle collision directly resulted in the death of Mr. KEIPER along with the injuries sustained by several other passengers who were riding the bus driven by Ms. AGUILAR at the time of the collision.

The SBCSD-CD conducted an autopsy of Mr. KEIPER and determined Mr. KEIPER's manner of death was Accidental and the cause of his death was multiple blunt force injuries.  Based on the totality of investigation, subject, witness and victim interviews, traffic reports, death scene examination, and review of medical records, the investigative findings of this office agree with the final determination of death as reported by the SBCSD-CD.

MAJ Gilbert J. COMLEY, Special Assistant to the U.S. Attorney, FICA, concurred probable cause existed to believe Ms. AGUILAR and Mr. KILTY committed the offenses of Vehicular Manslaughter, Involuntary Manslaughter and Reckless Driving.

**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

App. 300

USA-00008

**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

STATUTES:

18 U.S.C. 1112(a), Involuntary Manslaughter

CA Penal Code; Section 192, Vehicular Manslaughter

CA Vehicle Code; Section 23104, Reckless Driving

EXHIBITS:

Attached:

1. Agent's Investigation Report (AIR) of SA SWANSON, 2 Jun 14.

2. State of California Traffic Collision Report, 2 Jun 14.

3. VEOLIA Transportation Daily Bus Report, 2 Jun 14.

4. Statement of Mr. LIENERT, 2 Jun 14.

5. Consent to Search of Mr. LIENERT, 2 Jun 14.

6. Evidence/Property Custody Document (EPCD), Document Number (DN): 095-14.

7. CD containing Call Logs from Mr. LIENERT'S phone, 2 Jun 14.

8. Death Scene Examination AIR of SA WOOD, 3 Jun 14.

9. Photographic Packet. (Death Scene)

10. CD containing all original images associated with Exhibit 9. (USACRC and file copy only)

11. AIR of SA SWANSON, 26 Jun 14.

12. EPCD, DN: 73-14.

13. CD containing Victorville Transit Authority (VVTA), Internal Bus Video, 3 Jun 14.

14. CD containing photographs of scene provided by SGT GUTIERREZ, 3 Jun 14.

15. Traffic Collision Sketch prepared by SGT GUTIERREZ, 3 Jun 14.

**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

App. 301

USA-00009

FOR OFFICIAL USE ONLY
Law Enforcement Sensitive

16. Weed Army Community Hospital Emergency Room (WACH ER), Medical Records of Ms. AGUILAR, 3 Jun 14.

17. CD containing FICA Video Reenactment, 4 Jun 14.

18. EPCD, DN: 74-14.

19. CD containing Autopsy Photographs of Mr. KEIPER, 4 Jun 14.

20. VVTA Driver Complaints pertaining to Ms. AGUILAR, 4 Jun 14.

21. EPCD, DN: 76-14 and associated hand receipt.

22. Statement of Mr. CHESTNUT, 13 Jun 14.

23. Statement and Interview Sketch of SPC DEROSIER, 13 Jun 14.

24. Statement of Mr. TUSIESEINA, 17 Jun 14.

25. Statement of Mr. AGUILAR, 17 Jun 14.

26. Statement and Seating Layout of SPC MARTINEZ-MIRANDA, 19 Jun 14.

27. WACH ER Medical Records of Mr. CHESTNUT, 26 Jun 14.

28. WACH ER Medical Records of SPC MARTINEZ-MIRANDA, 26 Jun 14.

29. WACH ER Medical Records of SPC DEROSIER, 26 Jun 14.

30. Statement of Ms. BRIDGETTE, 26 Jun 14.

31. AIR of SA SWANSON, 30 Jul 14.

32. EPCD, DN: 103-14.

33. (2) EPCDs prepared by SGT GUTIERREZ, 3 Jun 14.

34. CD containing Extracted Forensic Files from the VVTA Removable HDD System, 1 Jul 14.

35. SBCSD Electronic Storage Device Processing Request, 1 Jul 14.

36. Statement of SSG HOEGLE, 30 Jul 14.

4
FOR OFFICIAL USE ONLY
Law Enforcement Sensitive

USA-00010

**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

37. AIR of SA WOOD, 29 Aug 14.

38. Drivers License Record of Mr. KILTY, 1 Aug 14.

39. Drivers License Record of Ms. AGUILAR, 18 Aug 14.

40. SBCSD-CD Autopsy Protocol, Toxicology Report, SBCSD-CD Body Examination Checklist and SBCSD-CD Coroner Investigation, Coroner's Case #701404229, 18 Aug 14.

41. Statement of Mr. DAVIS, 20 Aug 14.

42. Statement of Mr. HERRERA, 20 Aug 14.

43. AIR of SA WOOD, 22 Oct 14.

44. FIMP Military Police Report and Traffic Report, Report Number: 00618-2014-MPC146, 7 Oct 14.

45. USACIL Digital Evidence Report, Report Number: 2014-CID131-1383, 12 Oct 14.

46. AIR of SA WOOD, 20 Nov 14.

47. DVD containing audio/video recorded interview of Ms. AGUILAR, 17 Nov 14.

48. Fort Irwin Physical Security Plan (Commercial Vehicle Procedures), 20 Nov 14.

49. AIR of SA WOOD, 10 Dec 14.

50. USACIL Laboratory Examination Request, 1 Aug 14. (USACRC and file copy only)

Not Attached:

None.

The originals of Exhibits 1 through 5, 7 through 11, 13 through 15, 17, 19, 22 through 26, 30, 31, 34 through 39, 41 through 43, 46, 47 and 49 are maintained in the files of this office. The originals of Exhibits 6, 12, 18, 21, 32 and 33 are maintained in the files of the Evidence Depository, this office. The originals of Exhibits 16 and 27 through 29 are maintained in the files of WACH ER. The original of Exhibit 20 is maintained in the files of VVTA. The originals of Exhibit 40 are maintained in the files of the SBCSD-CD. The originals of Exhibits 45 and 50 are maintained in the files of USACIL. The original of Exhibits 44 and 48 are maintained in the files

**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

App. 303

USA-00011

**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

of the FIMP.  Copies of 1 through 5, 7 through 11, 13 through 15, 17, 19, 22 through 26, 30, 31, 34 through 39, 41 through 43, 46, 47 and 49; retained at the Crime Records Center, become the original exhibits of record, when final disposition of the originals retained by this office occurs; IAW AR 25-400-2.

STATUS: This is a Final (C) Report.  This investigation was conducted jointly with the SBCSD-CD, Coroner's Case #701404229.  Commander's Report of Disciplinary or Administrative Action (DA Form 4833) is pending.

CID reports of investigation may be subject to a Quality Assurance Review by CID Higher Headquarters.

Report Prepared By:                                      Report Approved By:


KEVIN MARTIN WOOD                          CHRISTOPHER R. HENNIGAN
Special Agent                                          Special Agent


DISTRIBUTION:
Dir, USACRC, Quantico, VA
Commander, U.S. Army Criminal Investigation Command (ATTN:  CIOP-CO), Quantico, VA
Commander, 6th Military Police Group (CID), Joint Base Lewis-McChord, WA
Commander, 22nd Military Police Battalion (CID), Joint Base Lewis-McChord, WA
Armed Forces Medical Examiner, Dover Air Force Base, DE
Commanding General, National Training Center and Fort Irwin, Fort Irwin, CA
Chief of Staff, National Training Center & Fort Irwin, Fort Irwin, CA
Commander, U.S. Army Garrison, Fort Irwin, CA
Director, Emergency Services, (ATTN:  LTC SWENSON), Fort Irwin, CA
Special Assistant U.S. Attorney (ATTN: ), Fort Irwin, CA
Staff Judge Advocate (ATTN: LTC MILLER), Fort Irwin, CA
FILE

**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

App. 304

USA-00012

**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

DATE:       19 NOV 2014

FROM:       SAC, FORT IRWIN CID OFFICE//

TO:         DIR USACRC QUANTICO VA //CICR-ZA//
            CG USACIDC QUANTICO VA //CIOP-ZA//
            HQUSACIDC//CIOP-CO//
            6TH MP GROUP (CID)
            22ND MP BN (CID)
            CG, NTC AND FORT IRWIN//MG MARTIN//
            CHIEF OF STAFF, NTC//COL WILSON//
            CDR, USAG//COL BRAGA//
            SJA, FICA//LTC MILLER//
            SJA, CHIEF, MILITARY JUSTICE////
            SAUSA//MAJ COMLEY//
            DIR, DES//LTC SWENSON//
            ARMED FORCES MEDICAL EXAMINER

SUBJECT:    CID REPORT OF INVESTIGATION - 4TH STATUS/SSI/JOINT - 0159-2014-
            CID146-81168 - 5H3N / 5Q5A

DRAFTER:    WOOD, KEVIN MARTIN

RELEASER:   CUMMINGS, MATTHEW R.

1. DATES/TIMES/LOCATIONS OF OCCURRENCES:
      1. 02 JUN 2014, 0430 - 02 JUN 2014, 0600; FORT IRWIN ROAD, FORT IRWIN,
CA 92310

2. DATE/TIME REPORTED: 02 JUN 2014, 0530

3. INVESTIGATED BY:
         SA BLAINE S MOORE, 7363
         SA JOSHUA RAY STEWART, 8009
         SA KEVIN MARTIN WOOD, 7946
         SA MATTHEW R. CUMMINGS, 6580

4. SUBJECT:
         1. [CHANGE] AGUILAR, DINORAH ELIZABETH; CIV; ▮▮▮▮▮▮▮▮▮
( ▮▮▮▮▮ E
▮▮▮▮▮▮▮ [CARELESS OR RECKLESS DRIVING], [INVOLUNTARY
MANSLAUGHTER]

App. 305

USA-00013

2. [ADD] KILTY, STEVEN R.; CIV; ████████

[CARELESS OR RECKLESS DRIVING], [INVOLUNTARY MANSLAUGHTER]

5. VICTIM:

1. KEIPER, DAIL LEE SENIOR (DECEASED); ████████

████████ [INVOLUNTARY MANSLAUGHTER]

2. [ADD] CHESTNUT, MICHAEL JOSEPH; ████████ [CARELESS
OR RECKLESS DRIVING]

3. [ADD] BRIDGETTE, NAIOMI AUDREA; CIV; ████████

[CARELESS OR RECKLESS DRIVING]

4. [ADD] MARTINEZ, PEDRO ; SPC; ████████
████ FC ; [CARELESS OR RECKLESS DRIVING]

5. [ADD] AGUILAR, JESUS  JUNIOR; CIV; ████████
████████ ; [CARELESS OR
RECKLESS DRIVING]

6. [ADD] DEROSIER, ARIEL KAYLEEN; CPL ████████
████████ L
92310; FC ; [CARELESS OR RECKLESS DRIVING]

6. INVESTIGATIVE SUMMARY:
THE INFORMATION IN THIS REPORT IS BASED UPON AN ALLEGATION OR
PRELIMINARY INVESTIGATION AND MAY BE CHANGED PRIOR TO THE
COMPLETION OF THE INVESTIGATION.

4TH STATUS:

THIS REPORT WAS GENERATED TO CHANGE THE INCIDENT FROM AN
UNDETERMINED DEATH TO RECKLESS DRIVING AND INVOLUNTARY
MANSLAUGHTER; TO ADD MRS. AGUILAR AND MR. KILTY AS SUBJECTS IN THIS
INVESTIGATION; AND ADD MR. AGUILAR, CPL DEROSIER, SPC MARTINEZ, MR.
CHESTNUT AND MS. BRIDGETTE AS VICTIMS IN THIS INVESTIGATION.

**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

THIS OFFICE RECEIVED THE SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT-CORONER DIVISION (SBCSD-CD) AUTOPSY AND TOXICOLOGY REPORT WHICH LISTED THE MANNER OF DEATH OF MR. KEIPER WAS ACCIDENTAL AND REFLECTED THE CAUSE OF DEATH AS MULTIPLE BLUNT FORCE INJURIES.

BASED ON THE TOTALITY OF INVESTIGATION, INTERVIEWS OF WITNESSES, TRAFFIC REPORTS, DEATH SCENE EXAMINATION, REVIEW OF MEDICAL RECORDS. THE INVESTIGATIVE FINDINGS OF THIS OFFICE AGREE WITH THE FINAL DETERMINATION OF DEATH AS REPORTED BY THE CORONER.

MAJ GILBERT J. COMLEY, SPECIAL ASSISTANT U.S. ATTORNEY, OFFICE OF THE STAFF JUDGE ADVOCATE, FICA, OPINED PROABLE CAUSE EXISTED TO BELIEVE MRS. AGUILAR AND MR. KILTY COMMITTED THE OFFENSES OF CARELESS OR RECKLESS DRIVING AND INVOLUNTARY MANSLAUGHTER.

PENDING ADMINISTRATIVE REVIEW AND CLOSURE.

3RD STATUS:

THIS REPORT WAS GENERATED TO PROVIDE AN INVESTIGATIVE UPDATE.  THIS OFFICE HAS MAINTAINED COORDINATION WITH SBCSD AND THE UNITED STATES ARMY CRIMINAL INVESTIGATION LABORATORY (USACIL) THROUGHOUT THIS INVESTIGATION.  THIS INVESTIGATION IS PENDING THE FINDINGS OF USACIL.

2ND STATUS:

THIS REPORT WAS GENERATED TO CHÁNGE THIS CASE TO A JOINT INVESTIGATION.

THIS OFFICE COORDINATED WITH THE SAN BERNARDINO COUNTY SHERIFF DEPARTMENT (SBCSD), SAN BERNARDINO, CA, WHO AGREED TO CONDUCT A JOINT INVESTIGATION, WITH USACIDC ACTING AS THE LEAD AGENCY.  THE SBCSD WILL CONDUCT THE RECOVERY OF THE DATA FROM THE DIGITAL RECORDERS THAT WERE COLLECTED FROM THE WRECKED VICTORVILLE VALLEY TRANSIT AUTHORITY (VVTA) BUS.  USACIDC WILL CONDUCT ALL OTHER INVESTIGATIVE ACTIVITY.

INITIAL REPORT:

THIS OFFICE WAS NOTIFIED BY SSG CLINTON HOLT, DESK SERGEANT, FORT IRWIN POLICE DEPARTMENT (FIPD), FORT IRWIN, CA 92310 (FICA), OF AN ON-POST

**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

App. 307

USA-00015

**FOR OFFICIAL USE ONLY**
Law Enforcement Sensitive

TRAFFIC FATALITY.

PRELIMINARY INVESTIGATION HAS REVEALED MS. DINORAH E. AGUILAR, ███ ███ ███████ ███████████ WAS DRIVING A CIVILIAN PASSENGER BUS WITH EIGHT PASSENGERS, NOT INCLUDING HERSELF, ON THE FORT IRWIN ROAD TRUCK ANNEX WHEN SHE REAR-ENDED A PARKED TRUCK OCCUPIED BY MR. STEVEN R. KILTY, ████████████████████████ EMERGENCY MEDICAL SERVICES PERSONNEL RESPONDED, AND BEGAN LIFE SAVING MEASURES AND TRIAGING PATIENTS.  EIGHT INDIVIDUALS WERE SUBSEQUENTLY TRANSPORTED TO VARIOUS MEDICAL FACILITIES BOTH ON AND OFF POST.

MS. DONNA SOBIESIAK, DEPUTY CORONER INVESTIGATOR, SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT CORONER DIVISION, 175 S LENA ROAD, SAN BERNARDINO, CA 92415 (SBCA) PRONOUNCED MR. KEIPER DECEASED ON THE SCENE WITH A TIME OF DEATH OF 0514, 2 JUN 14.

THE AUTOPSY OF MR. KEIPER'S REMAINS IS SCHEDULED FOR 4 JUN 14 BY THE SAN BERNARDINO COUNTY CORONER, SBCA.

THE CASUALTY LIAISON OFFICER (CLO) FOR THIS OFFICE IS SPECIAL AGENT-IN-CHARGE MATTHEW CUMMINGS AT (760) 380-5895 AND EMAIL MATTHEW.R.CUMMINGS.MIL@MAIL.MIL.

7. COMMANDERS ARE REMINDED OF THE PROVISIONS OF AR 600-8-2 PERTAINING TO SUSPENSION OF FAVORABLE PERSONNEL ACTIONS AND AR 380-67 FOR THE SUSPENSION OF SECURITY CLEARANCES OF PERSONS UNDER INVESTIGATION.

8. USACIDC REPORTS ARE EXEMPT FROM AUTOMATIC TERMINATION OF PROTECTIVE MARKINGS IN ACCORDANCE WITH CHAPTER 3, AR 25-55.

App. 308

USA-00016

0 1 5 9 - 1 4   CID146 8 1 1 6
SH 3r

## MILITARY POLICE TRAFFIC ACCIDENT REPORT
For use of this form, see AR 190-45; the proponent agency is PMG

### PRIVACY ACT STATEMENT

**AUTHORITY:** Title 10 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 *(SSN)*.
**PRINCIPAL PURPOSE:** To provide commanders and law enforcement officials with means by which information maybe be accurately identified.
**ROUTINE USES:** Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval.
**DISCLOSURE:** Disclosure of your social security number is voluntary.

| 1. PM ACTIVITY CODE/REPORT NO. 00618-2014-MPC146 | 2. DATE OF ACCIDENT *(YYYYMMDD)* 2014/06/02 | 3. TIME OF ACCIDENT *(Use 2400 hour)* 0506 | 4. DAY OF WEEK OF COLLISION *(Sunday, Monday, etc.)* Monday |
|---|---|---|---|

### 5. LOCATION OF ACCIDENT

| a. MILITARY RESERVATION [X] YES [ ] NO | b. NAME AND LOCATION OF MILITARY RESERVATION *(Include City and State, etc.)* FORT IRWIN, CA |
|---|---|

| c. ROAD OR STREET ON WHICH ACCIDENT OCCURED MGRS 11SNU2230493914 | d. NAME OF INTERSECTING STREET IF AT INTERSECTION |
|---|---|

| e. NAME OF NEAREST INTERSECTING STREET, HIGHWAY, OR OTHER PERMANENT IDENTIFYING LANDMARK IF NOT AT INTERSECTION | f. NO. OF FEET | g. DIRECTION |
|---|---|---|

h. IF ACCIDENT OCCURED OFF MILITARY RESERVATION, AND OUTSIDE CITY LIMITS, INDICATE:
_____ MILES [ ] N [ ] S [ ] E [ ] W FROM [ ] CITY LIMITS [ ] CENTER OF CITY OR TOWN

| i. KIND OF LOCALITY | [ ] Troop Billets [ ] Residential | [ ] Mfg or Industrial [X] Open Country | [ ] School or Playground [ ] Business | [ ] Other *(Specify)* |
|---|---|---|---|---|

### 6. TYPE OF ACCIDENT

| [X] Vehicle-Vehicle | [ ] Vehicle-Object | [ ] Single Vehicle *(Non Collision)* | a. SEVERITY | |
|---|---|---|---|---|
| [ ] Vehicle-Pedicycle | [ ] Vehicle-RR Train | [ ] Hit and Run | NO. KILLED 1 | NO. INJURED 8 |
| [ ] Stolen Vehicle | [ ] Vehicle-Pedestrian | [ ] Other *(Specify)* | | |

| b. TOTAL NO. OF VEHICLES INVOLVED 2 | [ ] PROPERTY DAMAGE ONLY |
|---|---|

### 7. WEATHER, LIGHT, AND ROAD CONDITIONS

| VEHICLE 1 | 2 | DRIVING LANES | VEHICLE 1 | 2 | CHARACTER | VEHICLE 1 | 2 | SURFACE | VEHICLE 1 | 2 | WEATHER |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | One | X | X | Straight | | | Concrete | X | X | Clear |
| X | X | Two | | | Curve | X | X | Black Top | | | Rain |
| | | Three or More | | | Level | | | Brick | | | Fog |
| | | Divided Highway | X | X | On Grade | | | Gravel | | | Snowing |
| | | Other | | | Other | | | Other | | | Other |

| VEHICLE 1 | 2 | CONDITIONS | VEHICLE 1 | 2 | DEFECTS | VEHICLE 1 | 2 | LIGHT |
|---|---|---|---|---|---|---|---|---|
| X | X | Dry | | | Holes, Ruts, Bumps, etc. | | | Daylight |
| | | Wet | | | Loose Material on Surface | X | X | Dawn |
| | | Mud | | | Defective Shoulder | | | Dusk |
| | | Snow | X | X | No Defects | | | Dark, Street Lights |
| | | Other | | | Other | | | Dark, No Street Lights |

### 8. TRAFFIC CONTROL

| VEHICLE 1 | 2 | | VEHICLE 1 | 2 | | VEHICLE 1 | 2 | | VEHICLE 1 | 2 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Stop and Go Signal | | | Flashing Light | X | X | Warning Sign | X | X | One Way Street |
| X | X | No Traffic Signal | | | Officer or Watchman | | | Solid Center Line | | | Stop Sign |
| | | Other *(Explain)* | | | | | | | | | |

DA FORM 3946, DEC 1998            00618-2014-MPC146            DA FORM 3946, SEP 73, IS OBSOLETE            Page 1 of 5

"FOR OFFICIAL USE ONLY/ LAW ENFORCEMENT SENSITIVE"

EXHIBIT ___44___

USA-00212

App. 309

0159-14   CID146-8-1168

| 9a. VEHICLE NO. 1 | | | | 9b. VEHICLE NO. 2 | | | |
|---|---|---|---|---|---|---|---|
| USA REGISTRATION OR LICENSE NO. 1358942 CA | MAKE BUS | YEAR 2010 | BODY TYPE BUS | USA REGISTRATION OR LICENSE NO. 53549W WI | MAKE VOLVO | YEAR 2006 | BODY TYPE TRACTOR TRUCK, DIESEL |
| UNIT MARKINGS/DECAL NO. GREEN IN COLOR | | | X Privately Owned   Government | UNIT MARKINGS/DECAL NO. BLUE IN COLOR | | | X Privately Owned   Government |

| REGISTERED OWNER  *(If not driver) (Last, First, MI)* VICTOR VALLEY TRANSIT AUT USDOT: 505166 | REGISTERED OWNER  *(If not driver) (Last, First, MI)* FBN TRANSPORTATION LLC USDOT: 1134215 |
|---|---|
| ADDRESS OF OWNER 11741 SMOKE TREE LANE HESPERIA CA 92345 | ADDRESS OF OWNER 317 WASHINGTON STREET ATHENS WI 54411 |
| NAME AND ADDRESS OF INSURANCE COMPANY OR AGENT OLD REPUBLIC INSURANCE CO. POLICY #MWTB21268 CHICAGO IL  92345 | NAME AND ADDRESS OF INSURANCE COMPANY OR AGENT KUNKEL & ASSOCIATES INC. POLICY # NDP00012902 DUBUQUE IA  52003 |

| 10a. DRIVER NO. 1 | | 10b. DRIVER NO. 2 | |
|---|---|---|---|
| NAME *(Last, First, MI), Grade and Address)* AGUILAR DINORAH E 15251 VILLAGE DR APT #83 VICTORVILLE CA 92394 | SSN ▆▆▆-5656   AGE 49      Male   X Female | NAME *(Last, First, MI), Grade and Address)* KILTY STEVEN R 85 W WINDSONG ST APACHE JUNCTION AZ 85120 | SSN 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   AGE 47   X Male      Female |
| DRIVER'S LICENSE/PERMIT NUMBER C1292028 | STATE   CA | DRIVER'S LICENSE/PERMIT NUMBER D06252419 | STATE   AZ |
| LIMITATIONS ON LICENSE/PERMIT   ☐ N   X Y *(Specify)* BUSES > 26001 GVWR | YEAR'S DRIVING EXPERIENCE | LIMITATIONS ON LICENSE/PERMIT   X N   ☐ Y *(Specify)* | YEAR'S DRIVING EXPERIENCE |

| CODES | CAT (1) | INJ (2) | SEAT BELT (3) | SEAT POS (4) | CODES | CAT (1) | INJ (2) | SEAT BELT (3) | SEAT POS (4) |
|---|---|---|---|---|---|---|---|---|---|
| | E | F | C | 1 | | E | A | C | 7 |

**11. OCCUPANTS**

| NAME AND ADDRESS | VEH NO. | AGE | SEX | CODES | | | |
|---|---|---|---|---|---|---|---|
| | | | | CAT (1) | INJ (2) | SEAT BELT (3) | SEAT POS (4) |
| ARIEL DEROSIER 2301 MURIEL DR APT 50 BARSTOW CA 92311 | 1 | 23 | F | B | F | D | 7 |
| NAIOMI BRIDGETTE 755 E VIRGINIA WAY APT #98 BARSTOW CA 92311 | 1 | 27 | F | E | E | D | 7 |
| JERMAINE RATLIFF 755 E. VIRGINIA WAY APT #98 BARSTOW CA 92311 | 1 | 4 | M | E | F | D | 7 |
| JESUS AGUILAR 32488 SYLVAN AVE BARSTOW CA 92311 | 1 | 32 | M | E | E | D | 7 |
| PEDRO MARTINEZMIRANDA 2306 ANTIETAM ST FORT IRWIN CA 92310 | 1 | 36 | M | B | F | D | 7 |

| CODES | | | |
|---|---|---|---|
| (1) CATEGORY | (2) INJURY CLASS | (3) SHOULDER/LAP BELTS | (4) SEAT POSITION |
| A. Army officer B. Army enlisted C. Other service officer D. Other service enlisted E. Civilian F. Dependent O. Other | A. No injury B. Dead at scene C. Dead on arrival D. Died in hospital E. Incapacitating injury F. Non-incap (evident) injury G. Possible injury H. Injury unknown | A. Lap belt used B. Shoulder harness used C. Both used D. Not used E. Not installed F. Lap belt failed G. Shoulder harness failed H. Both failed U. Unknown | 1. Front Left 2. Front Center 3. Front Right 4. Back Left 5. Center Back 6. Back Right 7. Other Position *(Bus-Motorcycle)* 8. Position Unknown |

"FOR OFFICIAL USE ONLY/ LAW ENFORCEMENT SENSITIVE"

App. 310

EXHIBIT ▢   USA-00213

0159-14  CIDI46 81165

SH3

| 9a. VEHICLE NO. 1 | | | | 9b. VEHICLE NO. 2 | | | |
|---|---|---|---|---|---|---|---|
| USA REGISTRATION OR LICENSE NO. 1358942 CA | MAKE BUS | YEAR 2010 | BODY TYPE BUS | USA REGISTRATION OR LICENSE NO. 53549W WI | MAKE VOLVO | YEAR 2006 | BODY TYPE TRACTOR TRUCK, DIESEL |
| UNIT MARKINGS/DECAL NO. GREEN IN COLOR | | X Privately Owned / Government | | UNIT MARKINGS/DECAL NO. BLUE IN COLOR | | X Privately Owned / Government | |
| REGISTERED OWNER *(If not driver) (Last, First, MI)* VICTOR VALLEY TRANSIT AUT USDOT: 505166 | | | | REGISTERED OWNER *(If not driver) (Last, First, MI)* FBN TRANSPORTATION LLC USDOT: 1134215 | | | |
| ADDRESS OF OWNER 11741 SMOKE TREE LANE HESPERIA CA 92345 | | | | ADDRESS OF OWNER 317 WASHINGTON STREET ATHENS WI 54411 | | | |
| NAME AND ADDRESS OF INSURANCE COMPANY OR AGENT OLD REPUBLIC INSURANCE CO. POLICY #MWTB21268 CHICAGO IL. 92345 | | | | NAME AND ADDRESS OF INSURANCE COMPANY OR AGENT KUNKEL & ASSOCIATES INC. POLICY # NDP00012902 DUBUQUE IA  52003 | | | |

| 10a. DRIVER NO. 1 | | 10b. DRIVER NO. 2 | |
|---|---|---|---|
| NAME *(Last, First, MI), Grade and Address* AGUILAR DINORAH E 15251 VILLAGE DR APT #83 VICTORVILLE CA 92394 | SSN ⬛-5656 AGE 49 ☐ Male X Female | NAME *(Last, First, MI), Grade and Address* KILTY STEVEN R 85 W WINDSONG ST APACHE JUNCTION AZ 85120 | SSN ⬛-9512 AGE 47 X Male ☐ Female |
| DRIVER'S LICENSE/PERMIT NUMBER C1292028 | STATE CA | DRIVER'S LICENSE/PERMIT NUMBER D06252419 | STATE AZ |
| LIMITATIONS ON LICENSE/PERMIT ☐ N  X Y *(Specify)* BUSES > 26001 GVWR | YEAR'S DRIVING EXPERIENCE | LIMITATIONS ON LICENSE/PERMIT X N  ☐ Y *(Specify)* | YEAR'S DRIVING EXPERIENCE |

| CODES | CAT (1) E | INJ (2) F | SEAT BELT (3) C | SEAT POS (4) 1 | CODES | CAT (1) E | INJ (2) A | SEAT BELT (3) C | SEAT POS (4) 7 |
|---|---|---|---|---|---|---|---|---|---|

**11. OCCUPANTS**

| NAME AND ADDRESS | VEH NO. | AGE | SEX | CODES CAT (1) | INJ (2) | SEAT BELT (3) | SEAT POS (4) |
|---|---|---|---|---|---|---|---|
| MICHAEL CHESTNUT 321 W. GRACE ST BARSTOW CA 92311 | 1 | 49 | M | O | F | D | 7 |
| MISIONA TUSIESEINA 486 STANFORD DR BARSTOW CA 92310 | 1 | 59 | F | O | F | D | 7 |
| DAIL KEIPER 1150 MOJAVE DR BARSTOW CA 92311 | 1 | 62 | M | O | C | D | 7 |
| | | | | | | | |
| | | | | | | | |

| CODES | | | |
|---|---|---|---|
| **(1) CATEGORY** | **(2) INJURY CLASS** | **(3) SHOULDER/LAP BELTS** | **(4) SEAT POSITION** |
| A. Army officer B. Army enlisted C. Other service officer D. Other service enlisted E. Civilian F. Dependent O. Other | A. No injury B. Dead at scene C. Dead on arrival D. Died in hospital E. Incapacitating injury F. Non-incap (evident) injury G. Possible injury H. Injury unknown | A. Lap belt used B. Shoulder harness used C. Both used D. Not used E. Not installed F. Lap belt failed G. Shoulder harness failed H. Both failed U. Unknown | 1. Front Left 2. Front Center 3. Front Right 4. Back Left 5. Center Back 6. Back Right 7. Other Position *(Bus-Motorcycle)* 8. Position Unknown |

*DA FORM 3946, DEC 1998*          00618-2014-MPC146          Page 3 of 5

"FOR OFFICIAL USE ONLY/ LAW ENFORCEMENT SENSITIVE"

EXHIBIT ⬛ —USA-00214

App. 311

**12. PEDESTRIAN**

0159-14  CID146 8116 B

| a. NAME AND ADDRESS | | | | | | | | b. AGE | c. SEX | d. CATEGORY | e. INJURY |
|---|---|---|---|---|---|---|---|---|---|---|---|

**f. PEDESTRIAN WAS GOING** [ ] N [ ] S [ ] E [ ] W [ ] ALONG [ ] ACROSS [ ] INTO STREET, ROAD OR HIGHWAY,
FROM *(NW to SW corner, or east to west side, etc.)* _____ TO _____

| [ ] Crossing With Signal | [ ] Crossing No Signal | [ ] Standing on Roadway | [ ] Walking in Road Against Traffic |
|---|---|---|---|
| [ ] Crossing Against Signal | [ ] Hitching on Roadway | [ ] Coming From Behind Parked Car | [ ] Walking in Road With Traffic |
| [ ] Crossing Not at Intersection | [ ] Playing on Roadway | [ ] Pushing or Working on Vehicle | [ ] Other |

**13. WITNESSES**

| a. NAME AND ADDRESS | b. TELEPHONE NUMBER |
|---|---|
| | |
| | |
| | |
| | |

**14. VEHICLE DAMAGE**

| a. | DAMAGED VEHICLE NO. 1 | | | DAMAGED VEHICLE NO. 2 | | DAMAGED TRAILER, MOTORCYCLE ETC. |
|---|---|---|---|---|---|---|
| X | Right Front of Car | | Left Front Door | Right Front of Car | Left Front Door | *(Sketch Damage)* |
| X | Right Front Fender | | Left Front Fender | Right Front Fender | Left Front Fender | |
| X | Right Front Door | | Left Front of Car | Right Front Door | Left Front of Car | |
| X | Right Rear Door | | Hood | Right Rear Door | Hood | |
| | Right Rear Fender | X | Roof | Right Rear Fender | Roof | |
| | Right Rear of Car | | Trunk | Right Rear of Car | Trunk | |
| | Left Rear of Car | X | Undercarriage | Left Rear of Car | Undercarriage | |
| | Left Fender | | Overturn | Left Fender | Overturn | |
| | Left Rear Door | | | Left Rear Door | | |

| b. | SEVERITY OF DAMAGE VEHICLE NO. 1 | | SEVERITY OF DAMAGE VEHICLE NO. 2 | | SEVERITY OF DAMAGE OTHER VEHICLE | |
|---|---|---|---|---|---|---|
| X | Disabling Damage | [ ] Other MV Damage | [ ] Disabling Damage | [ ] Other MV Damage | [ ] Disabling Damage | [ ] Other MV Damage |
| | Functional Damage | [ ] No Damage | [ ] Functional Damage | X No Damage | [ ] Functional Damage | [ ] No Damage |

| c. TOWED BY<br>ARC TOWING | TOWED BY<br>BY OWNER | TOWED BY |
|---|---|---|
| **d. TOWED TO**<br>821 W. MAIN, BARSTOW CA 92311 | TOWED TO | TOWED TO |

**e. DAMAGE TO PROPERTY OTHER THAN VEHICLE**
VEH 2: LFT SIDE OF TRAILER AND LOAD DAMAGED BY V-1

**f. SKETCH OF COLLISION.** (1) Identify roadway and roadway features, vehicles, pedestrians, objects on/off roadway, traffic controls, skimarks, unusual / temperature conditions *(ice patch, construction areas, etc.)*. (2) Locate probable point of impact. (3) Show vehicle, pedestrain or object positions at impact. (4) Show probable vehicle or pedestrian paths before and after collision.

NORTH = ↑

**g. DESCRIPTION OF COLLISION.** Indicate what probably happened before, during, and after the crash; include information not on sketch, e.g., driver disability, reduced visibility, pedestrian clothing color, construction or repair work, etc.
VEH 1:  SEE SUPPLEMENTAL REPORT FOR FURTHER INVESTIGATIVE DETAILS OF COLLISION.
VEH 2:  SEE SUPPLEMENTAL REPORT FOR FURTHER INVESTIGATIVE DETAILS OF COLLISION.

"FOR OFFICIAL USE ONLY/
LAW ENFORCEMENT SENSITIVE"

App. 312

EXHIBIT 44  USA-00215

0159-14  CID146 8 1 1 6 8

## 15a. DRIVER'S ACTION BEFORE ACCIDENT

| DIRECTION HEADED | DRIVER (check one or more) 1 | 2 | | DRIVER (check one or more) 1 | 2 | | VEHICLE (Specify Feet/MPH) 1 | 2 | |
|---|---|---|---|---|---|---|---|---|---|
| VEHICLE 1: X N  S / E  W | X | | Backing | | | Other (Specify) | 118 (feet) | 0 (feet) | Estimated Distance When Danger Was First Noticed |
| | X | | Going Straight Ahead | | | | 45 (MPH) | 0 (MPH) | Estimated Speed When Danger Was First Noticed |
| | | | Making Left Turn | | | | | | |
| | X | | Skidding | | | | 40 | 0 | Estimated Speed at Impact (MPH) |
| VEHICLE 2: X N  S / E  W | | | Making Right Turn | | | | | | |
| | | | Making "U" Turn | | | | 22 | 11 | Distance Traveled After Impact (Feet) |
| | X | | Overtaking or Passing | | | | | | |
| | X | | Avoiding Veh/Obj | | | | 45 | 45 | Lawful Speed (MPH) |
| | X | | Slowing or Stopping | | | | | | |
| | | X | Stop in Traffic Lane | | | | | | |

## b. CONTRIBUTING CIRCUMSTANCES

| DRIVER (check one or more) 1 | 2 | | DRIVER (check one or more) 1 | 2 | | DRIVER (check one or more) 1 | 2 | |
|---|---|---|---|---|---|---|---|---|
| | | Exceeding Speed Limit | | | Alcohol Involved | X | | Chemical Test Given |
| | | Speed Excessive for Conditions | | | Drugs Involved | | | Chemical Test Refused |
| | | Failed to Yield | | | Ability Impaired | | | TEST RESULTS |
| | | Disregarded Stop Signal | X | | Ability Not Impaired | | | DRIVER NO. 1 / DRIVER NO. 2 |
| X | | Vision Obstructed | | | Unknown | | | % 0.00% BAC  BAC  %  BAC |
| | | Following Too Close | | | | | | |
| | | Improper Overtaking | | See attached DD Form 1920 (Alcoholic Influence Report) | | | |
| | | No or Improper Signal | VEHICLE (Check one or more) 1 | 2 | | | | |
| | | Disregarded Traffic Signal | | | Defective Brakes | | | |
| | | Improper Turn | | | Defective Head Light | | | |
| | | Unknown | | | Tires Worn or Smooth | | | |
| | X | Other (Specify) | | | Tires Punctured or Blown | | | |
| DRIVER #2: SLEEPING IN SLEEPER BERTH | | | | | Other (Specify) | | | |

## 16. MILITARY POLICE ACTIVITY

| a. NAME OF PERSON(s) APPREHENDED | b. CHARGES | c. REPORT NUMBER |
|---|---|---|
| | | |
| | | |

| | | YES | NO |
|---|---|---|---|
| d. TIME MILITARY POLICE NOTIFIED (Hour) 0509 | e. TIME MILITARY POLICE ARRIVED AT ACCIDENT (Hour) 0519 | | |
| f. WHERE ELSE WAS INVESTIGATION MADE? FORT IRWIN, CA | h. DID MILITARY OPERATOR COMPLETE DD FORM 518 (Accident Identification Card)? | | X |
| g. IF OFF MILITARY RESERVATION, WHO ELSE CONDUCTED AN INVESTIGATION? (If other agency conducted complete investigation, so indicate) | i. DID MILITARY OPERATOR COMPLETE SF FORM 91 (Motor Vehicle Accident Report)? | | X |
| | j. WAS FORM COMPLETED FROM ON SCENE INVESTIGATION? (If not, explain?) N/A | | X |

| k. DATE 2014/08/11 | l. TYPED OR PRINTED NAME AND GRADE OF INVESTIGATOR GS7 JUAN GUTIERREZ | m. INVESTIGATOR'S SIGNATURE AND GRADE |
|---|---|---|
| n. DATE APPROVED | o. APPROVED BY | p. ENCLOSURES     q. DISTRIBUTION |

DA FORM 3946, DEC 1998          00618-2014-MPC146          Page 5 of 5

"FOR OFFICIAL USE ONLY/ LAW ENFORCEMENT SENSITIVE"

EXHIBIT _USA-00216

0 1 5 9 - 1 4   CID146 8 1 1 6 8
SHS

FORT IRWIN POLICE DEPARTMENT
**NARRATIVE/SUPPLEMENTAL**

| DATE OF INCIDENT/OCCURRENCE | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 06/02/2014 | 0506 | | 201 | 0618-2014-MPC146 |

## FIELD SKETCH MEASUREMENT WORKSHEET   Sheet 1   of 2
DATA

| TYPE OF COLLISION **Vehicle to Vehicle** | INVESTIGATOR 1: RANK, LAST, FIRST, MI. **Sgt Gutierrez, J.** |
|---|---|
| LOCATION **Truck Bypass Rd** | SSAN/BADGE #, UNIT, INSTALLATION **#201, Fort Irwin Police Dept.** |
| **Fort Irwin, CA 92311** | STATE, ZIP **Fort Irwin, CA 92310** |
| **MPGRS 11SNU2230493914** | INVESTIGATOR 2: RANK, LAST, FIRST, MI **Sgt Grove, R.** |
| DATE/TIME **06/02/14  0506** | SSAN/BADGE #, UNIT, INSTALLATION **#G2213, Fort Irwin Police Dept.** |
| REMARKS **Fatal Traffic Collision** | STATE, ZIP **Fort Irwin, CA 92310** |

PHOTOS   YES ✕   NO_____
TOTAL NUMBER OF PHOTOS (IF ANY): _____
CASE NUMBER **00618-2014-MPC146**

### GRID COORDINATE / TRIANGULATION MEASUREMENTS
For Triangulation Measurements, Use the "RL" Block and Place N/A in "DIR" Block

| FROM | TO | RL | DIR | FROM | TO | RL | DIR |
|---|---|---|---|---|---|---|---|
| RP1 | Rumble Strip, East side on Truck Bypass Rd | 0' | 8' 6" W | RP2 | Check In Point / Do No Enter / One Way Sign | 138' N | 8' E |
| RP1 | Rumble Strip, West side on Truck Bypass Rd | 0' | 37' 6"W | RP1 | Do No Enter / One Way Sign | 141' N | 8' E |
| RP1 | Fog Line, East side on Truck Bypass | 0' | 10' 6" W | RP1 | AOI (debris / scuff mark) | 43' 08" N | 17' 6"W |
| RP1 | Fog Line, West side on Truck Bypass | 0' | 35' 6" W | RP2 | RT windshield / debris, V1 | 133' N | 23' E |
| RP1 | Intermediate Line, Truck Bypass | 0' | 23' W | RP2 | LR Tire, V1 | 42' N | 18' E |
| RP1 | RR Tire, V1 | 41' N | 22' W | RP2 | LF Tire, V1 | 65' N | 17' E |
| RP1 | RR Tire, V2 Trailer | 56' N | 13' W | RP2 | LR Tire, V2 | 95' N | 29' E |
| RP1 | RF Tire, V2 Trailer | 61' N | 12' W | RP2 | LF Tire, V2 | 119' N | 29' E |
| RP1 | RR Tire, V2 | 98' N | 10' W | RP1 | LF scrub mark, V1 | 43' 08" | 29' W |
| RP1 | RF Tire, V2 | 118' N | 9' W | RP1 | Begin arrow mark #2 lane | 132' N | 16' W |
| RP1 | Begin LF S1, skid mark, V1 | 20' N | 13' W | RP1 | End arrow mark #2 lane | 157' N | 16' W |
| RP1 | End LF S1, skid mark,V1 | 30' N | 15' W | RP1 | Begin arrow mark #1 lane | 132' N | 20' W |
| RP1 | Begin scrub mark, RR tires, V2 Trailer | 43' 8" N | 11' 4" W | RP1 | End arrow mark #1 lane | 157' N | 20' W |
| RP1 | End scrub mark, RR tires V2 Trailer | 58' N | 13' 8" W | RP1 | Jersey Barrier w/ Truck Stop times | 127' N | 9' W |
| RP1 | Begin gouge mark, V1 | 35' N | 16' 1" W | RP1 | MGRS 11SNU2230593902 | 0' | 0' |
| RP1 | End gouge mark, V1 | 65' N | 23' 8" W | | | | |
| RP1 | RP2 | 46' 6" N | 0' | | | | |

| PREPARER'S NAME AND I.D. NUMBER **GUTIERREZ, J. #201** | DATE **06/06/2014** | REVIEWER'S NAME | DATE |
|---|---|---|---|

Use previous editions until depleted

App. 314

"FOR OFFICIAL USE ONLY/ LAW ENFORCEMENT SENSITIVE"

EXHIBIT   USA-00217
1

FORT IRWIN POLICE DEPARTMENT
**NARRATIVE/SUPPLEMENTAL**

0 1 5 9 - 1 4   CID146 8 1 1 6 8

| DATE OF INCIDENT/OCCURRENCE | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 06/02/2014 | 0506 | . | 201 | 00618-2014-MPC146 |

### SKETCH



Truck Bypass Road

**Legend**

A. Check in Point / Do Not Enter / One Way Sign
B. Do Not Enter / One Way Sign
C. Reference Point 1
D. Reference Point 2
E. Jersey Barrier (Truck Stop Times)

NOT TO SCALE

11'   12' 6"   12' 6"   10' 6"

| PREPARER'S NAME AND I.D. NUMBER | DATE | REVIEWER'S NAME | | DATE |
|---|---|---|---|---|
| Gutierrez, J. #201 | 06/06/2014 | | | |

Use previous editions until depleted

"FOR OFFICIAL USE ONLY/
W ENFORCEMENT SENSITIVE"

EXHIBIT

3

USA-00218

FORT IRWIN POLICE DEPARTMENT
**NARRATIVE/SUPPLEMENTAL**

0159-14  CID146 8 1 1 6 8 -5

| DATE OF INCIDENT/OCCURRENCE | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 06/02/2014 | 0506 | | 201 | 00618-2014-MPC146 |

**NOTIFICATION:**
I was initially notified of a fatal traffic collision at 0523 hours. I was on Fort Irwin Road in route to begin my watch at 0600 hours when I received the initial call. I responded from Fort Irwin Road south of the installation and arrived on scene at 0610 hours. There were a number of Fort Irwin Police patrols with CHP officers on scene assisting with road closure and gathering driver/passenger data. Fort Irwin EMS was on scene conducting triage and assisting with the transport of all patients. I was the primary officer on scene and Sgt Grove was the assisting officer on scene conducting the traffic investigation for the Fort Irwin Police Department. All times, speed, and measurements in this investigation are approximate. Measurements were taken utilizing a measure tape and Laser. All Photographs associated with this traffic collision were taken by me, Sgt Grove, CID, and CHP. A photo log is attached with associated photos.

**PARTIES/VEHICLES**
Party #1 (P-1, Aguilar, D.) complained of pain to the left side and was transported by Fort Irwin Ambulance and located at the WACH ER. P-1 was identified by her valid California driver license. P-1 holds a California CDL, Class B Commercial driver license. P-1 exhibited fatigue which was determined by statement and video. P-1 was established as the driver of Vehicle #1 (V-1) by the following:

- P-1 admitted to driving V-1
- P-1 is employed as a bus driver for Victor Valley Transit Authority

Vehicle #1 (V-1, NABI, Public Transit Bus) was located on its wheels straddling lane #1 and lane #2 on the Truck Bypass Road in vicinity of MGRS 11SNU22330493914 facing in northeasterly direction. V-1 sustained severe eccentric disabling damage from the right front and extends to the right midpoint entry of the bus. V-1 has a unladen weight of 31680 lbs. and GWVR of 43,420 lbs. No prior mechanical defects or damage were noted or claimed. V-1 was towed and stored for evidence at 821 W. Main Street, Barstow, CA 92311, by ARC Towing.

Party #2 (P-2, Kilty, S.) was located standing at the driver's door of Vehicle #2 (V-2). P-2 was identified by his valid Arizona driver license. P-2 holds a P-2 was established as the passenger of V-2 by the following items:

- P-2 admitted to driving V-2 the night prior and stopping in Lane #2
- P-2 admitted to sleeping in sleeper berth of V-2
- No other occupants were onboard V-2

Vehicle #2 (V-2, Volvo Tractor Truck) was located on its wheels on lane #2 on the Truck Bypass Road in vicinity of MGRS 11SNU22330493914 facing in northeasterly direction. V-2 was carrying a load on the trailer of one HEMTT, a tan colored Heavy Expanded Mobility Tactical Truck. V-2 did not sustain any damage but the trailer sustained disabling damage to the left rear, to include the left side of the load. The trailer was towed at P-2's request. V-2 had a gross vehicle weight of 87560 lbs. No prior mechanical defects or damage were noted or claimed.

Party #3 (P-3, Derosier, A.) P-3 was a passenger of V-1 and was transported by Fort Irwin Ambulance to WACH ER and treated for minor head trauma. P-03 was seating on seat #26 on bus diagram.

Party #4 (P-4, Bridgette, N.) P-4 was a passenger of V-1 and was Medevac by Fort Irwin Air Ambulance detachment to Loma Linda Hospital and treated for a hip injury. P-4 was seating with her son, P-5 on seats #11-14 on bus diagram.

Party #5 (P-5, Ratliff, J.) P-5 was a passenger of V-1 and was Medevac with mother, P-4, by Fort Irwin Air Ambulance detachment to Loma Linda Hospital and treated for a minor head trauma. P-5 was seating with his mother, P-4 on seats #11-14 on bus diagram.

| PREPARER'S NAME AND I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|
| Gutierrez, J. #201 | 08/03/2014 | | |

Use previous editions until depleted

App. 316

EXHIBIT  USA-00219

FORT IRWIN POLICE DEPARTMENT
**NARRATIVE/SUPPLEMENTAL**

| DATE OF INCIDENT/OCCURRENCE | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 06/02/2014 | 0506 | | 201 | 00618-2014-MPC146 |

Party #6 (P-6, Aguilar, J.) P-6 was a passenger of V-1 and was Medevac by Mercy Air Ambulance to Arrowhead Hospital and treated for right arm amputation. P-6 was seating on seats #34/35 on bus diagram.

Party #7 (P-7, Martinez, P.) P-7 was a passenger of V-1 and was transported by Fort Irwin Ambulance to WACH ER and treated for minor leg and hip injury. P-7 was seating on seat #22 on bus diagram.

Party #8 (P-8, Chestnut, M.) P-8 was a passenger of V-1 and was transported by Fort Irwin Ambulance to WACH ER and treated for minor head laceration.

Party #9 (P-9, Tusieseina, M.) P-9 was a passenger of V-1 and was transported by Desert Ambulance to Barstow Hospital and treated for lower and back pain. P-9 was seating on seat #9 on bus diagram.

Party #10 (P-10, Keiper, D.) P-10 was a passenger of V-1 and was dead on arrival and pronounced by Deputy Donna Sobiesiak, SBSO Coroner Investigator. P-10 was seating on seat #37 on bus diagram. *See CID report for autopsy results.*

**STATEMENTS:**
Party #1 (P-1, Aguilar, D.) was interviewed by myself, Sgt Grove, and SA Wood on 06/02/2014 at 1236 in the WACH ER and related the following information. P-1 (Aguilar, D.) related that she has seven years of employment with Victor Valley Transit Authority and estimated to be a commercial driver license holder since 1986. P-1 (Aguilar, D.) related that she has been driving for buses on Fort Irwin since October 2013. P-1 (Aguilar, D) related that prior to the collision; she last slept at 9:00 PM and woke up for work at 1:30 AM. She related that it was a normal working day with nothing out of the usual. She related that she had three stops prior to reaching Fort Irwin; Walmart in Barstow, Williams in Barstow, and cemetery in Barstow which she related stopping there at 4:35 AM that morning. P-1 (Aguilar, D) related that she driving V-1 on Fort Irwin Road as usual and got onto the Truck Bypass road at approximately 5:02 AM. P-1 (Aguilar, D) related that she was traveling the right lane and was unaware that "buses" were considered to be an "authorized vehicle", which would allow them to travel on the left lane. P-1 (Aguilar, D) describe the morning of the collision as dark and stated that she had her head lights on but did not illuminate far. P-1 (Aguilar, D) related that she was traveling a approximately 40 45 MPH on the Fort Irwin Truck Bypass Road and noticed a truck in her lane with no lights. P-1 (Aguilar, D) related that she tried to avoid it by quickly hitting the brakes, approximately 3 seconds, and serving left of V-2. P-1 (Aguilar, D) related that works Monday through Friday, drives the same route, same time, and that she never seen a standing truck on the Truck Bypass Road; she stated that it caught her by surprise. P-1 (Aguilar, D) related that she was focused on driving and not on the phone or texting. P-1 (Aguilar, D) related that after the collision, a passenger called 911 and she called her work. P-1 (Aguilar, D) related that she was a diabetic and was taking the following medications: metformin and glyburide. She related that she was also wearing glasses that morning and when asked on why it wasn't annotated on her driver license, she stated that was waiting on the two year medical renewal to add it on.

Party #2 (P-2, Kilty, S.) spoke with Sgt Grove and I on scene and related the following information. P-2 (Kilty, S) related that he had been stopped on the Truck Bypass Road since an estimated time of 8:30 PM because of sign that was located near the shoulder of the roadway that stated "Check-In Point". P-2 (Kilty, S) related that this was his second time on Fort Irwin, also indicated that the previous time, he had to wait behind other trucks on the bypass road before gaining access to the installation. P-2 (Kilty, S) related that he turned off his vehicle, to include any lighting, so that his battery would not drain. P-2 related that after stopping V-2, he went into the sleeper berth of V-2 and fell asleep. P-2 (Kilty, S) related that he was awoken from his sleep when V-2 was pushed forward and hearing a loud noise. After the collision, P-2 (Kilty, S) described the scene as disorienting and overheard the passengers of V-1 stating that the driver of V-1 had fallen asleep. A supplemental was provided by Sgt Grove referencing the interview with P-2, Kilty S.

Party #3 through Party # 9 were interviewed by SA Swanson, CID agency, and related that all passengers of V-1 were asleep during the time that collision had occurred but were able to identify P-1 as the bus driver when they boarded V-1.
*- See CID Report for details on statements for Party #1 – Party#9*

| PREPARER'S NAME AND I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|
| Gutierrez, J. #201 | 08/03/2014 | | |

App. 317

USA-00220

FORT IRWIN POLICE DEPARTMENT
**NARRATIVE/SUPPLEMENTAL**

0 159 - 14   CID146 8 1168

| DATE OF INCIDENT/OCCURRENCE | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 06/02/2014 | 0506 | | 201 | 00618-2014-MPC146 |

**SUMMARY**

At 0513 on 02 June 2014, a fatal traffic collision was reported to this station. Preliminary Investigation revealed that at 0506 on 02 June 2014, P-1 (Aguilar), while driving a Victor Valley Transit Nabi Bus, rear ended a stopped tractor truck with trailer, occupied by P-2 (Kilty), while traveling northbound on the Fort Irwin truck bypass road. V-1 sustained disabling damage to the left rear. One passenger was DOA and pronounced deceased by Deputy Donna Sobiesiak, SBSO Corner Investigator, two passengers sustained severe injuries, five other passengers and the bus driver sustained minor injuries. The occupant of V-1 (Tractor Truck) did not sustain any injury.

**AREA OF IMPACT**
I measured the area of impact from the tire friction marks of both V-1 and V-2 and determined the location utilizing a Military Grid Reference System device. The area where the right front of V-1 collided into the rear of V-2 was located within lane #2 of the Truck Bypass Road, MGRS 11SNU22330493914. The area of impact was determined by the statements from P-1 & P-2, and the damage, debris to both vehicles.

**CAUSE:**
Investigation conducted by CID.

| PREPARER'S NAME AND I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|
| Gutierrez, J. #201 | 08/03/2014 | | |

App. 318

EXHIBIT 4

USA-00221

0159-14  CID146 81168

SH3W

FORT IRWIN POLICE DEPARTMENT
**NARRATIVE/SUPPLEMENTAL**

| DATE OF INCIDENT/OCCURRENCE | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 06/02/2014 | 0506 | | G2213 | 00618-2014-MPC146 |

NOTIFICATION:

ON 06/02/2014 AT APPROXIMATELY 0610 HRS, I WAS NOTIFIED BY SPC LIRA OF A FATAL TRAFFIC COLLISION LOCATED ON THE TRUCK BYPASS. I RESPONDED FROM BLDG #326 WITH ALL NECESSARY EQUIPMENT TO ASSIST IN INVESTIGATING THE COLLISION. I WAS ASSISTANT TRAFFIC ACCIDENT INVESTIGATOR ON SCENE.

STATEMENTS:

PARTY #1 (KILTY) WAS LOCATED ON THE RIGHT LANE OF THE TRUCK BYPASS IN THE CAB OF V-2 (2006, BLUE, VOLVO, WI LICENSE PLATE #53549W). P-1 RELATED THE FOLLOWING INFORMATION. P-1 VERBALLY STATED THAT HE HAD BEEN PARKED AT THE TRUCK BYPASS AT AN ESTIMATED TIME OF 2030 HRS, DUE TO SIGNAGE ON THE BYPASS STATING CHECKPOINT. P-1 ALSO RELATED THAT THIS WAS HIS SECOND TIME TO FORT IRWIN, ALSO INDICATING THAT THE FIRST TIME HE HAD TO WAIT BEHIND OTHER TRUCKS ON THE BYPASS IN ORDER TO ACCESS THE INSTALLATION. P-1 THEN STATED THAT HE TURNED OFF HIS VEHICLE SO THAT THE BATTERY WOULD NOT DIE AND PROCEEDED TO FALL ASLEEP. P-1 WAS THEN AWOKEN FROM HIS SLEEP, WHICH WAS CAUSED BY THE FEELING AND NOISE OF SOMETHING IMPACTING HIS VEHICLE. P-1 THEN DESCRIBES THE SCENE BEING VERY DISORIENTING AS WELL AS OVER HEARING PASSENGERS STATING THAT THEY BELIEVED THE DRIVER OF V-1 HAD FALLEN ASLEEP.

INDEPENDENT WITNESS (JUSTICE). ON 7 JUL 2014 I INTERVIEWED DASG JUSTICE WHO RELATED THE FOLLOWING INFORMATION. DASG JUSTICE RELATED THAT DURING 0600HRS TO 0800HRS WHILE THE CHECKPOINT AT THE TRUCK BYPASS IS IN OPERATION THAT ONLY THE LEFT LANE IS OPEN FOR VEHICLE TRAVEL. DASG JUSTICE ALSO STATED THAT MOST TRUCK OPERATORS REST AT THE RUBA IF THEY ARE TO WAIT OVER NIGHT AND THAT THEY DO NOT STOP IN THE ROADWAY IN ORDER TO SLEEP. DASG JUSTICE THEN INDICATED THAT AT 0600HRS DURING THE CHECKPOINT COMMUTER BUSES PASS ON THE LEFT HAND LANE. PRIOR TO 0600HRS BOTH LANES ON THE TRUCK BYPASS ARE OPEN TO ALL VEHICLE TRAVEL. DASG JUSTICE THEN RELATED THAT DEPARTMENT OF THE ARMY SECURITY GUARDS ARE NOT REQUIRED TO CONDUCT CHECKS OF THE TRUCK BYPASS.

INDEPENDENT WITNESS (HIJOE) AND INDEPENDENT WITNESS (JOHNSON). ON 9 JUL 2014 I INTERVIEWED BOTH INDIVIDUALS COLLECTIVELY. BOTH PARTIES RELATED THAT AT 0600HRS WHILE THE CHECKPOINT AT THE TRUCK BYPASS IS IN OPERATION ONLY THE LEFT LANE IS OPEN FOR VEHICLE TRAVEL. THE PARTIES ALSO STATED THAT IF TRUCKS ARRIVE PRIOR TO 0600HRS WITH THE PROPER DOCUMENTS THEY ARE AUTHORIZED TO ACCESS THE INSTALLATION. PARTIES THEN INDICATED THAT AT 0600HRS DURING THE CHECKPOINT ALL TRAFFIC OTHER THAN LARGE TRUCKS PASS ON THE LEFT HAND LANE. THE PARTIES ALSO STATED THAT PRIOR TO 0600HRS BOTH LANES ON THE TRUCK BYPASS ARE OPEN TO ALL VEHICLE TRAVEL. BOTH PARTIES THEN RELATED THAT DEPARTMENT OF THE ARMY SECURITY GUARDS ARE NOT REQUIRED TO CONDUCT CHECKS OF THE TRUCK BYPASS.

| PREPARER'S NAME AND I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|
| SGT GROVE | 06/06/2014 | SGT GUTIERREZ | 08/16/2014 |

Use previous editions until depleted

FOR OFFICIAL USE ONLY/
LAW ENFORCEMENT SENSITIVE

EXHIBIT 44

USA-00222

App. 319

FORT IRWIN POLICE DEPARTMENT
**NARRATIVE/SUPPLEMENTAL**

0 1 5 9 - 1 4   CID146 8 1 1 6 8   ᏚᏜᏗᎻ

| DATE OF INCIDENT/OCCURRENCE | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 06/02/2014 | 0506 | | 201 | 00618-2014-MPC146 |

### TIME DISTANCE ANALYSIS

A time distance analysis was conducted using the time and distance equation where a known distance is used to calculated the average velocity. Time was determined utilizing the video obtained from the Smart Drive camera from within and broken into frames utilizing the Windows Movie Maker software. Distance was determined, utilizing a laser measuring device, by measuring 15 skip lines and gaps from the AOI which is depicted on the aforementioned video. I took several points from the video and calculated the time and distance from the measurements taken. The results were as follow:

Point 1 = 45.77 MPH or 67.14 fps
Point 2 = 46.78 MPH or 68.62 fps
Point 3 = 43.86 MPH or 64.34 fps
Point 4 = 45.13 MPH or 66.20 fps
Point 5 = 47.61 MPH or 69.85 fps
Point 6 = 45.72 MPH or 67.08 fps

Based on the calculations of the distance points taken, I concluded that the suggested average speed of V-1 was between 43 and 47 MPH, approximately 10 seconds prior to impacting with V-2. It was also concluded that V-1 was covering an average of 64.34 and 69.85 (fps) feet per second, approximately 10 seconds prior to impact.

| PREPARER'S NAME AND I.D. NUMBER | DATE | REVIEWER'S NAME | | DATE |
|---|---|---|---|---|
| Gutierrez, J. #201 | 08/03/2014 | | | |

Use previous editions until depleted
FOR OFFICIAL USE ONLY

USA-00223

**FORT IRWIN POLICE DEPARTMENT**

**0 159 - 14**   CID146 8 1168

## NARRATIVE/SUPPLEMENTAL

| DATE OF INCIDENT/OCCURRENCE | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 06/02/2014 | 0506 | | 201 | 00618-2014-MPC146 |

*Speed Analysis breakdown shown below.*

*Software used:*   **Windows Movie Maker**

| | Seconds | | | **GAP / SKIP LINES MEASUREMENTS** | | | |
|---|---|---|---|---|---|---|---|
| Total Length of Video | 20.22 | | Brake applied - | 26.8 | Gap | | Point 3,6, *AIS* |
| Time of Impact from Video frame | 10:40 | | | | 15.4 Line | 15 | Point 5 |
| **ANALYSIS - AVERAGE SPEED** | | | | 32.3 | Gap | | |
| **Still Frame Image** | | | | 29.4 | 12.3 Line | 14 | |
| | | | | | 11.5 Line | 13 | *AIS* |
| Formula: | V = de - di / te - ti | V = feet per second (fps) | | 38.6 | Gap | | |
| | S = V/1.467 | 1.467 is constant | | | 11.8 Line | 12 | |
| | | | | 34.6 | Gap | | |

| POINT 1 | | POINT 2 | | | 14.5 Line | 11 | Point 3 |
|---|---|---|---|---|---|---|---|
| 0.13 | Ti | 3.63 | Ti | 33.6 | Gap | | Point 2 |
| 3.63 | Te | 6.90 | Te | | 12.8 Line | 10 | |
| 3.50 | Total Time | 3.27 | Total Time | 32.6 | Gap | | Point 5 |
| 13.00 | di | 248.00 | di | | 15.3 Line | 9 | |
| 248.00 | de | 472.40 | de | 32.9 | Gap | | |
| 235.00 | Total Dist. | 224.40 | Total Dist. | | 14.1 Line | 8 | |
| 45.76881877 | S (MPH) | 46.77835938 | S (MPH) | 35.9 | Gap | | |
| 67.14285714 | V (Velocity) | 68.62385321 | V (Velocity) | | 10.1 Line | 7 | |
| | | | | 35.1 | Gap | | Point 2 |
| POINT 3 | | POINT 4 | | | 11.8 Line | 6 | Point 1 |
| 6.90 | Ti | 4.63 | Ti | 35.2 | Gap | | |
| 10.40 | Te | 10.40 | Te | | 12.7 Line | 5 | |
| 3.50 | Total Time | 5.77 | Total Time | 34.4 | Gap | | |
| 472.40 | di | 315.60 | di | | 13 Line | 4 | |
| 697.60 | de | 697.60 | de | 34 | Gap | | |
| 225.20 | Total Dist. | 382.00 | Total Dist. *Tank Crossing Sign* | | 12.5 Line | 3 | |
| 43.86016165 | S (MPH) | 45.12917932 | S (MPH) | 34.8 | Gap | | |
| 64.34285714 | V (Velocity) | 66.20450607 | V (Velocity) | | 12 Line | 2 | |
| | | | | 34.6 | Gap | | Point 1 |
| POINT 5 | | POINT 6 | | | 13 Line | 1 | Point 6 |
| 5.63 | Ti | 0.00 | Ti | | | | |
| 9.63 | Te | 10.40 | Te | Total Dis. | 697.6 | | |
| 4.00 | Total Time | 10.40 | Total Time | | | | |
| 391.40 | di | 0.00 | di | | | | |
| 670.80 | de | 697.60 | de | | | | |
| 279.40 | Total Dist. | 697.60 | Total Dist. | | | | |
| 47.6141786 | S (MPH) | 45.72387394 | S (MPH) | | | | |
| 69.85 | V (Velocity) | 67.07692308 | V (Velocity) | | | | |

| Average Impact Speed | | | | **43 - 47 MPH** |
|---|---|---|---|---|
| 8.40 | Ti | *Total Average Speed Based on D/T of Points:* | | **64 - 69 FPS** |
| 10.40 | Te | | | |
| 2.00 | Total Time | | | |
| 581.40 | di | | | |
| 697.60 | de | | | |
| 116.20 | Total Dist. | | | |
| 39.60463531 | MPH | | | |
| 58.1 | Velocity (fps) | | | |

*AIS not used for Total Average Speed*

| PREPARER'S NAME AND I D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|
| Gutierrez, J. #201 | 08/03/2014 | | |

App. 321

EXHIBIT   USA-00224



*Safety, Service, Security*

*An Internationally Accredited Agency*

**Officer Michael Seruga**
Investigator
Multidisciplinary Accident Investigation Team
**California Highway Patrol**                    (909) 428-5559
Inland Division MAIT                    Direct (909) 428-5564
13892 Victoria Street                        Fax (909) 428-5570
Fontana, California 92336                    mseruga@chp.ca.gov

**Department of the Army**
**Directorate of Emergency Services**
**NTC & Fort Irwin, CA 92310**

**LTC Graham R Swenson**
Director of Emergency Services

Office: (760)380-1258                    Cell (760) 499-4023
Fax: (760) 380-5566
Email: graham.r.swenson.mil@mail.mil

USA-00242

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

## Case Activity Summary

**Case Number: 00159-2014-CID146-081168**

| Date, Time, and Participant | Summary of Case Activity |
|---|---|
| 2014/06/02 0520<br>MOORE, Blaine S<br>00:10 Investigative | BASIS FOR INVESTIGATION: This office was notified by SSG Clinton HOLT, Desk Seargent, Fort Irwin Police Department (FIPD), Fort Irwin, CA 92310 (FICA), of an accident fatality on FICA. |
| 2014/06/02 0550<br>MOORE, Blaine S<br>00:05 Investigative | About 0550, 2 Jun 14, SA MOORE and SA Joshua R. STEWART, this office, arrived at the scene of the accident. |
| 2014/06/02 0551<br>Stewart, Joshua Ray<br>02:00 Investigative | About 0551, 2 Jun 14, SA STEWART exposed photographs of the crime scene on truck bypass, FICA. (See Photo Packet) |
| 2014/06/02 0551<br>MOORE, Blaine S<br>01:30 Investigative | COORDINATION WITH LOCAL LAW ENFORCEMENT:<br><br>About 0551, 2 Jun 14, SA MOORE coordinated with Officer Chad CLARK, #20389, California Highway Patrol (CHP), 300 E. Mountain View St, Barstow, CA 92311 (BCA), who related Ms. Dinorah E. AGUILAR, 9172 Olima AVE, 15251 Village, Victorville, CA, reported she was driving in lane 1 when she saw the truck and attempted to swerve into lane 2 and was unable to avoid the truck. She reported she was not asleep at any time while driving the route. Officer CLARK provided the CHP 555 Page 1, which listed all parties involved in the accident. (See CHP Page 555) |
| 2014/06/02 0730<br>MOORE, Blaine S<br>00:10 Investigative | ATTEMPTED TO INTERVIEW ACCIDENT VICTIMS:<br><br>About 0730, 2 Jun 14, SA MOORE, SA CUMMINGS, and SA WOOD, this office, attempted to fully identify and interview the passengers involved in the accident at Weed Army Community Hospital (WACH), FICA, and were told the victims were being treated and were not available for interview. SA CUMMINGS requested CID be notified when they would be available for interview. |
| 2014/06/02 0829<br>CUMMINGS, MATTHEW R.<br>00:01 Investigative | Case Initiation |

App. 323

USA-00243

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
|---|---|
| Case Number: 00159-2014-CID146-081168 | |
| Date, Time, and Participant | Summary of Case Activity |
| 2014/06/02 0830<br>MOORE, Blaine S<br>00:30 Investigative | About 0830, 2 Jun 14, SA MOORE conducted a DPS search in an attempt to further identify the victims of the accident. SA MOORE printed DPS printouts for Mr. Michael J. CHESTNUT, XXX-XX-6506, Military Contractor, FICA, SPC Pedro J. MARTINEZMIRANDA, XXX-XX-2580, Maintenance Troop, 11th Armored Cavalry Regiment (ACR), FICA, and CPL Ariel K. DEROSIER, XXX-XX-0154, Heaquarters and Headquarters Troop, Regimental Support Squadron, 11th ACR, FICA. |
| 2014/06/02 1110<br>Stewart, Joshua Ray<br>00:05 Investigative | About 1110, 2 Jun 14, SA STEWART coordinated with Flight Operations, C/2916th Aviation Battalion, FICA, who related the contact information for Mercy Air Ambulance, San Bernardino Dispatch, was 909-356-3805. |
| 2014/06/02 1130<br>Stewart, Joshua Ray<br>00:15 Investigative | About 1130, 2 Jun 14, SA STEWART coordinated with the Arrowhead Healthcare, Emergency Department, who related Jesus AGUILAR had been transported to their facility via Air ambulance from a Motor Vehicle Collision at FICA and was in room 6318.  They also related Mr. AGUILAR was stable. |
| 2014/06/02 1200<br>Stewart, Joshua Ray<br>00:10 Investigative | About 1200, 2 May 14, SA STEWART coordinated with the operator, Barstow Community Hospital Emergency Room, who related Mr. Misiona TUNESISNA, XXX-XX-  , who  related there had been numerous complaints to VVTA Dispatch regarding Mrs. AGUILAR's driving.  Mr. TUNESISNA further related, the morning of 2 Jun 14, he was asleep on the bus when he was awakened by a loud crash that threw him from his seat into the floor. When he stood up he saw Mr. KEIPER laying on the floor with an abdominal evisceration, a large laceration to his chest and a large laceration to his head. He also saw Mr. AGUILAR's right arm had been amputated.  Mr. TUNESISNA also stated he instructed SPC DEROSIER to hand him Master RATLIFF after he had climbed out the emergency exit so he could get the child to safety.  Mr. TUNESISNA related SPC DEROSIER was the individual who called 911 for help because Mrs. AGUILAR was on the phone with an unknown individual. |
| 2014/06/02 1200<br>WOOD, KEVIN MARTIN<br>00:30 Investigative | -WITNESS INTERVIEW:<br><br>About 1200, 2 Jun 14, SA WOOD interviewed Mr. Michael J. CHESTNUT, XXX-XX-6506, 321 West Grace Street, Barstow, CA 92311, who related he was traveling on the bus, which was his normal means of transportation to FICA. Mr. CHESTNUT related he had dosed off several times but had been talking to Mr. Dale KEIPER, 1150 Mojave Drive, Barstow, CA 92311, when |

App. 324

USA-00244

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| **Case Activity Summary** |
|---|
| Case Number: 00159-2014-CID146-081168 |
| Date, Time, and Participant | Summary of Case Activity |

| | |
|---|---|
| | the bus tires hit the rumble strip on the right hand side of the road, he yelled something out loud to get the drivers attention, and the bus swung left into the left lane. Mr. CHESTNUT related he yelled because he glanced up and saw the rear end of the truck. Mr. CHESTNUT related he put his head down and when the bus hit the truck it came to an instant stop. Mr. CHESTNUT related he ended up about 3 or 4 rows back from where he was originally seated and was on his knees. Mr. CHESTNUT related the seat he was in at the time was completely gone, and he had blood which ran down his face. Mr. CHESTNUT related he immediately went to Mr. KEIPER and checked for a pulse, which he was not able to obtain. Mr. CHESTNUT related he moved to the gentlemen sitting behind Mr. KEIPER because he noticed his arm was caught in the wreckage and he was trying to rip his arm from it. Mr. CHESTNUT related he realized from his past Army training the gentlemen was in shock, so he reassured him it was going to be ok and put his body weight on the man to keep him from trying to rip his arm out. Mr. CHESTNUT related he yelled at the driver, but she just sat there in the driver seat. Mr. CHESTNUT related he knew it sounded weird, but it seemed like she was trying to grab the drivers wheel, like she was still trying to drive. Mr. CHESTNUT related he yelled at her to help, but there was no response. Mr. CHESTNUT related he stayed with the man with the trapped arm until the para medics arrived. Mr. CHESTNUT related he felt no attempt to brake, and felt like the bus was traveling at approximately 55 to 65 MPH. |
| 2014/06/02 1218
CORONEL, MANUEL
01:00 Investigative | About 1218, 2 Jun 14, INV CORONEL observed ARC Towing, 821 W. Main Street, Barstow, CA 92311, tow away the VVTA bus to their impound lot. ARC Towing employees conduct a cleanup of the traffic accident area, which included several pieces of human flesh. |
| 2014/06/02 1240
WOOD, KEVIN MARTIN
00:25 Investigative | -WITNESS INTERVIEW (DRIVER):

About 1245, 2 Jun 14, SA WOOD, SGT Juan GUTIERREZ and SGT Ray GROVE, Traffic Investigator's, FIPD, FICA, interviewed Ms. Dinorah E. AGUILAR, 15251 Village, Victorville, CA 92368, who related she has been driving buses for Victorville Transit Authority for the past 7 years. Ms. AGUILAR related she woke up at about 0130, 2 Jun 14, and picked up her bus for the day in Hesperia, CA. Ms. AGUILAR related she went to bed at 2100, 1 Jun 14, and had a normal day prior to the accident. Ms. AGUILAR related she made three stops before she arrived on Fort Irwin. Ms. AGUILAR related she did her pre check this morning with her bus and identified no issues. Ms. AGUILAR related her normal route was the truck bypass on Fort Irwin Road. Ms. AGUILAR related it was still dark out, her |

App. 325

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
|---|---|
| Case Number: 00159-2014-CID146-081168 | |
| Date, Time, and Participant | Summary of Case Activity |
| | headlights were on and she traveled in the right lane. Ms. AGUILAR related she was not aware she was an authorized vehicle which is supposed to travel on the Fort Irwin Road instead of the bypass. Ms. AGUILAR related the truck which she hit had no lights on or cones out to identify itself. Ms. AGUILAR related the bus she drove did not have a full view with the headlights on, but instead you could only see directly in front of you. Ms. AGUILAR related she saw the truck, hit the brakes, but could not avoid it. Ms. AGUILAR related she thought it was 3 seconds from when she saw the truck and realized it was not moving until impact. Ms. AGUILAR related she was traveling approximately 40-45 MPH, and the last time she verified her speed was the first hill on the bypass. Ms. AGUILAR related she traveled the same route everyday and never saw another truck on the side of the road. Ms. AGUILAR related the truck caught her by surprise, because she was focused. Ms. AGUILAR related she did not daydream or fall asleep. Ms. AGUILAR related she took 1 Metformin and 1 Glyburide, prior to her leaving for work, which is her diabetes medication she took every morning. Ms. AGUILAR related she has never had any issue with her diabetes. Ms. AGUILAR related she did not drink any alcohol the day before and had a half of a burrito for breakfast. Ms. AGUILAR related after the impact she could not get out of her seat initially, but once she was able to, she got out and started to check on passengers. Ms. AGUILAR related she then called her company to inform them about the accident. Ms. AGUILAR related she does not remember anyone yelling directly prior to the incident and was not talking to any passengers. Ms. AGUILAR related her cell phone was in her pocket and there was no music playing. |
| 2014/06/02 1320 Williams, Terrence Abraham 00:45 Investigative | VICTIM INTERVIEW: About 1320, 2 Jun 14, INV WILLIAMS arrived at Loma Linda Hospital, 11234 Anderson ST, Loma Linda, CA 92354, and obtained verbal from Ms. BRIDGETT, which stated she and Master RATLIFF, was asleep while on the bus headed to work at Fort Irwin Burger King. Ms. BRIDGETT stated the bus driver is a very scary driver which drifts in the lanes and over the lanes often with speed and jerked the wheel alot. |
| 2014/06/02 1320 CORONEL, MANUEL 01:00 Investigative | About 1320, 2 Jun 14, INV CORONEL observed ARC Towing assist the driver of the semi-truck to move the vehicle off the road.  INV CORONEL, INV SMITH and LT. Daniel PERKINS, Operations Lieutenant, FIPD, FICA, removed the barriers and opened the truck by-pass lanes. |

App. 326

USA-00246

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

**Case Activity Summary**

| Case Number: 00159-2014-CID146-081168 | |
|---|---|
| Date, Time, and Participant | Summary of Case Activity |

| | |
|---|---|
| 2014/06/02 1355<br>WOOD, KEVIN MARTIN<br><br>00:10 Investigative | -CORONER:<br><br>About 1355, 2 Jun 14, SA WOOD coordinated with Deputy Donna SOBIESIAK, Deputy Coroner Investigator, San Bernardino County Sheriff's Department (SBCSD), San Bernardino County, CA, who related the time off death was 0514, 2 Jun 14. Deputy SOBIESIAK related the Medical Examiner will get with this office to set up a time for an autopsy. |
| 2014/06/02 1400<br>MOORE, Blaine S<br><br>00:20 Investigative | COMPANY COMMAND COORDINATION:<br><br>About 1420, 2 Jun 14, SA MOORE and SA CUMMINGS coordinated with CPT Joseph GLASS, CDR, HHT, RSS, 11th ACR, and obtained a valid address for CPL DEROSIER. |
| 2014/06/02 1430<br>Williams, Terrence Abraham<br><br>00:20 Investigative | VICTIM INTERVIEW:<br><br>About 1430, 2 Jun 14, INV WILLIAMS arrived at Arrowhead Medical Center, 400 N. Pepper Ave, Colton, CA 92324, and obtained verbal from Mr. AGUILAR , which stated he was asleep while on the bus headed to work at Fort Irwin Burger King. Mr. AGUILAR stated he only remembers hearing a loud boom and doesn't remember much about the bus driver or her driving habits. |
| 2014/06/02 1440<br>WOOD, KEVIN MARTIN<br><br>00:20 Investigative | -VVTA COORDINATION:<br><br>About 1440, 2 Jun 14, SA WOOD coordinated with Mr. Kevin Kane, Executive Director, Victorville Transit Authority, Hesperia, CA 92345, who related there is a video feed which is triggered by G force and will record 10 seconds before and after triggered. Mr. KANE related his office was in the process of figuring out how to download the video and as soon as it was his office would provide it to this office. Mr. KANE related his office was able to view the video and it was clear the truck was parked in the right lane and the bus driver was not able to see the truck until it was too late. Mr. KANE related you could see the drivers arms and hands moving around so it was clear she was awake. Mr. KANE related there are a total of 6 cameras located on the bus and are transmitted to a box located within the bus, which is locked with a certain key. Mr. KANE related his office would be able to provide the key by 0830, 3 Jun 14, so this office would be able to obtain a copy of the video. Mr. KANE related he would look into the drivers past to see if there were any |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 327

USA-00247

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

**Case Activity Summary**

| Case Number: 00159-2014-CID146-081168 | |
|---|---|
| **Date, Time, and Participant** | **Summary of Case Activity** |
| | prior complaints, and if there were, his office would provide what information they had to this office. |
| 2014/06/02 1445<br>MOORE, Blaine S<br>00:05 Investigative | COORDINATION WITH MEDICAL RECORDS DIVISION:<br><br>About 1445, 2 Jun 14, SA MOORE and SA CUMMINGS coordinated with Mrs. Jamie SLOCUM, Patient Administration Division, WACH, FICA, who related the records pertaining to Ms. AGUILAR'S emergency room treatment would be in the system and available with a PAD request. |
| 2014/06/02 1445<br>MOORE, Blaine S<br>00:45 Investigative | At 1445, 2 Jun 14, SA MOORE and SA CUMMINGS traveled to BCA to interview CPL DEROSIER. |
| 2014/06/02 1505<br>MOORE, Blaine S<br>00:05 Investigative | FIPD COORDINATION:<br><br>About 1505, 2 Jun 14, SA MOORE attempted to coordinate with Mr. RON SILVERA, FIPD, to obtain a copy of the 911 calls pertaining to the accident and met with negative results. SA MOORE left a message and requested a return call. |
| 2014/06/02 1510<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1510, 2 Jun 14, SA WOOD coordinated with SGT Ray GROVE, Traffic Investigator, Fort Irwin Police Department (FIPD), FICA, who related the bus involved in the crash does not have cruise control capabilities. |
| 2014/06/02 1515<br>Williams, Terrence Abraham<br>01:00 Investigative | VICTIM INTERVIEW:<br><br>About 1515, 2 Jun 14, INV WILLIAMS arrived at Loma Linda Hospital, 11234 Anderson ST, Loma Linda, CA 92354, and obtained verbal from SPC MARTINEZ, which stated he was asleep while on the bus headed to work. SPC MARTINEZ stated the bus driver is a very scary driver which drifts in the lanes and over the lanes often and jerked the wheel when driving. |

App. 328

USA-00248

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
|---|---|
| Case Number: 00159-2014-CID146-081168 | |
| Date, Time, and Participant | Summary of Case Activity |
| 2014/06/02 1530<br>MOORE, Blaine S<br>00:45 Investigative | VICTIM INTERVIEW (CPL DEROSIER):<br><br>About 1530, 2 Jun 14, SA MOORE and SA CUMMINGS interviewed CPL DEROSIER who related she was asleep on the bus and awoke after the bus impacted with the truck. She related she was thrown forward into a seat and sustained a concussion and a bruised leg. She was able to stand on her own. She related she had to leave the bus after seeing the injuries to the other passengers and the constant Screaming from Mr. AGUILAR. CPL DEROSIER related she rode the bus daily and Ms. AGUILAR was the driver every day but one. She related Ms. AGUILAR drove to fast and took turns faster than advisable. CPL DEROSIER related she did not see anything prior to the impact with the truck but after the impact she related Ms. AGUILAR stood from her seat and then returned to the seat, and did not check on any passengers that she saw. |
| 2014/06/02 1558<br>CORONEL, MANUEL<br>00:10 Investigative | About 1558, 2 Jun 14, INV CORONEL provided a PAD request form to Mrs. Jaime SLOCUM, Patient Affairs, WACH, FICA.  Mrs. SLOCUM related she would email Ms. AGUILAR's paperwork on 3 Jun 14. |
| 2014/06/02 1559<br>Stewart, Joshua Ray<br>00:01 Investigative | Recorded data pertaining to TUSESINA, Misiona NMN |
| 2014/06/02 1615<br>MOORE, Blaine S<br>00:45 Investigative | About 1615, 2 Jun 14, SA MOORE and SA CUMMINGS returned to FICA. |
| 2014/06/02 1628<br>CORONEL, MANUEL<br>00:01 Investigative | Recorded data pertaining to CHESTNUT, Michael Joseph |
| 2014/06/02 1631<br>CORONEL, MANUEL<br>00:01 Investigative | Recorded data pertaining to AGUILAR, Pinorah Elizabeth |

App. 329

USA-00249

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

**Case Activity Summary**

| Case Number: 00159-2014-CID146-081168 | |
|---|---|
| **Date, Time, and Participant** | **Summary of Case Activity** |
| 2014/06/02 1705<br>Stewart, Joshua Ray<br>00:10 Investigative | About 1705, 2 Jun 14, SA STEWART collected the call logs from Mr. LIENER' s utilizing the Universal Forensic Extraction Device (UFED) which revealed he had contacted VVTA.(See Report) |
| 2014/06/02 1746<br>MOORE, Blaine S<br>00:05 Investigative | FIPD COORDINATION:<br><br>About 1746, 2 Jun 14, SA MOORE coordinated with Mr. Ron SILVERA and requested a copy of the 911 calls associated with the accident. Mr. SILVERA related the earliest the recording would be ready was 1000, 3 Jun 14. |
| 2014/06/02 1818<br>MOORE, Blaine S<br>00:01 Investigative | Recorded data pertaining to DEROSIER, Ariel Kayleen |
| 2014/06/02 1818<br>MOORE, Blaine S<br>00:01 Investigative | CRC Name Check Requested for: DEROSIER, Ariel |
| 2014/06/02 1920<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1920, 2 Jun 14, SA WOOD coordinated with Mr. KANE, who related he would have a bus waiting at the entrance of the Fort Irwin Road Bypass, FICA, at 0445, 3 Jun 14, to reenact the traffic accident. |
| 2014/06/03 0445<br>WOOD, KEVIN MARTIN<br>00:30 Investigative | -ACCIDENT REENACTMENT:<br><br>Between 0445 and 0530, 3 Jun 14, SA WOOD and SA CUMMINGS conducted a vehicle traffic accident reancment on the Fort Irwin Road Bypass utilizing the same style city bus. At 0512, 3 Jun 14, SA WOOD rode with the driver and accelerated to 50 MPH. Once the cones, which were set in place to mark where the truck had been parked, became visible, SA WOOD told the bus driver to stop. SA CUMMINGS measured the distance from the cones to the bus, utilizing a Light Detection and Ranging (LIDAR) hand held gun provided by FIPD. The total distance was measured at 817 feet. The cones were clearly visible from where the bus came to a stop. The sun was starting to rise but had not crested over the horizon to create a blinding effect on the driver. After measuring the distance there were three buses, which crested the hill, prior to the accident scene, and were traveling in the left lane. SA CUMMINGS stopped the buses and asked the drivers which lane they normally trave in. All of the drivers stated they normally travel in the left lane because trucks are usually parked in the right lane waiting to pass the barrier. |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 330

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
| --- | --- |
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |
| 2014/06/03 0535<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | -EVIDENCE COLLECTION:<br><br>About 0535, 3 Jun 14, SA WOOD collected two CD's from Mr. KANE, which documented the vehicle accident. The CD's were documented on Evidence/Property Custody Document (EPCD), Document Number (DN): XXX-14. |
| 2014/06/03 0657<br>KELLY, CHERYL ANN<br>00:01 Investigative | CRC Name Check has been completed for DEROSIER, ARIEL KAYLEEN in case 0159-2014-CID146 |
| 2014/06/03 0756<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 0756, 3 Jun 14, SA WOOD coordinated with SGT GUTIEREZ, who provided a CD with all of the pictures he took while at the scene. SGT GUTIEREZ also provided his rough sketch of the accident. |
| 2014/06/03 0833<br>MOORE, Blaine S<br>00:01 Investigative | Recorded data pertaining to KEIPER, Dail Lee |
| 2014/06/03 0833<br>MOORE, Blaine S<br>00:01 Investigative | CRC Name Check Requested for: KEIPER, Dail |
| 2014/06/03 0945<br>CORONEL, MANUEL<br>00:15 Investigative | About 0945, 3 Jun 14, INV CORONEL obtained Mrs. AGUILAR's Medical Records and Clinical Notes from Mrs. SLOCUM. |
| 2014/06/03 1000<br>WOOD, KEVIN MARTIN<br>00:15 Investigative | About 1015, 3 Jun 14, SA WOOD reviewed the medical records of Ms. AGUILAR's treatment, which revealed she received Morphine at multiple times while being treated, which gave her a positive result for Opiates. The records also revealed Ms. AGUILAR had a BAC of .010 at 0736. (See Medical Records) |
| 2014/06/03 1028<br>Williams, Terrence Abraham<br>00:05 Investigative | About 1028, 3 Jun 14, INV WILLIAMS coordinated with Mr. Ron SILVEIRS on when to obtain the 911 recordings of the traffic incident. Mr. SILVEIRS related to coordinate with after 1500. |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 331

USA-00251

| Case Activity Summary | |
| --- | --- |
| Case Number: 00159-2014-CID146-081168 | |
| Date, Time, and Participant | Summary of Case Activity |
| 2014/06/03 1140<br>WOOD, KEVIN MARTIN<br>00:20 Investigative | -WITNESS INTERVIEW:<br><br>About 1140, 3 Jun 14, SA WOOD interviewed Dr. Tom NGUYEN, Attending, Weed Army Community Hospital (WACH) ER, FICA, who related the results of Ms. AGUILAR's BAC test do not indicate she had consumed any alcohol. Dr. NGUYEN related the 0.01 reflected on her medical records is normal amount any person could have at anytime and could easily be the result of some sort of byproduct. Dr. NGUYEN related her blood sugar, electrolytes, CT scan and cardiac test reults all indicate they were not elements which contributed to the accident. |
| 2014/06/03 1240<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1240, 3 Jun 14, SA WOOD coordinated with Mr. KANE, who related he will get back with this office to try and have another bus ready for this office to utilize while reenacting the accident on the morning of 4 Jun 14. |
| 2014/06/03 1550<br>Williams, Terrence Abraham<br>00:05 Investigative | About 1550, 3 Jun 14, INV WILLIAMS coordinated with Mr. SILVEIRS who related the disc with the 911 recordings is ready to be picked up. |
| 2014/06/03 1600<br>Williams, Terrence Abraham<br>00:15 Investigative | About 1600, 3 Jun 14, INV WILLIAMS arrived at FIPD to obtain the 911 recordings disc from Mr. SILVEIRS. |
| 2014/06/03 1700<br>MOORE, Blaine S<br>00:10 Investigative | EVIDENCE:<br><br>About 1700, 3 Jun 14, SA MOORE processed evidence annotated on EPCD DN 073-14 into the evidence depository, this office. |
| 2014/06/03 1758<br>CUMMINGS, MATTHEW R.<br>00:01 Investigative | Send Investigative Report for Approval |
| 2014/06/03 1800<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | -Released Evidence to Evidence Custodian. |

App. 332

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
|---|---|
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |
| 2014/06/03 1801<br>CUMMINGS, MATTHEW R.<br>00:01 Investigative | Approve Investigative Report |
| 2014/06/03 1815<br>CUMMINGS, MATTHEW R.<br>00:30 Investigative | SAC:<br><br>1. Reviewed and approved Initial Report. Great response by all.<br><br>2. There is a second re-enactment scheduled for 0506, 4 Jun 14, with a semi truck and VVTA bus.<br><br>3. The hard drive containing the video footage from the six cameras within the bus was damaged, and currently the CHP laboratory is recovering the data.<br><br>4. There were five or six people identified as regular passengers on that bus that need to be interviewed concerning Mrs. AGUILAR's regular driving habits, and if there were any additional complaints.<br><br>5. VVTA has stated they are compiling Mrs. AGUILAR's record to see if any formal complaints were made.<br><br>6. Need to determine if Mrs. AGUILAR reported her medical conditions to the state and company, and what requirements she had under the law as a commercial driver.<br><br>7. Need to determine what her uncorrected vision, and if she was wearing her glasses when she was driving.<br><br>TO CIC FOR REVIEW, THEN TO CA |
| 2014/06/04 0400<br>WOOD, KEVIN MARTIN<br>02:00 Investigative | -2ND ACCIDENT REENACTMENT:<br><br>Between 0400 and 0600, 4 Jun 14, SA WOOD, SA CUMMINGS and INV CORONEL, conducted an accident reenacment on Fort Irwin Road Bypass. At approximately 0506, 4 Jun 14, a bus provided by VVTA, which was the same style bus involved in the accident, traveled from a point established approximately 1 mile from the accident scene, to the exact accident location. |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 333

USA-00253

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary |
|---|

| Case Number: 00159-2014-CID146-081168 |
|---|

| Date, Time, and Participant | Summary of Case Activity |
|---|---|
| | The bus traveled in the center of the Bypass for safety measures. The driver was instructed to change lanes to the left lane once the truck was completely visible. Cones were placed on the right hand side of the Bypass at 100' increments. SA WOOD recorded the view of the driver utilizing a Sony Handycam Digital Camera. The camera was secured to a tripod and placed at eye level of the bus driver. A second camera was operated by Mr. Stein E. HUSHER, Principal Scientist, KEVA Engineering, 840 Calle Plano, Camarillo, CA 93012. Distance was called out by INV CORONEL as the bus crossed each cone. The skies were clear with a slight breeze. There was no moisture on the ground. At the time of the reenacment the sun started to rise but had not crested over the horizon. Visibility was good and there was not dust being blown by the wind. The truck became visible inside the bus at approximately 850'. The truck did not reflect from the buses headlights, but was still visible. The bus driver made a lane change at approximately 350', while traveling at 45 MPH. (See DVD) |
| 2014/06/04 0715 WOOD, KEVIN MARTIN 00:15 Investigative | -EVIDENCE COLLECTION: About 0715, 4 Jun 14, SA WOOD coordinated with Mr. HUSHER who provided a SD Card, which contained his video footage of the accident reenactment. SA WOOD collected the SD Card on EPCD, DN: 74-14. (See EPCD) |
| 2014/06/04 0745 KELLY, CHERYL ANN 00:01 Investigative | CRC Name Check has been completed for KEIPER, DAIL LEE in case 0159-2014-CID146 |
| 2014/06/04 1055 WOOD, KEVIN MARTIN 00:10 Investigative | -Submitted evidence to Evidence Custodian. |
| 2014/06/04 1406 WOOD, KEVIN MARTIN 00:10 Investigative | About 1406, 4 Jun 14, SA WOOD coordinated with Mr. KANE, who provided Ms. AGUILAR's driving history, which revealed there were two complaints against her driving. |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 334

USA-00254

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

**Case Activity Summary**

| Case Number: 00159-2014-CID146-081168 | |
|---|---|
| **Date, Time, and Participant** | **Summary of Case Activity** |
| 2014/06/04 1515<br>WOOD, KEVIN MARTIN<br>00:25 Investigative | About 1515, 4 Jun 14, SA WOOD coordinated with Mr. LEINERT, and showed him the copies of the complaints against Ms. AGUILAR's driving. Mr. LEINERT related he made a verbal complaint and those were not the complaints he called and talked to a supervisor at VVTA about. |
| 2014/06/04 1600<br>CUMMINGS, MATTHEW R.<br>00:30 Investigative | SA CUMMINGS coordinated with Mr. BUTOLPH and discussed the remaining activity that DES would fulfill in this investigation.<br><br>Mr. BUTOLPH requested a meeting at 0800, 5 Jun 14. |
| 2014/06/04 1620<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | -EVIDENCE COLLECTION:<br><br>About 1620, 4 Jun 14, SA WOOD coordinated with LTC Anthony STOEGER, 916th Support Brigade, FICA, who provided Mr. KEIPER's government cell phone. SA WOOD collected the cell phone on EPCD, DN: XX-14. (See EPCD) |
| 2014/06/05 0800<br>CUMMINGS, MATTHEW R.<br>00:45 Investigative | SA CUMMINGS attended a meeting with Mr. BUTOLPH, DES; SGM KNELL, DES; CPT JOHNSON, FIPD; and SGT GUTIEREZ, Traffic Section, FIPD, to discuss the status of the investigation. |
| 2014/06/05 0945<br>CUMMINGS, MATTHEW R.<br>00:30 Investigative | SA CUMMINGS briefed the status of this investigation to CPT Jennifer DONAHUE, Staff Judge Advocate, FICA. |
| 2014/06/05 1330<br>CUMMINGS, MATTHEW R.<br>00:30 Investigative | SA CUMMINGS coordinated with Detective Jason SCHRODER, San Bernardino County Sheriff's Office, Digital Forensic Laboratory, San Bernadino, CA, who agreed to work a joint investigation with this office, with CID as the lead agency, and conduct the examination and recovery of the video from the buses "black box".<br><br>SBCSD's case number for this case is T-2014-252.<br><br>SA CUMMINGS prepared a Status Report to reflect this as a joint investigation. |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 335

USA-00255

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

## Case Activity Summary

**Case Number: 00159-2014-CID146-081168**

| Date, Time, and Participant | Summary of Case Activity |
|---|---|
| 2014/06/05 1423<br>CUMMINGS, MATTHEW R.<br>00:01 Investigative | Send Investigative Report for Approval |
| 2014/06/05 1445<br>CUMMINGS, MATTHEW R.<br>00:30 Investigative | SAC:<br><br>1. Reviewed and approved Status Report.<br><br>2. Victims have been contacted, and written statements will start being collected starting 10 Jun 14.<br><br>3. A meeting has been scheduled with CID and SAUSA on 10 Jun 14.<br><br>4. The status of the recovery of the digital recording is pending SBCSD examiners receiving program tools from the camera's manufacturer.<br><br>TO CA |
| 2014/06/05 1455<br>CUMMINGS, MATTHEW R.<br>00:01 Investigative | Approve Investigative Report |
| 2014/06/06 1039<br>Smith, Zachary David<br>00:01 Investigative | Recorded data pertaining to BRIDGETTE, Naiomi Audrea |
| 2014/06/06 1053<br>Smith, Zachary David<br>00:01 Investigative | Recorded data pertaining to AGUILAR, Jesus |
| 2014/06/06 1059<br>Smith, Zachary David<br>00:01 Investigative | Recorded data pertaining to MARTINEZ, Pedro |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 336

USA-00256

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
| --- | --- |
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |
| 2014/06/06 1106<br>Smith, Zachary David<br>00:01 Investigative | Recorded data pertaining to LIENERT, Michael Anthony |
| 2014/06/06 1930<br>CUMMINGS, MATTHEW R.<br>00:45 Investigative | SAC:<br><br>1. Reviewed case file with CA.<br><br>2. Remaining leads were prioritized for completion.<br><br>3. Complete as soon as possible.<br><br>TO CA |
| 2014/06/09 0852<br>MOORE, Blaine S<br>00:05 Investigative | EVIDENCE:<br><br>DELAYED ENTRY: On 3 Jun 14, SA MOORE processed evidence annotated on EPCD DN: 73-14 into the evidence depository of this office.<br><br>On 4 Jun 14, SA MOORE processed evidence annotated on EPCD DN: 074-14, and 076-14 into the evidence depository of this office. |
| 2014/06/13 1113<br>WOOD, KEVIN MARTIN<br>01:00 Investigative | -WITNESS INTERVIEW:<br><br>About 1113, 13 Jun 14, SA WOOD interviewed Mr. CHESTNUT, who provided a sworn statement, wherein he detailed the actions he took after the crash took place. (See Sworn Statement) |
| 2014/06/13 1212<br>SWANSON, SASHA R<br>02:30 Investigative | VICTIM INTERVIEW DEROSIER:<br><br>About 1212, 13 Jun 14, SA SWANSON interviewed SPC DEROSIER, who provided details on her actions after the accident and the injuries she had |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 337

USA-00257

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

**Case Activity Summary**

| Case Number: 00159-2014-CID146-081168 | |
|---|---|
| Date, Time, and Participant | Summary of Case Activity |
| | sustained. SA SWANSON coordinated with SPC DEROSIER, who provided a rough sketch of the bus layout. (See Sworn Statement/Sketch) |
| | AGENTS COMMENT: SPC DEROSIER was issued a DA Form 2701 and briefed on all aspects of the form. SPC DEROSIER requested monthly briefs. |
| 2014/06/13 1234 SWANSON, SASHA R 00:10 Investigative | Attempted to coordinate with HHT, RSS, FICA Commander and 1SG to obtain contact information for SSG HOEGLE and SSG SKINNER. Met with negative results and was unable to leave contact information |
| 2014/06/16 0900 CUMMINGS, MATTHEW R. 00:30 Investigative | SAC: 1. Case pending completion of written statements from the passengers. 2. Need to get a mechanic to remove the computer from the buses engine, since the cameras were not running inside the bus at the time of the accident. 3. Need to coordinate with the lawyers for the bus and truck driver and interview. TO CA |
| 2014/06/17 1441 SWANSON, SASHA R 00:30 Investigative | FIPD COORDINATION: About 1441, 17 June 14, SA SWANSON coordinated with SGT GUTIEREZ, who related the event data recorder (EDR) was located in the engine block SGT GUTIEREZ related EDRs may record a wide range of data elements, potentially including whether the brakes were applied, the speed at the time of impact, and the steering angle at the the time of the crash. SGT GUTIEREZ related he did not have a point of contact for someone who has the capability of retrieving them but CHP might. CHP COORDINATION: About 1447, 17 June 14, SA SWANSON coordinated wih Officer S. MANTEI, CHP, Barstow, CA, who related the Multidisciplinary Accident Investigation |

App. 338

USA-00258

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
|---|---|
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |
| | Team (MAIT), CHP, had the capability to remove the EDR. Officer MANTEI provided contact information for MAIT: 909-428-5559 |
| | About 1501, 17 June 14, SA SWANSON left a message with MAIT. |
| | About 1508, 17 June 14, SA SWANSON coordinate with SGT GUTIEREZ and informed him not to give out any information to any of the victims and their lawyers, due to the ongoing CID Investigation |
| 2014/06/17 1453<br>Stewart, Joshua Ray<br>03:00 Investigative | About 1453, 17 Jun 14, SA STEWART interviewed Mr. TUSIESEINA, who related he had observed erratic driving while riding the bus for the past two months.(See Sworn Statement) |
| 2014/06/17 1457<br>MOORE, Blaine S<br>01:47 Investigative | VICTIM INTERVIEW (Mr. AGUILAR):<br><br>About 1457, 17 Jun 14, SA MOORE interviewed Mr. Jesus AGUILAR Jr., XXX-XX-5533, 32788 Sylvan Ave, Barstow, CA 92311 (BCA), who related he did not remember much about the accident on 2 Jun 14. He was asleep and woke upon impact. He could not provide details about how or why the accident occured. (See Sworn Statement)<br><br>AGENT'S NOTE: Mr. AGUILAR was accompanied by his mother Mrs. Jo Ellen ARANA, XXX-XX-6066, 32788 Sylvan Ave, BCA, and his attorney Mr. Kevin L. ELDER, XXX-XX-6343, Penney & Associates, 6536 Lonetree Boulevard, Rocklin, CA 95765. |
| 2014/06/18 0900<br>SWANSON, SASHA R<br>00:10 Investigative | Acknowledged SAC Review:<br><br>1. Roger.<br><br>2. Roger<br><br>3. Will Comply. |

App. 339

USA-00259

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
|---|---|
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |

| | |
|---|---|
| 2014/06/19 1107<br>SWANSON, SASHA R<br>01:30 Investigative | VICTIM INTERVIEW MARTINEZ MIRANDA:<br><br>About 1107, 19 Jun 14, SA SWANSON interviewed SPC Pedro MARTINEZ-MIRANDA, XXX-XX-2580, Maintenance Troop, RSS, FICA, who related he fractured his hip during the accident. SPC MARTINEZ-MIRANDA was provided a layout of the bus wherein he identified where he was sitting. (See SwornS Statement/Layout) |
| 2014/06/19 1700<br>MOORE, Blaine S<br>00:05 Investigative | EVIDENCE:<br><br>About 1700, 19 Jun 14, SA MOORE processed evidence annotated on EPCD DN: 095-14 into the evidence depository of this office. |
| 2014/06/20 0730<br>MOORE, Blaine S<br>00:05 Investigative | CIVIL ATTORNEY COORDINATION:<br><br>About 0730, 20 Jun 14, SA MOORE coordinated with Penney & Associates and arranged to interview Ms. BRIDGETTE at the Fort Irwin CID Office on 26 Jun 14, at 1300. |
| 2014/06/20 1800<br>CUMMINGS, MATTHEW R.<br>00:30 Investigative | SAC:<br><br>THERE IS NO INVESTIGATIVE ACTIVITY IN THIS CASE DUE TO MANDATORY TRAINING |
| 2014/06/22 1001<br>MOORE, Blaine S<br>00:01 Investigative | CRC Name Check Requested for: AGUILAR, Jesus |
| 2014/06/23 0651<br>LENNIER, James E.<br>00:01 Investigative | CRC Name Check has been completed for AGUILAR, JESUS  in case 0159-2014-CID146 |
| 2014/06/23 1000<br>SWANSON, SASHA R<br>01:00 Investigative | Coordinated with Keva Engineering who related they currently had a case open on the accident. Mrs. April (NFI) Kevas Engineering, Camillario, CA, related her office had seen and conducted a vehicle inspection. Mrs. April further identified the current engineer assigned to the case was Stein HUSHER. |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 340

USA-00260

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
|---|---|
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |
| | Mr. Stehin HUSHER called and related he had only taken exterior photos of the scene. Mr. HUSHER related the drive cam and DVD+R System should show the information requested. Mr. HUSHER further related the Engine Control Module may be able to identify the speed and breaking information. Mr. HUSHER stated we would possibly need the cooperation of the bus company to reconnect the system to a bus that was still working. Mr. HUSHER stated he would call this office back in a few days to follow up.

Mr. HUSHERS # 805-231-5577
SHUSHER@KEVAENG.COM |
| 2014/06/23 1020 SWANSON, SASHA R 00:10 Investigative | Sent email to Mr. Robert J. AGHASSI, Special Assistant United States Attorney (SAUSA), Office of the Staff Judge Advocate, FICA to identify who was responsible for paying the bill for the hold on the bus. |
| 2014/06/23 1020 SWANSON, SASHA R 00:10 Investigative | MAIT COORDINATION:

About 1020, 23 Jun 14, SA SWANSON coordinated with SGT BERNS, MAIT, CHP, Barstow, CA, who related his section has the capability to pull out the EDR on small trucks and personal vehicles. SGT BERNS provided a point of contact for Keva Engineering, which is a private company that reconstructs accidents.

KEVA Engineering 805-388-6016 |
| 2014/06/23 1023 SWANSON, SASHA R 00:10 Investigative | Attempted to coordinate with SGT GUTIEREZ for a copy of his traffic accident report. Met with negative results. Provided contact information. |
| 2014/06/24 1100 SWANSON, SASHA R 03:00 Investigative | Conducted Administrative Review. SA SWANSON became primary case agent. |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 341

USA-00261

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| **Case Activity Summary** | |
|---|---|
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |
| 2014/06/24 1119<br>Stewart, Joshua Ray<br>00:05 Investigative | DELAYED ENTRY: About 1100, 4 Jun 14, SA STEWART exposed photos of the autopsy of Mr. KEIPER. Dr. Chanikarn CHANGSRI, Forensic Pathologist, SBCSD-CO, SBCA, related preliminary cause of death to multiple blunt force trauma. (See Photo Packet) |
| 2014/06/24 1132<br>SWANSON, SASHA R<br>00:30 Investigative | Coordinated with Mrs. SLOCUMM to identify which PAD Request have been submitted. Mrs. SLOCUM related she had not received any pad requests.<br><br>SA SWANSON drafted PAD Request for the following:<br><br>SPC Pedro MARTINEZ- MIRANDA,<br>Mr. Misiona NMN TUSIESEINA,<br>Mr. Jesus NMN AGUILAR,<br>Mr. Michael J. CHESTNUT,<br>SPC Ariel K. DEROSIER,<br>Ms. Naiomi A. BRIDGETTE,<br>Mr. Michael A. LIENETT,<br>Mr. Dail L. KEIPER, |
| 2014/06/24 1132<br>SWANSON, SASHA R<br>00:10 Investigative | KEVA COORDINATION:<br><br>Sent email to Mr. Stein HUSHER providing contact information. |
| 2014/06/26 1000<br>CORONEL, MANUEL<br>00:30 Investigative | About 1000, 26 Jun 14, INV CORONEL coordinated with Mrs. Jaime SLOCUM, Patient Coordinator, WACH, FICA, who provided medical records for Mr. CHESTNUT, SPC DEROSIER and SPC MARTINEZ, which indicated they were treated at WACH ER, FICA. Mrs. SLOCUM related there were no records for Mr. TUSIESEINA, Mr. AGUILAR, Ms. BRIDGETTE, Mr. LIENETT and Mr. KEIPER. (See Paperwork) |
| 2014/06/26 1040<br>SWANSON, SASHA R<br>00:30 Investigative | KEVA COORDINATION:<br><br>Coordinated with Mr. HUSHER to identify what kind of equipment he needs for the extraction of the bus. |

App. 342

USA-00262

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
| --- | --- |
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |
| 2014/06/26 1459<br>MOORE, Blaine S<br>02:00 Investigative | VICTIM INTERVIEW (Ms. BRIDGETTE):<br><br>About 1459, 26 Jun 14, SA MOORE interviewed Ms. Naiomi A. BRIDGETTE, XXX-XX-2808, 1219 E Ensign Circle, Orange, CA 92865, who provided information about her experience before, during, and after the bus accident on 2 Jun 14. (See Sworn Statement) |
| 2014/06/26 1630<br>CUMMINGS, MATTHEW R.<br>00:30 Investigative | SBCSD DFE COORDINATION:<br><br>SA CUMMINGS coordinated with Deputy SCHOEDER who related the six cameras were not recording inside of the bus on the day of the accident, due to a software malfunction. Deputy SCHOEDER further related he would prepare a report to document his efforts, and have it ready to be picked up with the evidence by 3 Jul 14. |
| 2014/06/28 1018<br>SWANSON, SASHA R<br>00:10 Investigative | SA SWANSON was summoned for court 24-25 Jun 14.<br><br>SA SWANSON was duty agent from 24-29Jun 14.<br><br>To TC for Review. |
| 2014/07/01 0952<br>MOORE, Blaine S<br>01:00 Investigative | EVIDENCE:<br><br>About 0952, 1 Jul 14, SA MOORE obtained the Removeable HDD system and one CD which contained the Forensic Ecamination Files from the Removeable HDD System from Mrs. Mary GUILLIAM, A2351, San Bernardino County Sheriff's Office, 655 E. 3rd Street, San Bernardino, CA 92315. The collection was annotated on EPCD DN: 103-14. (See EPCD)<br><br>AGENT'S NOTE: A copy of the CD was provided to the case agent for enclosure in the case file. |
| 2014/07/01 1400<br>SWANSON, SASHA R<br>00:10 Investigative | About 1400, 01 Jul 14, SA SWANSON obtained a copy of the extraction from the black box. |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 343

USA-00263

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

**Case Activity Summary**

| Case Number: 00159-2014-CID146-081168 |
|---|

| Date, Time, and Participant | Summary of Case Activity |
|---|---|
| 2014/07/01 1430<br>MOORE, Blaine S<br><br>00:10 Investigative | EVIDENCE:<br><br>About 1400, 1 Jul 14, SA MOORE processed evidence annotated on EPCD DN: 103-14 into the evidence despository of this office. |
| 2014/07/03 1900<br>HENNIGAN, CHRISTOPHER R.<br><br>00:45 Investigative | SAC ENTRY:<br><br>Little to no investigative activity from 3 Jul 14 to 6 Jul 14, in observance of the Independence Day DONSA. |
| 2014/07/08 1602<br>SWANSON, SASHA R<br><br>00:10 Investigative | SA SWANSON coordinated with Ron ZIRGES, Director of Maintenance & Facilities, Victor Valley Transit Authority, 17150 Smoketree St.,Hesperia, CA 92345, who related:<br><br>I have contacted Ft. Irwin and spoke with the current agent in charge, (Sasha R Swanson), of getting information from the EDR, (event data recorder), that is supposedly attached to the engine. She is waiting on an outside 3rd party that has been hired to retrieve the data to come and retrieve it. I have left her a message that this unit does not have an EDR attached to the engine and the only data recorder that is on the bus is the GE Penta 5 video surveillance system. Veolia attempted to retrieve this data but were unable to. GE believes they have the capability to do so but from my understanding the investigating unit at Ft. Irwin would not allow that and insisted on having a third party make the attempt to retrieve the data. The video system should have the time, vehicle speed, possibly G force and video from the 8 cameras. Sasha informed me in our original conversation that she hopes to have the data she needs by the end of July and then she will be able to release the vehicle.<br><br>I have offered to assist in getting the information in whatever way I am able to. If they would allow us to help I would be willing to go to the vehicle with them and connect another lap top with the GE program to see if we can retrieve the data for them. If we are unable to retrieve the data I could get GE involved as they would be the most likely company able to retrieve it. |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 344

USA-00264

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
|---|---|
| Case Number: 00159-2014-CID146-081168 | |
| Date, Time, and Participant | Summary of Case Activity |
| 2014/07/09 1200<br>SWANSON, SASHA R<br>01:00 Investigative | SA SWANSON reviewed the black box recording extraction, which revealed the video was not recording at the time of the accident. |
| 2014/07/09 1206<br>SWANSON, SASHA R<br>00:10 Investigative | SA SWANSON coordinated with Mr. ZIRGES to clarify if the data he was talking about was located in the black box. |
| 2014/07/09 1530<br>HENNIGAN, CHRISTOPHER R.<br>01:00 Investigative | ASAC REVIEW:<br><br>Reviewed and discussed investigation with Case Agent and determined the following leads need to be completed NLT 19 Jul 14.<br><br>Coordinate with Mr. HUSHER with KEVA Engineering and determine if there is any other system on the bus, which records traffic accident information besides the DVR system.<br><br>Coordinate with the MP Traffic Investigations office and determine what they did with the DVR system they retrieved from the bus.<br><br>Interview SSG HOEGLE and SSG SKINNER, they are frequent passengers on the bus; however, they were not on the bus the day of the accident. We need to interview them to determine the "normal" driving patterns and operations of the bus.<br><br>Re-interview Mrs. AGUILAR and obtain her DL, it's been over 30 days since she invoked her rights and should have had time to obtain the services of an attorney. We obtained a verbal statement; however, we would be better with a written statement if we can get one.<br><br>Interview Steve KILTY and obtain a copy of his DL, he was the truck driver that was parked.<br><br>Coordinate with BN CIC, Edward CAMPBELL, and attempt to obtain the driving records for both drivers. We need to know what they are qualified to drive, are there any restrictions on the driving privileges, and do they have any incidents on record regarding poor performance.<br><br>Coordinate with PMO and Garrison CDR's office to determine the SOP for |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 345

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
|---|---|
| Case Number: 00159-2014-CID146-081168 | |
| Date, Time, and Participant | Summary of Case Activity |

the bypass.

Continue with IP.

| | |
|---|---|
| 2014/07/09 1600<br>SWANSON, SASHA R<br>00:10 Investigative | Acknowledged ASAC Review:<br><br>1. Acknowledged.<br>2. It is the black box they were referring to. It was with SBCSD. There was nothing on the footage. It was brought back to our office by the evidence custodian 01 Jul 14.<br><br>3. They are currently on block leave. They come back the week of the 21st.<br>4. Acknowledged<br>5. Acknowledged.<br>6. Wilco<br>7. Will comply. |
| 2014/07/16 0800<br>CUMMINGS, MATTHEW R.<br>00:30 Investigative | SAC REVIEW:<br><br>1. Reviewed case file, and discussed face to face with Case Agent.<br><br>2. Mr. HEVER is scheduled on 29 Jul 14 to complete the examintion of the bus.<br><br>3. Once that is complete, interviews of the drivers will be completed.<br><br>TO CA |
| 2014/07/16 0900<br>SWANSON, SASHA R<br>00:20 Investigative | About 0900, 16 Jul 14, SA SWANSON coordinated with Mr. James (Ted) R. Tedford II, Tedford & Associates, Attorneys, 301 East Colorado Boulevard, Suite 514, Pasadena, California 91101, who related:<br><br>Thank you for taking the time to speak with me this morning. In addition to this email I have also mailed you a formal representation letter for your file. As I indicated in our conversation, Ms. Aguilar would most likely be willing to submit to an interview so long as I am present and so long as the interview is recorded and we are provided a copy of that recording immediately following |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 346

USA-00266

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| **Case Activity Summary** | |
| --- | --- |
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |
| | the interview. Due to the preliminary nature of your investigation and the fact that you have indicated your investigation may take as long as a year, I would encourage you to contact me in the future once you have had an opportunity to interview the driver of the semi-truck that was left unaccompanied in the lanes of travel of Ammo Road. |
| | Should you have any questions regarding this matter, please do not hesitate to contact me immediately. Your professional courtesy and cooperation is greatly appreciated. |
| 2014/07/16 1600<br>SWANSON, SASHA R<br>00:10 Investigative | Coordinated with Mr. HUSHER, who related he could do the extraction on 28 or 29 Jul 14. Mr. HUSHER realted he will be in court the week of the 21st. |
| 2014/07/16 1631<br>SWANSON, SASHA R<br>00:10 Investigative | About 1631, 16 Jul 14, SA SWANSON coordinated with INV. Todd WRIGHT, Law Office of Welebir, Tierney & Weck, LLP, Redlands, CA 92374, and he provdced a copy of a copy of his formal request. SA SWANSON informed him that our office will not release any reports to his office. SA SWANSON further informed INV WRIGHT she would speak to the SAC in reference to photographing the exterior portion of the bus. |
| 2014/07/17 2042<br>SWANSON, SASHA R<br>00:10 Investigative | Provided Information about the following victims to Mr. BUTOLPH so they could be recognized by COL BRAGA:<br>SPC Ariel DEROSIER - Called 911 and provided comfort to the child on the bus.<br><br>Mr. Misiona TUNESISNA - Obtained accountability of personnel on the bus, assessed injuries, provided immediate aide to passengers<br><br>Mr. Jesus AGUILAR - Gentleman who lost a limb that worked at burger king. |
| 2014/07/20 1606<br>SWANSON, SASHA R<br>00:10 Investigative | Acknowledged SAC Review:<br>1. Roger<br><br>2. Mr. HUSHER has scheduled the bus tenteviley on 29 Jul 14.<br><br>3. Once that is complete, interviews of the drivers will be completed. |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

USA-00267

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
|---|---|
| Case Number: 00159-2014-CID146-081168 | |
| Date, Time, and Participant | Summary of Case Activity |

4. Acknowledge

2014/07/29 0830
SWANSON, SASHA R
00:20 Investigative

About 0830, 29 Jul 14, SA SWANSON received an email from Mr. HUSHER, which stated he was having problems coordinating the equipment, mechanice and getting it paid for. SA SWANSON called Mr. HUSHER, which brought negative results. SA SWANSON left call back information.

2014/07/29 0930
SWANSON, SASHA R
00:30 Investigative

About 0930, 29 Jul 14, SA SWANSON attempted to coordinate with DET SCHROEDER on various phone numbers and met with negative results. SA SWANSON was able to identify the correct number was 909-387-3664. SA SWANSON left a voicemail, which requested to call this office back. SA SWANSON briefed DET SCHROEDER on the possibility of SBCSD assuming lead investigation or possible referral.

2014/07/29 0950
SWANSON, SASHA R
00:10 Investigative

About 0950, 29 Jul 14, SA SWANSON coordinated with 1SG Edward R. CAMPBELL, First Sergeant, Headquarters and Headquarters Troop, Regimental Support Squadron, FICA, to obtain the number of SSG HOEGLE (NFI) and SSG SKINNER (NFI)

2014/07/29 1000
SWANSON, SASHA R
00:20 Investigative

SA SWANSON coordinated with Mr. Edward CAMPBELL, Criminial Intelligence Coordinator, 22nd Military Police Battalion, JBLM, to obtain the driver's license information of Mr. KILTY and Ms. AGUILAR.

2014/07/29 1424
SWANSON, SASHA R
00:20 Investigative

Received a letter of Representation for Dinorah AGUILAR, who is being represented by Tedford and Associates, 301 East Colorado BLVD., Ste. 514, Pasadena, CA

2014/07/29 1444
SWANSON, SASHA R
00:15 Investigative

SBCSD COORDINATION:

About 1443, 29 Jul 14, SA SWANSON coordinated with DEP SCHROEDER, who related his office does not conduct investigations and to contact the Barstow Sheriff Department to approach for a joint investigation or referral.

Barstow Watch Commander, 760-256-4835

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 348

USA-00268

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
| --- | --- |
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |
| 2014/07/29 1446<br>SWANSON, SASHA R<br>00:10 Investigative | BARSTOW SHERIFF DEPARTMENT COORDINATION:<br><br>About 1446, 29 Jul 14, SA SWANSON coordinated with Watch Commander, Barstow Sheriff Department, who related they do not handle traffic fatalties and to try to refer it to the California Highway Patrol. |
| 2014/07/29 1452<br>SWANSON, SASHA R<br>00:10 Investigative | Received contact information for SSG HOEGLE 760-810-3084 and SSG SKINNER 757-331-0676. |
| 2014/07/29 1456<br>SWANSON, SASHA R<br>00:10 Investigative | CALIFORNIA HIGHWAY PATROL COORDINATION:<br><br>About 1456, 29 Jul 14, SA SWANSON coordinated with Officer Mark STEVENSON, Court Officer, California Highway Patrol, 300 E Mountain View St, Barstow, CA 92311, and left a voicemail requesting a call back to talk about a joint investigation or referral. |
| 2014/07/29 1530<br>SWANSON, SASHA R<br>00:10 Investigative | CALIFORNIA HIGHWAY PATROL:<br><br>About 1530, 29 Jul 14, SA SWANSON coordinated with Officer WHEELER, CHP, BCA, and briefed him on the investigation. Officer WHEELER related he would coordinate with his LT to identify if they would take the case.<br><br>Officer WHEELER: 760-255-8712 |
| 2014/07/29 1810<br>SWANSON, SASHA R<br>00:10 Investigative | WITNESS INTERVIEW:<br><br>About 1810, 29 Jul 14, SA SWANSON interviewed SSG Gregory S. HOEGLE, XXX-XX-2276, HHT, RSS, FICA, who related he was not riding the bus that day because he did not buy his ticket. SSG HOEGLE further related he did not like the driving of the bus driver, because she drove irratic and often was speeding around turns. SSG HOEGLE related she often made him feel sick and drove irratic.<br><br>AGENT's COMMENT: SSG HOEGLE will be in 30 Jul 14 to provide a sworn statement on the bus driver's driving habits. |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

USA-00269

App. 349

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| **Case Activity Summary** | |
|---|---|
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |
| 2014/07/29 1815 SWANSON, SASHA R 00:05 Investigative | Attempted to coordinate with SSG SKINNER and met with negative results. Provided contact information for this office. |
| 2014/07/30 1610 SWANSON, SASHA R 02:00 Investigative | WITNESS INTERVIEW (HOEGLE): About 1610, 30 Jul 14, SA SWANSON interviewed SSG Gregory S. HOEGLE, XXX-XX-2276, HHT, RSS, FICA, who provided a sworn statement, wherein he detailed Ms. AGUILAR's driving habits. During the interview, SSG HOEGLE further related trucks were often stopped in the right lane, and Ms. AGUILAR would drive around them. (See Sworn Statement for Additional Details) AGENT's COMMENT: SSG HOEGLE was unable to identify Ms. AGUILAR. |
| 2014/08/01 1432 SWANSON, SASHA R 01:00 Investigative | Drafted USACIL Request for the HDD System |
| 2014/08/01 1447 SWANSON, SASHA R 00:10 Investigative | DRIVERS LICENSE (KILTY): About 1447, 01 Aug 14, SA SWANSON coordinated with Mr. CAMPBELL, who provided a copy of Mr. KILTY's drivers license. A review of the record revealed Mr. KILTY was a registered Class A Driver and had a Corrective Lense restriction. (See Drivers License Record for Additional Details) |
| 2014/08/02 1302 SWANSON, SASHA R 00:10 Investigative | SA SWANSON was TDY: 20-26 Jul 14 03-16 Aug 14 |
| 2014/08/04 0915 HENNIGAN, CHRISTOPHER R. 01:30 Investigative | About 0915, 4 Aug 14, SA Christopher R. HENNIGAN, this office, coordinated with Mr. Stein E. HUSHER, Principal Scientist, KEVA Engineering, LLC, 840 Calle Plano, Camarillo, CA 93012, who stated he could not connect to the module in the bus and pull the data, because as soon as the system powered up, new sensor readings would overwrite the sensor readings pertinent to this investigation. The procedure to obtain the |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 350

USA-00270

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
|---|---|
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |

data from the module in a forensically sound manner, requires a mechanic to remove the module from the crashed bus and install the module in a similar bus to power the module and then extract the data.

AGENT'S COMMENT:   I don't believe pulling this data will have any probative value for this criminal investigation, because we know who the driver was and we know she collided with another vehicle. This module will only tell us if there were any issues with the bus' systems and what speed the bus was traveling at impact.  Where the data on the module may become germane, is during a civil lawsuit.

AGENT'S NOTE:
Mr. HUSHER, may be reached by office phone at: (805) 388-6016 ext. 111, by cellular phone at: (805) 231-5577, by office fax at: (805) 231-6046, or by email at: shusher@kevaeng.com

|  |  |
|---|---|
| 2014/08/04 1000<br>CUMMINGS, MATTHEW R.<br>00:45 Investigative | **POST COMMAND BRIEF:**<br><br>SA CUMMINGS briefed MG MARTIN, COL BRAGA, and LTC MILLER on the status of this investigation.<br><br>LTC MILLER stated his office was currently briefing the U.S. Attorney's Office concerning them taking over the lead in this investigation.  LTC MILLER requested this office not coordinate with CHP concerning a joint investigation until the U.S. Attorney had made their decision. |
| 2014/08/05 1040<br>CUMMINGS, MATTHEW R.<br>00:30 Investigative | **SJA COORDINATION:**<br><br>SA CUMMINGS coordinated with Mr. AGHASSI who concurred the examination of the bus would not be necessary, since the examination would provide information which had been provided by several other parts of the investigation. |

App. 351

USA-00271

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| **Case Activity Summary** | |
|---|---|
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |
| 2014/08/05 1100<br>CUMMINGS, MATTHEW R.<br><br>00:30 Investigative | DES COORDINATION (BUS):<br><br>SA CUMMINGS coordinated with Chief KANDOLL, FIPD, and related CID no longer needed the bus held for the investigation, and requseted their traffic section coordinate with the evidence custodian to transfer the custody of the bus to VVTA. SA CUMMINGS further related the Traffic Report needed to be completed, and provided, as the case was being prepared to be presented to the U.S. Attorney's Office. |
| 2014/08/05 1800<br>CUMMINGS, MATTHEW R.<br><br>01:00 Investigative | SAC:<br><br>1. reviewed and made proposed corrections to the FIPD Traffic Report. Pending SGT GUTIERRIZ to return.<br><br>2. Informed SGT GUTIERRIZ for the need to complete a DA Form 4137, rather than a CHP Evidence Form, so the bus can be transferred to the VVTA.<br><br>3. SJA is arranging a meeting with the AUSA to discuss referring this case to the FBI. If the AUSA does not accept the case, we will be referring it to the CHP.<br><br>NEXT REVIEW: ASAC / 19 Aug 14 |
| 2014/08/06 1400<br>HENNIGAN, CHRISTOPHER R.<br><br>01:30 Investigative | About 1400, 6 Aug 14, SA HENNIGAN packaged and sent item one from EPCD DN 103-14; Removable DVR, to USACIL for examination. The item was sent through Registered Mail under Registered Mail #RB993995253US. (See EPCD DN 103-14 for details) |
| 2014/08/11 1100<br>CUMMINGS, MATTHEW R.<br><br>00:30 Investigative | SA CUMMINGS coordinated with SGT RODRIGUEZ, California Highway Patrol (CHP), Barstow, CA, who related he or SGT MEDENA would be the POC for a possible joint investigation. SA CUMMINGS related the case was being reviewed by the AUSA, Los Angelas, CA, and based on whether the U.S. Attorney's Office wished to pursue prosecution, SA CUMMINGS would be in contact with CHP for a possible joint investigation.<br><br>SGT RODRIGUEZ: (760) 380-8717<br>SGT MEDENA: (760) 380-8700 |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 352

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

**Case Activity Summary**

**Case Number: 00159-2014-CID146-081168**

| Date, Time, and Participant | Summary of Case Activity |
|---|---|
| 2014/08/11 1530 CUMMINGS, MATTHEW R. 00:30 Investigative | SJA COORDINATION: <br><br> SA CUMMINGS and SA HENNIGAN briefed LTC MILLER on the status of this investigation. |
| 2014/08/15 1515 CUMMINGS, MATTHEW R. 00:30 Investigative | LITTLE TO NO INVESTIGATIVE ACTIVITY DUE TO UNIT TRAINING |
| 2014/08/18 0800 CUMMINGS, MATTHEW R. 01:30 Investigative | DES COORDINATION: <br><br> SA CUMMINGS and SA HENNIGAN coordinated with Mr. Micheal BUTOLPH, Deputy Director, Direcorate of Emergency Services, FICA, concerning SGT GUTIERREZ' errors when processing evidence during the conduct of the accident scene analysis. It was determined SGT GUTIERREZ would prepare an MFR explaining the issues. |
| 2014/08/18 1812 SWANSON, SASHA R 00:20 Investigative | Acknowledged SAC Review: <br><br> 1. Roger <br><br> 2. Acknowledged. Thank you. <br><br> 3. Acknowledged. Pending possible joint with FBI |
| 2014/08/18 1812 SWANSON, SASHA R 00:20 Investigative | CIC COORDINATION: <br><br> About 1812, 18 Aug 14, SA SWANSON coordinated with Mr. CAMPBELL, who provided a copy of Mrs. AGUILAR's drivers license. A review of the record revealed Mrs AGUILAR had a Class B license, which limited her to drive buses weighing less than 26001 pounds. |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 353

USA-00273

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
|---|---|
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |
| 2014/08/18 1815<br>SWANSON, SASHA R<br>00:30 Investigative | About 1815, 18 Aug 14, SA SWANSON received a copy of the Coroner's report. A review of the report revealed Mr. KEIPER suffered fractures of the skull, clavicles, right, manible, and left ribs, right tibia, sternum, and right fibula. Further, there were lacerations of the right chest wall, lung aorta, and liver. Mr. KEIPER had blood present in both pleural cavities, and a lacerated tongue. Dr. Chanikarn CHANGSRI, SBCCO, SBCA, related the Cause of Death was Multiple blunt force injuries and the Manner of Death was Accident. |
| 2014/08/19 1830<br>CUMMINGS, MATTHEW R.<br>00:30 Investigative | SAC:<br><br>1.  Coordinated with SA SWANSON and directed an interview of Mr. KANE be completed, or at a minimum scheduled by COB 20 Aug 14.<br><br>TO CA |
| 2014/08/20 0908<br>SWANSON, SASHA R<br>00:10 Investigative | Acknowledged SAC Review:<br><br>1. Efforts are ongoing to reach Mr. KANE. Three voicemails have been left on office and cell phone with call back information to coordinate with Mr. KANE to identify if Mr. KANE signed the Evidence Voucher. |
| 2014/08/20 1250<br>SWANSON, SASHA R<br>01:30 Investigative | Traveled to Hesperia, CA |
| 2014/08/20 1401<br>Williams, Terrence Abraham<br>01:00 Investigative | WITNESS INTERVIEW:<br><br>About 1401, 20 Aug 14, INV WILLIAMS interviewed Mr. Adam J. DAVIS, XXX-XX-4702, Transdev Services, Inc., Hesperia, CA 92345, who provided a sworn statment, wherein he stated around 0830, 3 Jun 14, he extracted the black box video from the bus while at the impound yard. Mr. DAVIS stated once Officer Juan GUTIERREZ, Fort Irwin Police Department, Fort Irwin, CA 92310, arrived around 0850, 3 Jun 14, he attempted to play video evidence of the bus crash, which revealed a blank screen with no video. (See Statement for Details) |

App. 354

USA-00274

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
| --- | --- |
| Case Number: 00159-2014-CID146-081168 | |
| Date, Time, and Participant | Summary of Case Activity |
| 2014/08/20 1600<br>HENNIGAN, CHRISTOPHER R.<br>00:45 Investigative | ASAC REVIEW: (0159-14):<br><br>Received and reviewed case file.<br><br>1. 120 day stat due 30 Sep 14, unless we complete and close the investigation before then.<br><br>2. Remaining leads:<br><br>    a. Interview Mr. KANE who signed the evidence voucher<br><br>    b. Interview Detective SCHROEDER who attempted to examine the DVR and provide his contact information to USACIL for coordination between examiners.<br><br>    c. Coordinate with FBI and AUSA to determine if they are planning to assume the investigation. If they do, we'll punch a status report declaring this a joint investigation or we'll do a Final referral to them, which is what I would prefer, but we'll need BN's blessing.<br><br>    d. Obtain Final report from USACIL.<br><br>    e. Subject interviews of Ms. AGUILAR and Mr. KILTY. |
| 2014/08/20 1600<br>SWANSON, SASHA R<br>01:30 Investigative | Traveled to Fort Irwin, CA |
| 2014/08/20 1632<br>Williams, Terrence Abraham<br>00:01 Investigative | Recorded data pertaining to DAVIS, Adam Joel |
| 2014/08/21 1125<br>SWANSON, SASHA R<br>00:30 Investigative | Acknowledged ASAC Review:<br><br>1. Roger<br><br>2. Remaining leads: |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

USA-00275

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

## Case Activity Summary

**Case Number: 00159-2014-CID146-081168**

| Date, Time, and Participant | Summary of Case Activity |
|---|---|

a. Acknowledge

b. Acknowledged.

c. LTC MILLER was working on referring it to FBI. Will coordinate with SAC to identify if FBI accepted lead in the investigation.

d. Roger.

e. Acknowledged. Subject interviews of Ms. AGUILAR and Mr. KILTY.

2014/08/21 1411
SWANSON, SASHA R
01:30 Investigative

About 1411, 20 Aug 14, SA SWANSON interviewed Mr. Simon A. HERRERA, DL #A3950977, 14908 Butler Peak Court, Victorville, CA 92394, who provided a sworn statement which detailed how he attempted to extract the data of the blackbox. (See Sworn Statement for Additional Details)

2014/08/23 0935
CUMMINGS, MATTHEW R.
00:30 Investigative

SAC:

DUE TO MANDATORY TRAINING, THERE WAS LIMITED TO NO INVESTIGATIVE ACTIVITY ON 22 AUG 14.

2014/08/29 0948
SWANSON, SASHA R
00:10 Investigative

Briefed Mr. AGHASSI on the status of the investigation.

2014/09/03 0907
SWANSON, SASHA R
00:10 Investigative

To SAC for Review:
Pending:

IV of:
Dep SCHROEDER
Mr. KANE

DFE

Possible Joint with FBI.

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 356

USA-00276

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

## Case Activity Summary

| Case Number: 00159-2014-CID146-081168 | |
|---|---|
| Date, Time, and Participant | Summary of Case Activity |

| | |
|---|---|
| 2014/09/03 1025<br>SWANSON, SASHA R<br>00:10 Investigative | Attempted to coordinate with Mr. KANE and met with negative results.<br><br>AGENT'S COMMENT: There was no voicemail on the office line. |
| 2014/09/03 1455<br>CUMMINGS, MATTHEW R.<br>00:30 Investigative | SAC REVIEW:<br><br>1. Reviewed file.<br><br>2. Pending interview Mr. KANE, Det SCHROEDER, and USACIL exam.<br><br>3. After that activity is complete, coordinate with SAUSA.<br><br>4. If Mr. KANE does not answer his cell tomorrow, coordinate with his secretary for a good email address, and attempt contact that way.<br><br>NEXT REVIEW: ASAC / 16 Sep 14<br><br>TO CA |
| 2014/09/04 0900<br>SWANSON, SASHA R<br>00:10 Investigative | Acknowledge SAC Review:<br>1. Roger<br>2. Will comply<br>3. Roger.<br>4. Acknowledged. |
| 2014/09/10 0954<br>SWANSON, SASHA R<br>00:10 Investigative | Attempted to coordinate with Mr. KANE and met with negative results. Provided contact information. |
| 2014/09/15 0800<br>CUMMINGS, MATTHEW R.<br>00:45 Investigative | SAC:<br><br>Due to four Agents being out of the office from 1 – 12 Sep 14 due to PSD missions, TDY and Leave, and remaining Agents responding to priority investigations, there was limited to no investigative action in this case. |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 357

USA-00277

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

## Case Activity Summary

**Case Number: 00159-2014-CID146-081168**

| Date, Time, and Participant | Summary of Case Activity |
|---|---|
| 2014/09/16 1004<br>SWANSON, SASHA R<br>00:10 Investigative | About 1004, 16 Sep 14, SA SWANSON coordinated with Mr. HERRERA, who related there was not a username/password on the software. Mr. HERRERA further related he would provide this office with the manufacturer's contact information in efforts to obtain the username/password to further extract the data from the black box. |
| 2014/09/19 0910<br>SWANSON, SASHA R<br>00:10 Investigative | About 0910, 19 Sep 14, SA SWANSON coordinated with Mr. HERRERA, who related his daughter had been in the hospital and was not at the office. Mr. HERRERA related he would provided the information requested on 22 Sep 14.<br><br>Sent email to Mr. HERRERA to remind him |
| 2014/09/19 1100<br>HENNIGAN, CHRISTOPHER R.<br>00:45 Investigative | ASAC Review<br><br>1. Reviewed file. Coordinate with the manufacturer of the DVR device and assist USACIL with unlocking it for their examination.<br><br>2. 120 day status report is due on 3 Oct 14, since the last status report was on 6 Jun 14.<br><br>Continue with SAC guidance:<br><br>TO CA |
| 2014/09/22 1035<br>SWANSON, SASHA R<br>00:10 Investigative | Acknowledged ASAC Review:<br><br>1. Will comply. Will coordinate with Mr. HERRERA to obtain data.<br><br>2. Will Draft Status |
| 2014/09/24 0850<br>SWANSON, SASHA R<br>00:10 Investigative | Attempted to coordinate with Mr. HERRERA and met with negative results. SA SWANSON coordinated with Secretary who related he would be in later this afternoon. SA SWANSON attempted to coordinate with the cell phone provided but was unable to leave a voicemail. |

App. 358

USA-00278

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

## Case Activity Summary

**Case Number: 00159-2014-CID146-081168**

| Date, Time, and Participant | Summary of Case Activity |
|---|---|
| 2014/09/24 0853<br>SWANSON, SASHA R<br>00:10 Investigative | About 0853, 24 Sep 14, SA SWANSON interviewed Mr. KANE, who related he "did not recall" signing any documents releasing the black box to SGT GUITERREZ. Mr. KANE further related Mr. HERRERA attempted to extract the data from the black box was unable to do so. Mr. KANE further provided the manufacturer was GE Mobile View but did not have any contact information for them. Mr. KANE stated the reason why Mr. HERRERA had not got back to this office was because it was past through the legal department. Mr. KANE clarified he would attempt to obtain contact information for GE Mobile View. |
| 2014/09/24 1017<br>SWANSON, SASHA R<br>00:10 Investigative | Attempted to coordinate with Mr. SMITH, USACIL and met with negative results. Provided callback information. |
| 2014/09/24 1039<br>SWANSON, SASHA R<br>00:25 Investigative | Attempted to coordinate with Mobile View, UTC Building & Industrial Systems, 3211 Progress Drive,  Lincolnton, NC 28092 and met with negative results. Provided contact information and requested additional information.<br><br>phone number 855-286-8889<br>opt 2<br>menu item 2<br>Mobile View |
| 2014/09/25 0926<br>SWANSON, SASHA R<br>00:10 Investigative | Coordinated with Mr. SMITH, who related he was currently in a class that would benefit our investigation on the extraction of hard drives. Mr. SMITH further related he had attempted to coordinate with Mobile View as well and had also met with negative results |
| 2014/09/26 1130<br>SWANSON, SASHA R<br>00:15 Investigative | Coordinated with Mr. Eddie CORONA, Mobileview, who provided two potential user names and pass words. Mr. CORONA further related the Default username was: viewer and the password was: geview Mr. CORONA stated the Master username was: administrator and the password was: adminge06<br><br>Mr. CORONA provided contact information if there were any further issues: 971-239-6653. SA SWANSON informed him this office would provide his contact information to the USACIL examiner. |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 359

USA-00279

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

## Case Activity Summary

**Case Number: 00159-2014-CID146-081168**

| Date, Time, and Participant | Summary of Case Activity |
|---|---|
| 2014/09/27 1133<br>SWANSON, SASHA R<br>00:10 Investigative | To SAC for review:<br><br>Pending USACIL |
| 2014/09/27 1133<br>SWANSON, SASHA R<br>00:10 Investigative | Provided Username/Password information to Mr. SMITH. |
| 2014/09/29 1100<br>CUMMINGS, MATTHEW R.<br>00:30 Investigative | SAC:<br><br>1. Reviewed, concurred the case is pending USACIL.<br><br>2. Since the interviews that have been completed confirmed SGT GUTIERREZ attempted to document the chain of custody, I dont think the interview of Det SCHROEDER is necessary.<br><br>3. Need to coordinate with SGT GUTIERREZ and determine what he is pending to get his completed report to us.<br><br>4. Due to CA being scheduled for extended TDY, case is re-assigned to SA WOOD for completion.<br><br>TO CA |
| 2014/09/29 1600<br>WOOD, KEVIN MARTIN<br>00:20 Investigative | -Received and reviewed case file.<br><br>-Response to SAC review on 29 Sep 14:<br><br>1. Tracking we are still pending USACIL examination.<br><br>2. Noted. Will not conduct IV of Det SCHROEDER.<br><br>3. Will coordinate with SGT GUTIERREZ to obtain his report. |

App. 360

USA-00280

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
| --- | --- |
| Case Number: 00159-2014-CID146-081168 | |
| Date, Time, and Participant | Summary of Case Activity |
| 2014/09/29 1620<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | -Drafted 120 Day Status Report.<br><br>-To ASAC for review: |
| 2014/09/29 1624<br>WOOD, KEVIN MARTIN<br>00:01 Investigative | Send Investigative Report for Approval |
| 2014/09/29 1900<br>HENNIGAN, CHRISTOPHER R.<br>00:45 Investigative | ASAC REVIEW:<br><br>Received and reviewed investigative file.<br><br>Made minor corrections to the verbiage of the 120 day status report (3RD STAT).<br><br>Remaining leads:<br><br>1. Obtain final laboratory report from USACIL.<br><br>2. Draft a status report to change the manner of death and the subject if appropriate.<br><br>3. Conduct final brief with Garrison Commander and SJA.<br><br>4. Draft the final report.<br><br>Continue with IP: |
| 2014/09/29 1917<br>HENNIGAN, CHRISTOPHER R.<br>00:01 Investigative | Approve Investigative Report |
| 2014/09/30 1500<br>WOOD, KEVIN MARTIN<br>00:15 Investigative | -Discussed with ASAC who related since we are pending the USACIL results to hold off on submitting Status Report to change to Accidental Death. |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 361

USA-00281

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

## Case Activity Summary

**Case Number: 00159-2014-CID146-081168**

| Date, Time, and Participant | Summary of Case Activity |
|---|---|
| 2014/10/01 0900<br>HENNIGAN, CHRISTOPHER R.<br>00:45 Investigative | SAC ENTRY:<br><br>Little to no investigative activity due to promotion celebration and ceremony of CW3 CUMMINGS and SSG SWANSON. |
| 2014/10/01 1630<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1630, 1 Oct 14, SA WOOD emailed SGT GUTIERREZ to obtain an estimated time of completion for his traffic report. |
| 2014/10/02 1450<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1450, 2 Oct 14, SA WOOD coordinated with SGT GUTIERREZ who related he thought Chief KANDOLL had already provided the report to SA CUMMINGS. SA WOOD informed him this office does not have a copy of the report and requested he directly send it to him. |
| 2014/10/07 0815<br>MOORE, Blaine S<br>00:05 Investigative | About 0815, 7 Oct 14, SA MOORE obtained a copy of the FIPD Traffic Accident Report 00618-2014-MPC146, from the FIPD, FICA. A review of the report revealed the bus was traveling between 43 and 47 mph prior to impact with the tractor trailer. (See MPR) |
| 2014/10/10 1800<br>CUMMINGS, MATTHEW R.<br>00:30 Investigative | SAC:<br><br>THERE WAS LITTLE TO NO INVESTIGATIVE ACTIVITY IN THIS ACTION FROM 2 - 10 OCT 14, DUE TO MINIMAL OFFIC MANNING CAUSED BY TDY AND SEVERAL ASSIGNED PERSONNEL ON EXTENDED QUARTERS. |
| 2014/10/12 1030<br>WOOD, KEVIN MARTIN<br>00:15 Investigative | About 1030, 12 Oct 14, SA WOOD obtained the USACIL Digital Evidence Final Report, Report Number; 2014-CID131-1383, from Mr. Geoff SMITH, USACIL. A review of the report revealed the last date anything was recorded to the hard drive was on 2 Jun 13. The report revealed the surveillance system was operated after the dat date, but was not recorded. (See Report) |
| 2014/10/14 1020<br>WOOD, KEVIN MARTIN<br>00:15 Investigative | -Discussed case with ASAC and SAC. SAC related to obtain FICA Bypass policies and to prepare case file to discuss with Mr. AGHASSI. |

App. 362

USA-00282

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| **Case Activity Summary** | |
|---|---|
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |
| 2014/10/16 1000<br>CUMMINGS, MATTHEW R.<br><br>00:30 Investigative | SAC REVIEW:<br><br>1. Conducted a review of the case file with assigned Case Agent present.<br><br>2. Updated IP with additional identified leads.<br><br>Continue |
| 2014/10/17 0950<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 0950, 17 Oct 14, SA WOOD emailed Mr. BUTOLPH to request a copy of the Truck bypass policy. |
| 2014/10/17 1200<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1200, 17 Oct 14, SA WOOD called Mr. AGHASSI to discuss this investigation but he did not answer the phone. |
| 2014/10/18 1300<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | -Response to SAC review on 16 Oct 14:<br><br>1. Tracking plan for case. Will continue with IP. |
| 2014/10/18 1325<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | -LEADS REMAINING:<br><br>1. Obtain Truck Bypass policy.<br><br>3. Coordinate with Mr. AGHASSI to have case transferred. |
| 2014/10/22 1500<br>CUMMINGS, MATTHEW R.<br><br>00:30 Investigative | SJA COORDINATION:<br><br>About 1500, 22 Oct 14, SA CUMMINGS briefed MAJ Gilbert J. COMLEY, Special Assistant U.S. Attorney, FICA, on the status of this investigation. MAJ COMLEY related he would be in contact with the U.S. Attorney's Office and the San Bernardino County District Attorney's Office to begin establishing which would continue with the investigation and prosecution of this case. MAJ COMELY related he would be in contact with the Fort Irwin CID Office with a status by the first week of November. |

App. 363

USA-00283

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| **Case Activity Summary** | |
| --- | --- |
| Case Number: 00159-2014-CID146-081168 | |
| Date, Time, and Participant | Summary of Case Activity |
| 2014/10/28 1300<br>MOORE, Blaine S<br>00:10 Investigative | EVIDENCE:<br><br>About 1300, 28 Oct 14, SA MOORE received Item 1 evidence annotated on EPCD DN: 103-14 via registered mail number RA390213089US from USACIL. SA MOORE processed the evidence into the evidence depository of this office. |
| 2014/11/03 1025<br>WOOD, KEVIN MARTIN<br>00:05 Investigative | -SA WOOD returned from TDY (20-31 Oct 14). |
| 2014/11/03 1300<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | -Discussed with SAC who related to get with Mr. KILTY's and Mrs. AGULIAR's to attempt to schedule their interviews. |
| 2014/11/03 1515<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1515, 3 Nov 14, SA WOOD coordinated with the Attorney's Assistant, Tedford and Associates Office, 301 East Colorado Boulevard, Suite 514, Pasadena, CA 91101, who related Mr. TEDFORD was in court all day but would call this office back to schedule the interview of Mrs. AGUILAR. |
| 2014/11/04 0920<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 0920, 4 Nov 14, SA WOOD received an email from Mr. TEDFORD who related to provide a time and he would ask his client if she would be able to meet for an interview. |
| 2014/11/04 1415<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1415, 4 Nov 14, SA WOOD coordinated with Mr. KILTY to obtain his Attorneys phone number.  Mr. KILTY related he would call this office back with the phone number. |
| 2014/11/04 1425<br>WOOD, KEVIN MARTIN<br>00:05 Investigative | About 1425, 4 Nov 14, Mr. KILTY called and provided the number to Mr. Keith ZINKOWICH, Owner, SNB Transportation, who provided his Attorney's contact information. |

App. 364

USA-00284

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
|---|---|
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |
| 2014/11/04 1500<br>WOOD, KEVIN MARTIN<br>00:05 Investigative | About 1500, 4 Nov 14, SA WOOD called Mr. Jack WILLIAMSON, Williamson Law Firm, but he did not answer the phone. |
| 2014/11/06 1115<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1115, 6 Nov 14, SA WOOD coordinated with Mr. TEDFORD who related he would bring Ms. AGUILAR to this office for an interview at 1000, 17 Nov 14. |
| 2014/11/12 0830<br>CUMMINGS, MATTHEW R.<br>00:30 Investigative | SAC:<br><br>NO INVESTIGATIVE ACTIVITY DUE TO OBSERVATION OF VETERAN'S DAY WEEKEND. |
| 2014/11/12 1000<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | -SA WOOD returned from leave (7-11 Nov 14). |
| 2014/11/12 1015<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1015, 12 Nov 14, SA WOOD coordinated with Ms. Brenda ROWLAND, Legal Assistant, Williamson Law Group, 1851 E. First St., Suite 1225, Santa Ana, CA 92705, who related her office was looking to obtain a copy of the traffic collision report. SA WOOD related it would not be released until the completion of this investigation and related this office would like to schedule the interview of Mr. KILTY. |
| 2014/11/12 1630<br>WOOD, KEVIN MARTIN<br>00:15 Investigative | About 1630, 12 Nov 14, SA WOOD coordinated with Mr. John WILLIAMSON, who related he was not sure what this office needed to talk to Mr. KILTY about since he was already interviewed at the start of this investigation. SA WOOD related Mr. KILTY was interviewed by SGT GUTIERREZ and not this office. Mr. WILLIAMSON related he would contact Mr. KILTY to determine his schedule and talk with his bos to see if an interview would be appropriate. |
| 2014/11/13 1740<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1740, 13 Nov 14, SA WOOD emailed Mr. AGHASSI to inform of Ms. AGUILAR's interview at this office. |

App. 365

USA-00285

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
| --- | --- |
| Case Number: 00159-2014-CID146-081168 | |
| Date, Time, and Participant | Summary of Case Activity |
| 2014/11/14 1310<br>WOOD, KEVIN MARTIN<br>00:20 Investigative | About 1310, 14 Nov 14, SA WOOD briefed MAJ Gilbert J. COMLEY, Administrative Law, OSJA, FICA, on all aspects of this investigation and the interview of Ms. AGUILAR. |
| 2014/11/14 1615<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1615, 14 Nov 14, SA WOOD emailed Mr. TEDFORD the original AIR entry of Ms. AGUILAR's statement.<br><br>AGENT's COMMENT:  MAJ COMPLEY related it would be a good idea to make sure her attorney has a copy of her prior statement and to acknowledge that none of that information will be covered again. |
| 2014/11/17 0953<br>WOOD, KEVIN MARTIN<br>00:30 Investigative | About 0953, 17 Nov 14, SA WOOD interviewed Ms. AGUILAR who reviewed her previous statement and stated she was not made aware by VVTA of any previous complaints or counseled on complaints from passengers. Ms. AGUILAR stated VVTA provided training to the drivers assigned to the FICA route. Ms. AGUILAR stated the drivers were put on a bus with a supervisor and drove the FICA truck bypass. Ms. AGUILAR stated she was instructed to travel in the right lane of the bypass. (See DVD containing audio/video recorded interview)<br><br>AGENT's COMMENT: Mr. TEDFORD was present for the interview but not visible. |
| 2014/11/17 1040<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | -Discussed with MAJ COMLEY who related to obtain the training record which documented the training Ms. AGUILAR received by VVTA to drive on the FICA truck bypass. |
| 2014/11/17 1530<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1530, 17 Nov 14, SA WOOD emailed MAJ COMLEY to show Ms. AGUILAR had been briefed about prior complaints by her supervisors. Ms. AGUILAR related she was never informed of complaints made against her in her interview. |
| 2014/11/17 1545<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1545, 17 Nov 14, SA WOOD sent an email to Mr. KANE to obtain documentation on the training conducted by VVTA for the drivers who would be driving the Fort Irwin Bypass route. |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 366

USA-00286

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

## Case Activity Summary

**Case Number: 00159-2014-CID146-081168**

| Date, Time, and Participant | Summary of Case Activity |
|---|---|
| 2014/11/17 1810<br>WOOD, KEVIN MARTIN<br>00:05 Investigative | About 1810, 17 Nov 14, SA WOOD received an email from Mr. KANE who directed a person named Simon to provide training documentation. |
| 2014/11/17 1820<br>WOOD, KEVIN MARTIN<br>00:15 Investigative | -During a review of emails and a previous discussion with Mr. WILLIAMSON, SA WOOD discussed with the SAC that since the lawyer already showed interest in not having Mr. KILTY interviewed to follow up with the other remaining leads and submit for final. |
| 2014/11/18 1035<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | -Discussed with SAC who related when the opine is obtained, and if it is for negligent homicide, we will need to draft a status report to add the other bus paasengers as victims. |
| 2014/11/18 1045<br>WOOD, KEVIN MARTIN<br>00:05 Investigative | -Emailed MAJ COMLEY to see if he was ready to provide an opine. |
| 2014/11/18 1715<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1715, 18 Nov 14, SA WOOD coordinated with MAJ COMLEY who opined probable cause to believe Mr. KILTY and Ms. AGUILAR committed the offenses of CA Vehicle Code Section 23104, CA Penal Code Section 192, and 18 U.S.C. 1112(a). |
| 2014/11/18 1840<br>WOOD, KEVIN MARTIN<br>00:15 Investigative | -Discussed with SAC to clarify MAJ COMLEY's opine before drafting Status Report. |
| 2014/11/19 1000<br>WOOD, KEVIN MARTIN<br>00:15 Investigative | About 1000, 19 Nov 14, SA WOOD coordinated with MJ COMLEY who opined probable cause to believe Ms. AGUILAR and Mr. KILTY committed the offenses of CA Vehicle Code Section 23104 (Reckless Driving); CA Penal Code Section 192 (Vehicular Manslaughter; 18 U.S.C 1112(a) (Involuntary Manslaughter). |
| 2014/11/19 1152<br>WOOD, KEVIN MARTIN<br>00:01 Investigative | Recorded data pertaining to KILTY, Steven R |

App. 367

USA-00287

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
| --- | --- |
| Case Number: 00159-2014-CID146-081168 | |
| Date, Time, and Participant | Summary of Case Activity |
| 2014/11/19 1158<br>WOOD, KEVIN MARTIN<br>00:01 Investigative | CRC Name Check Requested for: KILTY, Steven |
| 2014/11/19 1158<br>WOOD, KEVIN MARTIN<br>00:01 Investigative | CRC Name Check Requested for: AGUILAR, Dinorah |
| 2014/11/19 1256<br>WOOD, KEVIN MARTIN<br>00:01 Investigative | Recorded data pertaining to U.S. Government |
| 2014/11/19 1300<br>WOOD, KEVIN MARTIN<br>00:25 Investigative | -Drafted 4th Status Report. |
| 2014/11/19 1449<br>WOOD, KEVIN MARTIN<br>00:01 Investigative | Send Investigative Report for Approval |
| 2014/11/19 1500<br>WOOD, KEVIN MARTIN<br>00:05 Investigative | -To SAC for review of 4th Status Report: |
| 2014/11/19 1900<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | -Briefed the SAC on the status of this investigation.<br><br>-Leads remaining:<br><br>1. Training documents from VVTA<br>2. FICA Truck Bypass Policy |
| 2014/11/19 1941<br>CUMMINGS, MATTHEW R.<br>00:01 Investigative | Approve Investigative Report |

USA-00288

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
|---|---|
| Case Number: 00159-2014-CID146-081168 | |
| Date, Time, and Participant | Summary of Case Activity |
| 2014/11/19 1950<br>CUMMINGS, MATTHEW R.<br>00:30 Investigative | SAC:<br><br>1.  Reviewed and approved Status Report.<br><br>2.  Prepare Final Report for ASAC review by 28 Nov 14.<br><br>TO CA |
| 2014/11/19 2025<br>WOOD, KEVIN MARTIN<br>00:05 Investigative | -Response to SAC review on 19 Nov 14:<br><br>1. Final Report is drafted.  Still pending two leads. |
| 2014/11/20 0830<br>WOOD, KEVIN MARTIN<br>00:05 Investigative | About 0830, 20 Nov 14, SA WOOD emailed LTC SWENSON to obtain a copy of the Fort Irwin Truck Bypass Policy. |
| 2014/11/20 0845<br>WOOD, KEVIN MARTIN<br>00:05 Investigative | About 0845, 20 Nov 14, SA WOOD emailed Mr. KANE to ask about the training documentation again. |
| 2014/11/20 0905<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 0905, 20 Nov 14, SA WOOD obtained the Fort Irwin Physical Security Plan for Commercial Vehicle Procedures from SGM Danny R. KNELL, Department of Emergency Services (DES), FICA.  A review of the plan did not mention a specific plan for parked trucks or for the VVTA transit buses. (See Plan for details) |
| 2014/11/20 1125<br>WOOD, KEVIN MARTIN<br>00:05 Investigative | About 1125, 20 Nov 14, SA WOOD emailed Mr. Simon HERRERA, VVTA, to obtain all of the training documentation. |
| 2014/11/21 0826<br>LENNIER, James E.<br>00:01 Investigative | CRC Name Check has been completed for AGUILAR, DINORAH ELIZABETH in case 0159-2014-CID146 |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

USA-00289

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| **Case Activity Summary** | |
| --- | --- |
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |
| 2014/11/21 1025<br>Wynder, Cynthia L<br>00:01 Investigative | CRC Name Check has been completed for KILTY, STEVEN R in case 0159-2014-CID146 |
| 2014/11/21 1350<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1350, 21 Nov 14, SA WOOD received an email from Mr. WILLIAMSON who related he declined to have Mr. KILTY interviewed by this office. |
| 2014/11/24 1325<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1325, 24 Nov 14, SA WOOD coordinated with Mr. HERRERA who related he had to send the requested information to his lawyers before providing it to this office.  Mr. HERRERA related he would provide this office with their contact information. |
| 2014/11/25 0900<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 0900, 25 Nov 14, SA WOOD coordinated with Mr. HERRERA who related he forwarded this office's request to his lawyer.  SA WOOD requested that lawyers contact information but Mr. HERRERA related he was in a meeting and would have to call this office back. |
| 2014/11/26 1100<br>CUMMINGS, MATTHEW R.<br>00:30 Investigative | SAC:<br><br>1.  Discussed case with Case Agent.<br><br>2.  Remaining leads were prioritized.<br><br>TO CA |
| 2014/11/26 1230<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1230, 26 Nov 14, SA WOOD coordinated with MAJ COMLEY and briefed him on all aspects of this investigation.  MAJ COMLEY related he still would like this office to at least get the contact info for the people who attended the training or the trainees info. |
| 2014/12/01 0900<br>CUMMINGS, MATTHEW R.<br>00:30 Investigative | SAC:<br><br>THERE WAS NO ACTIVITY IN THIS CASE FROM 27 - 30 NOV, DUE TO OBSERVANCE OF THANKSGIVING HOLDIAY. |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 370

USA-00290

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
|---|---|
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |
| 2014/12/01 1325<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1325, 1 Dec 14, SA WOOD coordinated with Mr. HERRERA who related he forwarded the information to his lawyers and this office should have heard fromthem already. Mr. HERRERA related he would call this offic later today with his lawyers online but had to go because he was in a meeting. |
| 2014/12/01 1635<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1635, 1 Dec 14, SA WOOD coordinated with Mr. HERRERA who provided Mr. Lee ROBERTS', VVTA Attorney, phone number. |
| 2014/12/01 1645<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1645, 1 Dec 14, SA WOOD coordinated with Mr. Lee ROBERTS, Attorney, VVTA, who related he was not sure if any of the documentation was formally written down, but he was checking and would provide this office with an answer by 3 Dec 14. |
| 2014/12/03 1820<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1820, 3 Dec 14, SA WOOD called and left a voice mail for Mr. ROBERTS to call this office back about the training documentation. |
| 2014/12/04 1100<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1100, 4 Dec 14, SA WOOD called and left a vocie mail for Mr. ROBERTS to call this office. |
| 2014/12/05 1400<br>WOOD, KEVIN MARTIN<br>00:15 Investigative | About 1400, 5 Dec 14, SA WOOD coordinated with Mr. ROBERTS who related he spoke with VVTA who informed him there was a meeting with the Fort Irwin Security Office about which route they wanted the buses to travel on. Mr. ROBERTS related that information was then taken back to VVTA and briefed to 14 veteran drivers by one Manager. Mr. ROBERTS related the 14 drivers and the Manager drove the route and did not conduct additional training because they were veteran drivers. Mr. ROBERTS related he still was not sure if the training was documented, but would try to obtain a list of the drivers and their contact information. Mr. Roberts stated it was briefed to travel on the bypass at no more than 45 MPH, and slower than that during the designated hours the trucks would be present. As far as he knew there was no specific lane the drivers were told to travel in on the bypass but were aware certain lanes would be blocked by barricades/trucks during designated times. |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 371

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
| --- | --- |
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |
| 2014/12/05 1418<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1418, 5 Dec 14, SA WOOD coordinated with MAJ COMLEY and briefed him on all aspects of this investigation. |
| 2014/12/05 1630<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1630, 5 Dec 14, SA WOOD emailed Ms. Kimberly A. SCHMIDT, Department of Emergency Services, FICA, to see if she had any information on the training between VVTA and FICA. |
| 2014/12/08 1300<br>WOOD, KEVIN MARTIN<br>00:15 Investigative | About 1315, 8 Dec 14, SA WOOD coordinated with Mr. Del DOMEK, Garrison Safety Specialist, FICA, who related he did not have any recollection of training conducted by VVTA and FICA, but related Mr. Dave KEY, Installation Saety, FICA, might know something about it. |
| 2014/12/08 1315<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1315, 8 Dec 14, SA WOOD coordinated with Mr. Dave KEY, Installation Safety, FICA, who related he did not know anything about the training between VVTA and FICA. |
| 2014/12/08 1340<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1340, 8 Dec 14, SA WOOD coordinated with Mr. KEY who related he spoke with Ms. Joan BULUSHI, G8, FICA, who related she provided VVTA with guidance she received from DES, FICA, but never conducted any training. Mr. KEY related he would provide the guidance when he received it from Ms. BULUSHI. |
| 2014/12/10 1400<br>WOOD, KEVIN MARTIN<br>00:15 Investigative | About 1400, 10 Dec 14, SA WOOD coordinated with Mr. KEY who related the training he referred to which was sent to VVTA from FICA, was training sent after the bus crash. Mr. KEY related sometime in 2012, Ms. Stephanie JEFFERY, conducted training with VVTA but it was limited to the bus stops on-post and the not the bypass. |
| 2014/12/10 1415<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | About 1415, 10 Dec 14, SA WOOD coordinated with Ms. Stephanie JEFFERY, Installation Transportation Officer, FICA, who related she conducted training with VVTA in 2012, because she handled the transfer from the NTC Express to VVTA. Ms. JEFFERY related VVTA conducted training because they were taking the contract and wanted to see how long it would take them to travel their routes on FICA. Ms. JEFFERY related she traveled on a bus with all males drivers, and never discussed travel on the Fort Irwin Bypass, and never provided them with any type of any other specific training. Ms. JEFFERY related the NTC Express only traveled on the |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 372

USA-00292

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

**Case Activity Summary**

| Case Number: 00159-2014-CID146-081168 | |
|---|---|
| **Date, Time, and Participant** | **Summary of Case Activity** |
| | Fort Irwin Road. |
| 2014/12/10 1415<br>WOOD, KEVIN MARTIN<br>00:10 Investigative | -Emailed MAJ COMLEY to update him on the information about the training between VVTA and FICA.<br><br>-Briefed SAC who related we still need MAJ COMLEY to inform us before the case can be closed. |
| 2014/12/10 1430<br>WOOD, KEVIN MARTIN<br>00:15 Investigative | About 1430, 10 Dec 14, SA WOOD coordinated with MAJ COMLEY and briefed him on all aspects of this investigation.  MAJ COMLEY related he would not require any further investigative activity. |
| 2014/12/10 1805<br>WOOD, KEVIN MARTIN<br>00:05 Investigative | -To SAC for review of Final(C) Report:<br><br>-Request this case be closed Final(C) in accordnace with CID Regulation 195-1, 4.10(5): The SJA or prosecutor is of the opinion that sufficient admissible evidence is available to prosecute the subject/suspect for the offense(s), that additional investigation would produce only cumulative and unneeded evidence.<br><br>--Leads Remaining:<br><br>1. Medical Records of Mr. AGUILAR.<br>2. Medical Records of SPC MARTINEZ.<br>3. IV of SSG SKINNER.<br>4. IV of Mr. KILTY.<br>5. Vehicle Training of Ms. AGUILAR. |
| 2014/12/10 1823<br>WOOD, KEVIN MARTIN<br>00:01 Investigative | Send Investigative Report for Approval |

App. 373

USA-00293

**Case Activity Summary**

**Case Number: 00159-2014-CID146-081168**

| Date, Time, and Participant | Summary of Case Activity |
|---|---|
| 2014/12/16 0900<br>CUMMINGS, MATTHEW R.<br><br>00:30 Investigative | SAC:<br><br>- LIMITED TO NO INVESTIGATIVE ACTIVITY IN THIS ACTION FROM 12 DEC 14 - 16 DEC 14 DUE TO CONDUCTING PRELIMINARY INVESTIGATIONS 0335-14-CID146 & 0336-14-CID146. |
| 2014/12/17 1600<br>HENNIGAN, CHRISTOPHER R.<br><br>00:45 Investigative | SAC ENTRY:<br><br>Per SAC guidance, there was little to no investigative activity due to priority investigation: 0336-14-CID146-81260; a case involving possible obstruction of justice by a SHARP/SARC. |
| 2014/12/19 0900<br>CUMMINGS, MATTHEW R.<br>00:30 Investigative | LIMITED TO NO INVESTIGATIVE ACTIVITY FROM 13 - 19 DEC 14 DUE TO PRIORITY INVESTIGATION 0336-14-CID146. |
| 2014/12/22 1230<br>HENNIGAN, CHRISTOPHER R.<br><br>03:00 Investigative | ASAC REVIEW:<br><br>Received and reviewed investigative file:<br><br>Made minor changes to the verbiage of the Final Report.<br><br>Discussed investigation with SAC who agreed with the findings of my review and those of this investigation. Further, SAC agreed there was no reason to keep this investigation open.<br><br>Case file to Case Agent and CIC for review and distribution: |
| 2014/12/22 1557<br>HENNIGAN, CHRISTOPHER R.<br><br>00:01 Investigative | Approve Investigative Report |
| 2014/12/23 0830<br>Deguzman, David Lee<br><br>04:00 Criminal Intelligence | FINAL CIC REVIEW<br><br>1. Reviewed Final, and confirmed Exhibits are numbered and stamped appropriately.  Made four complete copies for distribution.<br><br>2. Referred 4833, and dispatched it to the Action Commander. Tracking |

USA-00294

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

**Case Activity Summary**

**Case Number: 00159-2014-CID146-081168**

| Date, Time, and Participant | Summary of Case Activity |
|---|---|
| | suspense date on Excel spreadsheet. |
| | 3. Dispatched Final Report and Exhibits, 1st Letter and DA Form 4833 to USAG Commander, Commanding General, SOUSA and CRC. |
| 2015/02/06 1040 Deguzman, David Lee 00:45 Criminal Intelligence | On 06 February 2015, the Second Letters and a copies of the DA Form 4833's were sent to the Commander via email.

The new suspense date is 07 April 2015.

Copy of the email is posted to the case file.

Updated ACI2, Task Manager and spreadsheet to reflect new suspense date. |
| 2015/03/03 0900 Deguzman, David Lee 00:10 Criminal Intelligence | 4833 STATUS UPDATE:

Received the following email from the SAUSA:

Mr. Deguzman,

Unfortunately, the status is as it existed below on the 6th of FEB. The case remains with the Assistant US Attorney, Criminal Branch Chief for Central District of CA (Los Angeles). As soon as I have an update, I will push it out. Magistrate Court is on the 13th of March so I should have some news thereafter.

Very Respectfully,
Gilbert J. Comley
Special Assistant U.S. Attorney
OSJA, NTC & Fort Irwin
(760) 380-9664

Placed a copy of the email in the case folder for record. |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 375

USA-00295

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
|---|---|
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |
| 2015/03/19 1610<br>Deguzman, David Lee<br>00:10 Criminal Intelligence | FINAL REPORT TO CHP:<br><br>Per SA CUMMINGS instructions, David DEGUZMAN, IOT, emailed a copy of the Final to CHP Officer TA WILLIAMS at TAWILLIAMS@CHP.CA.GOV (760-255-8712).<br><br>Placed a copy of the email in the case folder for record. |
| 2015/03/24 1300<br>Deguzman, David Lee<br>01:00 Criminal Intelligence | CRC EMAIL TRAFFIC:<br><br>Received the following email from the CRC:<br><br>The following deficiencies were identified during processing of the subject ROI:<br><br>1. ROI 0159-14-CID146-81168:<br>    a. A Corrected Final is needed to correct the location of where the original for Exhibits 7, 10, 19 and 47 will be retained.  Once completed, please send a "Signed" copy to me via email attachment.<br><br>    b. Exhibit 16 is not legible.<br>    c. Exhibit 38 missing page 3 of 3.<br>    d. Exhibits 7, 13, 14, 17, 34 and 47 are missing.<br><br>Please send the missing exhibits/pages to me as an electronic copy via email.  Once I have received missing exhibit this case(s) can be removed from the group deficiency spreadsheet.<br><br>Thank you in advance for your assistance.<br><br>Stacey M. McKee<br>Criminal Investigations Technician<br>USACID/CRC<br>27130 Telegraph Road<br>Quantico, VA 22134<br>stacey.m.mckee.civ@mail.mil<br>571-305-4221<br><br>Replied with the following: |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 376

USA-00296

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

**Case Activity Summary**

| Case Number: 00159-2014-CID146-081168 | |
|---|---|
| Date, Time, and Participant | Summary of Case Activity |

Ms. McKee,

a. The Corrected Final will follow once completed by the ASAC.

b. Please see attached Exhibit 16, the attachment is of the same quality and legibility of what we were supplied and maintain in the case folder.

c. Please see attached Exhibit 38 with page 3 of 3 included.

d. Exhibits 7, 13, 14, 34 and 47 are all DVD/CD's and the originals were included when the Final and Exhibits were mailed to the CRC. Please let me know if you are unable to locate them and I will mail new originals.

Please contact me with any questions or concerns.

Respectfully,

Mr. David L. Deguzman
Investigative Operations Technician
Fort Irwin CID Office
760-380-5812
david.l.deguzman.civ@mail.mil

Placed a copy of the email traffic in the case folder.

Turned the case folder over to ASAC for Corrected Final.

2015/03/26 1030
Deguzman, David Lee
01:00 Criminal Intelligence

CRC EXHIBIT REPLACEMENT:

Received a reply from Ms. MCKEE, Stacey M at CRC stating that they misplaced Original Exhibits (CD/DVD's) 7-13-14-17-34 & 47.

Recreated Exhibits 7-13-14-17-34 & 47 as New Originals, sealed with Evidence Tape and initialed tape.

Mailed to CRC via USPS Certified Return Receipt Mail 7014-2120-0003-

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

USA-00297

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| **Case Activity Summary** | |
|---|---|
| **Case Number: 00159-2014-CID146-081168** | |
| **Date, Time, and Participant** | **Summary of Case Activity** |

2172-0228 on 26 March 2015.

Emailed Ms. MCKEE informing her of the USPS Tracking Number.

Placed email traffic in the case folder for record.

2015/03/30 1000
HENNIGAN, CHRISTOPHER R.
01:30 Investigative

///ADMINISTRATIVE REVIEW///

Coordination with USACRC revealed the originals paragraph of the Final (C) reported the DVDs containing original images were kept at the local office; however, IAW CIDR 195-1, the originals of DVDs and CD's containing crime scene images and video recorded interviews are to be kept at the USACRC.

Changes were made and a corrected final was drafted.

2015/03/30 1029
HENNIGAN, CHRISTOPHER R.
00:01 Investigative

Send Investigative Report for Approval

2015/03/30 1033
HENNIGAN, CHRISTOPHER R.
00:01 Investigative

Approve Investigative Report

2015/03/30 1033
HENNIGAN, CHRISTOPHER R.
00:01 Investigative

Approve Investigative Report

2015/04/10 1300
DEGUZMAN, DAVID LEE
00:10 Criminal Intelligence

Per CRC's request, mailed CRC a new copy of Exhibit 14 via USPS Registered Return Receipt Mail 7014-2120-0003-2172-0365.

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

App. 378

USA-00298

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

## Case Activity Summary

**Case Number: 00159-2014-CID146-081168**

| Date, Time, and Participant | Summary of Case Activity |
|---|---|
| 2015/04/10 1415<br>DEGUZMAN, DAVID LEE<br>00:30 Criminal Intelligence | CRC:<br><br>SA Evans opened the original Exhibit 7 from evidence due to the copy in the case folder and the copy mailed to CRC not working.<br><br>Mr. Deguzman, IOT, made 2 copies of Exhibit 7 and placed one copy in the case folder and prepared the second copy to be mailed to CRC to replace their non-working copy.<br><br>Mailed Exhibit 7 to CRC, ATTN: Satacey McKee via USPS Certified Return Receipt Mail 7014-2120-0003-2172-1010, scheduled to go out on 13 April 2015. |
| 2015/04/16 1122<br>DEGUZMAN, DAVID LEE<br>00:10 Criminal Intelligence | 4833 STATUS:<br><br>Emailed Commanders and SJA requesting the current status of the 4833.<br><br>Placed a copy of the email traffic in the case folder. |
| 2015/04/17 0915<br>DEGUZMAN, DAVID LEE<br>00:30 Criminal Intelligence | 4833 STATUS:<br><br>Received the following email from MAJ Comley, SAUSA:<br>The case is still with the AUSA's office. Only update is that the LA office transferred the case to the Riverside office based on attorney expertise that was available. Mr. Aghassi and I are still pending a decision on prosecution.<br><br>Placed a copy of the email traffic in the case folder.<br><br>Reset the suspense dates to 30 June 2015 to accommodate the Civilian Court system.<br><br>Placed copys of bothe updated DA Form 4833's in the case folder for record.<br><br>Emailed MAJ Comley of the new suspense date and informed him that I would be requesting a new status at that time. |

App. 379

USA-00299

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

| Case Activity Summary | |
|---|---|
| Case Number: 00159-2014-CID146-081168 | |
| Date, Time, and Participant | Summary of Case Activity |
| 2015/05/12 1515<br>WOOD, KEVIN MARTIN<br>00:01 Investigative | Send Investigative Report for Approval |
| 2015/05/12 1525<br>WOOD, KEVIN MARTIN<br>00:15 Investigative | -To ASAC for review of 1st Supplemental: |
| **2015/05/12 1900**<br>**HENNIGAN, CHRISTOPHER RYAN**<br>**00:45 Quality Control** | **ASAC REVIEW:**<br><br>**Received and reviewed investigative file:**<br><br>**This investigation was re-opened at the request of the US Attorney's Office to conduct further traffic investigative analysis by the California Highway Patrol.**<br><br>**Made minor changes to the verbiage of the 1st Final Supplemental Report and made the CHP the lead investigative agency IAW Chapter 8, CIDR 195-1.**<br><br>**Approved and distributed the signed report via email.**<br><br>**To SA WOOD for action:** |

App. 380

USA-00300

# SWORN STATEMENT

For use of this form, see AR 190-45; the proponent of this form is ODCSOPS

J159-14  CID146 8 1168

5w3w

## PRIVACY ACT STATEMENT

**AUTHORITY:** Title 10 USC Section 301; Title 5 USC Section 2951; E.O. 9397Dated November 22, 1943 (SSN)
**PRINCIPAL PURPOSE:** To provide commanders and law enforcement officials with means by which information may be accurately recorded.
**ROUTINE USES:** Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval.
**DISCLOSURE:** Disclosure of your social security number is voluntary.

| 1. LOCATION FORT IRWIN ROAD, SECONDARY ROAD FOR COMMERCIAL SEMI LINE-HAUL TRUCKS & BUSSES | 2. DATE (YYYYMMDD) 2014-06-02 | 3. TIME 1700 | 4. FILE NUMBER |
|---|---|---|---|

| 5. LAST NAME, FIRST NAME, MIDDLE NAME TUSIESEINA, MISIONA (NMI) | 6. SSN 550980037 | 7. GRADE/STATUS CIV |
|---|---|---|

| 8. ORGANIZATION OR ADDRESS NORTHROP GRUMMAN CORPORATION, TECHNICAL SERVICES, P.O.BOX 11159, FORT IRWIN, CA 92310 |
|---|

**9.**

I, MISIONA TUSIESEINA, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

On the morning of June 02, 2014 I Mr. Tusieseina was one of eight passengers riding on a Victor Valley Transit Authority (VVTA) bus commuting from the city of Barstow to Fort Irwin, was involved in a severe motor vehicle accident when the right side of the bus hit something which I later learned was a parked commercial truck. I believe commercial truck was waiting to deliver inbound shipment on Fort Irwin carrying a military tactical vehicle (M984A4, HEMTT wrecker). After further observation once outside the bus, I notice a traffic safety barrier was in front of the parked commercial truck and a Port-Portie latrine on the side

On or about 0510-hrs, a VVTA bus which I was a passenger, sitting on the left side (drivers side), middle of the bus fourth set from the front, when our bus struck/hit a parked commercial line-haul truck on Fort Irwin secondary road. When I was awaken by the impact of the crashed, which I was tossed out of my seat and my body was subjected to banging against other parts of the bus. My reaction than was to prevent moving forward so I reached out to grab any object with my left hand to break my momentum moving forward. I was able to grab onto a steel bar, and when I my momentum stop I attempted to pull myself up from the steel bar and I felt numbness and paralyzed from my lower back and feet. As I was able gain movement again on to my feet and lower back, the accident scene inside the bus was just horrific and gruesome. I was standing over Mr. Keiper, whom had sustained an open chess/head wound with his internal chess organs exposed, and his upper body completely tangled up underneath metal/steel debris from the bus. I witness a hugh hole on the right side of the bus where the bus had struck the line-haul truck, and I witness our bus driver on her cell phone talking with someone. As I continue to observe the accident scene inside the bus I shouted out to the bus driver if she had a first-aide kit available, she wouldn't respond to me. As my observation continued, I witness Specialist Martinez on the front left side of the bus whom was tossed from the rear/back seat of the bus all the way to the front of the bus in severe pain attempting to move. At that moment understanding our current situation, Mr. Chestnut and I attempted to keep all passengers calm as possible. I instructed SPC Martinez to set-down, don't move, and be calm we have paramedics and ambulance enroute. I witness a small little boy next to SPC Martinez on the floor crying for his mother. I quickly picked up the little boy and ask him if he was okay, he motioned to me he was okay however I quickly checked his body from head to toe for possible open injuries and cuts which I didn't find, and then I released him to be with his mother whom was laying face down crying in agony due to her injuries. Because of the mother current position, it was unknown how severe her conditions were and we also advised her and assure her paramedics were enroute and be calm. The mother was located in the rear, center aisle of the bus vicinity of the bus center doorway. I also witness Mr. Jesus at his seat located on the right side of the bus, next to the center doorway (entrance/exit) of the bus. Mr. Jesus was pin-down at his seat, in shock and yelling out loud in excruciating pain, attempting to pull away from the debris of metal which his right arm was completely shivered/cut-off just above his elbow. Mr. Chestnut and I immediate reaction was to calm Mr. Jesus down and assure him paramedics were enroute, and that we will stay with him until they arrive. At this time, I addressed a female soldier standing behind Mr. Chestnut in shock, crying and on her cell phone, and I ask her if she was calling 911 and she said yes. I than turned to Mr. Chestnut and explained to him that I needed to get a first aide kit from anyone outside the bus to render emergency assistants and obtain a first aide kit for the wounded passengers, so I unlatched and opened a side window and crawled out and stop the first available line-haul truck and requested assistances and a first-aide kit, a truck driver pulled over in front of the accident scene and rush back to the accident scene with his first kit. After stopping the truck driver, I turned back to the bus and opened the bus window and instructed a female soldier inside the bus to hand me the little boy through the window so I can secure him outside in a safe location and wait for paramedics to arrive, she did and afterwards she scrawled out through the window as well and we all went to the side of road. By the time the truck driver with the first-aide kit arrived, the first paramedics and military police arrived on the accident scene as well. I immediately stop the first paramedics, provided him with a short briefed description how many passengers on the bus and their general disposition, I than handed the little boy over to the paramedics.

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT | |
|---|---|---|
| | | PAGE 1 OF 3 PAGES |

*ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT_____ TAKEN AT_____ DATED_____."*

*THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE INDICATED.*

USE ONLY SENSITIVE

EXHIBIT

—USA-00319

App. 381

DA FORM 2823, DEC 1998          DA FORM 2823, JUL 72 IS OBSOLETE          USAPA V1.00

**USE THIS PAGE IF NEEDED.  IF THIS PAGE IS NOT NEEDED, PLEASE PROCEED TO FINAL PAGE OF THIS FORM.**

STATEMENT OF MISIONA TUSIESEINA  TAKEN AT _____  DATED JUNE 17, 2014

9.   STATEMENT (Continued)

INITIALS OF PERSON MAKING STATEMENT

PAGE 2 OF 3 PAGES

FOR OFFICIAL USE ONLY
LAW          T SENSITIVE

App. 382          EXHIBIT          USA-00320

FORT IRWIN POLICE DEPARTMENT
## NARRATIVE/SUPPLEMENTAL

6159-14-CTO/46-87168-SH3N

| DATE OF INCIDENT/OCCURRENCE | TIME (2400) | NCIC NUMBER | OFFICER I.D. NUMBER | NUMBER |
|---|---|---|---|---|
| 06/02/2014 | 0506 | | 201 | 00618-2014-MPC146 |

## FACTUAL DIAGRAM



Truck Bypass Road

### Legend

A.  Check in Point / Do Not Enter / One Way Sign
B.  Do Not Enter / One Way Sign
C.  Reference Point 1
D.  Reference Point 2
E.  Jersey Barrier (Truck Stop Times)

NOT TO SCALE

| PREPARER'S NAME AND I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|
| Gutierrez, J. #201 | 06/06/2014 | | |

App. 383

USA-00325

FORT IRWIN POLICE DEPARTMENT
**NARRATIVE/SUPPLEMENTAL**

0159-14-050146-8168-SH31

| DATE OF INCIDENT/OCCURRENCE | TIME (2400) | NCIC NUMBER | OFFICER I.D NUMBER | NUMBER |
|---|---|---|---|---|
| 06/02/2014 | 0506 | | 201 | 00618-2014-MPC146 |

## SKETCH



N

B

A

E

Truck Bypass Road

Legend

D

C

NOT TO SCALE

**Legend**

A. Check in Point / Do Not Enter / One Way Sign
B. Do Not Enter / One Way Sign
C. Reference Point 1
D. Reference Point 2
E. Jersey Barrier (Truck Stop Times)

11'    12' 6'    12' 6'    11'

| PREPARER'S NAME AND I D NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|
| Gutierrez, J. #201 | 06/06/2014 | | |

"LAW ENFORCEMENT SENSITIVE"



**DEPARTMENT OF THE ARMY**
**DIRECTORATE OF EMERGENCY SERVICES**
**FORT IRWIN POLICE DEPARTMENT**
**FORT IRWIN, CA  92310**

**REPLY TO**
**ATTENTION OF:**

IMSW-IRW-ESP

12 August 2014

MEMORANDUM FOR RECORD

SUBJECT:  Errors in Documentation of Collection of Vehicle

1.  A NABI Bus, VIN# 1N940501XAA140432 was collected during the processing of a Death Scene by the undersigned, but at the time of collection, a DA Form 4137, Evidence Property Custody Document (EPCD) was not prepared, which is not IAW Chapter 2-3, AR 195-5. Further, a chain of custody, in any form, was not prepared until the date of this memorandum.

2. The evidence was stored in the ARC towing yard, which is IAW Chapter 4-3 c., AR 195-5, but the evidence was not marked with time, date and initials of the first DA law enforcement officer assuming custody of the evidence, which is not IAW 2-1, AR 195-5.

3.  The vehicle was impounded and annotated on a CHP 180 form and DD 2506 form IAW Chapter 6-4, AR 190-5.

4.  Point of contact for this action is the undersigned at (760) 380-3869 or email juan.a.gutierrez1.civ@mail.mil.


JUAN A. GUTIERREZ
Traffic Accident Investigator, Supervisor

App. 385

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME | NCIC | OFFICER ID | NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | i |

**TEAM DIVISION**
Inland Division

**AREA**
United States Army
Criminal Investigations
Command – Fort Irwin

**CASE NUMBER**
IF-014-15

**LEAD U.S ARMY INVESTIGATOR**
Special Agent K. Wood



**TEAM LEADER**
Sergeant L. Berns, ID 15244, Inland Division MAIT Investigator

**ENGINEER**
Caltrans Senior Transportation Engineer K. Youssef, R.C.E 57766, Inland Division MAIT Investigator

**MOTOR CARRIER SPECIALIST**
Motor Carrier Specialist-I T. Nazikoglu, ID A15922, Inland Division MAIT Associate

**OTHER TEAM MEMBERS**
Officer P. Wester, ID 12500, Inland Division MAIT Investigator
Officer M. Seruga, ID 13311, Inland Division MAIT Investigator
Officer D. Finn, ID 13602, Inland Division MAIT Investigator
Officer P. Gray, ID 16186, Inland Division MAIT Investigator*
Officer D. Stillmunks, ID 19269, Inland Division MAIT Associate Investigator (San Bernardino Area)

*Denotes primary MAIT investigator

**SUBPOENAS FOR MAIT PERSONNEL SHOULD BE DIRECTED TO:**

California Highway Patrol
Inland Division MAIT
847 East Brier Drive
San Bernardino, California 92408-2837

Attention:  Sergeant L. Berns

App. 386

USA-00349

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME | NCIC | OFFICER ID | NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | ii |

## TABLE OF CONTENTS

| TITLE | PAGE (S) | COMPLETED BY |
|---|---|---|
| **FACTS** | | |
| INTRODUCTION | 1 | GRAY |
| NOTIFICATION | 2-6 | GRAY |
| | | |
| ROADWAY ENVIRONMENT | | |
| GENERAL DESCRIPTION | 7-9 | GRAY |
| ROADWAY ALIGNMENT | 10 | GRAY |
| PAVEMENT DELINEATION | 11 | GRAY |
| TRAFFIC CONTROL DEVICES | 12-15 | GRAY |
| WEATHER AND LIGHTING CONDITIONS | 16-17 | GRAY |
| | | |
| DRIVERS | | |
| DINORAH AGUILAR | 18-19 | GRAY |
| PRE-COLLISION PROFILE | 20 | GRAY |
| STEVEN KILTY | 21-23 | GRAY |
| PRE-COLLISION PROFILE | 24 | GRAY |
| | | |
| OCCUPANTS | 25-26 | GRAY |
| | | |
| AUTOPSY AND INJURY DESCRIPTIONS | 27-29 | GRAY |
| | | |
| PHYSICAL EVIDENCE | | |
| PHYSICAL EVIDENCE LOCATION LIST | 30-31 | GRAY |
| VEHICLE POSITIONS OF REST | 31 | GRAY |
| PHYSICAL EVIDENCE DIAGRAM | 32 | GRAY |
| | | |
| PHYSICAL EVIDENCE | 33 | GRAY |
| | | |
| VEHICLE DESCRIPTIONS AND DAMAGE | | |
| VEHICLE #1 (NABI BUS) | 34-41 | GRAY |
| VEHICLE #2 (VOLVO VNL) | 42-43 | GRAY |
| VEHICLE #2A (MANAC TRAILER) | 44-58 | GRAY |
| | | |
| MECHANICAL INSPECTION | 49 | GRAY |
| | | |
| OTHER FACTUAL INFORMATION | 50-51 | GRAY |
| | | |
| PHOTOGRAPH LOG | 52 | GRAY |

USA-00350

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME | NCIC | OFFICER ID | NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | iii |

## TABLE OF CONTENTS

| TITLE | PAGE (S) | COMPLETED BY |
|---|---|---|
| **STATEMENTS** | | |
| INTERVIEW DOCUMENTATION | 53 | GRAY |
| DRIVER DINORAH AGUILAR | 54-55 | GUTIERREZ / GROVE / WOOD |
| DRIVER STEVEN KILTY | 56 | GROVE |
| PASSENGER ARIEL DEROSIER | 57-60 | SWANSON |
| PASSENGER NAIOMI BRIDGETTE | 61-64 | MOORE |
| WITNESS JESUS AGUILAR | 65-66 | MOORE |
| WITNESS PEDRO MARTINEZ | 67-69 | SWANSON |
| WITNESS MICHAEL CHESTNUT | 70-73 | WOOD |
| WITNESS MISIONA TUSIESEINA | 74-76 | STEWART |
| | | |
| **ANALYSIS AND OPINION** | | |
| PHYSICAL EVIDENCE ANALYSIS | 77 | GRAY |
| VEHICLE FACTORS | | |
|     DAMAGE ANALYSIS | 78-79 | GRAY |
| HUMAN FACTORS | | |
|     DRIVER DINORAH AGUILAR | 80-82 | GRAY |
|     DRIVER STEVEN KILTY | 83-85 | GRAY |
| ENVIRONMENTAL FACTORS | 86-89 | GRAY |
| SPEED ANALYSIS | 90 | GRAY |
| DYNAMICS DIAGRAM | 91 | GRAY |
| AREAS OF IMPACT | 92 | GRAY |
| COLLISION SEQUENCE | 93-94 | GRAY |
| | | |
| **CONCLUSIONS** | 95-96 | GRAY |
| VIOLATIONS | 97-101 | GRAY |
| | | |
| **RECOMMENDATIONS** | 102 | GRAY |

App. 388

USA-00351

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 1 |

## FACTS

Introduction

On Monday, June 2, 2014, at approximately 0506 hours, Ms. Dinorah Aguilar was driving Vehicle #1, a 2010 NABI transit bus, northbound on the Fort Irwin Road Truck Bypass route, north of Rocking K Ranch Road, within the #2 lane. At the time, Ms. Aguilar was employed by the Victory Valley Transit Authority and was operating Vehicle #1 in the course of her employment. Mr. Steven Kilty was sleeping in the sleeper berth of Vehicle #2, a 2006 Volvo tractor, which he parked within the #2 lane of the Fort Irwin Road Truck Bypass, just north of Vehicle #1's location. Vehicle #2 was hitched to Vehicle #2A, a 2014 Manac trailer hauling a military Heavy Expanded Mobility Tactical Truck (HEMTT). When Ms. Aguilar observed the rear of Vehicle #2A and recognized it as a hazard, she turned Vehicle #1 to the left in an attempt to avoid a collision. The right side of Vehicle #1 subsequently struck the left rear of Vehicle #2A. Vehicle #1 was transporting a total of eight passengers. One passenger, Mr. Dail Keiper, sustained fatal injuries as a result of the collision. The other seven passengers sustained injuries ranging from major to minor. The driver of Vehicle #1, Ms. Aguilar, complained of pain following the collision.

This collision occurred on United States government property and was initially investigated by the Fort Irwin Police Department and the United States Army Criminal Investigation Command. Their investigation was subsequently submitted to the United States Attorney's Office. On May 5, 2015, Assistant United States Attorney, Bilal Essayli, requested the California Highway Patrol further investigate the collision due the severity and complexity of the incident. On May 8, the California Highway Patrol Inland Division Multidisciplinary Accident Investigation Team (MAIT) was requested to assist in the investigation.

MAIT consists of investigators with specialized skills and training in accident reconstruction, traffic engineering and automotive engineering. MAIT investigators apply their specific skills in order to analyze the human, environmental and mechanical factors involved to determine the underlying collision and injury causes. The following investigation details MAIT's findings regarding this traffic collision.

All times, speeds, and measurements in this investigation are approximate, unless otherwise specified.

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 2 |

**FACTS**

Notification

The following MAIT investigators responded to the scene of the collision and/or assisted in this investigation at a later date:

California Highway Patrol, Inland Division MAIT
847 East Brier Drive, San Bernardino, California 92408 – Telephone (909) 428-5559

Sergeant L. Berns, ID 15244
Officer P. Wester, ID 12500
Officer M. Seruga, ID 13311
Officer D. Finn, ID 13602
Officer P. Gray, ID 16186
Officer D. Stillmunks, ID 19296
Motor Carrier T. Nazikoglu, ID A15922

App. 390

USA-00353

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 3 |

**FACTS**

Notification

United States Agency Involvement

The following United States Department of the Army – Criminal Investigations Command
(USACIDC) personnel responded to the scene and/or assisted in this investigation at a later
date:

United States Army Criminal Investigations Division - 6th MP Group, Fort Irwin
Building 986 Inner Loop Road, Fort Irwin, California 92310 - Telephone (760) 380-7529

    Special Agent in Charge C. Hennigan
    Special Agent M. Cummings
    Special Agent B. Moore
    Special Agent K. Wood
    Special Agent S. Swanson
    Special Agent J. Stewart
    Investigator M. Coronel
    Investigator Z. Smith
    Investigator T. Williams

The following United States Department of the Army – Installation Management Command
(IMCOM), Directorate of Emergency Services personnel responded to the scene and/or
assisted at a later date:

United States Fire Department, Fort Irwin
Building 6101 Southloop Road, Fort Irwin, California 92310 - Telephone (760) 380-5252

Engine E411
    Captain B. Caudle
    Firefighter R. Hernandez
    Firefighter C. Roth
    Engineer R. Lenihan

Engine T411
    Captain J. Dillow
    Firefighter C. Holloway
    Firefighter R. Rinaldo
    Engineer R. Whitaker

Engine E412A
    Captain R. Warsaw
    Firefighter C. Fratt
    Firefighter R. Nabors
    Engineer R. Villegas

USA-00354

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 4 |

**FACTS**

Notification

United States Agency Involvement

The following United States Department of the Army – Medical Command (MEDCOM) personnel responded to the scene and/or assisted in this investigation at a later date:

United States Army Medical Command – Weed Army Community Hospital
166 3rd Street, Fort Irwin, California 92310 - Telephone (760) 380-3124

Sergeant West
Specialist Staley
Specialist Gray
Private First Class Mizquiri
*First initials for the above personnel were not able to be obtained*

The following United States Department of the Army – 2916th Aviation Battalion, C Company (Air Ambulance) personnel responded to the scene and/or assisted in this investigation at a later date:

United States Army Fort Irwin – 2916th Aviation Battalion, C Company
Daggett Airport, 39500 National Trails Hwy 3, Daggett, California  92327 - Telephone (760) 569-7471

Aircraft 26003 – Army Evac 26003
Chief Warrant Officer J. Kondas, Pilot
Chief Warrant Officer C. Smith, Pilot
Sergeant C. Avogaro, Flight Medic
J. Mendoza, Fort Irwin Fire Department Paramedic

The following United States Department of the Army – Civilian Police personnel responded to the scene and/or assisted in this investigation at a later date:

Fort Irwin Police Department
326 Barstow Road, Fort Irwin, California 29310 - Telephone (760) 380-3869

Captain D. Johnson
Lieutenant D. Perkins
Sergeant R. Grove
Sergeant J. Gutierrez

USA-00355

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 5 |

## FACTS

Notification

### State Agency Involvement

The following California Highway Patrol personnel responded to the scene and/or assisted at a later date:

California Highway Patrol, Barstow Area
300 East Mountain View Street, Barstow, California 92311 - Telephone (760) 255-8700

> Sergeant J. Knight, ID 15097
> Officer C. Bissett, ID 16787
> Officer R. Bonnett, ID 19300
> Officer W. Nitto, ID 20150
> Officer M. Vargas, ID 20327
> Officer C. Clark, ID 20389

California Highway Patrol, (Air-83)
21605 Corwin Road, Apple Valley, California 92307 - Telephone (760) 240-8004

> Officer B. Parks, ID 16653

### San Bernardino County Agency Involvement

The following San Bernardino County Sheriff's Department – Coroner Division personnel responded to the scene and/or assisted at a later date:

San Bernardino County Sheriff's Department, Coroner Division
175 South Lena Road, San Bernardino, California 92415 - Telephone (909) 387-2542

> Deputy D. Sobiesiak, Coroner Investigator

App. 393

USA-00356

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 6 |

## FACTS

Notification

The following Mercy Air Ambulance personnel responded to the scene:

Mercy Air Ambulance
18374 Phantom Street, Victorville, California 92394 - Telephone (760) 246-7577

MA-2
A. Rudolph, Pilot
D. Griffith, Registered Nurse
V. Bedolla, Paramedic

The following Desert Ambulance Service personnel responded to the scene:

Desert Ambulance Service, Incorporated
831 West Main Street, Barstow, California 92311 - Telephone (760) 256-6854

Unit D-8
J. Garcia, Paramedic
J. Gaul, Emergency Medical Technician

Unit D-5
S. Delgado, Paramedic
J. Solano, Emergency Medical Technician

The following ARC Towing Service personnel responded to the scene:

ARC Towing Service
821 West Main Street, Barstow, California 92311 - Telephone (760) 256-3028

The identities of the ARC Towing Service personnel that were at the collision scene were
not determined.

USA-00357

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 7 |

**FACTS**

Roadway Environment

General Description

This collision scene was located on the northbound Fort Irwin Road Truck Bypass route, north of Rocking K Ranch Road.  The collision occurred on United States government property within San Bernardino County, California (*Figures 1 and 2*).



*Figure 1 - Vicinity Map*



*Figure 2 - Vicinity Map-Aerial View*

App. 395

USA-00358

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 8 |

**FACTS**

Roadway Environment

General Description

The Fort Irwin Road Truck Bypass route was designed as a one-way northbound roadway
that generally ran parallel and east of Fort Irwin Road.  The truck bypass route was 3.9
miles in length.  The bypass was intended to divert slower moving truck traffic entering into
Fort Irwin and to relieve congestion at Fort Irwin's main gate.  The United States Army
Corps of Engineers began work on the bypass road in May 2008 and completed the roadway
in October 2009.

The truck bypass route originated as it diverged from Fort Irwin Road, approximately 1,900
feet south of Rocking K Ranch Road.  The bypass roadway generally traversed alongside
Fort Irwin Road for approximately 3.9 miles and then merged back into Fort Irwin Road just
south of a local landmark known as "Painted Rocks" (*Figure 3*).



*Figure 3*

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 9 |

**FACTS**

Roadway Environment

General Description

This collision event was isolated to the Fort Irwin Road Truck Bypass route. The bypass consisted of two northbound through lanes, with adjacent paved shoulders. The lanes were composed of asphalt concrete pavement with occasional sections of Portland cement concrete, designed as swale crossings that directed water across the roadway. Some of the Portland cement concrete sections were also designed for military tank crossing. The asphalt pavement exhibited cracking; however, the integrity of the pavement appeared intact and in serviceable condition.

The roadway consisted of an inside paved shoulder that was separated from the #1 lane by a solid yellow edgeline with reflective pavement markers (Detail #25). The #1 and #2 travel lanes were separated by a broken white laneline with retro-reflective pavement markers (Details #12). The outside paved shoulder was separated from the #2 lane by a solid white edgeline (Detail #27B). The inside shoulder was bordered to the west by a section of desert terrain followed by Fort Irwin Road. The outside shoulder was bordered to the east by desert terrain (*Figure 4*).



*Figure 4*

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 10 |

**FACTS**

Roadway Environment

Roadway Alignment

The horizontal and vertical alignment of the roadway was determined based on scene measurements, photographs and satellite imagery.

Starting at the area of impact and traveling south, the horizontal alignment of the Fort Irwin Road Truck Bypass route was relatively straight for approximately 8,250 feet. For approximately 830 feet prior to (south of) the area of impact, the vertical alignment for the roadway consisted of an ascending grade of approximately 2.4 percent.

Roadway Cross-Section

The cross-slopes for the Fort Irwin Road Truck Bypass route and its adjacent shoulders were as depicted in the following diagram (*Figure 5*):



*Figure 5*

App. 398

USA-00361

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 11 |

## FACTS

Roadway Environment

Pavement Delineation



**DETAIL 27B**
**Right Edgeline**

Right Edgeline pattern for use on all State highways may be used on local streets and highways. It is generally dropped at the beginning of the intersection flares on conventional highways.

50 mm

Edge of Traveled Way



**DETAIL 25**

50 mm
50 mm

Left Edgeline for use on State highways.

14.64 m

Edge of Traveled Way



**DETAIL 12**

14.64 m
5.49 m    3.66 m    5.49 m

Laneline pattern with pavement markers for use on multilane conventional streets and highways.

USA-00362

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (*2400*) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 12 |

**FACTS**

Roadway Environment

Traffic Control Devices

The truck bypass route originated south of Rocking K Ranch Road, as the lanes diverged from northbound Fort Irwin Road. Prior to the beginning of the truck bypass route, a traffic sign informed motorists that the bypass route was to begin.

There were other miscellaneous traffic signs along the truck bypass route leading up to the collision location. The following signs were installed proximate to the roadway and were standard in size and shape. There were no postmile markers associated with the location of sign placement. The following signs are not all inclusive of the signage located along the truck bypass route.

| SIGN SYMBOL | DESCRIPTION |
|---|---|
| **FORT IRWIN** ↑ ↗ PASSENGER CARS AND ALL PICKUPS / TRUCK BYPASS | Truck Bypass directional sign |
| Left Lane For Authorized Vehicles Only | Lane usage advisory sign |
| TANK CROSSING | Tank Crossing advisory sign |
| Check-in Point | Check-In Point advisory sign |
| SPEED LIMIT 45 | Speed Limit regulatory sign |

App. 400

USA-00363

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-0B) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 13 |

## FACTS

Roadway Environment

Traffic Control Devices

| SIGN SYMBOL | DESCRIPTION |
|---|---|
| TRUCKS STOP HERE HOURS: 0600 - 0800 MONDAY - FRIDAY MAIN GATE: 760-380-2255 | Truck Stop advisory sign |
| DO NOT ENTER WRONG WAY | Do Not Enter and Wrong Way warning sign |
| ONEWAY | One Way regulatory sign |

At the time of this MAIT investigation, there were painted roadway markings within the left lane of the truck bypass which indicated, "BUS LANE ONLY." There were three locations where this roadway advisory marking was painted between the start of the truck bypass route to where the collision occurred. According to the Army Directorate of Plans, Analysis and Integration, these roadway markings were installed approximately three weeks following the date of this collision. On the date of the collision, there were no advisory markings pertaining to the left lane of the bypass route.

The "Left Lane for Authorized Vehicles Only" signs along the bypass route were also erected approximately three weeks following the date of this collision.

App. 401

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 14 |

**FACTS**

Roadway Environment

Truck Stop Advisory Signs

At the scene of the collision there were two signs which directed truck drivers to stop and "check-in" (*Figure 6*). One of the signs, which indicated the location was a check-in point, was located east of the outside paved shoulder. This particular sign did not indicate a check-in time nor did it specify exactly where the check-in point was located (i.e. within the lane or on the paved shoulder). The second sign notified truck drivers to "stop here." This sign was attached to a temporary k-rail type divider, which at the time of the collision, was situated parallel to the roadway on the dirt shoulder at the time of the collision. This sign was specific as to the times at which a truck driver was to stop, indicating between 0600 and 0800 hours, Monday through Friday. This sign was not specific as to exactly where a truck was to stop.

According to Fort Irwin personnel, the temporary k-rail sign was placed perpendicular (visible to approaching drivers) within the #2 lane between 0600 and 0800 hours, Monday through Friday. Outside of the indicated hours and days, the k-rail sign was placed parallel (not visible to approaching drivers) to the roadway on the outside dirt shoulder so that truck drivers would proceed to the front gate of Fort Irwin and not stop at the check-in location.



*Figure 6*

App. 402

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (*2400*) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 15 |

**FACTS**

Roadway Environment

Speed Limit

The Fort Irwin Road Truck Bypass route was regulated by the posted speed limit of 45 miles per hour for all vehicles.  The posted speed limit signs were posted outside of the roadway edge and were visible with no obstructions.

App. 403

STATE OF CALIFORNIA

DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**

CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 16 |

## FACTS

Weather and Lighting Conditions

Weather

The Weather Underground website,[1] history database link was accessed and the following weather information was obtained for Fort Irwin, California, for June 2, 2014, at approximately 0455 hours (Pacific Daylight Time):

| | | |
|---|---|---|
| Temperature | - | 71.7 degrees Fahrenheit |
| Dew Point | - | 23.7 degrees Fahrenheit |
| Barometric Pressure | - | 29.69 inches of Mercury |
| Wind | - | 10.4 miles per hour out of the northwest |
| Condition | - | Clear |
| Visibility | - | 10 statute miles |

The data above was obtained from the Bicycle Lake Army Airfield. The airfield was located approximately 9.5 miles northeast of the collision location. These reported conditions were consistent with those observed at the time of the collision by on scene personnel.

---

[1] http://www.wunderground.com

USA-00367

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 17 |

## FACTS

Weather and Lighting Conditions

Lighting

This collision occurred during early morning hours, prior to sunrise. Sun data was obtained through the United States Naval Observatory Astronomical Applications Department website.[2]  The following information was provided for June 2, 2014, for Fort Irwin, California (longitude W116° 42', latitude N35° 15'):

Sun

| | | |
|---|---|---|
| Begin civil twilight | - | 0504 hours (Pacific Daylight Time) |
| Sunrise | - | 0533 hours |
| Sun transit | - | 1245 hours |
| Sunset | - | 1957 hours |
| End civil twilight | - | 2026 hours |

Moon

| | | |
|---|---|---|
| Moonrise | - | 0959 hours |
| Moon transit | - | 1649 hours |
| Moonset | - | 2335 hours |

The phase of the moon on June 2, 2014, was waxing crescent with 23 percent of the Moon's visible disk illuminated. At the time of the collision, the moon was below the horizon and not visible.

No artificial lighting sources were noted in the area of the collision.

---

[2] http://aa.usno.navy.mil

USA-00368

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 18 |

## FACTS

<u>Drivers</u>

<u>Driver #1 – Dinorah Aguilar</u>

<u>Identification</u>

Ms. Dinorah Aguilar was a 49-year old female with a date of birth of December 1, 1965, and a physical description as follows:

| | | |
|---|---|---|
| Height | - | 5 feet, 3 inches |
| Weight | - | 180 pounds |
| Hair | - | Black |
| Eyes | - | Brown |

Ms. Aguilar was identified by her California Driver License and was determined to be an involved party in this collision by the following:

- Her statement that identified her as the driver of Vehicle #1
- Her employment with the registered owner of Vehicle #1
- Passenger statements which identified her as the driver of Vehicle #1
- Video footage of Ms. Aguilar driving Vehicle #1 at the time of the collision

<u>Restraints</u>

The driver's seating position in Vehicle #1 was equipped with a Type 1 (pelvic restraint), 2-point occupant restraint system. It was determined that Ms. Aguilar was utilizing her seatbelt at the time of this collision based on video evidence of the collision event.

<u>Driver License History</u>

Ms. Aguilar possessed a valid Class "B" California Commercial Driver License, with a passenger transportation endorsement and a restriction to wear corrective lenses while driving. A DMV records check revealed at the time of the collision, Ms. Aguilar's driver license had been issued on December 8, 2009, and was due to expire on December 1, 2014. Ms. Aguilar had no prior traffic related convictions, collisions, departmental actions or failures to appear on her driving record.

App. 406

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 19 |

## FACTS

Drivers

### Driver #1 – Dinorah Aguilar

Medical History

Ms. Aguilar indicated in her statement that she was a diabetic. She took one Metformin and one Glyburide pill (milligrams were not determined) prior to leaving for work. Both medications were prescribed for her diabetes. When she took her medications, she also ate half of a burrito. At the time of officer collision, Ms. Aguilar was wearing corrective lenses.

Intoxication

Ms. Aguilar was observed by Fort Irwin Police Department (FIPD) personnel at the scene of the collision. She was also contacted at Weed Army Community Hospital by Sergeant Gutierrez and Sergeant Grove. She displayed no objective signs of intoxication when observed at either location. A sample of Ms. Aguilar's blood was taken at 0748 hours and submitted to the San Bernardino County Sheriff's Department – Scientific Investigations Division for testing. On June 11, 2014, the sample was tested and resulted in 0.00 percent ethyl alcohol.

Cellular Telephone Usage

Based on video evidence, Ms. Aguilar was determined not to have been utilizing her cellular telephone prior to or during the collision.

USA-00370

STATE OF CALIFORNIA

DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**

CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 20 |

**FACTS**

<u>Drivers</u>

<u>Driver #1 – Dinorah Aguilar</u>

<u>Pre-Collision Profile</u>

Due to MAIT's late involvement in this collision investigation, the Pre-Collision Profile was limited to the following:

Ms. Aguilar was hired by Victor Valley Transit Authority (VVTA) as a bus driver on September 25, 2006. She had a brief lapse of employment due to an injury and was reinstated on June 15, 2007. Prior to her employment with VVTA, she was employed as a commercial driver with Laidlaw Incorporated, MV Transportation Incorporated, and Victor Valley Community Hospital. Ms. Aguilar has had her commercial driver license since 1986. She had been driving the Fort Irwin route since October 2013.

On the night before the collision, Ms. Aguilar went to bed at approximately 2100 hours. She woke up at approximately 0130 hours and prepared herself for the day. She ate half a burrito and took her diabetic medication, which included Metformin and Glyburide. The morning was a typical morning and uneventful. She had three stops in Barstow prior to heading towards Fort Irwin. The stops included Walmart, Williams Street and the Barstow cemetery. She stopped at the cemetery at approximately 0435 hours and then headed towards Fort Irwin on Fort Irwin Road. She merged onto the Fort Irwin Road Truck Bypass route at approximately 0502 hours and remained within the #2 lane.

USA-00371

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 21 |

**FACTS**

<u>Drivers</u>

<u>Driver #2 – Steven Kilty</u>

<u>Identification</u>

Mr. Steven Kilty was a 47 year old male with a date of birth of January 23, 1967, and a physical description as follows:

| | | |
|---|---|---|
| Height | - | 5 feet, 10 inches |
| Weight | - | 290 pounds |
| Hair | - | Brown |
| Eyes | - | Blue |

Mr. Kilty was identified by his Arizona Driver License and was determined to be an involved party in this collision by the following:

- His statement regarding his involvement in this collision
- His employment with the registered owner of Vehicle #2

<u>Restraints</u>

Mr. Kilty was in the sleeper berth of Vehicle #2 at the time of the collision.  An evaluation of whether or not Mr. Kilty was utilizing a restraint was not conducted.

<u>Driver License History</u>

Mr. Kilty possessed a valid Class "A" Arizona Commercial Driver License, with a restriction to wear corrective lenses.  A Department of Motor Vehicles (DMV) records check revealed that Mr. Kilty's current driver license was issued on January 22, 2013, and was due to expire on January 23, 2018.

A check of his Arizona driving record revealed the following violations:

| VIOLATION DATE | VEHICLE LICENSE | VEHICLE CODE SECTION VIOLATED |
|---|---|---|
| 05/01/2006 | N/A | S92 (Speeding) |
| 02/27/2009 | N/A | S92 (Speeding) |
| 07/13/2009 | N/A | S92 (Speeding) |
| 05/04/2011 | WCBE218 - AZ | 28-701A (Speeding) |
| 11/25/2013 | 53549W – WI | 28-1104C (Violation of Permit) R17-5-202 395.8E (False Record of Duty Status) |
| 04/03/2014 | N/A | S92 (Speeding) |

CS5x4309.tip

App. 409

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 22 |

## FACTS

### Drivers

#### Driver #2 – Steven Kilty

#### Driver License History

Mr. Kilty had the following mechanical violations noted on his California Driver/Vehicle Examination Reports:

| VIOLATION DATE | VEHICLE LICENSE | VEHICLE CODE SECTION VIOLATED |
|---|---|---|
| 11/23/2009 | AD77240 – AZ 4GE6753 – UT | 393.47E (Brakes out of adjustment) 393.53B (Airbrake adjustment system fails to compensate for wear) 369.3A1B (Unapplied air leak under cab) |
| 12/08/2009 | AD77240 – AZ 4GT5964 – CA | 393.47 (Inadequate brake lining) 396.3A1 (Steering box and hoses leaking) |
| 12/18/2009 | AD77240 – AZ 4CD7906 – CA | 393.48A (Brake contaminated) 396.3A1BA (Brake out of adjustment) 393.11 (Rear red clearance lamp required) |
| 05/18/2010 | AB94562 – AZ 287665Y – ME | 396.3A1 (Applied air loss) 393.207C (Pivot beam bolts loose) |
| 08/17/2010 | AB94562 – AZ W06163 – AZ | 393.45 (Brake tubing or hose defective) |
| 08/31/2010 | AB94562 – AZ 554356 – WI | 393.75A (Inner tire flat) |
| 04/28/2011 | AE07511 – AZ 554334 – WI | 393.45 (Brake tubing or hose defective) |

On September 24, 2014, Mr. Kilty received a citation in Alamorgordo, New Mexico, while operating Vehicle #2 for the following violations:

| VIOLATION DATE | VEHICLE LICENSE | VEHICLE CODE SECTION VIOLATED |
|---|---|---|
| 09/24/2014 | 53559W - WI | **392.2MI (Vehicle Parked in Right Hand Lane of Road)** 395.3A2-PROP (Driving Beyond 14 Hour Duty Period) 392.2MI (Driver Without OS/OW Permit) 396.1 (Driver Must Have Knowledge and Comply With FMCSR) 392.2 (Driver Has No OS/OW Flags or Banners) 393.100A (No or Improper Load Securement) |

App. 410

USA-00373

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (*2400*) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 23 |

## FACTS

Drivers

### Driver #2 – Steven Kilty

Medical History

Mr. Kilty's medical history information was not obtained during his initial interview.  Any attempt to obtain further information from Mr. Kilty was met with negative results.

Intoxication

Mr. Kilty was contacted at the scene of the collision by Sergeant Gutierrez and Sergeant Grove.  He did not exhibit signs of intoxication and was determined not to be under the influence drugs or alcohol.  It was not determined if Mr. Kilty submitted to a mandatory blood screening after the collision.

Cellular Telephone Usage

Mr. Kilty was asleep within the sleeper berth of Vehicle #2.  It was not determined whether or not he was utilizing a cellular telephone at the time of the collision.

App. 411

USA-00374

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 24 |

**FACTS**

Drivers

Driver #2 – Steven Kilty

Pre-Collision Profile

Through a search of multiple databases, it was determined that Mr. Kilty was employed by four motor carriers dating back to September 2008.  FBN Transportation appeared to be his most current employer.

Mr. Kilty provided a preliminary statement at the scene of the collision.  On November 21, 2014, Special Agent Wood received notification from Mr. Williamson, attorney representing Mr. Kilty, that Mr. Kilty would not provide any further information pertaining to the collision or his pre-collision profile.

Inland Division MAIT also attempted to interview Mr. Kilty; however, Mr. Williamson reiterated that Mr. Kilty would not be providing any further information.

USA-00375

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (*2400*) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 25 |

## FACTS

<u>Occupants</u>

<u>Vehicle #1 (NABI Bus)</u>

The following diagram illustrated the seating configuration for Vehicle #1 at the time of the collision.  The illustration was utilized at the time the passengers were interviewed by FIPD and/or CID, in order to establish their seating position.



<u>Passenger Dail Lee Keiper</u>:  Mr. Dail Keiper was seated in seat #39 at the time of the collision.  This was established by the following:

- The statement from other passengers within Vehicle #1
- The location he was found at the time first responders arrived at the collision scene

<u>Passenger Ariel Kayleen Derosier</u>:  Ms. Derosier was seated in seat #29 at the time of the collision.  This was established by the following:

- Her statement and the statements from other passengers within Vehicle #1

<u>Passenger Naiomi Andrea Bridgette</u>:  Ms. Bridgette was seated in seat #14 at the time of the collision.  This was established by the following:

- Her statement and the statements from other passengers within Vehicle #1

<u>Passenger Jermaine Ratliff</u>:  Mr. Ratliff was seated in seat #13 at the time of the collision.  This was established by the following:

- The statement from Ms. Bridgette and the statements from other passengers within Vehicle #1

USA-00376

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 26 |

## FACTS

Occupants

Vehicle #1 (NABI Bus)

Passenger Jesus Aguilar:  Mr. Aguilar was seated in seat #35 at the time of the collision. This was established by the following:

- His statement and the statements from other passengers within Vehicle #1

Passenger Pedro Martinez:  Mr. Martinez was seated in seat #22 at the time of the collision.  This was established by the following:

- His statement and the statements from other passengers within Vehicle #1

Passenger Michael Chestnut:  Mr. Chestnut was seated in seat #5 at the time of the collision.  This was established by the following:

- The statements from other passengers within Vehicle #1

Passenger Misiona Tusieseina:  Mr. Tusieseina was seated in seat #9 at the time of the collision.  This was established by the following:

- His statement and the statements from other passengers within Vehicle #1

USA-00377

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 27 |

## FACTS

Autopsy and Injury Descriptions

Passenger Dail Lee Keiper

Mr. Keiper was pronounced dead at the scene of the collision by the responding medical personnel at 0514 hours. An on-scene coroner investigation examination of Mr. Keiper was performed by Coroner Deputy D. Sobiesiak. Mr. Keiper was subsequently transported to the San Bernardino County Coroner's Office where an autopsy was performed. Coroner case number 701404229 was assigned.

On Wednesday, June 4, 2014, an autopsy of Mr. Keiper was conducted by Dr. C. Changsri. According to the autopsy report, the cause of death was determined to be "multiple blunt force injuries." Mr. Keiper sustained the following traumatic injuries as a result of this collision. The following is not all inclusive:

- Fractures of the:
    - Skull
    - Both clavicles
    - Sternum
    - Right and left ribs
    - Right tibia
    - Right fibula
    - Mandible
- Laceration of right chest wall
- Avulsion of right lung
- Lacerated ascending aorta
- Lacerated liver
- Lacerated tongue

App. 415

USA-00378

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 28 |

### FACTS

<u>Autopsy and Injury Descriptions</u>

<u>Vehicle #1 (NABI Bus)</u>

<u>Driver Dinorah Aguilar</u>

Ms. Aguilar complained of pain to her left side following the collision and was transported to Weed Army Community Hospital by a United States Army Ambulance.

- Leg fracture
- Hip fracture

<u>Passenger Ariel Kayleen Derosier</u>

Ms. Derosier sustained the following injuries as a result of this collision and was transported to Weed Army Community Hospital by a United States Army Ambulance.

- Head injury
- Right knee pain

<u>Passenger Naiomi Andrea Bridgette</u>

Ms. Bridgette sustained the following injuries as a result of this collision and was transported to Loma Linda Medical Center by a United States Army Air Ambulance.

- Head injury
- Fractured leg

<u>Passenger Jermaine Ratliff</u>

Mr. Ratliff sustained the following injuries as a result of this collision and was transported to Loma Linda Medical Center by a United States Army Air Ambulance.

- Head injury

<u>Passenger Jesus Aguilar</u>

Mr. Aguilar sustained the following injuries as a result of this collision and was transported to Arrowhead Regional Medical Center by Mercy Air Ambulance.

- Right arm amputation

USA-00379

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 29 |

## FACTS

Autopsy and Injury Descriptions

Vehicle #1 (NABI Bus)

Passenger Pedro Martinez

Mr. Martinez was sustained the following injuries as a result of this collision and was transported to Weed Army Community Hospital by United States Army Ambulance.

- Leg fracture
- Hip fracture

Passenger Michael Chestnut

Mr. Chestnut was sustained the following injuries as a result of this collision and was transported to Weed Army Community Hospital by United States Army Ambulance.

- Head laceration

Passenger Misiona Tusieseina

Mr. Tusieseina was sustained the following injuries as a result of this collision and was transported to Barstow Hospital by Desert Ambulance.

- Back and lower extremity pain

USA-00380

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 30 |

## FACTS

Physical Evidence

FIPD documented the physical evidence related to this collision and created a physical evidence diagram. On May 14, 2015, Inland Division MAIT returned to the collision scene and utilized a Leica 1200 GPS system to document the physical evidence, as marked by FIPD, and the scene in relation to the surrounding environment. The longitude and latitude positions for each item were recorded using a GPS Rover that was two-way radio linked to the Instrument Base. The positions were recorded in the earth-centered, earth fixed, World Geodetic System (WGS-1984) coordinate system and converted to Easting and Northing coordinates using Leica Geo software. All measurements were in feet within this section.

A reference line, Reference Line "A," was established at a concrete asphalt seam located north of the collision location. Reference Line "A" was placed on the physical evidence diagram.

The origin of the coordinate system was designated as "Instrument Base" on the Physical Evidence Diagram. The Instrument Base was located 132.2 feet south of Reference Line "A" and 28.3 feet west of the yellow edgeline of the truck bypass route. The base location had an easting of 6933625.1572 feet, a northing of 2257040.6870 feet, and an elevation of 2873.9355 feet.

Physical Evidence Location and Description

| ITEM | POINT(S) | ITEM DESCRIPTION AND WIDTH AT SPECIFIC DATA POINTS |
|---|---|---|
| A | 121-140 | Multiple areas of scrape marks |
| | 121 | Begin scrape mark, 0.1 foot in width |
| | 122 | End scrape mark, 0.1 foot in width |
| | 123 | Begin scrape mark, 0.1 foot in width |
| | 124 | Point on mark, 0.1 foot in width |
| | 125 | Point on mark, 0.1 foot in width |
| | 126 | End scrape mark, 0.1 foot in width |
| | 127 | Begin scrape mark, 0.1 foot in width |
| | 128 | Point on mark, 0.1 foot in width |
| | 129 | End scrape mark, 0.1 foot in width |
| | 130 | Begin scrape mark, 0.1 foot in width |
| | 131 | Point on mark, 0.1 foot in width |
| | 132 | End scrape mark, 0.1 foot in width |
| | 133 | Begin scrape mark, 0.5 foot in width |
| | 134 | End scrape mark, 0.1 foot in width |
| | 135 | Begin scrape mark, 0.1 foot in width |
| | 136 | End scrape mark, 0.1 foot in width |
| | 137 | Begin scrape mark, 0.1 foot in width |
| | 138 | End scrape mark, 0.1 foot in width |
| | 139 | Begin scrape mark, 0.1 foot in width |
| | 140 | End scrape mark, 0.3 foot in width |

App. 418

USA-00381

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 31 |

## FACTS

Physical Evidence

Physical Evidence Location and Description

| ITEM | POINT(S) | ITEM DESCRIPTION AND WIDTH AT SPECIFIC DATA POINTS |
|---|---|---|
| B | 141-150 | Multiple areas of scrape marks |
| | 141 | Begin scrape mark, 0.1 foot in width |
| | 142 | Point on mark, 0.1 foot in width |
| | 143 | End scrape mark, 0.1 foot in width |
| | 144 | Begin scrape mark, 0.3 foot in width |
| | 145 | Point on mark, 0.1 foot in width |
| | 146 | Point on  mark, 0.1 foot in width |
| | 147 | End scrape mark, 0.2 foot in width |
| | 148 | Begin scrape mark, 0.1 foot in width |
| | 149 | Point on mark, 0.1 foot in width |
| | 150 | End scrape mark, 0.1 foot in width |
| C | 151-173 | Multiple areas of tire friction marks |
| | 151 | Corner of duel tire friction mark |
| | 152 | Corner of duel tire friction mark |
| | 153 | Begin tire friction mark, 10.1 feet in length, 0.3 foot in width* |
| | 154 | Begin tire friction mark, 12.5 feet in length, 0.4 to 1.0 foot in width* |
| | 155 | Begin tire friction mark, 5.1 feet in length, 0.3 foot in width* |
| | 156 | Begin tire friction mark, 5.2 feet in length, 0.3 foot in width* |

* Tire friction mark placement was estimated based on photographs

Vehicle Positions of Rest

The position of rest locations for the involved vehicles was estimated based on scene
photographs taken following the collision.

USA-00382



Fort Irwin Road Truck Bypass Route

USA-00383

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 33 |

**FACTS**

Physical Evidence

The following evidence items were collected by either FIPD or CID:

- 1 General Electric MobileView removable HDD system, which was removed from Vehicle #1
- 1 CD-R containing traffic collision video footage

The above items remained in the custody of CID.

USA-00384

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 34 |

## FACTS

### Vehicle Descriptions and Damage

#### Vehicle #1 (NABI Bus)

| | | |
|---|---|---|
| Year | – | 2010 |
| Make | – | North American Bus Industries (NABI) |
| Model | – | 40-LFW CNG |
| License number | – | 1358342 (California exempt) |
| VIN | – | 1N940501XAA140432 |
| Engine | – | Compressed Natural Gas |
| Transmission | – | Automatic |
| Color | – | Green |
| Odometer | – | Indeterminate |

#### Registered Owner

Victor Valley Transit
17150 Smoke Tree Street
Hesperia, California 92345

#### Location

MAIT investigators inspected Vehicle #1 on Thursday, August 13, 2015, at approximately 1330 hours.  The inspection was conducted at:

Victor Valley Transit
17150 Smoke Tree Street
Hesperia, California 92345

USA-00385

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 35 |

## FACTS

<u>Vehicle Damage Descriptions</u>

<u>Vehicle #1 (NABI Bus)</u>

<u>Overview</u>

Vehicle #1 sustained major right front and right side damage, with a principal direction of force (PDOF) from front to rear (*Figure 7*).



*Figure 7*

USA-00386

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 36 |

**FACTS**

Vehicle Damage Descriptions

Vehicle #1 (NABI Bus)

Front

The roof was collapsed downward on the right side, causing the left side window support to bend outward. All windshield glass was missing from the vehicle. The bumper was displaced upward and rearward on the right side, which caused the left side to be displaced outward and downward. The bicycle rack, attached to the bumper, was also displaced rearward and upward. The right side of the bumper and bicycle rack were pushed into the fiberglass cowl, which covered electrical and mechanical components in the front of the bus. The left side of the cowl was displaced outward, exposing the components behind it. Structural components behind the bumper were pushed rearward and upward on the right side (*Figure 8*).



*Figure 8*

USA-00387

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 37 |

**FACTS**

Vehicle Damage Descriptions

Vehicle #1 (NABI Bus)

An exemplar 2010 NABI bus (VIN 1N940501BAA140428) was inspected and photographed at the Victor Valley transit yard. The exemplar bus was equipped with a forward mounted bicycle rack that appeared identical in design and placement to the bicycle rack that was mounted on the front of Vehicle #1 at the time of the collision (*Figures 9 and 10*).



*Figure 9*



*Figure 10*

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 38 |

## FACTS

Vehicle Damage Descriptions

Vehicle #1 (NABI Bus)

Right

A significant amount of the sheet metal "skin," including the window frames, were torn and pushed rearward; which exposed interior components of the vehicle, insulating material, and electrical wiring. Window glass from the two forward windows was missing. Portions of the fiberglass roof structure sustained cracks with missing pieces. The forward portion of the floorboard was exposed and displaced upward. Front suspension components and the front wheel were displaced rearward. The front tire sustained significant gouges; however, remained inflated (*Figures 11 through 13*).



*Figure 11*



*Figure 12*



*Figure 13*

USA-00389

STATE OF CALIFORNIA

DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**

CHP 558 (REV. 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 39 |

**FACTS**

Vehicle Damage Descriptions

Vehicle #1 (NABI Bus)

Rear

This section did not sustain damage attributable to this collision.

Left

This section did not sustain damage attributable to this collision.

USA-00390

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (*2400*) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 40 |

**FACTS**

Vehicle Damage Descriptions

Vehicle #1 (NABI Bus)

Interior

Significant damage was noted to the front right passenger space within Vehicle #1. The damage included torn and bent sheet metal, and structural components which intruded into the passenger space surrounding seats #36 to #40. The intrusion was isolated to the front right of Vehicle #1, extending to the right rear door. The torn sheet metal exposed interior wiring and insulation. Multiple handrails within Vehicle #1 were bent and torn away from their securement points. Broken glass panels were noted throughout the interior. The floorboard and steps at the right front of the vehicle were cracked and pushed upward. This caused induced damage to the payment collection device and the structural components surrounding the device. Seats #38, #39 and #40 were bent and pushed rearward. The seat backs for the seats were also bent downward (*Figures 14 through 17*).



*Figure 14*



*Figure 15*



*Figure 16*



*Figure 17*

USA-00391

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 41 |

**FACTS**

Vehicle Damage Descriptions

Vehicle #1 (NABI Bus)

Occupant Restraints

Vehicle #1 was not furnished with restraints for passengers, nor was it required.  The driver's seating position in Vehicle #1 was equipped with a Type 1 (pelvic restraint), 2-point occupant restraint system.  Upon inspection, the restraint was found unlatched and in its retracted position.  The restraint extended with ease and spooled into its retracted position without issue.

USA-00392

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 42 |

**FACTS**

Vehicle Damage Descriptions

Vehicle #2 (Volvo VNL)

| | | |
|---|---|---|
| Year | – | 2006 |
| Make | – | Volvo |
| Model | – | VNL |
| License Number | – | 53549W (Wisconsin) |
| VIN | – | 4V4NC9TGX6N386310 |
| Engine | – | Diesel |
| Transmission | – | Manual |
| Color | – | Blue |
| Odometer | – | Indeterminate |

Registered Owner

FBN Transportation, LLC
504 Pine Street #126
Athens, Wisconsin 54411

Location

Vehicle #2 was not inspected by MAIT investigators.  The following damage description
was based on photographs taken at the collision scene.

USA-00393

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 43 |

## FACTS

Vehicle Damage Descriptions

Vehicle #2 (Volvo VNL)

Damage Overview

From the photographs taken by on-scene investigators, it did not appear Vehicle #2 sustained damage from this collision (*Figures 18 through 20*).



*Figure 18*



*Figure 19*



*Figure 20*

USA-00394

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 55B (REV. 9-0B) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 44 |

**FACTS**

Vehicle Damage Descriptions

Vehicle #2A (Manac Trailer)

| | | |
|---|---|---|
| Year | – | 2014 |
| Make | – | Manac |
| Model | – | Semitrailer |
| License Number | – | 674498 (Wisconsin) |
| VIN | – | 2M5521468E1138738 |
| Color | – | Black |
| Odometer | – | Not Applicable |

Registered Owner

Amston Supply Incorporated
1521 Waukesha Road
Caledonia, Wisconsin 53108

Location

Vehicle #2A was not inspected by MAIT investigators.  The following damage description
was based on photographs taken at the collision scene.

App. 432

USA-00395

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 45 |

**FACTS**

Vehicle Damage Descriptions

Vehicle #2A (Manac Trailer)

Damage Overview

The damage Vehicle #2A sustained appeared to be minor and isolated to the left rear.  The PDOF was from rear to front with a slight right to left component.

Front

This section of Vehicle 2A did not sustain damage attributable to this collision (*Figure 21*).



*Figure 21*

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 46 |

## FACTS

Vehicle Damage Descriptions

Vehicle #2A (Manac Trailer)

Right

This section of Vehicle 2A did not sustain damage attributable to this collision (*Figures 22 and 23*).



*Figure 22*



*Figure 23*

USA-00397

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (*2400*) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 47 |

**FACTS**

<u>Vehicle Damage Descriptions</u>

<u>Vehicle #2A (Manac Trailer)</u>

<u>Rear</u>

Multiple scrapes and bent railing were noted on the left side (*Figure 24*).



*Figure 24*

C558d399.trp

App. 435

USA-00398

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 48 |

**FACTS**

Vehicle Damage Descriptions

Vehicle #2A (Manac Trailer)

Left

The rear of the flat bed was pushed inward, causing it to buckle upwards (*Figure 25*).



*Figure 25*

App. 436

USA-00399

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (*2400*) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 49 |

**FACTS**

Mechanical Inspection

Due to the nature of the California Highway Patrol's involvement in this collision, a mechanical inspection was not conducted on the involved vehicles.

Between May 19 and May 30, 2014, Vehicle #1 underwent preventative maintenance conducted by Victor Valley Transit Authority mechanics. The maintenance included regularly scheduled servicing and inspection. During that the inspection, some mechanical deficiencies were noted, including an exhaust system leak, a faulty EGR cooler, issues with the rear radius rod, shallow tread depth on the left rear tire, and a cracked cylinder head. These noted mechanical deficiencies were resolved and on May 30, 2014, Vehicle #1 was placed back into service. There were no braking deficiencies noted on the preventative maintenance and inspection documentation supplied by Victor Valley Transit Authority.

No mechanical related deficiencies were claimed by the driver of Vehicle #1, Ms. Aguilar.

USA-00400

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (MAIT use only)

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 50 |

**FACTS**

Other Factual Information

*Truck Stop Procedures*

Fort Irwin had policies pertaining to commercial vehicle traffic. These policies were specified in the National Training Center (NTC) and Fort Irwin Security Plan – Commercial Vehicle Procedures. A portion of the policy dictated the operation of the truck bypass road and included the following statement:

> *During normal operations, "access control personnel are responsible to open and close the commercial vehicle bypass route. The road will be closed MON-FRI for 2 hours from 0600-0800."*

*Transportation Facility Guide*

A Transportation Service Provider (TSP) or carrier is required to reference the Transportation Facilities Guide (TFG) for the particular military installation in which a delivery is being made. The United States Army Military Surface Deployment and Distribution Command specified in the Military Freight Traffic Unified Rules Publication the following:

> *"TSP will review TFG for installation policies regarding the minimum requirements for shipping and receiving hours, installation closures or any other important information."*

According to Mr. Michael Butolph, Deputy Director of Emergency Services at the National Training Center and Fort Irwin, a Carrier and Customer Advisory was created for entry into the TFG on June 13, 2014. The advisory stated the following:

> *"All semi-trailers, delivery trucks, buses, etc. are required to utilize the Fort Irwin Bypass Road. The Bypass Road requires that all delivery vehicles, semi-trailers, etc. stop in the right lane of that road from 0600-0800 hrs PST Monday through Friday. Trucks arriving after normally scheduled delivery days/hours, should proceed to the Fort Irwin Main Gate for instructions/directions."*

The above advisory was entered into the TFG after the collision date. In addition, when a change is made to the TFG, the prior entry is purged; therefore, any advisory specific to Fort Irwin prior to June 13, 2014 was not available.

USA-00401

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 555 (REV. 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 51 |

**FACTS**

Other Factual Information

*Bill of Lading*

According to the Military Freight Traffic Unified Rules Publication, a bill of lading is a "contract for carriage of cargo made with a carrier that also operates as a receipt of the goods and documentary evidence of title to the goods."

The Bill of Lading may contain specific delivery information for the particular military installation; however, all attempts to obtain a copy of the Bill of Lading for the delivery made by Mr. Kilty was met with negative results. At the time of this investigation it was undetermined what if any specific information pertaining delivery procedures for Fort Irwin was included on the Bill of Lading.

*Witness*

In the days following the collision, a local San Bernardino newspaper reported that there was a witness who had observed Vehicle #2/2A stopped within the #2 lane of the truck bypass. The witness, who remained anonymous, related that he warned the front gate personnel of the hazard that Vehicle #2/2A posed. All follow-up to determine the identity and to obtain a statement from the possible witness was met with negative results.

*Video Footage*

Vehicle #1 was equipped with a SmartDrive camera recording system that captured video footage of the driver and forward view from within Vehicle #1 at the time of the collision. This video footage was obtained by FIPD and was provided to Inland Division MAIT for analysis.

On January 26, 2016, Investigator Gray obtained a Windows Media Video file (.wmv) from an attorney representing Victor Valley Transit Authority, Mr. Jeremy Alberts, which contained the same video footage provided by FIPD. However, the video footage provided by Mr. Alberts also contained superimposed speed, throttle, RPM and acceleration data. This data was captured by the SmartDrive event recording system which utilized "sensors to capture video, audio and vehicle data from the ECU."[3] It appeared the .wmv file with the superimposed data and graphs was created by proprietary SmartDrive software; however, it was not determined whom or when this video file was created.

---

[3] http://www.smartdrive.net/smartdrivesafety.aspx

USA-00402

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 52 |

## FACTS

Photograph Log

During the course of this investigation, MAIT investigators took 491 digital images of the collision scene and Vehicle #1.  At the conclusion of this investigation, digital media discs containing the images were delivered to CID:

| DATE | DESCRIPTION | PHOTOGRAPHER | NUMBER |
|---|---|---|---|
| 05-14-2015 | Collision scene | D. Finn | 242 |
| 08-13-2015 | Vehicle #1 | P. Gray | 249 |

FIPD and CID took multiple photographs of the collision scene and created a video of a "drive-through" on the truck bypass.  A copy of the electronic data was utilized during the course of this investigation; however, the original digital media remained in the custody of CID.

USA-00403

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 53 |

### STATEMENTS

Interview Documentation

Interviews were conducted by both FIPD and CID.  In total, eight individuals were interviewed regarding this collision.  Any digital media associated with the interviews remained with CID.

Inland Division MAIT did not re-interview the parties or passengers involved in this collision; however, the interviews obtained by FIPD and CID were incorporated into this investigation in the following section.  These statements were copied verbatim from the reports authored by either FIPD or CID.

App. 441

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (MAIT use only)

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 54 |

## STATEMENTS

Driver Dinorah Aguilar

On Monday, June 2, 2014, Sergeant Gutierrez and Sergeant Grove from FIPD, and Special Agent Wood from CID, obtained a statement from Ms. Aguilar while she was in the Weed Army Community Hospital Emergency Room. This statement was not recorded. The following was verbatim from the CID Report of Investigation:

*Party #1 (P-1, Aguilar, D.) was interviewed by myself, Sgt Grove, and SA Wood on 06/02/2014 at 1236 in the WACH ER and related the following information. P-1 (Aguilar, D.) related that she has seven years of employment with Victor Valley Transit Authority and estimated to be a commercial driver license holder since 1986. P-1 (Aguilar, D.) related that she has been driving for buses on Fort Irwin since October 2013. P-1 (Aguilar, D) related that prior to the collision; she last slept at 9:00 PM and woke up for work at 1:30 AM. She related that it was a normal working day with nothing out of the usual. She related that she had three stops prior to reaching Fort Irwin; Walmart in Barstow, Williams in Barstow, and cemetery in Barstow which she related stopping there at 4:35 AM that morning. P-1 (Aguilar, D) related that she driving V-1 on Fort Irwin Road as usual and got onto the Truck Bypass road at approximately 5:02 AM. P-1 (Aguilar, D) related that she was traveling the right lane and was unaware that "buses" were considered to be an "authorized vehicle" which would allow them to travel on the left lane. P-1 (Aguilar, D) describe the morning of the collision as dark and stated that she had her head lights on but did not illuminate far. P-1 (Aguilar, D) related that she was traveling at approximately 40 45 MPH on the Fort Irwin Truck Bypass Road and noticed a truck in her lane with no lights. P-1 (Aguilar, D) related that she tried to avoid it by quickly hitting the brakes, approximately 3 seconds, and serving left of V-2. P-1 (Aguilar, D) related that she works Monday through Friday, drives the same route, same time, and that she never seen a standing truck on the Truck Bypass Road; she stated that it caught her by surprise. P-1 (Aguilar, D) related that she was focused on driving and not on the phone or texting. P-1 (Aguilar, D) related that after the collision, a passenger called 911 and she called her work. P-1 (Aguilar, D) related that she was a diabetic and was taking the following medications: metformin and glyburide. She related that she was also wearing glasses that morning and when asked on why it wasn't annotated on her driver license, she stated that was waiting on the two year medical renewal to add it on.*

On Monday, November 17, 2014, Special Agent Wood interviewed Ms. Aguilar at the CID office on Fort Irwin. James Tedford, Ms. Aguilar's attorney was present at this interview. The interview was digitally recorded and the following is verbatim from the CID Report of Investigation:

*09:56:44 - SA WOOD, Ms. AGUILAR and Mr. TEDFORD enter the interview room.*
*09:57:54 - SA WOOD offers a drink of water to Ms. AGUILAR and Mr. TEDFORD and exits room to let Ms. AGUILAR review her previous statement.*

USA-00405

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 55 |

## STATEMENTS

Driver Dinorah Aguilar

10:01:30 - Ms. AGUILAR stated to Mr. TEDFORD, "I never said I was not aware I was an authorized vehicle allowed to travel on Fort Irwin Road."

10:01:56 - Ms. AGUILAR stated to Mr. TEDFORD, "I said I was only going 40 MPH not 45 MPH."

10:02:38 - Mr. TEDFORD asked Ms. AGUILAR "is everything ok," referring to the statement and Ms. AGUILAR responded "yes."

10:03:03 - SA WOOD reentered the room. Mr. TEDFORD stated "Ms. AGUILAR never stated she was told to drive on Fort Irwin Road instead of the bypass, and was specifically instructed to drive on the bypass and she told the officers she drove 40 MPH and not 40-45 MPH.

10:04:00 - SA WOOD stated he was present at her initial interview and Ms. AGUILAR said those things.

10:04:34 - Ms. AGUILAR stated "VVTA told the drivers to travel on the bypass and to stay within the speed limit." Ms. AGUILAR stated "I was never told by VVTA I could not drive on Fort Irwin Road, but was told to drive on the bypass."

10:05:15 - VVTA told Ms. AGUILAR while she was trained to travel on the bypass. Ms. AGUILAR stated "VVTA brought all of the drivers that are going to drive on Fort Irwin and put us on a bus and drove the road." Ms. AGUILAR related she was aware of the trucks on Fort Irwin Bypass but they were usually there around 0600 and she never saw them.

10:06:48 - Ms. AGUILAR stated "I drove the route every day before the accident."

10:07:05 - Ms. AGUILAR stated VVTA never informed her of any complaints, or was disciplined, or counseled in any way for complaints received.

10:07:30 - Ms. AGUILAR stated "as an operator I check everything but the engine on the bus before I operate it."

10:10:20 - Ms. AGUILAR stated "I received training on how to perform checks on the buses prior to driving them by VVTA."

10:11:03 - Ms. AGUILAR stated "I drive a different bus every day."

10:11:35 - Ms. AGUILAR stated "with a Class B license I am able to drive vehicles which weigh more than 48,000 lbs. with no restrictions."

10:13:10 - SA WOOD clarified there are only two lanes with a shoulder on each side. Mr. TEDFORD stated there were two lanes with an emergency lane.

10:13:55 - Ms. AGUILAR stated she always drove in the right lane of the bypass and never traveled in the left lane.

USA-00406

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (MAIT use only)

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 56 |

### STATEMENTS

Driver Steven Kilty

On Monday, June 2, 2014, Sergeant Grove from FIPD obtained a statement from Mr. Kilty while at the scene of the collision. This statement was not recorded. The following was verbatim from the CID Report of Investigation:

*Party #2 (P-2, Kilty, S.) spoke with Sgt Grove and I on scene and related the following information. P-2 (Kilty, S) related that he had been stopped on the Truck Bypass Road since an estimated time of 8:30 PM because of the sign that was located near the shoulder of the roadway that stated "Check-In Point". P-2 (Kilty, S) related that this was his second time on Fort Irwin, also indicated that the previous time, he had to wait behind other trucks on the bypass road before gaining access to the installation. P-2 (Kilty, S) related that he turned off his vehicle, to include any lighting, so that his battery would not drain. P-2 related that after stopping V-2, he went into the sleeper berth of V-2 and fell asleep. P-2 (Kilty, S) related that he was awoken from his sleep when V-2 was pushed forward and hearing a loud noise. After the collision, P-2 (Kilty, S) described the scene as disorienting and overheard the passengers of V-1 stating that the driver of V-1 had fallen asleep.*

Due to the limited nature of the information gathered during the above interview, Inland Division MAIT requested a second interview from Mr. Kilty. This request was subsequently denied by Mr. Kilty's attorney.

USA-00407

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (MAIT use only)

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 57 |

## STATEMENTS

Passenger Ariel Derosier

On Friday, June 13, 2014, Special Agent S. Swanson from CID, obtained a statement from Ms. Derosier. This interview was obtained at the CID office on Fort Irwin and was not recorded. The following was verbatim from the CID Report of Investigation:

*On June 2nd I woke up around 3:15am and left my house around 3:30am to walk to Walmart to catch the bus that left at 4:15am. I usually take the 4:30am bus that goes to the Barstow cemetery, but I didn't have a ride so I had to walk to the closest bus stop. I arrived at Walmart at 4:10am and sat down and waited for the bus. The bus arrived at 4:15am. When I got on the bus I was going to sit closer to the front but something told to go to the back and lay down so I did. I was the only one to get on at that stop. As soon as the bus drove off I put my backpack in the seat to the left of me and laid down with my head on the backpack. She went to the two stops one at Williams street and the last one at the cemetery. Once she left the cemetery I fell asleep. The next thing I hear is a loud crushing sound and I am being thrown into the sit in front of me. I didn't realize what was going on until I stood up. Once I stood up and got focused, I saw the man lying in over the sit with his skull cracked open. When I realized what had happened I called 9-1-1 around 5:15am. Then the mother was yelling, "Where is my son?" while she was walking back to the back of the bus. When she got to the step she fell and then started going in and out of consciousness. The Samoan guy found the little boy and the little boy walked to his mom and laid down trying to go to sleep next to her. Then I saw the other guy with the amputated arm and he was passed out. A couple seconds later he came to and started screaming and saying help me. That is when the guy with a cut on his head started trying to calm him down. Saying, "don't move, and to calm down". I saw the bus driver get up and going to the exit window to open it but then she stopped and I think she sat down but I am not sure. The Samoan guy saw a semi coming and opened the emergency window tried waving it down but it didn't stop. So he climbed out and the next on that came by pullover. That is when I thought that we should get the little boy off the bus, so he did not see everything. So I yelled for the Samoan guy to come back to the window and I asked him if we should get the little boy off and he said yes. So I handed him the boy and he took him to the side of the road. That is when the other soldier got up from the front and tried walking back to his stuff in the back saying I need my ID. I told him don't worry about it, and that he needed to sit down. A few seconds later I had to get off the bus because I could not take any more of the yelling or it was going to break me down. So I climbed through the same window and went to the side of the road and sat down were the little boy and Samoan guy was. That is when I realized I was injured in my right knee and the right side of my head. A few minutes later the police showed up and then ambulance. That is when I got off the phone with 911. When the fire department got there they started taking the door off so they could get to the guy with the amputated arm. When the firefighter came to me he put an ice pack on my*

App. 445

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (MAIT use only)

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 58 |

## STATEMENTS

Passenger Ariel Derosier

knee then took me to the ambulance to sit down and waited a minute for another passenger. The person who got in the ambulance was the bus driver. She asked if I was ok but I didn't answer her. As soon as they loaded her up we left for the hospital. They said that I have a concussion and that my knee is badly bruised and scheduled an appointment for me to go see the TBI doctor. They released me from the hospital the same day in the afternoon and told me to follow up with my primary care doctor in three days. I went to my primary doctor and they scheduled me for an MRI for a head injury and came back with negative results. My primary care doctor stated that he believed I had torn ligaments in my knee and has referred me to an MRI.

Q: SA SWANSON.
A: SPC DEROSIER.
Q: Did you type the above narrative?
A: Yes.
Q: How long have you rode on the bus on the route for?
A: About month and a half.
Q: Can you describe how the rides are normally?
A: Usually she speeds and goes fast around the curves.
Q: Have you ever been concerned for your safety prior to the accident?
A: No.
Q: Can you describe the bus driver?
A: She is Hispanic, short, long black hair, wore glasses, and heavy set.
Q: Did she always wear glasses?
A: Yes.
Q: Do you know if her glasses are for nearsighted or farsighted?
A: No.
Q: Do you know any of the passenger's names?
A: I know the man who is deceased. His name is Dale.
Q: Can you further describe the Samoan male?
A: He is tall, heavy set, short hair. He was wear a black shirt and Khakis that day.
Q: Can you describe the man with the gash on his head?
A: He was tall, white, short hair. He had on blue jacket and jeans.
Q: Can you describe the little boy?
A: He was about 5-6 years old, he was black. He had on a red jacket and blue jeans.
Q: Can you further describe the little boy's mother?
A: She was black, a little taller than me. I think she had a black sweater on.
Q: Can you describe the Soldier?
A: He was white, he was wearing PT's with his fleece cap. His name was Martinez. He was with Maintenance Troop, RSS, FICA.
Q: What were the lighting conditions about the time of the accident?
A: The sun was starting to come up. It wasn't too dark but it wasn't too light. It was right about dawn.

App. 446

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (MAIT use only)

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 59 |

## STATEMENTS

Passenger Ariel Derosier

> Q: Can you describe what was going through your mind when you realized you had been in an accident?
>
> A: I was confused. I was wondering why it happened. I just thought about calling 911 to get help.
>
> Q: Why do you think the bus driver just sat down after the accident?
>
> A: I think she went into shock and realized what she had actually done.
>
> Q: Did you feel anything that indicated that the bus driver did to prevent an accident?
>
> A: No.
>
> Q: Can you describe what it feels like when you are a passenger and someone corrects a vehicle?
>
> A: You feel a jerk. Your body moves with the jerk. It makes your body jump and scares you for a second.
>
> Q: Has the bus driver ever fallen asleep while driving previously?
>
> A: No.
>
> Q: Is this bus driver the normal bus driver for the route?
>
> A: Yes.
>
> Q: How has this accident affected you?
>
> A: I cannot sleep at night and it runs through my mind all day. I can't focus at work and keep burning myself
>
> Q: Did you burn yourself at work a lot prior to the accident?
>
> A: No.
>
> Q: Do you still ride VVMT Buses?
>
> A: No.
>
> Q: Is there any other passengers that normally ride the bus that did not ride it that day?
>
> A: Yes, SSG Curtis Skinner and SSG Gregory Hoegle both cooks in HHT, RSS, FICA. There is another man who works in my company but I cannot remember his name
>
> Q: In your narrative, you referred to she went to two other stops; who is she?
>
> A: The bus driver.
>
> Q: Did you witness the bus driver make any phone calls?
>
> A: No.
>
> Q: Do you know if the bus driver tried to call 911?
>
> A: No.
>
> Q: Did the bus driver try to help anyone?
>
> A: She did not.
>
> Q: Can you provide a rough sketch of where you were sitting?
>
> A: Yes.
>
> Q: Have you been contacted anyone other than law enforcement?
>
> A: No.
>
> Q: Did you see if the driver was asleep that morning?
>
> A: No.

USA-00410

STATE OF CALIFORNIA

DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**

CHP 558 (REV. 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 60 |

## STATEMENTS

Passenger Ariel Derosier

> *Q: Why have you not been riding with the bus?*
> *A: Because of the crash. I panic when I see buses.*
> *Q: Have you ever felt the bus driver hit rumble strip?*
> *A: There are a couple of times.*
> *Q: Have you filed a complaint?*
> *A: No.*
> *Q: Do you plan on filing a complaint?*
> *A: Yes with the bus company. I am trying to find out my rights first before I do it.*
> *Q: Has anyone complained about the bus driver's driving'?*
> *A: I do not know*
> *Q: Do you have anything else to add to this statement?*
> *A: No*

USA-00411

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (MAIT use only)

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 61 |

## STATEMENTS

Passenger Naiomi Bridgette

On Thursday, June 26, 2014, Special Agent B. Moore from CID, obtained a statement from Ms. Bridgette. This interview was obtained at the CID office on Fort Irwin and was not recorded. The following was verbatim from the CID Report of Investigation:

*On Monday, 2 Jun 14, I got up with my son at 0300 to eat and get dressed. We left the house between 0350 -0355. I pushed my son in the stroller to the bus stop. The bus stop is on William Street, by a parking lot and a bunch or individual businesses. The bus came at 0425. Alter my stop is the cemetery stop. I am not sure what time we arrived at the cemetery. After the cemetery the bus headed to Fort Irwin. I am not sure if it happened before or after the cemetery but I felt the bus jerk a little. I am not sure if anyone else noticed. Shortly after that I fell asleep and so did my son. My son was sitting next to me with his head in my lap and I was hunched over him. We were sitting towards the back of the bus. It was riding smoothly and then I heard a loud bang and I was knocked from my seat onto the floor. I don't know if I blacked out or not. I noticed my head was towards the floor and I could see my blood on the floor. I looked back because I felt pain in my leg and I looked at it and it was turned. I could not move it. I then looked up to see what was going on and straight to the front or the bus. I noticed a gentleman was slouched in a seat and all I could see was his head. He was hunched over. I just thought wow he is not moving or anything. Next to him maybe a seat before him was my coworker, Jesus. He was straight up in his seat. I saw the bus where the accident occurred on his side. I hear him saying my arm, my arm, where is my arm. I can't feel my arm. He was the only one speaking and then I looked over trying to find my son. I am not sure how he survived. He was flung out of his seat too. I am not sure if someone caught him. He was standing up and he started calling "mommy" and then he ran to me. Then I heard someone say she is right here. He ran to me and gave me a hug. Then someone pulled him away from me. Shortly after that I saw the bus driver walk across the bus. I said to her "oh my gosh, what happened?" I was freaked out because she was standing next to me uninjured. I asked her to call my boyfriend. She was going to call my boyfriend and then emergency services arrived. She turned away from me and was speaking to a firefighter. Before she walked away I grabbed her leg and said "I need someone to hold me, I am in pain." I was holding on to her and the firefighter pulled her away. The more I heard Jesus saying "My arm, my arm," I started to become more aware or my pain and told people "I am in pain and hurt." The fire fighter told me to hold still or I would make my injury worse. I felt like everyone was ignoring me. Then a fire fighter came in after me and they were trying to saw a pole that was blocking me from getting out of the bus. Then the fire fighter told me they were going to get me out. I saw blood leaking from my leg. My nose and lip were busted and I could see where I bled on the floor. I was then put in an ambulance. Someone was talking to me and I was zoning in and out. I just kept asking where is my son where is my son. I was told he is coming and would be in the ambulance with me. I heard one of the emergency services guy say how my son was acting strange and unresponsive.*

USA-00412

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 555 (REV. 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 62 |

## STATEMENTS

Passenger Naiomi Bridgette

> *My son Jermaine D. RATLIFF was on the ambulance with me and vomited. The ambulance went to a helipad and my son and I were airlifted to the hospital. They were trying to put something into my sons nose and he just kept saying "No, no, no." I did hear them try and calm down Jermaine. I remember someone placing my hand on Jermaine's hand to calm him down. We were taken to Loma Linda University Hospital for treatment.*

Q: SA MOORE
A: Ms. BRIDGETTE
Q: Did you provide the above narrative which SA MOORE typed?
A: Yes.
Q: How often do you ride the bus to Fort Irwin?
A: Monday through Friday. I recently stopped riding on Mondays because of school. I was not supposed to be on the bus that day but my boss put me on the schedule.
Q: Do you ride the bus at the same time every day?
A: Yes unless I am late. If I don't catch that bus I catch the 0525, 0605, or the 0630 bus.
Q: How often do you ride the 0425 bus?
A: Normally I am on that bus.
Q: Why do you ride the bus to Fort Irwin?
A: Togo to work at Burger King. I come early because I have to walk Jermaine to school before I start my shift.
Q: Is the bus driver always the same?
A: No, She has only been there for a couple of months.
Q: Since the new driver took over has she been the driver consistently?
A: I don't know I sometimes miss the bus.
Q: When you have been on the bus has it been the same driver from 2 Jun 14?
A: It was a mix of the driver from the accident and another driver who is a black woman.
Q: Do you know either of the driver's names?
A: No.
Q: Do you know the name or the bus driver on 2 Jun 14?
A: No, but I have seen a paper since the accident and I believe the driver's name is Lisa or Leslie.
Q: Have you ever ridden the bus with the Driver from the accident on 2 Jun 14?
A: Yes
Q: Have you ever heard any of the other passengers on the bus complain about the driver from 2 Jun 14?
A: No.
Q: Did you ever hear anyone complain about the driver from 2 Jun 14, driving erratically?
A: Yes.

USA-00413

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 63 |

## STATEMENTS

Passenger Naiomi Bridgette

> *Q: What were the complaints?*
> *A: I don't remember what they said. I just know people were talking about her driving.*
> *Q: Have you ever seen other vehicles parked on the by-pass road where the accident occurred?*
> *A: I don't pay attention, once we get on the bus, my son and I go to sleep.*
> *Q: When you ride the bus does it always use the by-pass lane?*
> *A: Yes.*
> *Q: Did you feel any sudden movements or jerks prior to the accident?*
> *A: I did not feel any jerks but I heard the bus hit the rumble strip on the side of the road and it seemed like she drove on it for a while.  It woke me up and then I went back to sleep.  I remember it because it was the first time I have ever heard that noise on the bus.*
> *Q: Did the bus driver on 2 Jun 14, fall asleep while driving?*
> *A: I have no idea.*
> *Q: When you looked up and around the bus after accident, how much light was there outside or the bus?*
> *A: It was not dark.  There was enough light outside to see.  But I don't remember if I noticed the light before or after I got off the bus.*
> *Q: Did you see the bus driver provide aid to any of the injured passengers?*
> *A: Nope.*
> *Q: Did anyone prior to the Emergency Services personnel provide you with aid?*
> *A: No.*
> *Q: I am showing you a diagram of the bus that you rode that day. Can you provide the number of the seat you were seated in the day of the incident?*
> *A: I am not sure exactly.  I was in one of the seats 11-14.*
> *Q: Referring to the same diagram, do you remember where the other passengers were seated on the bus?*
> *A: There was a passenger underneath a bunch of metal in front of Jesus.  I don't know which seat and I do not know his name.  Jesus was in one of the seats behind the guy buried under the metal, one of the seats between 34-37.  There was an Army guy sitting on the back of the bus in the row 20-24.*
> *Q: Did you see where the other passengers were on the bus?*
> *A: No.*
> *Q: What injuries did you receive from the accident?*
> *A: Broken fibula, busted lip, and I lost a tooth.  They put a metal plate in my leg to correct the injury.*
> *Q: What injuries did Jermaine sustain from the accident?*
> *A: Honestly I am not sure if he had any injuries.  The hospital told me everything is fine.*
> *Q: How has this accident affected your everyday life?*
> *A: I can't work, I can't walk, I don't feel like I speak right.  I am in so much pain at night I have to take a bunch of pills.*

USA-00414

STATE OF CALIFORNIA

DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**

CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 64 |

## STATEMENTS

Passenger Naiomi Bridgette

> *Q: Are you able to sleep at night?*
> *A: No.*
> *Q: Why can't you sleep?*
> *A: Because of the pain in my leg.*
> *Q: How has the accident affected Jermaine?*
> *A: I noticed his behavior has changed.  When he goes to the bathroom, he has been forgetting to wipe off, like he has short term memory loss. He has had trouble sleeping.  He cries in his sleep.*
> *Q: Did he used to cry in his sleep?*
> *A: No.*
> *Q: Have you and Jermaine been receiving the care you need?*
> *A: Yes we have.*
> *Q: Do you have anything else to add to this statement?*
> *A: No*

App. 452

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 65 |

## STATEMENTS

Passenger Jesus Aguilar

On Tuesday, June 17, 2014, Special Agent B. Moore from CID, obtained a statement from Mr. Aguilar. This interview was obtained at the CID office on Fort Irwin and was not recorded. The following was verbatim from the CID Report of Investigation:

*I got on the bus at 0425 at Williams street. After the final stop at the cemetery at 0435 we headed to Fort Irwin. I fell asleep right after we left the cemetery. When I woke up I noticed my glasses were gone and my arm was pinned. It was in front of me on the right side under some metal. I noticed Mr. KEIPER under all of the metal. I noticed Mr. CHESTNUT was bleeding from the face and I saw the bus driver who appeared to be in shock from the accident. I heard Mrs. BRIDGETTE behind me complaining about being in pain. I am near sighted so I can only see so far in front of me without my glasses. There was also a Samoan on the bus who everyone calls "T". That is all I can remember. The next thing I know they take Mrs. BRIDGETTE out and they are strapping me down to a gurney. They placed me on a helicopter for emergency services.*

*Q: SA MOORE*
*A: Mr. AGUILAR Jr.*
*Q: Did you provide the above narrative which SA MOORE typed?*
*A: Yes.*
*Q: How often do you ride the bus to Fort Irwin?*
*A: I ride the bus three days a week, Mondays, Thursdays and Fridays. I drive on the weekends.*
*Q: Is the bus driver always the same?*
*A: No, they do change out every so often.*
*Q: Do you know the name of the bus driver that day?*
*A: No.*
*Q: Have you ever ridden the bus with the Driver from the day of the incident?*
*A: I have no idea. They change them out so often and I am usually asleep on the bus.*
*Q: Have you ever heard any of the other passengers on the bus complain about the driver?*
*A: No, they complain about being late, but only because we have a new driver and they are not used to the route.*
*Q: Did you ever hear anyone complain about a driver, driving erratically?*
*A: No, not that I can remember.*
*Q: Have you ever seen other vehicles parked on that road?*
*A: Yes, I have seen big rigs parked on the side of the road before, usually when I am driving myself.*
*Q: At what times did you see these trucks parked on the side of the road?*
*A: I have no idea.*
*Q: Did you feel anything during the bus drive prior to the accident?*
*A: No, I did not wake up until after the accident was over.*

USA-00416

STATE OF CALIFORNIA

DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**

CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 66 |

## STATEMENTS

Passenger Jesus Aguilar

    *Q: Did you see the bus driver provide aid to any of the injured passengers?*

    *A: Not that I saw.*

    *Q: Did anyone provide you with aid?*

    *A: I don't remember I only remember emergency services helping me.*

    *Q: I am showing you a diagram of the bus that you rode that day, can you provide the number of the seat you were seated in the day of the incident?*

    *A: I was seated in seat 34 and 35.*

    *Q: Referring to the same diagram, do you remember where the other passengers were seated on the bus?*

    *A: Mr. KEIPER was in seats 38, 39, and 40.*

    *Q: Did you see where the other passengers were on the bus?*

    *A: No, I know that Mrs. BRIDGETTE normally sits in the back of the bus around seats 25-27. I don't remember any of the other passengers.*

    *Q: Do you have anything else to add to this statement?*

    *A: No*

USA-00417

STATE OF CALIFORNIA

DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**

CHP 558 (REV. 9-08) OPI 065 (MAIT use only)

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 67 |

## STATEMENTS

Passenger Pedro Martinez

On Thursday, June 19, 2014, Special Agent S. Swanson from CID, obtained a statement from Mr. Martinez. This interview was obtained at the CID office on Fort Irwin and was not recorded. The following was verbatim from the CID Report of Investigation:

*I was at the bus stop at L Street, Barstow, CA and I entered the bus around 0425. Then we headed to the next bus stop at the Cemetery in Barstow, CA. That was around 0430-0435. When the driver left the Cemetery, we headed to the base on Fort Irwin. We were on Fort Irwin Road. I was between being sleep and being awake, and I felt the driver hit the rumble strip on the left side of the bus. I then fell completely asleep, because I do not remember everything after that. I then felt a big hit and a loud boom. That was the moment I felt myself moving to the front of the bus. Then I saw the light coming on of the bus. The first thing I saw was the old man who died in front of me. I saw the burger king guy who lost his arm. After that, I started to check myself. I saw everything was okay. I did not lose any arms or legs. I did not feel like my head had been hit. I started to try to move myself from the front of the bus to the middle part of the bus in front of the middle door. That is when the other guy that had minor lacerations started to call 911. They started to assist the other passengers. I related to him that I was okay. Then the paramedics and the fire department of Fort Irwin arrived to the crash site. They broke the door and they were asking me if I was okay. I answered that I had a possible fracture in my hip. They took me out of the bus and put me in the ambulance. They drove me to the ER on Fort Irwin. After that I do not know what happened to the other guys. I just remember that I saw after the crash I saw the 18 wheeler trailer and the recovery truck. After the paramedic brought me to the ER, they stabilized me and sent me to Loma Linda Hospital. I had an open wound in my left leg and open wound on my left butt cheek. I also had a pelvis fracture and a surgery to repair it.*

*Q: SA SWANSON*
*A: SPC MARTINEZ-MIRANDA*
*Q: Did you type the above narrative?*
*A: No.*
*Q: Is the above narrative in your own words?*
*A: Yes.*
*Q: Can you describe the other people who were on the bus?*
*A: One was a Samoan guy but I do not know his name. He is about 6'3" tall, 45-50 years old, and I did not see any injuries. He seemed like took charge of the situation. There was another white, American, tall man, about 6' tall. He was probably about 45- 50 years old. I did not see any injuries on him. There was a little boy. He was African American. He was probably 3-4 years old. His mother was also there. She was African American. She is about 20-25 years old. There was another female Soldier. I do not know her name. She was white, between 22-25 years old, shorter, about 5'1".*

App. 455

USA-00418

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 68 |

## STATEMENTS

Passenger Pedro Martinez

> *She had minimum damage and she also was in charge of the situation. There
> was the man that died. He was a white man, big beard, about 5'11". He is
> about 60-70 years old. There was the burger king guy, Hispanic. I know his last
> name is Hispanic but I do not know it. He is tall, about 6'. He lost his right arm
> from the bicep down. He was conscious the whole time. The bus driver was a
> female, 5'1"-5'3", dark skin, she may have been Native American. She did not
> get any lacerations or injuries.*

Q: *Prior to the crash, did you feel any jerking?*

A: *No. I just felt the impact of the crash.*

Q: *Did you feel any heavy breaking?*

A: *No. I just felt the hit of the crash.*

Q: *Do you know if the bus driver was awake?*

A: *My opinion was she was not. It was starting to be daylight and she crashed right
into the truck. How do you miss that if you are awake? It is impossible.*

Q: *Does the bus driver have a habit of going on the rumble strip?*

A: *Before yes. The other passengers felt that too.*

Q: *Did the bus driver speed in the past?*

A: *No.*

Q: *Does the bus driver normally take the truck bypass?*

A: *She has to take the bypass.*

Q: *Is she the normal driver?*

A: *She has been the driver for the last month and half. The company would rotate
the drivers from time to time.*

Q: *How long have you been riding on the bus route?*

A: *Since August 2013.*

Q: *Do you still ride on the bus?*

A: *No.*

Q: *Why do you no longer ride on the bus?*

A: *I cannot be by myself right now because of my injuries. I do plan on riding the
bus again because it is the only company that is here.*

Q: *How did the Samoan guy take charge?*

A: *He started taking care of all of the passengers. He helped the others get out of
the bus. He helped the fire department and the paramedics.*

Q: *How did the female Soldier take charge?*

A: *She was helping the Samoan guy. I think she was the one who made the call for
911.*

Q: *What did the bus driver do after the crash?*

A: *She called the company and let the company know about the accident. She let
the company know one guy died. That's it.*

Q: *Did she help any of the passengers?*

A: *I did not see her helping. I think she was in shock.*

Q: *Did you hear any noises on the bus after the crash?*

USA-00419

STATE OF CALIFORNIA

DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**

CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (*2400*) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 69 |

## STATEMENTS

<u>Passenger Pedro Martinez</u>

> A: The African American female she was yelling, because something happened with her leg.  She was in pain.  The boy was crying.  The burger king guy was yelling.
>
> Q: Referencing the diagram that I showed you, what seat were you sitting in prior to the accident?
>
> A: I was sitting in seat 22.
>
> Q: Is there anything else you want to add to your statement?
>
> A: No

App. 457

USA-00420

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (MAIT use only)

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 70 |

## STATEMENTS

Passenger Michael Chestnut

On Friday, June 13, 2014, Special Agent K. Wood from CID, obtained a statement from Mr. Chestnut. This interview was obtained at the CID office on Fort Irwin and was not recorded. The following was verbatim from the CID Report of Investigation:

*Dale and I were at Williams Street and we got on the bus between 0415 and 0420, 2 Jun 14, and we proceeded to go to the other stops. There were nine of us on the bus. The trip was uneventful on the way to work. For some reason the bus driver took the bus bypass. Maybe 200 meters after that the bus hit the right lane rumble strip and that woke me up. We went from the right into the left lane and I assumed it was to recover from going off the right hand side of the road. It couldn't have been minutes after that when we crashed. I was initially shocked. I was on my hands and knees. I had been thrown back 2 or 3 rows from where I was initially sitting. I got to my feet, pulled out my handkerchief and applied pressure to my forehead where I was bleeding. Mr. T looked over at me and said we need to get organized and get some help. The female Soldier that worked at the DFAC her phone was functional. Went over to Dale and I could only see chest up. He was in bad shape, and tangled in the wreckage. I could not get any vitals and I knew he was dead. I looked over and saw Jesus arm was tangled in the wreckage and I rendered aid. Mr. T was getting accountability on the bus to ensure no one had been thrown out or anything like that. He found an emergency exit window that functioned and five or six minutes later the first responders showed up and took charge of Jesus and started extracting us from the bus. Another weird thing that happened was when Mr. T and another Soldier got out of the bus they were trying to make sure no one hit the bus. I remember the driver getting on her what I assumed to be work phone, and she called her dispatch to relay what happened.*

*Q: SA WOOD*
*A: Mr. CHESTNUT*
*Q: Did I type the above narrative as you dictated it to me?*
*A: Yes.*
*Q: Can you fully identify Dale?*
*A: Dale KEMPERS was all I knew him as.*
*Q: Can you fully identify Mr. T?*
*A: I have always called him Mr. T because he has a really long name. He is 5'9", Caucasian male, crew cut hairstyle, probably 260 lbs.*
*Q: Can you fully identify Jesus?*
*A: That is all I ever knew him as. He was the shift supervisor at Burger King on Fort Irwin.*
*Q: Can you fully identify the female Soldier?*
*A: Not really, she was a blonde, but she did not ride the bus all of the time.*

USA-00421

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 71 |

## STATEMENTS

Passenger Michael Chestnut

*Q: What do you mean when you said "for some reason the bus driver took the bypass?"*

*A: It is odd and it has been on my mind.  Sometimes they do and sometimes they don't.  This morning was the first morning the bus had taken the bypass since the accident.*

*Q: Was it always the same driver?*

*A: In the morning about 95% of the time yes.*

*Q: Can you fully identify the driver?*

*A: Dark hair, maybe 5'2", female, Hispanic.  She would wear glasses sometimes.*

*Q: Do you remember if she was wearing glasses the morning of the accident?*

*A: I do not remember.*

*Q: Can you describe how the bus hit the rumble strip?*

*A: I was asleep, and all of the sudden I felt the vibration and woke up.  It was a common occurrence with that driver to hit the rumble strip.  We swung over into the left lane.  It seemed like minutes later we crashed.*

*Q: How often would the driver typically hit the rumble strip?*

*A: One to two times on every morning drive into Fort Irwin.  Sometimes it was more often, and that was when Dale and I would discuss the issue and he would tell me he called and filed a complaint.  She was the only driver who would hit the rumble strip on every trip.  I have been in high winds with other drivers and they never hit the rumble strip.*

*Q: Did you ever file a complaint?*

*A: No, I never did, because Dale went to the VVTA meetings and was kind of our spokesperson on the issues with the bus driver.  Any time there was a new bus driver, the driver would always ask who Dale was, and then he would show them the route and how to get everywhere.*

*Q: Do you know if anyone else has ever filed a complaint against this driver?*

*A: I know myself and Mr. T had discussed the issue at great length with Dale, but Dale was the only one I knew who had filed numerous complaints.*

*Q: Can you describe to me what happened after the bus hit the rumble strip?*

*A: After the bus went into the left lane, and I assume the driver was trying to get back to the left lane and the next thing I remember is we crashed.*

*Q: Did anyone yell to warn the bus driver?*

*A: As soon as we were on the rumble strip, I think I yelled something, but I am not 100%.*

*Q: Did the female Soldier call 911?*

*A: Yes, she was upset and then regained her composure very quickly.*

*Q: Where did you attempt to gain vitals on Dale?*

*A: On his neck.  I couldn't see his hands.  It looked like his organs in the chest area were exposed.*

*Q: Can you describe how you rendered aid to Jesus?*

USA-00422

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (MAIT use only)

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 72 |

## STATEMENTS

Passenger Michael Chestnut

>   A: He was obviously in some extreme shock. His arm was seriously tangled in the
>   wreckage, and he was trying to yank his arm out. I put my body weight on him to
>   try and calm him down and to stop from yanking anymore. I used a coat to apply
>   a pressure dressing. There was a lot of tissue and bone exposed. There was not
>   a lot of blood so I realized he did not need a tourniquet.
>
>   Q: How long were you with Jesus before the paramedics arrived?
>
>   A: It seemed like forever, but it couldn't have been any more than 5 minutes. The
>   first person to arrive was a security guard from the NTC gate. I told him Jesus
>   was hurt bad and he needed an air MEDDEVAC. He told me there was one on
>   the way. At that point they took charge of Jesus and the security guard helped
>   me climb out of the window.
>
>   Q: Can you fully identify the security guard?
>
>   A: Young guy, black hair, white. I recognized him as someone who is always at the
>   gate. I do not know his name.
>
>   Q: Have you ever seen the bus driver fall asleep?
>
>   A: No, and Dale and I had discussed that. I don't think she was going to sleep, but
>   it seemed like she had some sort of depth perception problem?
>
>   Q: What made you think she had a depth perception problem?
>
>   A: When I was in the military I had a license to drive vehicles similar to the bus. It
>   was difficult to learn how to control a vehicle like that. Especially at night there
>   was always a false shadow or depth perception problem. It was always seemed
>   like she was afraid of the center line.
>
>   Q: What lane did the bus normally travel in when it took the bypass?
>
>   A: Right hand lane.
>
>   Q: Where the semi-trucks normally parked there?
>
>   A: I wouldn't say always, but even when we didn't take the bypass there was always
>   trucks parked on the bypass.
>
>   Q: Where would the trucks park on the bypass?
>
>   A: The trucks would be parked on the shoulder, and the bus would still travel in the
>   right lane.
>
>   Q: Did the driver ever speed?
>
>   A: It is impossible to see the speedometer. The driver was usually late about 1 out
>   of 4 times, but we would always make it to work on time.
>
>   Q: Did it ever feel like the driver lost control of the bus?
>
>   A: Every time we got on the rumble strip. It always seemed like a shock, because
>   we would have the jerking motion to get the bus back on the road. I always
>   called it a wheel snatch.
>
>   Q: On the morning of 2 Jun 14, when the bus hit the rumble strip, can you
>   remember how visible it was outside?
>
>   A: I can remember after the accident, I had no trouble seeing Dale or Jesus or
>   anyone else on the bus. After the rumble strip, I looked at the road and could tell
>   we were in the left hand portion of the road. I don't think I looked forward.

App. 460

USA-00423

STATE OF CALIFORNIA

DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**

CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 73 |

## STATEMENTS

Passenger Michael Chestnut

> *Q: Where were you sitting on the bus?*
>
> *A: Probably the 2nd forward facing seat on the left hand side.*
>
> *Q: Did you ever have any conversations with the driver?*
>
> *A: No. She would greet people, but she never spoke to anyone during the trip.*
>
> *Q: Was there music playing on the bus?*
>
> *A: No, that morning. There is a radio on the buses in general. The drivers always turned off the radios before driving.*
>
> *Q: Do you remember what the driver said to her dispatch?*
>
> *A: I'm assuming she was talking to the dispatch. She said "what do you want me to do? She said "Yes, there is one fatality." She was in a state of disbelief. I hollered "Do you have a first aid kit?" She walked over to the cabin but she could not get into it. That is when she dialed the number and called whoever it was. That was around the same time the female Soldier called 911.*
>
> *Q: Do you have anything else to add to this statement?*
>
> *A: No*

USA-00424

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 74 |

## STATEMENTS

Passenger Misiona Tusieseina

On Tuesday, June 17, 2014, Special Agent J. Stewart from CID, obtained a statement from Mr. Tusieseina. This interview was obtained at the CID office on Fort Irwin and was not recorded. The following was verbatim from the CID Report of Investigation:

*I boarded the Victor Valley Transit Authority bus to Fort Irwin at the Williams Street Bus stop in Barstow. I sat in seat #9. Mr. Dail KEIPER was seated in #39, Mr. CHESTNUT was seated in #5, Mr. Jesus AGUILAR was seated in #35, SPC DEROSIER was seated in #31, SPC MARTINEZ was seated in #15 or 13, and a mother and her son were seated in #19. We departed that stop around 0425 and stopped at the cemetery on Fort Irwin Road around 0430 and departed around 0435. After the bus left the cemetery, I fell asleep. I woke up when the bus crashed. I was thrown from my seat and broke my fall by grabbing a metal post by seat #3. I saw the bus driver on her phone and asked her "How could you do this to us?" and got no response. At first I could not feel my legs and was worried I had broken my back. I regained feeling to my legs. Mr. CHESTNUT yelled Mr. KEIPER's name. I looked down to see I had landed on Mr. KEIPER. I heard him take his last breath and heard him moan. Mr. KEIPER was twisted into the metal wreckage of the bus. Mr. KEIPER had an open chest wound; a large cut to his head on the left and his eyes and mouth were open. I looked to my left and saw SPC MARTINEZ trying to stand up and told him to just sit down because he appeared to be in pain when he tried to stand. I told him the medics were on the way and he should just wait for them. The little boy was thrown from his original seat to the aisle near seat # 11. The little boy stood up and was crying for his mother, who also wound up in the floor near seat # 11. The boy's mother was in a lot of pain. She was just moaning face down in the aisle. When I looked to my right, I saw Mr. Jesus AGUILAR. He was trying to pull away from his seat and I could see his right arm had been amputated by the wreck. Mr. CHESTNUT and I tried to calm him down. I asked the driver where the first aid kit was but she was still on her phone and didn't respond. Behind me, Mr. CHESTNUT and SPC DEROSIER called 911. The Emergency Exit would not open so I opened another window, near seat #10, and crawled out. I flagged down a truck. The truck was a red and black truck, with a flatbed trailer, from TERESE Trucking Company. The driver was a white male, about 6'1", slim. I don't remember his name. He stopped in front of the wreckage and gave me a first aid kit. As soon as I was handed the first aid kit, the first ambulance arrived. I went back to the bus and had SPC DEROSIER hand me the boy through the open window. SPC DEROSIER then climbed out of the open window. Mr. CHESTNUT opened another window and climbed out of the bus. We all went to the side of the road for safety and I handed the boy to one of the medics. A little while later I was transported to Barstow Community Hospital.*

USA-00425

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 75 |

## STATEMENTS

Passenger Misiona Tusieseina

> *Q: SA Joshua R. STEWART*
>
> *A: Mr. Misiona TUSIESEINA.*
>
> *Q: Did you narrate the statement above while I typed it?*
>
> *A: Yes.*
>
> *Q: Who is Mr. Dail KEIPER?*
>
> *A: He was a DOD Civilian, a GS employee on Fort Irwin. He worked with the 916th.*
>
> *Q: Who is Mr. CHESTNUT?*
>
> *A: His first name is Michael. He is a DOD Civilian that works at Building 990 on Fort Irwin.*
>
> *Q: Who is Mr. Jesus AGUILAR?*
>
> *A: He works at the Burger King on Fort Irwin.*
>
> *Q: Who is SPC MARTINEZ?*
>
> *A: I don't know his first name or his unit.*
>
> *Q: Who is SPC DEROSIER?*
>
> *A: I don't know her first name or her unit.*
>
> *Q: Do you know the name of the mother?*
>
> *A: No I don't. I do know she works at Burger King.*
>
> *Q: Do you know the name of the boy?*
>
> *A: I do not. He gets off the bus with his mother at the Burger King stop.*
>
> *Q: Are there other people that normally ride the bus with you?*
>
> *A: Yes.*
>
> *Q: Who are they?*
>
> *A: There is one older gentleman that works at Bike Lake. He wears glasses and gets on the bus at the cemetery stop. There is another older gentleman that catches the bus at the cemetery. He is a white male. There are three soldiers that normally ride the bus. SPC DEROSIER knows them. One of them is a 1SG. He is Hispanic and sometimes rides a motorcycle. Another one is a SPC from 11th ACR, he is white. Then there is a SSG who works at the hospital.*
>
> *Q: How often do you ride the bus?*
>
> *A: Almost every day.*
>
> *Q: Have you always had the same driver?*
>
> *A: The driver that was driving that day has only been our driver for about 2 months.*
>
> *Q: Do you know the driver's name?*
>
> *A: No.*
>
> *Q: During the past two months, have you witnessed any erratic driving while riding the bus?*
>
> *A: Yes. The driver will drift to the left or right side of the road and jerk the wheel to correct her drift. She jerks the wheel hard enough to wake me up.*
>
> *Q: Have you ever filed a complaint on the driver?*
>
> *A: No. Mr. KEIPER called numerous times.*
>
> *Q: Did you ever confront the driver about driving erratically?*
>
> *A: Yes.*

App. 463

USA-00426

STATE OF CALIFORNIA

DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**

CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 76 |

## STATEMENTS

Passenger Misiona Tusieseina

> *Q: What was her response?*
> *A: She just stared at me.*
> *Q: Did you point out the locations of all the passengers on the bus diagram I*
> *provided you?*
> *A: Yes.*
> *Q: Do you have anything to add to this statement?*
> *A: No*

C555d3htl.bg

App. 464

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (*2400*) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 77 |

### ANALYSIS AND OPINION

Physical Evidence Analysis

#### Item #A

This item was an area of scrape marks created on the roadway surface by undetermined undercarriage components of Vehicle #1. This was evidenced by the marks' proximate location on the roadway surface relative to the path of travel of Vehicle #1.

#### Item #B

This item was an area of scrape marks created on the roadway surface by undetermined undercarriage components of Vehicle #1. This was evidenced by the marks' proximate location on the roadway surface relative to the path of travel of Vehicle #1.

#### Item #C

This item was an area of tire friction marks on the roadway surface that was deposited by the left rear duel tires of Vehicle #1, the right duel tires on axle #4 of Vehicle #2/2A, and the front right tire of Vehicle #1. This was evidenced by the recent nature of the mark and their proximate locations on the roadway surface relative to the post-impact path of travel of Vehicle #1 and Vehicle #2/2A.

USA-00428

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (MAIT use only)

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 78 |

## ANALYSIS AND OPINION

<u>Vehicle Factors</u>

<u>Damage Analysis</u>

An analysis of the damage sustained to the involved vehicles and the dynamics of this collision indicated a single impact collision event. The following analysis focused on the damage created during the collision identified in this investigation. An attempt was made to associate the documented damage with the object(s) responsible for its occurrence. This analysis was based on an evaluation of the damage to the involved vehicles, physical evidence, statements and dynamics of the collision sequence.

<u>Vehicle #1 (NABI Bus) vs. Vehicle #2A (Manac Trailer)</u>

Vehicle #1 sustained a significant amount of damage to the right front and right side of the vehicle, including the crumpling and tearing of the sheet metal on its right side. The damage penetrated into the interior of the vehicle affecting the interior components, which included the seats, floor, roof structure and hand railing (*Figure 26*). This damage was caused by the impact with the left rear of Vehicle #2A, which penetrated into the passenger space of Vehicle #1 during the collision (*Figure 27, Page 79*). The collision caused the left rear of Vehicle #2A to buckle forward into the left rear tire/wheel assembly (*Figure 28, Page 79*).



*Figure 26*

USA-00429

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 79 |

## ANALYSIS AND OPINION

    <u>Vehicle Factors</u>

      <u>Damage Analysis</u>



*Figure 27*



*Figure 28*

C558d399.frp

App. 467

USA-00430

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 555 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400t) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 80 |

## ANALYSIS AND OPINION

Human Factors

This investigation yielded the following opinions regarding the human influence during the collision event.

Driver Dinorah Aguilar

**Driver License and Experience:** Ms. Aguilar possessed a valid class "B" commercial driver license issued by the State of California, with an endorsement to carry passengers. The license also had a restriction to wear corrective lenses while driving.

Ms. Aguilar was hired by Victor Valley Transit Authority (VVTA) as a bus driver on September 25, 2006. She had a brief lapse of employment due to an injury and was reinstated on June 15, 2007. Prior to her employment with VVTA, she was employed as a commercial driver with Laidlaw Incorporated, MV Transportation Incorporated, and Victor Valley Community Hospital.

Ms. Aguilar was properly licensed to drive the type of vehicle she was operating and had driver training and experience beyond that of the average driver at the time of the collision. She was familiar with the truck bypass and knew the operation hours of when trucks stop in the #2 lane for inspection.

**Physical Condition:** Ms. Aguilar was wearing corrective lenses at the time of the collision, as required by the California DMV. There was no evidence to suggest that Ms. Aguilar had any physical conditions or limitations that would adversely influence her ability to operate a motor vehicle. Claims made by passengers in Vehicle #1 that Ms. Aguilar may have been fatigued were not substantiated by the video footage of the collision and Ms. Aguilar's reaction to Vehicle #2/2A stopped within the roadway.

**Medications and Intoxication:** Ms. Aguilar was a diabetic. She took medicines for her diabetes which included Metformin and Glyburide. She consumed these medications along with food prior to leaving for work on the day of the collision. There was no evidence to suggest that Ms. Aguilar was adversely affected by her diabetic condition at the time of the collision. She was interviewed and observed by investigating officers at the collision scene and was determined not to have been under the influence of drugs or alcohol at the time of the collision.

**Distraction and Inattention:** Video evidence of Ms. Aguilar's actions at the time of the collision was reviewed. Ms. Aguilar did not appear to be inattentive or distracted at the time of the collision.

App. 468

USA-00431

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 81 |

## ANALYSIS AND OPINION

### Human Factors

#### Driver Dinorah Aguilar

There were a number of factors which influenced the visibility and discernibility of Vehicle #2/2A. These factors influenced Ms. Aguilar's ability to "see" and react to the hazard that Vehicle #2/2A presented. "Seeing" or vision is composed of sensation and perception. Visual sensation refers to whether or not light from an object was sufficient enough to reach the physiological level needed for detection.[4]  Perception refers to the "input of sensory organs, combined with analysis and interpretation" of the viewer.[5]

An important visual characteristic of an object's visibility is its contrast. Contrast refers to the difference in brightness, color or texture between an object and the background behind the object.[6]

*Negative Contrast*

Negative Contrast occurs when a dark object lies on a light background. Due to civil twilight and the roadway alignment, Vehicle #2/2A was silhouetted by negative contrast.

There were no street lamps to provide ambient lighting in the area of the collision and although it appeared from the video of the collision that there was minimal contrast between Vehicle #2/2A and the sky above the horizon, it was possible this contrast made Vehicle #2/2A appear as part of the background topography to an approaching driver (*Figure 29*).



*Figure 29*

[4] Green, Marc, and J. Vernon. Odom. *Forensic Vision with Application to Highway Safety*. Tucson, AZ: Lawyers & Judges Pub., 2008. Print.
[5] Olson, Paul L., and Eugene Farber. *Forensic Aspects of Driver Perception and Response*. 2nd ed. Tucson, AZ: Lawyers & Judges Pub., 2003. Print.
[6] Ibid

App. 469

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (*2400*) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 82 |

## ANALYSIS AND OPINION

Human Factors

Driver Dinorah Aguilar

*Expectancy*

Any discernibility distance of Vehicle #2/2A estimated by MAIT investigators would not have been directly applicable to the collision investigation without applying some factor of expectancy. An unexpected hazard for a driver is something that would be unusual or not anticipated. In this collision event, Vehicle #2/2A, which was parked within a travel lane and without lighting, was an unexpected hazard and therefore extra time would be needed for Ms. Aguilar to interpret the event and to decide upon response.

The factors of sensation, perception, contrast and expectancy affected and extended the time and distance needed to avoid the collision.

App. 470

USA-00433

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (MAIT use only)

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 83 |

## ANALYSIS AND OPINION

<u>Human Factors</u>

<u>Driver Steven Kilty</u>

***Driver License and Experience:*** Mr. Kilty possessed a valid class "A" Commercial Driver License issued by the State of Arizona. According to his statement, Mr. Kilty had made a delivery to Fort Irwin once in the past. At that time, he stopped his vehicle in the #2 lane of the truck bypass behind other trucks which were in line to be inspected. Mr. Kilty most likely made this delivery between 0600 and 0800 hours since trucks were being inspected by military personnel at that time. This prior experience with the check-in procedure at Fort Irwin should have alerted Mr. Kilty that he had stopped within the #2 lane outside of the designated check-in hours.

Obtaining an Arizona Commercial Driver License (CDL) required training and experience beyond that of the average driver. Other requirements to obtain a CDL included successfully completing both a written and behind the wheel driving test. Written material provided by the State of Arizona intended to assist CDL applicants included the Arizona Commercial Driver License Manual. This Manual provided information concerning specific traffic laws and safe driving skills pertaining to a commercial driver. CDL applicants must successfully complete an examination dealing with the information provided in this manual.

Section 2.5.2 of the Arizona Commercial Driver License Manual explained safe driving practices as it pertained to communicating ones presence. The manual stated:

*"Other drivers may not notice your vehicle even when it's in plain sight. To help prevent accidents, let them know you're there."*

*"When you pull off the road and stop, be sure to turn on the four-way emergency flashers. This is important at night. Don't trust the taillights to give warning. Drivers have crashed into the rear of a parked vehicle because they thought it was moving normally.*

USA-00434

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 84 |

## ANALYSIS AND OPINION

Human Factors

Driver Steven Kilty

***Driver License and Experience:***

The manual continued in this section with the following:

> *"If you must stop on a road or the shoulder of any road, you must put out your emergency warning devices within ten minutes. Place your warning devices at the following locations:*

- *If you must stop on or by a one-way or divided highway, place warning devices 10 feet, 100 feet, and 200 feet toward the approaching traffic.*
- *If you stop on a two-lane road carrying traffic in both, directions or on an undivided highway, place warning devices within 10 feet of the front or rear corners to mark the location of the vehicle and 100 feet behind and ahead of the vehicle, on the shoulder or in the lane you stopped in."*

The manual also introduced the commercial driver to vehicle stopping distances at specific speeds.

The training and education that Mr. Kilty received, when he obtained his Commercial Driver License, was extensive and beyond that of the average driver. His training specifically addressed the difficulty other drivers might have noticing a truck trailer combination; particularly in dark environments. The training also specifically addressed the requirement of warning approaching drivers if it became necessary to stop on the shoulder or within a lane of the roadway.

USA-00435

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (MAIT use only)

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 85 |

## ANALYSIS AND OPINION

<u>Human Factors</u>

<u>Driver Steven Kilty</u>

***Physical Condition:*** Mr. Kilty was required by the Arizona Department of Motor Vehicles to wear corrective lenses while operating a motor vehicle. Due to the fact that Mr. Kilty was sleeping within Vehicle #2 at the time of the collision, the use of corrective lenses was not a factor in this collision. Mr. Kilty had a valid medical certificate which allowed him to operate a commercial vehicle. A specific medical history was not obtained due to his refusal to provide a statement to MAIT investigators.

***Medications and Intoxication:*** It is unknown if Mr. Kilty was taking medications at the time of the collision. Law enforcement personnel on scene at the collision determined that Mr. Kilty was not under the influence of drugs or alcohol.

***Distraction and Inattention:*** Although Vehicle #2/2A were in transport (within a lane of traffic), Mr. Kilty was asleep within the sleeper berth of Vehicle #2 at the time of the collision. It is unknown how many vehicles had passed Vehicle #2/2A during the time it was stopped in the roadway. Had Mr. Kilty been awake while his vehicle was in transport within the #2 lane, he should have been alerted to the danger Vehicle #2/2A posed for vehicles approaching from the rear. His inattention while asleep in the sleeper berth of Vehicle #2, when it was stopped in a lane of traffic, was a significant factor in this collision.

USA-00436

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 86 |

## ANALYSIS AND OPINION

Environmental Factors

The investigation yielded the following opinions regarding the environmental factors and influences at the time of the collision:

Weather

The temperature at the time of the collision was 71.7 degrees Fahrenheit with winds out of the northwest at 10.4 miles per hour. Weather conditions were mostly clear with visibility of 10 statute miles. Weather was not a contributing factor in this collision.

Speed Limit

The Fort Irwin Road Truck Bypass route was regulated by a 45 miles per hour posted speed limit for all vehicles.

Signing and Markings

Approaching the collision scene on Fort Irwin Road and the Fort Irwin Road Truck Bypass route, miscellaneous signs were visible with no physical obstructions. These signs consisted of guide, warning and regulatory signs that provided guidance to motorists regarding speed limits and informed highway users of traffic laws and regulations. All signs were standard in size and were mounted appropriately.

At the location Mr. Kilty brought Vehicle #2/2A to a stop within the #2 lane of the truck bypass lane, there were two signs which indicated a truck "check-in" location. One of the signs was installed on a temporary moveable "k-rail" type barrier. This particular sign indicated the time and days of the week truck drivers were to stop for inspection. On the days and time indicated on the sign, Monday through Friday 0600 to 0800 hours, the barrier was placed by Fort Irwin personnel within the #2 lane, perpendicular to the roadway. During these times, trucks were to stop and wait to be inspected by military or military contracted personnel. The signage was a factor in this collision in that the signs clearly indicated the days and time truck were to stop for inspection. Outside of the indicated days and times, truck drivers were to proceed to the main gate into Fort Irwin, or find an appropriate place to wait until the inspection times.

At the time of this investigation, there were painted roadway markings within the left lane of the truck bypass route which indicated, "BUS LANE ONLY." There were three locations where this roadway advisory marking was painted between the start of the truck bypass to where the collision occurred. According to the Army Directorate of Plans, Analysis and Integration, these roadway markings were installed approximately three weeks following the date of this collision. Prior to this date there were no advisory markings pertaining to the left lane of the bypass route.

The "Left Lane for Authorized Vehicles Only" signs along the bypass route were also erected approximately three weeks following the date of this collision.

App. 474

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (*2400*) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 87 |

## ANALYSIS AND OPINION

Environmental Factors

Lighting

This collision occurred at 0506 hours, just after civil twilight, which began at 0504 hours. Sunrise occurred at 0533 hours. There were no overhead lights in the vicinity of the collision, nor were there any sources of ambient lighting noted. Moonrise occurred at 0959 hours and therefore was not visible at the time of the collision.

*Video Discussion*

The SmartDrive recording system within Vehicle #1 captured video footage of the collision event. The recorded video was from a forward view, facing towards the roadway ahead of the vehicle. A screen capture of the forward facing video footage is shown below (*Figure 30*). The circle indicated the location of Vehicle #2/2A.



*Figure 30*

On June 3, 2014, between the hours of 0445 and 0530, CID conducted a drive-through of the collision scene, which was documented by video and photographs. Photographs taken from a cellular phone during the drive-through included a timestamp within the frame of the photograph. The photographs on the following page were those taken at the scene during the drive-through at 0506 hours and 0513 hours respectively (*Figures 31 and 32, Page 88*). It should be noted that lighting and visibility conditions improved rapidly during civil twilight as seen in the photographs. It should also be noted that the video footage and photographs of the scene at the approximate time of the collision varied significantly as far as accurately capturing the lighting and visibility conditions.

USA-00438

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 88 |

## ANALYSIS AND OPINION

<u>Environmental Factors</u>

<u>Lighting</u>

*Video Discussion*



*Figure 31*



*Figure 32*

USA-00439

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 89 |

## ANALYSIS AND OPINION

Environmental Factors

Lighting

Upon examination of an exemplar 2010 NABI bus (VIN 1N940501BAA140428), it was noted that the mounted bicycle rack partially blocked the right headlamp of the vehicle, while the rack was not in use carrying a bicycle. It appeared Vehicle #1 was outfitted with an identical bicycle rack at the time of the collision, which was in the "up" position, not being utilized. Although the placement of the bicycle rack appeared to partially occlude the right side headlamp, it was not determined to what degree lighting from the headlamp was affected (*Figure 33*).



*Figure 33*

USA-00440

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 90 |

## ANALYSIS AND OPINION

Speed Analysis

The original report authored by FIPD contained a speed analysis to determine a range of speeds Vehicle #1 was traveling prior to it impacting the rear of Vehicle #2A. The speed analysis utilized the video evidence that was captured by the Smart Drive video recording system installed within Vehicle #1. The analysis identified measurable markings on the roadway surface and used the timing (frames per second) of the video to calculate an average velocity for Vehicle #1. FIPD concluded the velocity of Vehicle #1 ranged between 43 and 47 miles per hour at the time it impacted the rear of Vehicle #2A.

This velocity was consistent with the post-impact travel distance, damage sustained to both vehicles, and the SmartDrive recording data. Inland Division MAIT reviewed the available data and agreed with the approximate speed determination by FIPD.

The speed, throttle, RPM and acceleration data associated with the SmartDrive video was not analyzed as a part of this MAIT investigation beyond recognizing that the indicated pre-impact speed data was consistent with the approximate speed determined by FIPD.

No further speed analysis was conducted by MAIT.



Fort Irwin Road Truck Bypass Route

App. 479

USA-00442

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 *(MAIT use only)*

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 92 |

## ANALYSIS AND OPINION

### Areas of Impact

The area of impact between Vehicle #1 and Vehicle #2/2A was determined based on the physical evidence, the damage to the involved vehicles, the dynamics of the collision event, and the positions of rest of the involved vehicles.

FIPD determined the area of impact utilizing a Military Grid Reference System device, which translated into MGRS 11SNU22330493914.

For the purposes of this investigation, the same rectangular coordinate system that was utilized to record the measurements of the physical evidence at the collision scene was also utilized to describe the area of impact listed below. The measurement utilized Reference A, which was established at a seam between the concrete swale and the asphalt concrete roadway, north of the collision scene. The measurement in this section was approximate and was rounded to the nearest foot.

### Area of Impact #1 – Vehicle #1 (NABI Bus) vs. Vehicle #2A (Manac Trailer):

This location was approximately 150 feet south of Reference Line "A" and 23 feet east of the yellow edgeline of the truck bypass route.

USA-00443

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (*2400*) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 93 |

### ANALYSIS AND OPINION

Collision Sequence

Pre-Collision

Driver Dinorah Aguilar

On the morning of June 2, 2014, Ms. Aguilar woke up at approximately 0130 hours after sleeping for approximately four and half hours. She prepared herself for work and ate breakfast. Her breakfast included one half of a burrito. She also took her diabetic medication, which included Metformin and Glyburide. Her sleeping pattern and morning routine were normal and uneventful. Ms. Aguilar was a bus driver for the Victor Valley Transit Authority and had been employed with the agency since September 25, 2006. Her normal route was to Fort Irwin, which she began in October of 2013. She had been a licensed commercial driver since 1986.

Ms. Aguilar had a typical start to her work day and had made three stops in Barstow before heading to Fort Irwin. The stops included Walmart, Williams Street and a cemetery in Barstow. She stopped at the cemetery at approximately 0435 hours and then headed towards Fort Irwin. At that time, she was transporting a total of eight passengers. She merged into the truck bypass route from Fort Irwin Road at approximately 0502 hours. Ms. Aguilar was traveling in the #2 lane of the truck bypass between 43 and 47 miles per hour. From her experience and training, she knew that commercial trucks stop within the #2 lane of the truck bypass during the inspection hours of 0600 to 0800, Monday through Friday. As she approached the location where trucks are usually inspected, she noticed a stopped vehicle in the roadway in front of her. She applied her brakes and turned to the left.

Mr. Steven Kilty

On the night of Sunday, June 1, 2014, at approximately 2030 hours, Mr. Kilty parked Vehicle #2/2A within the #2 travel lane of the Fort Irwin Road Truck Bypass route. At this location there was a forward facing yellow sign that indicated "Check-In Point" and a sign attached to a portable "k-rail" that indicated trucks were to stop Monday through Friday between the hours of 0600 and 0800 hours. The k-rail was on the dirt shoulder at the time Mr. Kilty parked Vehicle #2. The k-rail was positioned parallel to the roadway, causing the attached sign to be directed away from approaching motorists. This location also provided a wide dirt shoulder, suitable to park a vehicle out of the traffic lanes.

After he parked Vehicle #2/2A within the #2 lane, Mr. Kilty shut the vehicle off and turned off all of the vehicle's lighting. He did not activate Vehicle #2's hazard lights, nor did he place any warning devices such as flares or reflective triangles within the roadway. Mr. Kilty went into the sleeper berth of Vehicle #2 and went to sleep. This was the second occasion that Mr. Kilty had made a delivery to Fort Irwin. On the pervious occasion, he stopped his vehicle behind other stopped trucks on the bypass route between the hours of 0600 and 0800.

App. 481

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (*2400*) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 94 |

## ANALYSIS AND OPINION

Collision Sequence

### At-Collision

As Ms. Aguilar applied her brakes and turned Vehicle #1 to the left, the front right of Vehicle #1 impacted the left rear of Vehicle #2A. Vehicle #1 continued forward and the left rear of Vehicle #2A continued to intrude into the passenger space of Vehicle #1. This impact significantly damaged the right side of Vehicle #1 causing considerable intrusion into the right side passenger space. The impact caused Vehicle #2/2A to be pushed forward approximately 14 feet. Mr. Kilty awoke from sleeping due to Vehicle #2 being pushed forward and the sound of the impact.

### Post-Impact

A passenger in Vehicle #1, Mr. Dail Keiper, was sitting in the area of intrusion into Vehicle #1 and sustained fatal injuries due to the impact. Ms. Aguilar and the other seven passengers suffered injuries ranging from minor to major. Mr. Kilty was not injured. Following the collision, Vehicle #1 came to rest within the #2 and #1 lanes of the truck bypass route, still in contact with the rear of Vehicle #2A. Vehicle #2/2A remained within the #2 lane of the bypass route.

USA-00445

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 55B (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 95 |

## CONCLUSIONS

On Monday, June 2, 2014, at approximately 0506 hours, Ms. Dinorah Aguilar was driving Vehicle #1, a 2010 NABI transit bus, northbound on the Fort Irwin Road Truck Bypass route, north of Rocking K Ranch Road within the #2 lane. Mr. Steven Kilty was sleeping in the sleeper berth of Vehicle #2, a 2006 Volvo tractor, which he stopped and parked within the #2 lane of the Fort Irwin Road Truck bypass route, just north of Vehicle #1's location. Vehicle #2 was hitched to Vehicle #2A, a 2014 Manac trailer hauling a Heavy Expanded Mobility Tactical Truck (HEMTT). When Ms. Aguilar observed the rear of Vehicle #2A and recognized it as a hazard, she turned Vehicle #1 to the left in an attempt to avoid a collision. The right side of Vehicle #1 subsequently struck the left rear of Vehicle #2A. Vehicle #1 was transporting a total of eight passengers. One passenger, Mr. Dail Keiper, sustained fatal injuries as a result of the collision. The other seven passengers sustained major to minor injuries.

Based on the findings of this investigation and the investigation conducted by the United States Army Criminal Investigations Command and Fort Irwin Police Department, the following conclusions were made:

1. Mr. Kilty illegally parked Vehicle #2/2A within the #2 lane of the Fort Irwin Road, truck bypass from 2030 hours on June 1, 2014, to 0506 hours the following day. This was determined to be the primary collision factor in this collision, a violation of §22400(a) of the California Vehicle Code (VC):

   *§22400. (a) No person shall drive upon a highway at such a slow speed as to impede or block the normal and reasonable movement of traffic, unless the reduced speed is necessary for safe operation, because of a grade, or in compliance with law.*

   *No person shall bring a vehicle to a complete stop upon a highway so as to impede or block the normal and reasonable movement of traffic unless the stop is necessary for safe operation or in compliance with law.*

2. Mr. Kilty stopped and parked Vehicle #2/2A within the #2 lane during the hours of darkness. This collision occurred just prior to the beginning of civil twilight. There were no overhead or ambient lighting sources at the scene of the collision. Visibility was limited due to the lighting conditions.

3. As required by law, Mr. Kilty failed to provide approaching drivers warning to the presence of Vehicle #2/2A within the lane. Warning should have been provided by utilizing the exterior lighting of Vehicle #2/2A and by placing triangles or other warning devices within the roadway.

4. The location where Mr. Kilty parked Vehicle #2/2A was a commercial truck check-in location for inspection prior to entering Fort Irwin. There were two signs at this location which provided guidance for truck drivers. One of the signs clearly indicated that the check-in time was Monday through Friday from 0600 to 0800 hours.

USA-00446

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 96 |

## CONCLUSIONS

5. Mr. Kilty had a valid commercial driver license. With this license he received training, testing and experience beyond that of the average driver. Part of the training and testing Mr. Kilty received included the dangers of stopping a vehicle within the roadway. This training also described the requirement to place warning devices, such as warning triangles, within the roadway if an extended stop was to become necessary.

6. Video evidence of Ms. Aguilar while driving Vehicle #1 did not corroborate statements that she fell asleep prior to the collision.

7. Lighting, contrast and expectancy contributed to Ms. Aguilar not being able to avoid Vehicle #2/2A. The extent of which these factors contributed to this collision was not determined in this investigation.

App. 484

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 97 |

## CONCLUSIONS

<u>Violations</u>

<u>Driver Steven Kilty</u>

Driver Steven Kilty was in violation of the following Sections of the California Vehicle Code:

*§22400. (a) No person shall drive upon a highway at such a slow speed as to impede or block the normal and reasonable movement of traffic, unless the reduced speed is necessary for safe operation, because of a grade, or in compliance with law.*
*No person shall bring a vehicle to a complete stop upon a highway so as to impede or block the normal and reasonable movement of traffic unless the stop is necessary for safe operation or in compliance with law.*

*§25300 (c) When any such vehicle is disabled or parked off the roadway but within 10 feet thereof during darkness, warning reflectors of the type specified in subdivision (a) shall be immediately placed by the driver as follows: one at a distance of approximately 200 feet and one at a distance of approximately 100 feet to the rear of the vehicle, and one at the traffic side of the vehicle not more than 10 feet to the rear of the vehicle. The reflectors shall, if possible, be placed between the edge of the roadway and the vehicle, but in no event less than two feet to the left of the widest portion of the vehicle or load thereon.*

USA-00448

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 98 |

## CONCLUSIONS

Violations

Driver Steven Kilty

Due to the fact that Vehicle #2/2A was in transport within the #2 lane of the truck bypass, all lighting requirements (usage and equipped) applied to Mr. Kilty and Vehicle #2/2A. The following Sections of the California Vehicle Code applied:

*§24600. During darkness every motor vehicle which is not in combination with any other vehicle and every vehicle at the end of a combination of vehicles shall be equipped with lighted taillamps mounted on the rear as follows:*

*(c) Every vehicle or vehicle at the end of a combination of vehicles, subject to subdivision (a) of Section 22406 shall be equipped with not less than two taillamps.*

*(e) Taillamps shall be red in color and shall be plainly visible from all distances within 500 feet to the rear except that taillamps on vehicles manufactured after January 1, 1969, shall be plainly visible from all distances within 1,000 feet to the rear.*

*§25100. (a) Except as provided in subdivisions (b) and (d), every vehicle 80 inches or more in overall width shall be equipped during darkness as follows:*

*(1) At least one amber clearance lamp on each side mounted on a forward-facing portion of the vehicle and visible from the front and at least one red clearance lamp at each side mounted on a rearward-facing portion of the vehicle and visible from the rear.*

*(2) At least one amber side-marker lamp on each side near the front and at least one red side-marker lamp on each side near the rear.*

*§24400. (b) A motor vehicle, other than a motorcycle, shall be operated during darkness, or inclement weather, or both, with at least two lighted headlamps that comply with subdivision (a).*

USA-00449

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 99 |

## CONCLUSIONS

### Violations

#### Driver Steven Kilty

Driver Steven Kilty was in violation of the following Sections of the California Penal Code:

> *§192 PC:  Manslaughter is the unlawful killing of a human being without malice.*
> *(c) Vehicular--*
> *(1) Except as provided in subdivision (a) of Section 191.5, driving a vehicle in the commission of an unlawful act, not amounting to felony, and with gross negligence; or driving a vehicle in the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence.*

### Elements of the Offence

*§192(c)(1)PC:*  Vehicular Manslaughter

> *Driving a vehicle in the commission of an unlawful act, not amounting to felony...*

Mr. Kilty was driving Vehicle #2/2A, a Volvo truck trailer combination, on the northbound Fort Irwin Road Truck Bypass route and parked his vehicle within the #2 lane of traffic at approximately 2030 hours on June 1, 2014.  The stopping of Vehicle #2/2A within a travel lane impeded the normal flow of traffic, was not in compliance with law, and posed a significant danger to approaching vehicles.  This action indicated Mr. Kilty failed to have *due regard* for the safety of drivers within the truck bypass route.  This causative factor was also a violation of Section 22400(a) of the California Vehicle Code.

This collision occurred during the hours of darkness.  After stopping his vehicle within the #2 lane of the truck bypass, Mr. Kilty shut off all exterior lighting on Vehicle #2/2A.  The absence of lighting on Vehicle #2/2A contributed to this collision and was a violation of Section 24600 and 25100(a) of the California Vehicle Code.

Mr. Kilty failed to provide any warning to approaching drivers by not placing warning devices within the roadway.  This was a violation of Section 25309(c) of the California Vehicle Code.

USA-00450

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 100 |

## CONCLUSIONS

Violations

### Elements of the Offence

*§192(c)(1)PC:* Vehicular Manslaughter

#### With gross negligence...

Mr. Kilty had a valid commercial driver license.  With this license he received training, testing and experience beyond that of the average driver.  Part of the training and testing Mr. Kilty received included learning of the dangers of stopping a vehicle within the roadway. This training also described the requirement to place warning devices, such as warning triangles, within the roadway if an extended stop was to become necessary.

Mr. Kilty consciously and voluntarily allowed Vehicle #2/2A to remain stopped within a lane of traffic, during the hours of darkness.  Mr. Kilty failed to use reasonable care and caution when he decided to shut off the exterior lighting of Vehicle #2/2A and decided not to utilize warning devices which would have warned approaching drivers.  Mr. Kilty's training and experience should have made it foreseeable to him that Vehicle #2/2A posed a threat of grave consequences by remaining stopped and without lighting, within a lane of traffic.

#### Unlawful killing of a human being...

Mr. Dail Keiper sustained fatal injuries as a result of this collision which was caused by Mr. Kilty.

USA-00451

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (*MONTH-DAY-YEAR*) | TIME (*2400*) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 101 |

## CONCLUSIONS

Violations

Driver Steven Kilty

Driver Steven Kilty was in violation of the following Section of Title 18 of the United States Code:

*§ 1112. Manslaughter*

*(a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:*

*Voluntary - Upon a sudden quarrel or heat of passion.*
*Involuntary - In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.*

USA-00452

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**MULTIDISCIPLINARY ACCIDENT INVESTIGATION TEAM NARRATIVE / DIAGRAM**
CHP 558 (REV. 9-08) OPI 065 (*MAIT use only*)

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER ID | REPORT NUMBER | MAIT CASE NUMBER | PAGE |
|---|---|---|---|---|---|---|
| 06-02-2014 | 0506 | | 16186 | 0618-2014-MPC1446 | IF-014-15 | 102 |

## RECOMMENDATIONS

It is recommended that a copy of this investigation be forwarded to the United States Attorney's Office for review.

USA-00453

1   John S. Williamson, Bar No. 106485
    *jwilliamson@williamsonlawgroup.net*
2   Connie L. Benson, Bar No. 185680
    *cbenson@williamsonlawgroup.net*
3   WILLIAMSON LAW GROUP
4   1851 East First St., Suite 1225
    Santa Ana, CA 92705
5   (657) 229-7400/FAX: (657) 229-7444

6
    Attorneys for Defendants, STEVEN KILTY; FBN TRANSPORTATION, LLC; AMSTON
7   SUPPLY, INC.; MARDAN TRANSPORTATION, LLC

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10

11  MARGARET KEIPER and DAIL          ) CASE NO.   EDCV 15-00703-BRO(SPx)
12  KEIPER, JR., Individually and as the ) EDCV 15-00762-BRO(SPx)
    Successors-in-Interest to DAIL KEIPER, ) EDCV 15-01481-BRO(SPx)
13  SR., Deceased,                     )         EDCV 15-02380-BRO(SPx)
                                       )
14                        Plaintiffs,  )
                                       )
15  vs.                                ) **DECLARATION OF STEVEN**
                                       ) **KILTY IN SUPPORT OF**
16  VICTOR VALLEY TRANSIT              ) **OPPOSITION OF TRUCKING**
    AUTHORITY, a Governmental entity;  ) **PLAINTIFFS TO THE UNITED**
17  DINORAH AGUILAR; TRANSDEV          ) **STATES OF AMERICA'S MOTION**
    SERVICES, INC., a Maryland         ) **TO DISMISS THIRD PARTY**
18  Corporation; VEOLIA               ) **COMPLAINTS**
19  TRANSPORTATION SERVICES, INC., )
20  A Corporation; STEVEN KILTY; FBN   ) **DATE:  January 4, 2016**
    TRANSPORTATION, LLC, a Wisconsin ) **TIME: 1:30 P.M.**
21  Limited Liability Company; MARDAN  ) **COURTROOM: 14, 312 N. Spring St.,**
22  TRANSPORTATION LLC, a Wisconsin ) **Los Angeles, CA 90012**
    Limited Liability Company; AMSTON  ) **HON. BEVERLY REID-O'CONNELL**
23  SUPPLY, INC., a Wisconsin Corporation; )
24  and DOES 1 to 100, inclusive,      )
                                       )
25                                     )
                          Defendants.  )
26  _____ )
                                       )
27  AND ALL RELATED ACTIONS            )
                                       )
28  _____ )

                            1

8.    The procedure I followed in stopping at the Check-in Point for military clearance was consistent with the procedure I followed while making my only other prior delivery to Fort Irwin several months earlier.

9.    Following the accident, I was advised by a Fort Irwin policeman investigating the accident that I had done nothing wrong and had followed procedures correctly.

I declare under penalty of perjury under the laws of the United States that this declaration was signed on December __11__, 2015 and is true and correct to the best of my knowledge.

_____
                        STEVEN KILTY

App. 492

USA-00461

I, Steven Kilty, declare as follows:

1.    I am a commercial truck driver, licensed by the State of Arizona. I have been so licensed since 1993.

2.    I was involved in a traffic accident on the Fort Irwin By-Pass Road on June 2, 2014. At the time of the accident I was operating under the motor carrier authority of the company that had dispatched me for delivery, FBN Transportation LLC.

3.    At the time of the accident, I was asleep in the sleeper berth of my tractor while waiting to receive clearance to proceed at the designated Fort Irwin NTC Check-in Point. I was delivering a piece of heavy equipment on my trailer known as a "Wrecker."

4.    I arrived at Fort Irwin NTC during the nighttime hours on June 1, 2014. I drove from Barstow, California toward Fort Irwin on Fort Irwin Road. As I entered the Base, signage directed truck traffic to the Fort Irwin By-Pass Road. The road consists of two lanes of traffic, separated by a white spaced line.

5.    As I proceeded on THE Fort Irwin Road By-Pass Road, I passed signage advising me to prepare to stop. I then arrived at an area designated by signage as the "Check-in Point." Hours of operation were not posted on the Check-in Point sign. No indication as to the operating hours of the Check-in Point was on the Check-in Point sign. A portable toilet unit and small structure was at the Check-in Point.

6.    A sign stating "TRUCKS STOP HERE" was located at the Check-in Point. The sign faced the By-Pass Road and was clearly visible from the roadway. This is where I stopped to wait for entry clearance between 6:00 a.m. and 8:00 a.m., as directed by the sign.

7.    I remained stopped, as directed, at the Check-in Point until my vehicle was struck from behind by a VVTA bus before 5:30 a.m.

///

///

2

App. 493

USA-00462

# Exhibit D-2

# Pretrial Government Discovery
## Second Batch, Letter and Bates 463-835
### (excerpts)



# United States Department of Justice

## United States Attorney's Office
## Central District of California

---

*Bilal A. Essayli*
*Phone: (951)276-6246*
*E-mail: bilal.essayli@usdoj.gov*

*3403 10th Street, Suite 200*
*Riverside, California 92501*

October 12, 2017

**VIA U.S. MAIL**

Rob Harley
825 N. Ross Street
Santa Ana, CA 92701

     Re:    <u>United States v. Steven Kilty</u>,
                  CR No. 16-00024-JGB

Dear Mr. Harley:

Pursuant to your request, enclosed please find the government's supplemental discovery production, which includes documents Bates numbered USA 00463-00835, along with digital photographs.  To assist your review of the discovery, I have also created the following index:

| BATES RANGE | DOCUMENT DESCRIPTION |
|---|---|
| USA-00463 USA-00468 | Incident Detail Report |
| USA-00469 USA-00471 | KILTY Wisconsin Driving Record |
| USA-00472 USA-00522 | KILTY Arizona Driving Record & Application |
| USA-00523 USA-00528 | FMCSA Analysis & Information |
| USA-00529 USA-00536 | VVTA Maintenance Records |
| USA-00537 USA-00794 | Military Freight Traffic Unified Rules Publication |
| USA-00795 USA-00806 | Wisconsin Commercial Driver's Manual |
| USA-00807 USA-00814 | Driver Product History |
| USA-00815 USA-00824 | Butolph, Michael Declaration |
| USA-00825 USA-00835 | Various News Articles |

App. 495

RE:  <u>United States v. Steven Kilty</u>
July 26, 2022
Page 2


The government will produce to you any additional Jencks material—including any relevant grand jury transcripts, assuming a Rule 6(e) order has been issued—one week before trial if you agree to the production of reciprocal Jencks material at that time or affirmatively represent that you have no Jencks material to produce.  Please inform me whether such an arrangement is acceptable to you.

The enclosed materials and any future discovery provided to you that may exceed the scope of discovery mandated by the Federal Rules of Criminal Procedure, federal statute, or relevant case law are provided voluntarily and solely as a matter of discretion.  By producing such materials to you, the government does not waive its right to object to any future discovery requests beyond the ambit of its legal obligations.

The government also hereby gives notice that it may seek to introduce the other crimes, wrongs, or acts committed by your client which are referenced in the enclosed items pursuant to Rules 404(b), 608, and/or 609 of the Federal Rules of Evidence, or on the theory that they are inextricably intertwined with the charged conduct.

With this letter the government requests all reciprocal discovery to which it is entitled under Rules 16(b) and 26.2 of the Federal Rules of Criminal Procedure.  The government also requests notice of any intention of your client to rely on an entrapment defense, or a defense involving mental condition or duress, and/or an alibi defense.  Pursuant to Federal Rule of Criminal Procedure 12.1, the dates, times, and places of the charged offenses are detailed within the documents included within the discovery.  Please contact me immediately if you believe that this notice is insufficient.

Please let me know if you have any questions, or would like to further discuss any of the matters raised above.

Very truly yours,

BILAL A. ESSAYLI
Assistant United States Attorney
General Crimes Section


Enclosures

1  LORETTA E. LYNCH
   Attorney General of the United States
2  LAURA E. DUFFY
   United States Attorney
3  Katherine L. Parker, SBN 222629
   Glen F. Dorgan, SBN 160502
4  Valerie E. Torres, SBN 223011
   Special Attorneys to the Attorney General
5  Office of the U.S. Attorney
   880 Front Street, Room 6293
6  San Diego, California 92101
   Tel: (619) 546-7634  Fax:  (619) 546-7751
7  Email: katherine.parker@usdoj.gov

8  Attorneys for Third-Party Defendant UNITED STATES OF AMERICA

9

10              IN THE UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12

13  MARGARET KEIPER, *et al.*,            CASE NO.: 5:15-cv-00703-BRO (SPx)

14              Plaintiffs,               CASE NO.: 5:15-cv-00762-BRO (SPx)

15  v.                                    CASE NO.: 5:15-cv-01481-BRO (SPx)

16  VICTOR VALLEY TRANSIT                 **DECLARATION OF MICHAEL V.**
    AUTHORITY, *et al.*,                  **BUTOLPH IN SUPPORT OF**
17                                        **UNITED STATES' MOTION TO**
                Defendants.               **DISMISS**
18

19  VICTOR VALLEY TRANSIT                 **[FRCP 12(b)]**
    AUTHORITY, *et al.*,
20                                        DATE:    January 4, 2016
                Third-Party Plaintiffs,   TIME:    1:30 p.m.
21                                        CTRM:    14 – Spring Street
    v.                                    JUDGE:   Hon. Beverly Reid O'Connell
22
    UNITED STATES OF AMERICA,
23
                Third-Party Defendant.
24

25
    AND CONSOLIDATED ACTIONS
26

27

28  ///

1    I, Michael V. Butolph, declare as follows:

2        1.    I am employed by the United States Department of the Army (the "Army"),

3    over the age of twenty-one, and competent to make this Declaration.  I make the

4    following declaration in lieu of an affidavit pursuant to 28 U.S.C. § 1746 and am aware

5    that this declaration is the legal equivalent of a statement under oath.  I have personal

6    knowledge regarding the following facts and, if called as a witness, could and would

7    competently testify thereto.

8        2.    Since 2007, I have been employed by the Army as the Deputy Director of

9    Emergency Services at the National Training Center Fort Irwin (NTCFI).  NTCFI is the

10   main training area for the United States Military and is located in the Mojave Desert in

11   northern San Bernardino County, California.  NTCFI's mission is to provide realistic

12   joint and combined arms training, and the base is home to the 11th Armored Cavalry

13   Regiment.  The base encompasses over 1,000 square miles and consists primarily of

14   desert training ranges and the Fort Irwin housing and offices complex.  The daily

15   population on the base is nearly 25,000, which includes over 4,400 active duty soldiers,

16   5,600 rotational soldiers, 7,700 family members and a civilian workforce in excess of

17   7,200 people.

18       3.    As Deputy Director of Emergency Services at NTCFI, I provide technical

19   advice to the garrison commander and staff on all matters of safety planning and risk

20   management at the base.  In this role, I supervise approximately 160 employees

21   organized into three departments:  Police, Fire and Physical Security Operations.  As

22   such, I am directly involved in planning, organizing, controlling and supervising the

23   functions of the three departments.  Through my experience and training, I have

24   developed specialized knowledge regarding traffic safety, access control and security

25   functions unique to a large, complex organization such as NTCFI.  Additionally, I am the

26   directorate's Budget Officer, and I plan and execute a budget of roughly $12 million,

27   which supports law enforcement and physical security functions.

28   ///

*Declaration of Michael V. Butolph in Support of*
*~~tion to Dismiss~~*

2

App. 498

4.      Among other duties, I am responsible for developing a comprehensive traffic safety program for vehicle traffic within the physical boundaries of the base. In carrying out this responsibility, I am guided by policies published at the Department of Defense level (*see, e.g.,* DoDI 6055.04, the Department of Defense Instruction on Traffic Safety); the Army level (*see, e.g.,* DLAR 190-5, the Army Regulations on Motor Vehicle Traffic Supervision); and the base level (*see, e.g.,* NTC Regulation 190-5, Motor Vehicle Traffic Supervision).      True and correct copies of DoDI 6055.04, DLAR 190-5, and NTC Regulation 190-5 are attached as Exhibits "A" through "C" hereto. While these policies articulate traffic safety goals[1] and provide guidance in identifying who is responsible for carrying out certain functions,[2] there are no provisions within these policies – or in any other statute, policy, or publication – that dictate mandatory and specific steps to be taken by my department, or NTCFI as a whole, in managing traffic safety on the base.

5.      Fort Irwin was selected as the site for the National Training Center in part because it is isolated from densely populated areas. To ensure that traffic access to the base is regulated and controlled, the base is designed with one main gate, located on Fort Irwin Road approximately 37 miles north of Interstate 15 and Barstow, California. My responsibilities for traffic safety extend approximately 6 miles south on Fort Irwin Road from the main gate to the southern-most property line for the base. Attached hereto as Exhibit "D" is a satellite photograph that accurately depicts the location of Fort Irwin Road, the main gate and the Fort Irwin housing and offices complex.

///

---

[1] For Example, DoDD 5255.4 provides, in part, that traffic safety programs must "[i]dentify locations experiencing high numbers or sharp increases in crashes" and "[d]evelop measures for reducing crashes and evaluate the effectiveness of safety improvements on any specific section or the road or street system." *See* DoDD 5255.4, Ex. "A," p. 11.

[2] AR 190-5, for example, provides that "Installation commanders will develop traffic circulation plans that provide for the safest and most efficient use of primary and secondary roads," and NTC Regulation 190-5 identifies the Director of Emergency Services as the "Garrison Commander's direct representative" regarding Motor Vehicle Traffic Supervision. *See* AR 190-5, Ex. "B," p. 12; NTC Regulation 190-5, Ex. "C," p. 4.

App. 499

6.     On the base, Fort Irwin Road is a two-lane road with a posted speed limit of 60 miles per hour.  Before I became Deputy Director, Fort Irwin Road was widely regarded as dangerous.  *See* For Troops, This Road is Not a Drill, Los Angeles Times, April 26, 2004 (online at http://articles.latimes.com/2004/apr/26/local/me-ftirwin26) ("before traffic arrives on base, it rumbles down Ft. Irwin Road, past 42 white wooden crosses" which memorialize "lives lost along the road since the early 1980s").  In late 2004, the Army and San Bernardino County officials improved the road to add, among other things, paved shoulders, "rumble strips," and "no passing zone" signage.  Although these improvements increased the safety of the road, a new development in or about 2008 required additional safety planning.  Specifically, NTCFI developed plans in 2008 and 2009 to install an Automated Installation Entry ("AIE") system at the main gate to Fort Irwin.  The AIE system was designed to equip the gate with new technology to read radio frequency identification tags on vehicle windshields and scan identification cards as a means of improving the efficiency of the gate operations.  Installation of the AIE system at the main gate required partial closure of inbound lanes to the gate between August 2009 and February 2010.

7.     Before construction began at the main gate in August 2009, my department was tasked with preparing a safety plan for effective and safe access through the main gate during the periods of partial lane closures.  In preparing the plan, we considered several factors, including the following:

7.A.     Traffic studies conducted in 2008 confirmed that over 17,000 vehicles enter through the main gate during an average work week.  In part based on these studies and my Department's observations, we were aware that a significant portion of the traffic consisted of large commercial trucks and passenger buses, and we were also aware that the operation of such large vehicles on Fort Irwin Road detrimentally affected the flow of traffic.  Traffic heading north on Fort Irwin Road must travel along a steady uphill grade for approximately seven miles until it reaches the main gate, and it is common for large trucks and buses to slow well below the posted 60 mph speed limit while traveling uphill.

1    As a result, it was not uncommon prior to 2009 for smaller vehicles traveling northbound

2    behind large trucks or buses to attempt unsafe or even illegal passing maneuvers.  We

3    anticipated that these problems would worsen during the partial lane closures associated

4    with the AIE system construction.

5          7.B.  The 2008 traffic studies revealed that the peak traffic period at the

6    main gate is between 5:00 a.m. and 8:00 a.m. on weekdays.  As compared to traffic

7    between 4:00 a.m. and 5:00 a.m. (with an average of 1,449 vehicles passing through the

8    main gate) and traffic between 8:00 a.m. and 9:00 a.m. (with an average of 911 vehicles),

9    an average of 2,990 vehicles passed through the main gate every hour between 5:00 a.m.

10   and 8:00 a.m. during the 2008 studies.  During these peak periods, it was common for

11   traffic to back up behind the gate while vehicles were processed and cleared to enter the

12   base.  Indeed, because of the size and reduced speed of commercial truck traffic and

13   passing limitations, there were occasions prior to the commencement of the AIE system

14   installation when trucks and vehicles were forced to come to a complete stop during the

15   peak hour traffic, causing back-ups in the northbound lane that extended as far as two to

16   three miles south of the main gate.  On occasion when security concerns at the gate were

17   heightened and security measures were increased, these back-ups worsened.  For

18   example, in the aftermath of the 9/11 terrorist attacks, when security measures at all

19   military facilities—including NTCFI—were increased, back-ups at the main gate during

20   peak hours sometimes extended as far as five miles south of the main gate.

21         7.C.  The vast majority of personnel traveling to NTCFI for work must

22   report to work (i.e., clear the main gate and be at their desks) between 6:00 a.m. and 8:00

23   a.m.  Our Department determined as a result that the plan for effective and safe access

24   through the main gate during the AIE system installation would have to prioritize the

25   clearance of personal vehicles over commercial truck traffic.  Simply stated, it was more

26   important that individuals report timely to work than for a shipment of milk to timely

27   arrive at the commissary, for example.

28   ///

7.D.   The process for clearing traffic through the main gate is much more involved for commercial truck traffic as compared to personal vehicles.  For commercial truck traffic, access control personnel must, among other measures, (1) direct the driver to turn off the engine and apply the parking brake; (2) scan the vehicle—including the high-threat "hot spots" such as the fuel and air tanks—for suspicious markings, alteration and damage; (3) collect and review the vehicle registration, proof of insurance, and any logbook, itinerary, manifest, shipping papers or bill of lading; and (4) interview the driver and any vehicle occupants to ascertain the purpose for the visit and the specifics of any cargo shipment.  Occasionally, the process requires that the driver exit the vehicle to open interior and exterior cargo doors.  Moreover, on a random basis, commercial truck traffic is subjected to anti-terrorism and anti-narcotics screening measures that include, for example, inspections by personnel with trained dogs.

7.E.   The prolonged presence of commercial trucks at the main gate awaiting clearance to enter on to the base creates unique security risks.  The risk of an attack through the use of explosives, and specifically a 200 lb Vehicle Borne Improvised Explosive Device ("VBIED"), represents one of the single greatest security risks faced by NTCFI, and the greatest security risk at the access control point.  Moreover, the most likely location for a VBIED attack would be within the large vehicle search area at the main gate, because of its close proximity to the main gate itself and two other installation resources, the base visitor center and the electric power substation.  Attached hereto as Exhibit "E" is a satellite photograph that accurately depicts the location of the main gate, the large vehicle search area, the visitor center, and the substation.  In the event of a VBIED attack at the main gate, it is estimated that the maximum blast radius would be approximately 2,000 feet.

7.F.   Although our traffic studies showed peak traffic between 5:00 a.m. and 8:00 a.m., our Department personnel were aware based on our own observations that the vast bulk of commercial truck traffic arrived at the main gate between 6:00 a.m. and

///

App. 502

1  8:00 a.m.   This is due in part to the fact that the personnel tasked with unloading
2  commercial shipments do not report to work until after 6:00 a.m.

3     7.G.   The AIE system installation project did not include additional funding
4  to pay for new measures associated with the Department's plan for an effective and safe
5  means of access through the main gate during the installation process.   Accordingly, any
6  additional measures developed as part of the plan would have to be paid for through
7  existing, limited resources.

8    8.   After considering these and other factors, my Department developed a safety
9  plan that accomplished the following:

10     8.A.   First, in early to mid-2009, the Department made minor improvements
11  to a previously-unused bypass road that branches off of Fort Irwin Road roughly 5 miles
12  south of the main gate (and within the property boundaries of the base) and rejoins Fort
13  Irwin Road roughly 2 miles south of the main gate.   Attached hereto as Exhibit "F" is a
14  satellite photograph that accurately depicts the location of the bypass road in relation to
15  the main gate.   In coordination with the NTCFI Department of Public Works, we installed
16  shoulder improvements and pavement "cappings" (or select areas of repaving), painted
17  the lane markings on the road, and painted the lane-merge markings at the location where
18  the bypass road rejoins Fort Irwin Road.   Additionally, in coordination with the
19  Department of Public Works, we installed signage along Fort Irwin Road just south of the
20  bypass road as well as along the bypass road itself.   The signage directed that all trucks,
21  trailers and buses "must" use the bypass road and reduce speed to 45 mph.   Attached
22  hereto as Exhibit "G" is a true and correct copy of the contractor submittals for the
23  installation of signage along the bypass road.   The contractor submittals accurately reflect
24  the signage that was installed in early to mid-2009 and existed as of June 2014.

25     8.B.   Second, we established a temporary security check point for
26  commercial truck traffic on the bypass road for use only during the peak hours of 6:00
27  a.m. to 8:00 a.m. on weekdays.   We set up the temporary security check point each
28  weekday morning at the mid-point of the bypass road (approximately 2.5 miles south of

App. 503

1   the main gate) because (1) the location was on level ground so vehicles could stop safely;

2   (2) the location was far enough south of the re-entry point onto Fort Irwin Road to allow

3   commercial truck traffic to pick up enough speed to safely merge with the traffic on Fort

4   Irwin Road; (3) the location was south of the main gate a sufficient distance to eliminate

5   the risk that a VBIED detonation at the security check point would threaten the

6   operations at the main gate, the visitors center or the electric power substation; and (4)

7   the lower elevation of the bypass road south of the check point, as compared to the higher

8   elevation of Fort Irwin Road in the adjacent area, created a natural berm between the two

9   roads that provided some blast protection to traffic on Fort Irwin Road in the event of a

10  VBIED detonation.   Attached hereto as Exhibit "H" is a satellite photograph that

11  accurately depicts the location of the temporary security check point on the bypass road.

12  Additionally, attached hereto as Exhibit "I" is a photograph that accurately depicts the

13  berm separating the bypass road and Fort Irwin Road from the vantage point of the check

14  point area facing south.

15          8.C.   Third, in advance of opening the bypass road, we communicated

16  directly with the companies operating buses and commercial truck traffic on Fort Irwin

17  Road to advise that the bus and truck traffic would be diverted onto the bypass road.

18  Unlike Fort Irwin Road, the bypass road consists of two north-bound traffic lanes.

19  Accordingly, we advised the companies that the Department's plan was to (1) create a

20  temporary security check point by erecting a temporary barricade between 6:00 a.m. and

21  8:00 a.m. in the right-hand lane of the bypass road; (2) direct all commercial traffic to the

22  right-hand lane of the bypass with instructions to come to a stop at the temporary

23  barricade <u>during the posted hours only</u> and await security inspections necessary for

24  clearance onto the base; and (3) direct all bus traffic to the left-hand lane of the bypass

25  road to proceed through to the main gate.   To carry out this plan, a road sign was placed

26  at the location of the temporary security check point that stated "Check-in Point."

27  Additionally, each weekday morning at 6:00 a.m., access control personnel placed a red

28  temporary barricade in the right lane near the "Check-in Point" sign to stop traffic.   A

1  separate sign was fastened to the barricade that advised, "Trucks Stop Here, Hours 0600-
2  0800, Monday – Friday." Each weekday between 6:00 a.m. and 8:00 a.m., the access
3  control personnel remained at the location and conducted the above-referenced security
4  inspections for commercial trucks. Moreover, each weekday at 8:00 a.m., the access
5  control personnel moved the red temporary barricade away from traffic and off to the side
6  of the bypass road, and the personnel then left the area to return to the main gate. Thus,
7  the temporary check in point and the requirement to stop on the bypass road was in place
8  only between the hours of 6:00 a.m. and 8:00 a.m. each weekday, and at all other times
9  the red barricade rested on the side of the bypass road away from traffic. Attached hereto
10  as Exhibits "J" and "K" are photos that accurately depict these signs and the barricade
11  during the period of 2009 through June 2014.

12     8.D. Fourth, commencing in August 2009, personnel from my Department
13  were stationed at Fort Irwin Road just south of the bypass road to direct commercial
14  traffic and buses to use the bypass road. Personnel remained on site on a daily basis for
15  30 days to provide this guidance.

16     8.E. Finally, in or about May 2012, when the Victor Valley Transit
17  Authority ("VVTA") first began running buses into Fort Irwin, I personally
18  communicated with a representative of VVTA to advise them of the operation of the
19  temporary check point and the practice for buses to use the bypass road and remain in the
20  left-hand lane to proceed to the main gate.

21     9. Between August 2009 and the completion of the AIE system upgrades at the
22  main gate in or about February 2010, all commercial vehicles and buses were required to,
23  and in practice did, use the bypass road. During peak hours, the practice of stopping
24  commercial trucks in the right-hand lane for security checks and directing buses to the
25  left-hand lane of the bypass road worked without incident. Outside the hours of 6:00 a.m.
26  to 8:00 a.m. on weekdays, the temporary check point was not in effect and trucks could,
27  and did, proceed to the main gate using the bypass road without stopping. Additionally,
28  during non-peak hours, buses continued to use the left-hand lane of the bypass road to

*Declaration of Michael V. Butolph in Support of*
*Motion to Dismiss*    9    USA_00823

App. 505

1   proceed to the main gate.  As a result of these practices, the traffic condition on Fort

2   Irwin Road and at the main gate improved significantly.  Because of the success of this

3   plan, my Department has kept this procedure in place through the present.

4          10.    I am aware that the accident at issue in this case occurred on June 2, 2014,

5   when a VVTA bus collided with a commercial truck in the right lane of the bypass road

6   near the location of the temporary security check point.  The accident occurred outside

7   the hours of 6:00 a.m. to 8:00 a.m.  Therefore, the temporary security check point was not

8   in effect, meaning the red barricade was not present in the right lane, no access control

9   personnel were present, and there was no requirement for truck traffic to stop on the

10  bypass road.  Attached hereto as Exhibit "L" is an aerial photo of the accident scene

11  taken on the day of the accident.[3]  With the exception of the accident at issue in this case,

12  there have been no other reported accidents on the bypass road since it opened in mid-

13  2009.

14         I declare under penalty of perjury under the laws of the United States of America

15  that the foregoing is true and correct.

16         Executed this 24th day of November, 2015, at Fort Irwin, California.

17

18                                             _____

19                                             Michael V. Butolph

20

21

22

23

24

25

26  [3] I am also aware the third-party plaintiffs have alleged that, prior to the accident, an
    "unidentified non-party" warned personnel working under my supervision at the main gate
27  that a tractor-trailer was stopped without lights at an unsafe location on the bypass road.
    My department investigated this allegation and uncovered no evidence that any such report
28  was made to the personnel at the main gate on the morning of June 2, 2014.

USA_00824

App. 506

⟳

## About Our Firm



#11 Largest Overall Verdict in TX in 2011

#1 Largest Auto/Truck Accident Verdict



Highest Auto Verdict in Texas in 2011
($18,795,800)

- Virginia School Bus Driver Cited Following Collision With Truck May 1, 2015
- More Than a Dozen Lives Lost in Nepal Bus Crash April 23, 2015
- Ohio School Bus Crash Results in Injury April 16, 2015
- Georgia Girl Killed in Bus Collision April 8, 2015
- Indiana Ambulance Collides With School Bus, 15 Hurt April 1, 2015

Follow us with

- Facebook
- Twitter
- Google+

# Fatal Injury in Fort Irwin Bus Crash

Category : Bus Crash Lawyer on June 6, 2014

FA man was killed and eight others injured from injuries they sustained while riding a Victor Valley Transit Authority (VVTA) bus this week. The vehicle was traveling in the early morning hours on Monday when it struck a tractor-trailer that was parked in the right lane of the highway. The truck did not have any lights on or signals indicating that it was there, and according to VVTA Executive Director Kevin Kane, video indicates that it was impossible to see the five-ton truck there until it was too late.

"The truck was invisible on the horizon because it blended in to the hills on the horizon," Kane said. He said that in his opinion the bus driver, who had approximately five years of experience, tried everything to avoid the accident. "She didn't see anything until her headlights hit the reflectors on the truck. She tried to swerve and couldn't get out of the way in time. It was dark but you could see the driver was moving her arms and the moment she saw the vehicle she turned her whole body."

USA_00825

Killed in the accident was Dail Keiper, a resident of Barstow whose wife is president of the Barstow Women's Club. Mrs. Keiper was quoted as saying, "You ride the bus thinking you're safe," and had no other comment.

The bus was carrying nine passengers at the time, and the injured, which included the bus driver, were transported to Weed Army Medical Center, Arrowhead Regional Medical Center and Loma Linda University Medical Center. The incident occurred on federal land, which means that Fort Irwin personnel will be conducting the investigation.  The injured did include two soldiers.

Fort Irwin is the site of the National Training Center, a major training area for the United States Military. The VVTA bus service took over the Fort Irwin route approximately two years ago after budget cuts forced the federal installation to discontinue se of contracted buses.  The VVTA bus drivers are contracted from a company called Veloia Transportation, which employs 17,000. This incident represents the first fatality in the last sixteen years for the VVTA.

The accident report will include video documentation derived from two separate video systems that are installed on the bus.  There is a DriveCam video installed near the windshield and another system that is accessible with a key, and which had not yet been viewed.

USA_00826

App. 508

## • UPDATE: Deceased man identified in bus crash



• •
Mike Lamb, Desert Dispatch
• • By JOSE QUINTERO, STAFF WRITER

Posted Jun. 2, 2014 at 12:01 AM
Updated Jun 8, 2014 at 11:29 AM

FORT IRWIN • A Barstow man died and eight people suffered injuries early Monday morning when a Victor Valley Transit Authority bus headed to Fort Irwin hit a tractor-trailer that was stopped in the right lane of Fort Irwin Road with no lights on, VVTA Executive Director Kevin Kane said.

The deceased passenger was identified as Barstow resident Dail Keiper, who was in his 60s, according to his wife, Peggy, who was recently installed as president of the Barstow Women's Club.

"You ride the bus thinking you're safe," Peggy Keiper said.

At a loss for words, Peggy Keiper declined to further discuss her husband's death.

Kane said after looking at SmartDrive video on the bus, it appeared the VVTA driver did everything she could to avoid the collision.

"The truck was invisible on the horizon because it blended in to the hills on the horizon," Kane said. "She (the driver) didn't see anything until her headlights hit the reflectors on the truck. She tried to swerve and couldn't get out of the way in time.

"It was dark but you could see the driver was moving her arms (on the video as she drove) and the moment she saw the vehicle she turned her whole body (to try to avoid the truck)."

According to a release from Fort Irwin, the bus struck a five-ton tractor-trailer on Fort Irwin Road near the Army post.

Fort Irwin officials said the injured were transported to Weed Army Medical Center, Arrowhead Regional Medical Center and Loma Linda University Medical Center. Kane confirmed the bus driver was among the injured. He said she was very sore on her left side and had lacerations on her right side that had been stapled.

USA_00827

App. 509

Kane noted VVTA contracts for all of its drivers with Veloia Transportation, which has 17,000 transit employees who serve 150 clients. Kane said this driver was not a rookie.

"I know she's been driving the Fort Irwin commuter service for 6-7 months," he said. "I believe she's been driving for five years."

California Highway Patrol officials said the crash occurred on federal land and was being handled by Fort Irwin personnel. The crash remains under investigation by the Fort Irwin Department of Emergency Services.

"This was our first bus out this morning; its three stops were all in Barstow," Kane said. "The odds are all of these are Barstow residents."

Fort Irwin Director of Public Affairs Pamela Portland said two soldiers were among the injured. Portland confirmed one of the soldiers was released from the hospital Monday afternoon.

Kane could not say how many passengers were on board because "that information is on the bus' fare box." However, Portland said there were nine people on the bus, including the driver.

"We had a full management crew up there, but we were not allowed on the scene," Kane said. "We were waiting at the National Training Center's visitor center and they told us there was no sense in waiting, so they sent us all back."

Kane said there are two video systems on the bus. Kane said the SmartDrive video came from a windshield camera. Kane said the other system located on the bus can only be accessed by a key.

"We have a DVR on our bus that has six cameras," he said. "We weren't able to unlock it."

Kane said he hopes to get with Fort Irwin officials today so he can view the video on the DVR and provide it to investigators as well.

Kane said in his 16 years with VVTA, Monday's fatality was the first involving a VVTA bus.

After budget cuts forced Fort Irwin to cut ties with a contracted buses, VVTA took over the Fort Irwin route in May 2012, Kane said. He said there are seven routes to Fort Irwin in the morning and seven in the evening. Routes begin as early as 4:15 a.m., with pickups made in Hesperia, Victorville, Helendale, Barstow and Fort Irwin.

Buses leave the National Training Center between 3:45 p.m. and 6 p.m. every afternoon and evening.

Just last week Kane told a Daily Press editor that the NTC commuter buses were popular. "It's been very successful," he said. "We just ordered five over the road coaches with bathrooms and (electrical) plugs for laptops. They're like Greyhound coaches."

USA_00828

Search

Victorville 75° e-edition | subscribe | newsletter

# DAILY★PRESS

HOME NEWS SPORTS ENTERTAINMENT LIFE OPINION CUSTOMER SERVICE CLASSIFIEDS JOBS AUTOS REAL ESTATE

Tue, May 12, 2015 » OBITUARIES ARREST MAP PLACE AN AD ROUTE 66 BUSINESS BUSINESS SERVICES PHOTO CONTEST SICKWEATHER MAP

**NEWS NOW** Crossover lanes may be adjusted for weekend traffic volumes ... Scanner traffic: Sheriff's officials searching for man with dementia

## Officials mum on bus crash probe



COMMENT 



Zoom  MIKE LAMB, DESERT DISPATCH

Workers prepare to remove a damaged Victor Valley Transit Authority bus from the entrance of the Fort Irwin National Training Center on Monday. VVTA officials said the bus hit a tractor-trailer stopped without lights in the right lane of Fort Irwin Road, killing one man and injuring eight people.

Posted Jun. 7, 2014 at 12:01 AM
Updated Jun 9, 2014 at 5:40 PM

FORT IRWIN • Nearly a week after the fatal bus crash on Fort Irwin Road, officials have yet to release additional information regarding the collision.

Barstow resident Dail Keiper, a passenger, was killed in the Monday morning collision and eight others were injured. A Victor Valley Transit Authority bus, serving commuters to the National Training Center at Fort Irwin, hit a tractor trailer that was stopped without lights in the dark in the right lane of Fort Irwin Road, according to VVTA Executive Director Kevin Kane.

Last week, Kane said because of the crash impact, the video from six cameras on a DVR located on the bus would not play. Kane said he contacted the DVR manufacturer for assistance in viewing the video, but no date was set for the manufacturer to meet with VVTA and Fort Irwin officials. In a text message Friday, Kane said information on a specific meeting date was not available.

Kane, who was out of state, said further information regarding the crash was also not available.

Because the accident occurred on federal land, the crash is being investigated by the Fort Irwin Department of Emergency Services. However, it has released precious little information. There has been no estimate of how long the investigation will take and no comment on whether any of the injured have been released from the three hospitals where they were taken.

Fort Irwin Director of Public Affairs Pamela Portland said Friday she had no additional information.

"I can't give you anything I don't have," Portland said. "The crash is currently under investigation by the Fort Irwin Department of Emergency Services and we will release information as soon as we have it."

A memorial service for Keiper will be held at 2 p.m. Sunday at the Barstow Senior Center, 555 Melissa Ave.

*Jose Quintero can be reached at 760-256-4122 or JQuintero@DesertDispatch.com. You can also follow him on Twitter at @JoseQuinteroDD.*

**» Comment or view comments**

" data-width="650" data-numposts="20" data-colorscheme="light">



WWW.SBCFAIR.COM

» STAY INFORMED

Email NewsLetter  Sign Up Today
Sign up for our newsletter and have the top headlines from your community delivered right to your inbox.

NEWSMAX

• Pew: Christianity Declines Sharply in US
• New Probiotic Fat Burner Takes GNC by Storm
• The One Secret to a Healthy Thyroid
• $1 Million in 30 Days System Has Wall Street in a Panic
• Dr. Ron Paul: A Crisis Bigger Than 2008 May Be Coming
• Trouble With Pelvic or Bladder Mesh - Take This Evaluation

What's This?

CALENDAR

TUE WED THU FRI SAT SUN MON
Tuesday, May 12, 2015
lil' Gary's Legacy Shoe Collection Fundraiser  All Day
Christian Treasures Bookstore

## CDL LIFE News

## Truck Driver Warns Guard Of Disabled Truck Before Deadly Crash

According to reports from news agency Desert Dispatch, a veteran tuck driver said he was making a delivery to the Fort Irwin Army base in California early in the morning of June 2nd when, in a 'near miss,' he had to swerve to avoid hitting another truck stopped in the left lane with no lights on.

The 46 -year -old driver who said he's been driving tractor trailers for 27 years, claims that when he got to the gate of the Army base about 5 minutes later, at about 4:15am, he warned the guard about the truck stopped in the dark telling him that, "It's an accident waiting to happen." Although the driver expected somebody to at least wake up the driver of the stationary truck or put up cones, the man at the gate, who was not dressed in fatigues but a black uniform, remained non responsive about the issue, handed him his paperwork and told him to have a nice day.

About an hour  after warning the solo man at the gate, the driver's prophecy came true when a Victor Valley Transit Authority bus carrying commuters to the Army's National Training Center struck the stationary truck. Passenger Dail Keiper of Barstow was killed and eight others were injured, including the female driver.

The driver who issued the warning said as he was leaving Fort Irwin, he came upon the crash scene and attempted to relay his story to the investigators, telling them it didn't have to happen, but they didn't 'want to hear what he had to say and was threatened with arrest if he didn't leave.

"I pulled over by the side of the road and was talking to an officer in plain clothes," he told the Desert Dispatch. "He kept telling me to get back in my truck and I told him I need to talk to somebody. Then another gentleman came and said he was a lieutenant for Fort Irwin police and said, 'If you don't move your truck I'll have you arrested."

Fort Irwin released the following statement Tuesday afternoon in response to the man's allegations: "Fort Irwin Public Affairs and the Department of Emergency services have no knowledge of the incident which you describe. The accident is still under investigation. The US Army Criminal Investigation Division encourages persons to come forward who feel they have something of substance to add."

The driver chose to remain anonymous for his interview with the Daily Dispatch in fear of retaliation from the Army against him or his company. "It could have been prevented," said the truck driver who lives in Los Angeles.

App. 512

"If it was a relative of mine (who died in the crash), I'd like someone to come forward and provide some answers."

Fort Irwin officials urge witnesses or anyone who has more information on the crash to call 760-464-6869

USA_00831

App. 513

On the Go? Go mobile! Visit the Golden Gate mobile-friendly Web site.

Golden Gate District's News & Events

**GOLDEN GATE BRIDGE**

**DISTRICT**
- About Us
- Board of Directors
- News & Events
- Current News
- Transit Service Alerts
- Bridge Alerts
- Multimedia Gallery
- Press Room
- Archives
- Links
- Permits
- Bus & Ferry Rider Info
- Contact Us

**TRANSIT**

**BRIDGE**

**FERRY**

**GO PLACES WITH US**
- Go Mobile!
- Go With Clipper!
- Going Green!

Search Golden Gate

Translations

**Shop**
- ▶ Golden Gate Transit
- ▶ Golden Gate Bridge Gifts

Fares, Schedules & Maps   |   Customer Alerts   |   Press Room

# GOLDEN GATE TRANSIT EXPANDS BIKE CARRYING CAPACITY WITH NEW 3-POSITION BIKE RACKS

To further advance options for alternative modes of travel within the County of Marin, the Transportation Authority of Marin (TAM) and Golden Gate Transit (GGT) joined together to seek grant funding to replace the 2-position, exterior mounted bike racks with new exterior mounted racks capable of carrying 3 bicycles. In 2008, grant funding was secured through a Bay Area Air Quality Management District "Transportation Fund for Clean Air" grant administered by TAM.

GGT's fleet of 10 articulated 60-foot-long buses are already equipped with the 3-position exterior bike racks. These coaches are used exclusively within Marin County to provide local bus services on routes with high passenger capacity demands. GGT provides these services under a contract with Marin County Transit District (Marin Transit). TAM, Marin Transit, and GGT will continue to partner to identify initiatives such as the bike rack replacement program to improve travel options within Marin County.

With installations beginning on July 7, 2009, GGT will be expanding its bike carrying capacity by upgrading its 2-position bike racks to 3-position bike racks on 90 of its buses. With 3-position racks all ready mounted on GGT's 10 articulated coaches, once installations are completed, there will be 100 buses in the fleet of 204 buses equipped with 3-position racks. Installations will be completed later this summer.

After extensive testing, there are three different bus models in the GGT fleet that cannot be mounted with the 3-position bicycle racks due to safety concerns with the racks blocking headlights on curb side of the buses. In addition, under state law, GGT's 45-foot-long buses cannot accommodate the 3-position rack but will retain the 2-position "underbelly" luggage racks.

| GGT Bus Model | Number of Buses in GGT Fleet | Type of Bike Rack |
|---|---|---|
| 40-foot-long 1997 NovaBus | 10 | Will be upgraded to 3-position, exterior mounted racks |
| 40-foot-long 2003 Orion | 80 | Will be upgraded to 3-position, exterior mounted racks |
| 60-foot-long articulated buses | 10 | Currently equipped with 3-position, exterior mounted racks |
| 40-foot-long 1991 repowered TMCs | 34 | Cannot accept 3-position rack; 2-position, exterior mounted rack remains |
| 40-foot-long 2000 NovaBus | 14 | Cannot accept 3-position rack; 2-position, exterior mounted rack remains |
| 30-foot-long 2001 NovaBus | 4 | Cannot accept 3-position rack; 2-position, exterior mounted rack remains |
| 45-foot-long 57-Passenger MCI | 52 | Cannot accept exterior racks and will remain with the 2-position racks located in the "underbelly" luggage rack |
| Total | 204 | |

**Additional Background**

In July 1999, GGT launched its Bike Racks on Buses program with the installation of front-mounted, 2-position, exterior bike racks on GGT's 40-foot-long buses. At that time, state law prohibited the installation of the bike racks on the 45-foot-long buses. In October 2006, a solution for the 45-foot-long buses came to fruition, when all of GGT's high-capacity, 45-foot-long buses were equipped with racks accommodating two bikes inside the luggage bays.

TAM is designated as both the congestion management agency (CMA) and the transportation sales tax authority for Marin County. As the CMA, TAM addresses Marin's unique transportation issues, fulfilling the legislative requirements of Propositions 111 and 116, approved in June 1990. TAM was designated the sales tax authority in 2004, for the purpose of administering the 1/2 cent transportation sales tax in Marin County, passed by voters in November 2004 as Measure A. TAM is responsible for managing a variety of transportation projects and programs in Marin County, receiving federal, state, regional, and local funds, working closely with all eleven cities and towns as well as the county. To learn more visit: www.tam.ca.gov.

Marin County Transit District (Marin Transit) was formed by a vote of the people of Marin County in 1964 and was given the responsibility for providing local transit service within Marin County. Although Marin Transit has responsibility for local services, it does not own any buses or facilities and does not employ its own drivers. Instead, Marin Transit contracts with other providers, including Golden Gate Transit and Whistlestop Wheels for local bus and paratransit services. To learn more

USA_00832

Wife of man killed in VVTA bus crash still has 'bitter feelings' - News - DesertDispatch.com - Barstow, CA

http://www.desertdispatch........rticle20150601/NEWS/150609994(2/2015 3:00:20 PM)

# DESERT DISPATCH

Barstow ☀ 91° e-edition | subscribe | newsletter

HOME   NEWS   OBITUARIES   SPORTS   OPINION   CUSTOMER SERVICE   CLASSIFIEDS   JOBS   AUTOS   REAL ESTATE

BUSINESS   PLACE AN AD   ROUTE 66   BUSINESS SERVICES   SICKWEATHER MAP

**NEWS NOW**   Post office meeting for Hinkley residents   ...   Barstow High, Central holding ceremonies   ...   UPDATE: Bodies found in ho...

## Wife of man killed in VVTA bus crash still has 'bitter feelings'

Posted Jun. 1, 2015 at 9:49 AM

**By Jose Quintero**
**Staff Writer**

BARSTOW — Tuesday marks one year since a Barstow man was killed as he rode a Victor Valley Transit Authority bus on his way to work at Fort Irwin.

Dale Kelper, a heavy equipment specialist, was a passenger in the bus that collided with a stopped tractor-trailer that was stopped in the No. 2 lane of the truck by-pass road, adjacent to Fort Irwin and Paradise View roads.

Kelper was an employee at the Army post for 35 years, according to his wife Peggy Kelper.

As the anniversary of her husband's death approaches, Peggy Kelper said she still has bitter feelings about her husband's death.

"This has been a very tough year for us," she said. "It's been a very tough month because last May was the last month I had with him. All those memories are really just coming back."

Earlier this year the Kelper family filed a wrongful death lawsuit against VVTA, the bus driver and the driver of the tractor-trailer.

The complaint alleges Dinorah Aguilar was speeding when the bus collided with the tractor-trailer. A message left with Aguilar's employer Transdev Services Inc. was not immediately returned Friday.

VVTA Executive Director Kevin Kane said the incident was still under investigation and he couldn't provide further comment.

Last June, Kane told the Desert Dispatch that the truck was "invisible on the horizon because it blended in to the hills on the horizon." Kane also said the driver "didn't see anything until her headlights hit the reflectors on the truck" and "she tried to swerve and couldn't get out of the way in time."



More videos:



Bloomberg

ANALYSTS EXPECT A 11% DECLINE IN AUTO SALES FOR MAY



**» STAY INFORMED**



Email Newsletter   Sign Up Today

Sign up for our newsletter and have the top headlines from your community delivered right to your inbox.

According to the filed complaint, the tractor-trailer was driven by a Wisconsin-based FBN Transportation LLC driver, Stuart Morse, the company's co-owner declined comment and provided the Desert Dispatch with his lawyer's number.

A message left with the company's lawyer was not immediately returned Friday.

"This is just something that we never thought would happen riding a bus," Peggy Kelper said. "You're supposed to be safe riding a bus. Dali loved riding the bus; he rode it everyday to work so he could sleep or read."

She plans on going to the site, near the Painted Rocks, on Tuesday. She said a memorial cross in Kelper's honor was put in place last summer.

Peggy Kelper declined to comment on the legal aspects.

According to pervious reports California Highway Patrol initially responded but the investigation was taken over by the Fort Irwin Department of Emergency Services. According to Fort Irwin Director of Public Affairs Pamela Portland there were initially jurisdiction issues during the crash.

The USA Criminal Investigation Command is currently working a joint investigation with the California Highway Patrol's Multidisciplinary Accident Investigation Team, the lead agency. According to CID Chief of Public Affairs Chris Grey, the case was "recently" reopened.

## More Articles and Offers

Ads by AdBlade



FREE Financial Workshop
THE SACRAMENTO AREA
JUNE 18th-20th

**Rich Dad Education—FREE Financial Workshop** Sacramento Area June 18-20



**Effective management of a major crisis often starts right here.**

WELLS FARGO ADVISORS

**Download a free toolkit and understand the essentials of planning your estate.**



**22-Year Congressman Explains How And When A Dollar Collapse Could Happen—And How To Prepare**

## Connect with DesertDispatch.com

| | Facebook | Twitter | RSS | Back to top |

### Reader Services
Contact us
Subscribe
Report a problem

### Online Services
RSS feeds
Newsletters/Alerts

### Archives
Article archive

### Advertising Info
Advertise with us

© Copyright 2015 Local Media Group, Inc. All Rights Reserved.
Original content available for non-commercial use under a Creative Commons license, except where noted.

» UPCOMING EVENTS

| 2 Tue | 3 Wed | 4 Thu | 5 Fri | 6 Sat | 7 Sun | All events |

Search

**Cirque du Soleil for One Drop**
Wednesday, Jun 10, 7:30 pm
Cinemark at Victor Valley Mall, Victorville

**Insider Access to Disney Pixar's...**
Tuesday, Jun 16, 7:00 pm
Cinemark at Victor Valley Mall, Victorville

**Rifftrax Live: Sharknado 2**
Thursday, Jul 9, 8:00 pm
Cinemark at Victor Valley Mall, Victorville

**All Work All Play: The Pursuit...**
Tuesday, Jul 21, 5:30 pm
Cinemark at Victor Valley Mall, Victorville

Submit an Event | More Things To Do

Music | Theater | Food | Holiday

## Stay Informed



**Email newsletter** Sign up Today

Sign up for our newsletter and have the top headlines from your community delivered right to your inbox.

Your privacy is important, read our privacy policy.

http://www.desertdispatch..........rticle/20150601/NEWS/150609994/6/2/2013 3:00:20 PM]

Wife of man killed in VVTA bus crash still has 'bitter feelings' - News - DesertDispatch.com - Barstow, CA

DesertDispatch.com | Coolwater Lane, Barstow, CA, 97551

# Exhibit E

# Discovery Produced After Trial

# Exhibit E-1

# Post-trial Government Discovery
First Batch, Bates 836-842
August 7, 2019

 **Gmail**

**Sandra Mattarollo** <smattarollo@gmail.com>

---

## New Discovery on Kilty
8 messages

---

**Levers, Paul (USACAC)** <Paul.Levers@usdoj.gov>          Wed, Aug 7, 2019 at 2:00 PM
To: Sandra Mattarollo <smattarollo@gmail.com>, Robison Harley <rob.harley@sbcglobal.net>
Cc: "Yang, Jerry (USACAC) 1" <Jerry.Yang@usdoj.gov>

Please find enclosed some additional discovery on Mr. Kilty. I became aware of the emails contained within last Thursday.


Thank You


**Paul D. Levers | Special Assistant United States Attorney**
United States Attorney's Office | Central District of California

3403 Tenth Street, Suite 200 | Riverside, California 92501
Office (951) 276-6286 | Fax (951) 276-6202


**2 attachments**

 **Kilty Supp Discovery Letter 8-7-19.docx**
87K

 **Kilty Discovery USA-000836-000842.pdf**
3250K

---

**Sandra Mattarollo** <smattarollo@gmail.com>          Wed, Aug 7, 2019 at 2:06 PM
To: "Levers, Paul (USACAC)" <Paul.Levers@usdoj.gov>
Cc: Robison Harley <rob.harley@sbcglobal.net>, "Yang, Jerry (USACAC) 1" <Jerry.Yang@usdoj.gov>

Thank you, Paul. We will review it and get back to you if we have any questions.

Best,
[Quoted text hidden]
--
Sandra Case-Mattarollo
Paralegal
(714)717-5096

CONFIDENTIALITY NOTICE: This e-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521, is confidential and may be legally privileged. This e-mail message may contain legally privileged and/or confidential information. This e-mail message may contain material that is protected by the attorney-client and/or attorney work product privileges. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited by law. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer and destroy any and all copies.

---

**Sandra Mattarollo** <smattarollo@gmail.com>          Tue, Sep 3, 2019 at 12:56 PM
Draft To: Rob Harley <rob.harley@sbcglobal.net>

**App. 520**



# United States Department of Justice

## United States Attorney's Office
## Central District of California

*Bilal A. Essayli*
*Phone: (951)276-6246*
*E-mail: bilal.essayli@usdoj.gov*

*3403 10th Street, Suite 200*
*Riverside, California 92501*

August 7, 2019

## VIA E-MAIL

Rob Harley
825 N. Ross Street
Santa Ana, CA 92701

      Re:   <u>United States v. Steven Kilty</u>,
              CR No. 16-00024-JGB

Dear Mr. Harley:

Pursuant to your request, enclosed please find the government's supplemental discovery production, which includes documents Bates numbered USA 00836-00842.

The enclosed materials and any future discovery provided to you that may exceed the scope of discovery mandated by the Federal Rules of Criminal Procedure, federal statute, or relevant case law are provided voluntarily and solely as a matter of discretion. By producing such materials to you, the government does not waive its right to object to any future discovery requests beyond the ambit of its legal obligations.

Please let me know if you have any questions, or would like to further discuss any of the matters raised above.

Very truly yours,

PAUL D. LEVERS
Special Assistant United States Attorney

App. 521

FD-302 (Rev. 5-8-10)

- 1 of 2 -

**FEDERAL BUREAU OF INVESTIGATION**

OFFICIAL RECORD
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

Date of entry _____ 08/06/2019

    On August 6, 2019, SA Shannon Snead called SABAH ISSA, cell phone 563-209-0922, Assistant U.S. Attorney (AUSA) Jerry Yang, and Special Assistant U.S. Attorney (SAUSA) Paul Levers, phone 951-276-6286, so they could discuss an email ISSA wrote in 2017 regarding traffic signs on the Ft. Irwin truck bypass road (see attached email). After SA Snead merged the calls, AUSA Yang introduced himself and SAUSA Levers and read the pertinent email aloud, which ISSA said he remembered. ISSA then provided the following information:

    He earned an electrical engineering degree but had received no specialized training as a civil engineer or traffic engineer.

    From 2005 to 2010 and November 2015 to May 2019 (when he retired), he was employed first as a General Engineer and later as Chief Engineer at Ft. Irwin where he was responsible for handling general engineering matters including those pertaining to traffic engineering.

    ISSA was not employed at Ft. Irwin when the fatal traffic accident on the bypass road occurred in 2014, but he heard about it when he returned to Ft. Irwin in November 2015. Specifically, he heard a commuter bus hit a truck parked at the bypass road checkpoint at night and a person on the bus was killed and another person on the bus lost his arm.

    ISSA did not independently investigate the collision or bypass road, did not review any accident investigation reports, witness statements, or the video taken from inside the bus during the collision, did not talk to the drivers of the truck or bus or any other witnesses, and did not know any details about the collision.

    He did not intend his 2017 email to represent his independent expert opinion on the causes of the 2014 collision on the Ft. Irwin truck bypass road. Rather, he was expressing his general opinion that a lack of signage

Investigation on ___08/06/2019___ at Victorville, California, United States (Phone)

File # 343A-LA-2220419      Date drafted ___08/06/2019___

by SNEAD SHANNON

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

App. 522

FD-302a (Rev. 5-8-10)

343A-LA-2220419

Continuation of FD-302 of  (U) Phone call with Sabah Issa _____ ,On  08/06/2019 ,Page  2 of 2

may have contributed to the collision and he wanted to improve signage on
the road.  He based his general opinion on a summary of events relayed to
him by Michael Butolph and others.

    AUSA Yang then told ISSA he may be contacted by defense attorneys and
their investigators and experts, and he was free to talk to them.  ISSA
replied that he did not want to talk to them and would refuse.

App. 523

# Truck By-Pass Traffic Signs (UNCLASSIFIED)

| From: | "Issa, Sabah A CIV USARMY IMCOM CENTRAL (US)" <sabah.a.issa.civ@mail.mil> |
|---|---|
| To: | "Toyofuku, Lance K CIV USARMY USAG (US)" <lance.k.toyofuku.civ@mail.mil> |
| Cc: | "Issa, Sabah A CIV USARMY IMCOM CENTRAL (US)" <sabah.a.issa.civ@mail.mil>, "Berg, Kenneth H CIV USARMY IMCOM CENTRAL (US)" <kenneth.h.berg2.civ@mail.mil> |
| Date: | Wed, 23 Aug 2017 15:06:45 -0700 |
| Attachments: | Truck By-Pass Signs SOW.docx (20.1 kB) |

CLASSIFICATION: UNCLASSIFIED

Lance,

The traffic signs at the truck by-pass road are not up to standards.
The signs were up to Fed/Cal standards when we repaired the road 10 years ago.
Since then, we , Ft Irwin, installed a truck check stop in the middle of the road which changed the road conditions.
The new conditions require additional direction and warning signs to keep the road safe.

Due to the fact we did not update the signage after installing the truck stop, we had two traffic accidents.

The first, two years ago, where a bus hit a truck and a person lost his life and another person lost his arm.
Contributing factors were darkness, speed and lack of travel directions (signs).

The second, three months ago, where a truck hit another truck in the rear.
Contributing factors were speed and lack of warning signs.

The work I am proposing will cover all these deficiencies and provide a safer road to travel.

If we don't update the signs, we will see more accidents in the future.

Attached is my Scope of Work (SOW) to repair the signage for an estimated cost of $76,750.

Please consider my proposal and give me your directions, thanks.

Sabah A. Issa
Mechanical Engineer
DPW, Ft. Irwin, CA
(760)380-0322

CLASSIFICATION: UNCLASSIFIED

FI-SABAH-000065002

Sabah Issa, cell 563-209-0922, lives in Iowa now


Retired

Chief Engineer at Ft Irwin, electrical engineering degree, acting as a general engineer at Ft Irwin

Not a traffic/civil engineer

acted as a traffic engineer

No specialized training as a civil/traffic engineer

June 2014 – time of accident

Wasn't employed at Ft Irwin at the time of the accident

at Ft Irwin – 2005 – 2010 and 11/2015 – 5/2019

checkpoint installed between 2010 - 2015 when he wasn't at Ft Irwin


important to update signs on the road to reflect checkpoint added in the middle of the road

maybe signage was a contributing factor to the accident

did not independently study the road or accident

Conclusion

Does not know any facts of the accident

Did not speak to any of the witnesses or review reports

People at Ft Irwin explained to him that a bus was driving, it was dark, truck parked in the road and bus hit the truck

Did not have access to reports, witness reports, driver's reports, never saw video from inside the bus, did not independently study the accident/road

Mike Butolph explained to him what happened

Not providing an expert opinion

He did not base his conclusion based on his comprehensive study

Not forming an expert opinion based on a formal study

Never conducted independent study

Never read reports

Didn't know anything about bus driver or truck driver

Hadn't seen video

Yang said free to talk to defense attorneys, experts, investigators but said would not, refused

App. 525

# ESD SITREPS (UNCLASSIFIED)

**From:** "Issa, Sabah A CIV USARMY IMCOM CENTRAL (US)" <sabah.a.issa.civ@mail.mil>

**To:** "Ortiz, Ivonne L CIV (US)" <ivonne.l.ortiz.civ@mail.mil>

**Cc:** "Toyofuku, Lance K CIV USARMY USAG (US)" <lance.k.toyofuku.civ@mail.mil>, "Issa, Sabah A CIV USARMY IMCOM CENTRAL (US)" <sabah.a.issa.civ@mail.mil>

**Date:** Wed, 24 Jan 2018 13:10:39 -0800

CLASSIFICATION: UNCLASSIFIED

ESD SITREP:

1. Two Members of the 213th Engr Fac Det visited ESD, 22 and 23 Jan 2018. The purpose of the visit is to plan
   their support trip late Apr 2018. 12 Facilities engineers will be here for two week helping DPW's engineering.
2. ESD started installing AutoCAD software on PMs computers. This will provide design capabilities to the engineering staff.
3. ESD started funding projects on the 18AWP from the 2nd quarter SRM allotment.
4. Bridge inspection is coming to Ft. Irwin in March 2018, which is a 2 year requirements. A team from the CoE will here to conduct the        Inspection.
5. The contract to upgrade the traffic signs on the Truck Buy-Pass road has been awarded. The signs will make the road much safer.

Sabah A. Issa
Chief, Engineering Division
Directorate of Public Works
Bldg. 384, Ft. Irwin, CA
(760)380-5050

CLASSIFICATION: UNCLASSIFIED

App. 526

# RE: By-Pass Road Site Visit (UNCLASSIFIED)

| | |
|---|---|
| **From:** | "Issa, Sabah A CIV USARMY IMCOM CENTRAL (US)" <"/o=easf/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=sabah.a.issa.civ163"> |
| **To:** | "Renshaw, David J CIV USARMY ACC (US)" <david.j.renshaw.civ@mail.mil> |
| **Cc:** | "Darden, Derrick C CIV USARMY USAMC (US)" <derrick.c.darden.civ@mail.mil>, "Velez, Marie G CIV USARMY ACC MICC (US)" <marie.g.velez2.civ@mail.mil> |
| **Date:** | Mon, 14 May 2018 15:25:42 -0700 |

David,

In scope:
1. Complete the striping of the road from the beginning to the middle, where the contractor started before. Also, from the end of the striping, where the contractor sopped, to the end of the road where it merges with Ft. Irwin road. All striping is similar to what the contractor already did.
2. Complete the installation of the road markers along the whole road, yellow in the middle and white at the sides.
3. Provide and install two signs at the entrance of the road with the wording "Right Lane Trucks Only" and "Left Lane Busses Only". Signs shall be equipped with four LED/Solar flashing lights, each. Lights shall be yellow and installed at each side.

Not in scope:
1. Add "Trucks Only" road markings on the right lane and re-do "Buses Only" on the left lane. Install the markings in the same location of the existing markings.

I suggest a meeting with the contractor to make sure they understand our requirements, thanks.

Sabah A. Issa
Chief, Engineering Division
Directorate of Public Works
Bldg. 384, Ft. Irwin, CA
(760)380-5050

-----Original Message-----
From: Renshaw, David J CIV USARMY ACC (US)
Sent: Friday, May 11, 2018 3:47 PM
To: Issa, Sabah A CIV USARMY IMCOM CENTRAL (US) <sabah.a.issa.civ@mail.mil>
Cc: Darden, Derrick C CIV USARMY USAMC (US) <derrick.c.darden.civ@mail.mil>; Velez, Marie G CIV USARMY ACC MICC (US) <marie.g.velez2.civ@mail.mil>
Subject: By-Pass Road Site Visit (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Good Afternoon Mr. Sabah,

Thanks for taking time out of your day to show us the short comings on the By-Pass Road.    Now we need to get to the problem solving portion of this.   What I will need help with is a list of the short comings for the IN-SCOPE work that was not completed.    Also could you include a list of the Out of Scope work that you would like to have completed as well.

The goal of attaining this information is so that I can craft a letter for the vendor, so that they can be informed of the deficiencies noted, and provide a remedy for those.   I will also ask for a proposal for the additional Out of Scope work.

Regards,

Mission and Installation Contracting Command Fort Irwin Bldg. 503, Langford Lake Road Contracting Specialist (Intern)

App. 527

# Truck By-Pass Traffic Signs (UNCLASSIFIED)

| | |
|---|---|
| **From:** | "Issa, Sabah A CIV USARMY IMCOM CENTRAL (US)" <sabah.a.issa.civ@mail.mil> |
| **To:** | "Toyofuku, Lance K CIV USARMY USAG (US)" <lance.k.toyofuku.civ@mail.mil> |
| **Cc:** | "Issa, Sabah A CIV USARMY IMCOM CENTRAL (US)" <sabah.a.issa.civ@mail.mil>, "Berg, Kenneth H CIV USARMY IMCOM CENTRAL (US)" <kenneth.h.berg2.civ@mail.mil> |
| **Date:** | Wed, 23 Aug 2017 15:06:45 -0700 |
| **Attachments:** | Truck By-Pass Signs SOW.docx (20.1 kB) |

CLASSIFICATION: UNCLASSIFIED

Lance,

The traffic signs at the truck by-pass road are not up to standards.
The signs were up to Fed/Cal standards when we repaired the road 10 years ago.
Since then, we , Ft Irwin, installed a truck check stop in the middle of the road which changed the road conditions.
The new conditions require additional direction and warning signs to keep the road safe.

Due to the fact we did not update the signage after installing the truck stop, we had two traffic accidents.

The first, two years ago, where a bus hit a truck and a person lost his life and another person lost his arm.
Contributing factors were darkness, speed and lack of travel directions (signs).

The second, three months ago, where a truck hit another truck in the rear.
Contributing factors were speed and lack of warning signs.

The work I am proposing will cover all these deficiencies and provide a safer road to travel.

If we don't update the signs, we will see more accidents in the future.

Attached is my Scope of Work (SOW) to repair the signage for an estimated cost of $76,750.

Please consider my proposal and give me your directions, thanks.


Sabah A. Issa
Mechanical Engineer
DPW, Ft. Irwin, CA
(760)380-0322

CLASSIFICATION: UNCLASSIFIED

App. 528

# Exhibit E-2

# Post-trial Government Discovery
### Second Batch, Bates 843
No Letter Produced

# Truck Bypass safety issue

| | |
|---|---|
| **From:** | "Kandoll, Michael F CIV (US)" <michael.f.kandoll.civ@mail.mil> |
| **To:** | "Butolph, Michael V CIV USARMY IMCOM CENTRAL (US)" <michael.v.butolph.civ@mail.mil> |
| **Cc:** | "Fisher, Bradford A (Brad) LTC USARMY ID-READINESS (US)" <bradford.a.fisher.mil@mail.mil>, "Cheadle, Randy L SGM USARMY ID-READINESS (US)" <randy.l.cheadle.mil@mail.mil> |
| **Date:** | Thu, 01 Jun 2017 08:32:33 -0700 |

Sir,

I believe we need to make a change due to the activities that occur on weekdays between 6 AM and 8 AM on the truck bypass.

In the accident that happened this morning the tanker truck driver came over the hill crest and too late realized that the semi truck and trailer in front of him was stopped in the traffic lane.  He applied brakes and at the last second he swerved to the right. His trailer left about 40 feet of skid marks before the left front corner of his tractor struck the right rear corner of the trailer of the truck in front of him.

The tanker truck driver complained of minor injury in his neck. The tanker truck suffer disabling damage and leaked some fluid from the engine compartment. The semi truck trailer was damaged on the right rear corner but appeared to be still drivable.

This accident could have been much worse if the two tanks full of gasoline on the tanker had been ignited.

Until we can establish a long-term fix I will provide a patrol for two hours between 6 AM and 8 AM every weekday morning to provide the flashing light notification needed to warn approaching drivers of the stopped traffic in the roadway.

Michael Kandoll

Sent from my iPhone

FI-BUTOLPH-000191316

# Exhibit E-3

# Post-trial Government Discovery
Third Batch, Bates 844-875
September 11, 2019

Gary Rowe

| | |
|---|---|
| From: | Palmer, Carley (USACAC) 3 <Carley.Palmer@usdoj.gov> |
| Sent: | Friday, August 20, 2021 5:33 PM |
| To: | Gary Rowe |
| Subject: | FW: New Discovery on Kilty |

**A. Carley Palmer | Assistant United States Attorney**
Deputy Chief, General Crimes Section
United States Attorney's Office | Central District of California | Criminal Division
1000 United States Courthouse | 312 North Spring Street | Los Angeles, California 90012
Telephone: 213.894.0282 | Email: carley.palmer@usdoj.gov

From: Sandra Mattarollo <smattarollo@gmail.com>
Sent: Wednesday, September 11, 2019 5:26 PM
To: Yang, Jerry (USACAC) 1 <jyang1@usa.doj.gov>
Cc: Levers, Paul (USACAC) <PLevers@usa.doj.gov>; Rob Harley <rob.harley@sbcglobal.net>
Subject: Re: New Discovery on Kilty

Thank you, Jerry.

I think this is everything we need. I appreciate your help.

Best,

Sandra

 Virus-free. www.avg.com

On Wed, Sep 11, 2019 at 5:15 PM Yang, Jerry (USACAC) 1 <Jerry.Yang@usdoj.gov> wrote:

> Sandra and Rob, please see attached discovery and cover letter.  Thank you.
>
>
>
> From: Sandra Mattarollo <smattarollo@gmail.com>
> Sent: Thursday, September 5, 2019 9:28 AM
> To: Levers, Paul (USACAC) <PLevers@usa.doj.gov>; Rob Harley <rob.harley@sbcglobal.net>; Yang, Jerry (USACAC) 1
> <jyang1@usa.doj.gov>
> Subject: Re: New Discovery on Kilty
>
>
>
> Hi Paul and Jerry,

1

App. 532

Exhibit A page 1

Can you provide us with the collision report of the second accident that occurred on the Fort Irwin Bypass that is mentioned in Sabah Issa's email.

Thank you.

Best,

Sandra

On Wed, Aug 7, 2019 at 2:06 PM Sandra Mattarollo <smattarollo@gmail.com> wrote:

Thank you, Paul. We will review it and get back to you if we have any questions.

Best,

On Wed, Aug 7, 2019 at 2:01 PM Levers, Paul (USACAC) <Paul.Levers@usdoj.gov> wrote:

Please find enclosed some additional discovery on Mr. Kilty.  I became aware of the emails contained within last Thursday.

Thank You

Paul D. Levers | Special Assistant United States Attorney
United States Attorney's Office | Central District of California

3403 Tenth Street, Suite 200 | Riverside, California 92501
Office (951) 276-6286 | Fax (951) 276-6202

--

Sandra Case-Mattarollo
Paralegal

2

App. 533



# United States Department of Justice

## United States Attorney's Office
## Central District of California

---

*Jerry C. Yang*
*Phone: (951)276-6221*
*E-mail: jerry.yang@usdoj.gov*

*3403 10ᵗʰ Street, Suite 200*
*Riverside, California  92501*

September 11, 2019

**<u>VIA E-MAIL</u>**

Rob Harley
Sandra Mattarollo
825 N. Ross Street
Santa Ana, CA 92701

   Re: <u>United States v. Steven Kilty</u>, ED CR No. 16-00024-JGB

Dear Mr. Harley and Ms. Mattarollo:

Pursuant to your request, enclosed please find the government's supplemental discovery production, which includes documents Bates numbered 844-875.  In the course of responding to your discovery request, we learned that as part of the civil case, the Southern District USAO has approximately 120,000 pages of discovery in their possession that may be related to the accident.  Out of this discovery, they gave us the discovery previously produced to you, bates numbered 836-843, as well as the current enclosed discovery referenced above.  Please let me know if you would like any other documents from that discovery, or if you would like to inspect those documents.  They are in the custody of the Southern District USAO but we can arrange a time for you to inspect them.

The enclosed materials and any future discovery provided to you that may exceed the scope of discovery mandated by the Federal Rules of Criminal Procedure, federal statute, or relevant case law are provided voluntarily and solely as a matter of discretion.  By producing such materials to you, the government does not waive its right to object to any future discovery requests beyond the ambit of its legal obligations.

Please let me know if you have any questions, or would like to further discuss any of the matters raised above.

Very truly yours,

/s/
JERRY C. YANG
Assistant United States Attorney

Enclosures

App. 534

# FOR OFFICIAL USE ONLY



DEPARTMENT OF THE ARMY

Directorate of Emergency Services
Fort Irwin, CA
P.O. BOX 105066 BLDG #344
FORT IRWIN, California, 92310

IMNT-ES                                                                                                    2017/09/11

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT: Law Enforcement Report - 2ND Corrected Final - 00062-2017-TAI146-3C2

1. Offense: Traffic Collision- POV Vs.POV (None)

2. Dates/Times/Locations of Occurrences: 0704, 01 Jun 17 - 0705, 01 Jun 17; Fort Irwin road Truck Bypass, Fort Irwin, CA, 92310

3. Date/Time Reported: 0704, 01 Jun 17

4. Investigated By:      PVT STEVEN A. VIGUERS

5. Subjects/Suspects: Garcia, Jose Maria CIV; XXX-XX-5926; Age 39; Male; Other; 29401 Wildcat Cayon, Menifee, CA, 92587; [Traffic Collision- POV Vs.POV]

6. Victims: Uribe-Stalhkopff, David Ernesto CIV; XXX-XX-0607; Age 25; Male; Other; 700W Calle Colado, Tucson, AZ, 85756; [Traffic Collision- POV Vs.POV]

7. Report Summary:
At 0704 hrs on 01 June 2017, Uribe, D reported a vehicle to vehicle traffic collision on the Fort Irwin Truck Bypass. MP Viguers arrived on scene and made contact with Garcia who stated while operating Vehicle 1 (2015 yellow in color Kenworth, CA# 4HU2652), he was driving on the truck bypass when his vision was obstructed by the sun and struck Veh 2 (1998 blue in color Freightliner AZ# 45076) while it was parked in the right lane of traffic awaiting vehicle inspection. Damage to Veh 1 consisted of extensive damage to the front of the vehicle to include the engine block, making the vehicle inoperable, no paint transfer was observed. Damage to Veh 2 consisted of dents and scratches in rear passenger side trailer and no paint transfer, no paint transfer was observed. TMCI INV Garcia, B. responded. Veh 1 began smoking prior to TMCI arrival and had to be extinguished by FIFD for safety purposes and hazmat class 3 contents. Scene was washed away as a result and rendered any remaining measurements

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

IMNT-ES
SUBJECT: Law Enforcement Report - 2ND Corrected Final - 00062-2017-TAI146-3C2

useless as they would provide inaccurate information. Both parties were released on scene. ECOD is unknown. No injuries were reported. This is a final report.

8. Exhibits:

a. Attached:

(1)   FI Uribe E

(2)   FI Uribe D

(3)   FI Garcia

b. Not Attached:

(4)   MP Garcia: Officer report

(5)   MP Viguers: Officer report

(6)   MP Garcia: Officer statement (DA 2823)

(7)   MP Viguers: Traffic Accident Report (DA 3946)

(8)   Photos: (48)

Commanders are reminded of the provisions of AR 600-8-2 pertaining to suspension of favorable personnel actions and AR 380-67 for the suspension of security clearances of persons under investigation. Army Law Enforcement reports are exempt from automatic termination of protective markings IAW Chapter 3, AR 25-55. IAW AR 25-22, AR190–45, and DODM 5400.07, information contained in this report is law enforcement sensitive, confidential and private in nature, and any further distribution (forwarding to unauthorized personnel) without the authorization of the Provost Marshal General will be in violation of the UCMJ and USC.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

App. 536

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

IMNT-ES
SUBJECT: Law Enforcement Report - 2ND Corrected Final - 00062-2017-TAI146-3C2

Report Prepared By                           Report Approved By

                                             BROUGHTON.VONNA.P   Digitally signed by BROUGHTON.VONNA.P.1399549830
                                             .1399549830         DN: c=US, o=U.S. Government, ou=DoD, ou=PKI,
                                                                 ou=USA, cn=BROUGHTON.VONNA.P.1399549830
                                                                 Date: 2017.06.11 09:37:06 -07'00'

Steven Viguers                               Police Records Specialist Vonna Broughton

                                             "THIS DOCUMENT IS PROVIDED FOR INFORMATION AND
                                             USE. COPIES OF THIS DOCUMENT, ENCLOSURES
                                             THERETO, AND INFORMATION THEREFROM, WILL
Signature Authority                          NOT BE FURTHER RELEASED WITHOUT THE PRIOR
                                             APPROVAL OF THE INSTALLATION PROVOST MARSHAL/
                                             DIRECTORATE OF EMERGENCY SERVICES."

Administrative Officer Lieutenant JEFFREY STRAIGHT

DISTRIBUTION:

Admin File

CASE HISTORY:

00062-2017-TAI146
00358-2017-MPC146

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

App. 537

FOR OFFICIAL USE ONLY

| MILITARY POLICE INVESTIGATION REPORT<br>*AR 190-45* | LER NUMBER  62-2017-MPC146 |
|---|---|
| | PAGE 1 of 1 PAGES |

DETAILS

On the 21st of June 2017, I was working as a uniformed investigator as unit 6-2 in the Central District of California for the Fort Irwin Police Department. (Location code CC10)

At approximately 0700 hrs MP Viguers was dispatched to the Fort Irwin Rd truck bypass for a traffic collision. Upon arrival on scene I was informed that Vehicle 2 (1998 blue in color Freightliner AZ# 45076) was found on-scene at a controlled rest. That meaning, the driver was able to physically move the vehicle off the roadway after the collision had ended. Vehicle 1 (2015 yellow in color Kensworth, CA# 4HU2652) was found partly on the roadway, with the driver cab off to the right hand side shoulder and the remainder of the vehicle and trailer on the right lane. MP Viguers informed me that upon arrival on scene fire department had just finished extinguishing an unknown source of smoke from vehicle two. The scene was covered in water and disturbed, this was an understandable response due to the vehicle rear tank and trailer tank containing class 3 hazardous materials. I waited for the scene to dry in order to investigate any remaining evidence and discovered partially washed away skid marks. The majority of the skid marks were disrupted closer to the vehicle final rest and I was unable to obtain accurate measurements from most of them except one, which would lead to inconsistent results when used in speed equation. Driver 1 stated that he allegedly had sun in his eyes coming over a hill and had little reaction time to stop. This was deemed plausible as this is not the first collision to occur at this location. Army Corps of Engineers representatives arrived on scene and stated they would work to lower the speed limit in the area from 45 MPH to 25 MPH.

Due to disturbed/lack of sufficient evidence I was not able to determine PPOI (Primary point of impact or minimum speed for the collision. It was deemed plausible for the vehicle to have been afforded too little reaction time over the hill due to sunlight and posted speed limit along with commercial vehicles normally being parked at location awaiting inspection.///END OF STATEMENT/// ⅃⅃ㄴ

| NAME OF INVESTIGATOR | ORGANIZATION | |
|---|---|---|
| SPC Garcia, B MP | Fort Irwin Military Police, Fort Irwin, CA 92310 | |
| SIGNATURE | DATE | EXHIBIT |
| | 22 June 2017 | |

FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE

FOR OFFICIAL USE ONLY

| | LER NUMBER |
| MILITARY POLICE INVESTIGATION REPORT<br>AR 190-45 | 00062-2017-TAI146 |
| | PAGE 1 of 1 PAGES |

**DETAILS**

**INITIAL:**

At approximately 0704hrs on 01 June 2017 I was notified by Dispatch (Irwin) that Garcia and Uribe were involved in a motor vehicle accident on the Fort Irwin Road Truck Bypass. I was working as a uniformed patrol in a fully marked police vehicle (A-011) as unit 1-3 in the Central District of California for the Fort Irwin Police Department. (Location code CC10)

**ON-SCENE:**

Upon arrival I had patrols set up traffic control points on each side of the collision. I immediately began documenting the collision scene by taking photographs. I then made contact with Driver 1, MR. Garcia, Jose (Contractor; Pacific tank lines), he stated that he was traveling inbound on Fort Irwin road truck bypass when he observed another vehicle in front of him. He stated that he did not notice the vehicle was stationary, and when he did notice he was approximately 150-200 ft. away at a speed of approximately 50mph. Garcia then attempted to apply pressure to his brakes and then at the last moment before the collision attempted to evade the truck by turning to the right. Garcia failed to evade the other vehicle striking rear passenger side quarter panel with the front of his vehicle, ultimately damaging the engine block his vehicle. Garcia's vehicle, a 2015 yellow in color Kensworth, came to a halt after the collision to its final resting position. Garcia denied medical attention and reported no injuries. I then made contact with Uribe, David as he proceeded to tell me that he and his passenger Uribe Ernesto were stopped in the lane of traffic waiting for the inspection line for the bypass to begin. Uribe's vehicle, a blue in color 1998 Freightliner, was turned off and there wasn't anybody operating the vehicle at the time of the incedent

**PHOTOGRAPHS:**

All photographs were taken by myself on scene and entered into a photo log attached to the case file.

**COLLISION:**

The cause of the collision is a result of was the result excessive speed CVC 22350

No person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent having due regard for weather, visibility, the traffic on, and the surface and width of, the highway, and in no event at a speed which endangers the safety of persons or property.

*(Amended by Stats. 1963, Ch. 252.)*

**INVESTIGATION:**

Investigation revealed that Driver 1 (Garcia) was failed to obey the posted speed limit on Fort Irwin Road Truck Bypass and did not have sufficient amount of time to avoid the vehicle prior to the collision.

.///  END OF STATEMENT///

| NAME OF INVESTIGATOR | ORGANIZATION | |
| PFC Viguers, Steven | Fort Irwin Military Police, Fort Irwin, CA 92310 | |
| SIGNATURE | DATE | EXHIBIT |
| | 2 June 2017 | |

FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE

App. 539

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

# SWORN STATEMENT

For use of this form, see AR 190-45; the proponent agency is PMG.

| AUTHORITY: | Title 10, USC Section 301; Title 5 USC Section 2951; E.O. 9397 Social Security Number (SSN) |
|---|---|
| PRINCIPAL PURPOSE: | To document potential criminal activity involving the U.S. Army, and to allow Army officials to maintain discipline, law and order through investigation of complaints and incidents. |
| ROUTINE USES: | Information provided may be further disclosed to federal, state, local, and foreign government law enforcement agencies, prosecutors, courts, child protective services, victims, witnesses, the Department of Veterans Affairs, and the Office of Personnel Management. Information provided may be used for determinations regarding judicial or non-judicial punishment, other administrative disciplinary actions, security clearances, recruitment, retention, placement, and other personnel actions. |
| DISCLOSURE: | Disclosure of your SSN and other information is voluntary. |

| 1. LOCATION | 2. DATE | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| Fort Irwin | 20170601 | 1214 | |

| 5. STATEMENT OF | 6. SSN | 7. GRADE/STATUS |
|---|---|---|
| Garcia, Jose, Maria | 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 | E-7 IAD CiV |

8. ORGANIZATION OR ADDRESS

Fort Irwin Military Police

9.

I, GARCIA, JOSE, MARIA , WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH: On 06/01/2017 0330 I got to our work yard at Pacific Tank Lines. After conducting a Pre-Trip inspection on my vehicle I left the yard at 0400 to load it with fuel. After fueling my manager Jake Bolin and I started driving to Fort Irwin for the fuel delivery. As I was on Ft Irwin Rd Truck bypass at approximately 0700 I was coming up towards a hill, as to my knowledge I was traveling at a speed of 45-50 mph. As I was coming up the hill I had my right hand covering the sun that was hitting my eyes with the left hand on steering wheel once I came up the hill there was a line of trucks waiting in line at a stand-still at a check point. When I got a full vision of the situation I saw a trailer in front at me at approximately 150 ft. and that time I held stirring wheel with both hands and put pressure on my breaks and pumped them one and turned my stilling a little to right before impact with trailer. Both my passenger and I were wearing our seatbelts and we were secured to our seat. After impact, both Jake and I got out of vehicle with no injuries and also checked with parties of the other vehicle involved. Both were okay just one was complaining of a little neck pain but said everything ok. At the time of impact the vehicle in front of me was in a traveling lane completely stopped and to my knowledge no hazard lights on or any lights of some kind of warning telling me stopped vehicles ahead. On 05/31/2017 I also was at Ft Irwin doing a delivery and left the location at approximately 1130. I got to our yard at about 1500 went home and took my break on my hour break before returning to work the next day.

Q: MP Viguers
A: Mr. Garcia
Q: When you applied pressure to your breaks initially after you noticed the truck in front of you, did you lockout your breaks?
A: No
Q: Was information swapped between you and the operators of the other vehicle?
A: Yes, insurance, registration, drivers licenses.
Q: When you noticed the vehicle, confirming you said no lights were left on, for example the hazard lights?
A: No
Q: Were there any signs dictating that traffic would come to a halt?
A: I did not see any.
Q: Confirming that moments before the collision you attempted to maneuver the vehicle to the right?
A: A slight right, so I wouldn't hit vehicle directly.
Q: Are you currently taking any medications, to include but not limited to over the counter, or prescribed medications?
A: No
Q: Do you have any prior medical conditions that could inhibit your driving?
A: No.
Q: Were you using a cruise control or a feature similar to that on the vehicle?
A: No.
Q: How long have you been driving driving commercial vehicles?
A: Approximately 2 ½ years.
Q: Given your experience about how far away would you have to be to notice a stop in traffic and safely stop your vehicle if you were travelling at 45 mph?
A: Approximately 500-600ft.
Q: Approximately how much sleep did you get before coming to work?
A: Approximately 5hrs.
Q: Is there anything else you would like to add to this statement?
A: NO///END OF STATEMENT///

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT | PAGE 1 OF 2 PAGES |
|---|---|---|

ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT OF _____ TAKEN AT _____ DATED _____

THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE INDICATED.

DA FORM 2823

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

STATEMENT OF GARCIA, JOSE, MARIA TAKEN AT FORT IRWIN DATED 20170601

**9. STATEMENT** *(Continued)*

_9._

**AFFIDAVIT**

I, GARCIA, JOSE, MARIA, HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE 2. I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

WITNESSES:

_____

*(Signature of Person Making Statement)*

Subscribed and sworn to before me, a person authorized by law to administer oaths, this 1st day of June, 2017 at Fort Irwin.

ORGANIZATION OR ADDRESS

*(Signature of Person Administering Oath)*

MP Viguers, Steven
*(Typed Name of Person Administering Oath)*

UCMJ Art 136 (b) (4)

ORGANIZATION OR ADDRESS

*(Authority To Administer Oaths)*

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT | PAGE 2 OF 2 PAGES |
|---|---|---|

**DA FORM 2823**

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

App. 541

## MILITARY POLICE TRAFFIC ACCIDENT REPORT

For use of this form, see AR 190-45; the proponent agency is PMG.

### PRIVACY ACT STATEMENT

| | |
|---|---|
| **AUTHORITY:** | Title 10 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 *(SSN)*. |
| **PRINCIPAL PURPOSE:** | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| **ROUTINE USES:** | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| **DISCLOSURE:** | Disclosure of your social security number is voluntary. |

| 1. PM ACTIVITY CODE/REPORT NO. | 2. DATE OF ACCIDENT *(YYYYMMDDD)* | 3. TIME OF ACCIDENT *(Use 2400 hour)* | 4. DAY OF WEEK OF COLLISION *(Sunday, Monday, etc.)* |
|---|---|---|---|
| 00062-2017-TAI146 | 2017/06/01 | 0704 | Thursday |

### 5. LOCATION OF ACCIDENT

| a. MILITARY RESERVATION   ✓ YES ☐ NO | b. NAME AND LOCATION OF MILITARY RESERVATION *(Include City and State, etc.)* Fort Irwin, CA P.O. BOX 105066 BLDG #344, FORT IRWIN, California, 92310, United States |
|---|---|

| c. ROAD OR STREET ON WHICH ACCIDENT OCCURRED Fort Irwin road Truck Bypass, Fort Irwin, California, 92310, United States | d. NAME OF INTERSECTING STREET IF AT INTERSECTION |
|---|---|

| e. NAME OF NEAREST INTERSECTING STREET, HIGHWAY, OR OTHER PERMANENT IDENTIFYING LANDMARK IF NOT AT INTERSECTION | f. NO. OF FEET | g. DIRECTION |
|---|---|---|

h. IF ACCIDENT OCCURRED OFF MILITARY RESERVATION, AND OUTSIDE CITY LIMITS, INDICATE:
_____ MILES ☐ N ☐ S ☐ E ☐ W FROM ☐ CITY LIMITS ☐ CENTER OF CITY OR TOWN

| i. KIND OF LOCALITY | ☐ Troop Billets   ☐ Residential | ☐ Mfg or Industrial   ✓ Open Country | ☐ School or Playground   ☐ Business | ☐ Other *(Specify)* |
|---|---|---|---|---|

### 6. TYPE OF ACCIDENT

| ✓ Vehicle-Vehicle | ☐ Vehicle-Object | ☐ Single Vehicle *(Non Collision)* | a. SEVERITY | |
|---|---|---|---|---|
| ☐ Vehicle-Pedicycle | ☐ Vehicle-RR Train | ☐ Hit and Run | NO. KILLED | NO. INJURED |
| ☐ Stolen Vehicle | ☐ Vehicle-Pedestrian | ☐ Other *(Specify)* | | |

b. TOTAL NO. OF VEHICLES INVOLVED
2

✓ PROPERTY DAMAGE ONLY

### 7. WEATHER, LIGHT, AND ROAD CONDITIONS

| VEHICLE 1  2 | DRIVING LANES | VEHICLE 1  2 | CHARACTER | VEHICLE 1  2 | SURFACE | VEHICLE 1  2 | WEATHER |
|---|---|---|---|---|---|---|---|
| | One | | Straight | | Concrete | ✓  ✓ | Clear |
| ✓  ✓ | Two | | Curve | | ✓ Black Top | | Rain |
| | Three or More | | Level | | Brick | | Fog |
| | Divided Highway | ✓  ✓ | On Grade | ✓ | Gravel | | Snowing |
| | Other | | Other | | Other | | Other |

| VEHICLE 1  2 | CONDITIONS | VEHICLE 1  2 | DEFECTS | VEHICLE 1  2 | LIGHT |
|---|---|---|---|---|---|
| ✓  ✓ | Dry | | Holes, Ruts, Bumps, etc. | ✓  ✓ | Daylight |
| | Wet | | Loose Material on Surface | | Dawn |
| | Mud | | Defective Shoulder | | Dusk |
| | Snow | ✓  ✓ | No defects | | Dark, Street Lights |
| | Other | | Other | | Dark, No Street Lights |

### 8. TRAFFIC CONTROL

| VEHICLE 1  2 | | VEHICLE 1  2 | | VEHICLE 1  2 | | VEHICLE 1  2 | |
|---|---|---|---|---|---|---|---|
| | Stop and Go Signal | | Flashing Light | | Warning Sign | | One way Street |
| | No Traffic Signal | | Officer or Watchman | | Solid Center Line | | Stop Sign |
| ✓  ✓ | Other *(Explain)* | | | | | | |

Vehicle NO: 1 - Inspection Lane Vehicle NO: 2 - Inspection Line

---

**DA FORM 3946, DEC 1998**          DA FORM 3946, SEP 73, IS OBSOLETE          Page 1 of 4
APD V1.01

FOR OFFICIAL USE ONLY

| 9a. VEHICLE NO. 1 | | | | 9b. VEHICLE NO. 2 | | | | |
|---|---|---|---|---|---|---|---|---|
| USA REGISTRATION OR LICENSE NO. | MAKE | YEAR | BODY TYPE | USA REGISTRATION OR LICENSE NO. | MAKE | YEAR | BODY TYPE | |
| 4HU2652 | Kensworth | 2015 | Tractor Truck | AG45076 | Freightliner | 1998 | Tractor Truck, | |
| UNIT MARKINGS/DECAL NO. | | ✓ Privately Owned / Government | | UNIT MARKINGS/DECAL NO. | | | ✓ Privately Owned / Government | |

| REGISTERED OWNER *(If not driver) (Last, First, MI)* | REGISTERED OWNER *(If not driver) (Last, First, MI)* |
|---|---|
| Garcia, Jose, Maria | Uribe-Stalhkopff, David, Ernesto |
| ADDRESS OF OWNER | ADDRESS OF OWNER |
| 29401 Wildcat Cayon , Menifee, California, 92587, United States | 700W Calle Colado , Tucson, Arizona, 85756, United States |
| NAME AND ADDRESS OF INSURANCE COMPANY OR AGENT | NAME AND ADDRESS OF INSURANCE COMPANY OR AGENT |
| American Insurance Comp | New Alliance |

| 10a. DRIVER NO. 1 | | | 10b. DRIVER NO. 2 | | |
|---|---|---|---|---|---|
| NAME *(Last, First, MI), Grade and Address* | SSN 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 | | NAME *(Last, First, MI), Grade and Address* | SSN | |
| Garcia, Jose, M., (CIV) U.S. Civilian (no DOD affiliation), 29401 Wildcat Cayon, Menifee, CA, 92587 | AGE 39 ✓ Male ☐ Female | | | AGE ☐ Male ☐ Female | |
| DRIVER'S LICENSE/PERMIT NUMBER | STATE | | DRIVER'S LICENSE/PERMIT NUMBER | STATE | |
| LIMITATIONS ON LICENSE/PERMIT ✓ NO ☐ YES *(Specify)* | YEARS' DRIVING EXPERIENCE 2 | | LIMITATIONS ON LICENSE/PERMIT ☐ NO ☐ YES *(Specify)* | YEARS' DRIVING EXPERIENCE | |

| CODES | CAT (1) E | INJ (2) A | SEAT BELT (3) C | SEAT POS (4) 1 | CODES | CAT (1) | INJ (2) | SEAT BELT (3) | SEAT POS (4) |
|---|---|---|---|---|---|---|---|---|---|

### 11. OCCUPANTS

| NAME AND ADDRESS | VEH NO. | AGE | SEX | CODES | | | |
|---|---|---|---|---|---|---|---|
| | | | | CAT (1) | INJ (2) | SEAT BELT (3) | SEAT POS (4) |
| Uribe-Stalhkopff, David, E., 700W Calle Colado, Tucson, AZ, 85756 | 2 | 25 | Male | E | A | C | 5 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

### CODES

| (1) CATEGORY | (2) INJURY CLASS | (3) SHOULDER/LAP BELTS | (4) SEAT POSITION |
|---|---|---|---|
| A. Army Officer<br>B. Army Enlisted<br>C. Other Service Officer<br>D. Other Service Enlisted<br>E. Civilian<br>F. Dependent<br>O. Other | A. No Injury<br>B. Dead at Scene<br>C. Dead on Arrival<br>D. Died in Hospital<br>E. Incapacitating Injury<br>F. Non-incap (evident) Injury<br>G. Possible Injury<br>H. Injury Unknown | A. Lap Belt Used<br>B. Shoulder Harness Used<br>C. Both Used<br>D. Not Used<br>E. Not Installed<br>F. Lap Belt Failed<br>G. Shoulder Harness Failed<br>H. Both Failed<br>U. Unknown | 1. Front Left<br>2. Front Center<br>3. Front Right<br>4. Back Left<br>5. Center Back<br>6. Back Right<br>7. Other Position *(Bus-Motorcycle)*<br>8. Position Unknown |

*DA FORM 3946, DEC 1998*

Page 2 of 4
APD V1.01

FOR OFFICIAL USE ONLY

App. 543

FOR OFFICIAL USE ONLY

| 12. PEDESTRIAN | | | | | | | |
|---|---|---|---|---|---|---|---|
| a. NAME AND ADDRESS | | | | b. AGE | c. SEX | d. CATEGORY | e. INJURY |

f. PEDESTRIAN WAS GOING [ ] N [ ] S [ ] E [ ] W [ ] ALONG [ ] ACROSS   INTO STREET, ROAD OR HIGHWAY,
FROM *(NW to SW corner, or east to west side, etc.)* _____ TO _____

| | | | |
|---|---|---|---|
| [ ] Crossing With Signal | [ ] Crossing No Signal | [ ] Standing on Roadway | [ ] Walking in Road Against Traffic |
| [ ] Crossing Against Signal | [ ] Hitching on Vehicle | [ ] Coming From Behind Parked Car | [ ] Walking in Road With Traffic |
| [ ] Crossing Not at Intersection | [ ] Playing on Roadway | [ ] Pushing or Working on Vehicle | [ ] Other |

| 13. WITNESSES | |
|---|---|
| a. NAME AND ADDRESS | b. TELEPHONE NUMBER |
| | |
| | |
| | |
| | |

**14. VEHICLE DAMAGE**

| a. DAMAGED VEHICLE NO. 1 | | DAMAGED VEHICLE NO. 2 | | DAMAGED TRAILER, MOTORCYCLE ETC. |
|---|---|---|---|---|
| ✓ Right Front of Car | Left Front Door | [ ] Right Front of Car | [ ] Left Front Door | *(Sketch Damage)* |
| ✓ Right Front Fender | ✓ Left Front Fender | [ ] Right Front Fender | [ ] Left Front Fender | |
| [ ] Right Front Door | ✓ Left Front of Car | [ ] Right Front Door | [ ] Left Front of Car | |
| [ ] Right Rear Door | ✓ Hood | [ ] Right Rear Door | [ ] Hood | |
| [ ] Right Rear Fender | [ ] Roof | ✓ Right Rear Fender | [ ] Roof | |
| [ ] Right Rear of Car | [ ] Trunk | [ ] Right Rear of Car | [ ] Trunk | |
| [ ] Left Rear of Car | [ ] Undercarriage | [ ] Left Rear of Car | [ ] Undercarriage | |
| [ ] Left Fender | [ ] Overturn | [ ] Left Fender | [ ] Overturn | |
| [ ] Left Rear Door | | [ ] Left Rear Door | | |

| b. SEVERITY OF DAMAGE VEHICLE NO. 1 | | SEVERITY OF DAMAGE VEHICLE NO. 2 | | SEVERITY OF DAMAGE OTHER VEHICLE | |
|---|---|---|---|---|---|
| ✓ Disabling Damage | [ ] Other MV Damage | [ ] Disabling Damage | [ ] Other MV Damage | [ ] Disabling Damage | [ ] Other MV Damage |
| [ ] Functional Damage | [ ] No Damage | ✓ Functional Damage | [ ] No Damage | [ ] Functional Damage | [ ] No Damage |

| c. TOWED BY | TOWED BY | TOWED BY |
|---|---|---|
| G&M Towing | | |

| d. TOWED TO | TOWED TO | TOWED TO |
|---|---|---|
| Pacific Tank Lines | | |

e DAMAGE TO PROPERTY OTHER THAN VEHICLE

f. SKETCH OF COLLISION. (1) Identify roadway and roadway features, vehicles, pedestrians, objects on/off roadway, traffic controls, skidmarks, unusual/temperature conditions *(ice patch, construction areas, etc.)*. (2) Locate probable point of impact. (3) Show vehicle, pedestrian or object positions at impact. (4) Show probable vehicle or pedestrian paths before and after collision.
NORTH = ↑

g. DESCRIPTION OF COLLISION. Indicate what probably happened before, during, and after the crash; include information not on sketch, e.g., driver disability, reduced visibility, pedestrian clothing color, construction or repair work, etc.

Vehicle 1 was approaching the truck bypass checkpoint unaware of the stopped vehicles ahead of him and rear ended vehicle 2

*DA FORM 3946, DEC 1998*

FOR OFFICIAL USE ONLY

Page 3 of 4
APD V1.01

App. 544

FOR OFFICIAL USE ONLY

## 15a. DRIVER'S ACTION BEFORE ACCIDENT

| DIRECTION HEADED | DRIVER (Check one or more) | | DRIVER (Check one or more) | | | VEHICLE (Specify Feet/MPH) | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | | 1 | 2 Other (Specify) | 1 | 2 | |
| | | | Backing | | | | | |
| VEHICLE 1 | ✓ | | Going Straight Ahead | | | 150 | | Estimated Distance When Danger Was First Noticed |
| ✓ N  S | | | Making Left Turn | | | | | Estimated Speed When Danger was First Noticed |
| E  W | | | Skidding | | | | | |
| | | | Making Right Turn | | | | | Estimated Speed at Impact (MPH) |
| VEHICLE 2 | | | Making "U" Turn | | | | | |
| ✓ N  S | | | Overtaking or Passing | | | | | Distance Traveled After Impact (Feet) |
| E  W | | | Avoiding Veh/Obj | | | | | |
| | ✓ | | Slowing or Stopping | | | 45 | | Lawful Speed (MPH) |
| | | ✓ | Stop in Traffic Lane | | | | | |

### b. CONTRIBUTING CIRCUMSTANCES

| DRIVER (Check one or more) | | | DRIVER (Check one or more) | | | DRIVER (Check one or more) | | |
|---|---|---|---|---|---|---|---|---|
| 1 | 2 | | 1 | 2 | | 1 | 2 | |
| ✓ | | Exceeding Speed Limit | | | Alcohol Involved | | | Chemical Test Given |
| | | Speed Excessive for Conditions | | | Drugs Involved | | | Chemical Test Refused |
| | | Failed to Yield | | | Ability Impaired | | | **TEST RESULTS** |
| | | Disregarded Stop Signal | ✓ | | Ability Not Impaired | | DRIVER NO. 1 | DRIVER NO. 2 |
| ✓ | | Vision Obstructed | | | Unknown | % | BAC | % | BAC |
| | | Following Too Close | | | | | | |
| | | Improper Overtaking | | | See attached DD Form 1920 (Alcoholic Influence Report) | | | |
| | | No or Improper Signal | VEHICLE (Check one or more) | | | | | |
| | | Disregarded Traffic Signal | 1 | 2 | | | | |
| | | Improper Turn | | | Defective Brakes | | | |
| | | Unknown | | | Defective Head Lights | | | |
| | | Other (Specify) | | | Tires Worn or Smooth | | | |
| | | | | | Tires Punctured or Blown | | | |
| | | | | | Other (Specify) | | | |

## 16. MILITARY POLICE ACTIVITY

| a. NAME OF PERSON(s) APPREHENDED | b. CHARGES | c. REPORT NUMBER |
|---|---|---|
| Garcia, Jose Maria | Traffic Collision- POV Vs.POV | 00062-2017-TAI146 |

| d. TIME MILITARY POLICE NOTIFIED (Hour) 0704 | e. TIME MILITARY POLICE ARRIVED AT ACCIDENT (Hour) 0712 | | YES | NO |
|---|---|---|---|---|
| f. WHERE ELSE WAS INVESTIGATION MADE? | h. DID MILITARY OPERATOR COMPLETE DD FORM 518 (Accident Identification Card)? | | | ✓ |
| g. IF OFF MILITARY RESERVATION, WHO ELSE CONDUCTED AN INVESTIGATION? (If other agency conducted complete investigation, so indicate) | i. DID MILITARY OPERATOR COMPLETE SF FORM 91 (Motor Vehicle Accident Report)? | | | ✓ |
| | j. WAS FORM COMPLETED FROM ON SCENE INVESTIGATION? (If not, explain) | | ✓ | |

| k. DATE | l. TYPED OR PRINTED NAME AND GRADE OF INVESTIGATOR | m. INVESTIGATOR'S SIGNATURE AND GRADE |
|---|---|---|
| 20170601 | PFC Viguers, Steven | |

| n. DATE APPROVED | o. APPROVED BY | p. ENCLOSURES FI Uribe E | q. DISTRIBUTION |
|---|---|---|---|
| 20170602 | SGT Cano, Eric A. TMCI NCOIC | | |

DA FORM 3946, DEC 1998

Page 4 of 4
APD V1.01

FOR OFFICIAL USE ONLY



# FORT IRWIN POLICE
## PHOTO LOG



**PHOTOS TAKEN BY :** PFC Viguers, Steven          **DATE TAKEN :** 20170601

MPR#: 00062-2017-TAI146

| | |
|---|---|
| PHOTO #01: | Damage to Vehicle 1 and debris |
| PHOTO #02: | Damage to Vehicle 1 and debris |
| PHOTO #03: | Damage to Vehicle 1 and debris |
| PHOTO #04: | Damage to Vehicle 1 and debris |
| PHOTO #05: | Profile passenger side of vehicle1 |
| PHOTO #06: | License plate of vehicle 1 |
| PHOTO #07: | Hazard Placard of vehicle 1 |
| PHOTO #08: | Profile rear of vehicle 1 |
| PHOTO #09: | Damage to Vehicle 1 and debris |
| PHOTO #10: | Damage to Vehicle 1 and debris |
| PHOTO #11: | Damage to Vehicle 1 and debris |
| PHOTO #12: | Damage to Vehicle 1 and debris |
| PHOTO #13: | Company logo vehicle 2 |
| PHOTO #14: | License plate of vehicle 2 |
| PHOTO #15: | Debris |
| PHOTO #16: | Profile front of vehicle 2 |
| PHOTO #17: | Profile rear and passenger side vehicle 2 |
| PHOTO #18: | Damage to rear passenger side of vehicle 2 |
| PHOTO #19: | Profile front passenger side of vehicle 2 |
| PHOTO #20: | Profile vehicle 2 |
| PHOTO #21: | Rear undercarriage vehicle 2 |
| PHOTO #22: | Damage to rear passenger side of vehicle 2 |
| PHOTO #23: | Damage to rear passenger side of vehicle 2 |
| PHOTO #24: | Damage to rear of vehicle 2 |
| PHOTO #25: | Damage to Vehicle 1 and debris |

FOR OFFICIAL USE ONLY



# FORT IRWIN POLICE
# PHOTO LOG



**PHOTOS TAKEN BY :** PFC Viguers, Steven          **DATE TAKEN :** 20170601

MPR#: 00062-2017-TAI146

| | |
|---|---|
| PHOTO #26: | Damage to Vehicle 1 and debris |
| PHOTO #27: | Damage to Vehicle 1 and debris |
| PHOTO #28: | Damage to Vehicle 1 and debris |
| PHOTO #29: | Damage to Vehicle 1 and debris |
| PHOTO #30: | Damage to Vehicle 1 and debris |
| PHOTO #31: | Company name of vehicle 1 |
| PHOTO #32: | Hazard Placard of vehicle 1 |
| PHOTO #33: | Damage to Vehicle 1 and debris |
| PHOTO #34: | Debris |
| PHOTO #35: | Damage to Vehicle 1 and debris |
| PHOTO #36: | Vehicle 2 door hitch |
| PHOTO #37: | Damage to rear vehicle 2 |
| PHOTO #38: | Skid marks vehicle 2 |
| PHOTO #39: | Damage to rear vehicle 2 |
| PHOTO #40: | Damage to rear vehicle 2 |
| PHOTO #41: | Damage to Vehicle 1 and debris |
| PHOTO #42: | Damage to Vehicle 1 and debris |
| PHOTO #43: | Damage to Vehicle 1 and debris |
| PHOTO #44: | Damage to Vehicle 1 and debris |
| PHOTO #45: | Damage to Vehicle 1 and debris |
| PHOTO #46: | Damage to Vehicle 1 and debris |
| PHOTO #47: | Damage to Vehicle 1 and debris |
| PHOTO #48: | Damage to Vehicle 1 and debris |
| PHOTO #49: | |
| PHOTO #50: | |

FOR OFFICIAL USE ONLY






FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY









FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY









FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY









App. 551

FOR OFFICIAL USE ONLY









FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY






FOR OFFICIAL USE ONLY



FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY






FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY









OR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY









FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY









FOR OFFICIAL USE ONLY









FOR OFFICIAL USE ONLY

```
Message From Terminal/Unit:  CLETS    Operator:  CLETS(CLETS)
Originally Sent To: OFT002
Date/Time Sent:  01-JUN-2017 13:31:25
4EFYMOFT002.I*
DR.AZ007C000
06/01/2017 13:31 28132
06/01/2017 13:31 44375 CAUSA0800
*EFYMPLNBCP
TXT
 OLN/D06393776
NAME:DAVID,ERNESTO,URIBE-STALHKOPFF            DOB:12/02/1992   RCPT#:TL123125
ADDR:700 W CALLE COLADO                        TUCSON                 AZ 85756
ISSUE DT:05/07/2014 EXP:12/02/2018   SEX:M HGT:600 WGT:208 HAIR:BLK EYE:BRN
OLN:D06393776    SSN:601270607    OLT:CDL - CLASS A
PREV LIC: D06393776              PREV ST: AZ
          D06393776                       AZ
          D06393776                       AZ
STATUS    CDL MEDICALLY CERTIFIED - MEETS STD
```

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

```
Message From Terminal/Unit:  CLETS     Operator:  CLETS(CLETS)
Requested By:  1-3
Date/Time Sent:  01-JUN-2017 13:32:27
4EFYMOFT002.ID
DATE:06-01-17*TIME:13:32*
DMV RECORD FOR LAW ENFORCEMENT USE ONLY
DL/NO:B5406565*B/D:06-29-1977*NAME:GARCIA JOSE MARIA*
MAIL ADDR AS OF 03-21-16:29401 WILDCAT CANYON RD MENIFEE 92587*
OTH/ADDR AS OF 12-04-14:29401 WILDCAT CANYON RD QUAIL VALLEY *
AKA:GARCIA JOSE*
IDENTIFYING INFORMATION:
SEX:MALE*HAIR:BLACK*EYES:BRN*HT:5-10*WT:215*
ID CARD MLD:11-14-02*EXPIRES:06-29-08*
LIC/ISS:03-21-16*EXPIRES:06-29-20*CLASS:A COMMERCIAL*
ENDORSEMENTS:DOUBLES/TRIPLES,HAZARDOUS MATERIALS,TANK VEHICLE*
ORIGINAL DL ISSUE DATE:06-08-94*
TSA CLEARANCE APPROVED HAZARDOUS MATERIAL ENDORSEMENT EXP: 04-07-21*
MEDICAL EXAM EXP:10-05-18**
MEDICAL CERTIFICATE INFORMATION:
ISSUE DATE: 10-05-16     EXPIRATION DATE: 10-05-18
STATUS CODE: C
MED EXAMINER NUMBER: CA    PA20766CA
SPECIALTY: PA    MED EXAMINER PHONE NUMBER: 9517812200
MED EXAMINER NAME:
LAST NAME: ARREGUIN
FIRST NAME: GERARDO
SELF CERTIFICATION INFORMATION:
SELF CERTIFICATION CODE: NA
LATEST APP:
DL TYPE:DL MAG STRIPE REISSUE*ISS/DATE: 04-07-16*OFFICE: HQT*BATES:LIS*
RESTR:K-SELF-CERTIFICATION - CDL INTRASTATE ONLY,
ORGAN AND TISSUE DONOR: YES   UPDATED:03-21-16
LICENSE STATUS:
  VALID*
COMMERCIAL LICENSE STATUS:
  VALID*
DEPARTMENTAL ACTIONS:
NONE
CONVICTIONS:
VIOL/DT   CONV/DT   SEC/VIOL   DKT/NO        DISP      COURT   VEH/LIC
12-09-15  01-28-16  BP                                 N MEX
DMV POINT COUNT 1.5
FAILURES TO APPEAR:
NONE
ACCIDENTS:
NONE
END
```

FOR OFFICIAL USE ONLY

```
Message From Terminal/Unit:  CLETS    Operator:  CLETS(CLETS)
Requested By:  1-3
Date/Time Sent:  01-JUN-2017 13:33:26
4EFYMOFT002.ID
DATE:06-01-17*TIME:13:33*
DMV RECORD FOR LAW ENFORCEMENT USE ONLY
DL/NO:E2907134*B/D:11-19-1983*NAME:BOLIN JAKE EUGENE*
MAIL ADDR AS OF 05-17-16:28339 CIDER STREET ROMOLAND 92585*
OTH/ADDR AS OF 08-06-15:33590 WILLOW HAVEN LN 104 MURRIETA *
IDENTIFYING INFORMATION:
SEX:MALE*HAIR:BROWN*EYES:BRN*HT:5-11*WT:238*
LIC/ISS:08-06-15*EXPIRES:11-19-19*CLASS:A COMMERCIAL
 & M1 MOTORCYCLE*
ENDORSEMENTS:HAZARDOUS MATERIALS,TANK VEHICLE*
ORIGINAL DL ISSUE DATE:12-19-08*
TSA CLEARANCE APPROVED HAZARDOUS MATERIAL ENDORSEMENT EXP: 11-02-17*
MEDICAL EXAM EXP:08-07-17**
MEDICAL CERTIFICATE INFORMATION:
ISSUE DATE: 08-07-15    EXPIRATION DATE: 08-07-17
STATUS CODE: C
MED EXAMINER NUMBER: CA    7153720796
SPECIALTY: MD    MED EXAMINER PHONE NUMBER: 9517812200
MED EXAMINER NAME:
LAST NAME: MOGENSEN
FIRST NAME: THOMAS
MIDDLE NAME: K
SELF CERTIFICATION INFORMATION:
SELF CERTIFICATION CODE: NI
LATEST APP:
DL TYPE:DL MAG STRIPE REISSUE*ISS/DATE: 08-06-15*OFFICE: HQT*BATES:LIS*
ORGAN AND TISSUE DONOR: NO    UPDATED:08-06-15
LICENSE STATUS:
  VALID*
COMMERCIAL LICENSE STATUS:
 ·VALID*
DEPARTMENTAL ACTIONS:
NONE
CONVICTIONS:
VIOL/DT   CONV/DT   SEC/VIOL    DKT/NO          DISP    COURT  VEH/LIC
06-28-16  11-28-16  22348C VC   CH74818         B       19466  V146076
                    COMVEH OTH
DMV POINT COUNT 1.5
FAILURES TO APPEAR:
NONE
ACCIDENTS:
DATE/TIME    LOCATION           VEH LIC  REPORT NO    FR CASE NO
10-04-16 06 MENIFEE          113016 71101U1 33005004815 16 06 39965
                    NOT AT FAULT, OTHER PARTY AT FAULT
END
```

FOR OFFICIAL USE ONLY

## FORT IRWIN MILITARY POLICE INFORMATION WORKSHEET

| SUB☐ VIC☑ COMP☐ WIT☐ | LER # | | DATE/TIME 20170601 |
|---|---|---|---|

**NAME (LAST, FIRST, MI)** Garcia Jose M
**SSN** 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
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
**PROTECTED IDENTITY** Y☐ N☑

**DOB (YYYYMMDD)** 19770625
**POB (CITY, STATE)** Mexicala / Mexico
**GRADE/RANK** Civ
**BRANCH**
**COMPONENT** AD☐ NG☐ RSV☐

**HOME/CELL PHONE** 714 356-1767
**WORK PHONE** 951 680-1500
**NICKNAME/ALAIS**
**CITIZENSHIP** US☑ CNTRY☐ (specify)

**DRIVER LICENSE STATE** CA
**DRIVERS LICENSE #** B54106565
**SEX** M☑ F☐
**AGE** 39
**JUVENILE** Y☐ N☑

**HEIGHT** 5'10"
**WEIGHT** 215
**GLASSES** Y☐ N☑ **CONTACTS☐**
**FINGERPRINTED** Y☐ N☑
**COMBAT DEPLOYMENTS** 0☐ 1☐ 2☐ 3☐ 4+☐
**MOS**

**ETS DATE**
**PCS DATE**
**PHOTOGRAPHED** Y☐ N☐
**FUGITIVE** Y☐ N☐

**ORGANIZATION/UNIT** Pacific Tank Lines
**INSTALLATION/CITY** Riverside
**STATE** CA
**ZIP** 92505

**RESIDENCE ADDRESS** 25401 Wildcat Canyon
**INSTALLATION/CITY** Menefee
**STATE** CA
**ZIP** 92587

| RACE | ETHNICITY | BUILD | SKINTONE | EDUCATION |
|---|---|---|---|---|
| ☐American Indian | ☑Hispanic | ☐Heavy | ☐Albino | ☐Grade School (specify) |
| ☐Asian | ☐Not Hispanic | ☐Large | ☐Black | ☐High School |
| ☐Black | ☐Unknown | ☑Medium | ☐Dark | ☐GED |
| ☐Mixed | | ☐Muscular | ☐Dark Brown | ☐Associates |
| ☐Native Hawaiian/Pacific | | ☐Obese | ☐Fair | ☐Baccalaureate |
| ☐Unknown | | ☐Stocky | ☑Light | ☐Masters |
| ☐White | | ☐Thin | ☐Light Brown | ☐Doctorate |
| ☑Other | | | ☐Medium | |
| | | | ☐Medium Brown | |

**HAIR STYLE** Short
**HAIR COLOR** BRN
**EYE COLOR** BRN
**FACIAL HAIR** hale
**MARITAL STATUS** M
**DECEASED** Y☐ N☐

**DEMEANOR** Compliant
**CLEARANCE** TSA
**TIME IN SERVICE**
**ILLNESS/INJURY**

**SUBJECT INVOLVEMENT**
**APPREHENSION TYPE** MP☐ CIV POLICE☐ OTHER☐
**APPREHENSION DATE**
**INVOLVEMENT** ALCOHOL☐ DRUG☐
**DISPOSITION**

**IDENTIFYING MARKS (scars/tattoos)**

**HOW DRESSED AT TIME OF INCIDENT** Pacific Tank Lines Work Uniform

### VEHICLE INFORMATION

**VEH YEAR** 2015
**VEH MAKE** Peter Built
**VEH MODEL** #45
**VEH COLOR** Yellow
**VIN** 1NKYLP9X0FJ441907

**VEH LIC #** 4HU2652
**INS COMPANY** American Ins. Com.
**POLICY #** BAP038145301
**INS EXP DATE** 20170701

**DAMAGES** Front of Vehicle Destroyed to include the engine Block

**REGISTERED OWNER** Pacific Tank Lines
**RO LISTED ABOVE** Y☐ N☐

FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE

951 830 0067   446 82 3533

FOR OFFICIAL USE ONLY

| NAME (LAST, FIRST, MI) | | | | | | | | PROTECTED IDENTITY YE□ NE□ |
| Uribe, Erwerto Q | | | | | | | | |
| DOB (YYYYMMDD) | | POB (CITY, STATE) | | GRADE/RANK | | BRANCH | | COMPONENT |
| 19570325 | | Mavsco | | 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 | | CiV | | ADD□ NG□ RSV□ |
| HOME/CELL PHONE | | WORK PHONE | | NICKNAME/ALIAS | | | | CITIZENSHIP |
| 520 268-3704 | | | N/A | N/A | | | | US□ CNTRY□ (specify) |
| DRIVER LICENSE STATE | | DRIVERS LICENSE# | | | | SEX | AGE | JUVENILE |
| AZ | | DO3866492 | | | | M☒ F□ | 60 | YE□ NE☒ |
| HEIGHT | WEIGHT | GLASSES | | FINGERPRINTED | | COMBAT DEPLOYMENTS | | MOS |
| 5' 10" | 201 | YE□ NE□ CONTACTSE□ | | YE□ NE☒ | | 0□ 1□ 2□ 3□ 4□ | | |
| ETS DATE | | PCS DATE | | PHOTOGRAPHED | | | | FUGITIVE |
| | | | | YE□ NE□ | | | | YE□ NE□ |
| ORGANIZATION/UNIT | | | | INSTALLATION/CITY | | | STATE | ZIP |
| DSEA Trucking | | | | Tuscon AE | | | AZ | 85756 |
| RESIDENCE ADDRESS | | | | INSTALLATION/CITY | | | STATE | ZIP |
| 200 W Calle Colodo | | | | Tuscon | | | AZ | 85756 |

| RACE | ETHNICITY | BUILD | SKINTONE | EDUCATION |
| □American Indian | □Hispanic | □Heavy | □Albino | □Grade School (specify) |
| □Asian | ☒Not Hispanic | □Large | □Black | □High School |
| □Black | □Unknown | □Medium | □Dark | □GED |
| □Mixed | | □Muscular | □Dark Brown | □Associates |
| □Native Hawaiian/Pacific | | □Obese | □Fair | □Baccalaureate |
| □Unknown | | □Stocky | □Light | □Masters |
| □White | | □Thin | □Light Brown | □Doctorate |
| □Other | | | □Medium | |
| | | | □Medium Brown | |

| HAIR STYLE | HAIR COLOR | EYE COLOR | FACIAL HAIR | MARITAL STATUS |
| Short | BRN | BRN | Beaud | M |
| DEMEANOR | CLEARANCE | TIME IN SERVICE | ILLNESS/INJURY | DECEASED |
| Compliant | | | | YE□ NE☒ |
| SUBJECT INVOLVEMENT | APPREHENSION TYPE | APPREHENSION DATE | INVOLVEMENT | DISPOSITION |
| | MP□ CIV POLICE□ OTHER□ | | ALCOHOL□ DRUG□ | |
| IDENTIFYING MARKS (scars/tattoos) | | HOW DRESSED AT TIME OF INCIDENT | | |
| | | Red Shirt | | |
| | | Blue Jeans | | |
| | | Black Shoes | | |

### VEHICLE INFORMATION

| VEH YEAR | VEH MAKE | VEH MODEL | VEH COLOR | VIN |
| 98 | Freightliner | Century class | Blue | 1FUYS2V56WP890908 |
| VEH LIC# | INS COMPANY | POLICY# | | INS EXP DATE |
| AG 415076 | New oheanse | QAZD-94720 | | 5/17/18 |
| DAMAGES | | | | |

| REGISTERED OWNER | | RO LISTED ABOVE |
| | | YE□ NE□ |

FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE

FOR OFFICIAL USE ONLY

App. 564

FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE

Vehicle 2

| NAME (LAST, FIRST, MI) | | | SSN | | PROTECTED IDENTITY |
|---|---|---|---|---|---|
| Uribe-Stalkopff, David, Ernesto | | | 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 | | YES ☐ NO ☐ |

| DOB (YYYYMMDD) | POB (CITY, STATE) | | BRADE/RANK | BRANCH | COMPONENT |
|---|---|---|---|---|---|
| 0902 1702 | Tucson, AZ | | | Civ. U. | AD ☐ NG ☐ RSV ☐ |

| HOME/CELL PHONE | WORK PHONE | NICKNAME/ALIAS | CITIZENSHIP |
|---|---|---|---|
| 520 268 3704 | | | US ☐ CNTRY ☐ (specify) |

| DRIVER LICENSE STATE | DRIVERS LICENSE # | | SEX | AGE | JUVENILE |
|---|---|---|---|---|---|
| AZ | D06393776 | | M ☑ F ☐ | 24 | YES ☐ NO ☐ |

| HEIGHT | WEIGHT | GLASSES | FINGERPRINTED | COMBAT DEPLOYMENTS | MOS |
|---|---|---|---|---|---|
| 740 | 5'11" | YES ☐ NO ☑ CONTACTS ☐ | YES ☐ NO ☑ | 0 ☑ 1 ☐ 2 ☐ 3 ☐ 4+ ☐ | |

| ETS DATE | PCS DATE | PHOTOGRAPHED | FUGITIVE |
|---|---|---|---|
| | | YES ☐ NO ☑ | YES ☐ NO ☐ |

| ORGANIZATION/UNIT | INSTALLATION/CITY | STATE | ZIP |
|---|---|---|---|
| | | | |

| RESIDENCE ADDRESS | INSTALLATION/CITY | STATE | ZIP |
|---|---|---|---|
| 700W Calle Colado | Tucson | AZ | 85756 |

| RACE | ETHNICITY | BUILD | SKINTONE | EDUCATION |
|---|---|---|---|---|
| ☐ American Indian | ☑ Hispanic | ☐ Heavy | ☐ Albino | ☐ Grade School (specify) |
| ☐ Asian | ☐ Not Hispanic | ☐ Large | ☐ Black | ☑ High School |
| ☐ Black | ☐ Unknown | ☑ Medium | ☐ Dark | ☐ GED |
| ☐ Mixed | | ☐ Muscular | ☐ Dark Brown | ☐ Associates |
| ☐ Native Hawaiian/Pacific | | ☐ Obese | ☐ Fair | ☐ Baccalaureate |
| ☐ Unknown | | ☐ Stocky | ☐ Light | ☐ Masters |
| ☑ White | | ☐ Thin | ☐ Light Brown | ☐ Doctorate |
| ☑ Other | | | ☑ Medium | |
| Latino | | | ☐ Medium Brown | |

| HAIR STYLE | HAIR COLOR | EYE COLOR | FACIAL HAIR | MARITAL STATUS |
|---|---|---|---|---|
| Medium | Black | Bro | Go-Tee | Sin. |

| DEMEANOR | CLEARENCE | TIME IN SERVICE | ILLNESS/INJURY | DECEASED |
|---|---|---|---|---|
| CO-OP | | | Neck | YES ☐ NO ☑ |

| SUBJECT INVOLVEMENT | APPREHENSION TYPE | APPREHENSION DATE | INVOLVEMENT | DISPOSITION |
|---|---|---|---|---|
| Passenger | MP ☐ CIV POLICE ☐ OTHER ☐ | | ALCOHOL ☐ DRUG ☐ | |

| IDENTIFYING MARKS (scars/tattoos) | HOW DRESSED AT TIME OF INCIDENT |
|---|---|
| N/A | Red-Tee<br>Jeans<br>Black Nike |

## VEHICLE INFORMATION

| VEH YEAR | VEH MAKE | VEH MODEL | VEH COLOR | VIN |
|---|---|---|---|---|
| 1998 | Freightliner | 3axL | Blue | 1FUYSZYB6WP890808 |

| VEH LIC # | INS COMPANY | POLICY# | INS EXP DATE |
|---|---|---|---|
| AG 45076 | Qualitas | QAZD-94700-02 | 05/17/2018 |

| DAMAGES |
|---|
| Trailer L/rear Pass. Side |

| REGISTERED OWNER | RO LISTED ABOVE |
|---|---|
| D&E-A Trucking LLC | YES ☐ NO ☐ |

TAB
AG45076 perm    Unit 92       E-mail All-bwer
                              Davidu.uribe@gmail.com

FOR OFFICIAL USE ONLY

App. 565

FOR OFFICIAL USE ONLY



# FORT IRWIN
# POLICE DEPARTMENT
# REPORT COVER PAGE



**MPR#:** 00062-2017-TAI146

**DATE:** 20170602    **BLOTTER DATE:** _____

**ENTERED INTO COPS BY:** PFC Viguers

**REVIEWED BY:**

**WATCH COMMANDER:** SGT Mariscal    INITIALS ℳ

**DESK SERGEANT:** SGT Cano    INITIALS

**PRIMARY OFFICER:** PFC Viguers

**CASE REFERRED TO:** Traffic

**OFFENSE:** Traffic Collision POV vs. POV

## PLACE ALL DOCUMENTS IN ORDER

| | | | | |
|---|---|---|---|---|
| ✓ | **FI/GANG CARD** | | | **INTOX REPORT** |
| | 3975 | | ✓ | **PHOTO LOG & PHOTOS** |
| ✓ | 3946 | | | **CITATIONS** |
| ✓ | **OFC STATEMENT** | | | **DS 367** |
| ✓ | 2823 | | | **CHP 180** |
| | 4137 (COPY ONLY) | | ✓ | **CLETS PRINT OUT** |
| | 3881 | | | |
| | 2708 | | | |
| | 1920 | | | **FD 249** |

FOR OFFICIAL USE ONLY

App. 566

# Exhibit F

Email from Issa to Butolph,
July 18, 2017

CONFIDENTIAL

# Truck By-Pass

| | |
|---|---|
| **From:** | "Issa, Sabah A CIV USARMY IMCOM CENTRAL (US)" <"/o=easf/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=sabah.a.issa.civ163"> |
| **To:** | "Butolph, Michael V CIV USARMY IMCOM CENTRAL (US)" <michael.v.butolph.civ@mail.mil> |
| **Date:** | Tue, 18 Jul 2017 15:20:15 -0700 |
| **Attachments:** | Truck By-Pass Signs SOW.docx (20.09 kB) |

Mike,

As you know we had several accidents on the truck by-pass.
I believe it's time to update the signage on the road.

Attached is my SOW which I think will improve the safety of the road.
I am primarily like to keep the trucks and the busses in their lanes and cut down the speed around the truck check point from 45 to 25.
Anyhow, take a look at it and tell me what you think, or, you might have other ideas.

I don't know when we'll be able to do it, it's year end, but I think I can get the GC to approve it.

Thanks,

Sabah A. Issa
Mechanical Engineer
DPW, Ft. Irwin, CA
(760)380-0322



DEPOSITION
EXHIBIT
7
mb 11/8/19

App. 568

USA-3314

# Exhibit G

Issa Scope of Work Plan,
July 11, 2017

## SCOPE OF WORK
11 July 2017

**PREPARED BY:**   **SABAH ISSA**
                   **MECHANICAL ENGINEER**

**PROJECT TITLE:**   **REPAIR TRAFFIC CONTROL DEVICES**

**PROJECT NUMBER**   **EN-16105-6**

**CUSTOMER:**   **GARRISON**

**LOCATION:**   **TRUCK BY-PASS ROAD**

### 1.0 PURPOSE:
The Truck By-Pass road, located between the southern boundary of the installation and painted rocks, parallel to Ft. Irwin road, needs new traffic control devices which comply with the mandatory requirements of the Manual on Uniform Traffic Control Devices (MUTCD).

### 2.0 CONTRACTOR SHALL BE REQUIRED TO PROVIDE MATERIAL, EQUIPMENT AND LABOR TO PERFORM THE FOLLOWING:

2.1 Remove all existing traffic control devises and dispose of them, except "Tank Crossing", "One Way", "Subject to Flooding" and "Do Not Enter/ Wrong Way".

Provide and install the following traffic signs, all signs shall be 3 ft. wide by 4 ft. tall, white with black letters, Series 2000 Standard Alphabets. Engineer grade reflective aluminum, comply with MUTCD standards:

- Two signs at the entrance of the road with the wording "Right Lane Trucks Only" and "Left Lane Busses Only". Signs shall be equipped with four LED/Solar flashing lights, each. Lights shall be yellow and installed at each side, top side and bottom side.
- Six signs, two every half a mile, with the wording "Stay in Lane, No Passing". Signs shall be installed on the right side of the road.
- One sign half a mile before the truck check point with the wording "Truck Check Point Ahead".
- One sign half a mile before the truck check point with the wording "Reduced Speed Ahead".
- One sign quarter a mile before the truck check point with the wording "Speed Limit 25".
- One sign quarter a mile pass the truck check point with the wording "End 25 Speed Limit".
- Three signs, at each mile, with the wording "Speed Limit 45".
- Re-stripe the road with solid yellow line in the middle of the roadway to discourage drivers from passing each other. Re-strip the shoulder borders with white lines. Striping shall be reflective materials.
- Remove the existing reflective raised pavement markers and replace with new, 4x4 in, two way reflective raised markers at the MUTCD standard spacing. Markers color shall match the color of the adjacent line.

### 3.0 GENERAL REQUIREMENTS:



DEPOSITION
EXHIBIT
8
NP 11/8/19

PENGAD 800-631-6989

USA-327

App. 570

3.1 Prior to the commencement of construction, the Government will schedule a pre-construction to discuss and develop mutual understanding relative to the administration of the safety programs, quality control procedures and construction schedule, labor provisions and other contract procedures. The Contractor's key personnel will attend including the Project Manager, Superintendent (if any), QA representative, and any contractor's personnel required.

- Contractor shall comply with all Ft. Irwin's requirements for driving, access, parking, fire prevention, safety and environmental.

- Work shall be in full compliance with OSHA and all applicable labor laws and regulations.

3.2 Contractor shall provide a set of As-Built Drawings to include, but not limited to, Civil Drawings;

Mechanical Drawings and Electrical Drawings, three (3) hardcopy sets and One (1) electronic, compatible

with DPW systems

3.3 Contractor shall provide all submittals, in hardcopies and electronic, for Government approval before ordering the equipment or executing the work.

3.4 Contractor shall provide hardcopies and an electronic, a set of all operational and maintenance manuals.

4.0 Antiterrorism (AT): Contracts will ensure complying with AT provisions of the Defense Federal Acquisition Regulation Supplement. All contractor employees, to include subcontractor employees, requiring access to Fort Irwin and its facilities and controlled access areas shall complete AT Level I awareness training within 30 calendar days after contract start date or effective date of incorporation of this requirement into the contract, whichever is applicable. The contractor shall submit certificates of completion for each affected contractor employee and subcontractor employee, to the COR or to the contracting officer, if a COR is not assigned, within 5 calendar days after completion of training by all employees and subcontractor personnel. AT Level I awareness training is available at the following website: https://atlevel1.dtic.mil/at.

In addition should the Force Protection Condition (FPCON) at Fort Irwin and its facilities would change, the Government may require changes in contractor security matters or processes. Contractor employees are prohibited from possessing weapons, firearms, or ammunition, on themselves or within their Contractor-owned vehicle or privately-owned vehicle while in performance of the contract.

Operation Security (OPSEC): Contractor personnel must protect information that has been designated as critical in the performance of the contract.

Critical information will only be disseminated on a "need-to-know" basis and not be discussed in public areas such as hallways, bathrooms, eateries, smoke shacks, or any off-base gathering locations.

Contractor employees will not pass critical information over unsecured telephones, facsimiles, and or e-mail outside of the Department of Defense Network. Contractor employees will not post critical information on the web, personal "blogs," or where it is visible to visitors or the public.

Reporting Requirements: Contractor personnel shall report to an appropriate authority any information or circumstances of which they are aware may pose a threat to the security of personnel, resources, and classified or unclassified defense information. Contractor employees shall be briefed by their immediate supervisor upon initial on-base assignment.

**5.0 PERIOD OF PERFORMACE:** Period of performance for this project is 60 days from the date of Notice to Proceed (NTP).

ISSA.SABAH.A
.1231110239

CONFIDENTIAL

## FACILITIES ENGINEERING WORK REQUEST
For use of this form, see DA Pam 420-6; the proponent agency is OACSIM.

| PART A (See requestor instructions) | CUSTOMER ID | DOCUMENT SERIAL NUMBER | FY | TYPE | SHORT JOB DESCRIPTION | | DATE | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | DA | MON | YR |
| | EN | 17033 | 7 | Y | Repair Traffic Control Devices | | 24 | AUG | 17 |

| INSTALLATION ABBREVIATION OF FACILITIES | BUILDING/FACILITY NUMBERS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 1 Truck By-Pass Road | N/A | | | | | | | | | |
| 2 | | | | | | | | | | |
| 3 | | | | | | | | | | |

REMARKS

| INSTALLATION NAME Fort Irwin, CA | CUSTOMER NAME DPW, Engineering | POC NAME Sabah A. Issa | POC PHONE NUMBER 380-0322 |
|---|---|---|---|

**WORK DESCRIPTION** (Description and justification of work request)
The Truck By-Pass road, located between the southern boundary of the installation and painted rocks, parallel to Ft. Irwin road, needs traffic control devices which comply with the mandatory requirements of the Manual on Uniform Traffic Control Devices (MUTCD). Remove all existing devices and replace them with complete devices which comply with the MUTCD. This work is required to adjust the road conditions after the establishment of the truck check point and to restore the safety of the people traveling on the road.

| AUTHORIZED REQUESTOR (Type or print) Sabah A. Issa | AUTHORIZED REQUESTOR SIGNATURE  ISSA.SABAH.A.123111 0239  Digitally signed by ISSA.SABAH.A.123110239 DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, ou=USA, cn=ISSA.SABAH.A.123110239 Date: 2017.09.22 09:53:49 -07'00' |
|---|---|

| PART B (Approving Official Only) | APPROVAL ACTION CODE: | | SPECIAL INTEREST CODE: | | DATE | | |
|---|---|---|---|---|---|---|---|
| | WORK REQUEST PRIORITY: | | ESTIMATED WORK START DATE: | | DA | MON | YR |
| | PROGRAM INDICATOR CODE: | | ESTIMATED WORK COMPLETION DATE: | | | | |

| ENVIRONMENTAL IMPACT | | | WORK TO BE PERFORMED | WORKCLASS | APPROVAL AMOUNTS | | SOURCE OF FUNDS |
|---|---|---|---|---|---|---|---|
| YES | NO | | | | FUNDED | UNFUNDED | |
| ☒ | ☐ | ENVIRONMENTAL CONSIDERATION | ☐ IN-HOUSE | K | $ 80000.00 | $ 0.00 | ☒ DIRECT |
| ☐ | ☒ | EIS / EIA INITIATED | ☐ SELF-HELP | | $ | $ | ☐ AUTOMATIC REIMBURSEMENT |
| ☐ | ☒ | EIS / EIA COMPLETED | ☒ CONTRACT | | $ | $ | ☐ FUNDED REIMBURSEMENT |
| | | | ☐ TROOP | TOTAL | $ 80000.00 | $ | ACCOUNT PROCESSING CODE |

| DESIGN APPROVAL (Please type or print name) Issa, Sabah A., Chief, Engineering Div. | DATE | | | APPROVAL AUTHORITY (Please type or print name) Bari, Muhammad, Director, DPW | APPROVAL ACTION | DATE | | |
|---|---|---|---|---|---|---|---|---|
| DESIGN APPROVAL SIGNATURE  ISSA.SABAH.A.1231110239 | DA | MON | YR | APPROVAL AUTHORITY SIGNATURE | ☐ APPROVED | DA | MON | YR |
| | 22 | Sep | 17 | | ☐ DISAPPROVED | | | |

DA FORM 4283, SEP 2003    DA FORM 4283, AUG 1978, IS OBSOLETE.    APD LC v1.0JES

Page 1 of 2

App. 572

COMPLETION INSTRUCTION FOR DA Form 4283 - FACILITIES ENGINEERING WORK REQUEST

(Part "A" completed by requestor per instructions below)
(Part "B" completed by the DPW in accordance with local procedures)

PART "A"

CUSTOMER ID: One to three alpha numeric characters per local DPW policy.
A code used to identify the user, occupant, owner of a facility, or the organizational activity submitting a work request.

DOCUMENT SERIAL NO: Must be five alpha numeric characters. Based on local procedures, this number may be generated and entered by the requestor or computer generated and assigned by DPW. It is a number which indicates a place in a series and when used in conjunction with installation number, customer identification, document type, and fiscal year, it uniquely identifies one document of a particular type.

FISCAL YEAR: The last digit of the fiscal year; i.e., '3' for Fiscal Year 2003.

TYPE: Leave blank; DPW Work Reception will complete

SHORT JOB DESCRIPTION: Up to 30 alpha numeric characters that provide a description with a concise summary statement of the work to be performed.

DATE: The date Work Request was completed (Format - 15 JUL 03).

INSTALLATION ABBREVIATION: Up to eight alpha numeric characters for the locally assigned abbreviation of the installation's officially designated name, e.g., Fort Benjamin Harrison abbreviated as Fort Ben.

FACILITY NUMBER: A code of five alpha numeric characters which represent the unique serial number assigned to a real property facility within an installation for identification through its life cycle, e.g. P0001.

REMARKS: At a minimum, include email address of the Primary POC and an Alternate POC for requested work.

INSTALLATION NAME: The official name of an Army real estate holding and the principal function as defined in the real property inventory, e.g., Fort Lee.

CUSTOMER NAME: The name or description of the user, occupant, owner of a facility, or the organizational activity authorized to submit a request for work consisting of up to 15 alpha numeric characters.

POC NAME: Name of the person responsible for specific work information about requested work consisting of up to 15 alpha numeric characters (Format - Last Name, First Name)

POC PHONE NUMBER: Phone number for POC of this particular work request consisting of up to 12 alpha numeric characters.

WORK DESCRIPTION: Description of work to include impact and justification.

AUTHORIZED REQUESTOR: The name of the individual who is authorized to request work.

SIGNATURE: Signature of Authorized Requestor.

*DA FORM 4283, SEP 2003*

APD LC v1.03ES
Page 5 of 2

App. 573

USA-3279

# Exhibit H

Email from Knell to Queen, Reheem, & Butolph,
June 16, 2014

CONFIDENTIAL

# Instruction for By-pass users (UNCLASSIFIED)

| | |
|---|---|
| **From:** | "Knell, Danny R SGM USARMY IMCOM CENTRAL (US)" <danny.r.knell.mil@mail.mil> |
| **To:** | "Queen, Christopher H CIV (US)" <christopher.h.queen.civ@mail.mil>, "Raheem, Joshua CIV USARMY (US)" <joshua.raheem.civ@mail.mil> |
| **Cc:** | "Butolph, Michael V CIV USARMY IMCOM CENTRAL (US)" <michael.v.butolph.civ@mail.mil> |
| **Date:** | Mon, 16 Jun 2014 08:47:59 -0700 |
| **Attachments:** | Commercial Vehicles bypass road.pptx (86.12 kB); smime.p7s (5.62 kB) |

Classification: UNCLASSIFIED
Caveats: FOUO

Mr Queen,

Can you please have the guards that conduct the vehicle inspections every morning for **TWO weeks** pass the commercial vehicle flyer to the truckers for their awareness.  The new information is the following:

- Cannot park on the by-pass route anymore except Monday thru Friday from 0600-0800 hrs during inspection/check-in time
- Must apply Emergency flashers while stopped for inspection
- All vehicles will proceed to Main Gate during non-regulated hours
- All Buses will travel in Left Lane

```
Danny R. Knell
Provost Sergeant Major
Directorate of Emergency Services
Fort Irwin, CA 92310
O:  760-380-8348
BB: 760-499-4225
Cell: 606-202-3356
E-mail -  danny.r.knell.mil@mail.mil
danny.knell@us.army.mil
```

Classification: UNCLASSIFIED
Caveats: FOUO



App. 575

# Exhibit I

Email from Knell to Braga, Esmurriadiaz, Butlph, Taylor, & Fabrizio,
June 12, 2014

# RE: *fyi *FW: VVTA bus accident Desert dispatch article this morning (UNCLASSIFIED)

| | |
|---|---|
| **From:** | "Knell, Danny R SGM USARMY IMCOM CENTRAL (US)" <danny.r.knell.mil@mail.mil> |
| **To:** | "Braga, Jonathan P COL USARMY IMCOM (US)" <jonathan.p.braga.mil@mail.mil>, "Esmurriadiaz, Carlos E CSM USARMY IMCOM CENTRAL (US)" <carlos.e.esmurriadiaz.mil@mail.mil> |
| **Cc:** | "Butolph, Michael V CIV USARMY IMCOM CENTRAL (US)" <michael.v.butolph.civ@mail.mil>, "Taylor, Wayne D Jr CIV (US)" <wayne.d.taylor.civ@mail.mil>, "Fabrizio, Craig M CIV (US)" <craig.m.fabrizio.civ@mail.mil> |
| **Date:** | Thu, 12 Jun 2014 16:37:51 -0700 |
| **Attachments:** | Commercial Vehicles bypass road.pptx (86.07 kB); smime.p7s (5.62 kB) |

Classification: UNCLASSIFIED
Caveats: FOUO

Sir,

We are currently looking into the proper type of illuminated signs to post; however, tomorrow we are emplacing a temporary message board sign at the beginning of the By-pass road that states "TRUCKS STOPPED AHEAD, MON-FRI, 0600-0800. Once another sign comes available next week, that sign which states "TRUCKS NO STOPPING, PROCEED TO MAIN GATE" will be placed just ahead of the checkpoint.

Also, PSAs have been established and will be provided to all agencies that come to Fort Irwin for deliveries or other services utilizing a commercial vehicle (Semi-truck, Buses, or other required vehicles) to enhance the awareness and use of the by-pass route.

The PSAs will be distributed to the following agencies as well as put out on all social media to capture a larger audience:

- Movement Control Office (awareness to all long-hauler contractors) coming to Fort Irwin
- Silver Valley Unified School District (SVUSD) (Establishing the "Bus Only" lane (Left Lane)
- Victor Valley Transient Authority (VVTA) (Establishing the "Bus Only" lane (Left Lane)
- Vendor delivery for Commissary
- Vendor delivery for Exchange

Along with the social media exposure, the guards will distribute the PSAs daily to all vehicles that are checked from 0600 - 0800 hrs for two weeks.

I also want to have "BUSES ONLY" painted on the roadway (LEFT LANE) to enhance the visibility to all traffic that utilizes the by-pass route.

v/r

Danny R. Knell
Provost Sergeant Major
Directorate of Emergency Services
Fort Irwin, CA 92310
O: 760-380-8348

App. 577

USA-2759

BB: 760-499-4225
Cell: 606-202-3356
E-mail - danny.r.knell.mil@mail.mil
danny.knell@us.army.mil


-----Original Message-----
From: Braga, Jonathan P COL USARMY IMCOM (US)
Sent: Thursday, June 12, 2014 3:34 PM
To: Drylie, Kenneth W CIV USARMY IMCOM CENTRAL (US)
Cc: Fabrizio, Craig M CIV (US); Butolph, Michael V CIV USARMY IMCOM CENTRAL
(US); Knell, Danny R SGM USARMY IMCOM CENTRAL (US); Portland, Pamela J CIV
USARMY IMCOM CENTRAL (US); Cummings, Matthew R MIL USARMY 6 MP GP (US);
Esmurriadiaz, Carlos E CSM USARMY IMCOM CENTRAL (US); Figueroa, Nadia E CIV
USARMY IMCOM CENTRAL (US); Taylor, Wayne D Jr CIV (US)
Subject: RE: *fyi *FW: VVTA bus accident Desert dispatch article this
morning (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: FOUO

I also let the family know that we are planning on putting a sign out there
to assist with messaging.

DES any update on the sign?

Regards,

COL Jon P. Braga
Commander, USAG Fort Irwin and National Training Center
Phone:  760.380.6274
Cell:   760.267.5132
Email:  jonathan.p.braga.mil@mail.mil


-----Original Message-----
From: Drylie, Kenneth W CIV USARMY IMCOM CENTRAL (US)
Sent: Wednesday, June 11, 2014 9:07 AM
To: Braga, Jonathan P COL USARMY IMCOM (US)
Cc: Fabrizio, Craig M CIV (US); Butolph, Michael V CIV USARMY IMCOM CENTRAL
(US); Knell, Danny R SGM USARMY IMCOM CENTRAL (US); Portland, Pamela J CIV
USARMY IMCOM CENTRAL (US)
Subject: *fyi *FW: VVTA bus accident Desert dispatch article this morning
(UNCLASSIFIED)
Importance: High

Classification: UNCLASSIFIED
Caveats: FOUO

Sir,

Desert Dispatch is reporting that a driver warned security at the front gate
before last Monday's accident. Article states "it didn't have to happen."
Details drivers claims of rough treatment by Fort Irwin DES. Comments from
readers include some statements concerned that FI may be withholding facts.

-----Original Message-----
From: Ozawa, Leslie S CIV USARMY IMCOM CENTRAL (US)
Sent: Wednesday, June 11, 2014 8:29 AM
To: Portland, Pamela J CIV USARMY IMCOM CENTRAL (US)
Cc: Volb, Guy A CIV USARMY IMCOM (US); Drylie, Kenneth W CIV USARMY IMCOM CENTRAL
(US)
Subject: VVTA bus accident Desert dispatch article this morning
(UNCLASSIFIED)

App. 578

Importance: High

Classification: UNCLASSIFIED
Caveats: FOUO

Pam,

This morning's paper front page led with "It didn't have to happen": Driver
says he warned guard truck was stopped in lanes an hour before fatal
accident

The article was bylined as "Desert Dispatch staff writers Steve Hunt and
Mike Lamb" . The Desert Dispatch editor is Steve Hunt.  This may indicate
elevated interest by the  newspaper. Previous three articles on the accident
were by reporter Jose Quintero.

It looks like the "veteran truck driver" called the newspaper yesterday.
Based on his last quote ('Every time I look at your reports [Desert
Dispatch] online I think it didn't have to happen.") called the newspaper
because he was disturbed by how Fort Irwin has responded to the accident,
based on what he's been reading in the newspaper website articles.

Today's article  quoted him extensively. His name is not identified, because
he fears "the Army would seek to retaliate against him or his company."

The 46 year old driver from Los Angeles has been driving tractor trailers
for 27 years was making a delivery to Fort Irwin on June 2, "when he had to
swerve to avoid hitting the other truck." He entered the gate about 5
minutes later, at 4:15 am and  told the "lone employee"  that "it was an
accident waiting to happen."

The article includes a Fort Irwin response:

"Fort Irwin officials released the following statement Tuesday afternoon in
response to the man's allegations: 'Fort Irwin Public Affairs and the
Department of Emergency Services have no knowledge of the incident which you
describe. The accident is still under investigation. The US Army Criminal
Investigation Division encourages persons to come forward who feel they have
something of substance to add.'"

When the driver talked to the Fort Irwin employee, "He just listened to me
and gave me back my paperwork and ID and said, 'Do you know where to go?'
Then it was 'OK, have a good day.' I was expecting somebody would get in the
van and go see or at least wake the (truck driver) up. He just closed the
door and went back in his little room."

Later, after leaving Fort Irwin after making his deliveries and leaving Fort
Irwin, the driver saw the accident being investigated and  stopped to "give
his information to the investigators. But he claims he was threatened with
arrest if he didn't leave." The article then quotes him with his unpleasant
encounters with "an officer in plain clothes" and someone who identified
himself as "a lieutenant for Fort Irwin police."

I included in the attached, copied from today's Desert Dispatch website
article, comments from readers that are critical of Fort Irwin.

Leslie Ozawa

Community Information Manager

Public Affairs Office, Bldg 983

760-380-3076

App. 579

USA-2761

Classification: UNCLASSIFIED
Caveats: FOUO

Classification: UNCLASSIFIED
Caveats: FOUO

Classification: UNCLASSIFIED
Caveats: FOUO

Classification: UNCLASSIFIED
Caveats: FOUO

# Exhibit J

Fort Irwin PowerPoint with Flyers for Bypass Road Users Described in Exhibit I

## FORT IRWIN BYPASS ROAD
## ALL BUSES, including:
### *Silver Valley Unified School District (SVUSD)*
### *Victor Valley Transit Authority (VVTA)*

- **All Buses** will travel in the Left Hand Lane that is designated by painted road markings   "Bus Lane Only"

**NOTE**

- THE BYPASS ROAD REQUIRES THAT ALL DELIVERY VEHICLES, SEMI-TRAILERS, ETC. STOP ON THE BYPASS ROAD EVERY
  MONDAY– FRIDAY FROM 0600–0800 HOURS

- AS YOU APPROACH THE STOPPED VEHICLES AND THE CHECKPOINT, PLEASE SLOW DOWN AND PASS THROUGH CAREFULLY AND SAFELY IN THE LEFT HAND LANE OF TRAVEL

- ONCE CLEARED FROM THE AREA, RESUME SPEED AND BE CAUTIOUS AGAIN NEARING THE PAINTED ROCKS MERGE LANE



DEPOSITION
EXHIBIT
18
mf 11/8/19

App. 582

CONFIDENTIAL

USA-2654

CONFIDENTIAL

## FORT IRWIN BYPASS ROAD

### *Commercial Vehicles*

- All semi- trailers, delivery trucks, buses etc. are required to utilize the Fort Irwin Bypass road

- **All Commercial Vehicles** with "EXCEPTION" of "BUSES" will travel in the Right Hand Lane that is designated by the signage "Trucks, All Trailers"

**NOTE**

•The Bypass Road requires that all delivery vehicles, semi-trailers, etc. stop on the BYPASS road every
MONDAY– FRIDAY FROM 0600–0800 HOURS

•As you approach the stopped vehicles and the checkpoint, please slow down and apply your emergency flashers to warn other vehicles approaching from the rear

•Once cleared from the area, resume speed and be cautious again nearing the painted rocks merge lane

• During non-regulated hours proceed to main access point for further

App. 583

CONFIDENTIAL

USA-2667

CONFIDENTIAL

# FORT IRWIN BYPASS ROAD

## *Silver Valley Unified School District*

- All SVUSD buses are required to utilize the Fort Irwin Bypass road

- **All SVUSD Buses** will travel in the Left Hand Lane that is designated by the signage "Authorized Vehicles Only"

**NOTE**

•The Bypass Road requires that all delivery vehicles, semi-trailers, etc. stop on the BYPASS road every

MONDAY– FRIDAY FROM 0600–0800 HOURS

•As you approach the stopped vehicles and the checkpoint, please slow down and pass through carefully and safely in the left hand lane of travel

•Once cleared from the area, resume speed and be cautious again nearing the painted rocks merge lane

App. 584

CONFIDENTIAL

# FORT IRWIN BYPASS ROAD

## *Victor Valley Transient Authority (VVTA)*

- All VVTA buses are required to utilize the Fort Irwin Bypass road

- **All VVTA Buses** will travel in the Left Hand Lane that is designated by the signage "Authorized Vehicles Only"

**NOTE**
- THE BYPASS ROAD REQUIRES THAT ALL DELIVERY VEHICLES, SEMI-TRAILERS, ETC. STOP ON THE BYPASS ROAD EVERY
        MONDAY– FRIDAY FROM 0600-0800 HOURS

- AS YOU APPROACH THE STOPPED VEHICLES AND THE CHECKPOINT, PLEASE SLOW DOWN AND PASS THROUGH CAREFULLY AND SAFELY IN THE LEFT HAND LANE OF TRAVEL

- ONCE CLEARED FROM THE AREA, RESUME SPEED AND BE CAUTIOUS AGAIN NEARING THE PAINTED ROCKS MERGE LANE

App. 585

## FORT IRWIN BYPASS ROAD

### *BUSES*

- All semi- trailers, delivery trucks, buses etc. are required to utilize the Fort Irwin Bypass road

- **All Buses** will travel in the Left Hand Lane that is designated by the signage  "Authorized Vehicles Only"

**NOTE**
•THE BYPASS ROAD REQUIRES THAT ALL DELIVERY VEHICLES, SEMI-TRAILERS, ETC. STOP  ON THE BYPASS ROAD EVERY
        MONDAY- FRIDAY FROM 0600-0800 HOURS

•AS YOU APPROACH  THE STOPPED VEHICLES AND THE  CHECKPOINT, PLEASE SLOW DOWN AND PASS THROUGH CAREFULLY AND SAFELY IN THE LEFT HAND LANE OF TRAVEL

•ONCE CLEARED FROM THE AREA, RESUME SPEED AND BE CAUTIOUS AGAIN NEARING

App. 586

CONFIDENTIAL

USA-2670

## FORT IRWIN BYPASS ROAD

## *Commercial Vehicles*

- All semi- trailers, delivery trucks, buses etc. are required to utilize the Fort Irwin Bypass road

- **All Commercial Vehicles** with "EXCEPTION" of "BUSES" will travel in the Right Hand Lane that is designated by the signage "Trucks, All Trailers"

**NOTE**
•**THE BYPASS ROAD REQUIRES THAT ALL DELIVERY VEHICLES, SEMI-TRAILERS, ETC. STOP ON THE BYPASS ROAD EVERY**
MONDAY– FRIDAY FROM 0600-0800 HOURS

•**AS YOU APPROACH THE STOPPED VEHICLES AND THE CHECKPOINT, PLEASE SLOW DOWN AND APPLY YOUR EMERGENCY FLASHERS TO WARN OTHER VEHICLES APPROACHING FROM THE REAR**

•**ONCE CLEARED FROM THE AREA, RESUME SPEED AND BE CAUTIOUS AGAIN NEARING THE PAINTED ROCKS MERGE LANE**

• **DURING NON-REGULATED HOURS PROCEED TO MAIN ACCESS POINT FOR FURTHER**

App. 587

CONFIDENTIAL

USA-2671

# Exhibit K

Butolph to Knell, Braga, Taylor, & Contreras,
June 11, 2014

# Flyer for VVTA/ SVUSD Buses (UNCLASSIFIED)

| | |
|---|---|
| **From:** | "Butolph, Michael V CIV USARMY IMCOM CENTRAL (US)" <"/o=easf/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=michael.v.butolph.civ"> |
| **To:** | "Knell, Danny R SGM USARMY IMCOM CENTRAL (US)" <danny.r.knell.mil@mail.mil>, "Braga, Jonathan P COL USARMY IMCOM (US)" <jonathan.p.braga.mil@mail.mil>, "Taylor, Wayne D Jr CIV (US)" <wayne.d.taylor.civ@mail.mil> |
| **Cc:** | "Contreras, Saul CIV USARMY IMCOM CENTRAL (US)" <saul.contreras3.civ@mail.mil> |
| **Date:** | Wed, 11 Jun 2014 16:15:37 -0700 |
| **Attachments:** | Archived attachment list.txt (30 bytes) |

Quick Look

Classification: UNCLASSIFIED
Caveats: FOUO

Plan is to be given to bus program manager and imparted to bus drivers. Of course, this would make it in the hands of non-bus drivers (read newspapers and insurance company).

Nothing has been sent- just this for review and comments

Mike Butolph

National Training Center and Fort Irwin

Deputy Director of Emergency Services

P.O. Box 105066

Fort Irwin, CA 92310

Cell- 760-499-4234

Office- 760-380-2591

FAX-760-38



CONFIDENTIAL

USA-2773

# Exhibit L

Email from Knell to Cummings, Swenson, & Butolph,
November 18, 2014

# RE: By-Pass Policy for truck fatality (UNCLASSIFIED)

| | |
|---|---|
| **From:** | "Knell, Danny R SGM USARMY IMCOM CENTRAL (US)" <danny.r.knell.mil@mail.mil> |
| **To:** | "Cummings, Matthew R MIL USARMY 6 MP GP (US)" <matthew.r.cummings.mil@mail.mil>, "Swenson, Graham R LTC USARMY IMCOM CENTRAL (US)" <graham.r.swenson.mil@mail.mil> |
| **Cc:** | "Butolph, Michael V CIV USARMY IMCOM CENTRAL (US)" <michael.v.butolph.civ@mail.mil> |
| **Date:** | Tue, 18 Nov 2014 16:46:49 -0800 |
| **Attachments:** | APNDX D Commercial Vehicles.rtf (10.79 MB); smime.p7s (5.62 kB) |

Classification: UNCLASSIFIED
Caveats: FOUO

Sir,

Here is the only thing documented about the use of the bypass route for DES.
I have also included several emails from DPW, HDSS and DES back in 2009.

Since the accident on 2 Jun this year, a preventative measure has been put
in place of the Transportation Movement Office has contacted the SDDC to
notify all long haulers that come to Fort Irwin the proper steps they need
to take upon arrival.

From: Wagstaffe, Victoria L CIV (US)
Sent: Friday, June 13, 2014 11:45 AM
To: USARMY Scott AFB SDDC Mailbox CONUS CSC Team
Cc: Butolph, Michael V CIV USARMY IMCOM CENTRAL (US); Walsh, Jerry C CIV
USARMY ASC 404 AFSB DOL (US); Jeffery, Stephanie E CIV (US)
Subject: Request for Carrier and Customer Advisories (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: FOUO

Please put out as Carrier Advisory and Customer Advisory the following
information for the National Training Center, Fort Irwin, CA, effective
immediately:

"All semi-trailers, delivery trucks, buses, etc are required to utilize the
Fort Irwin Bypass Road. The Bypass Road requires that all delivery
vehicles, semi-trailers, etc stop in the right lane of that road from
0600-0800hrs PST Monday through Friday. Trucks arriving after normally
scheduled delivery days/hours, should proceed to the Fort Irwin Main Gate
for instructions/directions."

Victoria Lynn Wagstaffe

Chief, Freight Branch

Transportation Division, LRC

Fort Irwin, CA 92310-5031

760-380-3830

-----Original Message-----
From: Cooper, Gary W Mr CIV USA IMCOM
Sent: Friday, February 06, 2009 11:00 AM



EXHIBIT
9
Butolph 11/3/19

CONFIDENTIAL

# Exhibit M

Deposition of Sabah Issa
(excerpts)

1

```
 1              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
 2

 3

                MARGARET KIEPER AND DAIL       )
 4              KEIPER, JR., Individually       )
                and as the Successors-in-       )
 5              Interest to DAIL KEIPER,        )
                SR., Deceased,                  )
 6                                              )  Case 5:15cv-
                          Plaintiffs,           )  00703-JGB(SPx)
 7                                              )
                          -vs-                   )
 8                                              )
                VICTOR VALLEY TRANSIT           )
 9              AUTHORITY; DINORAH AGUILAR;      )
                TRANSDEV SERVICES, INC.;         )
10              VEOLIA TRANSPORTATION            )
                SERVICES, INC.; STEVEN          )
11              KILTY; FBN TRANSPORTATION,       )
                LLC; MARDAN TRANSPORTATION       )
12              LLC; AMSTON SUPPLY, INC.;        )
                and DOES 1 through 100,          )
13              inclusive,                       )
                                                )
14                        Defendants.           )
                ----------------------------)
15

16              VIDEOTAPED DEPOSITION OF SABAH ISSA, taken at
                131 East Fourth Street, Suite 310, Davenport, Iowa,
17              commencing at 11:09 a.m., November 8, 2019, before
                Michele L. Proesch, Certified Shorthand Reporter of
18              the State of Iowa.

19

20

21

22

23
                     Michele L. Proesch, CSR, RPR
24                       Magna Legal Services
                            866-624-6221
25                         www.MagnaLS.com
```

App. 593

Kieper, et al. vs. Victor Valley Transit Authority, et al.                                                                          Sabah Issa

---

**74**

1    MR. ALBERTS: Perfect.

2    THE VIDEOGRAPHER: Going off the record. The

3    time is 1:19.

4    (A recess was taken.)

5    THE VIDEOGRAPHER: We're back on the record.

6    This begins videotape number 2 in the deposition of

7    Sabah Issa. The time is 1:41.

8  Q.  Okay; so before we took a break we were taking a

9    look at Exhibit Number 8, which is Bates USA-3276,

10   and so this is the scope of work that you had

11   prepared for the bypass project that's got a date

12   July 11th, 2017, and I had asked you and you were

13   going through and identifying certain tasks that you

14   felt would help improve the safety of the bypass, so

15   do you remember that?

16 A.  Yes.

17 Q.  Okay; so what I want to do is to go back through

18   some of those scopes of work and kind of ask you why

19   you feel that those particular items are gonna help

20   improve the safety of the road, so I guess in doing

21   that let's just start with the first one that's on

22   Exhibit 8 USA-3276, so this one says, "Two signs at

23   the entrance of the road with the wording 'Right

24   Lane Trucks Only' and 'Left Lane Busses Only'."

25   MR. DORGAN: I'm going to object to the line of

---

**75**

1    questioning as under the, oh, Subsequent Remedial

2    Measures Doctrine, but I don't think that's

3    something I need to do to preserve test- -- you

4    know, to preserve the objection, so I'll just say it

5    once and allow you to proceed, but -- Okay.

6  A.  The first one, the flashing lights at the

7    entrance -- at the entrance, my intent was to keep

8    the trucks and buses on their lanes. I don't want

9    them to bypass each other and -- because that way

10   they both know, the trucks' drivers and the bus

11   driver, this is their own lane. If they keep going,

12   they're not gonna hit each other, so it was very

13   important to me to keep them in their lanes, and

14   that's -- the two signs provided that initial step

15   into the entrance, hey, this is your lane, this is

16   your lane. That's it.

17 BY MR. ALBERTS:

18 Q.  Okay; and I take it from reading what I've just read

19   to you on USA-3276, "Two signs at the entrance of

20   the road with the wording 'Right Lane Trucks Only'

21   and 'Left Lane Busses Only'" (indicating), I take

22   that that those signs were gonna be added to the

23   bypass road; is that correct?

24 A.  According to this scope, yes, they were added. They

25   were not there before.

---

**76**

1  Q.  Okay; and you felt that that improved -- that

2    putting a sign that said, "Right Lane Trucks Only",

3    "Left Lane Busses Only" helped improve the safety by

4    keeping buses in the left lane and trucks in the

5    right lane; right?

6  A.  That's correct.

7  Q.  And so the next bullet point down where it says,

8    "Six signs, two every half a mile, with the wording

9    'Stay in Lane, No Passing'", does that improve the

10   safety kind of along the same lines that we were

11   talking about?

12 A.  Yes, that adds to the sign -- the flashing signs,

13   emphasis, hey, stay in your lane. Don't ever leave

14   your lane: like I said, my intent to keep them

15   frozen on those lanes.

16 Q.  And moving down here a little bit, the sign at the

17   quarter mile before the truck checkpoint with the

18   wording "Speed Limit 25", that's -- I mean, so

19   you're reducing the speed limit as you're

20   approaching the -- the checkpoint; right?

21 A.  That's correct.

22 Q.  Okay, and how does that help with the safety of the

23   bypass road?

24 A.  MUTCD tells you that you have to warn the motorist

25   to any changes on the road ahead. You have to alert

---

**77**

1    them, warn them that there is a change coming, no

2    surprises. Surprises cause accidents, so I have --

3    according to the MUTCD I have to tell the motorist

4    that change is coming, and that is the reason for

5    this "Check Point Ahead", be alert. That's it.

6  Q.  And in this case when we're talking about the bypass

7    road, the checkpoint is the change that you're

8    referring to, the changed conditions?

9  A.  That's right.

10 Q.  Further down where it says, "Re-stripe the road with

11   a solid yellow line in the middle of the roadway to

12   discourage drivers from passing each other", how

13   does that improve the safety of the road, bypass

14   road?

15 A.  The same -- same story, I want them to stay in the

16   lane, don't bypass each other. As you know, we're

17   all motorists, we're all drivers. When you see a

18   solid line on the road, that tells you don't cross

19   it. You cross it, you get a ticket. That -- That

20   is the intent. They all support and emphasize each

21   other, those elements with the goal to keep them on

22   their lane, on their lanes, but let's face it, the

23   accident, they use the same lane both and they hit

24   each other, so --

25 Q.  You're referring to the accident in this case;

---

Kieper, et al. vs. Victor Valley Transit Authority, et al.                                                                                          Sabah Issa

78

1    correct?

2  A.   Yeah; so that was my intent, to keep them on their

3       lanes.

4  Q.   If the scope of work that you're talking about

5       identified in Exhibit 8 had been installed on the

6       bypass road in June 2014, do you think the accident

7       in this case would have been avoided?

8          MR. DORGAN:  Objection; calls for speculation,

9       lacks foundation, calls for a retrospective expert

10      opinion from a lay witness in an improper setting.

11      I can't instruct him not to answer.

12 A.   Well, I have a simple answer.  There was no check --

13      truck checkpoint back then.

14     BY MR. ALBERTS:

15 Q.   And that's your --

16 A.   There was no need for all this (indicating) scope

17      because there was no checkpoint, no -- no warning

18      needed for the checkpoint because there wasn't any.

19 Q.   And --

20 A.   So you draw your own conclusion.

21 Q.   When do you believe that the checkpoint on the

22      bypass road was installed and implemented?

23 A.   When I was away from Fort Irwin.

24 Q.   So between 2000 and --

25 A.   '10 and '14.

79

1  Q.   So sometime between February 2010 and November 2014

2       the -- the checkpoint on the bypass road was

3       implemented?

4  A.   Installed, yes, that's correct.

5  Q.   You have no recollection of there being a checkpoint

6       on the bypass road in 2009?

7  A.   No, there wasn't any.

8  Q.   Temporary or permanent?

9  A.   (Shakes head.)

10         THE REPORTER:  Your answer, sir?

11         THE WITNESS:  Do you want me to answer?

12         MR. ALBERTS:  Yes, please.

13 A.   When I constructed the road, there was no

14      checkpoint; clear road, 45 miles an hour, run.

15 Q.   Going back to the e-mail, Exhibit 7, USA-3314, when

16      you say, I primarily like to keep trucks and buses

17      in their lanes, did you -- did you have an

18      understanding that there was some confusion as to

19      where buses and trucks were supposed to be operating

20      on the bypass road?

21 A.   Yes.

22         MR. DORGAN:  Vague as to time.

23         THE WITNESS:  I'm sorry.  What are you --

24         MR. DORGAN:  I'm just making an objection.

25      Don't listen to my objection.

80

1          THE WITNESS:  Can I answer it?

2          MR. DORGAN:  Yes, you can answer it.

3  A.   Yes, I think there was confusion simply because we

4       had a bus and a truck driving on the same lane.

5       That tells you right there there was a confusion.

6      BY MR. ALBERTS:

7  Q.   And -- And no signage at least in June 2014

8       indicating which lane buses and trucks were supposed

9       to be operating in; correct?

10         MR. DORGAN:  Lacks foundation, calls for

11      speculation.

12 A.   Yeah, that's correct.

13     BY MR. ALBERTS:

14 Q.   Referring to Exhibit 8, your scope of work, under

15      Section 1.0 where it says PURPOSE, towards the end

16      it said, needs new traffic control devices which

17      comply with the mandatory requirements of the MUTCD.

18 A.   Oh, in the -- in the PURPOSE?  Okay.

19 Q.   Correct.

20 A.   Okay.

21 Q.   So was it under your understanding that at the time

22      you created this statement of work that the signage

23      that was present on the bypass road did not comply

24      with the mandatory requirements of the MUTCD?

25         MR. DORGAN:  Calls for speculation, lacks

81

1       foundation, calls for an expert -- retrospective

2       expert opinion.

3  A.   Yes, I believe so.

4      BY MR. ALBERTS:

5  Q.   And in what way?  Can you kind of explain that?

6          MR. DORGAN:  Same objections.

7  A.   There was truck checkpoint installed, but no warning

8       sign to motorist that there is one, which causes

9       surprise to the motorist when they approached it,

10      the checkpoints, and, like I said, surprises cause

11      accidents 'cause you don't know how they're gonna

12      react to that change.

13         MR. DORGAN:  The question spoke specifically to

14      the MUTCD.  I didn't understand --

15         THE WITNESS:  Okay.

16         MR. DORGAN:  -- him to be trying to elicit an

17      opinion as to what caused the accident.  I -- I

18      understood him to be asking you whether at the time

19      you were preparing this exhibit you had drawn

20      conclusions about the MUTCD and its application to

21      the signs.  Subject to my objection --

22         THE WITNESS:  No, I understand, but, Glen, the

23      MUTCD tells you specific warn the motorist to what's

24      coming up, and that was not present on the road.  I

25      mean, that -- it's not my opinion.  It's MUTCD

Kieper, et al. vs. Victor Valley Transit Authority, et al.                                              Sabah Issa

**82**

1    opinion.

2    BY MR. ALBERTS:

3    Q.   Okay.  You can set those aside.  We'll take a look

4         at another one.  So this will be what we've marked

5         as Exhibit 9.

6              THE WITNESS:  Oh, we're done with this now?

7              MR. ALBERTS:  Yeah, set those off to the side.

8              THE WITNESS:  Okay.

9    Q.   We might come back to 'em, but --

10   A.   Okay.

11   Q.   And for the record Exhibit 9 is USA-3177.  This

12        appears to be a revised scope of work -- it's a

13        revision to the scope of work we had just looked at;

14        correct?

15   A.   That's correct.

16   Q.   The revision's dated December 16th, 2017; right?

17        Correct?  (Indicating.)

18   A.   Where is the date of the original one?

19   Q.   (Indicating.)

20   A.   Yeah, I see that, but what was the date of the

21        original one?

22              MR. DORGAN:  (Indicating.)

23   A.   The same date.  Huh, that's a typo.  It was revised

24        '16, yes; and you see those lines (indicating), they

25        indicate the changes.

**83**

1         BY MR. ALBERTS:

2    Q.   Got it.  Kind of red line changes or --

3    A.   Yeah.

4    Q.   Gotcha.  Did you prepare this revision?

5    A.   Yes.

6    Q.   And then in here you -- in addition to the MUTCD in

7         Section 1.0 PURPOSE (indicating), you have added the

8         California Edition Parts 2 and 3 to the scope of

9         work; right?

10   A.   That's correct.

11   Q.   And why was that change made?

12   A.   I don't recall the specific, but I must have find

13        something in the California version of the MUTCD --

14   Q.   Okay.

15   A.   -- something I need to follow, because if we're in

16        California, we follow Cal. Trans.' MUTCD.

17   Q.   Okay.  Let's take a look at what we'll mark as

18        Exhibit 10, and for the record this is Bates

19        page USA-3307.

20              THE WITNESS:  It's me again (indicating).

21   Q.   And this is an e-mail from you to Lance Toyofuku?

22   A.   Yes.

23   Q.   And that's the individual who is associated with the

24        Corps of Engineers; is that right?

25   A.   No, he was -- he was the chief engineer.

**84**

1    Q.   Okay.

2    A.   And I was just the mechanical engineer under him.

3    Q.   When you came back?

4    A.   Yes.

5    Q.   And was Lance stationed at Fort Irwin?

6    A.   Yes.

7    Q.   Okay; and this e-mail just for the record is dated

8         August 23rd, 2017; right?

9    A.   Apparently, yes.

10   Q.   So you -- So this e-mail is after you created the

11        original scope of work that we were looking at in

12        Exhibit 8 (indicating); right?

13   A.   Yeah.

14   Q.   Okay.  Do you know if -- And, in fact, sorry,

15        Exhibit 10 says at the bottom, Attached is my scope

16        of work to repair the signage for an estimated cost

17        of $76,750.

18              Do you know if the statement of work that is

19        Exhibit 8 (indicating) had been approved when you

20        sent this e-mail on August 23rd, 2017?

21              MR. DORGAN:  Vague.

22   A.   I know they all approve my idea of repairing the

23        signage all the way to the garrison commander, but

24        they don't really look at my scope.  That's my

25        business.  Whatever I wrote on the scope goes on, so

**85**

1    he can say it was approved to what I'm doing.

2    BY MR. ALBERTS:

3    Q.   Okay, and maybe that's a better question.  Could you

4         explain to me kind of the approval process, the --

5         the steps that you would have to go through to bring

6         an idea like you had, improving the safety of the

7         bypass road to actually putting signs out on the

8         road.  How does that process -- approval process

9         work?

10   A.   There is a special form called Work Request --

11        Facility Engineer Work Request.  You're looking at

12        it, I think.

13   Q.   (Indicating.)

14   A.   Yeah, that's it.

15   Q.   And you're referring to Exhibit 8 Bates pages USA-

16        3278, 3279.

17   A.   Yeah, that documents what we're trying to do and

18        documents the approval of the civil engineer and the

19        director of public works.  Attached to that is the

20        scope I prepared, so if they sign that for me, I'm

21        authorized to spend 80,000 on it or any project for

22        any amount.

23   Q.   So who is "they"?  Who is -- Who is the individual

24        who has to sign off and approve this project?

25   A.   Both the chief engineer and the director of public

App. 596

Kieper, et al. vs. Victor Valley Transit Authority, et al.                                                    Sabah Issa

**86**

1       works.  At the lower left corner is the chief

2       engineer.

3  Q.  Which in this case is you; correct?

4  A.  No.  When I submit that, I was mechanical engineer,

5       remember?

6  Q.  So why don't you grab Exhibit 8 so we're actually

7       looking at the same thing.

8          MR. DORGAN:  I'll do it.

9          THE WITNESS:  I can't see what he's looking at.

10  BY MR. ALBERTS:

11  Q.  So if you'd turn to Exhibit 8, USA --

12  A.  Okay.

13  Q.  -- 3278 --

14  A.  4283 you're looking at?  This is called 4283.

15  Q.  So the bottom left it has your name, it says Chief

16      Engineering Division.

17  A.  Yeah, I don't -- I don't know; I mean, my name on

18      both, the originator here (indicating) and the

19      approver here (indicating).

20  Q.  But -- And to be fair this is dated -- up at the top

21      right it was August -- or it was August 24, 2017

22      (indicating); correct?

23  A.  Yeah, but this is just a date on the form.  It

24      doesn't mean -- There should have -- There should be

25      a signed version of this by the director of DPW, the

**87**

1      one in the middle (indicating).

2  Q.  Understood.

3  A.  You don't have a copy of that, but I'm sure in the

4      records in Fort Irwin he can find it out because I

5      cannot spend government/taxpayer money without that

6      signature.

7  Q.  Got it.

8  A.  I go to jail.

9  Q.  And ultimately that's what I was getting at, so

10      thank you.  So the approval authority is the

11      director of DPW?

12  A.  Exactly.

13  Q.  Okay, and you would fill out this form?

14  A.  Yeah.

15  Q.  It's Form DA --

16  A.  4283.

17  Q.  -- DA Form 4283; correct?

18  A.  '83.  Apparently by the time I --

19         MR. DORGAN:  There is no question pending.

20         THE WITNESS:  No.  Anyway, I answered you.

21      BY MR. ALBERTS:

22  Q.  So let's go back to Exhibit 10 --

23  A.  10.  Oh, okay.

24  Q.  -- your e-mail to Lance on August 23rd of 2017.  In

25      this e-mail you say, "The traffic signs at the truck

**88**

1      by-pass road are not up to standards."  What

2      standards are you referring to?

3  A.  MUTCD.

4  Q.  Anything else?

5  A.  No, that's the Bible for the traffic.

6  Q.  Are there any Army -- specific Army regulations that

7      apply to traffic control devices on installations?

8  A.  There are, which tells you follow Highway

9      Administration MUTCD.  That's what it says.

10  Q.  Gotcha.  And then in the e-mail you say, When the

11      bypass road was repaired ten years ago, it was up to

12      federal/California standards, and then you say,

13      Since then, we/Fort Irwin -- or we, Fort Irwin

14      installed a truck check stop in the middle of the

15      road which changed the road condition.  The new

16      conditions require additional direction and warning

17      signs to keep the road safe.

18  A.  What's the question?

19  Q.  So I was getting to it.  We've talked about this

20      already, but you were not involved in the decision

21      to put the truck check stop in the middle of the

22      bypass road; correct?

23  A.  That's correct.

24  Q.  And you -- do you know who did?

25  A.  Remember, I was not there, but it would be DES, Mike

**89**

1      Butolph and company.

2  Q.  Did Mr. Butolph tell you at any point, either when

3      you were first working at Fort Irwin or after you

4      came back, that he had made the decision to put the

5      check stop on the bypass road?

6  A.  I don't know whether he told me that, that he

7      himself -- Remember, he is a deputy director.  There

8      is a major, which is the director of DES.  It's my

9      understanding that DES, Mike Butolph or otherwise,

10      decided to put truck checkpoint on the truck bypass.

11  Q.  And it's your understanding that that was done after

12      you had left Fort Irwin --

13  A.  February 10, yes.

14  Q.  Yeah.  And, again, looking back at your e-mail,

15      Exhibit 10, I take it that you agree that -- when

16      you say putting a truckstop in the middle of the

17      bypass road, that changed the conditions of the

18      road?

19  A.  That's correct, that's my belief.  It still is.

20  Q.  And I guess I also take it that so by adding the

21      check stop on the bypass road, you felt that

22      additional direction and warning signs were needed?

23  A.  That's correct.

24  Q.  And without those additional warning signs and

25      direction the bypass road wasn't safe?

App. 597

Kieper, et al. vs. Victor Valley Transit Authority, et al.                                              Sabah Issa

90

1   A.   That's correct.

2   Q.   Going back to your e-mail on Exhibit 10, next you

3        say, Due to the fact that we did not update the

4        signage after installing the truck stop we had two

5        traffic accidents.  The first two years ago where a

6        bus hit a truck and a person lost his life and

7        another person lost his arm.  Contributing factors

8        were darkness, speed, and lack of travel directions

9        (signs).

10  A.   So what's your question?

11  Q.   Yeah, I'm getting to it.

12          MR. DORGAN:  We could move on.

13          THE WITNESS:  Well, like they say in court, any

14       question?

15       BY MR. ALBERTS:

16  Q.   You referred --

17  A.   No, no.

18  Q.   Yeah, we've talked a little bit about it, but you

19       refer to two traffic crashes, right, in this e-mail?

20  A.   Yes.

21  Q.   And one of those, which you said the first two years

22       ago where a bus hit a truck and a person lost his

23       life, that's the -- that's the crash at issue in

24       this case; correct?

25  A.   That's why we're here.

91

1   Q.   Right.  And then you said that the contributing

2        factor in that crash was lack of travel direction

3        (signs); right?

4           MR. DORGAN:  Misstates.  The document speaks for

5        itself.

6        BY MR. ALBERTS:

7   Q.   Do --

8   A.   That's my opinion.

9   Q.   Okay.  It's your belief that a contributing factor

10       in the crash that's at issue in this case is a lack

11       of signs; correct?

12          MR. DORGAN:  Calls for a retrospective expert

13       opinion, lacks foundation.

14  A.   Yes.

15       BY MR. ALBERTS:

16  Q.   And then the signs that you felt should have been

17       added to the bypass road are the ones that we were

18       talking about or are identified in your scope of

19       work in Exhibit 8?

20  A.   Yes.

21  Q.   And then you say -- in the e-mail you mention a

22       second crash, which you say three months ago where a

23       truck hit another truck in the rear.  Was that the

24       crash that we were talking about earlier today?

25  A.   Yes, that -- the one I witnessed myself for a reason

92

1   I   don't remember; I mean, I don't get into

2        accidents, but they hit each other.  Property damage

3        I call it.

4   Q.   And you -- you actually witnessed this crash?

5   A.   That -- The hitting?  No, no.  I was there after the

6        fact.

7   Q.   Understood.  Okay.

8   A.   And I saw the trucks damaging each other --

9        damaged -- already damaged.

10  Q.   As a result of the crash; right?

11  A.   Yes.

12  Q.   Was -- Was the crash that you're talking about right

13       now that you went out and inspected -- was it a

14       situation where you had a truck parked on the bypass

15       road and another truck struck it from the rear?

16  A.   Yeah, on the same lane; yeah.  On the lane, yes.

17  Q.   Other than the crash that occurred in this case and

18       the one that you were involved in investigating are

19       you aware of any other crashes that occurred on the

20       bypass road?

21  A.   Like I mentioned before, there was one more.  I

22       don't remember the specifics.  At least to my

23       understanding back then three of them, one is the

24       one we're meeting about here: plus this one,

25       rear-ended; and there was another one, I don't

93

1        remember the details.  That's why I said in my

2        e-mails and -- hey, too many accidents.  Let's do

3        something about it.

4   Q.   Okay.  Take a look at another e-mail.  This we'll

5        mark as Exhibit 11.

6   A.   Okay.

7   Q.   And for the record it's Bates USA-3290, 3291.  So

8        looking at the first e-mail in the string, which

9        kind of starts at the very bottom (indicating) of

10       3290 --

11  A.   Okay.

12  Q.   -- and then the substance of the e-mail is on the

13       next page, USA-3291.  This appears to be an e-mail

14       from you to Lucia Gonzalez?

15  A.   Yes.

16  Q.   Who is that?

17  A.   She is a contracting officer in Fort Irwin.  She's

18       the one who solicit a contractor for me to do the

19       work.

20  Q.   What does that mean, "solicit"?

21  A.   Well, normally they go out and ask for proposal from

22       SBA and other means, depending on the type of

23       contract, and they get proposals, and we review

24       them, and we end up selecting one and award it.  She

25       is authorized contract -- I cannot award any

App. 598

Kieper, et al. vs. Victor Valley Transit Authority, et al.                                                                Sabah Issa

146

1    into the base between 6:00 a.m. and 8:00 a.m. stop
2    at a check-in point and then proceed after 8:00 a.m.
3    to the main gate?
4           MR. ARCHER:  And this is Archer.  I'm going to
5    object to the question as vague and ambiguous as to
6    what you mean by "traffic".  Are you talking about
7    trucks, buses, or something else?
8           MR. WILLIAMSON:  Well, I'm assuming the traffic
9    on the bypass road would be limited to those
10   designated trucks, buses, and heavy equipment.
11          MR. DORGAN:  Do you have the question in mind,
12   sir?
13          THE WITNESS:  Now, I'm confused now.  Can you --
14   Can you repeat the question?  I'm confused.
15          MR. WILLIAMSON:  Of course.
16 Q.  As I understand it, the original purpose of the
17   bypass road was to defer slow moving traffic to the
18   bypass road to accommodate commuters coming into the
19   base in the morning.  Is that -- Is that a fair
20   statement?
21 A.  Yes, plus to minimize the accident because of the
22   competition between the trucks and the sedans.
23 Q.  And by putting the slow moving, larger traffic onto
24   the bypass road, that would keep it separated from
25   passenger vehicles bringing employees and other

147

1    people onto the base in the morning; correct?
2  A.  That's correct.
3  Q.  And after the bypass road was put into effect did
4    you come to learn that a system whereby traffic on
5    the bypass road would be held without allowing
6    access into the base further between 6:00 a.m. and
7    8:00 a.m.?
8  A.  No, I didn't know that before I left in 2010.
9  Q.  Did you become aware of that after you returned?
10 A.  Oh, yeah, I -- I -- I saw it the first day I went
11   to -- to work.  I see them held at the truck bypass.
12 Q.  And when you saw that and learned of the procedure,
13   is it fair to state that the stopping of the trucks
14   between 6:00 a.m. and 8:00 a.m. was only for that
15   limited two-hour period of time and otherwise they
16   could drive right in up to the gate?
17 A.  Yeah, that was my understanding.  They are stopped
18   for two hours only.
19 Q.  And -- And how was that message, as you understand
20   it, communicated to the bypass road traffic?
21          MR. DORGAN:  Calls for speculation.
22 A.  No, it was a physical conveyance of the message.
23   There was barricades right there on the road.  It
24   says, Stop.  You don't go there between 6:00 and
25   8:00, and after eight o'clock --

148

1           BY MR. WILLIAMSON:
2  Q.  At eight --
3  A.  And at eight o'clock -- Let me just finish.  At
4    eight o'clock those guards will put the barricades
5    on the sides of the road.
6  Q.  And there would be a sign present that said, Trucks
7    stop here --
8  A.  Right.
9  Q.  -- 6:00 a.m. to 8:00 a.m.; correct?
10 A.  Right on the barricade themselves, yes.
11 Q.  And at all times other than that, the 6:00 a.m. to
12   8:00 a.m. stop requirement did not exist; true?
13 A.  That's correct, they're not -- they're not visible.
14   They just move 'em to the side, and there is no sign
15   posted to say stop.
16 Q.  So the stop requirement would be a temporary
17   requirement for two hours each day and the other
18   22 hours it would not be in effect; true?
19 A.  That's correct, that's true.
20 Q.  Now --
21          MR. ALBERTS:  Hold on a second.
22          BY MR. WILLIAMSON:
23 Q.  -- you had mentioned --
24          MR. ALBERTS:  Hold on.
25

149

1           BY MR. WILLIAMSON:
2  Q.  -- you had mentioned the MUTCD earlier --
3           THE REPORTER:  Sir, just a minute, just a
4    minute.  We need to stop.
5           MR. DORGAN:  We're having a video issue.
6           MR. ALBERTS:  Yeah, we're out of tape, so we're
7    going to take a five-minute break and then -- then
8    resume.  Sorry.
9           (A recess was taken.)
10          THE VIDEOGRAPHER:  We're now back on the record.
11   This is the beginning of videotape number 3.  The
12   time is 3:48.
13          MR. WILLIAMSON:  Yes, sir.  Thank you.
14 Q.  You had mentioned earlier in testimony given in
15   questioning from others the MUTCD and its
16   applicability at Fort Irwin.  What is the MUTCD?
17 A.  MUTC (sic) is Manual on Uniform Traffic Control
18   Devices.
19 Q.  And would you agree that it was applicable at Fort
20   Irwin?
21 A.  They're applicable everywhere in the United States.
22   It's the Highway Administration standards.
23 Q.  And would you agree that one of the purposes of the
24   MUTCD is to avoid the confusion of signs you
25   recognized to exist when you returned to Fort Irwin

App. 599

150

1    in 2014?

2         MR. DORGAN:  Lacks foundation, calls for

3    speculation, calls for expert opinion in an improper

4    context.  Go ahead, sir.

5  **A.**    Yes, it's -- partly MUTCD agrees with that.  They --

6    not specifically, because of the signs we have at

7    Fort Irwin, but in general term, yeah, they would

8    support or avoid confusing the motorist.

9    BY MR. WILLIAMSON:

10  **Q.**    And the MUTCD has got different sections that apply

11    to different roadway conditions; true?

12  **A.**    Yeah, that's true.

13         MR. DORGAN:  Overbroad.

14    BY MR. WILLIAMSON:

15  **Q.**    And -- And one part of the MUTC deals -- MUTCD deals

16    specifically with situations involving the use of

17    temporary traffic control devices; true?

18  **A.**    That's true.

19  **Q.**    And the MUTCD requires that signage for temporary

20    control devices of traffic be either removed or

21    covered when the temporary traffic control was not

22    in effect; true?

23         MR. DORGAN:  Calls for speculation, lacks

24    foundation, calls for retrospective expert opinion

25    in an improper context, also the MUTCD speaks for

151

1    itself, calls for a legal conclusion potentially.

2  **A.**    Yes, it does.

3    BY MR. WILLIAMSON:

4  **Q.**    And the MUTCD also requires that there be a sign

5    available for temporary traffic control devices

6    stating specifically when the traffic control is

7    open and when it is closed; true?

8         MR. DORGAN:  Same objections, also overbroad.

9  **A.**    No, not true.  They don't require you to tell them

10    when they are going to remove the temporary.

11    BY MR. WILLIAMSON:

12  **Q.**    And it's your belief that there is no changeable

13    message sign required to be activated during the

14    times of preferential lane operation?

15         MR. DORGAN:  Same objections.

16  **A.**    I don't understand the question.

17    BY MR. WILLIAMSON:

18  **Q.**    There is no -- to your understanding of the MUTCD no

19    requirement that there be a sign reading open or

20    closed, as the case may be, during the use of

21    traffic control devices?

22         MR. DORGAN:  Same objections.

23  **A.**    I mean, for a temporary situation you could put any

24    sign you want instructing the traffic to do certain

25    things, and once the work is done, the reason is

152

1    gone, you remove the temporary sign, simple as that.

2    BY MR. WILLIAMSON:

3  **Q.**    You remove it or cover it; correct?

4  **A.**    Or cover it, yes.

5  **Q.**    And while it's in effect there needs to be a sign

6    accorded to the MUTCD stating whether or not things

7    such as a check-in point on a temporary traffic

8    control device is open or closed.

9         MR. DORGAN:  Same objections.  These are --

10    These are expert -- These are questions that ask for

11    expert testimony from a lay witness.  They're

12    inappropriate.  Go ahead.

13    BY MR. WILLIAMSON:

14  **Q.**    You can answer.

15  **A.**    I don't think your -- it specifically mentioned the

16    truck -- truck inspection checkpoint, but --

17  **Q.**    Were there any -- Go ahead.

18  **A.**    -- but -- but they do tell you that any change of

19    the conditions of the road you have to warn the

20    motorist.  That's specifically in MUTCD.

21  **Q.**    And what did you observe upon your return to Fort

22    Irwin in terms of signage that specifically warned

23    the motorist of the temporary traffic control

24    device?

25  **A.**    Temporary?  There was no temporary.  I did not

153

1    say --

2  **Q.**    Was there not a temporary period of time each day

3    where drivers were required to stop?

4  **A.**    The only temporary one is the barricade with sign on

5    it said between 6:00 and 8:00 trucks -- trucks only

6    not allowed to enter.

7  **Q.**    Right.  And was that sign covered or removed when

8    not in effect?

9         MR. DORGAN:  Calls for speculation, lacks

10    foundation.

11  **A.**    They just moved the old barricade with the sign

12    taped on it to the sidewalk -- to the shoulder.

13    BY MR. WILLIAMSON:

14  **Q.**    And how did you learn that that was the case or the

15    procedure being followed?

16  **A.**    I mean, I see it myself.  I personally drive the

17    truck bypass, even though I'm not supposed to, with

18    my sedan, but nobody would stop me, so --

19  **Q.**    And -- And --

20  **A.**    Yeah, go ahead.

21  **Q.**    And your own personal observations allowed you to

22    conclude that the temporary traffic control signage

23    was not removed and not covered but simply turned

24    sideways.  Is that a fair statement?

25  **A.**    Yes.

App. 600

# Exhibit N

Deposition of James Hijoe
(excerpts)

 1                    UNITED STATES DISTRICT COURT

 2                    CENTRAL DISTRICT OF CALIFORNIA

 3

     MARGARET KEIPER and DAIL        )
 4   KEIPER, JR., individually       )
     and as the                      )
 5   Successors-in-Interest to       )   LEAD CASE NO.
     DAIL KEIPER, SR.,               )   5:15-cv-00703-JBG(SPx)
 6   Deceased,                       )   (Consolidated
                                     )   5:15-cv-00762-JBG(SPx)
 7            Plaintiffs,            )   5:15-cv-01481-JBG(SPx)
                                     )   5:15-cv-02380-JBG(SPx)
 8     vs.                           )   5:16-cv-00601-JBG(SPx))
                                     )
 9   VICTOR VALLEY TRANSIT           )
     AUTHORITY; DINORAH AGUILAR;     )
10   TRANSDEV SERVICES, INC.;        )
     VEOLIA TRANSPORTATION           )
11   SERVICES, INC.; STEVEN          )
     KILTY; FBN TRANSPORTATION,      )
12   LLC; MARDAN TRANSPORTATION,     )
     LLC; AMSTON SUPPLY, INC.;       )
13   and DOES 1 through 100,         )
     inclusive,                      )
14                                   )
              Defendants.            )
15   _____   )
                                     )
16   AND ALL RELATED ACTIONS.        )
     _____   )
17

18

19        VIDEOTAPED DEPOSITION VIA ZOOM OF JAMES HIJOE

20              TUESDAY, FEBRUARY 23, 2021

21

22

23

24   REPORTED BY:  BRITTANY CASTREJON, RPR, CRR, NV CCR #926

25                   JOB NO.:  718699

App. 602

JAMES HIJOE - 02/23/2021

Page 37

1  BY MS. HAJIMIRZAEE:

2      Q.  Okay.  As you sit here today, do you have any

3  personal knowledge as to how a truck driver would become

4  aware that they need to get a pass from the visitor

5  center before proceeding to the main gate if it's during

6  the hours of operation of the visitor center?

7      A.  Oh, during the hours of operation, we would turn

8  them around to the -- back to the visitor center.

9      Q.  I see, okay.

10         So was there anything that would prohibit a truck

11  from proceeding to the main gate in June 2014 prior to

12  6:00 a.m.?

13     A.  No.

14     Q.  And the proper documents that are referred to on

15  Exhibit 2, are those the same documents that we talked

16  about earlier which would be the registration,

17  insurance, driver's license, and a document that shows

18  where they're delivering their load to?

19     A.  Yes.

20     Q.  Is there anything else that would have been

21  required from a truck driver?

22     A.  No.  That would be it.

23     Q.  The next sentence on Exhibit 2 states, "Parties

24  then indicated that at 0600 hours during the checkpoint,

25  all traffic other than large trucks pass on the

JAMES HIJOE - 02/23/2021

Page 45

1    Q.  Do you recall any truck drivers or commercial
2    truck companies that would routinely come on base in May
3    or June of 2014?
4    A.  Yes.  There's a -- I know during rotation,
5    there's a lot of trucks that deliver or drop off
6    military vehicles.
7    Q.  And do you remember any of their names?
8    A.  No, I don't.
9    Q.  Did you have a list of the truck drivers or
10   commercial companies that would routinely come on base
11   that you expected on each given day?
12   A.  No.
13   Q.  Are you aware of whether there were any cameras
14   on the bypass road back in May or June of 2014?
15   A.  No.
16   Q.  Do you know if there were any cameras at the main
17   gate in May or June of 2014?
18   A.  I believe there were cameras.  I'm not sure if
19   they were operable.
20   Q.  Have you ever looked at any of the footage from
21   those cameras?
22   A.  No, I have not.
23   Q.  As you sit here today, do you recall any truck
24   drivers coming through the main gate on June 2, 2014,
25   prior to 5:00 a.m.?

App. 604

JAMES HIJOE - 02/23/2021

Page 46

```
 1      A.  There were -- there was a few truck drivers.
 2      Q.  When you say "a few," do you recall approximately
 3  how many?
 4      A.  No, I don't.
 5      Q.  Was it more than one?
 6      A.  Yeah.
 7      Q.  Was it more than five?
 8      A.  Yes.
 9      Q.  And, again, this is on June 2, 2014, prior to
10  5:00 a.m.?
11      A.  Yes.
12      Q.  Was it more than ten?
13      A.  Probably not that much, but usually mid-shift,
14  that's when a lot of trucks come there during rotation.
15      Q.  So is five to ten trucks a fair estimate?
16      A.  Yeah.
17      Q.  At any time after the accident, did you become
18  aware that someone claimed that they warned that a truck
19  was parked on the bypass road with its lights off on
20  June 2, 2014?
21      A.  Yes.
22      Q.  And when did you become aware of that?
23      A.  Actually, there was a truck that did report it,
24  but I didn't -- I didn't think it was important at that
25  time because there was only one -- usually after two,
```

App. 605

JAMES HIJOE - 02/23/2021

Page 47

1   three reports, then we do something.  And then the other

2   trucks after didn't report it, so I thought it moved on.

3       Q.  So this individual spoke to you directly and told

4   you that there was a truck parked on the bypass road

5   with its lights off on June 2, 2014?

6       A.  Yes.

7       Q.  And do you recall exactly what information this

8   truck driver provided to you other than letting you know

9   that there was a truck parked with its lights off on the

10  bypass road?

11      A.  He just said there was a truck parked.

12      Q.  Did you do anything with that information?

13      A.  At that moment, no.  I didn't think it was

14  important.  And usually after two or three reports, we

15  do do something.  But there was other trucks that came

16  through after, and I thought it was -- it had moved.

17      Q.  You mentioned that usually after two or three

18  reports you do something.  Is that some kind of training

19  that you've been provided?

20      A.  No.

21      Q.  Okay.  Have you had an occasion prior to that

22  where it -- it was reported that a truck was parked on

23  the bypass road, and you waited to have additional

24  reports before you did something about it?

25      A.  No.

App. 606

010046

JAMES HIJOE - 02/23/2021

Page 48

1    Q.   Okay.  So why is it that you're saying it's not

2    until we get two or three reports that we do something

3    about it?

4    A.   Usually, like, during morning -- morning time

5    where all vehicles come through that people complain

6    about drivers driving crazy.  So usually two, three more

7    reports of the same type of vehicle that we do report

8    it.

9    Q.   Okay.  So these are different circumstances of

10   reports of an erratic driver or something like that --

11   A.   Yes.

12   Q.   -- where if you get multiple reports of that,

13   you'll do something about it?

14   A.   Yes.

15   Q.   Okay.  And in -- in that instance, what would you

16   do about it?

17   A.   I would call the MP station and let them know of

18   the report.

19   Q.   But it's your testimony that on June 2, 2014,

20   when you were warned that there was a truck parked on

21   the bypass road with its lights off, you decided to do

22   nothing; correct?

23   A.   Correct.  I didn't think it was important.

24   Q.   Have you received any training from anyone

25   whatsoever as to what to do if you are warned of a

App. 607

JAMES HIJOE - 02/23/2021

Page 49

1   circumstance like that?

2       A.  No.

3       Q.  After the accident did you let anybody know that

4   there was a truck driver that warned you that there had

5   been a truck parked on the bypass road with its lights

6   off?

7       A.  Once they talked to us about it.

8       Q.  I'm sorry.  I didn't hear what you said.

9       A.  Once they talked to us about what happened, and I

10  did give my statement.

11      Q.  Do you recall who you gave that statement to?

12      A.  It was my supervisor.

13      Q.  Do you know your supervisor's name?

14      A.  The lieutenant that was -- I forget.  It was a

15  female lieutenant that used to work with us.  I forget

16  her name.

17      Q.  And you let your lieutenant know that you had

18  been warned of a truck parked on the bypass road on

19  June 2, 2014, prior to the accident?

20      A.  Yes.

21      Q.  Did you provide her with any other information?

22      A.  No.

23      Q.  Do you know what, if anything, she did with that

24  information?

25      A.  No, I don't.

Page 50

1    Q.  Did you provide that information to the MP that

2  you were speaking with in July 2014 that interviewed

3  you?

4    A.  I believe he was aware of my statement that I

5  put.

6    Q.  And how did you become aware of the fact that he

7  knew about your statement that you had been warned of a

8  truck driver parked on the bypass road with its lights

9  off?

10    A.  I believe he had mentioned it.

11    Q.  And was that in the same interview with the

12  statements that we just went over on Exhibit 2?

13    A.  I'm not aware.

14    Q.  All right.  Do you recall being interviewed at

15  any other occasion other than the time with the MP?

16    A.  No.

17    Q.  And the statement that you provided to your

18  lieutenant regarding the truck driver being parked on

19  the bypass road with its lights off, was that a verbal

20  statement or a written statement?

21    A.  It was a written statement.

22    Q.  Do you know what other information was on that

23  statement?

24    A.  No.

25    Q.  Do you know when you provided that written

App. 609

JAMES HIJOE - 02/23/2021

Page 51

1   statement?

2     A.   I believe it was maybe two days after, two or

3   three.

4     **Q.   Two to three days after the accident?**

5     A.   Yeah.

6     **Q.   And did someone ask you to provide that written**

7   **statement?**

8     A.   Yes.  My lieutenant.

9     **Q.   And why did your lieutenant, if you know, ask you**

10  **to provide that written statement?**

11    A.   I guess so they can have it.

12    **Q.   Do you know what happened to your written**

13  **statement?**

14    A.   No, I do not.

15    **Q.   Did you provide it to your lieutenant?**

16    A.   Yes.

17    **Q.   She took possession of it?**

18    A.   Yes.

19    **Q.   Okay.  Have you ever seen it since you wrote the**

20  **statement?**

21    A.   No, I did not.

22    **Q.   Did you sign it?**

23    A.   I did.

24    **Q.   Did you date it?**

25    A.   I believe there was a date mark put on there.

010050

JAMES HIJOE - 02/23/2021

Page 52

1    Q.  And did you print your name on it?

2    A.  I believe so.

3    Q.  And as you sit here today, you don't recall the

4  name of the truck driver that warned you?

5    A.  No, I do not.

6    Q.  At any time after the accident other than

7  speaking with your lieutenant and the MP, did you tell

8  anyone else about the warning that you received

9  regarding the truck driver that was parked on the bypass

10  road?

11    A.  No.

12    Q.  So I just want to make sure I understand your

13  testimony.

14        You provided a written statement to your

15  lieutenant that there was a truck parked on the bypass

16  road, and you received a warning of that prior to the

17  accident; correct?

18    A.  That is correct, but I -- I didn't see how it was

19  parked, so -- it was two, three miles' distance from the

20  main gate --

21    Q.  Sure.

22    A.  -- to the truck bypass.

23    Q.  And you also spoke with an MP when you were

24  interviewed later on and also informed the MP of the

25  fact that you had been warned of a truck parked on the

Page 53

1  bypass road prior to the accident; correct?

2      A.  Correct.

3      Q.  Now, we discussed Mr. Johnson earlier, and I

4  believe his first name is Douglas Johnson.  Does that

5  sound accurate to you?

6      A.  Yes.

7      Q.  All right.  Did you ever provide Mr. Johnson any

8  training?

9      A.  Did I?  No.

10     Q.  Did you ever provide anyone with any training

11  with respect to the bypass road?

12     A.  No.

13     Q.  And going back to the lieutenant that you

14  provided your written statement to, do you know if she

15  was a civilian or enlisted in the Army?

16     A.  A civilian.

17     Q.  Was she still working there when you left Fort

18  Irwin?

19     A.  No, she wasn't.

20     Q.  Do you know when she left?

21     A.  That I can't think of right now.

22     Q.  Okay.  Do you recall what she looked like?

23     A.  She was a white female.

24     Q.  Any other physical characteristics that you

25  recall about her?

010052

JAMES HIJOE - 02/23/2021

Page 54

1     A.  No.

2     Q.  Do you recall how long she had worked at Fort

3  Irwin?

4     A.  It wasn't that long.

5     Q.  Did she start working there after you had started

6  working at Fort Irwin?

7     A.  Yes.

8     Q.  Okay.  And you don't happen to have this person's

9  contact information?

10     A.  No.  I don't have anyone's contact information

11  since I left.

12     Q.  At any time after the accident, did you speak

13  with any reporters?

14     A.  No, I didn't.

15     Q.  I have another exhibit that I'd like to show you,

16  but I need to bring it up.  So at this time, I'll go

17  ahead and let other people ask you questions so I don't

18  take up your time.  Okay?

19     A.  Okay.

20            MS. HAJIMIRZAEE:  Does anyone else have

21  questions for Mr. Hijoe?

22            MR. ARCHER:  Yeah.  This is Archer.  I'll

23  ask some questions.

24  ///

25  ///

App. 613

# Exhibit O

Deposition of Michael Butolph
(excerpts)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


MARGARET KEIPER AND DAIL KEIPER,          )
JR., Individually and as the             )
Successors-in-Interest to Dail           )
Keiper, Sr., Deceased,                   )
                                          )
                    Plaintiff,            )
                                          )
          vs.                             )Case No. 5:15cv-00703-
                                          )            JGB(SPx)
VICTOR VALLEY TRANSIT AUTHORITY;         )
DINORAH AGUILAR; TRANSDEV                 )
SERVICES, INC,; VEOLIA                    )
TRANSPORTATION SERVICES, INC.;           )
STEVEN KILTY; FBN TRANSPORTAION,         )
LLC; MARDAN TRANSPORTATION LLC;          )
AMSTON SUPPLY, INC.; and DOES            )
through 100, inclusive,                   )
                                          )
                    Defendants.           )
                                          )
AND ALL RELATED ACTIONS.                  )
                                          )


DEPOSITION OF MICHAEL BUTOLPH

RIVERSIDE, CALIFORNIA

WEDNESDAY, NOVEMBER 13, 2019


Reported by:

LAURA A. RUTHERFORD, RPR

CSR No. 9266



Page 2

```
 1                     UNITED STATES DISTRICT COURT
 2                     CENTRAL DISTRICT OF CALIFORNIA
 3
 4
 5    MARGARET KEIPER AND DAIL KEIPER,    )
      JR., Individually and as the       )
 6    Successors-in-Interest to Dail     )
      Keiper, Sr., Deceased,             )
 7                                        )
                         Plaintiff,      )
 8                                        )
            vs.                          )Case No. 5:15cv-00703-
 9                                        )         JGB(SPx)
      VICTOR VALLEY TRANSIT AUTHORITY;   )
10    DINORAH AGUILAR; TRANSDEV          )
      SERVICES, INC,; VEOLIA             )
11    TRANSPORTATION SERVICES, INC.;     )
      STEVEN KILTY; FBN TRANSPORTAION,   )
12    LLC; MARDAN TRANSPORTATION LLC;    )
      AMSTON SUPPLY, INC.; and DOES      )
13    through 100, inclusive,            )
                                          )
14                       Defendants.     )
                                          )
15    AND ALL RELATED ACTIONS.           )
                                          )
16
17
18           Deposition of MICHAEL BUTOLPH, taken on behalf of
19    Defendants, at 3403 10th Street, Suite 200, Riverside,
20    California, beginning at 10:08 a.m., and ending at 4:04
21    p.m., on Wednesday, November 13, 2019, before LAURA A.
22    RUTHERFORD, RPR, Certified Shorthand Reporter No. 9266.
23
24
25
```



App. 616

Page 25

1   And this higher headquarters is at Joint Base

2   Lewis-McChord.  They have a regional command.

3           Q.   So the actual individual who's in charge of

4   CID at Fort Irwin is not actually physically at Fort

5   Irwin?

6           A.   Yes, he is there.  But he reports to a higher

7   headquarters --

8           Q.   Understood.

9           A.   -- up at Fort Lewis.

10          Q.   And who is that individual?

11          A.   Well, are you talking about which time right

12   now?

13          Q.   Thank you.  That's a great clarification.

14               I'm interested in who would have been in

15   charge of CID in June of 2014?

16          A.   Matt Cummings.

17          Q.   You said that, as deputy director of

18   emergency services, you have supervisory role over

19   installation police?

20          A.   Yes.

21          Q.   Okay.

22               Now, is the installation police different

23   from military police?

24          A.   They have the same function, but they're

25   divided we have military police soldiers, who are in



Page 26

1    uniform, and we have the Department of The Army civilian

2    police officers.  They are in uniform as well but not Army

3    guys.  They are Department of The Army civilian police

4    officers.

5           Q.   Okay.

6           A.   So we have two groups of folks providing the

7    law enforcement.

8           Q.   And is that the same setup in June 2014?

9           A.   Yes, it was.

10          Q.   Okay.

11               Do you have supervisory role over both the,

12   kind of, civilian police and the military police?

13          A.   Yes.  When they're performing law enforcement

14   function, they role up under the police chief, and the

15   police chief reports to me.

16          Q.   So that's another situation where there's

17   somebody in between you and either police or military

18   police?

19          A.   Yes.

20          Q.   Okay.

21               MR. ELDER:  I'm sorry.  Does it include Fort

22   Irwin P.D., then?  Is that what you're talking about?

23               THE WITNESS:  Yes.  That's one and the same.

24               MR. ELDER:  Okay.

25               THE WITNESS:  Yes.



Page  27

1          Q.    BY MR. ALBERTS:  That's the civil arm?

2          A.    Civil and military.

3                MR. ELDER:  Both?

4                THE WITNESS:  They're both, and the Fort

5    Irwin P.D.  So when the soldiers aren't performing

6    military police functions, they belong to a headquarters

7    company.  So the manpower, when they support us, they fall

8    under the police department, yes.

9                MR. ELDER:  So Fort Irwin P.D. has both

10   civilian policemen, and they also have enlisted policeman?

11               THE WITNESS:  That's true.

12         Q.    BY MR. ALBERTS:  Either the enlisted police

13   or the civilian police, did either of those

14   groups -- either of those groups responsible for

15   patrolling Fort Irwin -- main road for the Fort Irwin

16   Bypass Road?

17               MR. HENRY:  Vague as to time.

18         Q.    BY MR. ALBERTS:  June of 2014?

19         A.    To patrol it?

20         Q.    Correct.

21         A.    Both of them, those groups, if you

22   will -- and we don't like to make a distinction -- so when

23   they are performing law enforcement duties, would have had

24   the opportunity to conduct traffic control, traffic

25   abatement, traffic enforcement on Fort Irwin Road, yes.



Page 28

```
 1              Q.    Is there a better term to use for the law

 2    enforcement officers?

 3              A.    Just law enforcement officers.

 4              Q.    Okay.

 5                    MR. ELDER:  Which are all part of Fort Irwin

 6    P.D.?

 7                    THE WITNESS:  Yes, exactly.  Yes.

 8                    MR. ELDER:  Okay.

 9              Q.    BY MR. ALBERTS:  Fort Irwin law enforcement

10    officers; is that fair?

11              A.    That's fine, yes.

12              Q.    So you said that there would be Fort Irwin

13    law enforcement officers conducting, let's say, a speed

14    enforcement on Bypass Road?

15              A.    During the same time you mentioned?

16              Q.    Correct.  June of 2014?

17              A.    Not necessarily in the bypass road.  Our

18    focal point would have been Fort Irwin Road proper.

19              Q.    To your knowledge, was there ever, in June

20    2014, law enforcement patrolling the bypass road?

21              A.    Not specifically the bypass road, no.

22              Q.    Not for speed?

23                    Not for unauthorized vehicles on the bypass

24    road?

25              A.    That wouldn't have been -- a focal point, no.
```



Page 165

1          A.    -- after 8:00?

2          Q.    No.   Any truck that was -- that showed up

3    before they could get onto the base, or onto the Fort, if

4    they had a delivery that they would -- if they showed up

5    early, that they would stop there, because nobody could

6    unload their truck until somebody showed up for work

7    between the hours of 6:00 and 8:00?

8          A.    We never turned around trucks.   They could

9    always continue 24/7 regards -- absent the 6:00 to 8

10   o'clock.   So regardless of time, they could access the

11   installation.

12         Q.    So if I've got a big tank that I'm

13   delivering, and I'm a commercial trucker, I could come on

14   the Fort at 4 o'clock in the morning and proceed through

15   the gate, and then find a spot to the park somewhere?

16         A.    Exactly.

17         Q.    Would there be any directions for me as a

18   truck driver, commercial truck driver, where I should stop

19   my truck if I'm going to have it unloaded, a tank unloaded

20   off the back?

21         A.    "Directions," you mean directional signs

22   or --

23         Q.    Yes.

24         A.    -- instructions.

25         Q.    All of that.



Page 166

1          A.   So no is the short answer.  But the companies

2    that drove up there weren't -- you know, there weren't 20

3    companies.  There's a core group of three or four trucking

4    companies that delivered the the rotational vehicles.

5               Now, repair vehicles and other types of

6    vehicles, those were other contracts.  So the folks who

7    came out there as a norm, they knew where the on and off

8    loading docks were for the rotational vehicles.

9               Those vehicles that were transporting other

10   vehicles for fleet repair or fleet insertion, or something

11   like that, they could still come onto the installation.

12   If they didn't know where they were going, the gate guards

13   would give them directions of where to go.

14          Q.   Did you recommend to anybody at VVTA that

15   they should operate their buses in a left lane to avoid

16   any of the confusion or the trucks that may have been

17   parked on the right lane on the bypass road?

18               MR. DORGAN:  Vague as to time.

19          Q.   BY MR. ELDER:  Before June of 2014?

20               MR. DORGAN:  Still vague as to time.

21               THE WITNESS:  Regarding a VVTA --

22          Q.   BY MR. ELDER:  -- bus?

23          A.   -- bus?

24               A discussion was had when they were assuming

25   that operation when I went into a meeting and indicated



Page 183

1          Q.   What was the plan to warn people or educate

2    people about the system that you had agreed to employ if

3    you can't personally contact them?

4               How would they learn?

5          A.   I don't know.

6          Q.   Was there discussion as to appropriate

7    signage to warn people and educate people as to the system

8    on the bypass road, including check-in procedures?

9          A.   We specifically knew that if there was a

10   instructional sign for truck bypass, that people would

11   take that.  And there weren't other signs there to say

12   stop here or check in.  That road was simply a bypass

13   road.  That was meant to bypass the main road and continue

14   on to the installation.

15         Q.   The information that you wanted to impart to

16   the people using the bypass road, was that if you arrived

17   between 6:00 a.m and 8:00 a.m. on a week day, you were to

18   stop at the check incompetent point; correct?

19         A.   That was the expectation, yes.

20         Q.   And if you arrived 22 hours throughout the

21   rest of the day, from 8:00 a.m. to 6:00 a.m. the following

22   morning, you did not need to stop; correct?

23         A.   Just use the bypass road.  No need stop,

24   yes.

25         Q.   The check-in procedure developed for those



Page 184

1   two hours was temporary in nature.   True?

2           A.   Initially, yes.

3           Q.   Well, and temporary in the sense it was only

4   a small part of every day where that would be in effect.

5   True?

6           A.   Two hours, Monday through Friday, yes.

7           Q.   And 22 hours a day, there would be no one at

8   the check stop, and no one was supposed to stop?

9           A.   Correct.

10          Q.   And you wanted to make sure that people were

11  aware that during those 22 hours, they were not to stop.

12  True?

13          A.   We wanted to make sure -- well, we didn't

14  address the other 22 hours.   We addressed the 06 to 08

15  process.

16          Q.   You didn't want people stopping there in

17  times other than those two hours?

18          A.   Right.   Because the bypass road is a bypass

19  road.   Continue on, yes.

20          Q.   Now, in connection with signage discussions

21  that you were a part of, did anyone ever come up with a

22  suggestion to follow the MUTCD as it relates to temporary

23  traffic stops?

24          A.   No.

25          Q.   As you sit here today, are you aware of MUTCD



Page 185

1    provisions that speaks specifically to temporary traffic

2    control devices?

3            A.    "Traffic control devices" meaning signs?

4            Q.    Correct.

5            A.    Not specifically, no.

6            Q.    Generally?

7            A.    No.

8            Q.    As one approaches the check-in stop on the

9    bypass road, one that, in 2014, would pass a number of

10   signs leading up to the check-in stop; correct?

11           A.    Yes.

12           Q.    One of the signs one would pass in 2014 would

13   say "Check stop ahead."  Is that correct?

14           A.    Yes.

15           Q.    And then as one got to the check stop, there

16   would be a sign that said, "Check stop" or "Check

17   location" or something like that?

18           A.    Timing?  Are you talking about --

19           Q.    At the time of this accident?

20           A.    Yes.

21           Q.    And then in addition to that, there was

22   the -- I think we called it a K-rail water-filled sign

23   that would be placed across the lane of traffic at 6:00

24   a.m.; correct?

25           A.    Yes.



Page 186

1              Q.    And there were occasions where you would see

2    many, many, even hundreds of trucks lined up behind where

3    that first truck had stopped in front of the sign;

4    correct?

5              A.    Several vehicles, yes.

6              Q.    And certainly, the first truck in line would

7    be able to see the sign blocking the lane.  And then when

8    that truck was given the green light to go through, the

9    sign would be moved to the side of the road, and it could

10   drive and pass, go to the main gate; correct?

11             A.    Yes.

12             Q.    And other vehicles behind the first vehicle

13   would drive by, and they would see the signage, if they

14   looked, on the side of the road; correct?

15             A.    They would seen the barricade.  They wouldn't

16   see the sign.

17             Q.    Why would -- the barricade was --

18             A.    The sign was only on one side of the

19   barricade.  So when they pushed the sign off to the side,

20   the verbiage was facing in the desert.

21             Q.    And if it was facing the roadway, that would

22   be a mistake; correct?

23             A.    I wouldn't see why it would be facing the

24   roadway.

25             Q.    Did you come to learn at the time of this



Page 187

1    accident it was facing the roadway?

2          A.   There's a photo that exists that shows that

3    it was, but --

4          Q.   And if, in fact, that was the case, and it

5    was left there at that time, it was a mistake.   True?

6          A.   Well, that's not the fact.   The fact is that

7    was moved in processing that scene.   That barricade was

8    moved.   It wasn't --

9          Q.   Your source of information?

10         A.   Hum?

11         Q.   Your source of information?

12         A.   My guys who responded to the incident.

13         Q.   Give me the names of everyone who told you

14   that barricade was moved after this accident?

15         A.   It wasn't after.   When we were responding, in

16   order get where we were going, they had to move that,

17   because we had fire vehicles, ambulances and police

18   cars.

19         Q.   And had you been told by people who were part

20   of this investigation that the water-filled barrier with

21   the sign on it was facing away from the road at the time

22   of this accident?

23         A.   Yes.

24         Q.   So it would be facing east; correct?

25         A.   Well, opposite the -- yes.



Page 188

1          Q.   And then someone told you that that was taken

2     and flipped around so it was facing west by the time that

3     photograph was taken; is that correct?

4          A.   No.   What occurred, according to Sergeant

5     Grove and Sergeant Gutierrez, is that, in making their

6     arrival, that barricade was in the way.   So they simply

7     moved it, whomever "they" is.   The barricade was moved.

8          Q.   Were you aware that the MUTCD requires a

9     temporary traffic control signs, like the one on the water

10    barrier, be removed when not in use?

11               MR. DORGAN:   Misstates.

12               THE WITNESS:   Say that again?   I'm sorry.

13               MR. WILLIAMSON:   Would you read that back,

14    please?

15               THE REPORTER:   "Were you aware that the MUTCD

16    requires a temporary traffic control sign, like the one on

17    the water barrier, be removed when not in use?"

18               THE WITNESS:   We did move that sign.

19               MR. DORGAN:   No, no.   The question was

20    specific, just whether you're aware that that's what the

21    MUTCD says.

22               THE WITNESS:   No.

23          Q.   BY MR. WILLIAMSON:   Were you aware that the

24    MUTCD, at the time of this accident, said temporary

25    traffic control devices must be covered when not in use?



Page 189

1          A.    No.

2                MR. DORGAN:  Misstates.

3          Q.    BY MR. WILLIAMSON:  Now, the water barrier

4    sign was turned around, so people would not mistakingly

5    stop during hours that they were not supposed to stop at

6    the check-in point.  True?

7          A.    Yes.

8          Q.    And the signage that we've discussed thus far

9    is the water barrier sign, the sign that says "checkpoint

10   ahead," and then checkpoint.

11               What was done to cover or remove these signs

12   as one approached the checkpoint that said "Checkpoint

13   Ahead" and "Checkpoint"?

14               MR. DORGAN:  Overbroad.  It's overbroad in

15   terms of I'm not sure how many signs you've identified.

16   But I did hear as it relates to two signs, "Checkpoint

17   Ahead" and "Check-in point."

18               And so the question is, what was done to

19   cover those?

20               THE WITNESS:  We didn't cover those signs.

21         Q.    BY MR. WILLIAMSON:  So even when the

22   checkpoint was not non-operational during those 22 hours a

23   day, the sign that said "Checkpoint ahead" would not be

24   covered or removed.  True?

25         A.    True.



Page 190

1          Q.   And the sign that said "Checkpoint" would not

2     be removed or covered.   True?

3          A.   True.

4          Q.   Were you ever told that the MUTCD required

5     that there be a sign stating whether a temporary traffic

6     control area was open or closed?

7               MR. DORGAN:   Misstates.

8               THE WITNESS:   No.

9          Q.   BY MR. WILLIAMSON:   You've seen weigh

10    stations on the freeway, I take it?

11         A.   Sure.

12         Q.   And you've seen signs when it's open, it

13    says, "Open," and when it's closed, it says "Closed."

14    True?

15         A.   Yes.

16         Q.   And was there any -- was there any discussion

17    at any time while you were involved with this check-in

18    location about having a sign that would say when this is

19    opened and active, and when it's closed?

20         A.   No.

21         Q.   And no one told you that the MUTCD had a

22    requirement to that effect; is that true?

23              MR. DORGAN:   Misstates.

24              THE WITNESS:   No.

25         Q.   BY MR. WILLIAMSON:   No one -- that is true,



Page 191

1    that no one told you?

2           A.    Correct.

3                 MR. WILLIAMSON:  Fair enough.  Nothing

4    further.  Thank you, sir.

5                 {SPEAKER6}:  Can you hear me good enough down

6    there.

7                 THE REPORTER:  (Nods affirmatively.)

8                          EXAMINATION

9    BY MR. TIERNEY:

10          Q.    I just have a few questions, Mr. Butolph.  My

11   name is Jim Tierney, and I represent a few of the

12   passengers as well on the bus.

13                Are you familiar with a document or a

14   procedure called the Terminal Facilities Guide?

15          A.    No.

16          Q.    You've never heard that terminology?

17          A.    No.

18          Q.    Are you aware, at any time before June of

19   2014, if a truck driver, say, in Iowa was dispatched to

20   deliver something to Fort Irwin and had never done it

21   before, if there was some method or means that he could

22   find out what the delivery procedures were upon his

23   arrival to Fort Irwin?

24          A.    I wasn't aware of that, no.

25          Q.    As far as you knew, prior to June of 2014, if



Page 192

1    a truck driver arrived at Fort Irwin for a delivery for

2    the first time ever in his life, he then just had to rely

3    upon whatever street signs and roadway signs were present

4    at that time; correct?

5            A.    Yes.

6            Q.    Now, the declaration, Exhibit 1, that's been

7    talked about a little bit, did you know what the purpose

8    of that declaration was when it was prepared and signed by

9    you?

10           A.    The overarching purpose.

11           Q.    Yes.

12           MR. DORGAN:  That may invade the

13   attorney/client privilege, but you can answer it for now,

14   as I listen and potentially interfere.

15           Q.    BY MR. TIERNEY:  Well, it says right on it it

16   was your declaration in support of the United State's

17   motion to dismiss this case; correct?

18           A.    That's what it says, yes.

19           Q.    You understood that that was probably a

20   pretty important document then; correct?

21           A.    Sure.

22           Q.    And you prepared the majority of this in your

23   own writing, and it was probably spruced up a bit by some

24   lawyers to present to a federal judge; right?

25           A.    That could have happened.



Page 193

```
 1          Q.    Okay.
 2                And then after it was spruced up in this
 3    format, you reviewed it, made any changes or corrections
 4    to anything that you felt was inaccurate, and upon your
 5    final review, it was prepared in final form, and you
 6    signed it under penalty of perjury --
 7          A.    Yes.
 8          Q.    -- correct?
 9          A.    Yes.
10          Q.    And you knew, at the time that you signed
11    this, that it was in reference to this accident
12    specifically and the bypass road and the impact between
13    the bus and the truck; correct?
14          A.    Yes.
15          Q.    And so on page 9, 8-E, you talk about this
16    meeting in May of 2012 with VVTA, because they had just
17    kind of taken over the transportation of people into the
18    Fort; correct?
19          A.    Yes.
20          Q.    You wanted to make sure that they knew how to
21    do this appropriately, officially, and safely; correct?
22          A.    Yes.
23          Q.    So you personally had a meeting with them?
24          A.    I was called to a meeting for which they were
25    present, yes.
```



Page 194

```
 1              Q.    Did anybody else from the Fort go with you?

 2              A.    There were other people from Fort Irwin

 3    there, yes.

 4              Q.    Do you remember the names of any of those

 5    people?

 6              A.    No.   These folks would have been contract

 7    oversight and contract managers for -- for that busing

 8    service.

 9              Q.    How about anybody involved with safety or

10    emergency services, such as yourself, for things that you

11    were concerned about?

12              A.    Right.   As stated earlier, our focus was

13    about the usage of the bypass road, and then the clearance

14    of the passengers at the access control point.

15              Q.    And the bypass road diverts off of Fort Irwin

16    Road approximately how many miles from the main gate?

17              A.    Five, give or take.

18              Q.    And then how long is the bypass road?

19                    About four miles; right?

20              A.    Just under four, right.

21              Q.    And so it then reintersects with Fort Irwin

22    about how far from the main access gate?

23              A.    A little over a mile, mile and a halfish.

24              Q.    And in paragraph 8-E, you mentioned that you

25    personally communicated with a representative of VVTA to
```



# Exhibit P

Ninth Circuit Memorandum Disposition in
*United States v. Kilty*, No. 19-50351

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

JAN 18 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 19-50351 |
| Plaintiff-Appellee, | |
| | D.C. No. |
| v. | 5:16-cr-00024-JGB-1 |
| STEVEN KILTY, | MEMORANDUM[*] |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the Central District of California
Jesus G. Bernal, District Judge, Presiding

Argued and Submitted December 8, 2021
Pasadena, California

Before: KELLY,[**] M. SMITH, and FORREST, Circuit Judges.

A jury convicted Defendant Steven Kilty of involuntary manslaughter under

18 U.S.C. § 1112. On appeal, he raises three arguments: (1) the evidence was

insufficient to prove that he acted with the requisite mental state, (2) the district court

erred in admitting an autopsy photograph into evidence, and (3) the district court

---

[*]       This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

[**]      The Honorable Paul J. Kelly, Jr., United States Circuit Judge for the
U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

erred by denying his motion for a new trial based on newly discovered evidence. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

**1.** *Sufficiency of the Evidence.* "We review de novo whether sufficient evidence supports a conviction . . . ." *United States v. Liew*, 856 F.3d 585, 596 (9th Cir. 2017). We first "consider the evidence presented at trial in the light most favorable to the prosecution" and then determine whether the record was "adequate to allow '*any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Reversal is warranted only on "rare occasions." *Id.* at 1167.

Kilty argues the evidence was insufficient to convict him of involuntary manslaughter. The only disputed element is whether he acted with the requisite mental state. "A conviction for involuntary manslaughter requires, at a minimum, 'gross negligence,' defined as a 'wanton or reckless disregard for human life.'" *United States v. Benally*, 843 F.3d 350, 353 (9th Cir. 2016) (citation omitted). "[C]riminal recklessness generally requires that 'a person disregards a risk of harm of which he is aware.'" *United States v. Rodriguez*, 880 F.3d 1151, 1159 (9th Cir. 2018) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "Thus, the defendant 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.*

(quoting same) (emphasis omitted). Relatedly, the jury must find that the defendant "had actual knowledge that his conduct was a threat to the lives of others, . . . or had knowledge of such circumstances as could reasonably be said to have made foreseeable to him the peril to which his acts might subject others." *United States v. Garcia*, 729 F.3d 1171, 1175 (9th Cir. 2013) (citation omitted). "In other words, the standard requires that the defendant 'was subjectively aware of the risk.'" *Rodriguez*, 880 F.3d at 1160 (quoting *Farmer*, 511 U.S. at 829). A jury may rely, as it did here, upon "inference[s] from circumstantial evidence" of the defendant's knowledge, such as the "risk's obviousness." *Farmer*, 511 U.S. at 840, 842.

Kilty—a licensed commercial truck driver with over 20 years' experience— parked his truck overnight, without lights or any other warning signals, in a moving traffic lane near an army base delivery checkpoint. There were no streetlights or other illumination around the checkpoint area. Around 5:00 A.M., while it was still very dark, a commuter bus smashed into the back of his parked truck, killing one passenger and injuring several others.

Kilty was trained on and aware of the hazards of parking his truck in a moving lane of traffic and the safety precautions required when placing his truck in a dangerous position. Kilty's reason for parking overnight in the moving lane of traffic was to be first in line at the checkpoint the following morning so he would not have to wait as he had before. This shows that he knew other vehicles would be coming

3

up behind him. Viewed in the light most favorable to the prosecution, the evidence also indicated that Kilty was aware of the surrounding circumstances and considered taking safety precautions but chose not to do so, at least in part, because he did not want to drain his truck battery.

Kilty testified that he did not believe he and his truck were in an unsafe area, and he presented other evidence disputing that he was subjectively aware of the risk. Ultimately the jury, properly instructed on the law, evaluated all the evidence and found that Kilty was "subjectively aware of the risk" he had created. *Rodriguez*, 880 F.3d at 1159 (quoting *Farmer*, 511 U.S. at 829, 837). We conclude that this was not error; the evidence of record was adequate to allow a "rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" *Nevils*, 598 F.3d at 1164 (citation omitted).

2. ***Autopsy Photo.*** Though Kilty argues otherwise, we review a district court's admission of evidence and Federal Rule of Evidence 403 determination for an abuse of discretion when the district court engages in explicit balancing, as we conclude it did here. *United States v. Curtin*, 489 F.3d 935, 943 (9th Cir. 2007) (en banc); *see also United States v. Boulware*, 384 F.3d 794, 808 n.6 (9th Cir. 2004). Relevant evidence may be excluded if its "probative value is substantially outweighed by [the] danger of . . . unfair prejudice." Fed. R. Evid. 403. Evidence is unfairly prejudicial if it "provokes an emotional response in the jury or otherwise

tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." *United States v. Pineda-Doval*, 614 F.3d 1019, 1035 (9th Cir. 2010) (citation omitted).

Kilty argues admission of the challenged autopsy photo was unnecessary because he offered to stipulate that the accident caused the victim's death and other admitted photos and testimony proved the cause of death. We conclude that the district court did not abuse its discretion. Death of the victim was an essential element of the offense. The government limited any prejudice by showing the challenged photo only briefly during its case-in-chief. Further, "a defendant's Rule 403 objection offering to concede a point generally cannot prevail over the Government's choice to offer evidence," *Old Chief v. United States*, 519 U.S. 172, 183 (1997), and does not prevent the government from "prov[ing] its case by evidence of its own choice." *Id.* at 186, 189.

**3. *Motion for New Trial*.** We review the denial of a motion for a new trial based on newly discovered evidence for abuse of discretion. *United States v. Hinkson*, 585 F.3d 1247, 1259 (9th Cir. 2009) (en banc). However, we review "de novo the denial of a motion for a new trial arising from the government's duty to produce exculpatory evidence pursuant to *Brady* [*v. Maryland*, 373 U.S. 83 (1963)]."

App. 640

*United States v. Bruce*, 984 F.3d 884, 890 (9th Cir. 2021).[1] A new trial may be granted "if the interest of justice so requires." Fed. R. Crim. P. 33(a). This standard is met where the defendant shows, among other requirements, that "the evidence was not cumulative or merely impeaching," and that "a new trial, if granted, would probably result in an acquittal." *United States v. George*, 420 F.3d 991, 1000 (9th Cir. 2005). If a defendant argues that the newly discovered evidence constitutes a *Brady* violation, then the defendant must prove prejudice, which occurs "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Ochoa v. Davis*, 16 F.4th 1314, 1334 (9th Cir. 2021) (citation omitted); *see also Bruce*, 984 F.3d at 894–95.

Kilty argues that he is entitled to a new trial under both standards. The evidence he seeks to introduce—emails from the army base's chief engineer who started working at the base after the accident at issue—relates to a different collision that occurred years after the accident at issue and the engineer's comments about the safety of the checkpoint area. It is questionable whether these emails could have been admitted given that they relate to a different, later-occurring event. *See United States v. Sarno*, 73 F.3d 1470, 1505 (9th Cir. 1995) (holding inadmissible evidence

---

[1] "[T]here is some tension in our case law concerning the correct standard of review for these appeals." *Bruce*, 984 F.3d at 890 n.1 (citing *United States v. Endicott*, 803 F.2d 506, 514 (9th Cir. 1986)). However, just as in *Bruce*, the court need not decide this issue because "[t]he outcome here does not depend on the standard of review." *Id.*

was not *Brady* material). The authoring engineer's statements about safety at the checkpoint were also speculative and cumulative of evidence that was presented. *United States v. Waggoner*, 339 F.3d 915, 919 n.5 (9th Cir. 2003) (quoting *Sarno*, 73 F.3d at 1506). Thus, either as *Brady* or non-*Brady* evidence, Kilty cannot show that the district court erred by denying his motion for a new trial.

**AFFIRMED.**

App. 642

**Declaration of John Nguyen**

I, John Nguyen, declare:

1.     I am an investigator in the Office of the Federal Public Defender for the Central District of California. I have been assigned to work on the investigation for Steven Kilty's § 2255 petition.

2.     I have made numerous attempts to contact Robison Harley, Mr. Kilty's trial attorney, and Sandra Mattarollo, the paralegal investigator who worked for Mr. Harley at the time of Mr. Kilty's two trials. Neither one has responded to my multiple efforts to contact them, both by telephone and in person.

3.     I attempted to contact Mr. Haley multiple times, in order to arrange or conduct an interview about his work on Mr. Kilty's case. I showed up to his office on July 15, 2022. I talked to his secretary, Ms. Maya Jauregi. She informed me that Mr. Harley was in court and told me that he would call me back. I left my business card that included my office telephone number, cell phone, and email address with Ms. Jauregi. I called Mr. Harley's office on July 14, 2022 and July 18, 2022. I left a message with his secretary. I have never received a telephone call or email from Mr. Harley, despite my efforts to contact him.

4.     I understand that Mr. Harley told Gary Rowe, the FPD attorney with whom I am working on Mr. Kilty's § 2255 petition, at one point that he threw away the entire file and materials from Mr. Kilty's trials. I understand that on another occasion Mr. Harley told Mr. Rowe that his former paralegal, Ms. Mattarollo, had taken the only copy of the trial file and materials that he had, which was on a portable hard drive.

5.     I attempted to contact Ms. Mattarollo to see if she in fact possessed that hard drive. I located her phone number on database searches and was also provided same from attorney, Gary Rowe when this case was first assigned to me. I called her on May 25, 2022; June 20, 2022; June 24, 2022; and June 27, 2022. I left several voice mail messages. Ms. Mattarollo never returned my call. I also located her home

1

1  address, and on July 15, 2022, I drove to her home in Long Beach, California. I rang

2  her doorbell. There was a Ring or Ring-like camera there. Through the camera and

3  microphone, a voice told me that Ms. Mattarollo was not home. I asked that Ms.

4  Mattarollo call me when she returned, and I left my business card securely on a screen

5  door. Ms. Mattarollo never called. I believe that the voice on the doorbell speaker was

6  Ms. Mattarollo.  Ms. Mattarollo was once an employee in our Riverside office of the

7  Federal Public Defender.  The voice from the Ring camera doorbell sounded like that

8  of Ms. Mattarollo.

9

10        I declare under penalty of perjury that the foregoing is true and correct.

11        Executed on September 12, 2022, at Los Angeles, California.

12

13                                                    _____

14                                                    John Nguyen

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Declaration of Steven Kilty

I, Steven Kilty, declare:

1.    I am the defendant in *United States v. Steven Kilty.*

2.    I have never received the trial file for my case from my trial attorney, Rob Harley.

3.    I arrived at the Fort Irwin bypass road checkpoint by the orange water barrier, outhouse, hand washing station, and Check-in Point sign at around 8:30 at night on Sunday, June 1, 2014. The orange barrier I saw there had four lines of text on its front face. The first line was "TRUCKS STOP HERE." The second line was "HOURS: 0600 - 0800." The third line was "MONDAY - FRIDAY." The fourth line was "MAIN GATE: 760-380-2255." Trial Exhibit 10, attached, from my second trial shows the barrier as I saw it.

4.  When I arrived, I did not call the telephone number listed for the main gate because it was a Sunday night. I thought that the main gate's telephone would not be answered and that that gate would not be staffed on a Sunday night. I thought this because of the way the sign appeared. The line directly above the telephone number was "MONDAY - FRIDAY." The sign's placement of these days of the week directly above the main gate's telephone number made me think that the main gate would be staffed only on weekdays and would be closed on the weekends, and that its telephone would not be answered on weekends as a result. I later learned that I was wrong about that. However, when I arrived on June 1, 2014, I was misled and confused by the four

1

lines on the barrier, which did not explain to me that the main gate was always open and did not tell me that the telephone there would be answered on weekends.

5.     I told everything in the previous paragraph to Mr. Harley before my second trial. I would have testified to everything in the previous paragraph if Mr. Harley had asked about this while I was on the witness stand testifying at trial.

I declare under penalty of perjury under the laws of Wisconsin and of the United States of America that the foregoing is true and correct.

Executed on August $\underline{21}$, 2022, at Plymouth, Wisconsin.

Steven Kilty

App. 646

# Exhibit A



EXHIBIT 10
1 of 1

**Declaration of David Royer**

I, David Royer, declare:

1.   I testified as an expert witness for the defense at both of Steven Kilty's criminal trials.

2.   I am a licensed civil and traffic engineer in California. I have over 55 years of professional engineering experience in all aspects of highway and traffic engineering. I have performed or approved of over 20,000 traffic engineering investigations. I have also prepared, approved, or stamped under my direction over 2,000 civil or traffic engineering design plans. I worked as a civil and traffic engineer for the City of Los Angeles for 32 years and retired as the principal transportation engineer for the City.

3.   I was disappointed that I did not receive proper advance notice concerning when I would be called to testify at Mr. Kilty's second trial. The first I heard about when I would have to testify at the second trial was a telephone call I received from defense attorney Robison Harley on the evening of September 27, 2018. He told me to be in court the next day. That call came as a surprise to me, particularly as I was in Las Vegas for a trade show at the time. I had to drive from Las Vegas to Riverside first thing the next morning in order to make it to court by the afternoon. Because I had not made plans to come to court before I came home, I did not have a suit and tie with me. I wound up testifying in white Levis and a Hawaiian shirt as a result. I would, of course, have strongly preferred to have worn a business suit, as I had always done when testifying as an expert witness, in order to look appropriately professional for the court and the jury.

4.   I testified on September 28, 2018, that the then-existing signs and traffic control devices at and approaching Fort Irwin's bypass road checkpoint did not comply with the Manual on Uniform Traffic Control Devices (MUTCD). I explained as well two different ways the bypass road and checkpoint could be made to comply with the MUTCD.

App. 649

5.     The MUTCD mandates that all signing for this truck inspection operation be immediately removed upon completion of the truck inspection activity. This mandate, for removal of all signing upon completion of any temporary operation, was developed by human factors studies which showed a need to avoid confusion by motorists who may misinterpret any signing that remains in place after the activity is completed.

6.     I was asked on cross-examination whether stopping on a highway is "obviously dangerous." I answered that "that's more a human factors ... decision as to whether a person might be confused or not confused, and that's outside my expertise."

7.     I was surprised to learn that defense counsel did not call a human factors expert witness to follow up on this matter and testify about the issue of potential driver confusion on this particular non-MUTCD-compliant highway. I was surprised as well that defense counsel did not follow up with me and ask about what I stated in paragraph 5, above, that the provisions of the MUTCD applicable here are based on human factors studies of how motorists can readily be confused by signs that remain in place after a temporary operation ceases and misinterpret them. My expertise permits me to note that the MUTCD was developed on the basis of human factors studies and exists to make highways safer and prevent accidents, to assess compliance with the MUTCD, and to propose ways to make an existing non-compliant road come into compliance with the MUTCD. My training as a highway and traffic engineer does not permit me to identify, in particular instances, when a person would likely be confused by the particular signs and road features that violate the MUTCD. A human professionals would be the proper person to address that issue.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August _25_, 2022, at Santa Clarita, California.


_/s/ David Royer_
David Royer

**Declaration of Anthony C. Stein, Ph.D.**

I, Anthony Stein, declare:

1.      I testified as an expert witness at both of Steven Kilty's criminal trials. I am a human factors professional. Human factors is the study of how people interact with their environment in considering their perceptional, psychological, and psychological capabilities. My research addresses how deficits in the transportation system affect the human operator. I hold a Ph.D. in psychology with a specialization in human factors from Saybrook University and have done research in the human factors field for over 40 years. I have authored approximately 100 peer-reviewed articles, technical reports, and papers, many of which involve the issues involved in the subject collision.

2.      Robison Harley, Steven Kilty's defense attorney, retained me as a human factors expert. In November 2017, I submitted to Mr. Harley a report stating my professional opinions. That report is attached as Exhibit A.

3.      I received no meaningful guidance from Mr. Harley concerning what my expert report should contain. Mr. Harley asked me to prepare the report the day before I was scheduled to appear in court to testify in this case. I submitted the report to him the next morning, the day I testified in this case, as a result. I provided in the report just my opinions and citations to the human factors literature supporting those opinions. However, because of the lack of guidance and the last-minute request, I did not elaborate on or even explain my conclusions in that report.

4.      Mr. Harley told me before I testified at Mr. Kilty's first trial that the Court had excluded Opinions 1 and 2 in my report and that I would not be permitted to testify about them. Opinions 1 and 2 concerned how drivers in Mr. Kilty's position would be expected to react to the signage he encountered on the bypass road at Fort Irwin.

5.      I was aware that the jury hung after Mr. Kilty's first trial and that I would need to testify at a second trial. Mr. Harley, however, did not ask me to revise my report. I decided to do so on my own. My revisions provided detailed explanations of

my opinions and their grounding in the scholarly human factors literature. It was my hope that a more extensive report, which provided extensive support for and explanations of my professional opinions, would be helpful to Mr. Harley in thinking about this case. It was my hope as well that this more detailed report would now enable the Court to permit me to testify on Opinions 1 and 2, which were particularly important to explaining Mr. Kilty's role in the accident.

6.      My second, revised expert report, which I submitted to Mr. Harley in August 2018, in advance of the second trial, is attached as Exhibit B.

I declare under penalty of perjury under the laws of California and of the United States of America that the foregoing is true and correct.

Executed on August 31, 2022, at La Cañada Flintridge, California.

_____.

Anthony C. Stein, Ph.D.

# Exhibit A



SAFETY RESEARCH ASSOCIATES, INC.

Litigation Report 12892-1

**Human Factors Opinions
Related to the Collision
Between the Bus Driven by Dinorah Aguilar
And the Truck Driven by Steven Kilty**

Anthony C. Stein, Ph.D.

November 2017

THE CONTENTS OF THIS REPORT ARE BASED ON
EXISTING DATA. THEY ARE SUBJECT TO REVISION OR
REVOCATION UPON FURTHER INVESTIGATION.

## TABLE OF CONTENTS

INTRODUCTIION ................................................................................................ 1

OPINIONS ......................................................................................................... 1

REFERENCES ................................................................................................... 3

App. 655

**INTRODUCTION.**

The purpose of this report is to provide the scientific basis for the opinions previously provided to the prosecution. It is presented in outline form with the reference(s) presented at the end of each statement or opinion.

**OPINIONS**

Opinion 1.

  a.  Driver's operate their vehicles based on their expectations and prior experience. (Austen & Enns, 2003; Borowsky, et al., 2008; Chute, et al., 1995; Gold, 2005; Houtenbos, et al, 2005; Jeng, 2006; Phillips, 1995; Räsänen & Summala, 1998; Wickens & Hollands, 2000 ).

  b.  Mr. Kilty's only prior experience had him stopping at this location. (CHP MAIT report, page USA483)

Opinion 2.

  The signing was confusing at best, and more likely misleading and indicating that Mr. Kilty should stop at this location. (This is my opinion.)

General Basis

  a.  Sign messages need to be designed and tested. (Allen, et al, 1986; Chatterjee, et al, 2002; Dewar, 1999; Lee, et al., 1999; Rommetveit, 2014; Stein & Johnson, 1984; Stewart & Martin, 1994; Wogalter, et al, 2006)

  b.  Preconceived knowledge of what the sign is supposed to mean results in a belief that the sign has this meaning. This is known as hindsight bias. (Blank, et al., 2008; Dilich, et al, 2006; Fischhoff, 1974; Hawkins & Hastie, 1990; Roese, 2004; Spellman & Mandel, 1999)

Opinion 3.

  a.  Ms. Aguilar was not driving her bus where she was supposed to driving, in the left lane. (CID Investigation, page USA014, CHP MAIT report, page USA483, Declaration of Michael Butolph, page 9)

  b.  During an accident reenactment 3 bus drivers were stopped and questioned about their driving behavior. They all indicated they drove in the left lane because trucks stopped in the right lane. (CID Investigation, pages USA051 & USA052)

Opinion 4.

Based on a reenactment, the bus should have become visible to Ms. Aguilar in time to avoid the collision. (CID Investigation, page USA051. Phone discussion with Stein Husher who stated the bus became clearly visible 10 seconds before impact)

Sub-opinion: Ms. Aguilar should have had an expectation a truck in the right lane would be stopped (CID Investigation, pages USA422 and USA450). This expectation should have alerted her that any truck she detected in the right lane may be stopped and that she would need to drive around it (Austen & Enns, 2003; Borowsky, et al., 2008; Chute, et al., 1995; Gold, 2005; Houtenbos, et al, 2005; Jeng, 2006; Phillips, 1995; Räsänen & Summala, 1998; Wickens & Hollands, 2000)

Opinion 5.

Ms. Aguilar's lack of any response appears to be related to chronic fatigue. (Brown, 1994; Lenne , et al., 1996; Mackie & Miller, 1978; Stein, et al., 1992; Wylie, et al., 1996)

a.   She only had 4.5 hours of sleep the night before the collision (CID Investigation, page USA483)

b.   She hit the right shoulder rumble strips at some point before the collision and made a rapid return to the roadway (CID Investigation, pages USA013, USA327, USA328, USA329, USA342, USA420)

c.   She drifted onto the shoulder hitting the rumble strips on many occasions before the day of the collision (indicating the fatigue was chronic and not simply episodic based on lack of sleep the night before) (CID Investigation, pages USA328, USA329, USA333, USA343, USA449)

Opinion 6.

a.   The SmartDrive video cannot accurately show what the bus driver could see and presents a misleading view of the road and lighting conditions to the jury.

1.      The frame rate is 4 frames/second which does not provide apparent continuous motion (Calculated by Stein Husher)

2.      The resolution is not high enough to provide an accurate representation of the scene (Resolution provided by Stein Husher)

3.      A typical video camera does not record light "truthfully." (Sangwine & Horne, 1998)

App. 657

4.      The dynamic range of the video camera is far less than that of the human eye and adapts to the middle range of the available light (Human eye refs: DiLaura , et al., 2007; Goldstein (2007); Hood, 1998; Sharp & Phillips, 1997. Video refs: Sangwine & Horne, 1998)

5.      The human eye focuses on a small portion of the visual field (Owens, 2007), but when viewing the video camera the observer focuses on a significant larger portion of the scene distorting the focus of attention.

b.   The SmartDrive video cannot be used to determine whether the bus driver was fatigued as it does not show the required physiological response of the driver to make this determination (eye blink duration and rate). The driver could be in a state of micro-sleep and look exactly as she does in the video. (FHWA, 1998; Grace & Steward , 2001; Mackie & Miller, 1978; Stern, et al., 1994).

Opinion 7.

a.  Based on the SmartDrive video, and on the testimony of Officer Gray, the right headlight of the bus appears to not provide full illumination of the roadway and forward view as intended by the manufacturer. this is due to an aftermarket installation of a bike rack on the front of the bus. (Grand Jury testimony of Paul Gray, Page 35 line 23 to page 36 line 11).

b.  This degradation of the forward lighting will impair the ability of the bus headlights to illuminate the retro-reflective tape on the rear of the trailer reducing the distance at which it becomes visible. (Based on headlight beam patterns per FMVSS 108).

Opinion 8.

Because the bus was being operated on a 1-way roadway with no opposing traffic, and because there was no other traffic ahead of the bus, it should have been operated with high beams on. (Consistent with CVC 24409).

**REFERENCES.**

Allen, R.W., Stein, A.C.., Hill, D.H. and Sumner, R. (1986). *Traffic Signal Display Complexity*. Washington, D.C.:  National Academy of Sciences, National Cooperative Highway Research Projects, 1986.

Austen, E. L., & Enns, J. T. (2003). Change detection in an attended face depends on the expectation of the observer. *Journal of Vision, 3*(1).

Blank, H., Nestler, S., von Collani, G., & Fischer, V. (2008). How many hindsight biases are there?. *Cognition*, *106*(3), 1408-1440.

App. 658

Borowsky, A., Shinar, D., & Parmet, Y. (2008). The relation between driving experience and recognition of road signs relative to their locations. *Human Factors: The Journal of the Human Factors and Ergonomics Society*, *50*(2), 173-182.

Brown, I. D. (1994). Driver Fatigue. *Human Factors. 36*(2), 298-314.

Chatterjee, K., Hounsell, N. B., Firmin, P. E., & Bonsall, P. W. (2002). Driver response to variable message sign information in London. *Transportation research part C: Emerging technologies*, *10*(2), 149-169.

Chute, R. D., Dunbar, M. G., Hoang, V., & Wiener, E. (1995). Cockpit/cabin crew performance: recent research. *Proceedings of the Annual International Air Safety Seminar*. Flight Safety Foundation, 48, 487-507.

Dewar, R. (1999). Design and evaluation of public information symbols. *Visual information for everyday use: Design and research perspectives*, 285-303.

DiLaura, D.L., Houser, K.W., Mistrick, R.G., & Steffy, G.R. (2011). *The Lighting Handbook. Tenth Edition: Reference and Application*. New York: Illuminating Engineering Society. ($10^{12}$)

Dilich, M., Kopernik, D., & Goebelbecker, J. (2006). Hindsight Judgment of Driver Fault in Traffic Accident Analysis. Misusing the Science of Accident Reconstruction. *Transportation Research Record, 1990*, 1-7.

FHWA (1998). PERCLOS: A Valid Psychophysiological Measure of Alertness As Assessed by Psychomotor Vigilance. Washington, DC: Federal Highway Administration: Office of Motor Carriers.

Fischhoff, B. (1974). Hindsight: Thinking Backward. *Oregon Research Monograph, 14*(1).

Gold, J. I. (2003). Linking reward expectation to behavior in the basal ganglia. *Trends in Neurosciences, 26*(1), 12-14.

Goldstein, E.B. (2007). *Sensation and Perception. Eighth Edition*. Belmont, CA: Wadsworth Press. ($10^{13}$)

Grace, R., & Steward, S. (2001). Drowsy driver monitor and warning system. In *International driving symposium on human factors in driver assessment, training and vehicle design* (Vol. 8, pp. 201-208).

Hawkins, S. A., & Hastie, R. (1990). Hindsight: Biased judgments of past events after the outcomes are known. *Psychological Bulletin, 107*(3), 311.

App. 659

Hood, D.C. (1998). Lower-level visual processing and light adaption. *Annual Review of Psychology, 49*, 503-535. ($10^{14}$)

Houtenbos, M., Jagtman, H. M., Hagenzieker, M. P., Wieringa, P. A., & Hale, A. R. (2005). Understanding road users' expectations: an essential step for ADAS development. *EJTIR*, *5*(4), 253-266.

Jeng, M. (2006). A selected history of expectation bias in physics. *American journal of physics, 74*, 578.

Lee, J. D., Gore, B. F., & Campbell, J. L. (1999). Display alternatives for in-vehicle warning and sign information: Message style, location, and modality. *Transportation Human Factors*, *1*(4), 347-375.

Lenne, M. G., Triggs, T. J., & Redman, J. R. (1996). Circadian Issues in Driving. In L. Hartley (Ed.), *Fatigue and Driving* (pp. 283-301). Fremantle, Western Australia: Promaco Conventions Pty LTD.

Mackie, R. R., & Miller, J. C. (1978). *Effects of Hours of Service Regularity of Schedules, and Cargo Loading on Truck and Bus Driver Fatigue*. Washington, D.C.: National Highway Traffic Safety Administration & Bureau of Motor Carrier Safety

Owens (2007) *Driver Vision*. Presented at the 2007 Transportation Research Board Human Factors Workshop on Nighttime Driver Visibility Issues. Washington, D.C.

Phillips, D. (1995). U.S. Jet Bound for Germany Mistakenly Lands in Belgium., *The Washington Post.*

Räsänen, M., & Summala, H. (1998). Attention and expectation problems in bicycle–car collisions: an in-depth study. *Accident Analysis & Prevention*, *30*(5), 657-666.

Roese, N. J. (2004). Twisted pair: Counterfactual thinking and the hindsight bias. *Blackwell handbook of judgment and decision making*, 258-273.

Rommetveit, R. (2014). *Words, Meaning, and Messages: Theory and Experiments in Psycholinguistics*. Academic Press.

Sangwine, S. J. and Horne, R. E. N. (1998) *The Colour Image Processing Handbook*. London: Chapman and Hall.

Sharp, P.F., & Phillips, R. (1997). Physiological Optics. In W.R. Hende & P.N.T. Wells (Eds.), *The Perception of Visual Information*. New York: Springer-Verlag.

App. 660

Spellman, B. A., & Mandel, D. R. (1999). When possibility informs reality: Counterfactual thinking as a cue to causality. *Current Directions in Psychological Science, 8*(4), 120-123.

Stein, A. C. and Johnson, W. A. Effective Signing to Reduce Truck Downgrade Runaways. In E. Petrocelli (Ed.) *Proceedings of the 28th Annual Conference of the American Association for Automotive Medicine*. Arlington, IL: American Association for Automotive Medicine, 1984, pp. 77-89.

Stein, A. C., Parseghian, Z., Allen, R. W., & Miller, J. C. (1992). *High Risk Driver Project: Theory, Development and Validation of the Truck Operator Performance System (TOPS)*. Washington, D.C.: FHWA

Stern, J. A., Boyer, D., & Schroeder, D. (1994). Blink Rate: A Possible Measure of Fatigue. *Human Factors, 36*(2), 285-297.

Stewart, D. W., & Martin, I. M. (1994). Intended and unintended consequences of warning messages: A review and synthesis of empirical research. *Journal of Public Policy & Marketing*, 1-19.

Wickens, C. D. & Hollands, J.G. (2000). Engineering Psychology and Human Performance (3rd ed.). Upper Saddle River, NJ: Prentice Hall

Wogalter, M. S., Silver, N. C., Leonard, S. D., & Zaikina, H. (2006). Warning symbols. *Handbook of warnings*, 159-176.

Wylie, C. D., Shultz, T., Miller, J. C., Mitler, M. M., & Mackie, R. R. (1996). *Commercial Motor Vehicle Driver Fatigue and Alertness Study: Technical Summary*. Washington, D.C.: FHWA.

App. 661

Exhibit B



SAFETY RESEARCH ASSOCIATES, INC.

Litigation Report 12892-2

**Human Factors Opinions
Related to the Collision
Between the Bus Driven by Dinorah Aguilar
And the Truck Driven by Steven Kilty**

Anthony C. Stein, Ph.D.

August 2018

THE CONTENTS OF THIS REPORT ARE BASED ON
EXISTING DATA. THEY ARE SUBJECT TO REVISION OR
REVOCATION UPON FURTHER INVESTIGATION.

## TABLE OF CONTENTS

INTRODUCTIION   ............................................................................................. 1

OPINIONS ......................................................................................................... 1

REFERENCES ................................................................................................... 6

App. 664

**INTRODUCTION.**

The purpose of this report is to provide the scientific basis for the human factors opinions related to the June 2, 2014 collision between the bus driven by the bus driven by Dinorah Aguilar and the truck driven by Steven Kilty. All opinions are those of the author, and are based on well recognized and accepted scientific research and knowledge.

**OPINIONS**

Opinion 1.

**Driver's operate their vehicles based on their expectations and prior experience, thus Mr. Kilty would be expected to stop at the "check point".**
(Austen & Enns, 2003; Borowsky, et al., 2008; Chute, et al., 1995; Gold, 2005; Houtenbos, et al, 2005; Jeng, 2006; Phillips, 1995; Räsänen & Summala, 1998; Wickens & Hollands, 2000 ).

During the first five years of driving drivers' learn what to expect in certain situations, what visual information is important and what can be ignored (e.g., a Stop sign is important, a tree on the side of the road is not), and how to approach novel situations during the driving task.

Once a novel task has been encountered and successfully negotiated the research indicates that the driver will approach all similar situations the same way the original "novel" situation was successfully negotiated.

In this case Mr. Kilty's only prior experience had him stopping at this location. (CHP MAIT report, page USA483). Given that his initial encounter had him stopping at the location of the check point, and this resulted in a successful encounter, *unless there was information presented telling Mr. Kilty to behave in a different manner* the research tells us he will be expected to stop at the check point on each future encounter.

Opinion 2.

**The signs indicating the desired behavior of Mr. Kilty did not convey the correct information. In fact, because his initial encounter with the signs directed behavior different than the desired behavior on this encounter, they were misleading and defective**.

While it may appear simple to design a sign to provide a driver necessary information to elicit a desired behavior, it is not. In fact, for a sign to be erected on a public street it must be listed in the Manual of Uniform Traffic Control Devices (MUTCD), or a specific variance must be sought from the Federal Highway Administration (FHWA) who may allow use of a unique sign without formal acceptance into the manual.

App. 665

Prior to submission for inclusion into the MUTCD Sign messages need to be designed and tested. (Allen, et al, 1986; Chatterjee, et al, 2002; Dewar, 1999; Lee, et al., 1999; Rommetveit, 2014; Stein & Johnson, 1984; Stewart & Martin, 1994; Wogalter, et al, 2006) I have been involved in the design and testing of three new sign types. Each of these projects were conducted under contract to the FHWA.

To develop the eventual sign the following steps were taken: First, the sign type was determined (i.e., regulatory, advisory, etc.). Next, as many as 10 different sign messages or formats were developed. Each of the possible designs was presented to a broad selection of drivers' who might encounter the signs, and the subjects rank ordered the potential signs.

The top three contenders were then "fabricated" for presentation in a realistic driving environment in a driving simulator. A new group of subjects was then brought in to drive the simulator, however none of the subjects were aware of the actual purpose of the test. The potential signs were embedded into a driving scenario at appropriate locations and the subject's response to the sign was recorded. Once the data were analyzed the "best performing" sign was determined.

The problem with not following this well accepted methodology and simply designing a sign message that you think conveys the appropriate message is that the message may not convey what you think it does. *Having preconceived knowledge of what the sign is supposed to mean results in a belief that the sign has this meaning*. This is known as hindsight bias. (Blank, et al., 2008; Dilich, et al, 2006; Fischhoff, 1974; Hawkins & Hastie, 1990; Roese, 2004; Spellman & Mandel, 1999)

In the current situation there are specific issues that result in a driver unfamiliar with the intended message of the signs believing the message is other that what was intended. The first issue, discussed above, is that the driver seeing the signs will assume he is to behave as he did on a previous occasion. He is presented first with a sign that tells him he needs to "Be Prepared to Stop". Since nothing has told him that this sign is not operative he proceeds with this understanding. He then reaches the location where he stopped on his previous encounter at the base (and where he stopped as intended). At this location he sees a permanent sign indicating "Check In Point" and a Jersey type barricade with a sign stating "Trucks Stop Here. Hours: 0600-0800. Monday – Friday. Main Gate 760-380-2255." Which has been placed parallel with the direction of travel.

The *intended message* of the sign placed on the barricade is that the hours of operation of the Check In Point are 0600 to 0800, and that at other times drivers are to proceed to the Main Gate. To the individual who understands that this is the intended message it appears clear.

But, let's look at a driver who doesn't know this is what is expected of him, and who has stopped at the check in point on a prior occasion. First he is told to expect to stop somewhere ahead. Next he is given the location of the Check In Point. At this point he stops. He then sees the sign on the barricade which has been turned, but which is clearly

App. 666

visible once he has stopped. The message on the sign tells him the check point will not open until 0600, It does not convey any other message, so the driver stops and waits assuming that he will be able to proceed at 0600 – he is simply first in line. To this driver no other behavior would be logical. The fact that the sign was not facing him is just an indication that the Check In Point is not operational yet.

Why does he stop in the lane and not on the shoulder. Again, this is dictated by his previous experience, and nothing has told him to other than what he did previously.

One potential remedy would have been to have a sign on the opposite side of the barricade that read "Check In Point Closed. Proceed to Main Gate." But, while this sign seems to provide a solution the problem, without going through the steps outlined above for development of a road sign even this sign may not be sufficient.

Opinion 3.

**Based on a reenactment, the bus should have become visible to Ms. Aguilar in time to avoid the collision**.
(CID Investigation, page USA051. Phone discussion with Stein Husher who stated the bus became clearly visible 10 seconds before impact) According to Mr. Husher the reenactment took place at a time where the sun was in the same relative position as it was on the date of the collision.

The CID investigation, and Mr. Husher's observations, are consistent with what would be expected based on the position of the sun at the time of the incident. According to the U.S. Naval Observatory's web site, on the date and time of the incident the sun was 6° below the horizon. (https://aa.usno.navy.mil/data/docs/AltAz.php) This position of the sun is the start of Civil Twilight. From the web site: "**Civil twilight** is defined to begin in the morning, and to end in the evening when the center of the Sun is geometrically 6 degrees below the horizon. This is the limit at which twilight illumination is sufficient, under good weather conditions, **for terrestrial objects to be clearly distinguished**" (emphasis added).

Ms. Aguilar should have had an expectation a truck in the right lane would be stopped (CID Investigation, pages USA422 and USA450). This expectation should have alerted her that any truck she detected in the right lane would require that she move to the left lane to drive around it (Austen & Enns, 2003; Borowsky, et al., 2008; Chute, et al., 1995; Gold, 2005; Houtenbos, et al, 2005; Jeng, 2006; Phillips, 1995; Räsänen & Summala, 1998; Wickens & Hollands, 2000) Since Ms. Aguilar did not respond as expected the question is why? See Opinion 4 for the answer.

Opinion 4.

 **Ms. Aguilar's lack of any response appears to be related to chronic fatigue.**
(Brown, 1994; Lenne , et al., 1996; Mackie & Miller, 1978; Stein, et al., 1992; Wylie, et al., 1996)

App. 667

She only had 4.5 hours of sleep the night before the collision (CID Investigation, page USA483) The above references point out that lack of sleep results in impaired driving behavior including inability to maintain lane position, missing obvious cues in the driving environment, and experiencing episodes of micro-sleep (5 to 30 seconds of visual information not being processed).

Her lack of response to the stopped truck in her lane is consistent with missing an obvious cue, and also consistent with a micro-sleep episode. Her inability to maintain lane control is evidenced by bus passengers stating that on the date of the collision she hit the right shoulder rumble strips at some point before the collision and made a rapid return to the roadway (CID Investigation, pages USA013, USA327, USA328, USA329, USA342, USA420)

The fact that bus passengers stated that she drifted onto the shoulder hitting the rumble strips on many occasions before the day of the collision indicates the fatigue was chronic and not simply episodic based on lack of sleep the night before. (CID Investigation, pages USA328, USA329, USA333, USA343, USA449)

Opinion 5.

**The SmartDrive video cannot accurately show what the bus driver could see and presents a misleading view of the road and lighting conditions to the jury.**

The frame rate of the SmartDrive video is 4 frames/second. (Calculated by Stein Husher) Since the brain processes visual information at 13 frames per second any frame rate below this rate does not provide apparent continuous motion. Additionally, the resolution is not high enough to provide an accurate representation of the scene (Resolution provided by Stein Husher)

A video camera such as the SmartDrive does not record light "truthfully." Most notably, it distorts both the light intensity (brightness) and wavelength (color). This partially due to the fact that light sensing device in the camera is non-linear in its response to light. That is, if a portion of the scene doubles in light the video camera will not record double the light – only a brighter area.  Additionally, the accuracy of the signal being recorded by the video camera changes over time (Sangwine & Horne, 1998). (Note: There are professional level video cameras used in the motion picture industry that don't have the problems discussed above, but these are not consumer level cameras. The SmartDrive unit does not even rise to level of a consumer video camera.)

Video has a small dynamic range relative to the human eye. The human eye is sensitive to light over a $10^{13}$ span of intensity (10,000,000,000,000:1) (Goldstein, 1980). The operable dynamic range is based on the brightest level of light the eye is adapted to (in this case the vehicle's headlights), and in photographic terms is about 13 f-stops ($2^{13}$) or 8192:1. At best, video cameras have a range of 9 f-stops ($2^9$) or 512:1. This range will change as the shutter speed of the video camera changes. However, as discussed above, the video signal drifts over time, making the output (video image) unreliable (Sangwine

App. 668

& Horne, 1998). (Note: as discussed above, professional level video cameras are capable of recording a 13 f-stop range, and can be set up to measure from the brightest light level rather than the average light level.)

The human eye focuses on a small portion of the visual field (Owens, 2007), but when viewing the video output the observer focuses on a significant larger portion of the scene distorting the focus of attention.

Opinion 6.

**The SmartDrive video cannot be used to determine whether the bus driver was fatigued.**

Absent real time EEG measurement, which is typically done in a laboratory environment, the observable behavior that most accurately predicts fatigue is eye blink duration and rate. (FHWA, 1998; Grace & Steward , 2001; Mackie & Miller, 1978; Stern, et al., 1994). Because of both the frame rate and resolution limitations it is impossible to determine these data. The driver could be in a state of micro-sleep and look exactly as she does in the video.

Opinion 7.

**Based on the SmartDrive video, and on the testimony of Officer Gray, the right headlight of the bus does not provide full illumination of the roadway and forward view as intended by the manufacturer. This is due to an aftermarket installation of a bike rack on the front of the bus.**
(Grand Jury testimony of Paul Gray, Page 35 line 23 to page 36 line 11).

This degradation of the forward lighting will impair the ability of the bus headlights to illuminate the retro-reflective tape on the rear of the trailer reducing the distance at which it becomes visible. (Based on headlight beam patterns per FMVSS 108). While the bus is visible without the headlights, illuminating the retroreflective tape on the rear of the truck adds to the information available to the approaching driver.

Opinion 8.

**Because the bus was being operated on a 1-way roadway with no opposing traffic, and because there was no other traffic ahead of the bus, it should have been operated with high beams on.**
(Consistent with CVC 24409).

Having the additional lighting provided by the high beams, and the broader beam pattern provided by these lights (FMVSS 108) would, as above, provide additional visual information to the approaching driver.

## REFERENCES.

Allen, R.W., Stein, A.C.., Hill, D.H. and Sumner, R. (1986). *Traffic Signal Display Complexity*. Washington, D.C.:  National Academy of Sciences, National Cooperative Highway Research Projects, 1986.

Austen, E. L., & Enns, J. T. (2003). Change detection in an attended face depends on the expectation of the observer. *Journal of Vision, 3*(1).

Blank, H., Nestler, S., von Collani, G., & Fischer, V. (2008). How many hindsight biases are there?. *Cognition*, *106*(3), 1408-1440.

Borowsky, A., Shinar, D., & Parmet, Y. (2008). The relation between driving experience and recognition of road signs relative to their locations. *Human Factors: The Journal of the Human Factors and Ergonomics Society*, *50*(2), 173-182.

Brown, I. D. (1994). Driver Fatigue. *Human Factors. 36*(2), 298-314.

Chatterjee, K., Hounsell, N. B., Firmin, P. E., & Bonsall, P. W. (2002). Driver response to variable message sign information in London. *Transportation research part C: Emerging technologies*, *10*(2), 149-169.

Chute, R. D., Dunbar, M. G., Hoang, V., & Wiener, E. (1995). Cockpit/cabin crew performance: recent research. *Proceedings of the Annual International Air Safety Seminar*. Flight Safety Foundation, 48, 487-507.

Dewar, R. (1999). Design and evaluation of public information symbols. *Visual information for everyday use: Design and research perspectives*, 285-303.

DiLaura, D.L., Houser, K.W., Mistrick, R.G., & Steffy, G.R. (2011). *The Lighting Handbook. Tenth Edition: Reference and Application*. New York: Illuminating Engineering Society. ($10^{12}$)

Dilich, M., Kopernik, D., & Goebelbecker, J. (2006). Hindsight Judgment of Driver Fault in Traffic Accident Analysis. Misusing the Science of Accident Reconstruction. *Transportation Research Record, 1990*, 1-7.

FHWA (1998). PERCLOS: A Valid Psychophysiological Measure of Alertness As Assessed by Psychomotor Vigilance. Washington, DC: Federal Highway Administration: Office of Motor Carriers.

Fischhoff, B. (1974). Hindsight: Thinking Backward. *Oregon Research Monograph, 14*(1).

Gold, J. I. (2003). Linking reward expectation to behavior in the basal ganglia. *Trends in Neurosciences, 26*(1), 12-14.

App. 670

Goldstein, E.B. (2007). *Sensation and Perception. Eighth Edition*. Belmont, CA: Wadsworth Press.

Grace, R., & Steward, S. (2001). Drowsy driver monitor and warning system. In *International driving symposium on human factors in driver assessment, training and vehicle design* (Vol. 8, pp. 201-208).

Hawkins, S. A., & Hastie, R. (1990). Hindsight: Biased judgments of past events after the outcomes are known. *Psychological Bulletin, 107*(3), 311.

Hood, D.C. (1998). Lower-level visual processing and light adaption. *Annual Review of Psychology, 49*, 503-535.

Houtenbos, M., Jagtman, H. M., Hagenzieker, M. P., Wieringa, P. A., & Hale, A. R. (2005). Understanding road users' expectations: an essential step for ADAS development. *EJTIR, 5*(4), 253-266.

Jeng, M. (2006). A selected history of expectation bias in physics. *American journal of physics, 74*, 578.

Lee, J. D., Gore, B. F., & Campbell, J. L. (1999). Display alternatives for in-vehicle warning and sign information: Message style, location, and modality. *Transportation Human Factors*, *1*(4), 347-375.

Lenne, M. G., Triggs, T. J., & Redman, J. R. (1996). Circadian Issues in Driving. In L. Hartley (Ed.), *Fatigue and Driving* (pp. 283-301). Fremantle, Western Australia: Promaco Conventions Pty LTD.

Mackie, R. R., & Miller, J. C. (1978). *Effects of Hours of Service Regularity of Schedules, and Cargo Loading on Truck and Bus Driver Fatigue*. Washington, D.C.: National Highway Traffic Safety Administration & Bureau of Motor Carrier Safety

Owens (2007) *Driver Vision*. Presented at the 2007 Transportation Research Board Human Factors Workshop on Nighttime Driver Visibility Issues. Washington, D.C.

Phillips, D. (1995). U.S. Jet Bound for Germany Mistakenly Lands in Belgium., *The Washington Post*.

Räsänen, M., & Summala, H. (1998). Attention and expectation problems in bicycle–car collisions: an in-depth study. *Accident Analysis & Prevention*, *30*(5), 657-666.

Roese, N. J. (2004). Twisted pair: Counterfactual thinking and the hindsight bias. *Blackwell handbook of judgment and decision making*, 258-273.

App. 671

Rommetveit, R. (2014). *Words, Meaning, and Messages: Theory and Experiments in Psycholinguistics*. Academic Press.

Sangwine, S. J. and Horne, R. E. N. (1998) *The Colour Image Processing Handbook*. London: Chapman and Hall.

Sharp, P.F., & Phillips, R. (1997). Physiological Optics. In W.R. Hende & P.N.T. Wells (Eds.), *The Perception of Visual Information*. New York: Springer-Verlag.

Spellman, B. A., & Mandel, D. R. (1999). When possibility informs reality: Counterfactual thinking as a cue to causality. *Current Directions in Psychological Science, 8*(4), 120-123.

Stein, A. C. and Johnson, W. A. Effective Signing to Reduce Truck Downgrade Runaways. In E. Petrocelli (Ed.) *Proceedings of the 28th Annual Conference of the American Association for Automotive Medicine*. Arlington, IL: American Association for Automotive Medicine, 1984, pp. 77-89.

Stein, A. C., Parseghian, Z., Allen, R. W., & Miller, J. C. (1992). *High Risk Driver Project: Theory, Development and Validation of the Truck Operator Performance System (TOPS)*. Washington, D.C.: FHWA

Stern, J. A., Boyer, D., & Schroeder, D. (1994). Blink Rate: A Possible Measure of Fatigue. *Human Factors, 36*(2), 285-297.

Stewart, D. W., & Martin, I. M. (1994). Intended and unintended consequences of warning messages: A review and synthesis of empirical research. *Journal of Public Policy & Marketing*, 1-19.

Wickens, C. D. & Hollands, J.G. (2000). Engineering Psychology and Human Performance (3rd ed.). Upper Saddle River, NJ: Prentice Hall

Wogalter, M. S., Silver, N. C., Leonard, S. D., & Zaikina, H. (2006). Warning symbols. *Handbook of warnings*, 159-176.

Wylie, C. D., Shultz, T., Miller, J. C., Mitler, M. M., & Mackie, R. R. (1996). *Commercial Motor Vehicle Driver Fatigue and Alertness Study: Technical Summary*. Washington, D.C.: FHWA.

App. 672